**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MERRITT HAWKINS** | § | |
| **& ASSOCIATES, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.** |
| **LARRY SCOTT GRESHAM,** | § | **13-CV-00312-P** |
| **BILLY BOWDEN, AND** | § | |
| **CONSILIUM STAFFING, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

_____

**APPENDIX IN SUPPORT OF DEFENDANTS GRESHAM AND BOWDEN'S
RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
_____

Defendants Scott Gresham and Billy Bowden serve their Appendix in Support of their Response to Plaintiff's Motion for Partial Summary Judgment and Brief in Support Thereof, as follows:

| **Tab** | **Document** | **App No.** |
|---|---|---|
| A. | Condensed Deposition of Mark Smith (dated May 20, 2014) | 001-036 |
| B. | Condensed Deposition of Tim Beidle (dated May 16, 2014, including Dep. Ex. 113) | 037-079 |
| C. | Condensed Deposition of Billy Jess Bowden (dated February 4, 2014) | 080-114 |
| D. | Condensed Deposition of Larry Scott Gresham (dated February 13, 2014, including Dep. Exs. 4, 11, 12, 21, 23) | 115-184 |
| E. | MHA-Bowden Employment Agreement (dated April 28, 2008) | 185-192 |
| F. | MHA-Gresham First Employment Agreement (dated March 31, 2008) | 193-201 |

G.      MHA-Gresham Second Employment Agreement (dated May 17,
        2010) ...............................................................................................................202-211

H.      Text Messages (dated September 17, 2012 to November 4, 2012)
        (Gresham Dep. Ex. 18) ................................................................................212-233

Date:  August 1, 2014                    Respectfully submitted,

                                         */s/ John Volney*
                                         Jeffrey M. Tillotson, P.C. (jmt@lynnllp.com)
                                         Texas Bar No. 20039200
                                         John Volney (jvolney@lynnllp.com)
                                         Texas Bar No. 24003118
                                         **LYNN TILLOTSON PINKER & COX, L.L.P.**
                                         2100 Ross Avenue, Suite 2700
                                         Dallas, Texas  75201
                                         (214) 981-3800 Telephone
                                         (214) 981-3839 Facsimile

                           **ATTORNEY FOR DEFENDANTS**


                           <u>**CERTIFICATE OF SERVICE**</u>

        The undersigned hereby certifies that a true and correct copy of the above and foregoing
document has been served as shown below on counsel of record on August 1, 2014:

            <u>*Via ECF*</u>
            Brian A. Colao (bcolao@dykema.com)
            Christine A. Nowak (CNowak@dykema.com)
            Zachary Q. Hoard (zhoard@dykema.com)
            DYKEMA GOSSET PLLC
            Comerica Bank Tower
            1717 Main Street, Suite 4000
            Dallas, Texas  75201
            (214) 462-6400 Telephone
            (214) 462-6401 Facsimile


                                         */s/ John Volney*
                                         John Volney

---

Transcript of the Testimony of
# Mark Smith

**Date:**
May 20, 2014

**Case:**
Merritt Hawkins & Associates v. Larry Scott Gresham, et al

Kim Tindall and Associates, LLC
Phone: 210-697-3400
Fax: 210-697-3408
Email: ktindall@ktanda.com
Internet: www.kimtindallandassociates.com

Mark Smith                                          May 20, 2014

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MERRITT HAWKINS &           )
ASSOCIATES                  )
            Plaintiff,      )
                            )
VS.                         ) CIVIL ACTION NO.
                            ) 13-CV-00312-P
LARRY SCOTT GRESHAM AND      )
BILLY BOWDEN,               )
            Defendants.     )


---------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

CORPORATE REPRESENTATIVE

MARK SMITH

MAY 20, 2014

VOLUME 1

-----------------------------------


    ORAL AND VIDEOTAPED DEPOSITION OF MARK SMITH,

produced as a witness at the instance of the DEFENDANTS,

and duly sworn, was taken in the above-styled and

numbered cause on May 20, 2014, from 9:54 a.m. to 12:44

p.m., before Lei Sherra Torrence, CSR in and for the

State of Texas, reported by machine shorthand, at the

offices of Dykema Gosset, PLLC, Comerica Bank Tower,

1717 Main Street, Suite 4000, Dallas, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

**APP. 0002**
32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                    May 20, 2014

Page 2

1       A P P E A R A N C E S
2
3    COUNSEL FOR THE PLAINTIFF:
4    Mr. Brian Colao
     DYKEMA GOSSET PLLC
5    Comerica Bank Tower
     1717 Main Street
6    Suite 4000
     Dallas, Texas  75201
7    (214) 462-6400
     (214) 462-6401 (fax)
8    Bcolao@dykema.com
9    COUNSEL FOR THE DEFENDANTS:
10   Mr. Jeffrey Tillotson
     Mr. John Volney
11   LYNN TILLOTSON PINKER & COX, LLP
     2100 Ross Avenue
12   Suite 2700
     Dallas, Texas  75201
13   (214) 981-3800
     (214) 981-3839 (fax)
14   Jvolney@lynnllp.com
15   THE VIDEOGRAPHER:
16   Mr. Alex Downing
17

     ALSO PRESENT:
18
        Ms. Whitney Laughlin
19
20
21
22
23
24
25

Page 4

1        THE VIDEOGRAPHER:  Today's date is May 20th,
2    2014.  The current time is 9:54 a.m.  We're here to take
3    the deposition of Mark Smith.  If the attorneys present
4    could please identify yourselves and state who you
5    represent.
6        MR. COLAO:  Brian Colao for Merritt Hawkins.
7        MR. TILLOTSON:  Jeff Tillotson and John
8    Volney for the defendants.
9        THE VIDEOGRAPHER:  And the court reporter
10   can swear in the witness.
11            MARK SMITH,
12   having been first duly sworn, testified as follows:
13            EXAMINATION
14   BY MR. TILLOTSON:
15   Q.  If you'll, state your full name for us.
16   A.  Mark E. Smith.
17   Q.  Where do you currently work?
18   A.  I currently work at Merritt Hawkins & Associates.
19   Q.  Your title there?
20   A.  President.
21   Q.  Are you, in effect, chief officer for Merritt
22   Hawkins?
23   A.  In effect, yes.
24   Q.  Whom do you report to, if anyone?
25   A.  Susan Sulka (phonetic), CEO of AMN Healthcare.

Page 3

1              INDEX
2                            PAGE
3    Appearances...................................... 2
4    MARK SMITH
        Examination by Mr. Tillotson................. 4
5
     Reporter's Certificate..........................133
6
7
            EXHIBITS
8
     NUMBER     DESCRIPTION           PAGE
9                              MARKED
10   114    Plaintiff's Supplemental
            Designation of Expert Witness     42
11   115    Recruitment Iceberg         97
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    Q.  What's the relationship between AMN Healthcare
2    and Merritt Hawkins?
3    A.  Merritt Hawkins is owned by AMN Healthcare.
4    Q.  How many direct reports do you have at Merritt
5    Hawkins?
6    A.  Direct reports, six.
7    Q.  And, if you will, describe for us overall your
8    job responsibilities at Merritt Hawkins.
9    A.  As president of Merritt Hawkins I'm responsible
10   for the performance of the organization, the strategy of
11   the organization, financial decisions, investments we
12   make, evaluation and performance of my direct reports
13   and their reports -- their direct reports as well.  Just
14   in general the day-to-day operations of the business,
15   report to our CEO and to our board of directors and
16   really everything that occurs on a daily basis at
17   Merritt Hawkins is somehow I hope to influence.
18   Q.  Is Merritt Hawkins a standalone corporate entity?
19   A.  Honestly I'm not sure.
20   Q.  Is Merritt Hawkins a separate legal entity to
21   your knowledge?
22   A.  I believe it is.  I know that structure has
23   changed a bit over the years the direction of AMN since
24   we've sold to them a number of years ago.
25   Q.  Okay.  How long have you been at Merritt Hawkins?

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                    May 20, 2014

Page 6

1    A. Twenty-five and a half years.
2    Q. Was did Merritt Hawkins -- was Merritt Hawkins
3  acquired by AMN?
4    A. The entity MHA Group, which owned Merritt Hawkins
5  another corporation, was acquired by AMN in November of
6  2005.
7    Q. Okay.  And you were working at Merritt Hawkins at
8  the time of the acquisition?
9    A. Yes, I was.
10   Q. What was your job title at the time of the
11 acquisition?
12   A. At the time of the acquisition I believe my title
13 was executive vice president.
14   Q. Okay.  And you stayed on after the acquisition?
15   A. Yes, I did.
16   Q. And at what point did you become president at
17 Merritt Hawkins?
18   A. I shared responsibilities as executive vice
19 president.  From the time of the acquisition, as I
20 mentioned, in November of '05, for several months, and
21 the individual I shared responsibilities with departed
22 due to a family emergency, I want to say that was in May
23 of '06, and by default assumed those responsibilities at
24 that time.  I couldn't give you the exact date that they
25 transitioned in the official title of president but

Page 7

1  functioned in that role since that period.  I want to
2  believe that was in very early 2007 if I'm not mistaken.
3    Q. Does Merritt Hawkins have its own board of
4  directors?
5    A. It does not.
6    Q. And so the board of directors you mentioned you
7  report to or are advised as the board of directors for
8  AMN?
9    A. That is correct.
10   Q. Where is the headquarters of Merritt Hawkins?
11   A. It was Irving, Texas.
12   Q. And where does it conduct business?
13   A. Across the entire country.
14   Q. Well, where else do you have -- let me ask a
15 better question.
16   A. Okay.
17   Q. Where else do you have offices besides Irving,
18 Texas?
19   A. We have offices -- Merritt Hawkins has an office
20 in Atlanta, Georgia and in Irvine, California.
21   Q. Okay.  Are those offices organized according to
22 any work responsibilities or geographical areas?
23   A. To a certain extent the Atlanta office
24 principally operates for the Eastern seaboard.  The
25 California office is a very small office.  Very small as

Page 8

1  in two employees.  It's more about where the employees
2  are located for convenience and that that one exception to
3  that would be our -- we have an academic team which
4  focuses really, lack of a better description, the ones
5  in Dallas are basically east of the Mississippi, if you
6  will.  There's some -- there's some variance to that and
7  the Atlanta office would handle those -- those -- excuse
8  me.  Dallas has west of the Mississippi, and the Atlanta
9  office handles east of the Mississippi.
10   Q. Okay.  What's the current business of Merritt
11 Hawkins?
12   A. Current business is to assist our clients by
13 placing physicians and other providers on a permanent
14 basis to fulfill their needs.
15   Q. Is that -- was that always Merritt Hawkins'
16 business while you worked there?
17   A. Principally, yes.  As a part of that process we
18 engage in a tremendous amount of consulting and
19 strategic advising.  The end result is the placement,
20 but to get there we end up assisting the client through
21 the process of not just recruiting one physician, but
22 are you going to need three, four, five physicians and
23 what specialties in assisting them with contracts and to
24 provide these potential candidates helping to determine
25 whether the physicians will be housed in an office.  The

Page 9

1  interview process itself and really everything that
2  would ever touch that candidate in the recruiting
3  process.
4    Q. And -- and distinguish what Merritt Hawkins does,
5  if you can, from the business of locums tenen.
6    A. Locums by definition is temporary placement
7  physicians.  There is a fair amount of crossover that
8  occurs there because a number of clients would utilized
9  locum tenens with the intent of doing temp-to-perm
10 placement as opposed to just direct-perm placement.  At
11 the end of the day they fulfill that same need of
12 putting a physician in a -- in a role permanently.
13 There's two vehicles in which to get there.
14   Q. Okay.  Does Merritt Hawkins currently conduct any
15 temporary placements as part of this business?
16   A. We have short-term placements but not what I
17 would call temporary in terms of weeks at a time.  It
18 could be six months to a year, a temporary spot.
19   Q. If a client tells one of your Merritt Hawkins
20 employees, I'm looking for someone for three weeks, what
21 happens at Merritt Hawkins?
22   A. At that point they'd be referred to Staff Care.
23   Q. Do Merritt Hawkins and Staff Care compete?
24   A. Yes, they do.
25   Q. On what basis do they compete?

3  (Pages 6 to 9)

APP. 0004

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                          May 20, 2014

Page 10

1    A.  We compete for the fact that when there's a need
2  for a physician to fulfill regardless of the setting,
3  more often than not that setting is for a permanent
4  replacement.  Staff Care would want to fill that on a
5  temporary basis and then see if their candidate would be
6  someone that would be considered for a permanent basis.
7  Merritt Hawkins would then, of course -- or to secure a
8  contract to fill that search on a permanent basis and to
9  do so very quickly.  But there's certainly a tremendous
10  amount of crossover that happens there.
11    Q.  Well, does Merritt Hawkins advertise itself as
12  doing temporary placements?
13    A.  We do not.
14    Q.  Does Merritt Hawkins pitch to any clients or
15  prospective clients that it has expertise or skill in
16  temporary placement?
17    A.  We do not.
18    Q.  Is there a difference between how you recruit
19  someone for a temporary assignment versus a permanent
20  assignment?
21    A.  I would say there's more commonalities than
22  differences, but there certainly are some differences.
23    Q.  Is the training that Merritt Hawkins gives its
24  employees to become permanent placement recruiters
25  different, to your knowledge, from the training Staff

Page 11

1  Care gives to its employees for purposes of doing
2  temporary placements?
3    A.  All of the training, whether it be Merritt
4  Hawkins or Staff Care, really begins with the same
5  foundation, the same education about the marketplace,
6  the same education about specialties, et cetera.  And
7  that goes forward to the same education of how to reach
8  out to a physician candidate whether it be temporary or
9  permanent, to be able to engage them in conversation, to
10  determine and to be able to figure out what their needs
11  and wants are in a situation to be able to converse with
12  them intelligently about their practice setting.  At
13  that point potentially involve a spouse, assist them in
14  giving feedback about their current situation in terms
15  of the current employment situation, in terms of how it
16  compares competitively in the marketplace and then to
17  present them the opportunities.
18       So really through that entire process it's
19  the same conversation to be able to vet, screen and
20  present a candidate to evaluate if they're of sufficient
21  quality for us to be able to work with.  Of course, we
22  also arrange travel for the candidate to interview.  At
23  the end of the day, the only difference would be
24  potentially family involvement and -- because more often
25  than not the physicians are relocating if they're on a

Page 12

1  temporary assignment.  On a permanent assignment you
2  could involve either directly or questions through the
3  family about needs that they would have in the
4  community, difference being if you're going to be here
5  for three weeks or three months versus three years,
6  those kind of questions.  So the foundation is really
7  all built the same.  The variances occur once it becomes
8  relevant that the job is only three months versus
9  indefinite.
10    Q.  Okay.  Are -- are you familiar with or are you
11  aware of the training practices used by Staff Care?
12    A.  I have been.  I have not been as involved in the
13  last couple of years.  Times --
14    Q.  Let me -- let me ask a followup, if I could.
15    A.  Sure.
16    Q.  Are any of the Staff Care training practices used
17  by Merritt Hawkins for its employees?
18    A.  No.  The training preferences of Staff Care are
19  used many of Merritt Hawkins practices.
20    Q.  Okay.
21    A.  If that --
22    Q.  Staff Care uses Merritt Hawkins training
23  practices?
24    A.  Ab -- yes.
25    Q.  Is that right?  Okay.  And in -- in your mind, or

Page 13

1  based on your testimony, the recruitment process of
2  doctors has many of the same characteristics, if you
3  will, whether you're recruiting someone for a temporary
4  assignment or a permanent assignment; is that correct?
5    A.  Absolutely.
6    Q.  Okay.  Now, let's talk about Merritt Hawkins in
7  training.  Does -- what sort of -- well, let me -- how
8  does Merritt Hawkins find employees to hire?  What
9  process does Merritt Hawkins go through to identify
10  them?
11    A.  We have a talent acquisition team and this talent
12  acquisition's team focus is to reach out into the
13  marketplace through various vehicles to be able to get
14  the attention of potential candidates.  Nothing -- those
15  could be from using LinkedIn, Facebook, various social
16  media sites to do some online advertising and the Career
17  Builder type, Monster, if you will, scenarios to be able
18  to generate interest in the marketplace.  It's
19  interesting that we would reach out to somewhere in the
20  range of 80 to 100 individuals that not one TA person
21  may reach out to to fulfill, you know, one spot within
22  Merritt Hawkins, narrow that down to the point that they
23  interview in our office face to face 15 to 20, I would
24  guess.  And then of that 15 to 20 they then invite back
25  somewhere in the range of four to five that they would

4  (Pages 10 to 13)

APP. 0005
32c2118f-4968-4edc-99d3-cd0a8a14a4e2
Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Mark Smith                                                    May 20, 2014

Page 14

1   pass on to our leadership team.  And the leadership team
2   based on our typical metrics would on average probably
3   hire one of those folks.
4       Q.  Okay.  And how many people in the talent
5   acquisition team?
6       A.  Specific to Merritt Hawkins?
7       Q.  Yes.
8       A.  Two.
9       Q.  Okay.  And when you say specific to Merritt
10  Hawkins, does Merritt Hawkins use the talent acquisition
11  teams of anyone else?
12      A.  Not directly.
13      Q.  Okay.  Tell me how they indirectly use.
14      A.  If someone else on the talent acquisition team
15  found someone they didn't feel was a good fit from their
16  organization, they could pass those folks over to the
17  talent acquisition team that supports Merritt Hawkins to
18  see if they're a good candidate.
19      Q.  Okay.  Let me -- let me try to -- I got that
20  right.  So I think what you mean is someone at Staff
21  Care identify someone they would refer them to Merritt
22  Hawkins?
23      A.  Well, Staff Care -- excuse me, Staff Care has
24  talent acquisition folks that work for them as well.
25      Q.  Right.

Page 15

1       A.  If someone at Staff Care found someone they
2   thought would be a better fit for a perm placement, they
3   could then refer them to Merritt Hawkins' talent
4   acquisition team.
5       Q.  Does Merritt Hawkins pay anything for that
6   service or referral?
7       A.  I'm honestly not sure of the compensation between
8   those things.  I -- you would think so, but I'm not
9   entirely sure.
10      Q.  Okay.  And does Merritt Hawkins ever refer people
11  to Staff Care?
12      A.  Yes.
13      Q.  Okay.  Does Merritt Hawkins charge for that?
14      A.  Not to my knowledge.
15      Q.  Okay.  So because you're owned by the same parent
16  company, Staff Care and Merritt Hawkins were able to
17  refer each other prospective candidates for possible
18  hiring; is that correct?
19      A.  That is correct.
20      Q.  And so Staff Care and Merritt Hawkins refer
21  each other potential business, correct?
22      A.  That is the intent.
23      Q.  Okay.  Now, those two people in the talent
24  acquisition department, are they full-time?
25      A.  They are.

Page 16

1       Q.  Do you pay them by salary or by the hour?
2       A.  We pay them by salary.
3       Q.  Do they get bonuses for the more people they
4   identify or get hired or is it straight salary?
5       A.  They get a bonus.
6       Q.  The bonus is based on what?
7       A.  Based on the number of hires that they generate
8   against a -- against a goal or quota.
9       Q.  Okay.  So there is a goal or quote of how many
10  people you want them to hire.  Is it monthly or
11  quarterly or what?
12      A.  They are paid on a quarterly basis.
13      Q.  Okay.  So the two talent acquisition people have
14  a quarterly goal of how many people Merritt Hawkins
15  wants to hire?
16      A.  Correct.
17      Q.  And how was that quota set?
18      A.  The leadership team will work with them to
19  establish what that goal is based on their expectations
20  of -- of growth.
21      Q.  Okay.  What's the turnover at Merritt Hawkins?
22      A.  I honestly don't know the percentage.
23      Q.  Do you think it's more than 25 percent a year?
24      A.  I think it would depend on how you calculated it.
25  If you looked at those in training or in those that were

Page 17

1   -- had completed the training process.
2       Q.  Okay.  Fair enough.  Let's start first with -- I
3   assume Merritt Hawkins hires people and they go through
4   a training process; is that correct?
5       A.  That is correct.
6       Q.  We're going to get to that in a minute, but what
7   -- do you have any sense of how many people drop out of
8   the training process on average?
9       A.  If you were to look over an extended period,
10  multiple quarters, I would guess it was somewhere
11  between 30 to 50 percent.
12      Q.  And once they've been trained and I guess go to
13  work for Merritt Hawkins doing the business, what --
14  what do you believe to be the annual turnover rate for
15  your employees?
16      A.  I haven't looked at it recently, but I believe
17  it's probably somewhere in the 20 percent range, 20 to
18  25 would be my best estimate.
19      Q.  Okay.  And -- and because you have 30 to 50
20  percent dropping out of the training process and then
21  another 20 to 25 percent dropping out or leaving after
22  they've been trained, as a result Merritt Hawkins has to
23  have talent acquisition team constantly looking for new
24  people; is that fair?
25      A.  That's fair.

Kim Tindall and Associates, LLC      645 Lockhill Selma, Suite 200      San Antonio, Texas 78216
210-697-3400                                                           210-697-3408

APP. 0006

Electronically signed by Lei Sherra Torrence (501-288-335-5388)      32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                    May 20, 2014

Page 18

1    Q.  Because you're not only hiring to expand, you're
2    also hiring to replace; is that right?
3    A.  Certainly is.
4    Q.  Okay.  And if one person -- if your turnover rate
5    was, let's say, 26 percent instead of 25 percent, on
6    average it went up one year, you wouldn't necessarily
7    hire another talent acquisition person, would you?
8    A.  If we went up one percentage point, I wouldn't
9    see that happening.
10   Q.  Okay.  And conversely if it went from 25 to
11   24 percent, dropped a percentage point, you wouldn't say
12   we no longer need that other talent acquisition person,
13   correct?
14   A.  Likely not.
15   Q.  Okay.  So is it fair to conclude from this that
16   the talent acquisition team costs at Merritt Hawkins are
17   essentially fixed overhead costs?  You're going to incur
18   them every quarter because you've got constant turnover?
19   A.  With the exception of the variable compensation
20   and their salaries are fixed on those direct overhead
21   costs are fixed.
22   Q.  The variable compensation would be paying them a
23   bonus for hitting the quota?
24   A.  Correct.
25   Q.  Okay.  And what's -- what's a quarterly quota for

Page 19

1    one of these individuals; do you know?
2    A.  It moves pretty significantly.  I would say it
3    could be as many as 12-plus to as few as six.
4    Q.  Okay.  Do you know if any quarterly quota was
5    changed, increased because Mr. Gresham departed Merritt
6    Hawkins?
7    A.  I'm not aware of that direct impact, no.
8    Q.  Okay.  So we can at least agree that based with
9    respect to talent acquisition cost, Mr. Gresham's
10   departure didn't result in any additional cost to
11   Merritt Hawkins?
12   A.  No.  It incurred in more loss of getting someone
13   through that entire process.
14   Q.  We're going to get there.
15   A.  Okay.
16   Q.  But with respect to how you pay the people to
17   identify them, can you at least agree with me that there
18   was no additional cost for talent acquisition because
19   Mr. Gresham left because you had in place two people
20   being paid quotas didn't change based on Mr. Gresham
21   departing?
22   A.  Yes.
23   Q.  Can we agree on that?  Okay.  All right.  Do you
24   -- does the talent acquisition team -- are they told to
25   replace specific people or is it just a numerical quota?

Page 20

1    A.  The quota is generated from our leadership team
2    in terms of where our needs are.
3    Q.  Okay.
4    A.  So that's -- they would not be aware of any
5    individual adjustment.  We do share with them overall
6    directions and trends but not necessarily if it's just
7    one individual.
8    Q.  Okay.  Now, once they're identified by the talent
9    acquisition team and they get into the leadership team
10   and at the time they're extended an offer, how long a
11   period is that; do you know, from finding them to -- to
12   getting them in?
13   A.  Again, it's one of those situations that could
14   vary pretty greatly --
15   Q.  Sure.
16   A.  -- depending on the candidate and the needs, but
17   I would say from the time that they are -- they've
18   gotten past the talent acquisition team and past the
19   leadership in general would be one to two weeks.
20   Q.  Okay.  And once they get started, do they
21   immediately go to training?
22   A.  Yes.
23   Q.  Are they -- are these individuals all being hired
24   to do the same thing which is placement?
25   A.  They would be hired to do really one of two

Page 21

1    things and that is either to direct placement, which is
2    what we're referring to here in terms of placement of
3    physicians, or marketing is what we are, for vernacular,
4    in business development.
5    Q.  Okay.  Do -- do you do either or, or does a
6    person do both of those?
7    A.  Either/or, it's a two decimal.
8    Q.  Okay.  So one is placement and the other one is
9    marketing?
10   A.  Correct.
11   Q.  And are you hired?  Is the individual hired to do
12   one of those two?
13   A.  They are.
14   Q.  Okay.  Which of those two did Mr. Gresham do?
15   A.  Recruiting.
16   Q.  Which means what?  His job titles were what?
17   A.  Well, he would have been a recruiter search
18   consultant.
19   Q.  Okay.  So he would've done what on a day-to-day
20   basis?
21   A.  His -- well, it's multiple facets, but his job
22   would have been to -- to work through our processing
23   system to be able to locate candidates for the searches
24   that he represented, or he would've been spending time
25   with clients preparing them to enter the search process.

6  (Pages 18 to 21)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                          May 20, 2014

Page 22

1    Q.  Okay.  And do the marketing people -- are they
2   charged with going out and finding people who will then
3   engage Merritt Hawkins to do a search?
4    A.  Yes.  Their -- their job is to work a -- work a
5   territory and to be able to secure new search agreements
6   for Merritt Hawkins.
7    Q.  Okay.  And then once they get a new search
8   agreement, someone like Mr. Gresham goes and tries to
9   fulfill that search?
10   A.  Yes.  And in that particular case -- once a new
11  search comes in, their job is to meet with -- meet with
12  the client, go through the great details of the things I
13  mentioned earlier regarding the consulting process of
14  ensuring that it's a competitive opportunity and the
15  client is in a good position to be successful,
16  reasonable expectations, parameters, et cetera.  And
17  then when that's completed, our satisfaction begins a
18  search process.
19   Q.  Okay.  Which means finding a doctor or other
20  health care provider to fulfill the search?
21   A.  Our job is to find that candidate and to get them
22  to interview in hopes -- hopes that's the case.
23  Obviously, the client has a tremendous amount of
24  influence and decision on that.
25   Q.  Got it.  So Mr. Gresham had no responsibility for

Page 23

1   convincing clients to engage Merritt Hawkins to do a
2   search; is that correct?
3    A.  Not new clients.
4    Q.  Okay.
5    A.  Your job as a recruiter -- our goal is we like to
6   have somewhere in the range of 40-plus percent of our
7   business to be repeat searches.  So your job is to do
8   more a quality job with the client's needs or
9   expectations, et cetera, and then to be able to engage
10  them to be able to extend that relationship with future
11  searches.
12   Q.  Okay.  I'm going to use a simple example.  So
13  let's just assume Mr. Gresham was working with Hospital
14  A to provide them with a anesthesiologist on a full-time
15  basis and then later Hospital A calls Mr. Gresham and
16  says now we need a urologist.  Would -- would
17  Mr. Gresham then be the one to negotiate the terms of --
18  of what that search would pay to Merritt Hawkins or
19  would a recruiter do that?
20   A.  He -- he is the recruiter.
21   Q.  I'm sorry.
22   A.  That's right.  In that situation it really comes
23  down to the relationship and there's some discretion
24  with the recruiter.  The recruiter is certainly capable
25  as empowered to be able to discuss with the client.

Page 24

1   Quite frankly the terms have already likely been
2   negotiated.
3    Q.  Okay.
4    A.  And so they could resend the same contract or, if
5   he so choose, he could pass it on to his marketing
6   counterpart and have them do that.
7    Q.  Do -- do the marketers solicit existing clients
8   for Merritt Hawkins for additional business?
9    A.  Certainly.
10   Q.  Okay.  So a marketer might -- in this particular
11  situation might solicit Hospital A or might solicit a
12  hospital that Merritt Hawkins has done no business for;
13  is that fair?
14   A.  That is correct.
15   Q.  Okay.  Did Mr. Gresham have access to the
16  identities of prospective clients that the marketers
17  might call?
18   A.  Yes.
19   Q.  How did he have that access?
20   A.  A big part of when we bring people into the
21  organization and why we have these employment agreements
22  is so that we can provide them access to the data that
23  we have in place, whether that data be candidate driven
24  or client driven.  So he would have accesses, anyone in
25  that role would, to seek client notes and to be able to

Page 25

1   look at those engagements that a marketing counterpart
2   had with the client.  And then, in addition, in joint
3   meetings between recruiting and marketing, they commonly
4   work together, whether it be for repeat business with an
5   existing client or new business with a client, to be
6   able to openly discuss what those pendings are.  They're
7   available reports.  They share the reports in terms of
8   pending clients, clients that are yet to be pending.
9   There are large calendars physically in the office that
10  will show each marketer's upcoming 60 days of meetings
11  they have scheduled, and so there is a tremendous amount
12  of transparency in that process.
13   Q.  Okay.  Let's go back to the -- return to the
14  stairstep process of bringing someone in.  So they're --
15  they're hired.  And upon hiring, do they then go through
16  a training process?
17   A.  Yes.
18   Q.  How long does that training process last?
19   A.  The initial steps of the training last about
20  20 weeks on average.  It really goes in tiers at that
21  point because once you completed training and let's say
22  that that average is 20 weeks, you've completed
23  training, you really haven't conducted a tremendous
24  number of encounters yet where you've successfully
25  placed a physician or successfully secured a contract,

                                          7  (Pages 22 to 25)

APP. 0008
32c2118f-4968-4edc-99d3-cd0a8a14a4e2
Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Mark Smith                                                    May 20, 2014

Page 26

1    and so it then becomes your -- your direct report's job
2    or your direct manager's job to really be able to
3    complete that training process. Our experience is for a
4    person to be independent and consistently productive on
5    either side is typically a minimum of a year. A year
6    that starts from their hire to that -- that 12-month
7    period. The learning just does not stop at that point.
8    We put them through at least biweekly training during
9    that process to continue to engage them further in the
10   business. Either deeper knowledge about what they've
11   learned in training or things -- health care is a
12   dynamic business. Things are changing every day and so
13   to keep them as updated as possible, a person that
14   oversees them will ride side by side with them on all
15   the new-client visits. If they received a new search to
16   be able to ensure that that's done properly, they will
17   commonly be involved in each closing call with a
18   candidate with an expressed opportunity where they'll be
19   involved in that particular phone call. And so that
20   training process, albeit ongoing, it still remains very
21   intense for the first year.
22       Q. Who's in charge of the training?
23       A. A gentleman named Mike Faye (phonetic).
24       Q. Okay.
25       A. And I say that specifically to that. Mike is

Page 27

1    responsible for the first 20 weeks, but then makes sure
2    that there's a healthy transition --
3        Q. Okay.
4        A. -- to their new -- new supervisor.
5        Q. Is the 20 weeks done -- is it on-the-job training
6    or is it separate and apart?
7        A. The first portion of it is separate and apart I
8    think. If you look at that first 10 days to two weeks,
9    it's vastly classroom driven, and from that period on
10   really will incur the stages. And a lot of it depends
11   on the ability and how quickly someone learns that
12   process where it can evolve to you might spend 20
13   percent of your time on the telephone, get some
14   experience and come back into a classroom setting. And
15   that typically remains 50/50, I would say two-thirds of
16   the process, and then it may turn where it's more of a
17   70 on the floor getting experience and 30 percent back
18   in training.
19       Q. Is training -- is that training process, the
20   classroom part, is it -- is it constantly ongoing at
21   Merritt Hawkins?
22       A. Well, there are -- as we continue to hire people,
23   there are people at different stages --
24       Q. Okay.
25       A. -- and phases. There's a capacity to what you

Page 28

1    can do. It isn't an infinite number of people that can
2    be involved because it's very hands on. If you look at
3    this business, there's no degree, no specific degree,
4    education that people receive outside of our --
5        Q. Right.
6        A. -- our business. And so we have to teach them
7    from scratch.
8        Q. Okay. So before I get to what you teach them,
9    let me make sure that I understand the mechanics.
10   Training classroom portion of it, the first 20 weeks,
11   it's not set up when you hire a single individual, is
12   it? It's ongoing as you're hiring people?
13       A. We try to hire in classes, but certainly will
14   remain flexible on that for quality candidates.
15       Q. So you try to hire a group of people and try to
16   have them all start in the same class?
17       A. Try to.
18       Q. Is that fair? Okay. And then they progress to
19   that 20-week process; is that fair?
20       A. Yes.
21       Q. And so the addition of having to have another
22   person in the class that's already going to be ongoing,
23   does that increase the cost of that class?
24       A. It depends on how many people are involved in
25   that.

Page 29

1        Q. Let's just say you had to hire someone to replace
2    Larry Gresham and that person had to -- to go through
3    the class process. What additional costs besides those
4    that were already being to be incurred for purposes of
5    that class did Merritt Hawkins incur?
6        A. It -- depending on the class size it could hold
7    them back, I think, but there's -- your question is that
8    as so long the class size wasn't above a reasonable
9    number we wouldn't be hiring an additional trainer or
10   paying overtime for that person, if you will, to work
11   extra.
12       Q. And do you know for anyone who replaced
13   Mr. Gresham, whether or not you busted a class size
14   because of that additional hire?
15       A. I'm not aware of that, no.
16       Q. And so as we sit here today, is it fair to say
17   you're not aware of additional cost other than the
18   normal expense Merritt Hawkins was going to incur
19   because Mr. Gresham left with respect to the training of
20   his replacement?
21       A. Only from the perspective of our objective, as
22   you mentioned earlier, was -- about growth and being
23   able to add to the size of the team, not having to
24   necessarily replace the size of the team. Obviously,
25   there's significant issues with that from a financial

8  (Pages 26 to 29)

APP. 0009
32c2118f-4968-4edc-99d3-cd0a8a14a4e2
Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Mark Smith                                                    May 20, 2014

| Page 30 | Page 32 |

**Page 30**

1  perspective, but in terms of training, I can't -- there
2  may not have been additional costs.
3  Q. Okay. You say may not have been. Are you aware
4  as you sit here today -- and you've been designated as
5  an expert -- of any additional cost we can point to,
6  traceable to Larry Gresham leaving, that was incurred by
7  your training department because they had to get someone
8  as a replacement for Mr. Gresham?
9  A. Only from the perspective of it would -- we
10 would've been able to hire just one more additional
11 person for that class or just based on our forecast of
12 our growth and what our future needs would be if, in
13 fact, Gresham was still in his role. From that
14 perspective, yes. In terms of the size of the classroom
15 and bringing in additional trainers, no.
16 Q. Okay. Because we know none of the hiring quotas
17 changed because Mr. Gresham left, correct?
18 A. We -- you know what, honestly I'm not sure about
19 that because when someone transitions, we go back and
20 take a look at where the hiring quotas are to be sure
21 that we've got sufficient numbers so.
22 Q. As you sit here today are you aware if -- if
23 Merritt Hawkins increased its quarterly quota for its
24 talent acquires because Mr. Gresham left?
25 A. No, I'm not.

**Page 31**

1  Q. Okay. So as we sit here today assuming that the
2  quotas stayed the same and Merritt Hawkins met that
3  quota we know there were no additional training cost
4  because you were going to train those people anyway even
5  though Mr. Gresham left, correct?
6  A. Correct.
7  Q. Okay. All right. So then once they've been
8  trained, the individual after the 20 weeks goes to work
9  and your testimony is there is still on-the-job training
10 being provided to that person --
11 A. There is.
12 Q. Okay. And that training -- is that training done
13 by supervisors or by the training department?
14 A. By supervisors.
15 Q. Okay. And I presume that that training goes on,
16 whether you've been there six weeks or whether you've
17 been there six years, that your supervisors are still
18 providing on-the-job training; is that correct?
19 A. Very different type of -- type of training.
20 Q. Understood. Just before you tell me that, I
21 mean, in general the training is ongoing for Merritt
22 Hawkins employees while they're there for all of it; is
23 that correct?
24 A. Not that level of training. There's training
25 available for people in a voluntary basis. That

**Page 32**

1  training is not voluntary.
2  Q. Okay. When does -- when does the involuntary
3  training stop, if you will? How long do you have to be
4  there?
5  A. It's based on a level of sufficiency.
6  Q. Okay.
7  A. But there's typically a time frame that coincides
8  with that efficiency.
9  Q. Had Mr. Gresham stopped with or been relieved of
10 involuntary training?
11 A. I'm honestly not sure.
12 Q. Okay. So he might have still been required to do
13 what we'll call the involuntary training; is that
14 correct?
15 A. He may have.
16 Q. Okay. I presumed his replacement, whoever that
17 person was, had to do the involuntary training as well?
18 A. Oh, yeah, absolutely.
19 Q. Okay. So what we don't know is how much of the
20 involuntary training Merritt Hawkins did for
21 Mr. Gresham's replacement would've had to have been done
22 anyway had Mr. Gresham stayed there; is that correct?
23 A. The involuntary training if someone has -- if you
24 put someone on a team. You have a team size of 10 and
25 reduces to nine you had a new team member there that's

**Page 33**

1  coming straight from training and know for a fact that
2  they're going to have a significant amount of hands-on
3  training by one of their leaders. That time takes
4  directly away from that leader being able to work on
5  behalf of their clients while they're assisting them and
6  so you know that new person coming in the team is going
7  to absorb and to utilize the resources there.
8  Q. How many people typically are on a team?
9  A. We break our company into regions. There are
10 eight regions. That team size of people in production
11 including those coming to the training process could be
12 as small as eight to as many as 14 or 15.
13 Q. Okay. So Mr. Gresham presumably was part of a
14 team somewhere between 8 and 14?
15 A. Correct.
16 Q. Okay. And he leaves and someone else comes in,
17 and your testimony is that the director for that team
18 would have had to have spent some extra time with a new
19 person to replace Mr. Gresham; is that correct?
20 A. Significant, yes.
21 Q. But nevertheless that team of 8 to 14 as having
22 20 to 25 percent turnover in a given year; is that
23 correct?
24 A. It could be, yes.
25 Q. So there's constantly -- let's just say it's a

9 (Pages 30 to 33)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Mark Smith                                                    May 20, 2014

Page 34

1  team of 10.  Every year you're replacing anywhere from
2  two to three people on average on each team; is that
3  right?
4      A.  Could be, yeah.
5      Q.  Okay.  So the director is constantly spending
6  time with new people training them, correct?
7      A.  Yes.
8      Q.  Okay.  And -- and do you know what the cost
9  would've been to the director of Mr. Gresham's team from
10 having to have extra supervisory time with three new
11 people to his team rather than two?
12     A.  It's proportional.  If you had -- it's about the
13 time you spend with each person, not so much the group,
14 because it's based on -- at that point you're directing
15 them based on the experiences they specifically are
16 having and where they're on the training process, again,
17 their ability to learn and absorb the information.  It
18 is very much one on one.
19     Q.  Okay.  And are your directors making salary?
20     A.  That's a portion of our compensation.
21     Q.  Okay.  What's the other portion?
22     A.  They receive compensation based on their billable
23 time.  They receive compensation based on their ability
24 to secure repeat business, refer candidates to other
25 recruiters and those being physician candidates, and of

Page 35

1  course, on the placement of physician candidates.
2      Q.  Okay.  All right.  Was Mr. Gresham a good
3  employee?
4      A.  Until he decided to come steal a bunch of
5  documents, he seemed fine.
6      Q.  Was he performing according to your expectations?
7      A.  I believe he met the minimal expectation.
8      Q.  Okay.  So was he -- was he -- okay.  So he had a
9  minimal quota, did he not?
10     A.  He did.
11     Q.  Do you know what that quota was?
12     A.  The quota is one a month.  One placement a month
13 for one candidate.
14     Q.  Did he get one placement a month on average?
15     A.  I'm not sure.
16     Q.  Okay.  Was he ever singled out for exemplary
17 performance or production?
18     A.  I'm not aware of it if he was.
19     Q.  Okay.  Do you know -- have you ever seen any of
20 his reviews?
21     A.  I have not.
22     Q.  Did you talk to his director?
23     A.  I did.
24     Q.  Okay.  What, if anything, did his director say
25 about Mr. Gresham's performance?

Page 36

1      A.  You know, there's nothing specific that stuck out
2  from the conversation.  So he met the average
3  expectation is my best estimate.
4      Q.  Was there any discussions to whether or not
5  Mr. Gresham would stick around?
6      A.  You know, I don't -- I don't recall.  I don't
7  recall that.
8      Q.  He had previously worked for Merritt Hawkins,
9  correct?
10     A.  That's correct.
11     Q.  And he left Merritt Hawkins to go to work for
12 Arthur Gallagher; is that correct?
13         MR. VOLNEY:  Arthur Marshall.
14         MR. TILLOTSON:  Arthur Marshall.  Sorry,
15 John.
16     A.  That is my understanding.  It's been a little
17 while.  He may have went to go to work somewhere else
18 first for a short period of time.  I don't know.  I
19 don't recall that specifically, but in very short order
20 he went to work for Arthur Marshall.
21     Q.  (BY MR. TILLOTSON)  Were you involved in any way
22 in any dispute between Merritt Hawkins and Arthur
23 Marshall over the hiring of Mr. Gresham?
24     A.  I was.
25     Q.  Okay.  Did Merritt Hawkins complain or bring

Page 37

1  legal action against Arthur Marshall in connection with
2  hiring Mr. Gresham?
3      A.  As I recall we brought legal action against him.
4      Q.  By that, I mean, you sued him, right?
5      A.  It may have been a step in the process.  I know
6  that we had communicated with him of our dissatisfaction
7  with that hiring and it was in breach of his employment
8  agreement.  I know that we had involved the attorneys.
9  I wouldn't want to say for certain that we filed against
10 him.  My memory believes that we did or came to that
11 edge before we reached some type of settlement.
12     Q.  Okay.  Do you remember what the terms of the
13 settlement were?
14     A.  In general, my -- if I recall correctly, it was
15 that he had to -- you know what, honestly, I don't
16 remember that specifically.  I don't want to -- I don't
17 want to guess.
18     Q.  Who would know?
19     A.  I could find out.
20     Q.  Okay.  I mean, who were the lawyers you used; do
21 you remember?
22     A.  I believe it would've been Nona Walker at that
23 time, but again --
24     Q.  Okay.
25     A.  -- it's been a few years and we've had a lot of

10  (Pages 34 to 37)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                        May 20, 2014

Page 38

1    engagements.
2       Q. Sure. Was Arthur Marshall -- is Arthur Marshall
3    a competitor of Merritt Hawkins?
4       A. They are.
5       Q. Did Mr. Gresham go to work for Arthur Marshall
6    within a 50-mile radius of his offices at Merritt
7    Hawkins?
8       A. He did.
9       Q. Okay. But nevertheless you reached or Merritt
10   Hawkins reached a settlement with Mr. Gresham that
11   allowed him to stay at Merritt -- stay at Arthur
12   Marshall; is that correct?
13      A. I believe that's correct.
14      Q. And then he leaves Arthur Marshall and comes back
15   to Merritt Hawkins; is that correct?
16      A. That is correct.
17      Q. Do you know how it is you guys wind up recruiting
18   him from Arthur Marshall?
19      A. I do not.
20      Q. Would it -- do you know if your talent folks
21   called your competitors for purposes and tried to --
22      A. As a general rule, no.
23      Q. Let me finish the question.
24      A. Okay.
25      Q. Do -- I'm sorry. I didn't mean to interrupt you.

Page 39

1       A. That's all right.
2       Q. She's -- you know, she's taking down everything
3    we say. If we talk at the same time, she can't do it.
4    So if I interrupt you just say so so I can let you
5    finish. Thank you. Do you know if your talent people
6    either solicit or look to your competitors for purposes
7    of hiring potential employees from Merritt Hawkins?
8       A. As a general rule they do not.
9       Q. Okay. But from time to time it happens?
10      A. Typically that only occurs if someone from a
11   competitor reaches out to our talent acquisition
12   department.
13      Q. Okay. So help me. I'm stuck here. Can I please
14   come to work for you?
15      A. Potentially.
16      Q. Okay. And do you know if it was Mr. Gresham that
17   asked to come back to Merritt Hawkins or was it Merritt
18   Hawkins that reached out to Mr. Gresham?
19      A. I do not know that.
20      Q. Okay. But nevertheless he comes back in the
21   interviewing process, correct?
22      A. Correct.
23      Q. And goes back to work for Merritt Hawkins?
24      A. That is correct.
25      Q. Did Arthur Marshall complain to Merritt Hawkins

Page 40

1    about hiring away its employee?
2       A. I believe they did.
3       Q. Do you know if they filed a lawsuit?
4       A. I don't recall.
5       Q. How was the matter resolved?
6       A. As I recall my position was he was our employee,
7    we trained him, we made the investment in bringing him
8    from knowing nothing about the business to a proficient
9    employee. They had no loss.
10      Q. Okay. Do you know if he had signed a noncompete
11   at Arthur Marshall?
12      A. I believe he did.
13      Q. Okay. So at least with respect to its
14   ex-employees, Merritt Hawkins doesn't have a problem
15   with hiring individuals who may be bound by a noncompete
16   with a competitor; is that fair?
17      A. No.
18      Q. Why did -- why did you hire Mr. Gresham from
19   Arthur Marshall if he had a noncompete with Arthur
20   Marshall?
21      A. It would've been one or two reasons. I don't
22   remember their -- Arthur Marshall's contracts
23   specifically, but in the very rare case when we do bring
24   someone on board from a competitor, our agenda is to
25   review that agreement and to make sure that we're

Page 41

1    abiding by it and so the potential outcomes with
2    Mr. Gresham would have been either one. Our opinion was
3    we were abiding by the agreement or two, it was invalid
4    because of the fact that we referred our original
5    agreement and that was the one that we had focused on
6    the fact that he had made that commitment to Merritt
7    Hawkins and he was still bound by that.
8       Q. Okay. Do you know how long he was gone from
9    Merritt Hawkins from the departure from the first time
10   to being rehired the second time?
11      A. I don't recall specifically.
12      Q. Okay. He was at Merritt Hawkins, what, about a
13   year before he left?
14      A. The first time?
15      Q. Second time.
16      A. The second time that sounds about right.
17      Q. So at least from the period we know he's
18   quit Merritt Hawkins twice and quit Arthur Marshall
19   once; is that right?
20      A. Yes, that's my understanding.
21      Q. Did you -- did Merritt Hawkins honestly have a
22   reasonable expectation that Mr. Gresham was going to
23   stay with you at Merritt Hawkins for any significant
24   length of time?
25      A. Yes.

11  (Pages 38 to 41)

APP. 0012

32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 42

1      Q. Okay. Now, I want to focus for a minute on -- on
2  your designation as an expert in this case. You -- you
3  are aware that you've been designated as an expert,
4  correct?
5      A. Yes.
6      Q. Okay. When is it you first began work on your
7  expert opinions in this case?
8      A. Be somewhere in the last -- as it pertains
9  specifically to the Gresham case, I'd say probably in
10  the last 60 to 90 days.
11         MR. TILLOTSON: Okay. I'm going to have
12  this marked as the next exhibit. Sorry.
13         (Exhibit Number 114 marked.)
14      Q. (BY MR. TILLOTSON) I'm going to show you what
15  we're marking as Exhibit 114 and ask to see if you can
16  identify that. All right. Do you recognize Exhibit 114
17  as a designation of experts identifying you as a
18  non-retained expert?
19      A. I do.
20      Q. Okay. Who approached you about serving as an
21  expert witness in this case?
22      A. I'm trying to remember if it would have been
23  in-house counsel or if it would've been Mr. Colao.
24         MR. COLAO: And just -- and just a caution.
25  I don't think Mr. Tillotson is asking you for anything

Page 43

1  you may have discussed with your lawyers, but obviously,
2  the substance of any communications with your lawyers
3  are privileged. If you want to tell him you were
4  approached by the lawyers, that's okay, but don't go
5  into any substance of anything you said.
6      Q. (BY MR. TILLOTSON) Okay. So just -- just so I
7  understand you -- you were -- you were -- were you asked
8  by the lawyers to serve as an expert in this case?
9      A. Yes.
10      Q. Okay. Were you given a particular topic or
11  topics on which they wanted you to serve as an expert?
12      A. We would have certainly had dialogue about the
13  merits of the case and where we stood in this.
14      Q. Okay.
15      A. I think it's very fair to say that I would have
16  participated as much of -- as anything in terms of
17  determining what those -- what those topics were to
18  which I was testifying and serving as an expert.
19      Q. Okay. Because you're identified on certain
20  topics, so I'm just trying to find out what are the
21  I will testify on these or did your lawyer say, will you
22  testify on these or some mix of those two?
23      A. A mix of those two. I mean, they would approach
24  me to say, do you want to serve as an expert.
25      Q. What materials were you given to help you do your

Page 44

1  expert work, if any?
2      A. At that point I would've been involved in that
3  process in terms of determining the impact of
4  Mr. Gresham's breach of his agreement. We would've
5  worked either together or with some of my other team
6  members to determine the financial impact of that
7  departure would be cost of training, et cetera.
8      Q. Okay. Did you make the decision or authorize
9  Merritt Hawkins to file the lawsuit in this case in the
10  first instance?
11      A. Yes.
12      Q. What role, if any, did the CEO of AMN have in
13  that decision?
14      A. I'm not aware of her involvement in that.
15      Q. Did you have to ask her or seek authorization
16  from her before the lawsuit was filed?
17      A. No.
18      Q. Was she aware the lawsuit was going to be filed?
19      A. I don't know.
20      Q. You are aware that Staff Care is suing Consilium
21  and others, correct?
22      A. I have heard that, yes.
23      Q. Were you aware of that lawsuit before Merritt
24  Hawkins filed this lawsuit?
25      A. Against Gresham?

Page 45

1      Q. Yes.
2      A. Yes.
3      Q. Okay. And you've retained the same counsel as
4  Staff Care, correct?
5      A. That is correct.
6      Q. Okay. You mentioned you compete against Staff
7  Care. Does Merritt Hawkins ever hire anyone from Staff
8  Care to come work for Merritt Hawkins?
9      A. Yes, we do.
10      Q. How often does that happen?
11      A. Maybe a couple of times a year. That's certainly
12  a guess.
13      Q. Does Staff Care sue you guys over that?
14      A. No, they do not.
15      Q. Well, the Staff Care people to your knowledge
16  violating their noncompetes when they come to work for
17  Merritt Hawkins?
18      A. No. They're all part of the same company --
19  owned by the same company.
20      Q. Okay. So even though you say Staff Care and
21  Merritt Hawkins compete, right?
22      A. Yes.
23      Q. And they're in the same business; is that right?
24      A. Similar businesses, yes.
25      Q. Okay. It is not a violation of a Staff Care

12  (Pages 42 to 45)

**APP. 0013**

Electronically signed by Lei Sherra Torrence (501-288-335-5388)      32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Page 46

1    noncompete in your mind to come work for Merritt Hawkins
2    because you have the same parent company?
3        A.  We -- we encourage across AMN for people to be
4    able to work in different organizations and -- and
5    different businesses.
6        Q.  Do Merritt Hawkins and Staff Care share their
7    database or information about doctors and providers and
8    hospitals?
9        A.  We do.
10       Q.  Okay.  So Staff Care people have access to the
11   Merritt Hawkins information?
12       A.  In general, yes.
13       Q.  So a Staff Care employee would have access to the
14   notes that might have been entered by Mr. Gresham about
15   a particular client?
16       A.  There is some limitation to that, and I'm not
17   exactly sure what that limitation is.  They do have
18   access to the same candidates, but there -- there is a
19   limitation.  The information shows in a different
20   format.
21       Q.  Okay.
22       A.  So I don't know that Merritt Hawkins knows
23   properly.
24       Q.  Okay.  So whatever Merritt Hawkins does to
25   protect its confidential information from outsiders,

Page 47

1    Staff Care has access to at least some aspects of that
2    information; is that correct?
3        A.  Some.
4        Q.  Okay.  All right.  I want to talk to you then
5    about your designation here.  What guidance, if any,
6    were you given by the lawyers in connection with
7    developing these opinions?
8        A.  More or less asked in terms of what I was
9    comfortable being an expert about.
10       Q.  Okay.  Were you given any instructions by the
11   lawyers or other disclosures, here's how we want you to
12   calculate damages, or did --
13       A.  No.
14       Q.  -- you come up with this yourself?
15       A.  We came up with this with a combination of myself
16   and some of my team members.
17       Q.  Okay.  Who were the team members that worked on
18   this?
19       A.  Principally it would've been Mike Faye.
20       Q.  Okay.
21       A.  I mentioned earlier --
22       Q.  Right.
23       A.  -- he was in charge of our training.
24       Q.  Okay.  All right.  I'll ask you to turn to page
25   four where you identified the damages plaintiffs

Page 48

1    incurred from the defendant Bowden and Consilium.  Do
2    you see that?
3        A.  I do.
4        Q.  And you seem to feel Gresham terminated his
5    employment with MHA.  Which amount is now less than
6    $70,000.  Do you see that?
7        A.  I do.
8        Q.  Okay.  First question is:  I take it that these
9    damages are based upon your belief that Mr. Bowden and
10   Consilium wrongfully induced defendant Gresham to quit
11   MHA and come to work for Consilium; is that correct?
12       A.  Yes.
13       Q.  Because if Mr. Gresham just decided to quit for
14   whatever reasons, then that wouldn't be the fault of
15   Mr. Bowden or Consilium, correct?
16       A.  Correct.
17       Q.  Okay.  Now, you say -- the first one is the
18   amount MHA incurred to train a new employee following
19   his resignation, which you say is approximately $45,000;
20   do you see that?
21       A.  I do.
22       Q.  And that you've calculated based upon a 20-week
23   training time and an annual starting salary of $45,000;
24   do you see that?
25       A.  I do.

Page 49

1        Q.  Okay.  Explain to me how you came up with this
2    calculation.
3        A.  This calculation came up with the fact of we
4    looked at the cost of the employee and their salary,
5    direct overhead and benefits.  The additional -- the
6    time specifically carved out for these folks from Mike
7    Faye over that 20-week period and their direct
8    supervisor during that 20-week period.  As I mentioned,
9    that direct supervisor is involved after the 20 weeks,
10   but they're also involved intimately before the
11   20 weeks.  So calculating on a very conservative basis,
12   that's what we saw the cost of that being.
13       Q.  Okay.  Let me take you through the different
14   components.  The first component:  Let's assume that
15   someone starts as a -- 20-week training period and is
16   being hired at a $40,000-a-year annual salary; is that
17   correct?
18       A.  That's correct.
19       Q.  Okay.  And -- and is that the general average
20   annual starting salary for a new hire?
21       A.  It is.
22       Q.  Okay.  So the first thing is that you assume that
23   for 20 weeks you're paying salary to someone that's not
24   producing any income; is that correct?
25       A.  Correct.  That is correct.

13  (Pages 46 to 49)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                      May 20, 2014

---

Page 50

1    Q. And the component of that is 15,384; is that
2  right?
3    A. That's right.
4    Q. And that's a cost you guys incur on every
5  trainee; is that correct?
6    A. That's correct.
7    Q. Okay. And then number two is the trainee's
8  overhead cost, which is $3,084 -- $3,846; do you see
9  that?
10   A. I do.
11   Q. Okay. How is that calculated?
12   A. That would've been a -- if we looked at the --
13 essence from our finance department determining what the
14 average cost of overhead and benefits for any -- an
15 individual is going to be in the 25 percent range of
16 their salary and that's where that calculation was made
17 from.
18   Q. Okay. What documents did your financial people
19 look at; do you know?
20   A. I'd have to assume.
21   Q. Because you didn't do this?
22   A. I asked for information from our finance team.
23   Q. Who did you ask?
24   A. Robert Easley who's my director of finance.
25   Q. Okay. And did he just give you a number or did

Page 51

1  he give you documents?
2    A. He likely would've showed me documents and --
3  where he generated the number from.
4    Q. Okay. What documents do you remember him showing
5  you?
6    A. I don't recall.
7    Q. Okay. And did he prepare a spreadsheet or
8  anything like that for you?
9    A. Likely not. It would've been not something that
10 required that level of complexity.
11   Q. Okay. But he did show you documents and you
12 don't recall what those are; is that right?
13   A. That's right.
14   Q. And you don't have possession of them today?
15   A. I do not.
16   Q. Okay. Did you provide those documents to your
17 lawyers?
18   A. I don't believe so.
19   Q. Okay. But nevertheless those documents formed
20 the based for coming up with this $3,846 figure; is that
21 right?
22   A. Correct.
23   Q. Okay. And that's just simply a mathematical
24 calculation of what does your finance guy think the
25 average overhead/benefits cost is to each employee?

Page 52

1    A. That's a common number, yes.
2    Q. Okay. And -- and do you know, does that include
3  things like fixed or cost like -- like operation cost
4  like electricity and running the shop and just their
5  proportional share of that?
6    A. The majority of that cost, and so I understand,
7  would've been based around the specific cost of them for
8  benefits, the cost of any employee's FICA, those types
9  of things, but it could have included some of those
10 fixed costs as well.
11   Q. All right. Then the third one is: MHA's
12 employees typed -- training new employee $125 an hour 10
13 hours a week equals $25,000. Do you see that?
14   A. I do.
15   Q. What is that a reflection of?
16   A. That is a reflection of their direct supervisor's
17 time spent away from their clients and away from the
18 focus of their business and spending time with this
19 person as an individual to review their progress in
20 training and to address questions they may have about
21 the training process or experiences they had on the
22 phone with candidates that may be willing to -- to
23 discuss those interactions in more detail.
24   Q. Okay.
25   A. And just to guide them through that process.

Page 53

1    Q. Okay. So where does the $125 an hour figure come
2  from?
3    A. That is the amounts they bill for their time.
4    Q. Okay. When you say they bill, they actually
5  write down they spent one hour training Mr. X?
6    A. What it would be is when a consultant bills their
7  time to a client, they will bill at that rate. And so
8  at this time is time away from where they weren't
9  allowed to bill for a client where we -- that's the
10 opportunity cost.
11   Q. Okay. You don't actually -- Merritt Hawkins
12 doesn't actually pay them $125 an hour?
13   A. No, we do not.
14   Q. Okay. Do you pay them anything for that?
15   A. Not directly. That's part of their process of
16 the manager training. What it does is it pulls them out
17 of production, if you will, where they're not -- they're
18 not in the position to bill their clients for those
19 times, and so it's a cost to the company because they
20 lost opportunity.
21   Q. Okay. And do we know that Mr. Gresham's
22 supervisor would've had 10 hours a week from 20 weeks
23 that he could've billed to a specific client or clients
24 during this time period?
25   A. Very likely.

14  (Pages 50 to 53)

Mark Smith                                                    May 20, 2014

---

Page 54

1    Q.  Okay.  So very likely you haven't looked to see
2  at his schedule what he billed and which clients he
3  didn't do work for?
4    A.  I did not.
5    Q.  Okay.  And do we even know, did Mr. Gresham's
6  replacement go to Mr. Gresham direct director, or was it
7  a one for one, whoever replaced Mr. Gresham in fact went
8  to the same team?
9    A.  It went to the same team.  I don't know if it was
10 the same individual that would have been over AMN.
11   Q.  Okay.  So we have no idea who the individual is
12 that might have overseen Mr. Gresham's?
13   A.  At a vice president level, yes.  If there was a
14 director involved below there, I'm not sure.
15   Q.  Okay.  So we don't really know what the schedule
16 was of the individual director through Mr. Gresham's
17 replacement because we don't know who that person is as
18 we sit here today?
19   A.  That's correct.
20   Q.  So we have no idea during that 20-week time
21 period, we don't know if in fact that director had
22 sufficient client business that he could've built to,
23 but gave that up to train and work with Mr. Gresham's
24 replacement?
25   A.  We can make a fair assumption that they did.

---

Page 55

1  Based on the success of the region and where they were
2  in terms of that revenue line item and the revenue that
3  was generated for their hours and the way we distributed
4  accounts to make sure that everyone has enough to be
5  staying busy during that period of time.
6    Q.  Who was Mr. Gresham's replacement; do we know?
7    A.  We didn't look at it as a replacement as that
8  individual.  This team was, again, as I look at it,
9  globally for the growth that we have as an organization
10 it's -- it's about an oversize of a team to be able to
11 grow from, let's say, eight to 10 or to 12 at that point
12 in time.  So that person wouldn't necessarily stepped in
13 and just been his exact replacement to take over his
14 exact account load.  They wouldn't have been prepared to
15 do that.  They were too young in the business.
16   Q.  Well, do we -- do we know if in fact Merritt
17 Hawkins even wound up hiring a replacement for
18 Mr. Gresham?
19   A.  Well, certainly that would have been part of our
20 standard process.  If someone believes, you want to be
21 sure that you've got the appropriate training class in
22 place to be able to fulfill that role.
23   Q.  But my understanding now from -- from you as you
24 explain this is you don't really look at -- on that
25 individual as the basis.  You have quarterly quotas for

---

Page 56

1  when you're hiring, correct?
2    A.  Well, I will.  As you look at the individual
3  teams.  In this case, the team that Mr. Gresham worked
4  for dropping from whatever the team size was at the
5  time, 10 to nine, very specific responsibilities to
6  focus on making sure you have the appropriate head count
7  in place to generate the revenue that they need.  I look
8  at it obviously, on a more global basis.
9    Q.  Okay.  Okay.  What I'm asking is:  We can't
10 really trace Mr. Gresham's departure to any particular
11 employee, so we can figure out how well that employee
12 did vis-a-vis Mr. Gresham's departure, correct?
13   A.  Correct, it'd be difficult to do.
14   Q.  Okay.  And -- and this $120 -- or 25,000 figure
15 you have here is really an opportunity cost, not an
16 out-of-pocket cost, correct?
17   A.  Correct.
18   Q.  You're making the assumption that a director
19 somewhere out there had to spend 200 more hours training
20 someone because Mr. Gresham left, correct?
21   A.  Absolutely, yes.
22   Q.  And you're therefore assuming that that person
23 would have billed 200 hours to a client during that same
24 time period, correct?
25   A.  Yes, we are.

---

Page 57

1    Q.  But we don't know who that particular director
2  was, right?
3    A.  Right.
4    Q.  We don't know what the director's schedule during
5  that time period was, correct?
6    A.  Correct.
7    Q.  We don't know if the director had the business
8  necessary to bill those 200 hours, correct?
9    A.  We can certainly assume that they did.
10   Q.  Right.  We can assume, but what I'm asking for is
11 a factual matter.  You don't -- you don't know?
12   A.  Correct.
13   Q.  And last, we don't even know if in fact there was
14 an individual who was hired to directly replace
15 Mr. Gresham as opposed to your quarterly hiring,
16 correct?
17   A.  Correct.
18   Q.  Okay.  I now want to focus on part B which is the
19 lost profits portion of it.  That you identify as a
20 figure of $30,684; is that correct?
21   A.  That's correct.
22   Q.  Okay.  Tell me how you calculated that number.
23   A.  Well, this calculation was generated to look at
24 the prior 12 months that Mr. Gresham was part of the
25 organization or part of that team and then going forward

---

15  (Pages 54 to 57)

Mark Smith                                                    May 20, 2014

Page 58

1  12 months and the fact that that team -- we did add an
2  additional person to that team that would have in
3  essence from a global perspective replaced that head
4  count number, and the difference in profitability during
5  that period was the 30,684. I will tell you I think as
6  I looked at this upon further reflection, I believe this
7  is a far insufficient number.
8     Q. Okay. So let me first understand that I know the
9  math.
10    A. Okay.
11    Q. I'll reference you to Exhibit F. Is -- is -- if
12  you'll take a look, if you will, on Exhibit F. There'
13  two categories: One listed for Gresham. One listed for
14  Wilmeth. Who is Wilmeth?
15    A. She is a member of that team that joined the team
16  after Gresham left, I believe.
17    Q. And do you know when she joined?
18    A. I do not know specifically.
19    Q. Okay. She starts off in September of zero. Do
20  you think she joined in September or is that just a
21  placeholder?
22    A. I'm not sure.
23    Q. Okay. And then for Gresham you've got an EBIDDDA
24  number, correct?
25        MR. TILLOTSON: E-B-I-D-D-D-A, all caps.

Page 59

1     A. Correct.
2     Q. (BY MR. TILLOTSON) And how is that EBIDDDA
3  number calculated?
4     A. My understanding is the EBIDDDA in this case is
5  the EBIDDDA per recruiter. If you took a total EBIDDDA
6  of the team and divided it by the number of recruiters
7  on the team, you would generate this number.
8     Q. Okay. What -- what's the number that we're
9  starting off with that we're dividing by?
10    A. The number you start off with is the EBIDDDA
11  that's the region he was involved with.
12    Q. Okay. And so I take it you have financial
13  documents that break down EBIDDDA by region?
14    A. Correct.
15    Q. Okay. And did you look at those documents to
16  prepare this?
17    A. I did.
18    Q. And are you relying on them to give us these
19  numbers?
20    A. I am.
21    Q. Okay. Did you give those documents to your
22  lawyers?
23    A. Don't believe so.
24    Q. Okay. Do you have them with you here today?
25    A. I do not.

Page 60

1     Q. Okay. So there's an EBIDDDA for the region and
2  then you divided that EBIDDDA by what?
3     A. By the number, if I recall correctly, the number
4  of recruiters were part of the team at that point.
5     Q. Okay. With the -- with the idea being each
6  recruiter would have a proportionate share of having
7  generated the EBIDDDA, correct?
8     A. Correct.
9     Q. But we know that's not true because they perform
10 at different levels, right?
11    A. It's an average contribution, correct.
12    Q. Right. But some are very good employees and some
13 are not-so-good employees contributing to different
14 levels, correct?
15    A. Correct.
16    Q. What's the average EBIDDDA someone would generate
17 if they met the minimum quota of one placement per
18 month; do you know?
19    A. I do not.
20    Q. Have you compared what the EBIDDDA would be for
21 someone who generated on average one placement a month
22 during this time period in your average EBIDDDA figures?
23    A. I have -- I do feel comfortable looking at this.
24 Average recruiter is going to generate somewhere between
25 45 and $65,000 a month and on average our regions

Page 61

1  produce an EBIDDDA at about 20 percent -- 20 percent
2  each point. It could be as high as 30, as low as middle
3  'teens.
4     Q. Okay. So -- so you're telling me that the
5  average recruiter would generate 45 to 65,000 a month in
6  -- in total revenue?
7     A. Uh-huh.
8     Q. And your EBIDDDA figure off that is somewhere
9  around 20 to maybe as high as 30 percent?
10    A. Yes.
11    Q. Is that right?
12    A. Uh-huh.
13    Q. Okay. Now, that average figure of 45 to 65, do
14 you know how that compares with what Gresham was doing
15 in realtime?
16    A. I don't. I don't. I'm obviously -- I'm
17 obviously --
18    Q. Is that information available? I mean, could
19 we see what you could do?
20    A. Yes, we could -- we could locate that.
21    Q. Okay. So for that --
22        MR. COLAO: Hey Jeff, I'm not trying to cut
23 you off. I've got to use the bathroom whenever you --
24 I'm not going to cut you off. Just tell me when we can
25 do it.

16  (Pages 58 to 61)

Page 62

1    THE WITNESS:  Second that.
2    MR. TILLOTSON:  All right.  The first rule
3  is if you ever need to take a break, particularly for
4  the bathroom, just say so.  So why don't we --
5    THE WITNESS:  Is that okay?
6    MR. TILLOTSON:  Sure.
7    THE VIDEOGRAPHER:  Going off the record.
8  It's 10:59 a.m.
9    (Break taken from 10:59 a.m. to 11:20 a.m.)
10    THE VIDEOGRAPHER:  Back on the record.  It's
11  11:20 a.m.
12    Q.  (BY MR. TILLOTSON)  Okay.  Since we were looking
13  at Exhibit F to your expert disclosures right before we
14  finished -- and I just want to make sure our -- the last
15  series of questions.  The figures listed for
16  Mr. Gresham, the monthly figures is just the average
17  monthly EBIDDDA for the Heartland region divided by the
18  number of recruiters in the Heartland region; is that
19  correct?
20    A.  It is not correct.  I apologize.  That's my
21  mistake.  I took a look at my notes and this calculation
22  was generated by looking at Mr. Gresham's monthly
23  billings multiplied by the EBIDDDA percentage of his
24  particular region.  That's the smallest profit center
25  that we calculate as an organization.  So if he had

Page 63

1  $50,000 of billing that month and his team, the
2  Heartland team, had 20 percent EBIDDDA, it would be
3  $10,000.  And then is why you look down to Ms. Wilmeth
4  and compare that she's starting off with zero because
5  she didn't generate anything in her her first months and
6  then we see the numbers begin to build over that -- over
7  that period of time.  Interestingly enough, as you look
8  at those numbers with the exception of the spike there
9  mid year, it took about 10 to 12 months for her to get
10  back to that full ramping of being, you know, as
11  successful as someone like Mr. Gresham who had been in a
12  territorial chair for a year or longer.  So I apologize
13  for that.
14    Q.  Okay.  So -- it's actual -- Mr. Gresham's
15  actual revenue?
16    A.  Correct.
17    Q.  But you're using the --
18    MR. VOLNEY:  Billing stubs.
19    Q.  (BY MR. TILLOTSON)  -- billings, but you're using
20  the gross billings that you would have on a particular
21  month times the average EBIDDDA percentage for his
22  region?
23    A.  That's correct.
24    Q.  Okay.  And is that -- EBIDDDA, does it vary on a
25  month-to-month basis?

Page 64

1    A.  It does.
2    Q.  Were you using each month's of it all or were you
3  using a global --
4    A.  That would've been month by month.
5    Q.  Okay.  And who -- who would have performed these
6  calculations?
7    A.  That would have been performed by a member of our
8  finance team.
9    Q.  Okay.  Not you, but someone else?
10    A.  Correct.
11    Q.  That person's name is?
12    A.  That would have likely been done by Robert
13  Easley.
14    Q.  Okay.  What format was this information presented
15  to you?
16    A.  I don't recall specifically.  Likely those --
17  those reports typically come to me in an Excel format.
18    Q.  Right, but the chart we see here today, who
19  prepared this chart?
20    A.  That would be prepared by my finance team or
21  Robert.
22    Q.  Okay.  At your direction?
23    A.  Correct.
24    Q.  But you didn't prepare the chart?
25    A.  No, I did not.

Page 65

1    Q.  And -- and have you even the backup information
2  that was used to prepare the chart?
3    A.  Now to reflect back, I have.
4    Q.  Okay.  And you had mentioned earlier to correct
5  yourself you said looked at your notes.  Which notes are
6  you referring to?
7    A.  Notes I have -- that I had in a separate file.
8    Q.  Okay.  Are those notes here?
9    A.  I looked at them online.  I don't have them with
10  me.
11    Q.  Okay.  So you went -- you went on a computer
12  while during the break and looked at notes online?
13    A.  I did.
14    Q.  Okay.  And are they handwritten notes, are they
15  finance notes?  What are they?
16    A.  It's -- it would've been -- actually it would've
17  been -- it would've been the format.  I'm looking back
18  from my notes.  As I looked on there, those would've
19  been just -- they actually would've been the spreadsheet
20  from -- from finance.
21    Q.  Okay.  What -- I'm confused because you used
22  different terminology.  Why don't you just tell me what
23  happened during the break that allowed you to figure you
24  had given mistaken testimony about this?  What did you
25  look at?  Who did you talk to?

17  (Pages 62 to 65)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Page 66

1    A. We talked to members of our legal department in
2 San Diego.
3    Q. Okay.
4    A. To clarify how we had generated these. Honestly,
5 as you looked at Wilmeth is where it began to not make
6 sense on the average.
7    Q. Okay. Who in San Diego legal did you talk to?
8    A. Barakat. I don't remember her last name.
9    Q. Barakat?
10    A. Barakat.
11    Q. Okay. Do you know who she is?
12    A. I do.
13    Q. Who is she?
14    A. She's a member of the legal team in San Diego.
15    Q. What -- like for AMN or for --
16    A. Yeah, for AMN corporate.
17    Q. So AMN corporate lawyers. Okay. And why did you
18 call her?
19    A. Because as I looked at these numbers specifically
20 with Wilmeth, it wasn't making sense. It was an average
21 that I had recalled.
22    Q. Okay. Why does -- why does -- why does the
23 individual at AMN, which is a separate company, know
24 about these particular numbers here in Exhibit F?
25    A. Well, they're our parent company, they're the

Page 67

1 owner of Merritt Hawkins.
2    Q. But when I asked you earlier who provided you
3 this information you told me it was members of your
4 finance team. You didn't mention anyone from AMN. What
5 role did AMN legal department play in preparing these
6 calculations?
7    A. They would not have prepared in the calculations,
8 but they would have been aware of the documents.
9    Q. How?
10    A. Assuming finance would've given them the copy.
11    Q. How did you know to call them if you don't know
12 how they --
13    A. Seemed like a good place to start.
14    Q. So randomly during the break you decided to call
15 AMN legal department to find out about calculations done
16 by your finance department?
17    A. Yes.
18    Q. Okay. And you don't remember the full name of
19 Barakat. How did -- how did you know to call her?
20    A. I work with her on an ongoing basis. She has a
21 very unique last name I just can't recall it.
22    Q. Okay. And did -- did AMN's lawyers prepare these
23 calculations that we're looking at here in Exhibit F?
24    A. Well, we would've provided spreadsheets to show
25 what these calculations were. I didn't type this if

Page 68

1 that's your question.
2    Q. Okay. Let's -- let's start with the beginning.
3 Who -- when -- when -- did AMN's lawyers ask you to come
4 up with some damages numbers in this case?
5    A. I don't recall if it would've been them directly
6 or if it would've been a combination of our -- our
7 counsel and in-house or not. I don't recall that.
8    Q. Okay. So you don't remember who actually
9 approached you about providing damages calculations in
10 this case?
11    A. Not specifically.
12    Q. It might have been your lawyers in this case
13 Mr. Colao, right?
14    A. Could have been.
15    Q. Might have been lawyers for your parent company,
16 AMN?
17    A. Could have been.
18    Q. Okay. Is AMN's in-house lawyers also
19 representing Merritt Hawkins in this case?
20    A. I don't know what you mean by representing. I
21 mean, there's attorneys that we do work with.
22 They're --
23    Q. Okay.
24    A. They're at our access.
25    Q. Okay. And then the calculations we look at here

Page 69

1 as Exhibit F, the chart we see, that was prepared by
2 whom?
3    A. The final chart just like exactly what you're
4 seeing.
5    Q. Yes.
6    A. I do not know.
7    Q. Who prepared the initial charts?
8    A. Those would have been prepared by our finance
9 team.
10    Q. Okay. But you don't know who did this final
11 chart?
12    A. I do not.
13    Q. And was AMN's lawyers in California involved in
14 the preparation of the various iterations of this chart?
15    A. I don't know.
16    Q. Okay. Did you have any involvement in it?
17    A. I was involved providing that data.
18    Q. Okay. Providing that data to whom?
19    A. Would've provided that to -- to Dykema,
20 Mr. Colao.
21    Q. Where are the prior iterations of this chart?
22    A. They're back in my office.
23    Q. Okay. You still have them or have you thrown
24 them away?
25    A. I believe I should be able to locate them. I

18  (Pages 66 to 69)

APP. 0019

Electronically signed by Lei Sherra Torrence (501-288-335-5388)          32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Page 70

1    don't know exactly where they are now.
2       Q.  Okay.  Did you have discussions with AMN's
3    lawyers in California regarding the preparation of this
4    chart?
5       A.  I don't recall doing that.
6       Q.  Did you have discussions with your current
7    counsel, Mr. Colao or other people at his firm,
8    regarding the preparation of this chart?
9       A.  I likely would have, yes.
10      Q.  Okay.  And then there was a final version of this
11   chart prepared which is attached here as Exhibit F,
12   correct?
13      A.  Correct.
14      Q.  Okay.  And -- and you don't know who prepared
15   that chart, but that's the chart that you're prepared to
16   testify about, correct?
17      A.  Correct.
18      Q.  Okay.  And you don't have the backup information
19   that goes to this chart here with you today, correct?
20      A.  I do not.
21      Q.  But it's available somewhere on a computer; is
22   that right?
23      A.  I should be able to get a copy of this, yes.
24      Q.  Okay.  In the meantime, during the break you
25   accessed a computer to look at information about these

Page 71

1    calculations, correct?
2       A.  Yes.
3       Q.  And what information did you access about these
4    calculations during the break?
5       A.  Well, a combination what I was able to find
6    basically looks like this, but I did call, as I
7    mentioned, to speak to Barakat about this and really
8    work through the logic because the average was no longer
9    making sense to me.  As I looked at this I was not
10   correctly recalling it, and as we talked through this
11   and looking at this information, we came to that
12   conclusion in recollection that this came from specific
13   revenue as it tied to Mr. Gresham and to Ms. Wilmeth.
14      Q.  And who told you that?  Ms. Barakat?
15      A.  Honest --
16      MR. COLAO:  Don't -- don't go through
17   anything that you discussed with AMN lawyers that's
18   privileged.  I -- I mean, Jeff, I'm trying to let you
19   ask questions, but a lot of this is priv -- you know,
20   involves communications with him and lawyers.
21      MR. TILLOTSON:  Not if he's going to be an
22   expert.  I don't think there is a privilege if he's a --
23   I mean, I'll lay a foundation and you can make an
24   objection, but just so you know my basis, if he's an
25   expert witness his communications with lawyers are no

Page 72

1    longer privileged if they serve as the basis for his
2    testimony.
3       MR. COLAO:  Not for a non-retained expert.
4       MR. TILLOTSON:  Yeah, I don't think you can
5    immunize privileged communications simply by hiring your
6    own employee.  That's the problem.  But I'll lay a
7    foundation.
8       MR. COLAO:  Yeah, I'm not going to let you
9    go into any substance of communications with the AMN
10   attorneys or with myself for that matter.
11      MR. TILLOTSON:  Okay.  So I'm going to lay a
12   foundation and if you'll just object, Brian, I'll give
13   you an opportunity if you think I've gone too far.
14      MR. COLAO:  Yeah, I'm going to try to
15   accommodate you so we don't have an issue here, but I
16   want to let you know my position that I do think it's
17   privileged and we're not going to get into that, but I'm
18   trying not to just say he can't answer.  I'm trying to
19   give you something so that you can get the answers that
20   you need versus -- versus just a blanket objection that
21   you don't get anything.
22      MR. TILLOTSON:  Okay.  Well --
23      MR. COLAO:  And I guess we can take it like
24   you were asking.  We can take it question by question.
25      MR. TILLOTSON:  Yeah, I'm -- I'm not going

Page 73

1    to argue.  It hasn't -- well, I'm sorry.  Let me just
2    ask the question.
3       Q.  (BY MR. TILLOTSON)  Did -- and give your lawyer
4    the opportunity to object during these next series of
5    questions.  Did Ms. Barakat give you information
6    regarding this particular chart during your phone call
7    during the break?
8       MR. COLAO:  That's a yes or no.  If that's a
9    yes or no you can answer that.
10      A.  Yes.
11      Q.  (BY MR. TILLOTSON)  And did you rely on what she
12   told you to come back in here and testify and explain to
13   me about this chart?
14      A.  In part, yes.
15      Q.  Okay.  What is it she told you?
16      MR. COLAO:  Well, yeah, that's where we're
17   going to object to the attorney/client privilege on the
18   substance of that.
19      MR. TILLOTSON:  Okay.  Are you going to
20   instruct him not to answer?
21      MR. COLAO:  Yes, I am going to instruct him
22   that.
23      Q.  (BY MR. TILLOTSON)  You're going to follow that
24   instruction, I assume --
25      A.  Yes.

19  (Pages 70 to 73)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Page 74

1    Q. -- and not answer that question? Okay. Did
2  Mr. Colao give you information about this chart during
3  the break? You can answer that yes or no.
4    A. Yes.
5    Q. And did you rely on that information in coming in
6  here to testify about how to interpret this chart?
7    A. In part, yes.
8    Q. What did Mr. Colao tell you?
9        MR. COLAO: Right, and that's where we'll
10 object to attorney/client privilege. I instruct you not
11 to answer the question.
12   Q. (BY MR. TILLOTSON) And I'll assume you'll follow
13 that instruction?
14   A. Yes.
15   Q. Okay. And did you actually have any original
16 input into this chart at all? I mean -- by that, I
17 mean, did you come up with any of the numbers or do any
18 of the calculations, or was that all done by members of
19 your finance team?
20   A. I would've provided instruction to the finance
21 team in terms of how to calculate this number.
22   Q. And what role, if any, did Ms. Barakat have in
23 the calculation of these numbers, if you know?
24   A. She wouldn't have had any in the calculation and
25 the creation of those numbers.

Page 75

1    Q. Okay. And can you explain why you turned to her
2  to get information about this chart if she had no role
3  in it?
4    A. Just to help remembering the -- you know, how we
5  had created these because I had discussed the number
6  with her once we had generated these.
7    Q. Okay. Now, I want to ask you about Mr. Gresham.
8  He had obviously gone through the Merritt Hawkins
9  training process from his prior employment, correct?
10   A. Yes.
11   Q. When he came back and was rehired at Merritt
12 Hawkins, do you know if he went through the same 20-week
13 process?
14   A. No. He would've gone through an abbreviated
15 version.
16   Q. Okay. So there -- there presumably might have
17 been some cost savings for rehiring Mr. Gresham?
18   A. Some, yes.
19   Q. Okay. And have you offset those costs against
20 the savings versus what you say your costs are here to
21 come with a true number?
22   A. We have not offset those costs because those
23 costs were still incurred at one point in time.
24   Q. Okay. But presumably you were going to hire
25 someone and instead of hiring that person, you hired

Page 76

1  Mr. Gresham instead, right?
2    A. Actually, in -- in some of those rare situations
3  where someone comes back to Merritt Hawkins or comes
4  from a competitor, would be more rare, it would've been
5  an add at that point in time because it brings somebody
6  back that's got experience. It would've been an
7  additional number. It would have been a --
8    Q. Okay.
9    A. -- positive to that.
10   Q. But presuming Mr. Gresham should have a faster
11 run-up time in terms of generating revenue than a new
12 hire?
13   A. Yes.
14   Q. Okay. But if you look at his numbers there in
15 Exhibit F going into the eighth month, which is April,
16 May and June, he actually has extremely low production
17 of the 7,000, 2,000, 5,000 figures. Do you see that?
18   A. I do.
19   Q. Okay. So it is possible even for a skilled
20 fully-trained employee to have low production months
21 during the course of their work there; is that correct?
22   A. It is.
23   Q. And I assume that's either seasonal or a
24 particular client related matters; is that right?
25   A. Or his own personal performance.

Page 77

1    Q. Okay. He may not have been doing what he was
2  supposed to be doing; is that right?
3    A. That's correct.
4    Q. Okay. So it's not always true that the longer
5  they're there, the greater their production is going to
6  be over a period of time; is that correct?
7    A. Not always.
8    Q. Okay. Now, do you know did -- did Wilmeth
9  literally start the day after Gresham left?
10   A. Yeah, I don't know those exact dates.
11   Q. I see Gresham ends there in August and Wilmeth
12 starts in September, and I'm assuming that Wilmeth
13 wasn't hired to replace Gresham because you -- you
14 couldn't have hired them literally the next day, right?
15   A. That's correct.
16   Q. Okay. So do you know if Wilmeth was actually
17 working during August?
18   A. I don't know her hire date off the top of my
19 head. It's likely she could've been hired a month or so
20 before and still been at zero because there's several
21 months we're not generating profitability.
22   Q. Okay. And then as I understand it, to -- to come
23 up with lost profits, what you've done is you've taken
24 the difference between what Wilmeth did and what Gresham
25 did during those particular time periods, subtracted

20  (Pages 74 to 77)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                          May 20, 2014

---

Page 78

1    them, and come out with that number; is that right?
2        A. Correct. We offset those two 12- month periods.
3        Q. And what you're assuming is that Mr. Gresham
4    would have during that same time period that Wilmeth was
5    working, Mr. Gresham would've continued to have the same
6    average billings that he had prior to his departure; is
7    that correct?
8        A. That is correct.
9        Q. Okay. Now, let me ask a couple of other
10   questions about that -- that -- that profit part of it.
11   If Mr. Gresham just quit of his own accord, then there
12   wouldn't be any damages, in your mind, accrued to
13   Merritt Hawkins because people are entitled to quit
14   Merritt Hawkins, correct?
15       A. That is correct.
16       Q. Okay. So the mere fact that Mr. Gresham quit and
17   went to Consilium, so long as he wanted to quit, you
18   would agree with me that you don't really have a claim
19   simply because someone quit because they no longer want
20   to work for you?
21       A. No, I would not agree with that.
22       Q. Okay. Well, how many of your employees during
23   the last three years at Merritt Hawkins that have left
24   have gone to competitors that you're aware of?
25       A. Yeah, I don't know that number specifically.

Page 79

1        Q. All right. You're losing on average 25 -- to
2    25 percent of your people a year, right?
3        A. Uh-huh.
4        Q. And I presume some of those people are going to
5    work for competitors?
6        A. Very few.
7        Q. Okay. How many lawsuits has Merritt Hawkins
8    filed within the last five years based on people
9    violating the noncompete?
10       A. I would really have to pull that number, but it's
11   any time someone has violated our employment agreement,
12   we have pursued that infraction. That could be from as
13   much as either just a letter from legal that engages a
14   conversation that we worked to resolution, to filing a
15   lawsuit, I would say at this given moment we are either
16   in the process of finishing or active with three or four
17   at this juncture.
18       Q. Is there any competitor out there for whom if the
19   employer goes to work for Merritt Hawkins doesn't bring
20   suit as a matter of course?
21       A. No. No, unless there's -- we're able to come to
22   resolution before we file, but other words, the -- the
23   direction of my legal department from me is if someone
24   breaches their agreement, to pursue this legally.
25       Q. And -- and when you say direction of your legal

Page 80

1    department, is there an in-house legal department at
2    Merritt Hawkins?
3        A. No, it's centralized through AMN.
4        Q. Okay. So if I did a tracking of all Merritt
5    Hawkins employees that left within the five years that
6    went to work for a competitor, leaving Merritt Hawkins,
7    for each of those individuals there would have either
8    been a lawsuit filed or some resolution with legal; is
9    that correct?
10       A. To the best of my knowledge, yes.
11       Q. Okay. So you're not singling out Mr. Gresham or
12   Consilium?
13       A. Absolutely not.
14       Q. Okay. Do you view Consilium as a competitor to
15   Merritt Hawkins?
16       A. Well, I have to. As I look on their web site,
17   they say they do permanent placement. So that's what I
18   do so, yes.
19       Q. Have you competed against them for any particular
20   client for permanent placement to your knowledge?
21       A. To my knowledge, I'm not aware of that, no.
22       Q. Have you lost any business to them on permanent
23   placement to your knowledge?
24       A. I wouldn't be aware of that.
25       Q. Okay. Well, have you heard from any of your

Page 81

1    people that Consilium got a particular matter or client
2    that Merritt Hawkins was chasing?
3        A. I haven't, but I don't hear that often anyway
4    regarding my competitors.
5        Q. Okay. So do your -- your expert designations
6    that you said if you'll turn and look at -- we were on,
7    I guess, page five, and I'm going to refer you to page
8    six. Where you say damages plaintiff incurred from
9    defendant Gresham's violation of his noncompete, you
10   identify MHA's -- MHA's lost profits which is the thing
11   we've just been looking at, right?
12       A. Correct.
13       Q. And these say profits made by Consilium as a
14   result of Gresham's employment with Consilium; do you
15   see that, in B?
16       A. Page five or six? I'm --
17       Q. Six.
18       A. Six. Okay.
19       Q. Okay. So we've looked at the -- the damages.
20   This is the damages to -- to -- you've incurred because
21   you believe Mr. Gresham violated his noncompete by going
22   to work for Consilium, correct?
23       A. Correct.
24       Q. And you do believe that, right?
25       A. Oh, I do.

21  (Pages 78 to 81)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                          32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                              May 20, 2014

---

Page 82

1    Q. Right.  And you've identified, first, lost
2  profits, right?
3    A. Correct.
4    Q. Which is the figure we just looked at?
5    A. Yes.
6    Q. Okay.  The second one is profits made by
7  Consilium; do you see that?
8    A. I do.
9    Q. You don't identify a figure because you don't
10  know if Consilium made any money off Mr. Gresham,
11  correct?
12    A. That is correct.
13    Q. And -- but one thing we're pretty certain of is
14  you're not aware of any client of MHA that Consilium got
15  because of Mr. Gresham, correct?
16    A. I'm not.  The only thing I'm aware of is when
17  Consilium hired him they have an employee that comes to
18  them fully trained and -- and prepared to engage in
19  their business and I spent a lot of money getting that
20  person trained up.
21    Q. Okay.  Did Mr. Gresham to your knowledge get
22  training at Arthur Marshall?
23    A. I'm not aware of that.
24    Q. Okay.  Was it wrong for you to hire him from
25  Arthur Marshall and get the benefit of whatever training

---

Page 83

1  or business he got at Arthur Marshall?
2    A. No.
3    Q. Did you pay money to Arthur Marshall to
4  compensate them for hiring away their employee that they
5  had trained personally?
6    A. Well, they -- they got him after he'd been with
7  me for an extended period of time.  There was no
8  training for them to do.
9    Q. Okay.
10    A. So no.
11    Q. Someone works for Merritt Hawkins gets training.
12  We're going to talk about that.  Other than that there
13  is no particular client or account or placement you can
14  identify that Consilium obtained money from because of
15  Mr. Gresham's employment, correct?
16    A. Specifically, no.  I cannot.
17    Q. Okay.  All right.  Okay.  I now want to talk
18  about the training part of it.  Explain to me, do you
19  considering the training that's given to MHA employees
20  such as Mr. Gresham proprietary?
21    A. I do.
22    Q. Okay.  And tell me what's so proprietary or
23  secret about the training?
24    A. That training has been developed over many years
25  with countless hours and dollars invested in educating

---

Page 84

1  someone specifically how to come from outside of our
2  industry with no knowledge of the business itself, the
3  industry, the space and to how to go about either, one,
4  securing new searches or to be a recruiter and to be
5  able to recruit given the physician for a hospital and
6  those tactics are very specific and I believe unique to
7  Merritt Hawkins.  And you know, honestly, it's justified
8  especially in cases like this and we've seen it before
9  where the value to me is very clear when someone goes to
10  great lengths to steal it.  We've seen this in a prior
11  case as well very recently where that is the first thing
12  people want to steal.  And if it's not so valuable, why
13  bother?
14    Q. How do you steal the training?
15    A. They steal the training by downloading the
16  information either by printing it or dropping it into an
17  external drive and portably taking that with them.
18    Q. But what information are we talking about?  I
19  mean, is this a manual?  Is it a how-to?  Is it a guide?
20  What are we talking about?
21    A. It is -- it is a combination of several things.
22  It's a manual the how-to process step 1 through 44 of
23  recruiting.
24    Q. Okay.
25    A. In great detail it also is an appendix of various

---

Page 85

1  sources of information whether it be about specialties,
2  about hospitals, about these other given items.  It
3  gives very specific training syllabus of if you're in a
4  situation with a physician how to be able to address
5  that situation.
6    Q. Okay.
7    A. How to be able to specifically overcome certain
8  objectives, how to guide a candidates through the
9  emotional process of making -- a decision to make a
10  move.
11    Q. Okay.  And is that the essence of the training,
12  the documents you described for me?
13    A. It's a large part of it.
14    Q. Okay.  And you've obviously seen a list of the
15  documents that Merritt Hawkins claims Mr. Gresham
16  copied, correct?
17    A. Well, I've seen the list that our expert --
18    Q. Okay.
19    A. -- generated, yes.
20    Q. Okay.  And correct me if I'm wrong, but I didn't
21  see any of the documents you just described to me on
22  that list, did you?
23    A. You know what, let's take a look through it.  The
24  handoff call script is a part of that training process,
25  so that would incur that piece.

---

22  (Pages 82 to 85)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                        May 20, 2014

Page 86

1    Q. Would you -- would you -- is it okay if I -- did
2  you bring --
3         MR. COLAO: That's his personal copy. If
4  you want a --
5    A. I can give you the list. In looking through this
6  specifically, I would be careful.
7         MR. TILLOTSON: Is it attached in here?
8         MR. VOLNEY: Yeah, it's attached to that.
9    A. See, in much of the training --
10   Q. (BY MR. TILLOTSON) Hang on. Before you --
11   A. Okay.
12        MR. COLAO: Let them -- let him direct what
13 he wants to do next.
14   Q. (BY MR. TILLOTSON) What I want you to identify
15 is any documents that your expert claims were copied by
16 Mr. Gresham that you can identify are part of the
17 training materials --
18   A. Okay.
19   Q. -- other than you've identified for us, item 22,
20 which is a handoff call script doc; is that right?
21   A. Second. I'm getting that in multiple spots then.
22   Q. Okay.
23   A. That's right. On my list that's number 50. Does
24 that vary from what you have, Exhibit 5?
25   Q. Oh, I'm looking at two. I apologize.

Page 87

1    A. That's all right. I'm going to go back --
2         MR. COLAO: Yeah, I want you guys to be
3  looking at the same thing, though, you know. I mean,
4  Jeff, if you don't -- if the issue is you don't have a
5  copy or something, I'll try to help you out. I'll have
6  somebody make a copy, but I want everybody looking at
7  the same thing. I don't want it to be --
8    Q. (BY MR. TILLOTSON) So let's -- let's --
9  let me back and make sure we're on the same page.
10 You're -- an expert was retained by Merritt Hawkins in
11 connection with the digital issues in this case,
12 correct?
13   A. That's correct.
14   Q. And that expert has prepared list of documents
15 that were deleted and/or copied by Mr. Gresham
16 allegedly, correct?
17   A. Correct.
18   Q. Okay. Have you been provided with that expert's
19 report?
20   A. Yes.
21   Q. Have you reviewed it?
22   A. Yes.
23   Q. Okay. According to the expert report I have,
24 which has been previously marked Exhibit 2 as identified
25 as documents copied, I want to focus on those. Are you

Page 88

1  familiar with that list?
2    A. I've seen this, but it's been a while.
3    Q. Okay. So I think the other ones -- and I'm not
4  trying to be difficult, I think the other ones are files
5  deleted.
6    A. Okay.
7    Q. So I presume that -- that -- you -- you -- that
8  deleted is different from copied, obviously, right?
9    A. Yes.
10   Q. So I want to focus on the stuff that he copied
11 then that you can identify in that list of copy that
12 comprised the training materials.
13   A. Okay.
14   Q. If you'll look just at -- I'll show you where I
15 got confused item number 22 was the call script.
16   A. Absolutely.
17   Q. Okay.
18   A. It's --
19   Q. So if you'll just tell us the numbers in the list
20 of Exhibit 2 to your expert designations what you
21 believe are the training materials allegedly copied by
22 Mr. Gresham.
23   A. Okay. As part of that training process there
24 will be certain documents provided there that are
25 proprietary to Merritt Hawkins that are part of that

Page 89

1  training will be able to educate them on how to complete
2  this, and the value of it, whether it's with a client
3  interaction or a candidate. The first ones here begin
4  with a CV which I think the first CV, a curriculum vitae
5  -- let me back up here -- excuse me, cover letter. So
6  one of the first client encounters will be able to
7  educate a new recruiter on how to generate a cover
8  letter, which is a cover letter to the curriculum vitae,
9  and to be able to learn how to write that, what you can
10 give to a client legally, the information and data
11 that's pertinent to a client. The first one on this
12 list is number two and that's that CL. If you'd like,
13 there are several examples in here of copies of versions
14 of those cover letters being -- being copied. Do you
15 want me to mention each one of those?
16        MR. COLAO: Do you want him to mark the
17 exhibit? I mean, or just -- it's up to you.
18        MR. TILLOTSON: No.
19        THE WITNESS: Because it's a lot of
20 redundancy.
21        MR. TILLOTSON: Well, that's fine.
22   Q. (BY MR. TILLOTSON) Here's what I need. You've
23 testified just by background -- and I'll ask you to mark
24 the exhibits. We can do this. You testified that the
25 training -- their comprised proprietary materials

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 90

1  prepared by Merritt Hawkins given to your individuals.
2  You've also testified that Mr. Gresham improperly
3  benefitted by taking those with him wherever he went.
4      A. Uh-huh.
5      Q. We have a list here prepared by your expert of
6  materials that they believed he copied.
7      A. Okay.
8      Q. Okay. And I just want to identify which of those
9  materials on that list you would consider to be the
10  training materials that are proprietary by MHA and you
11  can -- you can highlight just the number of any of those
12  that you do.
13      A. Okay.
14      Q. And I'll ask you a few questions about it, okay?
15      A. Okay.
16      Q. Fair enough?
17          MR. COLAO: Okay. Well, let's -- let's just
18  -- you can stay there. I'm going to grab a -- I mean, I
19  guess you only have one copy of this. I want to follow
20  along. I mean, I've got --
21          MR. TILLOTSON: It's previously marked so I
22  apologize.
23          MR. COLAO: I'll grab a copy. Don't,
24  obviously, say anything to anybody, but if you want to
25  quietly review that for a second. Let's go off the

Page 91

1  record. I'm just going to grab my copy. If we're going
2  to do this, I want to follow along.
3          THE VIDEOGRAPHER: Off the record. It's
4  11:50 a.m.
5          (Break taken from 11:50 a.m. to 11:58 a.m.)
6          THE VIDEOGRAPHER: We're back on the record.
7  The time is 11:58 a.m.
8      Q. (BY MR. TILLOTSON) Okay. Mr. Smith, during the
9  break I asked you to go through Exhibit 2 to your expert
10  designations and highlight anything that you thought was
11  part of the training materials that was identified by
12  your expert as copied by Mr. Gresham. Have you done
13  that?
14      A. I have.
15      Q. Okay. And those are designated by the yellow
16  highlighting; is that correct?
17      A. That is correct.
18      Q. Okay. So I'm going to take one of the first ones
19  you told me, which was a CL. It's called number nine CL
20  Patel doc, and I assume that's a cover letter to
21  someone named Patel?
22      A. About someone named Patel, yes.
23      Q. Okay. And -- and I take it that this might be a
24  actual real-life document, like a real-life cover letter
25  that was sent out?

Page 92

1      A. I'm assuming, yes.
2      Q. Okay. And the reason why you think it's the
3  training materials is because you train your people on
4  how to send out the appropriate cover letters; is that
5  correct?
6      A. That's correct.
7      Q. Okay. So although you identified item nine as
8  part of the training material, what you really mean is
9  this is a cover letter which is an example of something
10  you train your people on; is that right?
11      A. It's a combination of a template that is used
12  during training, and of course --
13      Q. Okay.
14      A. -- I learned more about what to put in the
15  template.
16      Q. Who are the cover letters sent to?
17      A. They're sent to our clients.
18      Q. So basically hospitals?
19      A. Hospitals, clinics, whomever has us retained.
20      Q. Okay. And what requirements do you have of those
21  hospitals to keep those cover letters confidential,
22  i.e., not share them with anyone else?
23      A. We require our clients to -- to keep that
24  information to just within a need-to-know basis and that
25  they -- should they share that information outside of

Page 93

1  the group that's necessary to be involved and this
2  recruitment effort we didn't have issues with privacy
3  for letting others know that the candidate may be
4  looking for a role, but also in fact should they share
5  that data with another organization that then engages
6  that candidate and hires them that that party owes us
7  the placement fee.
8      Q. Okay. Who came up with the Merritt Hawkins
9  concept for the cover letter that you train your
10  employees on?
11      A. It's many iterations over the years. Principally
12  the most current version would have been the
13  responsibility of Mike Faye, who is the head of our
14  training with input from both internal and external
15  counsel.
16      Q. And -- and how many of these cover letters do you
17  think are sent out on an annual basis?
18      A. Thousands.
19      Q. Okay. Your web site identifies that more than
20  eight million practice opportunity letters are sent to
21  physicians each year?
22      A. That's different --
23      Q. Is that different?
24      A. Very different, yes.
25      Q. Okay. Is the practice opportunity physician's

24  (Pages 90 to 93)

APP. 0025

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Page 94

1  letter, does that consider part of the training
2  materials?
3      A.  How to write one is.
4      Q.  Okay.  And those are sent out to I presume to
5  doctors and physicians everywhere?
6      A.  Yes, physicians.
7      Q.  All over?
8      A.  And other practitioners.
9      Q.  Okay.  And they can show it to whoever they want,
10  I take it?
11      A.  They can.
12      Q.  Okay.  So it would be pretty hard to keep your --
13  your technique for practice opportunity letters secret
14  or confidential when millions are being sent out to
15  doctors and they can do whatever they want with them,
16  correct?
17      A.  There is a real art between getting the raw data
18  of what exists in a community and creating that letter,
19  and each one's unique.
20      Q.  Do you think Joe -- you know Joe Hawkins, don't
21  you?
22      A.  I do.
23      Q.  Okay.  You worked with him?
24      A.  I did.
25      Q.  Okay.  Did he know how to write a cover letter or

Page 95

1  have some of these ideas in his head at the time when he
2  left and sold the business?
3      A.  He did.  They've changed a bit since then, but
4  yes, he did.
5      Q.  Okay.  And so anything that's listed as a CL that
6  you've identified, that's a similar example of a cover
7  letter; is that correct?
8      A.  That's correct.
9      Q.  Okay.  You've also identified a bunch of
10  documents called itineraries.  Can you tell me what
11  those are?
12      A.  Those are the itineraries developed for each
13  physicians that goes on sites experience with client.
14      Q.  Okay.
15      A.  They're intended to be very customized, focus on
16  that physician's particular needs in terms of who it is
17  they want to meet specific to the job itself, but also
18  as it pertains to the personal needs of that given
19  candidate in a community to make sure we've provided
20  enough detail on that visit for them to be able to make
21  a decision to move themselves and their family there.
22      Q.  Okay.  The -- the notion that you guys do
23  detailed personalized interviews -- I'm sorry.  The
24  notion that Merritt Hawkins uses detailed personalized
25  itineraries is not a secret, correct?

Page 96

1      A.  That we do that, no.
2      Q.  Right.  Because your web site identifies your use
3  of detailed itineraries as one of the techniques Merritt
4  Hawkins uses that separates it from others, correct?
5      A.  Correct.
6      Q.  Okay.  And so the mere notion that you do a very
7  detailed itinerary is not a proprietary or confidential
8  information, correct?
9      A.  How to do develop it is.
10      Q.  Okay.
11      A.  But the fact that we do that is not.
12      Q.  And is the itinerary given to the doctor?
13      A.  It is.
14      Q.  And can the doctor do whatever he wants with it?
15      A.  He can.
16      Q.  Can the doctor show it to someone at Consilium if
17  he wants to?
18      A.  If they so chose.
19      Q.  Okay.  So it's pretty hard to keep it
20  confidential when you're giving them to people over whom
21  you have no control, correct?
22      A.  Correct.
23      Q.  Okay.  Now, one of the other ones you identified
24  was a personal interview.  Can you describe for me what
25  that is?

Page 97

1      A.  What I believe that is -- I'm going off the
2  descriptions of those particular files -- would've been
3  a packet that we provide a candidate that details the
4  itinerary experience of working with Merritt Hawkins
5  from the onset of our encounter with them to -- and that
6  can commonly include their itinerary as well as
7  expectations of them during and after the process.
8          MR. TILLOTSON:  Okay.  I'm going to have you
9  mark this.  Thank you.
10          (Exhibit Number 115 marked.)
11      Q.  (BY MR. TILLOTSON)  I'm going to show you what we
12  can compare as we go through here what I've marked as
13  Exhibit 115.  I'll represent to you this is a printout
14  from your Merritt Hawkins web site.  Do you recognize
15  this as some part of your web site?
16      A.  I do.
17      Q.  Okay.  This is entitled the recruitment iceberg.
18  Do you see that right there in the middle right under
19  that lovely lady?
20      A.  Yes.
21      Q.  Okay.  And I take it the recruitment iceberg
22  refers to there are things below the surface that you
23  guys do?
24      A.  That's correct.
25      Q.  Okay.  And you've got over here the overlooked

Mark Smith                                              May 20, 2014

Page 98

1    elements of the recruitment process.  If you turn to
2    page two you describe elements of your proven plan.  Do
3    you see that, the bullet points?
4        A.  I do.
5        Q.  Okay.  And you can see where if you'll go down,
6    number four says multiple hours of preinterview phone
7    time with candidates, spouse.  And then further down
8    preinterview personal recruiter consultant with
9    candidate.  Are those aspects what we're talking about
10   when we -- when you identify here the interview?
11       A.  Those are the titles, yes.
12       Q.  Okay.  So the proprietary part of it would be the
13   way you do it?
14       A.  It would.
15       Q.  Okay.  And is a document created of the
16   interview?
17       A.  I'm not sure I understand what you mean.
18       Q.  Is there any written document that's created from
19   the interview of the doctors?
20       A.  After the fact or before?
21       Q.  Yes.  Well, happening?
22       A.  Okay.  No.
23       Q.  Okay.  So you just -- so I understand, the
24   training part is you train your people to conduct these
25   pre-interviews in a certain way?

Page 99

1        A.  We do.  It's an 11-step process.
2        Q.  Okay.  And so the document that you say was
3    copied, what is that?
4        A.  That -- that portion is the document provided to
5    the candidate.
6        Q.  Okay.
7        A.  It guides them through their interview process,
8    expectations, et cetera.
9        Q.  Okay.  Again, is the candidate free to do
10   whatever he or she --
11           (Witness coughs.)
12       A.  Excuse me.
13       Q.  (BY MR. TILLOTSON)  No problem.
14       A.  Yes, they are.
15       Q.  And is there a manual that tells you or teaches
16   your -- your people how to do these interviews?
17       A.  There is.
18       Q.  Okay.  Was the manual on here in the list that
19   you --
20       A.  I did not see that.
21       Q.  Okay.  So to the best of your knowledge, whatever
22   Mr. Gresham did it does not appear that he copied the
23   manual?
24       A.  That's correct.
25       Q.  Okay.  Then you have a bunch of ones identified

Page 100

1    as direct mail client authorization.  Can you tell me
2    what those are?
3        A.  Yes.  Those -- that is the authorization we use
4    when we do a sourcing campaign for a client, that they
5    are aware of the costs and some specifics of what it is
6    that we intend to do in the process and that they
7    authorize that cost.
8        Q.  Okay.  So is it a form?
9        A.  Basically, yes.
10       Q.  Okay.  Not to be cute about it, but is there
11   anything secret about asking a client to authorize
12   expenses that you need --
13       A.  No.  It is -- I believe that document is unique
14   because we are one of the few people that actually do
15   that type of sourcing.  It's more specific to the
16   strategy of what we intend to do providing of the letter
17   campaign in terms of just not the contents, but in terms
18   of who it goes to, the volumes of which it goes to,
19   strategically where it's being mailed and then also the
20   bit of our online strategy about how we post the
21   opportunity, where we post it and what that means to
22   them and what the cost will be.
23       Q.  Okay.  Well, I saw one other one.  There was some
24   listed as expense or EXP reimbursement.  Do those sound
25   familiar?

Page 101

1        A.  They do.
2        Q.  What are those?
3        A.  Those are provided in that personal interview
4    packet.  It's a template we provided to the candidate to
5    let them know what is the process to be reimbursed for a
6    cost that they encounter and also, you know, what is in
7    essence appropriate to be reimbursed for and not
8    appropriate.
9        Q.  Okay.  Who is that given to:  Your employees or
10   to the client?
11       A.  That is given to the candidate and then that can
12   be returned directly to the client or to us to process
13   and get that to the client.
14       Q.  Okay.  And do you think if -- if Mr. Gresham had
15   that at Consilium it would provide him some competitive
16   advantage that he wouldn't otherwise have?
17       A.  Just a head start creating --
18       Q.  On what?
19       A.  Just to create that document.
20       Q.  To get authorization for expenses reimbursements?
21       A.  Yes.
22       Q.  You believe that honestly provides Consilium with
23   some competitive advantage knowing that?
24       A.  It's enough to steal.
25       Q.  Well, I'm not asking you whether or not it's

26  (Pages 98 to 101)

APP. 0027

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                    May 20, 2014

Page 102

1 enough to steal. I'm asking you: Do you honestly
2 believe that provides Consilium with some competitive
3 business advantage that they have your form for how
4 expenses might be reimbursed from a client?
5    A. I don't see why not, yes.
6    Q. Is there some proprietary way about how you have
7 your clients reimburse expenses that no one else in the
8 industry knows?
9    A. You know what, I only know our way. I've been
10 here almost 26 years. It's my only experience.
11   Q. But your web site says that your 44-step
12 improvement plan set the industry standard for
13 thoroughness and professionalism, correct?
14   A. Yes.
15   Q. Industry standard means that's what everyone is
16 doing and trying to follow, correct?
17   A. Attempting to.
18   Q. Okay. So you brag that everyone is out trying to
19 do what you're doing, correct?
20   A. I think they're trying to get our end result,
21 yes.
22   Q. It couldn't be the industry standard if no one
23 knew what you were doing, right?
24   A. The result, no. The process, yes.
25   Q. All right. Okay. Now, I want to ask you --

Page 103

1 since we're talking about confidential information, I
2 want to ask you to turn to your expert designation page
3 three, if you will. Page three. And if you want to
4 carry over, I'm going to start with the paragraph that
5 begins on page two based on his knowledge. I want to
6 focus, if you will on the paragraphs with the letters A,
7 B and C. Do you see that?
8    A. Yes.
9    Q. Which follows from number seven, it says the
10 industry standards and practices with respect to
11 noncompetition, non-solicitation and confidential
12 information provisions of employment contracts, okay?
13   A. Okay.
14   Q. Are you familiar with the industry standards and
15 practices with respect to noncompetition,
16 non-solicitation and confidential information?
17   A. I believe I am.
18   Q. Okay. And what are those standards?
19   A. They vary by organization and I'm answering your
20 question in terms of -- with each of our competitors to
21 know what their expectations are, I have a general idea
22 of each of their employment agreements and in what way
23 they restrict someone that has been their employee
24 before transitioning into a competitor.
25   Q. Okay. How did you gain that information?

Page 104

1    A. Either through a combination of conversation, but
2 also through various litigations that we've had with
3 these competitors to receive copies of their documents
4 or if in fact someone has came to me from a competitor,
5 asked for a copy of that to be able to look at that
6 document to determine if that's -- to make sure that
7 we're not in violation of any of that.
8    Q. Do -- are there any of your competitors that
9 don't employ noncompetes?
10   A. Yes.
11   Q. Okay. How many would you say as a percentage of
12 your competitors that don't employ noncompetes?
13   A. At a guess -- there are, to be specific, probably
14 10 to 20 percent that have a total at will arrangement
15 where there's no employment agreement. To my knowledge,
16 the rest have employment agreements. The question is to
17 whether they have a noncompetitive aspect to them.
18   Q. Okay. Do you know?
19   A. Do I know what any of --
20   Q. How many of those have noncompetes?
21   A. To one degree or another I would say the rest of
22 that -- that group in terms of it'll vary in terms of
23 the intensity and the specific expectations of the
24 employee in terms of what they're allowed to do and not
25 to do --

Page 105

1    Q. Okay.
2    A. -- but there's definitely limitations to them.
3    Q. Okay. Now, are you familiar with the two
4 noncompetes that are at issue in this case?
5    A. The ones that are mine?
6    Q. Yes.
7    A. Yes.
8    Q. Those would be the ones at issue in this case.
9 Okay. The -- we previously marked a complaint as
10 Exhibit 107.
11        MR. TILLOTSON: Brian, I have a copy if you
12 want it.
13   Q. (BY MR. TILLOTSON) Exhibit 107 is the complaint
14 in this case. Did you review the complaint before it
15 was filed?
16   A. I did.
17   Q. Okay. I'll ask you to turn to Exhibit A to the
18 complaint which has been identified as the employment
19 agreement of Billy Bowden. Do you see that?
20   A. One second here.
21   Q. Keep going. It's in the back.
22   A. Okay. Thank you.
23        MR. VOLNEY: There's a number on top.
24   Q. (BY MR. TILLOTSON) That's Mr. Gresham's. One
25 more and you'll be there.

27 (Pages 102 to 105)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                    May 20, 2014

Page 106

1    A. Oh, one more back?
2    Q. No, one more forward.
3    A. Forward. Okay.
4    Q. You got it.
5    A. Is that it?
6    Q. Okay. Can you confirm this is the employment
7    agreement between Mr. Bowden and Merritt Hawkins?
8    A. Yes, it is.
9    Q. Okay. I'm going to focus on the provision at
10   issue in the case which is the non-solicitation
11   provision so. There are some page numbers up at the
12   top, but if you'll generally turn to what's identified
13   at the top as page -- page ID32. Over here you see some
14   page numbers?
15   A. Yep.
16   Q. This is the noncompetition provision article
17   seven; do you see that?
18   A. Uh-huh.
19   Q. Okay. I want you to take a look at C1 and tell
20   me whether or not you think that's a industry standard
21   noncompete provision in the business in which Merritt
22   Hawkins is in.
23   A. I do.
24   Q. Okay. If you will then turn the page. If you'll
25   look at 4 -- D1 which is the same or similar businesses

Page 107

1    MHA which is defined as the business of recruitment of
2    medical specialist selling of services to clients and
3    account management of new and current business; do you
4    see that?
5    A. I do.
6    Q. To your understanding, does the recruitment of
7    medical specialists include both, temporary and
8    permanent placement?
9    A. It does.
10   Q. Okay. I then want you to focus then on the
11   article eight which is noninterference there at the
12   bottom and carries over to the top which provides that
13   Mr. Bowden for a period of 36 months subsequent to his
14   termination, whether such termination occurs at the
15   assistance of MHA or the employee, the employee shall
16   not solicit or recruit directly or by assisting others,
17   any other employees of MHA, its parent companies,
18   subsidiary companies, affiliated companies, successors
19   or assigns, not should the employee contact or
20   communicate with any other employees of MHA. And I'm
21   going to skip all of that down. For the purposes of
22   inducing other employees to terminate their employment
23   with MHA. Do you see that?
24   A. I do.
25   Q. Are you familiar with this provision?

Page 108

1    A. I am.
2    Q. First, can you confirm for us was Mr. Bowden
3    terminated from MHA?
4    A. You know, I'm honestly not sure.
5    Q. Okay. But in your mind, does it make any
6    difference whether you fire someone or whether they quit
7    as to whether they'll be bound by this?
8    A. I do not.
9    Q. Okay. Do you have any understanding as to why
10   there is a three-year requirement in this provision
11   whereas the other ones only have a year?
12   A. Yes, I do. It's when we bring people into our
13   organization there's a certain level of trust provided
14   them in different tiers, whether it be initially
15   allowing them into -- with training information, client
16   lists, financial data, et cetera, different levels. But
17   to allow someone to come into the organization and then
18   once they depart, whether it be at their own free will
19   or at our request, to be able to damage the organization
20   by recruiting away our team members is not something
21   that's acceptable. We've invested millions in getting
22   these folks trained and into their roles and productive,
23   and we weren't going to allow them to do damage to the
24   organization until they are outside of this window.
25   Q. Why three years?

Page 109

1    A. Seems like a fair period of time to me.
2    Q. Well, you have -- you told me about 25 percent
3    turnover during that three-year period approximately
4    75 percent turnover, correct?
5    A. Not necessarily. What ends up happening is that
6    that turnover occurs at that earlier stage of people's
7    career. So once they reach a certain tenure, that falls
8    off significantly.
9    Q. Okay. But why was three years picked as an
10   appropriate period of time; do you know?
11   A. Honestly, it seemed like a fair period of time
12   for all of us at that point in time. We designed this.
13   We had this in our agreement for many, many, years.
14   Q. Right, but other than it was there --
15   A. Okay.
16   Q. -- is there a business -- legitimate business
17   reason you can think of for three years versus one year
18   for -- for requiring ex-employees not to solicit or talk
19   to your employees about quitting their job?
20   A. Again, it's -- during that window if someone
21   decides to leave the organization and go do something on
22   their own, I felt that was a fair period of time for
23   them to have a arms-length relationship and not attempt
24   to negatively impact our business. And all that is in
25   return for what we gave them in the process in terms of

28 (Pages 106 to 109)

APP. 0029

Electronically signed by Lei Sherra Torrence (501-288-335-5388)         32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                              May 20, 2014

Page 110

1    training, experience and access.
2        Q.  Okay.  But -- but this would restrict or restrict
3    Mr. Bowden from offering his opinion of Mr. Gresham
4    asked Mr. Bowden.  I don't like it here.  I'd like to
5    quit.  What do you think I should do.  Under this
6    particular provision Mr. Bowden could not say you should
7    quit that job, correct?
8        A.  Correct.
9        Q.  And, he, Mr. Bowden, couldn't even tell
10   Mr. Gresham you should quit that job and go on a safari
11   somewhere, correct?
12       A.  Correct.
13       Q.  For any reason, correct?
14       A.  Correct.
15       Q.  And this restriction would apply to, let's say,
16   an employee left and you told Mr. Bowden you're fired.
17   We want you to leave here in 30 days.  Mr. Bowden calls
18   up a former employer of MHA and says, hey, they're
19   firing me.  What should I do.  The former employee would
20   be restricted under this provision and couldn't even
21   tell him you should leave even though you're trying to
22   fire Mr. Bowden, correct?
23       A.  Correct.
24       Q.  And does it matter whether the employee -- let me
25   give you another example.  If the employee called

Page 111

1    Mr. Bowden and said, I'm being sexually harassed here,
2    it's miserable over here at MHA, what should I do, it
3    would have been a violation of this non-solicitation for
4    Mr. Bowden to say you should get out of there if that's
5    how you feel, correct?
6        A.  Correct.
7        Q.  Is there any legitimate business reason in
8    restricting your employees from hearing from others
9    about whether or not they should take a different
10   direction in their life?
11       A.  I don't see a positive reason for them to be able
12   to do that.  It's -- this has to do with their
13   professional relationship, their vehicles throughout the
14   organization, if someone feels, as you mentioned,
15   harassed or something there, there's programs throughout
16   our entire company to be able to handle malicious
17   situations like that.  And that can be done anonymously
18   in any way where they feel protected and so situations
19   like that, calling an ex-employee or a friend is of no
20   value.  If they want to get career advice, if they want
21   to be able to say should I stay or should I go, then
22   they're going to need to get that from another party not
23   from a former ex-employee or disgruntled employee at
24   Merritt Hawkins.
25       Q.  What is -- what is Merritt Hawkins so concerned

Page 112

1    about its ex-employees communicating to its current
2    employees?  What's the business interest you're --
3        A.  The business interest, those are valuable assets.
4    These are folks that we've spent considerable money
5    training to get in a situation where we've allowed them
6    to develop relationships with our clients, which we
7    spent an incredible amount of money securing these folks
8    and not to be able to be influenced by an outside party
9    that has their own agenda.
10       Q.  Okay.  Do you -- do you know how many employees
11   if any, Merritt Hawkins has lost because they were
12   improperly solicited by ex-employees at Merritt Hawkins?
13       A.  I don't have the number for that.
14       Q.  Okay.  Now, I want to turn, if you will, to --
15   well, before let's just talk about Mr. -- Mr. Bowden.
16   Other than -- do you have any personal knowledge of any
17   communications Mr. Bowden had with Mr. Gresham?
18       A.  I've seen copies of text messages.
19       Q.  Okay.  Other than that, do you have any personal
20   knowledge?
21       A.  No.  I have no way of knowing that.
22       Q.  Okay.  Do you have any factual basis to believe
23   that Mr. Bowden was the reason Mr. Gresham quit other
24   than the text messages that you read?
25       A.  Other than the text messages where he was

Page 113

1    facilitating interviews, no.
2        Q.  Okay.  Did you have an opportunity to speak to
3    Mr. Gresham before he quit?
4        A.  I did not.
5        Q.  When's the last time you talked to Mr. Gresham
6    when he was employed there?
7        A.  I do not know that.
8        Q.  Did you ever talk to him?
9        A.  Yeah, hallway conversations.
10       Q.  Okay.  Do you know if Mr. Gresham was in fact
11   getting poor reviews from his boss?
12       A.  I don't recall that.
13       Q.  Are you aware of any information that Merritt
14   Hawkins had that Mr. Gresham was in fact not setting up
15   interviews and not doing his job despite claiming he was
16   prior to his termination?
17       A.  I don't not have that specific knowledge, no.
18       Q.  Okay.  When you guys fire people or terminate
19   them, do you ask them to leave like that day?
20       A.  If they're terminated, yes, quickly.
21       Q.  Okay.  So they're -- they leave right away.  They
22   don't --
23       A.  If they're terminated.  If they resign, it's
24   typically a different story.
25       Q.  Okay.  Okay.  Do you pay severance if they're

29 (Pages 110 to 113)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)          32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                          May 20, 2014

Page 114

1    terminated?
2       A.  Just according to company policy.
3       Q.  Okay.  Now, I want to turn to --
4          MR. TILLOTSON:  By the way, just before we
5    go here, I'm not trying to starve you, but --
6          THE WITNESS:  It's going to be hard to do.
7          MR. TILLOTSON:  I'll try to starve Brian.
8    I'd like to go till 1:00 because I may be able to finish
9    and then we can stop.  Is that all right with you?
10         THE WITNESS:  Okay.
11         MR. COLAO:  Oh, you think -- yeah, that's
12   fine.
13         MR. TILLOTSON:  I'm not trying to kill you.
14         THE WITNESS:  That's all right.
15      Q.  (BY MR. TILLOTSON)  Okay.  I want to, in turn,
16   turn to Mr. Gresham's employment agreement.
17      A.  Okay.  Do you have an ID number on that just
18   to...
19      Q.  Thirty-seven.
20      A.  Thirty-seven.  Save time there.
21      Q.  Okay.
22      A.  Okay.
23      Q.  And if you will, first will you confirm that this
24   is Mr. Gresham's employment agreement?
25      A.  This is.

Page 115

1       Q.  Okay.  His noncompete provision begins on page
2    five.
3       A.  Okay.
4       Q.  And I'm going to ask you first to look at the
5    cover document which is -- which is A.  If you'll read
6    that to yourself.  I'm going to ask you a couple of
7    questions about it.
8          (Witness complies.)
9       Q.  (BY MR. TILLOTSON)  Okay.  First, it -- it
10   restricts him for a period of 12 months within the
11   restricted territory.
12         MR. COLAO:  Jeff, I think that's on page
13   four, right?
14         MR. TILLOTSON:  Yeah.
15         MR. COLAO:  Oh, I'm sorry.  I thought you
16   said five.
17         MR. TILLOTSON:  No, I'm sorry.
18         MR. COLAO:  I just want to make sure
19   everybody's looking on at the right --
20      A.  Yeah, I've got the right number here.
21      Q.  (BY MR. TILLOTSON)  The noncompete is paragraph
22   five and it's on page four.
23         MR. COLAO:  Okay.
24      A.  Here we go.
25      Q.  (BY MR. TILLOTSON)  Okay.  So the covenant

Page 116

1    noncompete which is paragraph 5A restricts Mr. Gresham
2    for a period of 12 months after the termination of the
3    employee's employment from doing some things which we'll
4    talk about in a second within the restricted territory.
5    The restricted territory is defined as Dallas, Texas and
6    all counties adjacent to Dallas County which is:
7    Collin, Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall
8    and Tarrant.  What's the business interest in
9    restricting an employee from working in those counties?
10      A.  The business interest is that, again, as I've
11   mentioned, we make a significant investment in taking
12   folks that have had no experience in our industry, bring
13   them to the point that they're not only trained
14   proficient and that's a big investment.  If those folks
15   choose to leave and go on a safari for the next year,
16   then that's their prerogative.  That's a business
17   expense to me.  But if they choose or enticed to then
18   take all that investment I've made in them and walk to a
19   competitor, that's an issue for me.  That's not a
20   business expense.  That is a significant business
21   investment I've made in these folks and I'm at a fair
22   position to be able to protect that.  The vast majority
23   of my competitors are all in the greater Dallas market.
24   There are certainly a few that fall outside of that, but
25   in terms of numbers, the vast majority is in this

Page 117

1    market.  And so specifically in this situation is that
2    if someone chooses to go through our training, to make
3    that investment of time and effort and allow us to
4    invest in them and they wish to stay in the business,
5    what this asks them for is to say that that's fine if
6    you want to move to Tulsa or Atlanta or Houston or
7    anywhere outside of this.  If you want to drive -- it's
8    going to be roughly 50-plus miles and work out of that
9    office for that period of a first year then you can do
10   so.  That -- that is the limitation if you choose to
11   take all of the training and resources we've given you
12   and use them against me with a competitor.
13      Q.  And so is the purpose of this provision not so
14   much to keep them from soliciting clients in Dallas
15   County, but to keep them from working for your
16   competitors, almost all of them who reside in the Dallas
17   County area?
18      A.  Within that first year, yes.
19      Q.  Okay.  Because Mr. Gresham could've moved to
20   Kansas City and recruited people in Dallas, correct?
21      A.  Else he could've done so, if in fact, he was not
22   infringing on his clients he worked with in the past
23   12 months.
24      Q.  Okay.  Fair point.
25      A.  Okay.

                                    30  (Pages 114 to 117)

Mark Smith                                                May 20, 2014

Page 118

1    Q. And I appreciate that. But -- but it's not so
2  much you care that he might be calling Methodist
3  Hospital in Dallas County, you just want him to have to
4  move before he does that?
5    A. Well, what I want to happen is for there to be a
6  fair enough encumbrance from me making an investment
7  with people and then a competitor coming along and
8  saying I didn't make a penny investment, but I'm going
9  to entice this person to leave and to just take away
10  that investment from the company. That's -- that's not
11  something acceptable for me.
12    Q. Okay. So it -- it is -- the purpose of the
13  provision is to -- is to prevent your competitors from
14  poaching your employees?
15    A. Yes, from them benefitting from all the training
16  that we've done.
17    Q. Okay. All right. Now, the thing that they're
18  restricted from doing in the restricted territory is
19  performing services of the same, similar or greater
20  nature to those performed by the employee for the
21  company for any person, entity or venture which competes
22  with the business of the company which includes
23  recruitment and providing temporary and permanent health
24  care professional replacements. Do you see that?
25    A. I do.

Page 119

1    Q. Okay. So at least with respect to what a person
2  can't do, you're including temporary placements even
3  though you acknowledge that's not really the business of
4  Merritt Hawkins, correct?
5    A. Correct. It's -- it's the concept of recruiting
6  physicians so really drawing the line at recruitment,
7  but nevertheless what you're recruiting them for.
8    Q. Okay.
9       THE WITNESS: Do you mind if I get some
10  water?
11       MR. COLAO: Go ahead. You can take it off.
12       THE WITNESS: Okay. I didn't want to tear
13  off this thing. I'm timing you on when you think this
14  will be done by the number of bottles of water I have.
15  Thank you.
16    Q. (BY MR. TILLOTSON) But for whatever investments
17  you've made in training, so long as the employee moves
18  outside of these counties, you're prepared to let them
19  compete?
20    A. I'm prepared that to be a business expense that I
21  can live with.
22    Q. Okay. And that's driven by the fact that your
23  competitors are largely within these counties, correct?
24    A. I would say for our Texas competitors, it's
25  probably in the 80 percentile. For our national

Page 120

1  competitors, it's probably somewhere between 50 to 60.
2    Q. Okay. So effectively by having someone agree to
3  this noncompete, in your mind, you're locking them out
4  of 70 percent to maybe 80 percent of the potential
5  competitors in Texas and maybe as much as two-thirds of
6  the national market; is that correct?
7    A. For recruitment, yes.
8    Q. Okay.
9    A. If they chose to leave the business and do
10  something other than what they were doing, you could
11  work in that similar business, they could do that, but
12  yeah, to -- to leave and become a recruiter that we
13  trained them to be our business development, then yes.
14    Q. Do you think this provision gives you an
15  advantage with respect to your competitors?
16    A. No. I think it allows me to really invest in the
17  individual and to do so without limitation knowing that
18  I'm protected at least for that year, period.
19    Q. But you told me most of the people who leave your
20  business don't go to work for competitors, correct?
21    A. Because I have this provision.
22    Q. Okay. So it's effective. Is that what you're
23  telling me?
24    A. Yes, it is.
25    Q. Okay. What percentage of your new hires worked

Page 121

1  at another placement -- doctor placement company; do you
2  know?
3    A. I don't, but I would -- I feel comfortable saying
4  in a very low single-digit percentage. It's extremely
5  rare.
6    Q. Okay. I want to talk about clients. Are the
7  clients that you -- that Mr. Gresham worked with, are
8  those proprietary, the identity of those clients?
9    A. Yes. I mean, that's not information that we --
10  we don't release our client list publicly.
11    Q. How does Merritt Hawkins identify prospective
12  clients?
13    A. What we do is begin with a database of every
14  hospital and clinic in the country, employ a large team
15  to be able to work either geographical or vertical
16  territories to establish a relationship with these folks
17  telephonically to be able to travel in their territory.
18  One to two weeks a month to be able to conduct
19  face-to-face meetings with them, the idea of -- to be
20  able to discover needs and be able to sell our services,
21  build trust, et cetera, and build these searches. And
22  so, it's a very small world that not only allows an
23  outside firm to do their recruitment, but to do so on a
24  retained basis, which is what we do. So we require a
25  pretty significant investment up front and so you -- you

31 (Pages 118 to 121)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Mark Smith                                                        May 20, 2014

                                                                    Page 122

1    -- the work and effort of limiting that list is very
2    significant.  Each -- each of these clients you work
3    with stay in touch because that need could change.  The
4    intensity of the need could change and so they may say,
5    last year I only -- I do it all myself or I use only
6    contingent firms or I am willing to look at retained
7    firms maybe just Merritt Hawkins, maybe just someone
8    else, maybe 10 firms to get competitive.  And so by the
9    time you get down to that narrowed list, you're very
10   protective it because you spent so much time and
11   money getting down to -- to that group.  Clients are the
12   same way.  If you would ask question before if they
13   choose another organization, very uncommon they'll tell
14   me who they've chosen or why they've chosen them.
15   That's -- that's something we really want to know, but
16   everyone is just very protective of that data.
17       Q.  Is it a competitive business?
18       A.  Very.
19       Q.  How many competitors do you think you have?
20       A.  Hundreds.  Meaning that's either probably a group
21   of 8 or 10 of any size, but it's a very fragmented
22   business.
23       Q.  I understand.  Did -- what percentage of Merritt
24   Hawkins is retained searches?
25       A.  A hundred percent.

                                                                    Page 123

1        Q.  Okay.  So you don't do any contingent fee
2    services?
3        A.  Not secure.  We can do, to be specific, a
4    contingent search if we were secure to find two and we
5    have an extra candidate.  That would be a contingent
6    search or a spouse comes along, but nothing potentially.
7        Q.  Is the fee hourly or is it based upon the search
8    being completed?
9        A.  It's a hybrid.  Roughly -- I think it's fair to
10   say that roughly 50 percent of our fee comes at either a
11   monthly or hourly engagement and the rest is success
12   driven.
13       Q.  Okay.  And is every client of Merritt Hawkins
14   publicly known, not that they're your client, but I take
15   it that there aren't any secret or not publicly
16   available identities for hospitals or providers?
17       A.  No.  It's the -- the value there -- Baylor's in
18   the phonebook if someone wanted to call Baylor.
19       Q.  Right.
20       A.  The issue you would encounter is that's not the
21   person who makes the decision and that's not the person
22   who's going to talk to you.
23       Q.  Is the identity of those people that make the
24   decision at the various providers publicly known?
25       A.  Not always.  The issue there is executives aren't

                                                                    Page 124

1    always willing to publish that kind of access
2    information for all of the obvious reasons of everyone
3    approaching them.  The other issue is that it is
4    commonly a different person, a different title, a
5    different tier within each, either facility or
6    organization that makes that decision.  And once you
7    have that data, the ability to be effective, efficient
8    and successful is -- is much higher.  That data -- that
9    data is extremely valuable.
10       Q.  Okay.  Do you have any reason to believe that
11   Mr. Gresham took any client list from --
12       A.  Absolutely.
13       Q.  Okay.
14       A.  That list that you showed me, there was a big
15   portion, that downloaded client list from his region.
16       Q.  Okay.  Identifications of clients or documents
17   where clients' names were on them?
18       A.  It would've had -- it should've consisted with a
19   combination there with -- using the identity provided in
20   that file with the client -- those client files would
21   commonly have location, contact information for your
22   specific client and then details about a given search.
23       Q.  Okay.  What's the value, if you know, in dollars
24   and cents of the information you claim Mr. Gresham
25   copied?

                                                                    Page 125

1        A.  Looking at that list between having detailed
2    client list of the region, quite a large number of
3    candidate files, specifically CVs, cover letters, et
4    cetera, while difficult to put a fee on, or put a number
5    on, a value on, to me it would be in the hundreds of
6    thousands.  Simply if you took the candidates, we could
7    go back and count those candidates.  But if it had gone
8    far enough in the process that a candidate has given you
9    his curriculum vitae, he had discussed it in a great
10   enough detail to provide a cover letter and you would
11   forward that to a client, it's somebody looking for a
12   job.
13       Q.  Do you know if any of those were old files like
14   of people that replaced versus people for which there
15   were actually searches ongoing for?
16       A.  In terms of those specific candidates, I can only
17   assume they were active.  There's no motivation to have
18   a storage of people you've placed from years back.  We
19   could find that out pretty quickly.
20       Q.  Did -- didn't employees keep copies of documents
21   on their hard drive on their computers?
22       A.  Some of them did.
23       Q.  Okay.  So it's at least possible that some of
24   those reflected old candidates that had been previously
25   placed or considered but not active; is that correct?

                                                    32 (Pages 122 to 125)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    32c2118f-4968-4edc-99d3-cd0a8a14a4e2

Mark Smith                                                      May 20, 2014

---

Page 126

1    A. Possible. The question that I ask is why.
2    Q. We'll get to that. I think Mr. Gresham may be
3    the best person to answer that. So let's just stick
4    with what you and I can do here.
5    A. Okay.
6    Q. How do you calculate a value then for that
7    information based upon what you know?
8    A. The overall fee for placing a physician is you
9    know, in the low -- the low 20s to low $30,000 range.
10   And so to be able to take these clients, at least my
11   assumption, the only reason to take them is not for
12   historical references or Christmas card list but to get
13   a value from them and to be able to take those clients
14   -- those candidates and attempt to do something with
15   them in terms of placing them. You know, you only have
16   to place, you know, five to 10 to get in that 150 to
17   $300,000 range. The client list is another issue.
18   Those client lists are -- are quite -- a much more
19   valuable list to really rifle into an organization, I
20   say, you're the person to call. I know what your needs
21   are, both potentially and future needs, and all I have
22   to do is call you and convince you to turn from Merritt
23   Hawkins to my firm. That's very valuable.
24   Q. If -- if -- if it was demonstrated that Consilium
25   had done no permanent placements during the time period

---

Page 127

1    in which Mr. Gresham -- Mr. Gresham was employed by
2    Consilium, would the value then of those doctors, CVs,
3    et cetera, change in your mind?
4    A. It's likely. I think as you look at this, it's a
5    value of what people have done versus what they're going
6    to do.
7    Q. Okay. So for at least for the doctor
8    information, the value of that information is the
9    ability to use it, correct?
10   A. That's correct.
11   Q. There's no intrinsic value of having a doctor's
12   resume, right? It's just can you make a placement?
13   A. Correct.
14   Q. And so if no placements were made from that
15   information, at least nominally that information would
16   have a zero value as we sit here today, correct?
17   A. That's correct.
18   Q. Okay. The client lists, you say, are valuable,
19   but because people can then contact the individual at
20   that particular hospital or whatever, correct?
21   A. Uh-huh.
22   Q. So if no contacts were made to any of those
23   hospitals by Mr. Gresham, wouldn't you agree that the
24   value of those client lists as we sit here today is
25   zero?

---

Page 128

1    A. If they haven't reached them or attempted to do
2    business with them.
3    Q. Okay.
4    A. That's different.
5    Q. Thank you. Were -- were you the one who -- do
6    you know how much money was spent to try and recreate,
7    salvage the information that Mr. Gresham deleted on his
8    computer?
9    A. Yes. I'm aware of that cost.
10   Q. I mean, did you pay that bill or authorize the
11   payment on that bill?
12   A. I would have been involved in the authorization,
13   yes.
14   Q. Okay. Do you know how much it was?
15   A. It was approximately $30,000.
16   Q. Was this to the outside firm?
17   A. It was.
18   Q. Any other cost other than to the outside firm?
19   A. I know we had additional -- well, the total cost
20   reflect -- it was 30,000 and change. There -- I do
21   believe there was some internal cost associated with
22   that albeit a small part of that -- that number.
23   Q. Is there -- is there a policy at Merritt Hawkins
24   that prevents people from deleting anything on their
25   computer?

---

Page 129

1    A. In terms of deleting things, no. In terms of
2    protecting work product, yes.
3    Q. Sure. I'm going to put copy aside, but I just
4    want to focus on deleting.
5    A. Okay.
6    Q. Is there to your knowledge, are employees trained
7    or told don't delete anything from your computer?
8    A. What people are told -- or what they put in their
9    employment agreement -- in fact, I believe, was
10   Mr. Gresham it was the third article of the document
11   that says anything that you create and without -- I'm
12   not a lawyer and without getting into all of the
13   legalese --
14   Q. Sure.
15   A. -- is the product of the company and there's
16   implication if it's mine I could assume you wouldn't
17   walk by the desk and take a sledgehammer to it or you
18   know, throw your -- throw your hard drive down. You
19   wouldn't damage things that are mine.
20   Q. So you don't delete e-mails, for example?
21   A. Oh, I certainly do.
22   Q. Okay. So materials -- if Mr. Gresham created
23   e-mails or prepared e-mails and sent them, but then
24   deleted them because he didn't feel he needed them,
25   would he have violated his employment agreement in your

---

33 (Pages 126 to 129)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 130

1  mind?
2      A.  Well, only if the situation was that he -- if I
3  were to decide to leave Merritt Hawkins and I thought
4  the best way to do that is come in on a Sunday afternoon
5  in a clandestine fashion and then delete all this data
6  from my computer, something I hadn't done before and
7  then resign the next day, that's an issue.
8      Q.  Okay.  You know Mr. Gresham no longer works for
9  Consilium, correct?
10     A.  I've heard that, yes.
11     Q.  Okay.  Why is Merritt Hawkins still suing
12 Mr. Gresham if he no longer works for Consilium?
13     A.  Because there is damage to what he has done.  And
14 to do what Mr. Gresham did in this case, which was to
15 destroy work product at a very significant level, there
16 are a thousand documents there in question between
17 what's deleted and what's copied and I'm relying on the
18 experts to do that.  That's not an area of my expertise
19 or to pretend that it is and to do so in this
20 clandestine, sneaky fashion coming in on a Sunday
21 afternoon deleting all of this information, copying a
22 large quantity of other information, that damage is
23 still done.  And to me, you know, that -- it's a
24 combination that -- that's an unjust event and there
25 needs to be -- there's a punishment associated with

Page 131

1  that, whether that is to be accomplished on a civil
2  basis or if it's accomplished on a criminal basis.
3  That's just not something that you can do.  I -- I can't
4  stand for that to occur.
5      Q.  Okay.  Last couple of questions and I'll release
6  you.  Are there -- can you identify, if you can, any
7  clients of Merritt Hawkins that you believe were
8  wrongfully solicited by Mr. Gresham after he departed
9  Merritt Hawkins and while he work for Consilium?
10     A.  I'm not aware of that information, no.
11     Q.  Okay.  Because you had mentioned earlier that the
12 agreement restricts you from wherever you live from
13 contacting the same customers you used to call --
14     A.  Correct.
15     Q.  -- before he left, but as we sit here today there
16 is no evidence to suggest Mr. Gresham violated that
17 particular provision, correct?
18     A.  I'm not aware of any specific folks, no.
19     Q.  Okay.  And you don't have any -- do you have as
20 we sit here today, any evidence to suggest that
21 Consilium used any of the information you claimed
22 Mr. Gresham copied?
23     A.  I do not have that knowledge, no.
24         MR. TILLOTSON:  Okay.  All right.  There are
25 some materials that you've identified today in your

Page 132

1  deposition which I'm going to fully request from your
2  counsel.  So I'm going to conclude your deposition now,
3  but I'm going to for the record say I reserve time in
4  case those materials require me to ask you additional
5  questions, but I appreciate you here today and that's
6  all I have for now.  I pass the witness.
7         MR. COLAO:  Okay.  No -- no questions at
8  this time.  We'll reserve our questions for the time of
9  trial.
10        THE VIDEOGRAPHER:  All right.  Going off the
11 record at 12:44 p.m.
12        (Deposition concluded at 12:44 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 133

1         THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION
3  MERRITT HAWKINS &        )
   ASSOCIATES, LLC,         )
4       Plaintiff,      )
                            )
5  VS.                 ) CIVIL ACTION NO.
                       ) 13-CV-00312-P
6  LARRY SCOTT GRESHAM AND   )
   BILLY BOWDEN,           )
7       Defendants.    )
8
9         REPORTER'S CERTIFICATION
10        DEPOSITION OF MARK SMITH
11         MAY 20, 2014
12
13     I, LEI SHERRA TORRENCE, Certified Shorthand
14 Reporter in and for the State of Texas, hereby certify
15 to the following:
16     That the witness, MARK SMITH, was duly sworn
17 by the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by
19 the witness;
20     I further certify that pursuant to FRCP Rule
21 30 (f) (1) that the signature of the deponent:
22     _____ was requested by the deponent or a
23 party before the completion of the deposition and is to
24 be returned within 30 days from date of receipt of the
25 transcript.  If returned, the attached Changes and

34  (Pages 130 to 133)

Mark Smith                                                    May 20, 2014

Page 134

1   Signature Page contains any changes and the reasons
2   therefor;
3          __X__ was not requested by the deponent or a
4   party before the completion of the deposition.
5          I further certify that I am neither counsel
6   for, related to, nor employed by any of the parties or
7   attorneys to the action in which this proceeding was
8   taken.  Further, I am not a relative or employee of any
9   attorney or record in this cause, nor am I financially
10  or otherwise interested in the outcome of the action.
11
12         Subscribed and sworn to on this the 27th day
13  of May, 2014.
14
15
16  _____
    Lei Sherra Torrence, CSR
17  Texas CSR No. 7836
    Expiration Date:  12/31/2014
18  Firm Registration No.  631
    Kim Tindall & Associates, LLC
19  645 Lockhill Selma, Suite 200
    San Antonio, Texas  78216
20  (210) 697-3400
    (210) 697-3408 (Fax)
21
22
23
24
25

APP. 0036
32c2118f-4968-4edc-99d3-cd0a8a14a4e2
Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Transcript of the Testimony of
# Tim Beidle

**Date:**
May 16, 2014

**Case:**
Merritt Hawkins & Associates v. Larry Scott Gredham, et al

Kim Tindall and Associates, LLC
Phone: 210-697-3400
Fax: 210-697-3408
Email: ktindall@ktanda.com
Internet: www.kimtindallandassociates.com

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MERRITT HAWKINS &          )
ASSOCIATES, LLC,           )
              Plaintiff,   )
                           )
VS.                        ) CIVIL ACTION NO.
                           ) 13-CV-00312-P
LARRY SCOTT GRESHAM AND     )
BILLY BOWDEN,              )
              Defendants.   )

---------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

TIM BEIDLE

MAY 16, 2014

VOLUME I

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF TIM BEIDLE,

produced as a witness at the instance of the DEFENDANTS,

and duly sworn, was taken in the above-styled and

numbered cause on May 16, 2014, from 9:58 a.m. to 1:35

p.m., before Lei Sherra Torrence, CSR in and for the

State of Texas, reported by machine shorthand, at the

offices of Merritt Hawkins & Associates, 5001 Statesman

Drive, Irving, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

APP. 0038
b1b89364-d730-4811-a71c-bebb8f493c5b

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

---

**Page 2**

```
 1          A P P E A R A N C E S
 2
 3   COUNSEL FOR THE PLAINTIFF:
 4     Ms. Christine Nowak
       DYKEMA GOSSET PLLC
 5     Comerica Bank Tower
       1717 Main Street
 6     Suite 4000
       Dallas, Texas  75201
 7     (214) 462-6400
       (214) 462-6401 (fax)
 8     Cnowak@dykema.com
 9   COUNSEL FOR THE DEFENDANTS:
10     Mr. John Volney
       LYNN TILLOTSON PINKER & COX, LLP
11     2100 Ross Avenue
       Suite 2700
12     Dallas, Texas  75201
       (214) 981-3800
13     (214) 981-3839 (fax)
       Jvolney@lynnllp.com
14
     THE VIDEOGRAPHER:
15
       Ms. Keri Livingston
16
17   ALSO PRESENT:
18     Ms. Whitney Laughlin
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1            INDEX
 2                      PAGE
 3   Appearances...................................... 2
 4   TIM BEIDLE
       Examination by Mr. Volney.................... 4
 5     Examination by Ms. Nowak....................117
 6   Reporter's Certificate..........................126
 7
 8          EXHIBITS
 9   NUMBER      DESCRIPTION          PAGE
10   107   Plaintiff's Original Complaint    50
     108   E-mail from Scott Gresham       68
11   109   E-mail Re:  Community Worksheet    73
     110   E-mail Re:  Meetings Next Week    83
12   111   E-mail Re:  Hoopeston          84
     112   E-mail Re:  Smith4981@gmail.com    85
13   113   Employment Agreement         105
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1        THE VIDEOGRAPHER:  Good morning.  We are now
 2   on the record.  Today's date is May 16th, 2014, and the
 3   time is 9:58 a.m.  We are located at the offices of
 4   Merritt Hawkins at 5001 Statesman Drive in Irving, Texas
 5   for the video deposition of Tim Beidle in the matter of
 6   Merritt Hawkins and Associates versus Larry Scott
 7   Gresham, et al.  The cause number is 13-CV-00312-P.  My
 8   name is Keri Livingston.  I am the legal videographer.
 9   This is our court reporter Lei Sherra Torrence.  We're
10   both with Kim Tindall & Associates.  If counsel will
11   please introduce yourselves and state any agreements for
12   the record, our court reporter will then swear in the
13   witness.
14        MR. VOLNEY:  John Volney for the defendants.
15        MS. NOWAK:  Christine Nowak of Dykema Gosset
16   for the plaintiff Merritt Hawkins and Associates.
17           TIM BEIDLE,
18   having been first duly sworn, testified as follows:
19           EXAMINATION
20   BY MR. VOLNEY:
21      Q. Mr. Beidle, my name is John Volney.  I'm here
22   from the law firm of Lynn Tillotson Pinker & Cox to take
23   your deposition in connection with the lawsuit that your
24   employer Merritt Hawkins has filed against Larry Scott
25   Gresham and Billy Bowden.  Do you understand that?
```

---

**Page 5**

```
 1      A. I do.
 2      Q. Have you given a deposition before?
 3      A. I have.
 4      Q. How many times?
 5      A. Once.
 6      Q. Was it in connection with your employment at
 7   Merritt Hawkins?
 8      A. It was.
 9      Q. Can you tell me the name of the case, if you
10   know?
11      A. I don't know.  It was probably about eight years
12   ago.
13      Q. Eight years ago.  Do you remember the names of
14   any of the parties?
15      A. I do not.
16      Q. Was it an employment-related dispute?
17      A. It was about an ex-employee.
18      Q. It was an ex-employee.  Was Merritt Hawkins suing
19   the ex-employee?
20      A. No.  I honestly don't know the details.  It was
21   just hearsay that I had heard and they had asked for me
22   to come in and explain some information pertaining to
23   it.
24      Q. Okay.  How long have you been with Merritt
25   Hawkins?
```

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 6

1    A. Fourteen years.
2    Q. Where were you employed before Merritt Hawkins?
3    A. I was.
4    Q. Before your 14 years. Before you started at
5    Merritt Hawkins where did you work, I guess I should
6    say?
7    A. I was a schoolteacher.
8    Q. Schoolteacher. How long --
9    A. In California.
10   Q. In California. What did you teach?
11   A. I taught sixth grade for a year. That was
12   enough.
13   Q. That was enough. And then did you go to work for
14   Merritt Hawkins --
15   A. I did.
16   Q. -- in its San Diego office?
17   A. No, sir. Here. I relocated.
18   Q. And what did you start out doing for Merritt
19   Hawkins?
20   A. I worked on the Allied Consulting side
21   recruiting.
22   Q. What is Allied Consulting?
23   A. We recruit mid levels. Anything aside from a
24   physician, your pharmacist, physical therapist, rad
25   techs.

Page 7

1    Q. Okay. On a permanent or a --
2    A. Permanent.
3    Q. Permanent basis. And then after you worked for
4    Allied where did you go?
5    A. I went to Merritt Hawkins.
6    Q. Okay. Merritt Hawkins, what year was that?
7    A. That was in 2000 -- I'm trying to remember. It
8    was 2006. 2006.
9    Q. So you've been with Merritt Hawkins since 2006?
10   A. That's correct.
11   Q. Now for your entire 14 years of working for
12   Allied and Merritt Hawkins have you worked in this
13   building in effect?
14   A. No, sir. I had another location when I first
15   started.
16   Q. Okay. But your entire career for the AMN
17   affiliated companies has been here in Irving?
18   A. Yes, sir.
19   Q. All right. Okay. So when you started with
20   Merritt Hawkins in 2006, what did you start doing?
21   A. I was a senior director and I was doing physician
22   recruitment. I was still doing some recruiting. Most
23   of my responsibilities was training and leadership.
24   Q. Okay. When you say physician recruitment, what
25   is that?

Page 8

1    A. That's placing physicians at hospitals that we
2    were retained by on a permanent level.
3    Q. All right. And what is your -- did you have
4    another title after that?
5    A. Yes.
6    Q. What was it?
7    A. Vice president.
8    Q. You said you were a director?
9    A. Senior director and then I was promoted to vice
10   president.
11   Q. Okay. And what's your current title?
12   A. Vice president.
13   Q. Vice president. Okay. And what is your
14   responsibility as a vice president?
15   A. It is to lead a team. I oversee the Heartland
16   region and it's basically monitoring activity, making
17   sure client relations are -- are up to par, deal with
18   budgets, revenue, make sure that the revenue streams are
19   -- and metrics are being net.
20   Q. Okay. When you say Heartland, what does that
21   mean?
22   A. It's Heartland.
23   Q. Heartland. Sorry. Is that -- I take it that's a
24   geographical region?
25   A. It is.

Page 9

1    Q. What is the Heartland region?
2    A. It encompasses the seven states: Colorado,
3    Oklahoma, Nebraska, Illinois and Missouri and Arkansas.
4    Q. Correct me if I'm wrong, but I'm assuming that
5    means that you are -- that Merritt Hawkins is attempting
6    to place physicians on a permanent basis in the
7    Heartland region?
8    A. Correct.
9    Q. Okay. And that's what your team does?
10   A. Yes, sir.
11   Q. But the -- are the -- who hires Merritt Hawkins?
12   Is it the facility, the hospital or is it the doctor who
13   is looking for permanent placement?
14   A. The facility.
15   Q. The facility. Okay. How does Merritt Hawkins
16   identify the -- its facility clients?
17   A. Through the marketing consultants who are out
18   canvassing their territories.
19   Q. Okay. So are the marketing consultants a
20   separate group at Merritt Hawkins?
21   A. Separate in the fact that you have marketers who
22   go out into their territories and they're the ones that
23   are making relationships with clients and then once the
24   business is brought in, recruiting basically takes over
25   and finds physicians for the opportunities.

3 (Pages 6 to 9)

APP. 0040

Electronically signed by Lei Sherra Torrence (501-288-335-5388)          b1b89364-d730-4811-a71c-bebb8f493c5b

Page 10

1    Q.  All right.  And are you responsible for
2  overseeing the marketing consultants?
3    A.  No, sir.
4    Q.  Who does that?
5    A.  Rich Gherke.
6    Q.  Is that also located here in Irving?
7    A.  Yes.
8    Q.  Gherke, G -- sorry.
9    A.  G-H-E-R-K-E.
10   Q.  Now, are you familiar with how the marketing
11  consultants identify the potential facility clients?
12   A.  Yes, very.
13   Q.  So tell me.  Explain to me how they do that.
14   A.  They go out, each marketer -- we have a total of
15  three marketers.  Each marketer has a specific
16  territory within the Heartland region.  So it's usually
17  a two-state territory and they travel two weeks out of
18  the month.  Two weeks here in the office creating
19  meetings and then the other two weeks out on the road
20  conducting those meetings.
21   Q.  Is there a -- is there a -- is there a database
22  of information of potential facility clients that is
23  maintained by Merritt Hawkins?
24   A.  There is.
25   Q.  What's it called?

Page 11

1    A.  We have a hospital bluebook and that's a national
2  publication.  It has basically all of the hospitals
3  throughout the United States.
4    Q.  Okay.  Is there any other?
5    A.  Mhacs -- we use an in-house program called Mhacs
6  that has past clients, clients we've worked with, new
7  clients, et cetera.
8    Q.  Okay.  So there's a -- I take it the hospital
9  bluebook is available to anyone that wants to go out and
10  purchase it?
11   A.  That's correct.
12   Q.  And then the information that's in Mhacs, does it
13  include the information that's in the hospital bluebook?
14   A.  To a certain level but most of the stuff that's
15  in Mhacs is going to be much more extensive than what
16  you'd find in the bluebook.  Bluebook is only going to
17  include essentially the name of the hospital, either the
18  contact person being the CEO and an address and phone
19  number.
20   Q.  Okay.  Is the information in Mhacs -- does it --
21  well, let me back up.  You mentioned that some part of
22  the information that's contained in Mhacs is related to
23  past clients?
24   A.  Some of it is, yes.
25   Q.  Some of it is.  Is that just the information that

Page 12

1  was gleaned from the prior business relationship between
2  Merritt Hawkins and the client?
3    A.  Could be or just past communications that we had
4  with that client that may not have utilized our services
5  at that point and time, but we have notes in there as
6  far as what they're doing as far as recruitment at that
7  period of time.
8    Q.  So if a contact is made between your marketing
9  consultant and the particular facility the expectation
10  is that they would then put some of that information
11  into the Mhacs database?
12   A.  Correct.
13   Q.  Okay.  Does the Mhacs database include
14  information about potential clients?
15   A.  It does.
16   Q.  What information does it include about potential
17  clients?
18   A.  Generally just meetings that were conducted, what
19  -- what occurred during that meeting or even phone calls
20  as far as going over our -- our information and kind of
21  where they're at as far as making decisions as far as
22  utilizing Merritt Hawkins and what they're doing
23  currently as far as recruitment.
24   Q.  Okay.  So the marketing consultants do some
25  amount of prospect for new clients?

Page 13

1    A.  Oh, absolutely.
2    Q.  And do the market consultants use -- the
3  marketing consultants do they use the Internet to do
4  research about the particular facilities?
5    A.  Some, yes.
6    Q.  Can you find information about the people in
7  charge at the facilities of physician recruitment from
8  the Internet?
9    A.  Can you explain that one more time?
10   Q.  Like if I -- let's say I wanted to place a
11  physician at Scott and White Hospital in Temple, Texas
12  or any other facility, would I be able to go on the
13  Internet in some cases and find out who I need to call
14  to ask if they'd be interested in Merritt Hawkins
15  services?
16   A.  To a certain level.
17   Q.  All right.  I take it that neither Gresham nor
18  Bowden were marketing consultants?
19   A.  Correct.
20   Q.  What was their title at Merritt Hawkins?
21   A.  Search consultant.
22   Q.  What does a search consultant do?
23   A.  Recruit physicians.
24   Q.  How does a search consultant recruit physicians?
25   A.  Through the efforts of our marketing campaign,

4  (Pages 10 to 13)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    b1b89364-d730-4811-a71c-bebb8f493c5b

Page 14

1    utilization of Mhacs.  As I mentioned before, marketing
2    brings in the searches, recruiting then is responsible
3    for going out profiling the opportunity and filling the
4    opportunity.
5        Q.  So if there's a hospital in Nebraska that's in
6    need of a general practitioner, I take it the hospital
7    then signs some sort of agreement with Merritt Hawkins?
8        A.  Yes, sir.
9        Q.  And under that agreement Merritt Hawkins --
10   Merritt Hawkins agrees to consult -- to -- to do what, I
11   should ask, since you know better than I do?
12       A.  Well, we have the agreement and then it's --
13   essentially we're a retained staffing firm, meaning that
14   they pay us an upfront retainer.  There's an hourly,
15   monthly billing associated to that and then a placement
16   fee.  Once that search is brought in, as I mentioned we
17   go out and profile the opportunity and meet with the
18   administration, meet with the key decision makers and
19   then gather information as far as what they're looking
20   for particular to that opportunity.  We go over our
21   44-step process with the client as far as what Merritt
22   Hawkins is going to do and then we come back here to our
23   facility and begin the recruitment efforts.
24       Q.  Okay.  And how does Merritt Hawkins search
25   consultants go about finding potential placements,

Page 15

1    potential physicians to fill the roles that Merritt
2    Hawkins --
3        A.  Sure.
4        Q.  -- is being asked to fill?
5        A.  We've got a lot of different angles towards that.
6    Our biggest resource is through our direct mail.  We
7    used to do an advertising campaign for each opportunity
8    we represent.  The client pays for that.  It's an
9    out-of-pocket expense on behalf of the client and we'll
10   do the marketing campaign specific to that opportunity.
11   We also utilize our Mhacs and that's our database.  It
12   has thousands of physicians' names particular to each
13   opportunity, our specialty and we also use our web site,
14   different search engines.  We post it on a lot of
15   different web sites.
16       Q.  Are those proprietary web sites to Merritt
17   Hawkins?
18       A.  Ours is, yes.
19       Q.  You use --
20       A.  -- would be not.
21       Q.  I'm sorry.  I was -- my fault entirely.  I didn't
22   hear the very last part of what you said.  I'm assuming
23   Merritt Hawkins has its own web site --
24       A.  Yes.
25       Q.  -- where it advertises potential placements?

Page 16

1        A.  Potential opportunities.
2        Q.  Potential opportunities.
3        A.  Correct.
4        Q.  And then does Merritt Hawkins then -- does it use
5    any third-party web sites to --
6        A.  Yes.
7        Q.  -- advertise?
8        A.  We do.
9        Q.  Okay.  Give me an idea.  Can you tell me the
10   names of two or three of those?
11       A.  Healthy careers, dot, cafe.  Those are really the
12   two primarily that we use.
13       Q.  Okay.  Similar to the hospital bluebook is there
14   a publically available database that Merritt Hawkins
15   uses to identify physicians?
16       A.  No, sir.
17       Q.  How does Merritt Hawkins go about identifying
18   physicians for placement?
19       A.  Again, we usually identify candidates through
20   Mhacs our own database as well the marketing campaign
21   that goes out where physicians respond to that letter,
22   and at that point we're able to present the opportunity
23   to that physician.
24       Q.  Thank you.  I guess I'm trying to understand.
25   Did -- did Merritt Hawkins -- does it create its

Page 17

1    database of physician names and addresses from scratch?
2        A.  Well, I mean the database is something that
3    started from the onset.  So I mean, it's physicians who
4    responded to marketing pieces, it's physicians that you,
5    know, we've found throughout the years of just, you
6    know, perusing and reaching other doctors.  Some of them
7    have been referrals for other physicians.
8        Q.  Right.
9        A.  There's a whole glomerate of areas where we get
10   these physicians and then each physician that calls in
11   or each physician that we speak to we create a new
12   record for if there's not already a record created.
13       Q.  So is there any effort by the search consultants
14   to identify doctors in the publicly available means?
15       A.  There is some.
16       Q.  Okay.  How would they do that?
17       A.  Well, I mean there's different journals that we
18   can place ads in depending on specialty, you know, we've
19   posted information through different residency programs
20   and fellowships.
21       Q.  Right.
22       A.  So really it was kind of the areas that we may
23   utilize.
24       Q.  Thank you.  Does Merritt Hawkins go out and sort
25   of my -- state level physician records like at -- I

Kim Tindall and Associates, LLC      645 Lockhill Selma, Suite 200          San Antonio, Texas 78216
210-697-3400                                                               210-697-3408

APP. 0042

b1b89364-d730-4811-a71c-bebb8f493c5b

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 18

1    think it's called the Texas Medical Board. Do they
2    publish or provide a list of the doctors who are
3    licensed in Texas?
4        A. No.
5        Q. Okay. So to your knowledge there's no publicly
6    available database of physicians who were licensed to
7    practice in the United States -- any state in the United
8    States.
9        A. Yeah, you can buy the list through the AMA,
10   American Medical Association. We can buy those lists
11   and generally that's where the list comes from for the
12   source.
13       Q. Okay. So some of the addresses that the direct
14   mail pieces are sent to might come from an AMA list?
15       A. Yes, correct.
16       Q. Okay. Might not be because you have previously
17   contacted a particular physician, but it might be from
18   that sort of information you get from the AMA?
19       A. Correct.
20       Q. All right. Let's see. So you've given a
21   deposition before. It's been about eight years. So I
22   want to go over a little bit of the ground rules now
23   that we've gotten started a little bit. Do you
24   understand -- I'm sure that you're obligated to tell the
25   truth in this deposition?

Page 19

1        A. Uh-huh.
2        Q. Yes?
3        A. Yes.
4        Q. I like for you to answer verbally. She can't --
5    she has trouble taking down uh-huh, although, it's
6    perfectly natural and I understand. I'll prompt you if
7    I think I need a yes.
8        A. Okay.
9        Q. If I ask you a question you don't understand,
10   will you please stop me and ask me to explain?
11       A. I will.
12       Q. Okay. And similarly -- well, let's see. I heard
13   you mention before we started that you went to the
14   University of Southern California?
15       A. I did briefly. I graduated from Cal State
16   Northridge.
17       Q. Okay. Cal State Northridge. Is that outside of
18   LA?
19       A. It is.
20       Q. Okay.
21       A. It's in Northridge.
22       Q. And what's your degree in?
23       A. Mathematics, liberal studies.
24       Q. Okay. So aside from your one year as a sixth
25   grade teacher, I take it that the rest of work

Page 20

1    experience has been with AMN, correct?
2        A. Yes. And there was a brief stint that I worked
3    with Minolta Business Solutions and that was a copier
4    service. That was essentially my first job out of
5    college and I then went into teaching and that was --
6    and that was short.
7        Q. Do you consider yourself an expert -- well, never
8    mind. Do you consider yourself knowledgeable about the
9    permanent staffing industry?
10       A. I do, very.
11       Q. Okay. I take it you also consider yourself very
12   knowledgeable about medical staffing in general?
13       A. Yes, sir.
14       Q. Now, who -- who were the competitors of Merritt
15   Hawkins?
16       A. Not many. I mean, there's a select few, Delta,
17   Fidelus, MD firm. And there's just very, very small
18   companies out there that -- that compete.
19       Q. Is -- is the company Jackson Coker a competitor
20   of Merritt Hawkins?
21       A. Yes.
22       Q. Where are they located?
23       A. I believe in Atlanta.
24       Q. Atlanta. Is Arthur Marshall a competitor of
25   Merritt Hawkins?

Page 21

1        A. At a very low level, yes.
2        Q. When you say at a low level, does that mean
3    they're not very successful or what does that mean?
4        A. Not -- they're just very small.
5        Q. Very small. And where are they located?
6        A. Irving.
7        Q. Okay. Do any -- do you know whether any former
8    employees of Merritt Hawkins work for Arthur Marshall?
9        A. I don't know of any.
10       Q. Do you know of any former Merritt Hawkins
11   employers who work for Jackson Coker?
12       A. I believe Harold Livingston who was one of our
13   marketers and that's all I know.
14       Q. Now, do you know of any of your former employers
15   who work for Delta?
16       A. I do not.
17       Q. What about Fidelus?
18       A. I do not.
19       Q. Okay. When did Harold Livingston quit Merritt
20   Hawkins?
21       A. I want to say probably about six months ago.
22       Q. Did Merritt Hawkins institute any litigation
23   against Harold Livingston?
24       A. They did.
25       Q. What's the status of that?

6  (Pages 18 to 21)

APP. 0043
b1b89364-d730-4811-a71c-bebb8f493c5b
Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 22

1      A. I'm not sure.
2      Q. Who would I ask here about the status of that?
3      A. Mark Smith or Jim Merritt.
4      Q. Who's Mark Smith?
5      A. President. Jim Merritt is the founder.
6      Q. Jim Merritt is the founder. Now, did either
7   Arthur or Marshall ever work for Merritt Hawkins?
8      A. Well, yes. You're asking if the owners of Arthur
9   Marshall worked for Merritt Hawkins?
10     Q. Yes.
11     A. They did. One worked for Staff Care and one
12  worked for Merritt Hawkins. Curtis Pryor worked for
13  Merritt Hawkins. I honestly cannot remember the -- his
14  partner.
15     Q. So Curtis Pryor. Is there a gentleman named
16  Arthur?
17     A. No, sir.
18     Q. Is there a person named Marshall?
19     A. No.
20     Q. Okay.
21     A. I believe it's their middle names, honestly.
22     Q. That's pretty good. Do you know when they
23  started Arthur Marshall?
24     A. I want to say it's been about 10 -- nine or
25  10 years ago.

Page 23

1      Q. Did -- do you know whether Merritt Hawkins
2   instituted any -- any lawsuit against them?
3      A. I'm not sure.
4      Q. Not sure. Okay. What about Jackson or Coker?
5   Did they work for Merritt Hawkins?
6      A. No, sir.
7      Q. They worked for any AMN affiliated entity?
8      A. Not that I'm aware of.
9      Q. What about the founders of Delta? Did any of
10  them work for any AMN affiliated entity?
11     A. So long ago, but I believe if my -- if what I
12  know serves to be accurate, but yes, they did work for
13  Merritt Hawkins. I'm not sure that all the partners
14  did, but there was one or two that did.
15     Q. Okay. Do you know if any litigation was
16  instituted against those folks?
17     A. I'm not sure.
18     Q. What about Fidelus?
19     A. I'm not sure.
20     Q. All right. Do you consider -- do you consider
21  the company Staff Care to be a competitor of Merritt
22  Hawkins?
23     A. At some level, yes.
24     Q. At some level. At what level?
25     A. We go after essentially similar clients on a

Page 24

1   different a level in which we're doing permanent,
2   they're doing locums but they also do place physicians
3   on a permanent level. A lot of times they have
4   opportunities where they have a physician that will work
5   temporary and -- and then go permanent.
6      Q. Does Staff Care do the same sort of direct mail
7   and advertising campaigns that Merritt Hawkins does?
8      A. I believe they do.
9      Q. Do you -- do you share information with Staff
10  Care?
11     A. Absolutely not.
12     Q. How does that work? Does Staff Care have access
13  to the Mhacs database?
14     A. No, they do not.
15     Q. They have a separate database?
16     A. They do.
17     Q. Staff Care is located in this building, I take
18  it?
19     A. Yes.
20     Q. Are they physically separated from the folks at
21  Merritt Hawkins?
22     A. Yes. We serve different floors in -- on
23  different sides of the building.
24     Q. Is there any prohibition on the sharing of
25  information between Staff Care and Merritt Hawkins

Page 25

1   employees?
2      A. Define prohibition.
3      Q. Well, let me ask a different question which I
4   think I can get to the same information I'm asking for.
5   Do Staff Care and Merritt Hawkins share information
6   about physicians?
7      A. At times, yes.
8      Q. Under what circumstances would they share
9   information?
10     A. If we've got a candidate or a physician that has
11  responded to one of our letters or any communication
12  with is only looking for locum tenens, then we will
13  share that physician with Staff Care.
14     Q. Okay. Does it work the opposite direction?
15     A. No.
16     Q. Okay. I don't know even know if I understand the
17  inference I'm trying to get at. If Staff Care is
18  talking to a physician and the physician says, you know
19  what, I really want a permanent placement, would they
20  then refer that physician over to Merritt Hawkins?
21     A. If you're asking if that's the way it should
22  work, yes, but they have opportunities to where they
23  know clients that have permanent locations, so they will
24  place doctors on a -- on a permanent level. In fact,
25  it's part of their revenue stream that their quota is

7 (Pages 22 to 25)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                b1b89364-d730-4811-a71c-bebb8f493c5b

Page 26

1  based on is that -- some -- they do have some revenue
2  streams that are generated through permanent placement.
3      Q. Do you know what percentage of Staff Care's
4  business is permanent placement?
5      A. I don't.
6      Q. Does Merritt Hawkins ever do temporarily
7  placements?
8      A. Very rarely.
9      Q. All right. Is the -- is even the low level of
10 competition between Staff Care and Merritt Hawkins a
11 source of friction here within AMN?
12     A. I would say it's very low, low friction. I mean,
13 there's been instances where, you know, we know that
14 they've placed a physician permanently that if maybe one
15 of our clients that we've been working with permanently
16 as well that's created an issue but it's not very
17 common.
18     Q. Okay. Let's see -- when a -- I take it that the
19 marketing consultant at Merritt Hawkins is in charge of
20 obtaining the relationship with the facility; is that
21 right?
22     A. And the recruiters is, yes.
23     Q. And the recruiter. Once the marketing -- a
24 recruiter is different from a marketing consultant I
25 take it?

Page 27

1      A. Yes, recruiters fill the opportunities. The
2  marketers are the ones that go out and establish the
3  relationship, bring in the search agreement at which
4  point in time then the recruiter will go out and profile
5  the opportunity and the recruiter will -- will mentor
6  that relationship from that period on and the marketer
7  will usually follow up maybe monthly to just monitor the
8  progress and see how things are going.
9      Q. The -- the -- the person at Merritt Hawkins who
10 gets the search agreement is the marketing consultant?
11     A. Correct.
12     Q. And then the performance of the search agreement
13 is handled by the recruiter?
14     A. That's correct.
15     Q. Is the recruiter synonymous with search
16 consultant?
17     A. No.
18     Q. Okay. So how are -- okay. I'm sorry. I'm
19 confused now. Is -- I take it there has been three
20 people -- or three groups of people who were involved in
21 the client relationship, the marketing consultant?
22     A. Well, and in some cases to answer your question,
23 yes, it's marketing and recruiting and we do have some
24 variances where we have clinic callers that will set up
25 meetings for the marketer.

Page 28

1      Q. Right.
2      A. And you know, the marketer goes out and meets
3  them. So there is some variance to that, but there's
4  only a few clinic callers that we have.
5      Q. All right. And then what is -- how does the
6  search consultant fit into that relationship?
7      A. The search consultant -- the only time the search
8  consultant is through the process of bringing in the
9  business. The search consultant only is going out to
10 the client once the business is brought in unless
11 they've had a relationship with that client and they've
12 done a good job with that client and the client says,
13 hey, we have additional needs and then the recruiter can
14 bring in those -- those needs based upon their
15 relationship with that client. We call that repeat
16 business.
17     Q. All right. I got you. Let's see. How many
18 search consultants do you currently have working on the
19 Heartland?
20     A. Ten.
21     Q. How many search consultants did you have working
22 for the Heartland in 2013?
23     A. Eight.
24     Q. And what about 2012?
25     A. Between nine and 10, somewhere around there.

Page 29

1      Q. Are you responsible in any way for the
2  identifying of employee candidates for the search
3  consultant role?
4      A. No.
5      Q. Who handles that?
6      A. Search consultants.
7      Q. I -- I think I'm using the wrong terminology.
8  Who goes out and figures out who Merritt Hawkins is
9  going to hire to be search consultants?
10     A. The client. You're asking who's going to hire
11 the --
12     Q. No. I'm sorry. Let me stop because I know where
13 the confusion is coming from. You had eight people
14 working for you as search consultants in the Heartland
15 in 2013, right?
16     A. (Witness nods head up and down.)
17     Q. Who hired those eight people?
18     A. Our talent acquisition.
19     Q. Talent acquisition.
20     A. They are the ones that generally find the
21 recruiters or the candidates and then myself and
22 generally our senior VP Tom Thornes (phonetic)
23 interviews them -- interview the folks.
24     Q. Do they do that at job fairs?
25     A. There's a lot of different -- through job fairs,

8  (Pages 26 to 29)

APP. 0045

Electronically signed by Lei Sherra Torrence (501-288-335-5388)           b1b89364-d730-4811-a71c-bebb8f493c5b

Page 30

1    through referrals, through Monster.  Honestly, I don't
2    know all the tools that they utilize with talent
3    acquisition, but there's a lot of different angles.
4        Q.  Let me back up and ask a few just sort of
5    foundational questions.  I take it there are other
6    geographical regions other than the Heartland?
7        A.  There is.
8        Q.  What are they?
9        A.  West coast, Midwest, upper Midwest, southwest,
10   northeast and southeast.
11       Q.  Is your role and responsibility limited to the
12   Heartland?
13       A.  Yes.
14       Q.  Are there also directors or VPs who are in charge
15   of those other half dozen --
16       A.  Yes.
17       Q.  -- geographical regions?
18       A.  Yes.
19       Q.  And all of those handled out of this office?
20       A.  No.  We have an office in Atlanta and that's
21   where the northeast and southeast are handled.
22       Q.  Okay.  So and -- so west coast, midwest, upper
23   midwest and southwest and Heartland are handled here in
24   Irving?
25       A.  That's correct.

Page 31

1        Q.  All right.  How many total search consultants are
2    employed by Merritt Hawkins across the number of regions
3    that we've talked about?
4        A.  To date I believe there is 75.
5        Q.  And how many of those are located here in Dallas
6    -- Irving, sorry?
7        A.  I would say probably 55.
8        Q.  Are you -- well, let me ask this.  Do you know
9    whether any of the search consultants who are currently
10   employed by Merritt Hawkins ever worked for Delta?
11       A.  I do not believe so.
12       Q.  Do you know whether any of the search consultants
13   who are currently employed by Merritt Hawkins worked for
14   Fidelus?
15       A.  No.
16       Q.  What about Arthur Marshall?
17       A.  No.
18       Q.  What about Jackson Coker?
19       A.  No.
20       Q.  What about Staff Care?
21       A.  No.
22       Q.  So with respect to all of the search consultants
23   -- is -- is -- well, let me -- let me back up.  Is it
24   the company's policy that they won't hire people who've
25   worked for a competitor?

Page 32

1        A.  We've hired some recruiters from a competitor,
2    but most times we don't.  Usually we like to bring them
3    in and have them go through our training processes
4    versus them having learned possibly a different set of
5    protocols than what we go off of.
6        Q.  Give me a sense of what attributes a successful
7    search consultant has at Merritt Hawkins.
8        A.  Someone who is driven.  Someone who can fight
9    through the trenches.  Someone who can have a bad day
10   and able to bounce back.  Recruiting is a -- it's a
11   roller coaster of a ride.  You have a lot of highs.  You
12   have a lot of lows.  A person that is fairly resilient
13   and has a good work ethic and drive.
14       Q.  Is it -- would you consider it to be a sales job?
15       A.  Yes.
16       Q.  And is the vast majority of the time spent on the
17   telephone?
18       A.  Yes.
19       Q.  Is there -- do you have a dials-per-day
20   requirement here?
21       A.  We do.
22       Q.  What is the dials per day?
23       A.  Seventy-five to 100 dials.
24       Q.  And does the company keep track of the number of
25   dials?

Page 33

1        A.  We do.
2        Q.  How does it do that?
3        A.  We have a tracking system.  I'm not sure what
4    it's called or how it's -- I just get the report every
5    morning.
6        Q.  Identify the number of dials a particular --
7        A.  Outbound calls, inbound calls, phone time, yes.
8        Q.  All right.  How do you keep track of the
9    performance of your search consultants other than by the
10   number of dials they make?
11       A.  How many interviews are being set, how many
12   placements they're generating monthly, quarterly.  We
13   have a set quota in place that, you know, it's a minimum
14   of 400 views per month, minimum of one placement per
15   month and make sure that, you know, they're having four
16   to five presentations per day.  Presentation defined as
17   them presenting the opportunity to a physician about
18   their opportunity.
19       Q.  Okay.  So one placement per month per search
20   consultant?
21       A.  Correct.
22       Q.  So if you --
23       A.  That's minimum.
24       Q.  Minimum.  Do you know how many placements the
25   Heartland made in 2013?

Tim Beidle                                                                    May 16, 2014

Page 34

1     A. I want to say about 150.
2     Q. Do you know how many placements the Heartland
3  made in 2012?
4     A. I don't.
5     Q. There would be a record of that somewhere, I take
6  it?
7     A. Oh, yes. Yeah.
8     Q. Do you know if it was higher or lower than 150?
9     A. I don't know. I would imagine it was lower.
10    Q. Lower in 2012?
11    A. Yes.
12    Q. Why would you -- why do you say you imagine that?
13    A. Because of the head count.
14    Q. Well, you told me in 2012 you had nine to 10
15  recruiters.
16    A. I said eight in 2012, nine to 10 in 2013, I
17  believe.
18    Q. Whoops, looks like I wrote it down wrong. So
19  more recruiters means, in your mind, likely more
20  placements?
21    A. Correct.
22    Q. All right. And who replaced Scott Gresham?
23    A. Well, we didn't have a direct replacement for
24  Scott Gresham. I mean, we're -- we hired a couple of
25  individuals, but we tend to hire not in the replacement

Page 35

1  of someone but hire for growth and we do take into
2  account attrition and so it's not really a direct hire
3  to replace someone. It's usually just keeping that
4  person on the bench. If there is attrition, we're --
5  we're already equipped with other recruiters in
6  training.
7     Q. All right. What's the difference between a
8  search consultant and a senior search consultant?
9     A. A senior search consultant has reached a certain
10  level as far as production goes. It's strictly
11  production based to get to a senior search. Seven
12  placements in six months to get to search -- I'm sorry,
13  senior search and then search is a recruiter in training
14  who has hit their first placement and has had eight
15  interviews take place rather than transition from
16  recruiter in training to search consultant.
17    Q. All right. You said that one thing that you
18  handle in your role as VP is budgeting; is that right?
19    A. Correct.
20    Q. Do you keep track also of the revenues that were
21  being generated by your group?
22    A. I do.
23    Q. Do you know whether the revenues in 2013 were
24  higher or lower in 2012?
25    A. Higher in 2013.

Page 36

1     Q. Higher than -- in 2013. Were the profits higher
2  or lower in 2013?
3     A. Higher.
4     Q. Do you know by how much?
5     A. We had 29 percent growth in 2013.
6     Q. Twenty-nine percent growth. Okay. Let's see.
7  Pardon me for a minute. This is going a lot faster than
8  I thought which is good for all of us.
9         What is the attrition rate for search
10  consultants?
11    A. Attrition rate for consultants is generally very
12  low. Where we see most of the attrition is when they're
13  in a RAT status and that's when they're in training.
14  Either they have identified that this is not the right
15  fit for them early on, or early on we've identified that
16  they're not the right fit for the company.
17    Q. So by in large most people will washout in the
18  training process?
19    A. Correct.
20    Q. Okay. You told me that you had eight recruiters
21  in 2012. Do you -- did you have the same eight
22  recruiters in 2013?
23    A. No.
24    Q. What's the difference?
25    A. We had some attrition. We had some new hires and

Page 37

1  we had one individual transfer over from a different
2  region.
3     Q. Okay. So how many people -- how many of the
4  eight search consultants that you had in 2012 did you
5  have in 2013?
6     A. The same people?
7     Q. Yes.
8     A. About six.
9     Q. Six?
10    A. I would think. That's just an estimate.
11    Q. Okay. So over the nine or 10 search consultants
12  that you had in 2'13 you estimate that six of those had
13  been with you in 2012?
14    A. Correct.
15    Q. Now, what about 2014? How many search
16  consultants do you currently have?
17    A. Ten.
18    Q. Ten. And how many of those were employed by
19  Merritt Hawkins in 2013 as search consultants?
20    A. All of them.
21    Q. All of them. Okay. Thanks. Tell me about the
22  -- the training process that you put your recruits
23  through.
24    A. It's a 20-week program. The first day they start
25  they have an on boarding day which is through talent

10  (Pages 34 to 37)

APP. 0047

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                b1b89364-d730-4811-a71c-bebb8f493c5b

Page 38

1   acquisition and Mike Faye, who's our corporate trainer
2   and then they go through a 20-week program in which
3   they're taught the systems of Merritt Hawkins, taught
4   specialties and physicians and taught, you know, how to
5   screen a doctor, how to present a doctor, how to do a
6   community profile, how to do an airport interview.  It's
7   a 20-week program.
8       Q.  I don't know how to ask this question that will
9   make sense, but I think we can get to an answer that
10  will.  Is it -- I mean, is it like Merritt Hawkins
11  University there's a 20-week program, 40 people start
12  out on week one and then go along for 20 weeks, or is it
13  one by one sort of education program?
14      A.  No, there's a -- there's a class.  Usually the
15  classes stagger.  Depending on how many hires we have,
16  but generally the classes stagger by two weeks.  So
17  we'll have a starting class on a Monday and then
18  essentially two weeks after that we'll have another
19  starting class.  So they'll have, you know, the same
20  people in that class and work through the process.
21      Q.  Is there a goal for the number of people that you
22  have in the class?
23      A.  No.
24      Q.  Is it five people, 10 people, 20 people?
25      A.  It all can depend.  I mean, it depends on, you

Page 39

1   know, where we're at as a company if, you know, if we're
2   hiring, not hiring or aggressively hiring.  There is a
3   lot of different tangibles.
4       Q.  What's the most -- do you know what the -- the
5   highest number of people you've had in the recruiting
6   classes?
7       A.  I don't.
8       Q.  Same question for the lowest number.
9       A.  I don't.
10      Q.  Who would know that, would that be Mike Faye?
11      A.  Mike Faye.
12      Q.  Thanks.  Let's see.  Yesterday during
13  Mr. Branam's deposition we talked about a case involving
14  a person name Kivelhan.
15      A.  Yes.
16      Q.  Who is Kivelhan?
17      A.  He was a marketer for Merritt Hawkins.
18      Q.  Did he work in the Heartland?
19      A.  No.  I take that back.  There was a period of
20  time where, yes, he did and then he transitioned to a
21  different region.
22      Q.  And do you know whether Merritt Hawkins has filed
23  a lawsuit against Kivelhan?
24      A.  I'm aware of it.
25      Q.  You're aware of it.  Do you know where Kivelhan

Page 40

1   went to work?
2       A.  Delta.
3       Q.  Delta.  And do you know what the -- what Merritt
4   Hawkins is complaining about in that lawsuit?
5       A.  I don't.
6       Q.  Who would I ask about that?
7       A.  Mark Smith.
8       Q.  Okay.  I take it you're not a witness in that
9   lawsuit yet?
10      A.  I am not.
11      Q.  Okay.  Well, that's good.  Okay.  So my
12  understanding is that Gresham, Scott Gresham, had two
13  stints at Merritt Hawkins?
14      A.  That's correct.
15      Q.  Were you involved in the decision to hire
16  Mr. Gresham the first time around?
17      A.  Yes.
18      Q.  And what was he hired to?
19      A.  He was hired as a search consultant.
20      Q.  And did you participate in the training of
21  Mr. Gresham?
22      A.  I did.
23      Q.  Did Mr. Gresham have any prior medical staffing
24  experience before he came here?
25      A.  No.

Page 41

1       Q.  And during his first stint, was he -- after he
2   got out of the training process where he was then
3   employed by Merritt Hawkins to be a search consultant?
4       A.  That's correct.
5       Q.  And he -- I take it he worked in the Heartland?
6       A.  He did.
7       Q.  The Heartland doesn't include Texas, I take it?
8       A.  It does not.
9       Q.  Is Texas in the southwest region?
10      A.  Yes, sir.
11      Q.  All right.  And why did he leave Merritt Hawkins
12  the first time around?
13      A.  He left to go work with his father.  His father
14  owns a tombstone business, I believe down in
15  Stephenville, and he left to go work with his father.
16      Q.  Do you know whether he went to work for Arthur
17  Marshall after he left here the first time around?
18      A.  Do I know if he did?
19      Q.  Yeah.
20      A.  Yes, I do.
21      Q.  Well -- so he went to Arthur Marshall after he --
22  after he quit in -- was it 2010?
23      A.  Yes.
24      Q.  He went to work for his father for a bit and your
25  understanding is he then ended up working for Arthur

11  (Pages 38 to 41)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Tim Beidle                                                    May 16, 2014

Page 42

1   Marshall?
2       A. That's correct.
3       Q. And Arthur Marshall, is that located here in the
4   Dallas area?
5       A. Irving.
6       Q. Irving. So it's within 25 miles of the front
7   door of this office?
8       A. Correct.
9       Q. All right. And do you know what he did for
10  Arthur Marshall?
11      A. Recruiting.
12      Q. Was it a violation of his employment agreement
13  for him to go to work for Arthur Marshall?
14      A. Not necessarily a violation because he left to go
15  work with his father. I don't know what extent the
16  violation would've been, but he could've violated his
17  noncompete.
18      Q. Do you know whether he went to work at Arthur
19  Marshall within one year of his separation from Merritt
20  Hawkins the first time around?
21      A. I'm not sure.
22      Q. Did Merritt Hawkins threaten a lawsuit against
23  Mr. Gresham or Arthur Marshall?
24      A. I don't believe we did, no.
25      Q. No lawsuit filed in your understanding?

Page 43

1       A. My understanding, no.
2       Q. Is there any exchange of demand letters back and
3   forth between the companies?
4       A. To my understanding, no, but a lot of times that
5   goes -- it's elevated above my -- my role.
6       Q. Okay. Who would --
7       A. Mark Smith.
8       Q. Mark Smith. Okay.
9       A. And legal counsel.
10      Q. Thank you. Did -- how did it come to pass that
11  Mr. Gresham came back to Merritt Hawkins?
12      A. He reached out to an employee that was on my team
13  and had said that, you know, felt like he had made a
14  mistake, felt like he wished he hadn't felt having known
15  the circumstances with his father and that not working
16  out, you know, he missed Merritt Hawkins. He missed
17  working for a large, large company versus Arthur
18  Marshall and discussed with Billy if there was ever an
19  opportunity to come back to -- to Merritt Hawkins.
20  Billy had reached me and said, you know, Scott's
21  thinking about making a change and loved to come back
22  this way. So he and I met.
23      Q. Did -- do you remember around about when you met
24  with Scott Gresham? Obviously, sometime before he came
25  back the --

Page 44

1       A. Yeah. Some time --
2       Q. -- second time around?
3       A. Right. Right.
4       Q. Did you ask him if he was subject to any
5   employment agreement with Arthur Marshall?
6       A. I believe I did and being that they are such a
7   small organization of I believe probably 10, 12
8   employees I don't know that I even did ask him because
9   it's not generally common that a company of that size
10  even have a -- a noncompete.
11      Q. Well, let me -- let me drill down a little bit.
12  Do you -- do you recall, sitting here today, whether you
13  asked him if he had an employment agreement with Arthur
14  Marshall?
15      A. I believe I did ask him and I believe he said he
16  did not.
17      Q. All right. Was there any discussion at this --
18  when you talked to him about coming back to Merritt
19  Hawkins that there was any concern at Merritt Hawkins
20  about his violation of his employment agreement when he
21  went to work for Arthur Marshall?
22      A. Can you repeat that?
23      Q. Well, bad question. Let me start over. Sitting
24  here today you don't know whether Mr. Gresham's having
25  gone to work for Arthur Marshall violated his employment

Page 45

1   agreement with Merritt Hawkins; is that right?
2           MS. NOWAK: Objection to the extent it seeks
3   a legal conclusion. You can still answer the question
4   to the extent that you're able.
5       A. Yeah, to the extent that I am able because he
6   left Merritt Hawkins and went to work for his father. I
7   honestly don't know if that was a direct violation of
8   his noncompete, nor do I know the time frame of when all
9   of that occurred.
10      Q. (BY MR. VOLNEY) When Mr. Gresham came back to
11  Merritt Hawkins for his second stint, did Arthur
12  Marshall threaten any litigation against Merritt
13  Hawkins?
14      A. I'm not sure.
15      Q. Again, I'd have to talk to Mark Smith about that?
16      A. You would.
17      Q. Okay. Good.
18      A. It's above my pay grade.
19      Q. Hey.
20      A. Thank God.
21      Q. That's a good point you're making. I think we've
22  established that both in his first and second stint at
23  Merritt Hawkins, Scott Gresham was responsible for
24  search consultant activities in the Heartland, right?
25      A. That's correct.

12  (Pages 42 to 45)

Page 46

1    Q. And were you his direct supervisor during both
2  stints?
3    A. I was.
4    Q. Did anyone else supervise him?
5    A. No.
6    Q. And his -- was there a particular specialty or
7  type of facility that he specialized in?
8    A. No, sir.
9    Q. What kinds of doctors does Merritt Hawkins place
10 on a permanent basis?
11   A. All specialties. Anywhere from primary care to
12 specialists, to some allied being nurse practitioners.
13   Q. Pharmacists?
14   A. Pharmacists.
15   Q. Okay. And I take it that during both stints at
16 Merritt Hawkins he was responsible for permanent
17 placement of health care providers?
18   A. That's correct.
19   Q. And did he ever do any temporary placements?
20   A. No, sir.
21   Q. Does anybody -- does anybody move over from Staff
22 Care to become a search consultant for Merritt Hawkins?
23   A. No.
24   Q. Does anybody from Merritt Hawkins ever move over
25 to Staff Care to do whatever they do?

Page 47

1    A. We've a couple of instances. It's very rare.
2    Q. Any recent instances?
3    A. No.
4    Q. Well, let's talk about Billy Bowden for a little
5  bit. Do you recall how long he worked for Merritt
6  Hawkins?
7    A. It was roughly two years.
8    Q. Was he part of the same recruiting class that
9  Scott Gresham was a part of?
10   A. No.
11   Q. Was he hired before or after Scott?
12   A. I believe he was hired before Scott if my memory
13 serves correctly.
14   Q. And was Billy Bowden a search consultant?
15   A. He was.
16   Q. And -- okay. Do you know where Billy Bowden went
17 after he left Staff Care?
18   A. He went into the mortgage industry where he --
19   Q. I said Staff Care. I meant Merritt Hawkins,
20 sorry.
21   A. Yeah, Merritt Hawkins. He was in the mortgage
22 industry. We hired him from the mortgage industry. He
23 was terminated and then went back into the mortgage
24 industry.
25   Q. And I -- were you the person who terminated him?

Page 48

1    A. I was.
2    Q. Why did you terminate him?
3    A. For his production, lack of.
4    Q. And I take it, he, like Scott Gresham was -- his
5  region was the Heartland?
6    A. Yes.
7    Q. And his job was permanent placement of
8  physicians?
9    A. Yes.
10   Q. Are you generally familiar with the terms of
11 Merritt Hawkins' employment agreements?
12   A. Yes, to a certain level.
13   Q. Do you sign off on those employment agreements
14 with each of the new hires?
15   A. I do not.
16   Q. Who does that?
17   A. That would be I believe talent acquisition, and
18 then Mark Smith, I believe has the last -- last
19 signature.
20   Q. Are you -- do you know what -- well, are you ever
21 present when these employment agreements are signed off
22 on --
23   A. No.
24   Q. -- by the new employees?
25   A. My responsibility is to interview them along with

Page 49

1  the senior vice president Tom Florence (phonetic).
2  Together we'll make the decision of whether or not we
3  want to hire that individual and then from there the
4  talent acquisition department will forward the agreement
5  to that candidate and I don't get involved in any of
6  that.
7    Q. All right. So what --
8      MS. NOWAK: John, before we get going into
9  the employment agreements, we've been going for about an
10 hour. Do you want to take just a five- or 10-minute
11 body break?
12     MR. VOLNEY: Sure. Yeah, that's fine.
13 Let's go off the record.
14     THE VIDEOGRAPHER: Off the record at 10:52
15 a.m.
16     (Break taken from 10:52 a.m. to 11:10 a.m.)
17     THE VIDEOGRAPHER: We're back on the record
18 at 11:10 a.m.
19   Q. (BY MR. VOLNEY) Okay. Let's talk a little bit
20 more about Scott Gresham. Was Scott Gresham while he
21 was in the Heartland Group your best consultant?
22   A. Not my best, but a productive one, yes.
23   Q. Do you know how many placements Scott made in
24 2012 up until the time he quit?
25   A. I mean, he was on pace to -- he was steady at one

13 (Pages 46 to 49)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                        b1b89364-d730-4811-a71c-bebb8f493c5b

Page 50

1   to two placements a month. I'm not sure what the exact
2   total was, but again, he was -- he was good for one- or
3   two-a-month placements.
4       Q. You consider him one of your better employees,
5   then?
6       A. I would, yes.
7       Q. How did you -- how did you learn that Scott had
8   decided to terminate his employment with Merritt
9   Hawkins?
10      A. Through an e-mail.
11      Q. Here. I guess we can -- I can show you that.
12  Let's see. Just to make things easier, what I'm going
13  to do is I'm going to mark as 106.
14          THE REPORTER: We already have a 106.
15          MR. VOLNEY: Well, I'm not going to mark it
16  as 106. Must be 107.
17          THE REPORTER: Yeah.
18          MR. VOLNEY: Okay. What I marked as Exhibit
19  107 a copy of the complaint filed by your employer
20  against Scott and Billy.
21          (Exhibit Number 107 marked.)
22      Q. (BY MR. VOLNEY) Let me ask you a few sort of
23  background questions and then we'll talk about -- we'll
24  get to the e-mail that Scott sent you which I think is
25  attached there at the back of that complaint. Have you

Page 51

1   seen this document before?
2       A. No.
3       Q. What did you do to get ready for today's
4   deposition?
5       A. Just had a couple of conversations and -- and
6   looked at a couple of documents but nothing aside from
7   this.
8       Q. Do you know what documents you looked at?
9       A. I don't, no.
10      Q. Was that this morning?
11      A. For a little bit this morning and a little bit
12  yesterday.
13      Q. Sitting here today you don't recall what
14  documents you looked at, though?
15      A. It was just -- no, I don't.
16      Q. Was it the employment agreement?
17      A. No.
18      Q. All right. Never seen this before I take it. Do
19  you know why Merritt Hawkins is suing Scott Gresham, or
20  what's your understanding of why Merritt Hawkins is
21  suing Scott Gresham?
22      A. Because he violated his noncompete.
23      Q. By going to work for Consilium?
24      A. By going to work for a competitor, Consilium,
25  yes.

Page 52

1       Q. What is your understanding of what Consilium does
2   for business?
3       A. They do temporary and permanent staffing.
4       Q. What is your -- the basis for your statement that
5   they do permanent staffing?
6       A. What is the basis of my statement?
7       Q. Yeah, how do you know they do permanent staffing,
8   in other words?
9       A. Because, it -- one, I believe it even says it on
10  their -- their web site, if you were to look at their
11  web site. And I know that from speaking with physicians
12  who've worked with Consilium that they present
13  opportunities that are on a permanent level. And I
14  haven't been on their web site in some time, but I
15  believe again, if you go to their web site, they will
16  even list permanent opportunities.
17      Q. Your testimony sitting here today is that
18  Consilium lists on its web site permanent opportunities
19  for physicians?
20      A. I am not saying that for certain, but I do recall
21  that there has been positions listed that maybe it's
22  temp to perm or -- or regardless it's still mentioning
23  the placement of permanent level.
24      Q. Okay. What physicians did you talk to that told
25  you Consilium does permanent placement?

Page 53

1       A. I don't recall.
2       Q. When did you talk to these physicians?
3       A. I mean, it could've been a year or so ago, but I
4   mean, there's been discussions of working -- a physician
5   who is working with us oftentimes we'll ask the question
6   of you know, are you working with anyone else. Have you
7   heard of any other opportunities just to get a gauge as
8   far as their interest level in this position versus
9   other positions that they may be inquiring about and
10  there's been instances where they've said, yeah, we're
11  working with Consilium or another one of our
12  competitors.
13      Q. Does Merritt Hawkins encourage physicians to work
14  with different staffing companies?
15      A. Do we encourage it?
16      Q. Right.
17      A. No.
18      Q. Because that's not in the book, the Merritt
19  Hawkins book?
20      A. Well, we don't encourage physicians to work with
21  other companies because ultimately our goal is for them
22  to work with us and us place them.
23      Q. So have you read that Merritt Hawkins Guide to
24  Physician Recruiting?
25      A. I have.

14 (Pages 50 to 53)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)      b1b89364-d730-4811-a71c-bebb8f493c5b

Page 54

1    Q.  So your testimony is nowhere in that book does it
2  encourage a physician to talk to a number of different
3  recruiting companies?
4        MS. NOWAK:  Objection; argumentative.
5    A.  I'm not sure that it mentions it in the handbook.
6    Q.  (BY MR. VOLNEY)  Is -- do you consider the
7  information that's contained in that handbook to be
8  confidential information of Merritt Hawkins?
9    A.  I do.
10   Q.  And just to be clear, I'm talking about Merritt
11 Hawkins Guide to Physician Recruiting?
12   A.  Oh, the guide to physician recruiting?
13   Q.  Right.
14   A.  Okay.  I'm -- my understanding is the employee
15 handbook, but as far as the guide to physician
16 recruiting, I do not find that to be proprietary.  I
17 mean, that's something that we give out to clients and
18 -- for their resources.
19   Q.  Okay.  Can you tell me the names of any
20 physicians who Merritt Hawkins has lost to Consilium?
21   A.  Any physicians that we have lost?
22   Q.  Right.
23   A.  I'm not sure.
24   Q.  How would I go about determining that?
25   A.  I don't know that there's a way to determine what

Page 55

1  physicians we've worked with that we've lost to
2  Consilium.
3    Q.  Besides violating his noncompete, is there any --
4  do you have any other understanding of why Merritt
5  Hawkins has sued Scott Gresham?
6    A.  Yes.
7    Q.  What else?
8    A.  For downloading and deleting information that's
9  related to his --- his work and related to MHA
10 ownership.
11   Q.  What is your understanding based on?  Do you have
12 personal knowledge of that?
13   A.  I do.  I mean, personal knowledge in the fact
14 that I know there's been hundreds of records that have
15 been either deleted or shared from his computer.
16   Q.  Is that based on your personal investigation?
17   A.  No.  It's based on the investigation early on
18 when they inquired his desktop and started going through
19 what -- what information and how much information was
20 deleted.  I was not involved in the overall
21 investigation but...
22   Q.  Who was involved in the investigation?
23   A.  That I don't know, but the IT department.  I
24 don't know to what level.
25   Q.  Have you seen any reports of that investigation?

Page 56

1    A.  I have seen the reports to how many files were
2  deleted or?
3    Q.  What reports have you seen is probably a better
4  question.
5    A.  I have not seen any as far as reports that showed
6  all of the deletions.
7    Q.  Well, what files were deleted?
8    A.  I mean, I think there was personal files.  There
9  was files that had MHA information.  Information that is
10 -- would be considered proprietary and -- and extremely
11 high volume of -- of deletions from his -- from his
12 computer that typically we would not -- we would not
13 see.
14   Q.  I just want to understand.  I take it you,
15 yourself, did not look at Mr. Gresham's hard drive,
16 correct?
17   A.  Correct.
18   Q.  You did not conduct any independent investigation
19 as to the files that might have been deleted from that
20 hard drive, correct?
21   A.  I know of some files that were deleted from his
22 hard drive, yes.
23   Q.  Okay.  What files and how do you know that they
24 were deleted?
25   A.  Well, I saw some of the -- the files that were

Page 57

1  deleted when I was working with IT and they're inquiring
2  about certain -- certain information that was deleted
3  from his computer.
4    Q.  Who did you work with in IT?
5    A.  I don't recall the person's name.  Multiple
6  people that were down in the -- the IT department at
7  that time.
8    Q.  Did you see the actual file or just the name of
9  the file?
10   A.  The name of the file.
11   Q.  And what was your involvement in that
12 investigation?
13   A.  Well, early on my involvement was finding out
14 what -- how much volume was -- was deleted.  We quickly
15 acquired his desktop.  So that way they could go and
16 manually see what was deleted and then what could be
17 retrieved as far as deleted items.
18   Q.  When did -- well, I take it that you know that
19 Mr. Gresham's workstation at Merritt Hawkins was
20 actually redeployed to a -- a different Merritt Hawkins
21 employee for a period of time?
22   A.  I was unaware of that.
23   Q.  All right.  When did you learn that, or how did
24 you learn -- well, let me ask a different question.
25 When did you first suspect that Mr. Gresham had gone to

15  (Pages 54 to 57)

APP. 0052

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    b1b89364-d730-4811-a71c-bebb8f493c5b

Tim Beidle                                          May 16, 2014

Page 58

1   work for a competitor?
2       A. That was when Breanna Elliott had a conversation
3   with Tom Florence suggesting that she had spoken with
4   Scott and that he had been contacted by Billy Bowden
5   about an opportunity with Consilium.
6       Q. Do you know who made that initial contact between
7   Scott and Billy?
8       A. I don't know.  I don't know if Billy contacted
9   Scott or Scott contacted Billy, I'm not sure.
10      Q. And when you learned this information, did you
11  learn it from Mr. Florence?
12      A. I did.
13      Q. And what did you do once you learned that
14  information?
15      A. I'm not sure exactly what I did.  And I think we
16  may have looked into it a little bit further to see if
17  in fact that allocation was accurate at which point we
18  did identify that it was accurate that Scott was working
19  there.  I may have gone on his LinkedIn page to see if
20  he had updated his new employment status.
21      Q. Do any other former Merritt Hawkins folks work at
22  Consilium?
23      A. Aside from Billy Bowden?
24      Q. Right.
25      A. None that I'm aware of.

Page 59

1       Q. Do you know whether any people while employed by
2   Merritt Hawkins have interviewed with Consilium?
3       A. None that I'm aware of.
4       Q. What -- do your employees ever interview for new
5   jobs while they're employed for you?
6       A. Yes.
7       Q. Do they typically tell you who they're
8   interviewing with?
9       A. Not if they want to be continued employed here.
10      Q. If somebody comes to you and tells you that
11  they're interviewing for a new job you would -- your
12  reaction would be to terminate them, I take it?
13      A. Yeah.  If not termination then definitely warrant
14  a very strict conversation, but, yes.
15      Q. And when you say strict conversation, strict in
16  what way?  What would you tell them?
17      A. Probably be something to where we would either
18  put them on final as far as our corrective action plan
19  goes or otherwise, yes, we would terminate them.
20      Q. How many people have you terminated when they've
21  told you that they're interviewing for new jobs?
22      A. I have not.
23      Q. Because typically your employees don't tell you
24  when they're interviewing for new jobs, right?
25      A. Correct.

Page 60

1       Q. And you don't really expect them to tell you
2   that, do you?
3       A. Correct.
4       Q. All right.  I want to talk a little bit about the
5   -- the computer files here at Merritt Hawkins.  Does an
6   employee's workstation backup to a network drive here at
7   Merritt Hawkins?
8       A. From my understanding, yes, it does.
9       Q. And so whenever you in your employment at Merritt
10  Hawkins saves something to the my documents folder on
11  your desktop, that's actually backed up to a network
12  drive, isn't it or saved on a network drive?
13      A. From my understanding, yes.
14      Q. And whenever you save something to your my
15  documents file, you understand that it is actually
16  resident on a different server within the four corners
17  of this building, right?
18      A. Correct.
19      Q. And do you -- is that disclosed to your
20  employees?
21      A. It is.  We have a -- I don't know if it's called
22  the employee handbook but, yes, there's literature that
23  mentions what we can and can't do as far as saving
24  utilizations of USBs and CDs, and kind of the dos and
25  don't through our policies and procedures as it relates

Page 61

1   to IT.
2       Q. I'm going to show you what we looked at
3   yesterday, Exhibit 105, with Mr. Branam.  If you'll look
4   at the next-to-last bullet point.
5       A. Under please do or please do not?
6       Q. The one that says note.  Would you read that to
7   me?
8       A. I'm sorry.  Oh, the very bottom?
9       Q. Right, next to last.
10      A. Note:  Your my documents folder points to a
11  network drive.  It does not live on your computer's hard
12  drive.
13      Q. All right.  And that's -- is that one of the
14  policies that you're referring to that tells your
15  employees that their my documents folder lives on the
16  network drive?
17      A. Having not read through this whole document in a
18  very long period of time I'd have to probably go and
19  look through that further but...
20      Q. Certainly is your understanding as a vice
21  president in charge of the Heartland at Merritt Hawkins,
22  right?
23      A. Correct.
24      Q. Do you know how many documents Mr. Gresham kept
25  on his desktop versus in his my documents folder?

16  (Pages 58 to 61)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)               b1b89364-d730-4811-a71c-bebb8f493c5b

Page 62

1     A. I do not know.
2     Q. Do you know why Mr. Gresham computer wasn't
3  backing up -- or let me use the words of this policy.
4  Do you know why Mr. Gresham's my documents folder was
5  not pointed to a network drive?
6     A. I'm not sure.
7     Q. Do you know why certain documents in
8  Mr. Gresham's my documents folder were pointed to a
9  network drive, but your expert says others weren't?
10    A. Again, I'm not sure.
11    Q. I take it you're not a computer person?
12    A. I'm not in IT. I know how to -- the basics.
13    Q. What's the company's policy with respect to USB
14  drives?
15    A. They're not allowed.
16    Q. If you find an employee flashing around a USB
17  drive on the floor, what do you do?
18    A. We would quickly discuss that with the employee
19  that those are not -- is not allowed and they would have
20  to -- they'd have to put it away or otherwise we would
21  confiscate it. I honestly have not been in a situation
22  to where we've seen something of that nature, but at my
23  level if I saw it, I would tell them that they would
24  have to put it away and then I would report that to my
25  senior level vice president Tom Florence and we would

Page 63

1  probably escalate it from there.
2     Q. Have you ever terminated employment -- have you
3  ever terminated an employee for having a USB drive in
4  his or her position while on Merritt Hawkins premises?
5     A. I have personally, no.
6     Q. Has the company to your knowledge?
7     A. I am not -- to my knowledge, no.
8     Q. Tell me this. Do the USB ports on Merritt
9  Hawkins workstation, are they functional?
10    A. At a certain level, how I understand it, they are
11  functional in upper leadership. Lower levels my
12  understanding is they're not operable.
13    Q. We're talking about levels, you're talking about
14  sort of hierarchy within the company?
15    A. That's correct.
16    Q. So a guy like Mark Smith his USB port might work?
17    A. I would imagine it does.
18    Q. Does your USB port work on your --
19    A. It does, yes.
20    Q. It does. Okay.
21    A. I don't know that to be true for sure because
22  I've never used it, but how I understand it, yes, it
23  does.
24    Q. Was the USB port on Mr. Gresham's computer
25  functional? Did it work?

Page 64

1     A. I'm not 100 percent sure if it did or did not.
2     Q. Was it supposed to work?
3     A. Should not have worked, no.
4     Q. Who would've been responsible at Merritt Hawkins
5  for making sure that the USB port on Mr. Gresham's
6  computer did not work?
7     A. That would be IT level situation.
8     Q. How did Mr. Gresham copy documents from his
9  computer?
10    A. How did he copy them? Well, I know to the best
11  of my knowledge is that he forwarded a good amount of
12  documentation to his home e-mail address.
13    Q. All right.
14    A. So that would be how -- how he essentially he
15  copied that information by the forwarding of information
16  to his home -- home e-mail address.
17    Q. Do you know any other type of copying that
18  Mr. Gresham did?
19    A. I'm not aware of any.
20    Q. Let's look back at 105. Do you -- where in that
21  policy does it state that Merritt Hawkins employees may
22  not forward Merritt Hawkins related information to their
23  personal e-mail account?
24    A. Under please do not.
25    Q. Okay.

Page 65

1     A. Do not transfer from or store outside the network
2  any company files or data except for temporary use to
3  perform authorized work prohibited. Storage devices
4  include: Laptops, hard drives, removable drives, CDs,
5  DVDs, USB ports, et cetera. Do not abuse e-mails. Do
6  not send e-mails relating to personal business ventures
7  or promoting personal views or beliefs, do not send or
8  forward large e-mails. A large e-mail contains single
9  or multiple attachments that total five megabytes or
10  more. Do not use e-mail to transmit obscene, offensive
11  or pornographic materials.
12    Q. Do you know whether any of your employees may
13  occasionally forward information to their personal
14  accounts so they may work on company business after
15  hours?
16    A. That does not happen.
17    Q. Doesn't happen at all?
18    A. That we send to our personal e-mail --
19    Q. Right.
20    A. -- documents?
21    Q. Uh-huh.
22    A. That's incredibly rare.
23    Q. Okay.
24    A. The reason why I say that is because we have a
25  secured network through VPN that we can access all that

17  (Pages 62 to 65)

Page 66

1    information and, you know, when it comes to most
2    materials that we would bring on a profile or otherwise
3    an airport interview really kind of the two areas that
4    we would leave the office and travel, most of our
5    documents are a hard copy in which we can take notes and
6    -- and provide information to clients.
7        Q. All right.
8            THE WITNESS:  I don't know if this is a good
9    seat to be in.
10           MR. VOLNEY:  It's the best one in the house.
11       Q. (BY MR. VOLNEY)  All right.  Does -- does the
12   company ever take steps to review its employees' use of
13   their e-mail account to determine if they're forwarding
14   information that they shouldn't be forwarding to
15   personal e-mail accounts?
16       A. Does the company utilize steps?
17       Q. Right.
18       A. To the best of my knowledge I believe they do.
19   Especially when it's a high volume.  I mean, if it's one
20   or two e-mails or something of that nature, I don't
21   think it presents a red flag, but when you're talking
22   about multiple up to the hundreds of e-mails or
23   deletions, then yes, that's definitely going to create a
24   red flag and it will be investigated.
25       Q. Is it your understanding that Mr. Gresham

Page 67

1    forwarded to himself hundreds of documents?
2        A. Quite a few, yeah.  I believe it was in the
3    hundred range, absolutely.
4        Q. Okay.  And you're talking about attaching a
5    document to ScottGresham@MHA.com and then forwarding
6    that document to whatever his personal e-mail account
7    is?
8        A. Yeah.  I mean, it was in combination of deletions
9    and e-mails, yeah, I believe it was in the hundreds
10   range.
11       Q. Have you read Mr. Gresham's deposition?
12       A. I have not.
13       Q. Were you involved in -- well, any e-mail that
14   Mr. Gresham forwarded from his work e-mail account to
15   his personal e-mail account, wouldn't your company have
16   a copy of that?
17       A. Would they have a copy of the e-mails that were
18   sent from his computer to his home computer?
19       Q. Yes.
20       A. I believe they would.  I believe they can -- I
21   mean, I know a lot of it was deleted, but I believe you
22   can go back and retrieve and I believe there was
23   retrieval of a certain portion of those.  I don't
24   believe we were able to retrieve all of them.
25       Q. Well, I've asked your company to provide me

Page 68

1    copies of all the documents that Mr. Gresham sent from
2    his personal e-mail -- from his work e-mail account to
3    his company e-mail account -- sorry.  Let me back up.
4    I'm going to restate that so it's clear.  I've asked
5    your company to produce to me copies of all of the
6    e-mails that they say Gresham sent from his work e-mail
7    account to his personal e-mail account, okay.  So I have
8    some copies of those documents.  There's not that many
9    of them.  I want to talk to you about them, okay.
10       A. Okay.
11       Q. So let's spend some time looking at them.
12           (Exhibit Number 108 marked.)
13       Q. (BY MR. VOLNEY)  So let's look at what I've
14   marked as Exhibit 108.  What is Exhibit 108?
15       A. This is a authorization for a -- for a sourcing
16   campaign that identifies the cost and expense of what
17   we're going to do for advertisement and for the client
18   to authorize for approval.
19       Q. Okay.  Did Mr. Gresham do any work for Missouri
20   Eye Institute?
21       A. He did, yes.
22       Q. Okay.  What work did he do for Missouri Eye
23   Institute?
24       A. He recruited for a retina surgery search.
25       Q. Did he make that placement?

Page 69

1        A. He did not.
2        Q. He did not.  Do you know if Merritt Hawkins lost
3    this business to Consilium?
4        A. I'm not aware of that.
5        Q. You can certainly call up Missouri Eye Institute
6    and ask them, right?
7        A. We could.  I highly doubt -- yeah, we could.
8        Q. You highly doubt what?
9        A. That's just not a common practice for us to call
10   up a client and ask if they're working with another
11   company, and, I don't know, I guess I highly doubt that
12   that client would just want to volunteer that
13   information.
14       Q. Is the -- is the form that's the second page here
15   marked MHA104, is this form confidential?
16       A. Yeah.  I would see it as confidential, yes.
17       Q. This -- this -- the information on the form or
18   the form itself?
19       A. The information on the form.  We don't -- it's
20   not something that we want competitors to see what we're
21   charging per price point for each piece.  Yeah, I would
22   definitely see this as confidential to us and as well to
23   the client.
24       Q. How many of these client authorization for
25   personal letter campaign and Internet advertisements

18  (Pages 66 to 69)

APP. 0055

Electronically signed by Lei Sherra Torrence (501-288-335-5388)          b1b89364-d730-4811-a71c-bebb8f493c5b

|  | Page 70 |
|---|---|

1   does your group send out on a weekly basis?
2     A. These are not sent out. These are handled in
3   person. So this would be something to when we go out
4   and execute a non-site profile with the client. We
5   bring this information with us and a hardcopy for them
6   to sign and authorize the campaign and this is an
7   out-of-pocket expense to the client. We typically do
8   not send this as an e-mail to our clients. This is
9   something we bring in as a hard copy when we're out on
10  the profile.
11    Q. Okay. So how many of these hardcopies are
12  presented on a weekly basis to clients?
13    A. That can vary. It's all depending on how many
14  searches have been brought in on the marketing side to
15  how many profiles we have set up. I think if you were
16  to say averages we have probably about 10 to 12
17  sometimes upwards to 15 profiles a month.
18    Q. All right. And the date on this is July 20th,
19  2012; do you see that?
20    A. I see July 23rd, 2012.
21    Q. Oh, on the second page of Exhibit 108. When did
22  Mr. Gresham quit?
23    A. Mr. Gresham quit on September 24th, 2012.
24    Q. Is this one of the documents that your -- your
25  company is claiming that Mr. Gresham stole when he left

|  | Page 71 |
|---|---|

1   Merritt Hawkins?
2     MS. NOWAK: Objection to extent that it
3   calls for a legal conclusion and/or speculation.
4    A. I'm not sure.
5    Q. (BY MR. VOLNEY) Okay. Is the form that's
6   attached to Exhibit 108, is that published anywhere on
7   Merritt Hawkins web site?
8    A. On our web site?
9    Q. Yep.
10    A. No.
11    Q. I note when I look at this particular client
12  authorization here on the second page of 108 that
13  there's no instruction to the client that the document
14  be kept confidential, is there?
15    A. I don't know. At the bottom it says
16  confidential, attorneys' eyes only.
17    Q. Okay. Well, I'll represent to you that that was
18  a -- that's a legend that she put on it. She meaning
19  Christine Nowak.
20    A. I did not see that anywhere on here, but again, I
21  would think it's confidential for the fact that we as a
22  company don't want others to know what we are charging
23  per price piece for our sourcing nor would the client
24  want to know what they're being charged or paid for the
25  source.

|  | Page 72 |
|---|---|

1    Q. As part of your search agreement with a company
2  like Missouri Eye Institute, is there a confidentiality
3  clause in there?
4    A. What do you mean by that?
5    Q. I mean, is there any -- any -- you're familiar
6  with the terms of the search agreement, I take it?
7    A. Yes.
8    Q. Is there any provision in that agreement that
9  requires that the client requires to keep Merritt
10  Hawkins pricing confidential?
11    A. No.
12    Q. Okay. Is there any -- is there any
13  confidentiality agreement on the client, to your
14  knowledge?
15    A. I'm not sure honestly.
16    Q. Who would we ask?
17    A. Probably could ask Travis Singleton our marketer.
18    Q. Okay. And is that a standard document, the
19  search agreement?
20    A. Yes.
21    Q. In other words, it's not -- some of the terms,
22  price might be negotiated --
23    A. Yes.
24    Q. -- but the language is standard?
25    A. And I deal very little with search agreements.

|  | Page 73 |
|---|---|

1   That's more of a marketing.
2     (Exhibit Number 109 marked.)
3    Q. (BY MR. VOLNEY) Okay. That's fair. Let's look
4  at 109. This looks like it was sent out at the same
5  time as Exhibit 108, July 20th, 2012. Was this the time
6  period that Mr. Gresham was working with Missouri Eye
7  Institute to locate a retina surgeon?
8    A. Yes.
9    Q. Okay. And then so what's the community
10  worksheet?
11    A. This would be a worksheet that we take with us on
12  the profile to gather information based on community,
13  hospital while we're conducting the onsite profile.
14    Q. So this looks like a -- this is a blank document.
15  Do you see that?
16    A. I see that, yes.
17    Q. And it's not blank. It's not been filled in.
18    A. It's not been filled in.
19    Q. Is this community worksheet published on Merritt
20  Hawkins web site?
21    A. On our web site?
22    Q. Right.
23    A. No.
24    Q. And do you consider this to be a confidential
25  document of Merritt Hawkins?

Kim Tindall and Associates, LLC     645 Lockhill Selma, Suite 200     San Antonio, Texas 78216
210-697-3400                                                          210-697-3408

APP. 0056
b1b89364-d730-4811-a71c-bebb8f493c5b
Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 74

1     A. I do.
2     Q. And why is that?
3     A. Confidential because this is something that we've
4  put together and it's something that we wouldn't want
5  others to -- to know to what extent we go on a profile,
6  whether it be another staffing agency or -- or
7  competitor. So yeah, I would see it as confidential.
8     Q. Is the point of the profile for the search
9  consultant to get some basic information about the
10  location where the -- the placement is?
11     A. Where the future placement would be, yes, but
12  it's -- yeah, it's to go out and learn about the
13  community, learn about the practice, meet with the
14  administration, take it to the hospital. So yes, it's
15  definitely a fact gathering endeavor and we come back
16  and then recruit off the information we've learned on
17  the profile.
18     Q. Okay. So one of Scott's -- Scott Gresham's job
19  responsibilities would be able -- would be to go out and
20  get the sorts of information that are on the community
21  worksheet which is now Exhibit 109, right?
22     A. That's correct.
23     Q. And just to be perfectly frank, part of the
24  problem with some of your placements is that they're in
25  places like Springfield, Missouri where perhaps people

Page 75

1  don't want to go. So you have to sell the community
2  itself, right?
3     A. That is correct, yeah.
4     Q. And so once this community worksheet is filled
5  out, is it shared with the physician?
6     A. No, it's not.
7     Q. None of the information on here is shared?
8     A. Oh, it's shared verbally, but you're asking if
9  this information that --
10     Q. The document itself is not shared?
11     A. The document itself is not shared. The
12  information that we have learned on the profile.
13  Basically we go off this as notes to present to our --
14  our candidates verbally.
15     Q. Okay. So it's not -- you don't ever put anything
16  in writing that says here's all the great things that
17  Springfield, Missouri has to offer and why you may want
18  to go there?
19     A. Yes, we would do that through an e-mail or
20  something of that nature. I guess I'm not understanding
21  your question right. Do we send this document as a
22  whole to a physician? The answer to that is no.
23     Q. Right.
24     A. The information that we've learned on the profile
25  we could incorporate into an e-mail and send to a

Page 76

1  physician.
2     Q. This is more of a series of prompts about the
3  source of information that might be gathered on a
4  profile visit, correct?
5     A. Correct.
6     Q. All right. And so is the information that's put
7  on a community worksheet is that shared with the client
8  as well?
9     A. Yes. We do put together a separate document that
10  is called the post profile letter. That is information
11  that we will put into the letter of information that we
12  learned on the profile to make sure that our notes are
13  accurate, to make sure what we're presenting is -- is
14  accurate and then they review that and let us know that
15  yes, okay, we've agreed to the post profile letter or
16  otherwise they want to make some changes to it and we
17  adhere to that.
18     Q. I got you. So they might have something to add
19  or something to correct, right?
20     A. Correct.
21     Q. All right. And then although this is -- there is
22  a legend here at the bottom confidential, attorneys'
23  eyes only, you've seen this document in its native state
24  as used by your search consultants and it's not marked
25  confidential, is it?

Page 77

1     A. No.
2     Q. Is it -- I take it that everything that the
3  search consultant touches in connection with his or her
4  search the company believes is confidential?
5     A. Yes, I think so.
6     Q. Is there anything that the search consultant uses
7  in his or her search that the company does not consider
8  to be confidential?
9     A. Not that I'm aware of.
10     Q. Do you search your employees before they leave
11  the building?
12     A. Search them as far as --
13     Q. Like physically?
14     A. -- pat them down?
15     Q. Right. Physically search them.
16     A. I do not. We do not.
17     Q. Do you retain the right as their employer to look
18  through their personal effects when they leave the
19  building?
20     A. Yes.
21     Q. Have you ever done that?
22     A. As far as company information through the
23  computers; is that what you're asking?
24     Q. Well, I'm talking about you think you have a
25  problem employee, maybe you think this employee is

20 (Pages 74 to 77)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    b1b89364-d730-4811-a71c-bebb8f493c5b

Page 78

1    walking off with your community worksheet or some other
2    top secret Merritt Hawkins document, have you ever -- or
3    do you know of anyone at Merritt Hawkins ever stopping
4    that employee and asking to go through their personal
5    effects?
6        A. I'm not aware of a situation like that to go
7    through their personal effects as far as, you know,
8    they're walking out with their personal supplies in a
9    box. I'm not aware of an instance where we've asked to
10   scour through that box to see if they have any personal
11   information in there.
12       Q. So when you terminate an employee, do you stand
13   by while they gather all their materials?
14       A. Yes.
15       Q. And then you're the person who's in charge of
16   escorting them out of the building?
17       A. Yes.
18       Q. Okay. When was the last time you did that?
19       A. It was with a gentleman by the name of Kevin
20   Dodson and I would say probably about seven months ago.
21       Q. Do you know whether Kevin Dodson -- well, why did
22   you terminate Kevin Dodson?
23       A. For production.
24       Q. Do you know if he sought employment at Consilium?
25       A. Did Kevin Dodson?

Page 79

1        Q. Right.
2        A. I'm not aware of that.
3        Q. Where is he now; do you know?
4        A. I'm not aware of that either.
5        Q. How long did he work here?
6        A. I believe five years.
7        Q. All right. Let's see. You'll confirm for me
8    that the date on that document, the e-mail Exhibit 109
9    is July 20th, 2012?
10       A. Yes, sir.
11       Q. And that's approximately two months before
12   Mr. Gresham quit, right?
13       A. Yes.
14       Q. Do you know if Mr. Gresham has used that document
15   or used that document while he was at Consilium?
16       A. I'm not aware of that.
17       Q. Do you know what Scott Gresham is doing now?
18       A. Do I know what he's doing now?
19       Q. Right.
20       A. Yes.
21       Q. What is that?
22       A. Selling e-cigarette.
23       Q. Have you contacted him to ask him to come back to
24   Merritt Hawkins?
25       A. I have not.

Page 80

1        Q. Why not besides the fact that you're suing him?
2    Would you like to have him back in the absence of the
3    lawsuit?
4        A. I would not, no.
5        Q. And you consider him a flake?
6        A. Yeah, absolutely.
7        Q. And was that true while he worked here?
8        A. Towards the latter part he became a little bit
9    flaky. There was, you know, concerns to his promptness
10   of -- of being at work. He called in sick a couple of
11   times. So there was some concerns to -- if you want to
12   define it as flakiness, but the way he resigned that
13   would certainly categorize that as very flaky.
14       Q. Did he spend a lot of time outside smoking with
15   Breanna Elliott?
16       A. He did.
17       Q. Was that -- was that a problem for you?
18       A. I mean, yeah, it took away from time being spent
19   in the office and being productive, yeah.
20       Q. I mean, you can't make calls if you're smoking a
21   cigarette in the back, right?
22       A. No.
23           MS. NOWAK: Objection; argumentative.
24       Q. (BY MR. VOLNEY) Do you have any expectation that
25   -- well, do -- do your employees ever work from home?

Page 81

1        A. Yes. In some instances, yeah. I mean, as far as
2    during the normal work hours, no. We are required to be
3    here at a certain time. We depart at a certain time.
4    What's done after hours yes, we have capabilities of
5    working from home through a secured VPN access and --
6    and with our mobile devices we're able to access e-mail.
7        Q. Do you know whether Scott Gresham ever accessed
8    the VPN?
9        A. I'm not aware of if he did or not.
10       Q. All right. Let's say Mr. Gresham has a trip
11   planned to Springfield, Missouri to fill out that
12   community worksheet. Do you see that?
13       A. Yes.
14       Q. Would you expect him to take a copy of it with
15   him?
16       A. A hard copy, I would, yes.
17       Q. Would you ever tell your employees that they're
18   not allowed to take electronic copies of company
19   documents?
20       A. I've never told an employee that you can't take
21   an electronic, but the way that we retrieve our files
22   and once going back to when a marketer brings in a
23   search and then that search is then transferred to the
24   recruiter we get a -- a white file we call it and in
25   that file it has these documents already printed out and

21 (Pages 78 to 81)

Page 82

1    are in the file for us to bring on the road to get the
2    information filled out and it's already been printed and
3    supplied into that document into that folder.
4        Q.  Is there a prohibition in Exhibit 105 on a
5    company using -- for an employee using their personal
6    e-mail for company business?
7        A.  So your question is:  Can they use their company
8    e-mail for business?
9        Q.  Sorry.  No, because I'm assuming they can.  My
10   question is:  Can they use their personal e-mail for any
11   company-related business?
12       A.  I'm not aware of using your personal e-mail to
13   conduct business within Merritt Hawkins.
14       Q.  Is there any prohibition in that system's use
15   policy for using your personal e-mail for
16   company-related business?
17       A.  I'm not seeing anything in here as far as
18   personal e-mails.  What I do see is company files on
19   computer and network must be removed.
20       Q.  Well, I mean, to be fair that bullet point that
21   you're referring to does allow an employee to
22   temporarily store company documents outside of the
23   company network, right?
24       A.  I don't know that it's a common practice to store
25   company information on a -- on a personal device.

Page 83

1        Q.  Well, that -- that wasn't my question.  My
2    question was:  This policy allows an employee to
3    transfer from or store outside the network company files
4    or data for temporary use to perform authorized work.
5    Do you see that?
6        A.  I see it.
7        Q.  Okay.  And you agree that that's the company's
8    systems use policy?
9        A.  As it states there, yes.
10       Q.  Okay.  And Mr. Gresham did go to Springfield,
11   Missouri to fill out the community worksheet for the
12   retina surgery center, right?
13       A.  That is correct.
14       Q.  Do you know if he went on maybe July 23rd of 2012
15   or thereabouts?
16       A.  I would say yes, thereabouts, yeah.
17           (Exhibit Number 110 marked.)
18       Q.  (BY MR. VOLNEY)  Okay.  So let's look at 110.
19   This is again, Exhibit 110 an e-mail from Scott Gresham
20   at his work account to his home account forwarding some
21   flight information and contact information related to
22   the Missouri eye client, correct?
23       A.  That's correct.
24       Q.  Now, just to be clear, it's not -- it's not
25   hidden from Merritt Hawkins that he's sending e-mails

Page 84

1    from his work account to his personal account, correct?
2           MS. NOWAK:  Objection, argumentative.
3        A.  I believe it's not hidden.  I'm not -- I'm not --
4    I'm not sure.
5        Q.  (BY MR. VOLNEY)  I mean, you as the employer
6    retain the right to go and look at every single e-mail
7    that goes in and out of Scott Gresham's account?
8        A.  Yes.  Yes.
9        Q.  Right.  In fact, I think you say that here in
10   your system's use policy that the employee should expect
11   no privacy with respect to the information that goes in
12   and out of their work account, right?
13       A.  It's all company information.  It's all
14   company -- yeah.  Yeah, it's all company property, yes.
15       Q.  Okay.  What is Hoopeston?  Do you know what
16   Hoopeston is?
17       A.  It's a community, Hoopeston, Missouri.
18       Q.  Missouri?  Illinois?
19       A.  Illinois.  Yeah, it was in Illinois, maybe.
20       Q.  Yeah.  We're on 111?
21       A.  Yes.
22           (Exhibit Number 111 marked.)
23       Q.  (BY MR. VOLNEY)  Okay.  This is another of the --
24   the documents the fine folks of Dykema provided to me as
25   evidence that Mr. Gresham sending information from his

Page 85

1    work account to his personal account and we've marked it
2    as Exhibit 111; do you see that?  With respect to --
3    well, is the information here, is it confidential
4    information belonging to Merritt Hawkins?
5        A.  I wouldn't see it as confidential information
6    belonging to Merritt Hawkins.  It's his flight
7    itinerary.
8        Q.  Do you know why it's marked confidential?  Is the
9    fact that he went to the hotel, the Super 8 Motel in
10   Wysocka on July 8th, 2012 somehow valuable confidential
11   information belonging to Merritt Hawkins?
12           MS. NOWAK:  Objection; argumentative.  And
13   John, I'll stipulate that counsel applied that
14   endorsement.
15           MR. VOLNEY:  Indiscriminately.  Will you
16   stipulate to that?  Okay.  Let's continue this process.
17   I don't have that many more.  I can go out to my car for
18   the other box.  Teasing.  Let's look at 112.
19           (Exhibit Number 112 marked.)
20       Q.  (BY MR. VOLNEY)  This is a document that again
21   has been produced to me by your counsel and this one's
22   marked confidential attorneys' eyes only.  And -- all it
23   lists is an e-mail address.  Do you know whose e-mail
24   address that is?
25       A.  I have no idea.

22  (Pages 82 to 85)

Page 86

1    Q. Do you know if that e-mail address belongs to a
2  client or prospect of Merritt Hawkins?
3    A. I'm not aware of that.
4    Q. Can we look in the Mhacs system and figure out if
5  that e-mail address is in there anywhere; is that even
6  possible?
7    A. It probably would be possible. Anyone that works
8  here with Merritt Hawkins knows that Mhacs is pretty
9  outdated so, yeah, I can imagine we could probably at
10  some point research how to get ahold of that and find
11  out what that e-mail is.
12    Q. When you say outdated, I take it you mean it's a
13  cumbersome technology?
14    A. It is cumbersome, but I mean, it's not --
15    Q. Not outdated. I mean, it's supposed to contain
16  up-to-date information?
17    A. It's all updated information, it's just -- yeah,
18  cumbersome would be a better description.
19    Q. Okay. Got it. Were Scott Gresham and Breanna
20  Elliott friends?
21    A. Yes.
22    Q. Do you know if Breanna Elliott has applied for
23  any job at Consilium?
24    A. I'm not aware of that.
25    Q. She's still currently employed here?

Page 87

1    A. Yes.
2    Q. She is a search consultant too, right?
3    A. Yes.
4    Q. Okay. Is it -- do the search consultants
5  occasionally e-mail back and forth company-related
6  documents?
7    A. Yes.
8    Q. For example, CVs of doctors or prospects?
9    A. Yes.
10    Q. So you don't think there's anything wrong, if for
11  example, Breanna Elliott e-mailed a CV to Scott?
12    A. I don't see anything wrong with that, no.
13    Q. Is there an e-mail group called MHA Recruiting?
14    A. Yes.
15    Q. So you could just do a -- an effective blast
16  e-mail to everybody in that e-mail group and everybody
17  gets it?
18    A. That's correct.
19    Q. And you would expect the folks who are working in
20  your Heartland search department -- or search consulting
21  department to share information about potential
22  recruits, doctors?
23    A. Correct.
24    Q. Okay. Bear with me a moment. Have you seen any
25  listing of all of the documents or e-mails that the

Page 88

1  company contends Mr. Gresham improperly e-mailed to his
2  home e-mail account?
3    A. I have not seen that. I've seen a partial list
4  of some information but not a full list.
5    Q. All right. Your understanding is it's in the
6  hundreds?
7    A. My understanding is, yeah, somewhere in there.
8    Q. Did you ever see Mr. Gresham in possession of a
9  thumb drive while he was employed at Merritt Hawkins?
10    A. I did not.
11    Q. Tell me how the room arranged. Is it just like a
12  big bullpen of cubicles?
13    A. Yes.
14    Q. And is it -- are they low cubicles or high
15  cubicles?
16    A. Not high. I mean, they're probably at that level
17  if you were standing.
18    Q. Okay. So you -- is -- do you have a cubicle or
19  are you in an office on the perimeter?
20    A. No. I have a cubicle.
21    Q. Okay. And then -- are you -- do you on your
22  day-to-day basis walk around and talk to people and sort
23  of encourage them to work harder?
24    A. Yes, I do.
25       MR. VOLNEY: Okay. I need to look at

Page 89

1  something right quick. Sorry. Do you want to take a
2  lunch break now? Why don't we go off the record and we
3  can discuss this?
4       THE VIDEOGRAPHER: Off the record at 12:03
5  p.m.
6       (Break taken from 12:03 p.m. to 12:45 p.m.)
7       THE VIDEOGRAPHER: We're back on the record
8  at 12:45 p.m.
9       MR. VOLNEY: Okay. So we've had lunch.
10  Thank you.
11    Q. (BY MR. VOLNEY) Let's -- let's go back to
12  talking about Mr. Gresham. And I want to followup on
13  something that we discussed earlier. When Mr. Gresham
14  was -- quit he was not replaced by a new person,
15  correct?
16    A. He was actually replaced with Laura Wilmeth
17  (phonetic). She was a person that about the same time
18  of his resigning through e-mail we had simultaneously
19  hired Laura and then she filled in the shoes of Scott
20  Gresham.
21    Q. Okay. So that's a little bit different from what
22  you told me before we had our lunch break, which I
23  understood to be that it's not a one-to-one replacement
24  when somebody quits in your department. Why are you
25  changing your testimony?

23  (Pages 86 to 89)

APP. 0060

b1b89364-d730-4811-a71c-bebb8f493c5b

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 90

1    A. Well, it's not necessarily is it a one on one,
2  but we have just recently hired and I can't honestly
3  remember if it was -- I mean, it was right at the same
4  time that Scott had resigned and we had hired Laura. We
5  essentially at that time had Laura replace Scott. I
6  believe we actually had another new hire in the wings as
7  well at that time so...
8    Q. How much did you pay to train Laura Wilmeth; do
9  you know?
10   A. I don't have that information.
11   Q. How big of a recruiting class was Laura Wilmeth
12  in to go through your recruiter in-training program?
13   A. How big was that class?
14   Q. Yeah.
15   A. I'm not sure.
16   Q. More than 10?
17   A. I'm not sure.
18   Q. Were you in hiring mode -- or were you in hiring
19  mode back in September of 2012?
20   A. We were.
21   Q. Would it be possible to find records that would
22  indicate how many people were in that recruiting class?
23   A. It would definitely be possible to find records.
24  I don't have those records.
25   Q. When -- is the gentleman, the training person's

Page 91

1  name Michael Faye?
2    A. That is correct.
3    Q. Is he the person who's principally in charge here
4  of training?
5    A. Yes, sir.
6    Q. Do you know how much money he makes a year?
7    A. I don't.
8    Q. Do you know how many people he trains?
9    A. I don't.
10   Q. I guess we'd have to ask him, I take it. Does he
11  have anybody who works for him or with him?
12   A. He handles the over -- he oversees research along
13  with his duties of doing the on boarding and corporate
14  training, he also does run the research department.
15   Q. Is -- are there other people who are in the on
16  boarding corporate training department?
17   A. With Merritt Hawkins, no.
18   Q. Does he have that function just for Merritt
19  Hawkins?
20   A. Yes.
21   Q. Who else is in the research department?
22   A. Research department, are those that we have hired
23  who do not have the skill set as of yet to be a
24  recruiter. Either they're newly out of college or lack
25  experience in recruiting. Generally, they're very young

Page 92

1  in tenure and age and then we put them in a research
2  role and groom them to be a recruiter.
3    Q. Why didn't you put a senior search consultant in
4  place of -- or to takeover Mr. Gresham's role?
5    A. Why did we not?
6    Q. Why did you not.
7    A. That's not a common practice to -- we don't hire
8  people as a senior search consultant and most teams are
9  made up of search and senior and we don't generally
10  transfer team members from team to team.
11   Q. How many search members did you have on your
12  Heartland team in September of 2012?
13   A. I can't answer that. I wouldn't be -- I don't
14  know the accurate number -- what the accurate number
15  was.
16   Q. So same -- you would give me the same answer if I
17  asked you for how many senior search consultants you had
18  on your team?
19   A. I would.
20   Q. Do you have records that would reflect that?
21   A. I do.
22   Q. Do you have records that would reflect how many
23  placements your senior search consultants did in 2013?
24   A. Yeah, that's a little bit more challenging
25  because at times a senior search consultant, you know,

Page 93

1  mid year they could be promoted to that senior search
2  status. So I mean, could we find it out, yes, we could.
3  It would be a little more cumbersome.
4    Q. Frankly, for every person who worked in the
5  Heartland as a search consultant in 2012 you'd be able
6  to retrieve records and indicate how many placements
7  they made?
8    A. Yes, sir.
9    Q. And you would easily be able to retrieve records
10  as to how much you had paid them in compensation?
11   A. Yes, sir.
12   Q. I take it they are paid a base salary plus
13  commission?
14   A. That's correct.
15   Q. How -- is Laura Wilmeth still with the company?
16   A. She is.
17   Q. And she started in September of 2012?
18   A. That sounds to be accurate, yes.
19   Q. And was she hired specifically to replace Scott
20  Gresham?
21   A. She was hired into the class as a replacement for
22  Scott Gresham.
23   Q. Was she told that she was going to be replacing
24  Scott Gresham?
25   A. No.

24  (Pages 90 to 93)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Tim Beidle                                                      May 16, 2014

Page 94

1    Q. When was she hired?  Do you know the date?
2    A. I don't know the date.
3    Q. Was it before September 24th of 2012?
4    A. I don't know the date.
5    Q. Who would have records of the date of when she
6    was hired?
7    A. Talent acquisition and it's -- it would be in her
8    folder with -- with HR.
9    Q. When Scott Gresham sent you an e-mail terminating
10   his employment on September 24 of 2012, did you
11   immediately go to talent acquisition and say, we've got
12   to find somebody to replace Scott?
13   A. I don't know that to be the case.  We definitely
14   at that time were -- were looking for candidates and so
15   yes, I mean, when Scott did resign, absolutely.  It was
16   -- we evaluate each team and per the way our quotas are
17   set up, we're committed to having a certain metric
18   placement-wise and you need to have the head count to
19   get to that placement number.  So anytime we have a
20   recruiter resign, then yes, we will hire to replace that
21   person to make sure that we're able to obtain our quota.
22   Q. How many recruiters in training did you have as
23   of September 24th, 2012?
24   A. I don't know.
25   Q. Did -- would it have been common for you to have

Page 95

1    recruiters in training at that time?
2    A. It would be common to have a recruiter in
3    training at that time if we had someone who was possibly
4    on corrective action and we didn't see that person being
5    able to make it past the fit process which is a peer
6    performance improvement plan or otherwise we had someone
7    resign.
8    Q. So is it your testimony that when a search
9    consultant resigns -- let's say Laura Wilmeth resigns
10   tomorrow.  She is having a -- maybe Monday.  Probably
11   wouldn't resign on Saturday, maybe she would.  Resigns
12   on Monday, is it at that point that you would then take
13   up the mantle of calling talent acquisition and talent
14   acquisition would go out and find a person and then that
15   point that person is made a recruiter in training?
16   A. That in most cases would be the appropriate
17   scenario, yes.
18   Q. So when somebody quits as a search consultant, it
19   may take a period of weeks or months to find somebody to
20   replace that person, right?
21   A. Correct.
22   Q. In fact, it takes at least 20 weeks because
23   that's the length of the training program?
24   A. It takes 20 weeks for training, yes.
25   Q. And how many people do you currently have in your

Page 96

1    training program?
2    A. Currently today we have as a company five
3    recruiters that are in training.
4    Q. All right.  Who is Deleon McKee?
5    A. He was a marketer that worked for Merritt Hawkins
6    in the Heartland region.
7    Q. And when did he quit?
8    A. I don't know that date.
9    Q. I take it he has quit?
10   A. And it was years ago, yes.  Actually, he was
11   terminated, if that makes any difference.
12   Q. It does, years ago?
13   A. Years.
14   Q. Terminated for lack of performance?
15   A. I think there were other things that were
16   involved, but I don't know all of the details, but yeah,
17   it was a mutual departure.
18   Q. Did you terminate him?
19   A. I did not.
20   Q. Do you know where he currently works?
21   A. I do not.
22   Q. Was he a valuable employee of Merritt Hawkins?
23   A. He was to -- at one level.  I should say at one
24   point in time and then he was doing some things that
25   were inappropriate in the way of, you know, sending in

Page 97

1    reimbursements for travel that, you know, wasn't
2    necessarily going out traveling and meeting clients.  It
3    was almost like personal travel to the Chicago market
4    where he -- where his territory was.
5    Q. Okay.  So terminated by Merritt Hawkins.  Was it
6    over a year ago that he was terminated by Merritt
7    Hawkins?
8    A. Over a year ago.
9    Q. Right.
10   A. Yes.
11   Q. Do you have yourself an employment agreement with
12   Merritt Hawkins?
13   A. I do.
14   Q. Does it have a one-year noncompete?
15   A. It does.
16   Q. Does it have a three-year non-solicitation?
17   A. Thirty-six months, yes, sir.
18   Q. What is your understanding of -- if you, Tim
19   Beidle, quit Merritt Hawkins tomorrow, how long would
20   you have to wait before you could go to work for Arthur
21   Marshall?
22       MS. NOWAK:  Objection to the extent it calls
23   for a legal conclusion.
24   Q. (BY MR. VOLNEY)  I'm asking for your
25   understanding.  And I'm assuming you're not a lawyer.

25  (Pages 94 to 97)

Page 98

1    A. My understanding would be a year.
2    Q. Okay. And then how long would you have to wait
3  before you could contact folks at Merritt Hawkins about
4  potentially coming to work at Arthur Marshall?
5         MS. NOWAK: Objection to the extent it calls
6  for a legal conclusion.
7    A. To my understanding it would be 36 months.
8    Q. (BY MR. VOLNEY) What's the purpose of that
9  36-month waiting period?
10   A. We would not want someone to solicit employees
11 from our company and have them go to another company.
12   Q. Do you know why Scott Gresham quit?
13   A. I understand that he was discussed -- he was
14 discussed the opportunity at Consilium by Billy Bowden.
15   Q. Do you know whether Scott Gresham had a job at
16 Consilium before he quit?
17   A. I do not know that.
18   Q. Was there anything -- I think the e-mail by which
19 he quit is attached as Exhibit C to our -- to the
20 complaint here which is one of these exhibits. Maybe
21 it's this one at the very bottom here. So it's the next
22 to last page. And I just want to -- what I want to do
23 is I want to understand the sequence of events. He quit
24 or gave you -- or sent you this e-mail on
25 September 24th, 2012 at 7 a.m.?

Page 99

1    A. That's correct.
2    Q. Do you recall at what point during the day you
3  read the e-mail?
4    A. Generally, I'm in the office between the hours of
5  8:00 and 8:30, so it would've been somewhere around that
6  period of time.
7    Q. What did you do after you got this e-mail?
8    A. I believe I sent it to Tom Florence and walked
9  down to his office to make sure he had received it and
10 may have sent it to Gurdy as well.
11   Q. Is Gurdy in HR?
12   A. Yes.
13   Q. Okay. And did you try to call Scott?
14   A. I don't know that I did -- you know, in fact,
15 maybe I did call him because he had two potential closes
16 and I do remember this. He had two potential closes of
17 physicians that he was working with that he thought he
18 was going to be able to close over the weekend and so I
19 did leave him a message to follow up with him to see
20 where things stood with that -- with those doctors.
21   Q. You left him a voice mail message?
22   A. I did.
23   Q. Did he respond?
24   A. No.
25   Q. Did you, yourself, make efforts to figure out

Page 100

1  what was going on with those two potential closes?
2    A. Yes, through those candidates and clients, yes.
3    Q. Were those potential closes closed?
4    A. One of the candidates never interviewed. So that
5  was completely fabricated and the other one did not
6  close.
7    Q. One of the candidates never interviewed. What
8  does that mean?
9    A. One of the candidates that he felt like he was
10 going to be able to close over the weekend that
11 candidate never even interviewed for -- for the position
12 so that documentation and that interview was false.
13   Q. Was -- so there was documentation indicating that
14 that candidate had interviewed?
15   A. Yeah.
16   Q. But he, in fact, did not?
17   A. That is correct.
18   Q. All right. And since you left the voice mail
19 message for Mr. Gresham on September 24th of 2012, have
20 you had any other communications with Mr. Gresham?
21   A. I have not.
22   Q. Have you tried to communicate with Mr. Gresham?
23   A. I have not.
24   Q. I take it that this is a free country and we've
25 repealed slavery sometime ago. So it was certainly

Page 101

1  Mr. Gresham's right to quit his employment at Merritt
2  Hawkins?
3         MS. NOWAK: Objection; argumentative.
4    Q. (BY MR. VOLNEY) It means an at-will employment
5  relationship, correct? He not required to come to work
6  here every day if he doesn't want to?
7    A. That's correct.
8    Q. I mean, employees here quit all the time?
9         MS. NOWAK: Objection.
10   Q. (BY MR. VOLNEY) Right?
11   A. Yes. He can resign his position at Merritt
12 Hawkins.
13   Q. Okay. So you agree with me that he at least has
14 that right to resign his position, right?
15   A. I agree.
16   Q. And sitting here today knowing what you know now
17 about this fabricated candidate, you're probably happy
18 he resigned?
19   A. Well, I mean, he was doing well and I think
20 towards the latter part of his tenure with Merritt
21 Hawkins we saw some areas of -- of concern, but the
22 way -- and what we feel is an appropriate way of
23 resigning, Scott did not provide that at all.
24   Q. What's the appropriate way of resigning from
25 Merritt Hawkins?

26 (Pages 98 to 101)

APP. 0063
Electronically signed by Lei Sherra Torrence (501-288-335-5388)                b1b89364-d730-4811-a71c-bebb8f493c5b

| Page 102 | Page 104 |

**Page 102**

1    A. The appropriate way would be to come in with a
2  letter of resignation, to sit down with leadership and
3  recruiters and go over their files as far as
4  documentation for each candidate and client that they're
5  working with and to spend, you know, a day to go over
6  that information and to depart and -- you know and to
7  depart in a good way.
8    Q. Do you spend a day going over the files and the
9  candidates that they're working with with the people you
10 terminate?
11   A. I didn't terminate him.
12   Q. Well, I'm talking about you and your job as the
13 VP of the Heartland.  When you're in the business of
14 terminating somebody because they're not performing, do
15 you spend an entire day sitting down with them having an
16 exit interview?
17   A. No, we do not.
18   Q. You walk them off the property I think is what
19 you told me earlier?
20   A. Yes, sir.
21   Q. There's no contractual requirement, I take it,
22 that Scott sit down with you and have an exit interview,
23 right?
24   A. There's no -- you're right.  There's no
25 contractual agreement, but it's just standard protocol

**Page 104**

1  2012 to September 24, 2013, has Laura Wilmeth met her
2  quota?
3    A. Yes.
4    Q. So she's had over one placement per month?
5    A. Yes.
6    Q. Has she done more than four or five interviews
7  per month?
8    A. Yes.
9    Q. Thanks.  Okay.  Let's see.  Let's talk a little
10 bit about this agreement and then we'll kick off for the
11 weekend.  I want you to look at exhibit -- Exhibit A --
12 actually, let's not fool with Exhibit A.  Let's look at
13 Exhibit B?
14   A. Of 107?
15   Q. Yes, sir.  Thank you for clarifying for the
16 record.
17   A. What page is that?
18   Q. Oh, sorry.  I think it's 37.  Yes, 37 there at
19 the top.  So this is a copy of Mr. Gresham's employment
20 agreement, his second employment agreement with Merritt
21 Hawkins, all right?
22   A. Okay.
23   Q. Have you seen his first employment agreement with
24 Merritt Hawkins?
25   A. I have not.

| Page 103 | Page 105 |

**Page 103**

1  and if you want a good reference for future by the way
2  you want to handle it and it's just the right way of
3  handling it.  I don't know if sending an e-mail is an
4  appropriate way of terminating your relationship with a
5  company.
6    Q. You testified earlier that you had some concerns
7  with Mr. Gresham's performance before he terminated his
8  employment at Merritt Hawkins.  What were those concerns
9  specifically?
10   A. Just areas of production, being lighter than we
11 had seen in the past.  It's -- he was always a pretty
12 high performer, high volume setter and -- and we had
13 seen the volume begin to -- to decline a little bit.  I
14 mean, that happens.  Sometimes you hit a wall in this
15 industry and you know, sometimes you take a lot of kicks
16 in the gut and you've got to just bounce back from it,
17 but sometimes it -- it you know, you need that little
18 extra push and drive to get through it.
19   Q. What was his quota in 2012?
20   A. What was his quota?
21   Q. Yep.
22   A. Pretty much the standard quota of one placement a
23 month.  I mean, that's pretty much the minimum quota of
24 one placement a month, four to five interviews a month.
25   Q. Okay.  Tell me during 2000 -- from September 24,

**Page 105**

1    Q. Let's see.  I may have a copy of it for us to
2  refer to.  Yep.  Thank you.
3        (Exhibit Number 113 marked.)
4    Q. (BY MR. VOLNEY)  Let me show you 113.  So Exhibit
5  113 is a copy of Larry Gresham's employment agreement
6  with Merritt Hawkins dated March 31st, 2008; do you see
7  that?
8    A. Yes.
9    Q. And do you have a similar employment agreement to
10 this one with Merritt Hawkins?
11   A. Yes, I do.
12   Q. Do you consider the training that you provide to
13 your search consultants to be confidential?
14   A. I'm sorry.  What was the question again?
15   Q. Do you consider the training -- the 20-week
16 training program that you provide to your search
17 consultants to be confidential?
18   A. Through the years of our 25 years of doing this,
19 yeah, I would see that to be confidential, yes.
20   Q. What's -- what's secret about it?
21   A. Just the years of experience, the tenureship that
22 we provide and just the industry knowledge that really
23 no other company out there has.  So yeah, I would see it
24 as being confidential.
25   Q. Did you yourself go through the search consultant

Kim Tindall and Associates, LLC      645 Lockhill Selma, Suite 200          San Antonio, Texas 78216
210-697-3400                                                                210-697-3408

Electronically signed by Lei Sherra Torrence (501-288-335-5388)

Page 106

1  training?
2      A. I did.
3      Q. Did, did not?
4      A. I did.
5      Q. Okay. And you were a search consultant for some
6  period of time, right?
7      A. I was.
8      Q. Okay. So would you consider the training that
9  Merritt Hawkins provides to be confidential information
10 as that term is used in the employment agreement itself?
11     A. I would see it as confidential, yes.
12     Q. Okay. What aspects of the Merritt Hawkins
13 training are confidential?
14     A. Well, I think when you're talking about just the
15 information, itself the 44-step system that we have in
16 place. The different protocols and mechanisms that --
17 that we instill into our employees I would see, as yes,
18 confidential. Essentially it is the -- as we kind of
19 call it the Bible to recruiting and we'd like to think
20 that that is our brand and we do keep it confidential.
21     Q. Okay. After you -- after an employee terminates
22 his or her employment with Merritt Hawkins, can they
23 ever use Merritt Hawkins confidential information from
24 that day forward?
25     A. Confidential information as far as documents?

Page 107

1  No. They shouldn't, no.
2      Q. What about the confidential information that is
3  imparted during the training process?
4      A. They should not, no.
5      Q. Given that you consider the training that Merritt
6  Hawkins to be -- that Merritt Hawkins provides is
7  confidential information of the agreement, how is it
8  that any employee of Merritt Hawkins -- upon terminating
9  their employment with Merritt Hawkins, how is it that
10 that employment can go work in the recruiting -- the
11 medical recruiting industry?
12     A. How is it that they can?
13     Q. Right.
14     A. Well, I think that's why they put -- for one,
15 they put the year noncompete, but -- and I know that's
16 based on certain radius, but I don't know that there's
17 anything that states you can't do physician recruitment
18 outside of Merritt Hawkins if you've explored an
19 opportunity outside of that radius and I could be wrong.
20 I'm not sure.
21     Q. Okay. But it -- it you know from your personal
22 experience here at Merritt Hawkins over the years that
23 occasionally people get tired of Merritt Hawkins and
24 then will go work for other medical recruiters, correct?
25     A. Correct.

Page 108

1      Q. There's people like Billy Bowden who will wait
2  out the one-year noncompete, right?
3      A. Correct.
4      Q. And then go to work for, for example, Delta?
5      A. Correct.
6      Q. And at least in your understanding, you don't
7  have any problem with that as long as they're otherwise
8  abiding by the one-year noncompete, right?
9      A. As long as they're abiding by the one-year
10 noncompete.
11     Q. Okay. I have a question about -- sorry. Let's
12 look at -- we're on Exhibit 113 still. Let's look at
13 page marked MHA241.
14     A. What page is that? I'm sorry.
15     Q. Sorry. At the bottom. We're on this one. This
16 one right here. You know, forget that. Let's look at
17 exhibit -- the complaint.
18     A. What's that?
19     Q. Exhibit 106 -- 107 and then let's look at page --
20 I want to look at page 40 which would be page four of
21 the Gresham employment agreement. Now, Mr. Beidle, does
22 your employment agreement with Merritt Hawkins have a
23 geographical where you're prohibited from working after
24 you leave Merritt Hawkins for a period of a year?
25     A. Yes, to the best of my knowledge it does. I have

Page 109

1  not seen it in a long time, but yes.
2      Q. Does that geographical territory in effect a
3  radius around where we currently are here in Irving?
4      A. Correct.
5      Q. And so you would be prohibited from working at
6  any competing business within a 50-mile radius of
7  Merritt Hawkins?
8      A. That's correct.
9      Q. Now, what's the -- what's the purpose of that?
10     A. What is the purpose of --
11     Q. The 50-mile radius?
12          MS. NOWAK: Objection to the extent it calls
13 for a legal conclusion.
14     A. We do not want a recruiter or otherwise marketer
15 who leaves this company to go to a competing
16 organization within a certain radius of where we are
17 that is in direct competition with Merritt Hawkins such
18 as Consilium or Delta or Fidelus or any others.
19     Q. (BY MR. VOLNEY) Does -- does Merritt Hawkins --
20 Merritt Hawkins must know who its competitors are within
21 a 50-mile radius of the front door over here, at 5001
22 Statesman, right?
23     A. Yes.
24     Q. Why doesn't Merritt Hawkins just give its
25 employees a list of the places where they can't work?

28 (Pages 106 to 109)

Page 110

1          MS. NOWAK:  Objection to the extent it calls
2  for a legal conclusion.  It's argumentative.
3          A.  There's always new companies that are -- are
4  opening at any given time.  It also protects us to where
5  someone wouldn't leave here and set up a company across
6  the street.
7          Q.  (BY MR. VOLNEY)  Okay.  It looks like on page 40
8  of exhibit of whatever we're on, 111 -- sorry -- 107,
9  that Mr. Gresham actually had a little bit of a
10  different restricted territory and his restricted
11  territory here at Section 5A is defined as Dallas, Texas
12  and all counties adjacent to Dallas County including the
13  counties of Collin, Denton, Ellis, Hunt, Johnson,
14  Kaufman, Rockwall and Tarrant, right?  Do you see that?
15         A.  I do, yes.
16         Q.  So he can't -- or he's prohibited from going to
17  work at any company that competes with Merritt Hawkins
18  in any of those counties for a period of a year?
19         A.  That's correct.
20         Q.  And your understanding as the vice president of
21  Heartland is that that is to prevent employees from
22  going to work at competitors who are located nearby to
23  where this office is?
24         MS. NOWAK:  Objection to the extent it seeks
25  a legal conclusion or speculation.

Page 111

1          Q.  (BY MR. VOLNEY)  I just want your understanding
2  as the vice president of Heartland.
3          A.  That's correct.
4          Q.  Okay.  When Mr. Gresham -- actually, I have a
5  couple of questions.  Question one:  Are Dallas, Collin,
6  Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall and
7  Tarrant, are those within the Heartland?
8          A.  No, they're not.
9          Q.  In fact, the entire state of Texas is outside of
10  the Heartland as defined by Merritt Hawkins, right?
11         A.  That's correct.
12         Q.  Did Mr. Gresham attempt to find physicians for
13  any Merritt Hawkins clients located in Dallas, Collin,
14  Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall or
15  Tarrant County?
16         A.  Anyone within the Heartland region, is that what
17  your question was?
18         Q.  Right.
19         A.  No.
20         Q.  Okay.  Would -- does -- does Merritt Hawkins have
21  any search consultants who work offsite?
22         A.  Yes.
23         Q.  Like from their homes?
24         A.  Yes.
25         Q.  Do they have similar provisions preventing them

Page 112

1  from working within 50 miles of their homes?
2          A.  I'm not sure how that's set up.
3          Q.  Okay.  Is -- do you know if during his year
4  previous to his leaving Merritt Hawkins if he identified
5  any physician recruits within any of the counties listed
6  here on page 4 in Exhibit 107?
7          A.  After his departing from Merritt Hawkins, did he
8  speak with physicians within these counties?
9          Q.  I'm talking about the year prior to his
10  departing.  Did he speak to any physicians in those
11  counties?
12         A.  I would imagine, yes.
13         Q.  Is the purpose of that provision to prevent him
14  from speaking with physicians within those counties?
15         A.  The provisions stated here is to protect Merritt
16  Hawkins from an employees to leave and go to a competing
17  company within --
18         Q.  Within --
19         A.  -- a certain radius.
20         Q.  Okay.  If the employee moved to Hill County,
21  could the employee go to work for a Merritt Hawkins
22  competitor?
23         MS. NOWAK:  Objection to the extent it calls
24  for a legal conclusion or speculation.
25         A.  I'm not sure.  I don't know the legalities behind

Page 113

1  that.  I would not be the one to answer that.
2          Q.  (BY MR. VOLNEY)  Do employees ever ask you to
3  explain the terms of the employment agreement to them?
4          A.  With me?
5          Q.  Yes.
6          A.  No.
7          Q.  If an employee asked you could I go to work for X
8  company, would you be able to direct them to someone
9  within these four walls that could answer that question?
10         A.  If you're asking if one of my employees came to
11  me and asked if it was okay to go and work with
12  Consilium, would there be someone that they could go
13  speak with and to identify that that was right?
14         Q.  Right, at least according to Merritt Hawkins.
15         A.  I would -- yeah, I don't know that that would be
16  a question ever asked coming to your supervisor asking
17  if I leave is it okay if I work with Consilium.  Maybe
18  their last day of employment, but I imagine that yes,
19  they could go talk to talent acquisition or HR and get
20  that information, but I don't know that that question
21  has ever been asked or ever will be asked.
22         Q.  Do you know whether Mr. Gresham used any of
23  Merritt Hawkins' confidential -- confidential
24  information during the -- approximately 11 months he
25  worked for Consilium?

29 (Pages 110 to 113)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    b1b89364-d730-4811-a71c-bebb8f493c5b

Page 114

1    A. I'm not aware of that, no.
2    Q. I think I asked you this, but I just want to make
3  sure I have it.  Do you know any clients that the
4  Heartland lost to Consilium because of Mr. Gresham?
5    A. I don't know of any, no.
6    Q. Do you know whether Mr. Gresham contacted any of
7  his Heartland clients, his former Heartland clients
8  while he worked for Consilium?
9    A. I don't know of any, no.
10    Q. Do you know whether he was even operating in the
11  same geographical area?
12    A. I'm not aware of that.
13    Q. Okay.  I looked back at some records that the
14  company has provided to me and I've determined that
15  Gresham's first round at Merritt Hawkins was from
16  March 2008 to April 2009, all right?
17    A. Okay.
18    Q. And then he came back to Merritt Hawkins if we
19  look on the first page of this contract on May 17th,
20  2010.
21    A. Okay.
22    Q. So he was gone for a period of about 13 months,
23  got that?  April 2009 to May 2010?
24    A. Okay.
25    Q. If Mr. Gresham was working for Arthur Marshall

Page 115

1  during the middle of that time period, was he in
2  violation of his noncompete?
3       MS. NOWAK:  Objection to the extent it calls
4  for a legal conclusion or speculation.
5    A. Was he in violation of his noncompete with Arthur
6  Marshall?
7    Q. (BY MR. VOLNEY) No, he's working for Arthur
8  Marshall.  Of his noncompete with Merritt Hawkins which
9  I think is in Exhibit 113?
10    A. Right.  Is he in violation of his noncompete?
11    Q. Would he have been in violation of his
12  noncompete if he was working for Arthur Marshall during,
13  for example, July of 2009?
14    A. I'd have to say yes.
15    Q. If he was in violation of his noncompete, why did
16  Merritt Hawkins rehire him?
17    A. He was a good employee.  I honestly don't know
18  that we thought that it was a direct violation of his
19  noncompete even though you, I guess, could by the
20  language seen it as that but he left for -- for
21  different reasons.  And quite frankly, we don't really
22  see Arthur Marshall as a competitor because they are so
23  small in nature.  But he left on good terms and was a
24  good employee so we made the decision to rehire him.
25    Q. Is Arthur Marshall larger or smaller than

Page 116

1  Consilium?
2    A. Much smaller.
3    Q. How big is Consilium?
4    A. I don't know their exact employee number, but I
5  would think it is probably around 50 or 60 employees.
6    Q. Now, to be fair, this agreement doesn't say you
7  can't go to competitors except if they have less than 10
8  employees, does it?
9    A. That's correct.
10    Q. I guess some matter more to Merritt Hawkins?
11    A. Well, I don't know that that's the case, no, but
12  certainly that are some competitors that play a bigger
13  role in the industry than others.
14    Q. Did you ever work with Joe Hawkins?
15    A. I did.
16    Q. You did.  For what period of time?
17    A. I don't know the exact dates.  It was, you know,
18  before the merger.
19    Q. Did you work with him directly?
20    A. No, not directly.
21    Q. Let's see.  I think I'm almost done.  Has there
22  been any talk internally among the -- sort of the
23  management team about targeting Consilium for lawsuits?
24  I'm excluding from that any conversations you might have
25  had with lawyers.

Page 117

1    A. I have not had any of those conversations, no.
2       MR. VOLNEY:  Okay.  That's all the questions
3  I have.  Thank you.
4       MS. NOWAK:  I have a few, but it'll just be
5  very short.
6            EXAMINATION
7  BY MS. NOWAK:
8    Q. Mr. Beidle, do you maintain any personal files on
9  your MHA computer?
10    A. I do not.
11    Q. Why?
12    A. Because again, it's the company policy to have
13  personal information on a -- on your desktop or any
14  that's part of Merritt Hawkins.
15    Q. Are your team members allowed to or are they
16  supposed to maintain personal files on their computer?
17       MR. VOLNEY:  Objection; leading.
18    A. They are not.
19    Q. (BY MS. NOWAK) Would it be your expectation that
20  they would not maintain personal files on their
21  computer?
22       MR. VOLNEY:  Objection; leading.
23    A. It's my expectation that they would not.
24    Q. (BY MS. NOWAK) Okay.  Since there's been an
25  objection lodged, I'm going to ask that question again.

30  (Pages 114 to 117)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                    b1b89364-d730-4811-a71c-bebb8f493c5b

Tim Beidle                                                    May 16, 2014

Page 118

1  Do you have any expectations regarding whether your
2  employees would maintain personal files on their
3  computer?
4     A. My expectation is that they would not have
5  personal files on their computer.
6     Q. Are search consultants or senior search
7  consultants with MHA permitted to use USB devices or
8  drives on their computers?
9     A. They are prohibited to use those.
10    Q. Mr. Beidle, Mr. Gresham during his deposition
11 testified that he often or sometimes e-mailed from his
12 business e-mail to his personal e-mail when he was going
13 to be traveling for work, that that was a common
14 practice and was something that was acceptable, you
15 know, within MHA. Do you find that to be reasonable or
16 acceptable?
17       MR. VOLNEY: Objection; form.
18       MS. NOWAK: What's the basis, John?
19       MR. VOLNEY: I think it's a silly question.
20       MS. NOWAK: Silly question is not an
21 objection.
22       MR. VOLNEY: It's -- it's an incomplete
23 hypothetical. It's asking him for an opinion. He's a
24 fact witness. It's vague as to what you mean by
25 reasonable.

Page 119

1     Q. (BY MS. NOWAK) Mr. Beidle, I'm going to ask the
2  question again. Mr. Gresham testified that he would
3  e-mail from his business e-mail to his personal e-mail
4  address and that the reason for doing that was because
5  he would be traveling for MHA business. Have you ever
6  forwarded to yourself from your business e-mail to your
7  personal e-mail when you would be traveling for
8  business?
9     A. No.
10    Q. Okay. Why is that?
11    A. Well, we have a secured network VPN that we can
12 access from the road through either our -- at that time
13 we didn't have iPads, but through our laptop and then as
14 well when we were given the profile information, we call
15 it a white folder, all of the hard documents are in that
16 white folder that we would need to conduct the onsite
17 profile.
18    Q. And Mr. Beidle, I'm going to have you refer back
19 to Exhibits 108 and 109. These are two of the documents
20 that Mr. Gresham said that he e-mailed to himself so
21 that he could conduct MHA business. Would either of
22 these two documents been contained in the white folder
23 that you're talking about?
24    A. Both would've.
25    Q. Okay. And can you explain for me a little more

Page 120

1  why it is that MHA has a VPN system?
2     A. VPN system is set up to where you're on the road
3  you can check your e-mails or get into certain
4  unrestricted hard drives.
5     Q. Does VPN have security features attached to it?
6     A. It does.
7     Q. What are those security features?
8     A. I honestly don't know. I'm sorry.
9     Q. Does it require passwords --
10    A. Yes. Yes, it does.
11    Q. -- and et cetera?
12    A. Yeah.
13    Q. So is one of the reasons that MHA has it to
14 maintain the security of its confidential information?
15    A. That's correct.
16       MR. VOLNEY: Objection; leading.
17    Q. (BY MS. NOWAK) Mr. Beidle, can you tell us what
18 are the reasons that MHA has a VPN system?
19    A. To make sure it's protected and that none of that
20 information is leaked out.
21    Q. Mr. Beidle, John asked you earlier about this
22 AMN's systems use policy and one of the things he asked
23 you to do was -- or that he alleged was that there was
24 no prohibition on using personal e-mail for business.
25 Is your understanding -- is there a prohibition on using

Page 121

1  personal e-mail for business at MHA?
2     A. It is just -- it is understood that in the four
3  walls of -- of this company that you do not use company
4  devices for personal -- personal reasons.
5     Q. Okay.
6     A. Including e-mail and --
7       MR. VOLNEY: I think you mean personal
8  devices for company reasons, but she can fix it.
9     Q. (BY MS. NOWAK) Can you look with me at this MIS
10 and systems use policy and tell me what is the basis for
11 your assertion that employees should not be using
12 personal e-mail for business?
13    A. It's not conducive to -- towards what we do.
14 There's no reason for it. It's not something that we
15 condone in the workplace. It's just understood that
16 when we're here we're -- it's business related and we're
17 not sending out personal documents to personal e-mails
18 and also to protect what we have as a company.
19    Q. So does MHA actually issue a business e-mail
20 address for each of its employees?
21    A. Yes.
22    Q. So there's no reason -- or is there any reason to
23 use a personal e-mail for business?
24    A. No, not at all.
25    Q. Mr. Gresham has also testified and -- and

31 (Pages 118 to 121)

Electronically signed by Lei Sherra Torrence (501-288-335-5388)                b1b89364-d730-4811-a71c-bebb8f493c5b

Page 122

1   admitted to deleting hundreds of files on the day before
2   he sent you his resignation e-mail.  Is it common
3   practice for employees to delete hundreds of files off
4   of their computer?
5       A.  Absolutely not.
6       Q.  Why would you say that?
7       A.  It's just -- one, it's -- you shouldn't have
8   hundreds of files, I guess, to be deleted.  But in most
9   instances, it's one against -- I don't know if it's a
10  written company policy, but I've never once seen an
11  employee come in the day before their resignation and
12  access the building and delete hundreds of -- of files.
13      Q.  So let's talk about that.  Was there a difference
14  in the way that Mr. Gresham resigned from MHA the first
15  time he was employed versus the second?
16      A.  Yes.
17      Q.  Okay.  Can you tell me just a little bit about
18  that?
19      A.  The first time he resigned it was how we would
20  see appropriate.  He had a letter of resignation.  He
21  came in face to face.  He turned in his badge and -- we
22  have a badge to access the building.  Then I believe had
23  an exit interview.  I'm not certain because that's
24  something that talent acquisition will -- or HR will
25  conduct, but I mean, he went over some files with us and

Page 123

1   -- you know it was handled appropriately.
2       Q.  So the second time around when Mr. Gresham quit
3   he kind of slinked into the building the night before,
4   took a bunch of stuff and then sent you an e-mail.  He
5   never did again appeared in the building?
6           MR. VOLNEY:  Objection; argumentative and
7   misstates the record.
8       Q.  (BY MS. NOWAK)  Mr. Beidle, did Mr. Gresham to
9   your knowledge come into the building the day prior to
10  you receiving his resignation e-mail?
11      A.  Yes.
12      Q.  And was that a normal business day that he came
13  into the building?
14      A.  No.
15      Q.  What day was it?
16      A.  Sunday, the 23rd.
17      Q.  And did he ever come into the building again
18  after that or did he send you an e-mail to resign?
19      A.  He came into the building I believe on 24th and
20  sent an e-mail at approximately 7 a.m.
21      Q.  Okay.  And did he -- was 7 a.m. prior to MHA's
22  usual business hours?
23      A.  Yes.
24      Q.  What time does MHA's employees usually show up
25  for work?

Page 124

1       A.  Mondays 8:30.
2       Q.  We talked a little earlier about the employment
3   agreement that -- that you or other MHA employees
4   signed.  Where was Mr. Gresham located when he was
5   working for MHA physically?  Where was his physical body
6   sitting when he was working for MHA?
7       A.  Downstairs here in the building.
8       Q.  Okay.  And what is the address for this building?
9       A.  5001 Statesman Drive.
10      Q.  And what city is it located?
11      A.  Irving.
12      Q.  So when he was performing services for MHA --
13  when he was trying to source or -- or find doctors or
14  recruit doctors in the Heartland, was he working here in
15  Irving, Texas?
16      A.  Yes.
17      Q.  And can you tell me where are the competitors of
18  MHA located?  Where is Delta located; do you know?
19      A.  I believe they're in Las Colinas, Irving.
20      Q.  How far away is that from here?
21      A.  Approximately maybe five miles.
22      Q.  Okay.  What about Fidelus?  Where are they
23  located?
24      A.  I believe they're in North Dallas area.
25      Q.  So approximately how far from here?

Page 125

1       A.  Ten, 15 miles.
2       Q.  Jackson Coker, where are they located?
3       A.  I believe they're in Atlanta.
4       Q.  Okay.  And --
5       A.  And I think they may have an office in Denver,
6   but I'm not sure exactly of that.
7       Q.  Okay.  And what about Arthur Marshall; where are
8   they located?
9       A.  Irving.
10      Q.  Okay.  And Consilium, do you know where they are
11  located?
12      A.  I believe Las Colinas, Irving.
13          MS. NOWAK:  John, that's all I have.  Do you
14  have anything further?
15          MR. VOLNEY:  No.  Thank you.
16          MS. NOWAK:  Thank you.
17          THE VIDEOGRAPHER:  Off the record at
18  1:35 p.m.
19          (Deposition concluded at 1:35 p.m.)
20
21
22
23
24
25

32 (Pages 122 to 125)

Tim Beidle                                              May 16, 2014

Page 126

```
1          THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3   MERRITT HAWKINS &        )
    ASSOCIATES, LLC,         )
4        Plaintiff,    )
                       ) CIVIL ACTION NO.
5   VS.               ) 13-CV-00312-P
                       )
6   LARRY SCOTT GRESHAM AND      )
    BILLY BOWDEN,          )
7        Defendants.    )
8
9        REPORTER'S CERTIFICATION
10       DEPOSITION OF TIM BEIDLE
11          MAY 16, 2014
12
13       I, LEI SHERRA TORRENCE, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16       That the witness, TIM BEIDLE, was duly sworn
17  by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20       I further certify that pursuant to FRCP Rule
21  30 (f) (1) that the signature of the deponent:
22       _____ was requested by the deponent or a
23  party before the completion of the deposition and is to
24  be returned within 30 days from date of receipt of the
25  transcript.  If returned, the attached Changes and
```

Page 127

```
1   Signature Page contains any changes and the reasons
2   therefor;
3        __X__ was not requested by the deponent or a
4   party before the completion of the deposition.
5        I further certify that I am neither counsel
6   for, related to, nor employed by any of the parties or
7   attorneys to the action in which this proceeding was
8   taken.  Further, I am not a relative or employee of any
9   attorney or record in this cause, nor am I financially
10  or otherwise interested in the outcome of the action.
11
12       Subscribed and sworn to on this the 28th day
13  of May, 2014.
14
15
16
        _____
        Lei Sherra Torrence, CSR
17      Texas CSR No. 7836
        Expiration Date:  12/31/2014
18      Firm Registration No.  631
        Kim Tindall & Associates, LLC
19      645 Lockhill Selma, Suite 200
        San Antonio, Texas  78216
20      (210) 697-3400
        (210) 697-3408 (Fax)
21
22
23
24
25
```

                                    33 (Pages 126 to 127)

APP. 0070

Electronically signed by Lei Sherra Torrence (501-288-335-5388)        b1b89364-d730-4811-a71c-bebb8f493c5b



# EMPLOYMENT AGREEMENT

between

## Merritt, Hawkins & Associates

and

### Larry Gresham

### Search Consultant

### March 31, 2008



EXHIBIT
113 5.16.14
Beidle

MHA000238

APP. 0071

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT dated this March 31, 2008, ("Agreement") is entered into by and between Merritt, Hawkins & Associates, a Texas corporation (" "), and Larry Gresham ("Employee").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties covenant and agree as follows:

## ARTICLE I
## EMPLOYMENT

hereby agrees to employ the Employee and the Employee hereby accepts such employment and agrees to perform the services specified herein upon the terms and conditions set forth in this Agreement.

## ARTICLE II
## DUTIES

The Employee shall be employed as a[n] Search Consultant of, effective March 31, 2008. The Employee understands and agrees that his/her primary responsibilities will encompass part or all of the following: recruitment of medical specialists, selling of services to clients, and account management of new and current business either on the permanent or contract side of the business. The Employee agrees to perform the duties normally incidental to that position for as long as he or she shall hold that office and to perform such other duties and responsibilities as may be prescribed from time to time by the Board of Directors of (the "Board"). The Employee also agrees to perform, without additional compensation, such services for corporations or other enterprises affiliated with as the Board may from time to time specify.

## ARTICLE III
## EXTENT OF SERVICE

a:      The Employee shall devote such time, attention and energy to the business of and corporations affiliated with as the Board shall require, and shall not during the term of this Agreement be engaged in any other personal activity if such activity requires the personal services of Employee and is pursued for gain, profit or other pecuniary advantage.

b:      The foregoing shall not be construed as preventing the Employee (1) from making investments in businesses of enterprises provided such investments do not require any personal services on the part of the Employee in the operation or the affairs of such businesses or enterprises or (2) participating in any charitable or philanthropic activities.

MHA000239

ARTICLE IV
CONFIDENTIAL INFORMATION

a:    The Employee will be trained, by , in the capacity of a[n] Search Consultant or and will have access to and develop confidential information relating to the exact names and contacts of clients of , the fees charged by , and sales techniques unique to the success of .

b:    In addition, the Employee further acknowledges that the Confidential Information received through training and employment by  will enable the Employee to cultivate the loyalty and good will of  clients or customers and will enable the Employee to develop close, personal relationships with  clients.  The Employee agrees that Confidential Information documented in files, records and documents is the property of  and agrees that the Employee shall not, without the prior written consent of , disclose or make available to any person, or use directly or indirectly, any of such Confidential Information, except in connection with the performance of the Employee's employment by .

c:    This obligation shall not apply to such portion of  or its client's information which the Employee can establish:  (a) was previously known to the Employee prior to the Employee' obtaining the same from  or its client or developing the same for 's or its client; (b) was in the public domain prior to the time of disclosure by  or its client to Employee or prior to the time such information was developed by Employee for  or its client; or (c) was later disclosed to Employee by a third party who did not receive the same, directly or indirectly, from  or its client or who had no obligation of secrecy with respect thereto.  The Employee further recognizes the need of  to protect these legitimate business interests by a covenant not to compete as provided under Article VII.

d:    The Employee acknowledges and agrees that this non-disclosure obligation shall survive any termination of this Agreement and shall be fully enforceable by  or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason for such termination.

e:    For purposes of the Agreement, the term "Confidential Information" shall be defined as information in the possession of, prepared by, obtained by, or compiled by  which is not generally available to the public.  "Confidential Information" shall include, but is not limited to, information pertaining to:  (i) the identity of  customers, clients and prospects; (ii) the business, finances and special needs of , its customers, clients, contacts and prospects; (iii) policies and procedures; (iv) compensation plans and employee benefits; (v) confidential market studies; (vi) pricing studies, information and analyses; (vii) current and prospective business projections; (viii) business plans and strategies; (ix) financial statements and information; (x) special processes, procedures and services of ; (xi) methods of bidding, bids to customers, clients and prospects and profit margins; and (xii) unique software programs and databases developed by  including, but not limited to, all computer disks, slides, files, manuals or other information pertaining to such software programs and databases.  The Employee acknowledges and agrees that this information, if disclosed, could place  at a competitive advantage.

MHA000240

## ARTICLE V
### AUTHORSHIP

a:      Moreover, if during Employee's employment by , Employee creates any original work of authorship fixed in any tangible medium of expression which is the subject matter of copyright (such as videotapes, written presentations on acquisitions, computer programs, models, manuals, brochures or the like) relating to 's business products, or services, whether such work is created solely by Employee or jointly with others, shall be deemed the author of such work if the work is prepared by Employee in the scope of Employee's employment; or, if the work is not prepared by the Employee within the scope of Employee's employment but is specialty ordered by  as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation or as an instructional text, then the work shall be considered to be work made for hire and  shall be the author of the work.

b:      In the event such work is neither prepared by the Employee within the scope of Employee's employment or is not a work specially ordered and deemed to be a work made for hire, then the Employee hereby agrees to assign, and by these presents, does assign, to  all of Employee's worldwide right, title and interest in and to such work and all rights of copyright therein.

c:      Both during the period of Employee's employment by  and thereafter, Employee agrees to assist  and its nominee, at any time, in the protection of  worldwide right, title and interest in and to the work and all rights of copyright therein, including but not limited to, the execution of all formal assignment documents requested by  or its nominee and the execution of all lawful oaths and publications for registration of copyright in the United States and foreign countries.

## ARTICLE VI
### TERMINATION OF EMPLOYMENT

In the event that this Agreement is terminated for any reason, the Employee agrees he/she shall, prior to the effective date of termination, return any and all records; files; documents; materials; copies; equipment; literature; data; information; audio or videotapes; slides; computer disks, files or information; software programs; order forms; memoranda; correspondence; customer lists or information; prospect lists or information; financial statements or other information pertaining to  its customers clients, contacts or prospects; agreements; contracts; orders; records; policy or procedure manuals; memoranda; and/or any cards or notes acquired, compiled or coming into the Employee's knowledge, possession or control in connection with his/her activities as an employee of , as well as all machines, parts, equipment or other materials received from  or from any of its customers, clients, or prospects in connection with such activities.

## ARTICLE VII
### NON-COMPETITION

MHA000241

a:     The Employee acknowledges and agrees that as an employee and representative of , the Employee will be responsible for building and maintaining business relationships and goodwill with current and future customers, clients and prospects on a personal level. The Employee acknowledges and agrees that this responsibility creates a special relationship of trust and confidence between , the Employee and these persons or entities. The Employee acknowledges and agrees that this special relationship of trust and confidence between , the Employee and current and future customers, clients and prospects creates a high risk and opportunity for the Employee to misappropriate these relationships and goodwill existing between and such persons and entities. The Employee acknowledges and agrees that it is fair and reasonable for MHA to take steps to protect from the risk of such misappropriation.

b:     The Employee acknowledges and agrees that he/she has received and will continue to receive substantial, valuable consideration for the agreements set forth in this section including: (i) access to Confidential Information, as defined above; (ii) continued employment; (iii) specialized training and knowledge pertaining to the products, services, business practices, procedures and Confidential Information utilized by ; and (iv) compensation and benefits as described herein. The Employee acknowledges and agrees that this constitutes fair and adequate consideration for the agreements set forth in this section.

c:     In consideration for the valuable consideration described above, the Employee acknowledges and agrees as follows:

(1)     For a period of twelve (12) months following the termination of this Agreement by either party, for whatever reason, the Employee will not solicit, contact, or communicate with any person, company or business that was a client, customer or prospect of , and that the Employee personally solicited, contacted, communicated with or accepted business from while he/she was an employee of at any time during the twelve (12) months preceding the termination of this Agreement, for the purpose of engaging in the Same or a Similar Business as MHA in the Market Area.

(2)     For a period of twelve (12) months following the termination of this Agreement by either party, for whatever reason, the Employee will not engage in the Same or a Similar Business as anywhere in the Market Area, including working as an agent, consultant, partner, employee, officer, shareholder or independent contractor, for any company of business engaged in the Same or a Similar Business as anywhere in the Market Area.

(3)     The Employee acknowledges and agrees that these non-competition agreements shall survive any termination of the Agreement and shall be fully enforceable by MHA to its successor assignee subsequent to the termination of the Employee's employment. Regardless of the reason for such termination.

MHA000242

APP. 0075

(4)     In the event that the Employee violates this Section VII, and is required to initiate legal action to secure the Employee's compliance with Section VII, the Employee understands and agrees that, in addition to any other legal or equitable relief to which may be entitled under applicable law, he/she shall be prohibited from violating Section VII of the Agreement for a period of twelve (12) months from the date a final judgment is entered in favor of enforcing Section VII of this Agreement.

d.     For purpose of this section, the following definitions shall apply:

(1)     The term "Same or a Similar Business as " shall be defined as the business of recruitment of medical specialists, selling of services to clients, and account management of new and current business.

(2)     The term "Market Area" shall be defined as any location within fifty (50) miles of the office of  to which the Employee is currently assigned.  The Employee understands and agrees that  shall have the sole discretion to assign the Employee to a different office, or modify the geographic scope of the Employee's sales territory description.  In the event that  assigns the Employee to a new office, the parties agree that, for the purposes of this section, the "Market Area" shall be modified to include any location within fifty (50) miles of the new office to which the Employee is assigned.

e.   The Employee acknowledges and agrees that the Agreements set forth above are ancillary to an otherwise enforceable agreement and supported by independent valuable consideration as required by Tex. Bus. & Comm. Code Ann. ~ 15.50 (or any successor provision).  The Employee further acknowledges and agrees that the limitations as to time, geographical area, and scope of, activity to be restrained are reasonable and acceptable to the Employee, and do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of .  The Employee further agrees that if, at some later date, a court of competent jurisdiction determines that these Agreements do not meet criteria set forth in Tex. Bus. & Comm. Code Ann. ~ 15.50 (2) (or any successor provision), these Agreements may be reformed by the court, pursuant to Tex. Bus. & Comm. Code Ann. ~ 15.51 (c) (or any successor provision), and enforces to the maximum extent permitted under Texas law.

ARTICLE VIII
NON-INTERFERENCE

The Employee agrees that, for a period of thirty-six (36) months subsequent to the termination of this Agreement, whether such termination occurs at the insistence of  or the Employee, the Employee shall not solicit or recruit directly or by assisting others, any other employees of , its parent companies, subsidiary companies, affiliated companies, successors or assigns, nor shall the Employee contact or communicate with any other employees of  , its parent companies,

MHA000243

subsidiary companies, affiliated companies, successors or assigns, for the purpose of inducing other employees to terminate their employment with , its parent companies, subsidiary companies, affiliated companies, successors or assigns. For the purposes of this covenant, "other employees" shall refer to employees who are still actively employed by, or doing business with, , or any of its parent companies, subsidiary companies, affiliated companies, successors or assigns, at the time of the attempted recruiting or hiring. The Employee acknowledges and agrees that these non-interference agreement shall survive any termination of the Agreement and shall be fully enforceable by  or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason of such termination.

## ARTICLE IX
### REMEDIES

a.      and Employee, jointly and severally, acknowledge that it would be impossible to calculate or ascertain accurately and definitely the damages  would sustain from a breach by Employee of the provisions of this Agreement and that no adequate remedy at law exists.  Accordingly, in the event of a breach or threatened breach by the Employee of this Agreement, including without limitation breach of Article VII,  shall be entitled to an injunction restraining such prohibited activity.

b.      Nothing herein, however shall be construed as prohibiting  from pursuing concurrently with the above injunction, such other relief as a result of such breach or threatened breach, including the recovery of damages from the Employee.

c.      It is agreed that in the event of a breach of this Agreement by Employee it would be impractical or extremely difficult to fix the actual damages and therefore Employee agrees that upon its breach of this Agreement it will pay to  as liquidated damages and not as a penalty the sum equal to the standard fee charges to any client for each physician who accepts employment or associates with any person or entity as a result of a breach of this Agreement.

## ARTICLE IX
### MISCELLANEOUS

a.      The obligations specified in this Agreement shall survive the termination of the employment relationship and are in addition to the obligations otherwise imposed by the law; the expiration of these specific obligations does not terminate the obligations imposed by law.

b.      The parties acknowledge and agree that this Agreement may be assigned by  to any other person or entity without the consent of the Employee.  In the event of any such assignment, the duties and obligations of the Employee, and the rights of  (including, but not limited to, the Confidential Information, Non-Competition, Authorship and Non-Interference provisions set forth in this Agreement), shall inure to the benefit of, be fully enforceable by, the assignee.  The parties further acknowledge and agree that the Employee's duties; obligations, compensation and benefits are personal to the employee and may not be assigned to any person

MHA000244

or entity without the written consent of MHA. In the event of the Employee's death, this Agreement shall be enforceable by the Employee's estate, executors or legal representatives, but only to the extent that such persons may collect any compensation due to the Employee under this Agreement.

c.   The Employee understand and agrees that, with respect to any compensation or benefits required to be paid under this Agreement, is authorized to withhold any amounts from such compensation required by Federal, state or local law.

d.   The parties acknowledge and agree that, in the event that either party initiates litigation to enforce any provision of the Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party its reasonable costs and expenses, including attorneys' fees, incurred in connection with such litigation.

e.   The parties acknowledge and agree that each provision of this Agreement shall be enforceable independently of every other provision. Furthermore, the parties acknowledge and agree that, in the event any provision of this Agreement is determined to be unenforceable for any reason the remaining covenants and/or provisions will remain effective, binding and enforceable. The parties further agree that, in the event that any provision of this Agreement is determined to be unenforceable for any reason, the parties agree to substitute a comparable provision dealing with the same subject matter as the unenforceable provision which approximates the effect and intent of the unenforceable provision to the maximum extent permissible under applicable law.

f.   The parties acknowledge and agree that the failure of either to enforce any provision of this Agreement shall not constitute a waiver of that particular provision, or of any other provisions, of this Agreement

g.   The parties acknowledge and agree that this Agreement constitutes the complete and entire agreement between the parties; that the parties have executed this Agreement based upon the express terms and provisions set forth herein; that the parties have not relied on any representations, oral or written, which are not set forth in this Agreement; that all previous agreement, either oral or written, shall have any effect on the terms or provisions of this Agreement; and that all previous agreements, either oral or written, are expressly superseded and revoked by this Agreement. In addition, the parties acknowledge and agree that the provisions of this Agreement may not be modified by any subsequent agreement unless the modifying agreement (I) is in writing; (ii) contains an express provision referencing this Agreement; (iii) is signed by the Employee; and (iv) is signed by the President or CEO or .

h.   This Agreement does not alter in any way the fact that Employee's employment relationship with   exists only at the will of both   and Employee. Either   or Employee may terminate the employment relationship at any time for any lawful reason, with or without cause, by the giving of verbal or written notice of termination.

MHA000245

APP. 0078

i.     This Agreement shall be governed and construed in accordance with the substantive laws of the State of Texas.    is based in Irving, Texas, and this Agreement is to be partially performed in Irving, Texas. It is agreed that any and all disputes arising out of this Agreement will be heard and decided in the state or federal courts situated in Dallas County, Texas. Both   and Employee hereby appoint the Secretary of State for the State of Texas as its and Employee's agent to receive and accept service of process in connection with any and all such litigation.

Merritt, Hawkins & Associates

By: _____
        Robert Colmery
        Divisional Vice President

Date: _____3-24-08_____

EMPLOYEE: _____
                    Larry Gresham

Date: _____3-30-08_____

MHA000246

APP. 0079

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MERRITT HAWKINS                )
& ASSOCIATES, LLC              )
                               )
        Plaintiff,             )
                               )
v.                             )        CIVIL ACTION
                               )   NO. 3:13-cv-00312-P
LARRY SCOTT GRESHAM            )
AND BILLY BOWDEN               )
                               )
        Defendants.            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
BILLY JESS BOWDEN
FEBRUARY 4, 2014
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of

BILLY JESS BOWDEN, produced as a witness at the instance

of the Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 4th of February,

2014, from 10:06 a.m. to 2:05 p.m., before Lezley Cull,

CSR in and for the State of Texas, reported by machine

shorthand, at the offices of Lynn Tillotson Pinker &

Cox, LLP, 2100 Ross Avenue, Suite 2700, Dallas, Texas,

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

**2**

10:05  1        A P P E A R A N C E S
10:05  2
10:06  3  FOR THE PLAINTIFF:
           Ms. Christine A. Nowak
10:06  4  DYKEMA GOSSETT PLLC
           1717 Main Street
10:06  5  Suite 4000
           Dallas, Texas 75201
10:07  6  214.462.6400
           214.462.6401 (fax)
10:07  7  cnowak@dykema.com
10:07  8
10:07  9  FOR THE DEFENDANTS:
           Mr. John Volney
10:07  10 LYNN TILLOTSON PINKER COX
           2100 Ross Avenue
10:07  11 Suite 2700
           Dallas, Texas 75201
10:07  12 214.981.3822
           214.891.3839 (fax)
10:07  13 jvolney@lynnllp.com
10:07  14
10:07  15
10:07  16
10:07  17
10:07  18
10:07  19 ALSO PRESENT:
           Kevin Bray - Videographer
10:07  20
10:07  21
10:07  22
10:07  23
10:07  24
10:07  25

**4**

1        P R O C E E D I N G S
2  (Exhibit Nos. 1-2 marked before going on record.)
3        THE VIDEOGRAPHER:  We are now on the
4  record for the video deposition of Billy Bowden.  The
5  time is 10:06 a.m. on February 4th, 2014 in the matter
6  of Merritt Hawkins & Associates, LLC versus
7  Larry Scott Gresham, et al., Civil Action
8  No. 3:13-CV-00312-P, being held in the United States
9  District Court for the Northern District of Texas,
10  Dallas Division.
11        The court reporter is Lezley Cull and the
12  videographer is Kevin Bray.  Both are representatives of
13  DepoTexas.  Today's deposition is held at Lynn Tillotson
14  Pinker Cox, LLC.
15        Will counsel please state their
16  appearances for the record.
17        MS. NOWAK:  Christine Nowak, counsel for
18  plaintiff Merritt Hawkins & Associates.
19        MR. VOLNEY:  John Volney for the
20  defendants.
21        THE VIDEOGRAPHER:  Will the court
22  reporter please administer the oath.
23        BILLY JESS BOWDEN,
24  having been first duly sworn, testified as follows:
25

**3**

10:07  1        I N D E X
10:07  2
10:07  3  Appearances. . . . . . . . . . . . . . . . . . . .2
10:07  4  BILLY JESS BOWDEN
10:07  5    Examination by Ms. Nowak. . . . . . . . .5
       6
10:07     DEPOSITION EXHIBITS           PAGE
       7
10:07     Exhibit 1 - Notice of Deposition. . . . . . . .6
10:08  8  Exhibit 2 - Defendant Billy Bowden's
             Responses To Plaintiff's
             First Request For Production. . . .14
       9
10:08  10 Exhibit 3 - Document printed from
             Consilium Staffing website. . . . .34
10:08  11 Exhibit 4 - Employment Agreement. . . . . . .43
10:08  12 Exhibit 5 - BOWDEN 000065 - BOWDEN 000066. . .53
10:08  13 Exhibit 6 - BOWDEN 000016 - BOWDEN 000017. . .70
10:08  14 Exhibit 7 - BOWDEN 000022 - BOWDEN 000022. . .72
10:08  15 Exhibit 8 - BOWDEN 000027 - BOWDEN 000029. . .74
10:08  16 Exhibit 9 - BOWDEN 000056. . . . . . . . . .82
10:08  17 Exhibit 10 - Photocopy of a text
             message string. . . . . . . . . . .88
10:08  18
10:08     Exhibit 11 - GRESHAM 000001. . . . . . . .97
       19
10:08     Exhibit 12 - 9-24-12 resignation e-mail
10:08  20    from Scott Gresham to
             Tim Beidle. . . . . . . . . . . 103
10:08  21
10:08     Exhibit 13 - Defendant Billy Bowden's
10:08  22    Responses To Plaintiff's
             First Set of Interrogatories. . . 106
10:08  23
10:08     Exhibit 14 - Application for Employment. . . . 123
10:08  24
10:08     Exhibit 15 - CV of Billy Bowden. . . . . . . . 132
10:08  25

**5**

1        EXAMINATION
2  BY MS. NOWAK:
3     Q.  Good morning, Mr. Bowden.
4     A.  Good morning.
5     Q.  Can you please state your full name for the
6  record.
7     A.  Billy Jess Bowden.
8     Q.  And your current residence, please.
9     A.  11512 Jasper, Frisco, Texas 75035.
10    Q.  And can I also have a current phone number.
11    A.  972-697-6355.
12    Q.  And do you have any current e-mail addresses?
13    A.  I do.  Billy -- it's my name,
14  billyjbowden@gmail.com.
15    Q.  And do you have any other e-mail addresses at
16  this time?
17    A.  I have my work e-mail.
18    Q.  Can you please state that --
19    A.  Sure.
20    Q.  -- for the record.
21    A.  It's bbowden@consiliumstaffing.com.
22    Q.  Okay.  And Mr. Bowden, you understand you're
23  here for a deposition today in a lawsuit filed by
24  Merritt Hawkins & Associates?
25    A.  I do.

**2  (Pages 2 to 5)**

Billy Jess Bowden

**6**

10:08 1    Q.   And if I use the term today MHA, will you
10:08 2    understand that I am referring to Merritt Hawkins &
10:08 3    Associates?
10:08 4        A.   I do.
10:08 5        Q.   I'm also going to use a couple of other terms
10:08 6    here today.  If I use the phrase AMN Healthcare, do you
10:08 7    understand who that refers to?
10:08 8        A.   I do.
10:08 9        Q.   And are you aware that MHA falls under or is
10:08 10   part of a group of companies that are part of
10:08 11   AMN Healthcare?
10:08 12       A.   I understand that.
10:08 13       Q.   And do you also know that one of those
10:08 14   companies that's affiliated with MHA is a company by the
10:08 15   name of Staff Care?
10:08 16       A.   I do.
10:09 17       Q.   You understand you're a named defendant in the
10:09 18   lawsuit?
10:09 19       A.   Yes.
10:09 20       Q.   And I'm going to be showing you what's marked
10:09 21   as Deposition Exhibit 1.
10:09 22       Have you seen this deposition exhibit before?
10:09 23       A.   I believe so, yes.
10:09 24       Q.   And is it pursuant to this deposition exhibit,
10:09 25   the Amended Notice of Deposition, that you are appearing

**7**

10:09 1    today?
10:09 2        A.   Yes.
10:09 3        Q.   Mr. Bowden, have you ever been deposed before?
10:09 4        A.   No.
10:09 5        Q.   So this is your first deposition?
10:09 6        A.   Yes, ma'am.
10:09 7        Q.   Have you ever had any experience with
10:09 8    litigation before?
10:09 9        A.   No.
10:09 10       Q.   You've never been a plaintiff or a defendant
10:09 11   in a lawsuit?
10:09 12       A.   No.
10:09 13       Q.   Okay.  Well, then let's take a few minutes
10:09 14   just to go over what I'll call our deposition rules.
10:09 15       A.   Okay.
10:09 16       Q.   You understand that you're under oath here
10:09 17   today?
10:09 18       A.   I do.
10:09 19       Q.   So that means that it's just like we were in
10:09 20   the courtroom.  You've been sworn in.  We've got a --
10:09 21   it's just like having a judge and a jury present.
10:09 22       A.   I understand that.
10:09 23       Q.   Okay.  And you understand that we have a court
10:09 24   reporter here today who is taking down what I'm saying
10:09 25   and what you are saying?

**8**

1    A.   I do.
2        Q.   And so for that reason, you and I need to try
3    not to speak over each other.
4        A.   I understand.
5        Q.   And so I'll try to make sure that you're able
6    to finish your answer before I launch into my next
7    question.  And you similarly will try and let me get my
8    entire question out before you launch into your answer.
9        A.   Okay.
10       Q.   And also because of that, I need -- and you're
11   doing a great job so far -- but I need verbal answers.
12   So no uh-huhs, no huh-uhs.  I need a yes or a no or some
13   other type of verbal response.
14       A.   I understand.
15       Q.   Okay.  When I ask my questions to you today,
16   I'm going to assume that you understand what it is that
17   I'm asking unless you tell me, Ms. Nowak, I don't
18   understand what it is that you're asking, can you repeat
19   or can you rephrase that.
20       Can we have that agreement here today?
21       A.   Absolutely.
22       Q.   And before we continue on, is there any reason
23   today that you can't give me your best testimony?  Are
24   you under the influence of any type of medication,
25   drugs, alcohol?

**9**

1    A.   No.
2        Q.   And have you ever been convicted of a crime?
3        A.   No.
4        Q.   Have you ever been charged with a crime?
5        A.   No.
6        Q.   Not even traffic tickets?
7        A.   Oh, I'm sorry.  Traffic tickets, yes.
8        Q.   Mr. Bowden, what did you do to prepare for
9    your deposition here today?
10       A.   Met with my attorney.
11       Q.   Okay.  When did you meet with your attorney?
12       A.   Yesterday and previous dates that I don't
13   remember.
14       Q.   Okay.  How many previous dates?
15       A.   I would say three, four.
16       Q.   Okay.  And you don't recall those specific
17   dates?
18       A.   I don't.  I'm sorry.
19       Q.   Do you recall how long you met with your
20   attorney during each of those meetings?
21       A.   Anywhere from an hour up to two or three
22   hours.
23       Q.   And when you say you met with your attorney,
24   are you talking about Mr. Volney who is setting across
25   the table from --

**3  (Pages 6 to 9)**

Billy Jess Bowden

---

**10**

| | |
|---|---|
| 10:13 | 1   A. I've met -- |
| 10:13 | 2   Q. -- me here today? |
| 10:13 | 3   A. -- with Mr. Volney and I've met with |
| 10:13 | 4   Mr. Tillotson. |
| 10:13 | 5   Q. Is there anyone else that you've met with or |
| 10:13 | 6   spoken to about your deposition today? |
| 10:13 | 7   A. As far as attorneys, not the deposition, no. |
| 10:14 | 8   Q. Okay. Outside of attorneys, is there anyone |
| 10:14 | 9   else that you've spoken to about your deposition today? |
| 10:14 | 10   A. People I work with, my -- |
| 10:14 | 11   Q. Okay. And who have you spoken with that you |
| 10:14 | 12   work with? |
| 10:14 | 13   A. Our executive vice president, Matt Baade. |
| 10:14 | 14   Q. Okay. |
| 10:14 | 15   A. Our CFO, Monique DeGraauw. |
| 10:14 | 16   Q. Anyone else? |
| 10:14 | 17   A. The team I work with. I was going to be out |
| 10:14 | 18   of the office, so they needed to know where I was. |
| 10:14 | 19   Q. And when did you speak with Matt Baade about |
| 10:14 | 20   your deposition? |
| 10:14 | 21   A. It's been an ongoing process. It's been many |
| 10:14 | 22   times in the last few weeks. |
| 10:14 | 23   Q. And what was the substance of your |
| 10:14 | 24   conversations with Mr. Baade? |
| 10:14 | 25   MR. VOLNEY: Hold on. |

**11**

| | |
|---|---|
| 10:14 | 1   Matt's a lawyer is my understanding. |
| 10:14 | 2   MS. NOWAK: Is he representing Mr. Bowden |
| 10:14 | 3   in connection with this dispute? |
| 10:15 | 4   MR. VOLNEY: He's a lawyer for the |
| 10:15 | 5   company, Consilium Staffing. So I think any of his |
| 10:15 | 6   conversations with Mr. Baade potentially fall under |
| 10:15 | 7   attorney/client privilege. |
| 10:15 | 8   And I would instruct the witness on that |
| 10:15 | 9   basis not to answer. |
| 10:15 | 10   Q. (BY MS. NOWAK) During the conversations that |
| 10:15 | 11   you had with Mr. Baade, was he providing you legal |
| 10:15 | 12   advice in connection with this litigation? |
| 10:15 | 13   A. Not really, no. |
| 10:15 | 14   Q. Was he providing you with any legal advice or |
| 10:15 | 15   legal positions that Consilium is taking with respect to |
| 10:15 | 16   this litigation? |
| 10:15 | 17   A. No. |
| 10:15 | 18   Q. Are you going to follow your counsel's |
| 10:15 | 19   instruction not to answer my questions regarding the |
| 10:15 | 20   conversations you had with Mr. Baade? |
| 10:15 | 21   A. Yes. |
| 10:15 | 22   Q. You mentioned that you've also spoken with |
| 10:15 | 23   Ms. Monique DeGraauw. What was the substance of your |
| 10:15 | 24   communications with Ms. Monique DeGraauw? |
| 10:15 | 25   A. It was just very, hey, good luck tomorrow. |

**12**

| | |
|---|---|
| 1   That was it. |
| 2   Q. And your team, you mentioned that you told |
| 3   them you were going to be out of the office. Did you |
| 4   speak with them about anything else related to your |
| 5   deposition? |
| 6   A. That I was being deposed. |
| 7   Q. Did any of them offer any comments or |
| 8   questions related to the fact -- |
| 9   A. No. |
| 10   Q. -- that you were being deposed? |
| 11   A. No. |
| 12   Q. Is there anyone else besides your lawyer, |
| 13   Mr. Baade, Ms. DeGraauw, and your team that you've |
| 14   spoken with about this deposition or in preparation for |
| 15   this deposition? |
| 16   A. Scott Gresham. |
| 17   Q. Okay. When did you speak with Mr. Gresham? |
| 18   A. Just texts in the last couple of months saying |
| 19   when are you being deposed, things like that. |
| 20   Q. How many texts have you exchanged with |
| 21   Mr. Gresham in the last few months? |
| 22   A. Probably six to eight. |
| 23   Q. And can you walk me through, what was the |
| 24   substance of those six to eight texts? |
| 25   A. Well, most of the times, have you heard |

**13**

| |
|---|
| 1   anything on the lawsuit? No. Have you? Hey, I heard |
| 2   we're getting deposed. When are -- when are you |
| 3   supposed to do it? And he said next week sometime. And |
| 4   that was it. |
| 5   Q. Okay. So other than discussing the date that |
| 6   your deposition would be set and/or whether or not it |
| 7   had happened, was there any other discussions between |
| 8   you and Mr. Gresham related to your deposition? |
| 9   A. No. |
| 10   Q. Since Mr. Gresham has left Consilium, though, |
| 11   you have maintained contact with him? |
| 12   A. Very little. Those -- those texts were -- |
| 13   were about it. |
| 14   Q. Did you review any documents in connection |
| 15   with preparing for this deposition? |
| 16   A. I did. |
| 17   Q. Can you tell me what documents you reviewed. |
| 18   A. I'm sorry. I don't remember the names of |
| 19   them, but there's -- there's been many. I know the one |
| 20   with all the exhibits, the different exhibits, the |
| 21   actual -- |
| 22   Q. So the complaint that was filed? |
| 23   A. The complaint, the different questions on the |
| 24   complaint. |
| 25   Q. Did you review a copy, then, of your |

4 (Pages 10 to 13)

Billy Jess Bowden

**14**

| | |
|---|---|
| 10:18 | 1   employment agreement with MHA? |
| 10:18 | 2   **A.  I did.** |
| 10:18 | 3   Q.  And your communications with Mr. Gresham |
| 10:18 | 4   related to his employment with Consilium? |
| 10:18 | 5   **A.  I did.** |
| 10:18 | 6   Q.  And have all the documents that you reviewed |
| 10:18 | 7   in connection with the deposition been produced to me? |
| 10:18 | 8   **A.  As far as I know.** |
| 10:18 | 9   Q.  Since we're on the topic of documents, let's |
| 10:18 | 10  go ahead and take a look at this.  I'm going to hand you |
| 10:18 | 11  what's been marked as Deposition Exhibit No. 2. |
| 10:18 | 12      MS. NOWAK:  John, I know you have these, |
| 10:18 | 13  but I'll go ahead and give you an extra copy. |
| 10:18 | 14      MR. VOLNEY:  Sure. |
| 10:18 | 15  Q.  (BY MS. NOWAK)  Are you aware that you were |
| 10:18 | 16  requested to produce documents in this case? |
| 10:18 | 17  **A.  I was.** |
| 10:18 | 18  Q.  And did you review the request that MHA served |
| 10:18 | 19  upon you? |
| 10:18 | 20  **A.  I did.** |
| 10:18 | 21  Q.  And following receipt and review of those |
| 10:18 | 22  requests, did you go out and gather documents that were |
| 10:18 | 23  responsive? |
| 10:18 | 24  **A.  I did.** |
| 10:18 | 25  Q.  And can you tell me, what steps did you take |

**15**

| | |
|---|---|
| 10:18 | 1   to gather documents? |
| 10:18 | 2   **A.  Well, I went through -- I have, like, drawers** |
| 10:19 | 3   **with paperwork and stuff like that that I've kept** |
| 10:19 | 4   **through my -- my jobs throughout the years.  And I went** |
| 10:19 | 5   **through that and looked for anything I could find.** |
| 10:19 | 6   Q.  Did you go through your e-mail addresses? |
| 10:19 | 7   **A.  Yeah, I did -- I did do a search on that, but** |
| 10:19 | 8   **didn't find anything.** |
| 10:19 | 9   Q.  So just to confirm, you reviewed e-mails |
| 10:19 | 10  containing your personal e-mail address and also your |
| 10:19 | 11  work e-mail address? |
| 10:19 | 12  **A.  Correct.** |
| 10:19 | 13  Q.  Did you go through your phone to make sure |
| 10:19 | 14  that all text messages had been produced? |
| 10:19 | 15  **A.  Yeah.  I had a new phone, so there wouldn't be** |
| 10:19 | 16  **anything -- any old text messages on there.** |
| 10:20 | 17  Q.  What about social media, LinkedIn profiles, |
| 10:20 | 18  did you look at any of those types of things? |
| 10:20 | 19  **A.  I did.  I have a lot of connections from --** |
| 10:20 | 20  **from Merritt Hawkins and Staff Care on there, but I** |
| 10:20 | 21  **didn't...** |
| 10:20 | 22  Q.  When did you get a new phone? |
| 10:20 | 23  **A.  Like every six months.** |
| 10:20 | 24  Q.  So when's the most recent time that you got a |
| 10:20 | 25  new phone? |

**16**

| | |
|---|---|
| 1   **A.  Last week.** |
| 2   Q.  And prior to that? |
| 3   **A.  Last year, probably around August.** |
| 4   Q.  Just a big tech guy? |
| 5   **A.  No.  I broke that phone.  But I do like tech,** |
| 6   **yeah.** |
| 7   Q.  Do you still have a copy of the resume that |
| 8   you provided to Consilium in connection with your |
| 9   application for employment? |
| 10  **A.  Probably, yeah.** |
| 11  Q.  Do you still have a copy of the assessment |
| 12  that you submitted for Consilium in connection with your |
| 13  employment? |
| 14  **A.  They probably have a copy of that.** |
| 15  Q.  What about your application for employment? |
| 16  **A.  I have a blank one possibly.  And possibly it** |
| 17  **may still be in my e-mail, something that I had filled** |
| 18  **out and scanned back, yes.** |
| 19  Q.  What about your acceptance of employment with |
| 20  Consilium, the document by which you accepted -- |
| 21  **A.  That's in my e-mail.** |
| 22  Q.  What about any notes you took in connection |
| 23  with your interviews at Consilium? |
| 24  **A.  No.** |
| 25  Q.  So just to recap, we were talking about the |

**17**

| | |
|---|---|
| 1   resume, assessment, application and acceptance you |
| 2   submitted to Consilium.  And your representation here |
| 3   today is that you do believe you have copies of those |
| 4   documents? |
| 5   **A.  (Witness nods head.)** |
| 6   Q.  Why were those documents not produced to me, |
| 7   then? |
| 8   **A.  Because I didn't think they had -- they** |
| 9   **weren't -- you didn't ask for them.** |
| 10  Q.  So it's your position here today that the |
| 11  documents that you submitted to Consilium in connection |
| 12  with your becoming employed by them were not requested |
| 13  in this lawsuit? |
| 14      MR. VOLNEY:  Well, hold on. |
| 15      We produced his communications with |
| 16  Ms. Stephens and the e-mail communications he had with |
| 17  her, which were in the documents that were produced to |
| 18  you back in December. |
| 19      MS. NOWAK:  The documents, though, that |
| 20  are referenced in the e-mails with Ms. Stephens, so the |
| 21  resume that he submitted, the completed application, the |
| 22  documents that are -- you know, that states that he is |
| 23  submitting to Ms. Stephens, they were not included in |
| 24  the production.  So I'm trying to determine, to |
| 25  ascertain does he still hold copies of those.  And if |

5 (Pages 14 to 17)

APP. 0084

Billy Jess Bowden

**18**

| 10:20 | 1 | so, why were they not -- |
| 10:20 | 2 | **A. I don't know. I'd have to -- I'd have to** |
| 10:20 | 3 | **check.** |
| 10:20 | 4 | Q. (BY MS. NOWAK) But in any event, Consilium |
| 10:20 | 5 | would likely have a copy of those in your personnel |
| 10:20 | 6 | file? |
| 10:20 | 7 | **A. Sure.** |
| 10:20 | 8 | Q. If you went to Consilium and said I need |
| 10:20 | 9 | copies of these, you could get them? |
| 10:20 | 10 | **A. Sure.** |
| 10:20 | 11 | Q. When did your attorney/client relationship |
| 10:20 | 12 | with Lynn Tillotson begin? |
| 10:20 | 13 | **A. The day I was served on this.** |
| 10:20 | 14 | Q. Are you aware -- do you know what the terms of |
| 10:23 | 15 | that engagement are? |
| 10:23 | 16 | **A. They're my attorney. That's it.** |
| 10:23 | 17 | Q. Do you have an engagement letter or some type |
| 10:23 | 18 | of fee agreement with them? |
| 10:23 | 19 | **A. I did sign a letter at the beginning.** |
| 10:23 | 20 | Q. Okay. And what did that letter say? |
| 10:23 | 21 | **A. I don't recall.** |
| 10:23 | 22 | Q. Okay. And have you produced a copy of that |
| 10:23 | 23 | letter to me? |
| 10:23 | 24 | **A. I don't know.** |
| 10:23 | 25 | Q. If I represented to you today that I don't |

**19**

| 10:23 | 1 | have a copy of that letter, would you be surprised by |
| 10:23 | 2 | that? |
| 10:23 | 3 | **A. No.** |
| 10:23 | 4 | Q. Okay. |
| 10:23 | 5 | MR. VOLNEY: I think we objected to that |
| 10:23 | 6 | request for production. |
| 10:23 | 7 | MS. NOWAK: Do you continue to object to |
| 10:23 | 8 | that request for production and have a problem with |
| 10:23 | 9 | providing me with copy of that document? |
| 10:23 | 10 | MR. VOLNEY: I've not seen the document, |
| 10:23 | 11 | so I don't know what the document says. But yes. |
| 10:23 | 12 | Q. (BY MS. NOWAK) Mr. Bowden, how is |
| 10:23 | 13 | Lynn Tillotson paid? You don't pay for their services |
| 10:23 | 14 | out of your own pocket, do you? |
| 10:23 | 15 | **A. It's by my company.** |
| 10:23 | 16 | Q. Who informed you that Consilium would be |
| 10:23 | 17 | paying your fees? |
| 10:23 | 18 | **A. My owner.** |
| 10:23 | 19 | Q. And who is your owner? |
| 10:23 | 20 | **A. Joe Hawkins.** |
| 10:23 | 21 | Q. And what did Mr. Hawkins say when he told you |
| 10:23 | 22 | that he would be paying for Lynn Tillotson's fees? |
| 10:23 | 23 | **A. I don't remember.** |
| 10:23 | 24 | Q. Do you recall where he told you or how he told |
| 10:23 | 25 | you? |

**20**

| 1 | **A. I don't.** |
| 2 | Q. So do you recall anything else about your |
| 3 | interaction with Mr. Hawkins other than the fact that he |
| 4 | told you you won't be paying for the bills, I will be? |
| 5 | **A. It wasn't -- it wasn't put that way. It was** |
| 6 | **just -- I don't even remember, to be honest with you,** |
| 7 | **how it was put.** |
| 8 | Q. Do you ever see the bills? |
| 9 | **A. No.** |
| 10 | Q. So are you even aware what amount has been |
| 11 | paid to Lynn Tillotson to date -- |
| 12 | **A. I'm not.** |
| 13 | Q. -- in connection with this case? |
| 14 | Do you know if there's any agreements in this |
| 15 | case between your lawyers and Consilium's lawyers, any |
| 16 | joint defense agreements, anything of that nature? |
| 17 | **A. I don't know about that.** |
| 18 | Q. Are there any agreements between you and |
| 19 | Consilium with respect to your testimony today? |
| 20 | **A. No.** |
| 21 | Q. Things that you are supposed to say, things |
| 22 | you're not allowed to say? |
| 23 | **A. No.** |
| 24 | Q. Mr. Bowden, how old are you? |
| 25 | **A. 38.** |

**21**

| 1 | Q. If I had asked a girl that question, she might |
| 2 | not have told me. |
| 3 | Are you married? |
| 4 | **A. I am.** |
| 5 | Q. How long have you been married? |
| 6 | **A. It's going to be ten years this year.** |
| 7 | Q. Congratulations. |
| 8 | **A. Thanks.** |
| 9 | Q. Do you have any kiddos? |
| 10 | **A. I have four.** |
| 11 | Q. Oh, wow. |
| 12 | How old are they? |
| 13 | **A. I have a 13-year-old stepson, a nine-year-old** |
| 14 | **daughter, a seven-year-old daughter -- or six-year-old** |
| 15 | **daughter, and a 13-month-old son.** |
| 16 | Q. You stay busy. |
| 17 | **A. Very.** |
| 18 | Q. Do you do the birthday party routine on the |
| 19 | weekends? |
| 20 | **A. Birthdays, soccer, everything.** |
| 21 | Q. I feel like that's all that we do. |
| 22 | **A. Yeah.** |
| 23 | Q. Mr. Bowden, did you graduate from high school? |
| 24 | **A. I did.** |
| 25 | Q. Where did you graduate from high school? |

**6 (Pages 18 to 21)**

Billy Jess Bowden

**22**

| | | |
|---|---|---|
| 10:26 | 1 | A. Andress High School. |
| 10:26 | 2 | THE REPORTER: I'm sorry? |
| 10:26 | 3 | THE WITNESS: Andress High School, |
| 10:26 | 4 | El Paso, Texas. |
| 10:26 | 5 | Q. (BY MS. NOWAK) And when did you graduate from |
| 10:26 | 6 | high school? |
| 10:26 | 7 | A. 1994. |
| 10:26 | 8 | Q. And after graduating from high school, what |
| 10:26 | 9 | did you do? |
| 10:27 | 10 | A. I attended McMurry University. |
| 10:27 | 11 | Q. And where is McMurry? |
| 10:27 | 12 | A. Abilene, Texas. |
| 10:27 | 13 | Q. And did you graduate from McMurry? |
| 10:27 | 14 | A. I did not. |
| 10:27 | 15 | Q. What did you do after you left McMurry? |
| 10:27 | 16 | A. I transferred to UTEP. |
| 10:27 | 17 | Q. And where is UTEP? |
| 10:27 | 18 | A. El Paso. |
| 10:27 | 19 | Q. And did you graduate from -- |
| 10:27 | 20 | A. No. |
| 10:27 | 21 | Q. -- UTEP? |
| 10:27 | 22 | A. No, I didn't graduate. |
| 10:27 | 23 | Q. What did you do after leaving UTEP? |
| 10:27 | 24 | A. I went to work for Circuit City. |
| 10:28 | 25 | Q. Did you ever return to school? |

**23**

| | | |
|---|---|---|
| 10:28 | 1 | A. No. |
| 10:28 | 2 | Q. So do you have a college degree? |
| 10:28 | 3 | A. No. |
| 10:28 | 4 | Q. Did you also ever attend New Mexico State |
| 10:28 | 5 | University? |
| 10:28 | 6 | A. No. |
| 10:28 | 7 | Q. So other than your graduation from Andress |
| 10:28 | 8 | High School and your attendance at McMurry and UTEP |
| 10:28 | 9 | which did not result in a degree, have we covered your |
| 10:28 | 10 | educational background? |
| 10:28 | 11 | A. I did some community college. |
| 10:28 | 12 | Q. Okay. And where did you do that? |
| 10:28 | 13 | A. El Paso. |
| 10:28 | 14 | Q. And did that result in any type of degree? |
| 10:28 | 15 | A. No. |
| 10:28 | 16 | Q. Do you have any licenses or any types of |
| 10:28 | 17 | professional associations? |
| 10:28 | 18 | A. No. I have an insurance license, but it's |
| 10:28 | 19 | probably expired. |
| 10:28 | 20 | Q. Any other special certificates? |
| 10:28 | 21 | A. No, ma'am. |
| 10:28 | 22 | Q. Do you maintain any websites, Mr. Bowden, any |
| 10:28 | 23 | websites that -- |
| 10:28 | 24 | A. I don't understand that. |
| 10:28 | 25 | Q. Do you have a personal website, do you have a |

**24**

| | |
|---|---|
| 1 | blog, do you have a LinkedIn profile? |
| 2 | A. I have a LinkedIn and I have a Facebook. |
| 3 | Q. Any other social media? |
| 4 | A. Not that I know of. I might have signed up |
| 5 | for Twitter at some point. |
| 6 | Q. I don't even know how to use that. |
| 7 | A. I don't either. |
| 8 | Q. All right. So if you graduated from high |
| 9 | school in 1994 and then you went to McMurry, what year |
| 10 | did you leave McMurry? |
| 11 | A. 1996 or '97. |
| 12 | Q. Okay. And then when did you leave UTEP? |
| 13 | A. 1998. |
| 14 | Q. Okay. And then after that, you went to work |
| 15 | for Circuit City? |
| 16 | A. I had been working for Circuit City part time. |
| 17 | I just stayed on with them. |
| 18 | Q. Okay. And how long did you stay on with |
| 19 | Circuit City? |
| 20 | A. Through 2002, I believe. |
| 21 | Q. Okay. And after you left Circuit City, where |
| 22 | did you go? |
| 23 | A. I went to Ameriquest Mortgage. |
| 24 | THE REPORTER: American? |
| 25 | THE WITNESS: Ameriquest. |

**25**

| | |
|---|---|
| 1 | Q. (BY MS. NOWAK) And how long did you stay with |
| 2 | Ameriquest? |
| 3 | A. A couple of years. |
| 4 | Q. Can you give me a rough estimate of when you |
| 5 | think you departed from there? |
| 6 | A. '95, '96 -- no, no. I'm sorry. '05, '06 |
| 7 | possibly. |
| 8 | Q. Okay. |
| 9 | A. Maybe earlier than that. |
| 10 | Q. And where did you go from Ameriquest Mortgage? |
| 11 | A. Wells Fargo. |
| 12 | Q. And how long did you stay with Wells Fargo? |
| 13 | A. Just a little while. Maybe a few months, |
| 14 | maybe a year. |
| 15 | Q. So still in the 2006 time frame? |
| 16 | A. Around there. |
| 17 | Q. And then from Wells Fargo? |
| 18 | A. I started my own mortgage -- well, it was kind |
| 19 | of like a franchise. I was a branch manager/owner of a |
| 20 | couple of -- it was called Supreme Lending at one point, |
| 21 | it was called LMI Funding at another. Just different |
| 22 | names 'til I went to Merritt Hawkins. |
| 23 | Q. And so can you tell me the time frame that you |
| 24 | were with LMI Funding. |
| 25 | A. Between the time I was at Wells Fargo and |

7 (Pages 22 to 25)

**APP. 0086**

Billy Jess Bowden

26

10:29 1 Merritt Hawkins.
10:29 2   Q.  So roughly 2006 to 2008?
10:29 3   A.  Roughly.
10:29 4   Q.  And then in 2008, you joined Merritt Hawkins?
10:29 5   A.  Uh-huh, correct.
10:29 6   Q.  And where did you go when you departed
10:29 7 Merritt Hawkins?
10:29 8   A.  I went into the insurance field.  I worked for
10:29 9 a company called American General.  And that was 2010
10:29 10 and all of 2011.
10:29 11   Q.  Other than American General, did you work for
10:29 12 anyone else prior to joining Consilium?
10:29 13   A.  Yes.  I worked for a company called Design
10:29 14 Benefit Plans.
10:29 15   Q.  And when did you work for them?
10:29 16   A.  For two months in 2012 -- I'm sorry -- 2011.
10:30 17   Q.  And then after that?
10:30 18   A.  I started at Martin Fletcher on January 2nd of
10:30 19 2012 -- or January 3rd, whatever that Monday was.
10:30 20   Q.  And then from Martin Fletcher?
10:30 21   A.  I was there until August or -- yeah, the
10:30 22 beginning of August of -- or from January 'til August of
10:30 23 2012.  And then I went to Consilium.
10:30 24   Q.  So have we now covered all of your employment
10:30 25 history from the time of leaving college up until

27

10:30 1 present that you can recall?
10:30 2   A.  That I can recall.
10:30 3   Q.  Okay.  Let's talk about these.
10:31 4        What was your title with Circuit City?
10:31 5   A.  I was a salesperson, then I was an operations
10:31 6 manager, then I was a sales manager.
10:31 7   Q.  And --
10:31 8   A.  I was a store director in training, as well.
10:31 9   Q.  What about Ameriquest Mortgage, what was your
10:31 10 title with Ameriquest?
10:31 11   A.  I don't know -- I don't remember what the
10:31 12 official title was, but I was a loan officer basically.
10:31 13   Q.  And Wells Fargo?
10:31 14   A.  I was a loan officer, slash -- I had a little
10:31 15 team under me.
10:31 16   Q.  Why did you only stay with Wells Fargo for a
10:31 17 few months?
10:31 18   A.  I couldn't make any money there.
10:31 19   Q.  And then LMI Funding, what was your title with
10:31 20 LMI Funding?
10:31 21   A.  I was like the branch manager/franchise owner,
10:32 22 I guess.
10:32 23   Q.  Did any of Circuit City, Ameriquest, Wells
10:32 24 Fargo, or LMI Funding have anything to do with
10:32 25 healthcare recruiting?

28

10:32 1   A.  No.  Well, it's sales.
10:32 2   Q.  But nothing to do with placing doctors,
10:32 3 recruiting doctors or physicians?
10:32 4   A.  It's sales.  It's all sales, but not medical,
10:32 5 no, not the medical side.  But it is selling.
10:32 6   Q.  What was your title with MHA?
10:32 7   A.  I don't know the official title.  I don't
10:32 8 remember.  But I was a recruiter.
10:32 9   Q.  And before you went to work for MHA, you had
10:32 10 no prior experience in doing medical recruiting?
10:32 11   A.  Right.
10:32 12   Q.  So it's fair to say that when you arrived at
10:32 13 MHA, you had no background, no experience, no expertise
10:32 14 in performing healthcare recruiting?
10:32 15   A.  Recruiting, correct.
10:32 16   Q.  And MHA trained you?
10:32 17   A.  To be a recruiter, uh-huh.
10:32 18   Q.  Did MHA onboard you?
10:32 19   A.  They have an onboard process, correct.
10:32 20   Q.  What does that term or what does that phrase
10:32 21 mean to you?
10:32 22   A.  It was a training program they had that lasted
10:32 23 anywhere from three months to six months depending on
10:32 24 your performance.
10:32 25   Q.  And how long did your onboarding last?

29

10:30 1   A.  I want to say probably around five or six
10:32 2 months.
10:32 3   Q.  That sounds like a fairly intensive training
10:32 4 program.
10:32 5        MR. VOLNEY:  Objection; form.
10:32 6   Q.  (BY MS. NOWAK)  How would you characterize the
10:32 7 training program?
10:32 8   A.  It was -- it was good.
10:32 9   Q.  Now, after you left MHA, you went to work for
10:32 10 American General.
10:32 11   A.  Correct.
10:32 12   Q.  And what was the nature -- or sorry.
10:32 13        What was your title or position with American
10:32 14 General?
10:32 15   A.  I started off as a life insurance salesman,
10:32 16 and then I became a -- what's it called -- a branch
10:32 17 manager in training, I guess.
10:32 18   Q.  Were you doing anything with them related to
10:32 19 healthcare or physician staffing?
10:32 20   A.  I was recruiting.
10:32 21   Q.  But specifically, were you recruiting --
10:32 22   A.  No.
10:32 23   Q.  -- medical specialists?
10:32 24   A.  No.  I was recruiting life -- life insurance
10:32 25 salesmen.

8 (Pages 26 to 29)

Billy Jess Bowden

---

30

| | |
|---|---|
| 10:34 | 1   Q.   And then from American General, we went to |
| 10:34 | 2   Design Benefit Plans.  And what was your title with |
| 10:34 | 3   Design Benefit Plans? |
| 10:35 | 4   **A.   Health insurance salesman.** |
| 10:35 | 5   Q.   And again, were you doing any recruiting or |
| 10:35 | 6   placing of medical specialists? |
| 10:35 | 7   **A.   No.** |
| 10:35 | 8   Q.   And after Design Benefit Plans, you went to |
| 10:35 | 9   work for Martin Fletcher; is that correct? |
| 10:35 | 10   **A.   Correct.** |
| 10:35 | 11   Q.   And that was in January of 2012? |
| 10:35 | 12   **A.   That's correct.** |
| 10:35 | 13   Q.   So a little over a year after you departed |
| 10:35 | 14   from Merritt Hawkins? |
| 10:35 | 15   **A.   Correct.** |
| 10:35 | 16   Q.   What does Martin Fletcher do? |
| 10:35 | 17   **A.   Locum tenens staffing.** |
| 10:35 | 18   Q.   Is that all that Martin Fletcher does? |
| 10:35 | 19   **A.   I believe they have a permanent side to their** |
| 10:35 | 20   **business -- or they did at that time.** |
| 10:35 | 21   Q.   So similar to MHA, they also do healthcare |
| 10:35 | 22   staffing, healthcare placement? |
| 10:35 | 23   **A.   That's correct.** |
| 10:38 | 24   Q.   Okay.  You would agree with me that they're in |
| 10:38 | 25   the same industry? |

31

| | |
|---|---|
| 10:38 | 1   **A.   I do.** |
| 10:38 | 2   Q.   And that they are actually a direct competitor |
| 10:36 | 3   of MHA? |
| 10:36 | 4   **A.   Part of them are.** |
| 10:36 | 5   Q.   Where are Martin Fletcher's offices located? |
| 10:36 | 6   **A.   It was in Las Colinas.  I don't know where** |
| 10:36 | 7   **they are now.** |
| 10:36 | 8   Q.   So at the time you went to work for them, they |
| 10:36 | 9   were located in Las Colinas? |
| 10:36 | 10   **A.   Yes.** |
| 10:36 | 11   Q.   How far was that from MHA's offices? |
| 10:36 | 12   **A.   I don't know.  Six miles, five miles.** |
| 10:36 | 13   Q.   How did you become aware of the employment |
| 10:36 | 14   opportunity at Martin Fletcher? |
| 10:36 | 15   **A.   A recruiter called me.** |
| 10:36 | 16   Q.   Was it a cold call? |
| 10:36 | 17   **A.   It was a cold call.** |
| 10:36 | 18   Q.   Had she heard that you were looking for |
| 10:36 | 19   employment? |
| 10:36 | 20   **A.   I wasn't looking.  I -- in fact, I didn't want** |
| 10:36 | 21   **to get back into medical staffing.** |
| 10:36 | 22   Q.   And why is that? |
| 10:36 | 23   **A.   I just didn't -- I didn't like what I -- what** |
| 10:39 | 24   **I did at Merritt Hawkins.** |
| 10:39 | 25   Q.   They offered you a good deal, though? |

---

32

1   **A.   They offered -- the thing that -- that made me**
2   **actually talk to them is her and I actually figured out**
3   **we went to high school together.  So I -- I listened to**
4   **what she had to say and I went in for an interview.**
5   Q.   And as a result of that interview --
6   **A.   I liked it.**
7   Q.   -- process --
8   **A.   Yes, I liked --**
9   Q.   -- you went to work --
10   **A.   -- the interview process.**
11   Q.   -- for Martin Fletcher?
12   **A.   Yes.**
13   Q.   You didn't stay with Martin Fletcher for very
14   long, though, did you?
15   **A.   No.**
16   Q.   Why is that?
17   **A.   It's weird.  I really liked working at**
18   **Martin Fletcher and I was very happy there.  I'd**
19   **probably still be there today, but I got a call from**
20   **Christina at Consilium.  She called me and we talked**
21   **and -- or actually she e-mailed me through LinkedIn.**
22   **And I did some quick Google search and realized who they**
23   **were and who owned their company.  And it piqued my**
24   **interest.**
25   Q.   At the time that you went to work for

33

1   Martin Fletcher, did you tell them that you had an
2   employment agreement with Merritt Hawkins?
3   **A.   At that point, I believe it was already**
4   **expired, my one-year noncompete.**
5   Q.   Did you tell them --
6   THE REPORTER:  One-year what, noncompete?
7   THE WITNESS:  I had a one-year
8   noncompete.
9   **A.   I don't remember if I specifically told them,**
10   **but I think they -- they probably had an idea that --**
11   **that -- they knew I worked at Merritt Hawkins, that I**
12   **had a noncompete at some point, I'm sure.**
13   Q.   (BY MS. NOWAK)  Because every employee at
14   Merritt Hawkins has a noncompete at some point in time?
15   **A.   As far as I know, yes.  I don't know if they**
16   **still do.**
17   Q.   And Merritt -- I'm sorry.
18   Martin Fletcher hired you anyway.  So they --
19   you believe they knew that you had an employment
20   agreement with Merritt Hawkins?
21   **A.   Well, it was already over.  I would -- I**
22   **waited a year and the noncompete part of it was over.**
23   Q.   But there were other terms that were still in
24   existence, correct?
25   **A.   I believe there was a three-year nonsolicit.**

**9  (Pages 30 to 33)**

---

Billy Jess Bowden

**34**

| | |
|---|---|
| 10:39 | 1 |

10:39 1    Q.  Any other provisions that were still
10:39 2  enforceable?
10:39 3    A.  Not that I know of.
10:39 4    Q.  What about the nondisclosure?
10:39 5    A.  I don't know what that is.
10:39 6    Q.  We'll talk about it.
10:39 7    A.  Okay.
10:39 8    Q.  And then from Martin Fletcher, let's talk a
10:39 9  little bit about Consilium.
10:39 10    What is the exact title that you have with
10:39 11  Consilium?
10:39 12    A.  Client sales.
10:39 13    Q.  And is that the position that you've always held
10:39 14  with Consilium?
10:39 15    A.  Yes.
10:39 16    Q.  And what's the nature of Consilium's business?
10:39 17    A.  Locum tenens staffing.
10:39 18    Q.  Do they do any other type of staffing?
10:39 19    A.  No.
10:39 20    Q.  Do they do any perms?
10:39 21    A.  No.
10:40 22      (Exhibit No. 3 marked.)
10:40 23    Q.  (BY MS. NOWAK)  We're handing you what's been
10:40 24  marked as Deposition Exhibit 3.  Can you please review
10:40 25  that.

**35**

10:43 1      MS. NOWAK:  And I apologize, John.  I
10:43 2  only have the one copy.
10:43 3    A.  (Witness complies.)
10:43 4    Okay.
10:43 5    Q.  (BY MS. NOWAK)  So you would agree with me
10:43 6  following your review of that document that Consilium
10:43 7  represents that it does both locums and perm placements?
10:43 8    A.  This document says so.  But locum tenens
10:43 9  and -- and what Merritt Hawkins does is totally
10:43 10  different.
10:43 11    Q.  I understand.
10:43 12    But my question to you was:  This document
10:43 13  represents that Consilium does both locums and permanent
10:43 14  placements, correct?
10:43 15    A.  Yes and no, because people in the industry
10:43 16  would understand that locum tenens sometimes turn into
10:43 17  permanent opportunities.  So I mean, if you bring in a
10:43 18  search, it's not a permanent search, it's locum tenens,
10:43 19  sometimes you marry a good doctor and a good client and
10:43 20  it might become a permanent at some point, but it's not
10:43 21  brought in that way.  We don't bring in business -- we
10:43 22  don't bring in permanent business.
10:43 23    Q.  But the fact remains that Consilium has done
10:43 24  permanent placements?
10:43 25    A.  It -- it -- yes.  But it's different.  It is

**36**

1  different.  It happens after it's married.  I mean, what
2  they do at Merritt Hawkins is, like, totally different
3  than -- than what this is.  And a physician or somebody
4  reading this would understand that it's a locums that
5  would become a permanent if it -- there's a good fit.
6    Q.  But my question to you is --
7    A.  Uh-huh.
8    Q.  -- Consilium has done permanent placements?
9    A.  I --
10      MR. VOLNEY:  Objection; form.
11    A.  -- don't know if we've done that.  But -- I
12  don't know.
13    Q.  (BY MS. NOWAK)  Okay.  Irregardless of whether
14  Consilium does locums or perm, you would agree with me
15  that Consilium is in the business of placing medical
16  specialists?
17    A.  Yes, on temporary -- on temporary or contract
18  positions.
19    Q.  Okay.  So Consilium does place medical
20  specialists?
21    A.  On temporary positions.
22    Q.  I understand that you want to get the caveat
23  in there --
24    A.  It is --
25    Q.  -- based on temporary.

**37**

1    A.  It's -- it's like a lawyer.  I mean, if -- if
2  I have an immigration issue, I'm not going to go to a
3  patent lawyer.  Wouldn't you agree that's --
4    Q.  But you would --
5    A.  -- totally different?
6    Q.  -- agree they're both lawyers?
7    A.  They're both lawyers.  Okay.  We're all
8  medical staffing firms, yes.
9    Q.  That's my question.
10    A.  Okay.
11    Q.  That's what I'm trying to get you --
12    A.  All right.
13    Q.  Does Consilium do medical staffing?
14    A.  Yes, we do medical staffing.
15    Q.  So if we're talking MHA, we're talking
16  Martin Fletcher, we're talking Consilium, they each do
17  medical staffing?
18    A.  Medical staffing as a whole, correct.
19    Q.  And they're all located in Irving, Texas?
20    A.  That's correct.
21    Q.  Okay.  Just within a few miles of each other?
22    A.  Correct.
23    Q.  Do you recall when you first became employed
24  by MHA?
25    A.  I can kind of remember it.  I've slept since

**10  (Pages 34 to 37)**

Billy Jess Bowden

**38**

10:46  1  then.
10:46  2  Q. You and me both.
10:46  3  A. Yeah.
10:46  4  Q. If I represented to you that you first became
10:46  5  employed in April of 2008, would that sound right?
10:46  6  A. Yes, ma'am.
10:46  7  Q. And how was it that you came to be employed by
10:46  8  MHA? What -- what prompted you to leave LMI Funding and
10:46  9  join?
10:46  10  A. It was -- the market was crashing at that
10:46  11  point and I wanted an employed position. I wanted to go
10:47  12  somewhere that was recession proof. And I thought
10:47  13  medical staffing would be good.
10:47  14  Q. Did you have a friend that was in medical
10:47  15  staffing? Or how did you hear about medical staffing?
10:47  16  A. My best friend got -- took a job with MHA.
10:47  17  Q. And what's your best friend's name?
10:47  18  A. Stephan Chandy.
10:47  19  Q. And is he still with MHA?
10:47  20  A. No.
10:47  21  Q. Where is he now?
10:47  22  A. He's in the country of Sri Lanka.
10:47  23  Q. Who hired you at MHA? Who did you interview
10:47  24  with, do you recall?
10:47  25  A. I interviewed with I believe Tim Beidle, I

**39**

10:47  1  believe, and then whoever the corporate recruiter at the
10:45  2  time was. I don't remember. Joby Pillans.
10:45  3  Q. And where did you work for MHA? What was the
10:45  4  office address?
10:45  5  A. Statesman Drive. I don't know the number.
10:45  6  Q. If I represented to you that it was 5001
10:45  7  Statesman Drive, Irving, Texas --
10:45  8  A. I agree.
10:45  9  Q. -- does that sound...
10:45  10  And were you at that particular address the
10:45  11  entire length of your employment with MHA?
10:45  12  A. I was.
10:45  13  Q. You mentioned earlier that you were originally
10:45  14  hired as a recruiter. If I told you that the title was
10:45  15  a search consultant, does that sound about right?
10:45  16  A. Yes.
10:45  17  Q. What does a search consultant do?
10:45  18  A. You recruit physicians to fill jobs
10:45  19  permanently.
10:45  20  Q. Can you walk me through what -- what's a day
10:45  21  in the life of a search consultant like?
10:45  22  A. Basically, you make a lot of phone calls to
10:45  23  different physicians regarding jobs, try to find
10:46  24  physicians that will fit the job you're representing.
10:46  25  Q. Did you remain as a search consultant the

**40**

1  entire time that you were with MHA?
2  A. I did.
3  Q. You said just a moment ago that it was your
4  job to make a lot of phone calls to different
5  physicians.
6  Did you have any other specific job
7  responsibilities other than trying to locate a physician
8  to fit the job?
9  A. Sometimes you would meet with a client and
10  sell them a marketing package to help find that
11  physician.
12  Q. Were you part of a specific team when you were
13  at MHA?
14  A. It was called the Heartland.
15  Q. Okay. And what -- what does that mean?
16  A. The Midwest states included Oklahoma, Kansas,
17  Illinois, Arkansas --
18  Q. And were you --
19  A. -- Missouri.
20  Q. I'm sorry?
21  A. And Missouri.
22  Q. And Missouri.
23  And did you work with or try to place a
24  specific specialty or was it all specialties?
25  A. Primary care.

**41**

1  Q. And what does primary care mean?
2  A. Family practice, internal medicine,
3  pediatricians.
4  Q. What's family practice?
5  A. General physicians that can see all ages.
6  Q. So kind of your everyday doc you go to for
7  your wellness checks?
8  A. Correct.
9  Q. During the course of your employment with
10  MHA -- or at MHA, did you work with other MHA employees?
11  A. Yes.
12  Q. How big was the -- the team that you were part
13  of? How many other employees?
14  A. Anywhere from four, five to maybe, ten,
15  twelve. It would fluctuate.
16  Q. And did you only work with your team or would
17  you also work with other folks who were outside your
18  team while you were at MHA?
19  A. Well, there was other teams, like logistics
20  and things like that, yes.
21  Q. So you worked with those teams -- those other
22  teams, those other folks that were at MHA?
23  A. Sure.
24  Q. Okay. And through that work that you were
25  doing, did you kind of get to know those people, what

**11  (Pages 38 to 41)**

**42**

| | |
|---|---|
| 10:48 | 1  they were good at? |
| 10:48 | 2  **A.  Sure.** |
| 10:48 | 3  Q.  Their strengths and weaknesses? |
| 10:48 | 4  **A.  Uh-huh.** |
| 10:48 | 5  Q.  Did you get a feel for who were the top or |
| 10:49 | 6  high performers versus who were the low performers? |
| 10:49 | 7  **A.  I did.** |
| 10:49 | 8  Q.  And you learned that information while you |
| 10:49 | 9  were employed at MHA? |
| 10:49 | 10  **A.  Yes.** |
| 10:49 | 11  Q.  What date did your employment with MHA |
| 10:49 | 12  terminate? |
| 10:49 | 13  **A.  September of 2011.** |
| 10:49 | 14  Q.  2011? |
| 10:49 | 15  **A.  Was it -- yes -- no.  I'm sorry.  2010.** |
| 10:49 | 16  Q.  And again, just to make sure that I've got it |
| 10:49 | 17  down correctly, you went from there to American General? |
| 10:49 | 18  **A.  American General was my next company, yes.** |
| 10:49 | 19  Q.  And after approximately a year elapsed, you |
| 10:49 | 20  wound up at Martin Fletcher? |
| 10:49 | 21  **A.  Yes.** |
| 10:49 | 22  Q.  I asked you earlier if you had advised Martin |
| 10:49 | 23  Fletcher that you had an employment agreement. |
| 10:50 | 24     Did you ever advise Consilium that you had an |
| 10:50 | 25  employment agreement with MHA? |

**43**

| | |
|---|---|
| 10:52 | 1     **A.  Probably not, no.** |
| 10:52 | 2  Q.  Was it ever a topic of discussion when you |
| 10:52 | 3  were interviewing at Consilium that you had worked at |
| 10:52 | 4  MHA? |
| 10:52 | 5  **A.  Yes.** |
| 10:52 | 6  Q.  So they were aware that you'd previously been |
| 10:52 | 7  employed by MHA? |
| 10:52 | 8  **A.  Yes.** |
| 10:52 | 9  Q.  And during the course of that discussion, it |
| 10:52 | 10  never came up on whether you had an employment agreement |
| 10:52 | 11  or not? |
| 10:52 | 12  **A.  I don't recall.** |
| 10:52 | 13  Q.  Were you under the impression that because you |
| 10:52 | 14  had previously worked at MHA, they were aware you had an |
| 10:52 | 15  employment agreement? |
| 10:52 | 16  **A.  Yes.** |
| 10:53 | 17     MS. NOWAK:  Lezley, can you mark this as |
| 10:53 | 18  our next exhibit. |
| 10:53 | 19     THE REPORTER:  Uh-huh. |
| 10:53 | 20     MS. NOWAK:  And John, I did bring a copy |
| 10:53 | 21  and this is for you. |
| 10:53 | 22     MR. VOLNEY:  Thank you. |
| 10:53 | 23     MS. NOWAK:  Just because I'm so kind and |
| 10:53 | 24  wonderful. |
| 10:53 | 25     (Exhibit No. 4 marked.) |

**44**

| | |
|---|---|
| | 1  Q.  (BY MS. NOWAK)  Mr. Bowden, can you take a |
| | 2  minute just to look that over. |
| | 3  **A.  (Witness complies.)** |
| | 4     Okay. |
| | 5  Q.  Mr. Bowden, you're aware that in part, this |
| | 6  lawsuit centers around your employment agreement with |
| | 7  Merritt Hawkins & Associates? |
| | 8     MR. VOLNEY:  Objection; form. |
| | 9  Q.  (BY MS. NOWAK)  Mr. Bowden, do you understand |
| | 10  that in part, this lawsuit centers around your |
| | 11  employment agreement with Merritt Hawkins? |
| | 12     MR. VOLNEY:  Objection; form. |
| | 13  Q.  (BY MS. NOWAK)  You can still answer the |
| | 14  question. |
| | 15  **A.  Sure.** |
| | 16  Q.  Do you recall that in connection with your |
| | 17  employment at Merritt Hawkins, that you signed an |
| | 18  employment agreement? |
| | 19  **A.  Yes.** |
| | 20  Q.  And the exhibit that you have just reviewed |
| | 21  and that's sitting in front of you, is that a copy of |
| | 22  the employment agreement that you signed with |
| | 23  Merritt Hawkins? |
| | 24  **A.  It is.** |
| | 25  Q.  Okay.  And can you tell me on what date you |

**45**

| | |
|---|---|
| | 1  signed this employment agreement? |
| | 2  **A.  April 23rd of 2008.** |
| | 3  Q.  And at the time you signed this, you signed it |
| | 4  of your own free will? |
| | 5  **A.  I did.** |
| | 6  Q.  You were not under any type of duress? |
| | 7  **A.  Well, if I wanted the job, I had to sign it.** |
| | 8  Q.  But no one coerced you, no one held your pen |
| | 9  to the paper and said you must sign this? |
| | 10  **A.  No.  No one held my pen to the paper, no.** |
| | 11  Q.  And this is your signature on the last page of |
| | 12  this agreement? |
| | 13  **A.  Yes, it is.** |
| | 14  Q.  And you've signed contracts before? |
| | 15  **A.  I have.** |
| | 16  Q.  In fact, having experience with the mortgage |
| | 17  industry, you're familiar with the import of signing |
| | 18  contracts? |
| | 19  **A.  I am.** |
| | 20  Q.  And you agreed to be bound by the terms of |
| | 21  this employment agreement at the time that you signed |
| | 22  it? |
| | 23  **A.  I did.** |
| | 24  Q.  And at the time you signed it, you fully |
| | 25  intended to be bound by it? |

**12 (Pages 42 to 45)**

Billy Jess Bowden

**46**

| | |
|---|---|
| 10:53 | 1     **A. I did.** |
| 10:53 | 2     Q. And you understood the full impact and effect |
| 10:53 | 3   of signing this employment agreement? |
| 10:53 | 4     **A. I did.** |
| 10:53 | 5       MR. VOLNEY: Objection; form. |
| 10:53 | 6     Q. (BY MS. NOWAK) Mr. Bowden, at the time that |
| 10:53 | 7   you signed this employment agreement, you agreed that |
| 10:53 | 8   the restrictions in here were necessary to protect MHA? |
| 10:53 | 9     **A. I don't know that I agreed with it, but I did** |
| 10:53 | 10   **sign it, so...** |
| 10:53 | 11     Q. You understood that MHA was putting these |
| 10:53 | 12   restrictions in place to protect itself? |
| 10:54 | 13     **A. Sure, I do.** |
| 10:54 | 14     Q. And you certainly didn't think that this was a |
| 10:54 | 15   meaningless agreement at the time that you signed it? |
| 10:54 | 16     **A. No.** |
| 10:54 | 17     Q. Mr. Bowden, I want to walk through a few of |
| 10:54 | 18   the specific provisions that are in here. If you can, |
| 10:54 | 19   can you turn with me to the second page of this |
| 10:54 | 20   agreement. |
| 10:54 | 21     **A. Okay.** |
| 10:54 | 22     Q. If you look at the top, it's entitled |
| 10:54 | 23   Article IV, Confidential Information. |
| 10:54 | 24     **A. Uh-huh.** |
| 10:54 | 25     Q. And if you look down to Subpart E, there's a |

**47**

| | |
|---|---|
| 10:54 | 1   definition there of MHA's confidential information. |
| 10:54 | 2     **A. Okay.** |
| 10:54 | 3     Q. And you would agree with me, based on reading |
| 10:54 | 4   this provision, that MHA considers the exact names and |
| 10:54 | 5   the clients of MHA to be confidential information? |
| 10:54 | 6     **A. I understand.** |
| 10:54 | 7     Q. Do you agree that MHA does consider that to be |
| 10:54 | 8   confidential information? |
| 10:54 | 9     **A. I agree.** |
| 10:54 | 10     Q. And do you also agree that MHA considers the |
| 10:54 | 11   special needs of its clients to be confidential |
| 10:54 | 12   information? |
| 10:55 | 13     **A. I agree.** |
| 10:55 | 14     Q. Do you agree that MHA considers its client |
| 10:55 | 15   database to be confidential information? |
| 10:55 | 16     **A. I agree.** |
| 10:55 | 17     Q. Do you recall the name of MHA's database? |
| 10:55 | 18     **A. Max.** |
| 10:55 | 19     Q. Did you have access to that database -- |
| 10:55 | 20     **A. I did.** |
| 10:55 | 21     Q. -- while you were employed with MHA? |
| 10:55 | 22     **A. Yes.** |
| 10:55 | 23     Q. And was that database password protected? |
| 10:55 | 24     **A. Yes.** |
| 10:55 | 25     Q. Not just anybody off the street could access |

**48**

| | |
|---|---|
| 1   it? |
| 2     **A. No.** |
| 3     Q. You had to be issued a password? |
| 4     **A. Yes.** |
| 5     Q. There were protections in place? |
| 6     **A. Uh-huh, yes.** |
| 7     Q. Now, you would also agree under this |
| 8   definition of confidential information, that MHA |
| 9   considers the fees that MHA charges to its clients to be |
| 10   confidential? |
| 11     **A. Yes.** |
| 12     Q. Also MHA's profit margins? |
| 13     **A. Yes.** |
| 14     Q. Things like their training manuals? |
| 15     **A. Yes.** |
| 16     Q. And the sales technique that MHA uses? |
| 17     **A. Well --** |
| 18       MR. VOLNEY: Objection; form. |
| 19     Q. (BY MS. NOWAK) Do you agree with me that MHA |
| 20   considers the sales technique that it uses to be |
| 21   confidential information? |
| 22     **A. Yes. But I don't understand how that can be** |
| 23   **enforced because it's -- it's a part of me. I mean...** |
| 24     Q. It's something that you learned while you |
| 25   were -- |

**49**

| | |
|---|---|
| 1     **A. Sure.** |
| 2     Q. -- at MHA that they trained you on and how to |
| 3   approach this business and this industry? |
| 4       MR. VOLNEY: You mean making phone calls? |
| 5   I don't see sales technique in here. Can you point it |
| 6   out to me. |
| 7       MS. NOWAK: I sure can. If you look at |
| 8   Provision A, the employee will develop confidential |
| 9   information relating to the exact names and contacts -- |
| 10   contacts of clients of MHA, the fees charged by MHA, and |
| 11   sales techniques unique to the success of MHA. |
| 12     Q. (BY MS. NOWAK) Mr. Bowden, during your |
| 13   employment with MHA, did you have access to these types |
| 14   of things? Did you have access to the names of MHA's |
| 15   clients? |
| 16     **A. Yes.** |
| 17     Q. Did you have access to special needs of MHA's |
| 18   clients, what they were looking for in a doctor, the |
| 19   type of doctors that they would consider, things of that |
| 20   nature? |
| 21     **A. I did.** |
| 22     Q. We've already discussed you had access to the |
| 23   client database. |
| 24     **A. Yes.** |
| 25     Q. Did you also have access to the fees that MHA |

**13 (Pages 46 to 49)**

**APP. 0092**

Billy Jess Bowden

50

10:59  1  charged or the profit margins that MHA made?
10:59  2  **A. To the fees, I did. Profit margins, I don't**
10:59  3  **remember being shared that information.**
10:59  4  Q. So when it lists all these items here in your
10:59  5  employment agreement, you would agree with me that MHA
10:59  6  held up its end of the bargain, it gave you access to
10:59  7  each of these confidential items during your employment?
10:59  8  MR. VOLNEY: Objection; form.
10:60  9  **A. Yes.**
10:60  10  Q. (BY MS. NOWAK) And they had you sign an
10:60  11  agreement that laid all of these items out so you would
10:60  12  understand what they believed to be confidential?
10:60  13  **A. Yes.**
10:60  14  Q. And at the time you signed it, you understood
10:60  15  what MHA thought was confidential?
10:60  16  **A. Yes.**
10:60  17  Q. And you, in fact, agreed that each of these
10:60  18  categories was, in fact, MHA's confidential information?
10:60  19  **A. Yes.**
10:60  20  Q. Now, Mr. Bowden, you understand that under
10:60  21  this employment agreement, you can't use any of the
10:60  22  confidential information that you learned while you were
10:60  23  at MHA following your employment?
10:60  24  MR. VOLNEY: Objection; form.
10:60  25  **A. I don't understand how that could be possible**

51

10:60  1  **because once you learn something, it's not like you can**
10:60  2  **unlearn it.**
10:60  3  Q. (BY MS. NOWAK) So once you left MHA's
10:60  4  employment, it was inherent, you -- you were going to
10:60  5  have to use the knowledge you learned at MHA to continue
10:60  6  on in the medical specialist or medical staffing --
10:60  7  **A. If I --**
10:60  8  Q. -- industry?
10:60  9  **A. -- continued doing the same thing, yes.**
10:60  10  Q. There's no expiration or end point with
10:60  11  respect to this confidential information provision, is
10:60  12  there?
10:60  13  **A. To this confidential?**
10:60  14  Q. Yes.
10:60  15  **A. I don't know.**
10:60  16  Q. It doesn't -- it doesn't have a termination
10:60  17  date?
10:60  18  **A. That, I don't know.**
10:60  19  Q. Mr. Bowden, you keep saying that you can't
10:60  20  help but use MHA's confidential information because it
10:60  21  became part of who you are.
10:60  22  So --
10:60  23  MR. VOLNEY: Objection; form.
10:60  24  Q. (BY MS. NOWAK) -- as we sit here today, are
10:60  25  you alleging that you have the right to use MHA's

52

1  confidential information?
2  **A. I don't have the right to it, no.**
3  Q. But you are admitting that you have used MHA's
4  confidential information?
5  **A. No.**
6  MR. VOLNEY: Objection; form.
7  **A. No.**
8  Q. (BY MS. NOWAK) Mr. Bowden, are you alleging
9  that this Article IV, this provision, Confidential
10  Information, is unenforceable in this lawsuit?
11  **A. When you're talking about sales techniques,**
12  **it's hard for me to say I've got a sales technique from**
13  **Merritt Hawkins or I got one from Circuit City or I got**
14  **one from that. That part of it, I can't differentiate**
15  **because I don't know. It was a sales technique. When**
16  **it's something -- something tangible like customers and**
17  **clients, I understand that.**
18  Q. But my question to you is: Are you alleging
19  in this lawsuit that this provision is unenforceable?
20  **A. I don't know the -- the -- the enforce -- the**
21  **enforceable part of it, I don't -- I don't get. But I**
22  **can tell you, like I said, the sales techniques, I**
23  **wouldn't know if I got it from Merritt Hawkins or from**
24  **previous sales techniques because I had a lot of sales**
25  **training before I went to Merritt Hawkins, as well.**

53

1  Q. Okay. My question to you is: Are you
2  alleging as part of this lawsuit that this provision is
3  unenforceable?
4  **A. Part of it.**
5  Q. Okay. And just the part related to sales
6  techniques?
7  **A. At least the sales training, yes.**
8  Q. Everything else that is listed in here, you
9  agree is MHA's confidential information?
10  MR. VOLNEY: Objection; form.
11  **A. Yeah. Everything else I guess could be.**
12  MS. NOWAK: Lezley, can you mark this as
13  the next exhibit.
14  (Exhibit No. 5 marked.)
15  Q. (BY MS. NOWAK) Mr. Bowden, I'm handing you
16  two pages that were produced to me in connection with
17  this lawsuit. They're stamped at the bottom Bowden 65
18  and Bowden 66.
19  **A. Correct.**
20  Q. Can you tell me what this document is?
21  **A. This was a script that was given to us at some**
22  **point when we meet physicians before their interviews.**
23  **It was called an airport interview. Oh, it also looks**
24  **like -- we were given a number of scripts. This one's**
25  **actually when you're selling a marketing campaign to the**

**14 (Pages 50 to 53)**

Billy Jess Bowden

---

**54**

| | |
|---|---|
| 11:03 | 1 |
| 11:03 | 2 |
| 11:03 | 3 |
| 11:03 | 4 |
| 11:03 | 5 |

1  hospital.
2      Q.  And when you say the script was given to us,
3  who gave you this script?
4      A.  It came from various -- probably Mike Fay, the
5  trainer.
6      Q.  But it was -- it's an MHA document?
7      A.  Uh-huh.
8      Q.  And did you use this document during the
9  course of your employment at MHA?
10      A.  I used this one to memorize the script.  I
11  retyped it all up so I could memorize it.
12      Q.  But during the actual -- during the actual
13  course of your employment with MHA, you used items from
14  this script that MHA provided you with?
15      A.  I used the script word for word.
16      Q.  You found it helpful to accomplish your job?
17      A.  It was something that was non-negotiable.  We
18  had to learn it and memorize it.
19      Q.  Now, this document was produced to me as part
20  of this litigation.  So when you left MHA, you didn't
21  return this document?
22      A.  This was actually something I retyped and I
23  found it at the bottom of a drawer when I was served or
24  when y'all requested any paperwork.
25      Q.  Did you use any of the items on this script,

**55**

1  any of these questions or texts while you were an
2  employee at Martin Fletcher?
3      A.  Possibly.  I mean...
4      Q.  Well, you mentioned that you memorized it.  So
5  would it have been part of your airport interview at
6  Martin Fletcher to use pieces from this script?
7      A.  No, because it's totally different, different
8  type of work that I was doing at Martin Fletcher.
9      Q.  So none of the pieces on this script would be
10  applicable to your work at Martin Fletcher or at
11  Consilium?
12      A.  Not that I know of, no.
13      Q.  Well, please take a minute to -- to look at
14  it.
15      A.  Well, I mean, it's -- it's totally -- totally
16  different than what I -- what I've done at
17  Martin Fletcher and Consilium.
18      Q.  But you did still have this in your possession
19  at the time that you became employed by Consilium?
20      A.  Yes.
21      Q.  You had it at your disposal?
22      A.  Sure.
23      Q.  Did you ever attempt to access or use the MHA
24  computer system before you tendered your resignation to
25  MHA but after you had told Martin Fletcher you were

**56**

1  going to go to work for them?
2      A.  No.  That was a year and a half in between.
3      Q.  Did you ever attempt to access MHA's computer
4  system after you resigned or were no longer working for
5  MHA?
6      A.  No.
7      Q.  Did you ever download, copy, or print any
8  documents from MHA after the date your employment with
9  MHA terminated?
10      A.  No.
11      Q.  Did you ever ask anybody else to send you
12  copies of anything?
13      A.  No.
14      Q.  Let's go back to your employment agreement.
15  And if you don't mind, let's turn from Article IV, and
16  if we can look to -- I think it's Article VII now.  My
17  Roman numerals are not great.  But I think it's on
18  Page 4 of 8.
19      A.  Article VII.  Okay.
20      Q.  Can you review that provision.
21      A.  (Witness complies.)
22          Okay.
23      Q.  I want to look at the bottom of this page on
24  this Paragraph C.  There's actually two parts or two
25  different ways that you could violate this noncompete.

**57**

1          Now, it says here on that second part that,
2  For a period of 12 months following the termination of
3  this agreement by either party, for whatever reason, the
4  employee will not engage in the same or similar business
5  as MHA anywhere in the market area, including working as
6  an agent, consultant, partner, employee, officer,
7  shareholder, or independent contractor for any company
8  of business engaged in the same or a similar business as
9  MHA anywhere in the market area.
10          Did I read that correctly?
11      A.  Yes.
12      Q.  Okay.  And if we flip the page, I think if you
13  look about midway down under Subsection D, it actually
14  defines what is considered a same or similar business.
15  And it says, the same or similar business as MHA shall
16  be defined as the business of recruitment of medical
17  specialists, selling of services to clients, and account
18  management of new and current business.
19          Did I read that correctly?
20      A.  Correct.
21      Q.  And then if we look down to that very next
22  paragraph, it defines the market area as any location
23  within 50 miles of MHA's offices --
24      A.  Okay.
25      Q.  -- is that correct?

---

**15 (Pages 54 to 57)**

Billy Jess Bowden

58

11:08  1      A.  Correct.
11:08  2      Q.  Now, you agreed to this provision by signing
11:08  3  this employment agreement?
11:08  4      A.  Correct.
11:08  5      Q.  And at the time you signed it, you understood
11:08  6  that if you left MHA, you couldn't go to work for a
11:08  7  competitor who was located within 50 miles of MHA?
11:08  8      A.  Correct.
11:08  9      Q.  So that was your understanding of this
11:08 10  provision at the --
11:08 11      A.  For a year.
11:08 12      Q.  -- time you left?
11:08 13      For one year?
11:08 14      A.  Uh-huh.
11:08 15      Q.  And I just want to go back and cover this.
11:08 16      You're also aware that MHA has all of its
11:08 17  employees that have access to its confidential
11:08 18  information sign an employment agreement similar to the
11:08 19  one that you have signed?
11:08 20      A.  I don't --
11:08 21          MR. VOLNEY:  Objection --
11:08 22      A.  -- know that.
11:08 23          MR. VOLNEY:  -- form.
11:08 24      Q.  (BY MS. NOWAK)  Okay.  Are you generally aware
11:09 25  that MHA has its employees sign an employment agreement?

59

11:09  1      A.  I don't know.  I can only attest to my own.
11:09  2      Q.  So you never discussed with any other
11:09  3  employees of MHA whether they also had employment
11:09  4  agreements?
11:09  5      A.  Not all of them.  Maybe Scott.
11:09  6      Q.  So you and Scott discussed that he had an
11:09  7  employment agreement with MHA?
11:09  8      A.  (Witness nods head.)
11:09  9      Q.  And you've already agreed that
11:09 10  Martin Fletcher's office was within 50 miles of MHA's
11:09 11  office?
11:09 12      A.  Yes.
11:09 13      Q.  And Consilium's offices are also within 50
11:09 14  miles?
11:09 15      A.  Yes.
11:09 16      Q.  In fact, Consilium's office is very close,
11:09 17  less than ten miles perhaps?
11:09 18      A.  Perhaps, uh-huh.
11:09 19      Q.  And the terms of your contract with MHA say
11:09 20  that you won't go to work for any competitor within that
11:09 21  50-mile radius?
11:09 22          MR. VOLNEY:  For a year.
11:09 23      A.  For a year.
11:09 24      Q.  (BY MS. NOWAK)  For one year?
11:09 25      A.  Uh-huh.

60

 1      Q.  Okay.  I want to look again at the definition
 2  of same or similar business.
 3          Would you agree with me that the manner that
 4  same or similar business is defined here in your
 5  employment agreement, that Martin Fletcher would
 6  constitute a same or similar business as MHA?  They were
 7  involved in the recruitment of medical specialists?
 8      A.  I worked for Martin Fletcher Locums, so no.
 9      Q.  So Martin Fletcher Locums doesn't recruit
10  medical specialists?
11      A.  Not for permanent positions, no.
12      Q.  Can you point to me anywhere in this
13  definition of same or similar business where it says
14  that is limited to the recruitment of permanent medical
15  specialists?
16      A.  It's not in there.
17      Q.  Okay.  So it's not limited to temporary or
18  permanent.  It includes, just in general, the
19  recruitment of medical specialists.  It's talking about
20  the -- the staffing of medical specialists.
21      A.  Okay.
22      Q.  And would you agree with me that
23  Martin Fletcher staffs medical specialists,
24  Martin Fletcher recruits medical specialists?
25      A.  I'll agree with that.

61

 1      Q.  And Consilium also recruits medical
 2  specialists?
 3      A.  I'll agree with that.
 4      Q.  All right.  Let's go back to the first part
 5  just very quickly.  And it says here that for 12 months
 6  following the termination of this agreement by either
 7  party for whatever reason, the employee will not
 8  solicit, contact, or communicate with any person,
 9  company, or business that was a client, customer, or
10  prospect of MHA and that the employee personally
11  solicited, contacted, communicated with, or accepted
12  business from while he or she was an employee of MHA at
13  any time during the 12 months preceding the termination
14  of this agreement for the purpose of engaging in the
15  same or similar business as MHA in the market area.
16      Did I read that correctly?
17      A.  Correct.
18      Q.  So basically, at the time that you signed this
19  employment agreement, you understood that if you left
20  MHA, for one year after you left MHA, you couldn't work
21  with any of MHA's clients, customers, or prospects with
22  whom you had worked while you were at MHA?
23          MR. VOLNEY:  Objection; form.
24      Q.  (BY MS. NOWAK)  You couldn't call up MHA's
25  clients or customers on the phone or e-mail them for a

16  (Pages 58 to 61)

Billy Jess Bowden

**62**

11:12  1   year after you left MHA's employment if you had that
11:12  2   communication or contact with them during the last year
11:12  3   of your employment with MHA --
11:12  4        A.  I understand.
11:12  5        Q.  -- is that correct?
11:12  6        A.  Uh-huh.
11:12  7        Q.  What steps did you take after you left MHA to
11:12  8   make sure you weren't contacting or communicating with
11:12  9   any of MHA's, you know, customers, clients?
11:12  10       A.  I don't know that I took any steps.
11:13  11       Q.  Did you communicate with any of MHA's clients,
11:13  12  customers, prospects in that year following?
11:13  13       A.  Not that --
11:13  14       Q.  But you would --
11:13  15       A.  -- I recall, no.
11:13  16       Q.  -- agree with me that this agreement would
11:13  17  prohibit it had you reached out and contacted those
11:15  18  folks for a year following the termination of your
11:15  19  employment?
11:15  20       A.  For permanent recruiting, I -- I could see
11:15  21  that, yes.
11:15  22       Q.  So is it your position here today that you
11:15  23  could contact an employee of MHA if you weren't trying
11:15  24  to put them in a permanent position?
11:15  25       A.  No.  I mean, I agree with the agreement.

**63**

11:15  1        Q.  And the agreement says you cannot contact?
11:15  2        A.  Yes.
11:15  3        Q.  Let's flip the page one more.  We're going to
11:15  4   be on Page 5 of 8.  And at the very bottom of that page,
11:15  5   you can see the header that says Article VIII,
11:15  6   Noninterference.  But there's no actual text, so we'll
11:15  7   flip to the following page.
11:15  8        A.  (Witness complies.)
11:15  9        Q.  Now, it says here at the top of Page 6, The
11:15  10  employee agrees that for a period of 36 months
11:15  11  subsequent to the termination of this agreement, whether
11:16  12  such termination occurs at the insistence of MHA or the
11:16  13  employee, the employee shall not solicit or recruit
11:16  14  directly or by assisting others any other employees of
11:16  15  MHA, its parent companies, subsidiary companies,
11:16  16  affiliated companies, successors or assigns, nor shall
11:16  17  the employee contact or communicate with any other
11:16  18  employees of MHA.
11:16  19       And then if we skip down a little further, it
11:16  20  says, for the purpose of inducing other employees to
11:16  21  terminate their employment with MHA.
11:16  22       Did I read that correctly?
11:16  23       A.  Yes.
11:16  24       Q.  Okay.  Let's go back and break that down a
11:16  25  little bit because that's a big paragraph.

**64**

1   It says here that this particular provision is
2   enforceable for 36 months, correct?
3        A.  That's correct.
4        Q.  And is it your understanding that 36 months is
5   equal to three years?
6        A.  Yes.
7        Q.  Okay.  So --
8            MR. VOLNEY:  Glad we got that cleared up.
9            MS. NOWAK:  My math skills are not always
10  wonderful, John.
11       Q.  (BY MS. NOWAK)  So if you left MHA in
12  September of 2010, when is it your understanding that
13  this provision would expire?
14       A.  36 months later.
15       Q.  Okay.  And when is that?
16       A.  September of 2013, I believe.
17       Q.  Okay.  So this provision remained in effect
18  until September of 2013?
19       A.  Correct.
20       Q.  And it says here that until September of 2013,
21  you won't solicit or recruit any other employees of MHA
22  or the AMN Healthcare family?
23       A.  That's correct.
24       Q.  And I want to go back and focus on one
25  particular subset of language.

**65**

1   It says here that you won't solicit or recruit
2   directly or by assisting others.  Do you see that?  It's
3   about three lines down.
4        A.  Correct.
5        Q.  So you would agree with me that you couldn't
6   directly contact MHA's employees, correct?
7        A.  That's correct.
8        Q.  You would also agree with me that you couldn't
9   assist someone else in contacting them?
10       A.  That's correct.
11       Q.  In general, you would agree with me that you
12  can't instruct someone else to do something that you're
13  prohibited from doing under this agreement?
14           MR. VOLNEY:  Objection; form.
15       A.  I agree.
16       Q.  (BY MS. NOWAK)  If this agreement says,
17  Mr. Bowden, you can't recruit MHA employees or don't
18  recruit MHA employees, you can't go whisper in someone
19  else's ear and have them do that for you?
20       A.  Correct.
21       Q.  And you're not sitting here telling this jury
22  that you think you can circumvent your employment
23  agreement by having someone else do something you're
24  prohibited from doing?
25       A.  Correct.

**17 (Pages 62 to 65)**

Billy Jess Bowden

66

| | |
|---|---|
| 11:36 | 1 |
| 11:36 | 2 |
| 11:36 | 3 |

MS. NOWAK: John, I'm actually at a good
breaking point. And I would like to use the ladies --
MR. VOLNEY: Sure. Take --
MS. NOWAK: -- room, if that's all right.
MR. VOLNEY: Let's take a break.
THE VIDEOGRAPHER: We are now off the
record. The time is 10- -- 11:16.
(Break taken from 11:16 to 11:28 a.m.)
THE VIDEOGRAPHER: We are back on the
record. The time is 11:28 a.m. This is Tape No. 2.
Q. (BY MS. NOWAK) Mr. Bowden, we're just now
back from a brief break and I want to shift gears a
little bit and talk about your employment at Consilium.
A. Okay.
Q. Consilium is your current employer --
A. Correct.
Q. -- correct?
And you are placing medical specialists for
them?
A. No.
Q. What are you doing for Consilium?
A. I guess business development, bringing in new
clients.
Q. Okay. What do you mean when you say bringing
in new clients?

67

A. I canvas a territory looking for clinics,
hospitals, or doctors' groups that need locum tenens
coverage.
Q. And then what happens once you find a client
who is looking for a locums?
A. I pass it on to my account manager and I have
a recruiting team that recruits physicians to fill it.
Q. Okay. And so that side of the business then
places folks with the clients that you've located?
A. Correct.
Q. Other than bringing in new clients, do you
have any other job responsibilities at Consilium?
A. No.
Q. Is there anything that you do besides make
phone calls to these potential new clients as part of
your job?
A. Not really, no.
Q. What do you do once you place a phone call to
a potential new client? How -- how do you keep track of
that information?
A. We have a system online that -- that tracks
it.
Q. And what is the name of that system?
A. I believe it's called Blue Sky.
Q. And so do you enter information about every

68

phone call you place in that?
A. Not every phone call.
Q. What phone calls would merit being included
versus those that would not?
A. Somebody that uses locum tenens coverage in
the past or somebody that might want to use locum tenens
in the future.
Q. So you only include information on people who
could actually generate business or turn into an actual
client?
A. Correct.
Q. So if you were to contact someone and they
were to advise you, oh, I only do this type of work,
then you would not record that in Blue Sky?
A. Correct.
Q. Do you work in a specific territory?
A. I do.
Q. What territory is that?
A. The state of Florida.
Q. And you don't do -- or contact any clients who
are located outside of the state of Florida?
A. Not right now, no.
Q. Okay. Have you previously?
A. North Carolina and Georgia.
Q. Any others since joining Consilium?

69

A. No.
Q. And what specialties do you work in?
A. All specialties.
Q. All.
So that would include primary care?
A. Correct.
Q. Who do you report to?
A. Kyle Etter.
THE REPORTER: Who? I'm sorry.
THE WITNESS: Kyle, K-y-l-e, Etter,
E-t-t-e-r.
Q. (BY MS. NOWAK) And is there anyone who
reports to you?
A. No.
Q. Let's backtrack a little.
You mentioned earlier that Christina Stephens
called you about Consilium. Is that how you first
learned that there was a job opportunity at Consilium?
A. Yes.
Q. And do you recall when she contacted you?
A. Around July of 2012.
MS. NOWAK: Can you mark this as our next
exhibit.
THE REPORTER: Uh-huh.
MS. NOWAK: And I don't recall what

**18 (Pages 66 to 69)**

Billy Jess Bowden

---

**70**

11:34 1  number we were on.
11:34 2      THE REPORTER:  6.
11:34 3      MS. NOWAK:  Okay.
11:34 4      (Exhibit No. 6 marked.)
11:34 5  Q.  (BY MS. NOWAK)  Mr. Bowden, can you take a
11:34 6  moment to look back through this document that's been
11:34 7  marked as Deposition Exhibit 6.
11:34 8  **A.  Yes.**
11:34 9  Q.  Okay.  And if we scroll to the beginning of
11:35 10  this string, which starts at the bottom of this page
11:35 11  where it says, Hi, Billy, is this a true and correct
11:35 12  copy of the first contact that you received from
11:35 13  Consilium about potential employment?
11:35 14  **A.  Yes.**
11:35 15  Q.  Okay.  And in this e-mail, did Ms. Stephens
11:35 16  advise you Consilium was looking for new hires and she
11:35 17  was encouraging you to contact her?
11:35 18  **A.  Yes.**
11:35 19  Q.  Did you believe that Ms. Stephens was trying
11:35 20  to recruit you to go to work for Consilium?
11:35 21  **A.  Sure, yes.**
11:35 22  Q.  Is that Ms. Stephens' role, her job function
11:35 23  for Consilium, she's a corporate recruiter, she goes out
11:35 24  and finds new hires or contacts new hires for Consilium?
11:35 25  **A.  Yes.**

**71**

11:35 1  Q.  Did you ever work with Ms. Stephens during
11:35 2  your employment at MHA?
11:35 3  **A.  No.**
11:35 4  Q.  Are you aware that she used to be employed by
11:35 5  a company who's part of the AMN Healthcare family?
11:35 6  **A.  I believe she told me that at some point.**
11:35 7  Q.  Did you contact or reach out or somehow
11:35 8  otherwise initiate with Ms. Stephens prior to the time
11:35 9  you received this LinkedIn message?
11:36 10  **A.  No.**
11:36 11  Q.  Did Ms. Stephens ever tell you who gave her
11:36 12  your name or how she came across your name?
11:36 13  **A.  No.**
11:36 14  Q.  What happened next?  What happened after you
11:36 15  got this e-mail message from Ms. Stephens?
11:36 16  **A.  I responded to it.**
11:36 17  Q.  Okay.  And after you responded, what happened
11:36 18  next?
11:36 19  **A.  Her and I talked.**
11:36 20  Q.  And what did you discuss?
11:36 21  **A.  What they did and what they were looking for,**
11:36 22  **I guess.**
11:36 23  Q.  And why did you think that you would be a good
11:36 24  fit for Consilium?
11:36 25  **A.  Because of the opportunity there.**

**72**

11:34 1  Q.  What do you mean?
11:34 2  **A.  There was opportunity for advancement.  It's a**
11:34 3  **faith-based organization, which I really liked about it.**
11:34 4  Q.  And did it come up during this initial call
11:34 5  with Ms. Stephens that you had been previously employed
11:34 6  by MHA?
11:34 7  **A.  I don't recall.**
11:34 8  Q.  Was she aware that you had been previously by
11:34 9  MHA?
11:34 10  **A.  I don't know.**
11:34 11  Q.  Following this call with Ms. Stephens, what
11:34 12  happened next?
11:34 13  **A.  I think her and I met the next day -- or**
11:34 14  **whatever this was.  It might have been the next day.**
11:34 15      MS. NOWAK:  Lezley, let's make this our
11:34 16  next one.
11:34 17      (Exhibit No. 7 marked.)
11:34 18  **A.  I went to a meeting at her office.**
11:34 19  Q.  (BY MS. NOWAK)  And when you say her office,
11:34 20  do you mean Consilium's offices?
11:34 21  **A.  Correct.**
11:34 22  Q.  Mr. Bowden, will you take just a minute to
11:34 23  look at this next exhibit.
11:34 24  **A.  (Witness complies.)**
11:34 25  Q.  Does this -- does this exhibit reflect that

**73**

1  you met with Ms. Stephens at Consilium's offices on July
2  the 24th?
3  **A.  Yes.**
4  Q.  During this meeting, did you meet with anyone
5  else or was it just Ms. Stephens?
6  **A.  Just Ms. Stephens.**
7  Q.  Okay.  And do you recall, were Consilium's
8  offices where you interviewed the same that you work at
9  today?
10  **A.  No.**
11  Q.  And where were the offices that you
12  interviewed at?
13  **A.  Williams Square.**
14  Q.  Okay.  And how far away is that from MHA?
15  **A.  10 miles, 15 miles.**
16  Q.  What did Ms. Stephens tell you about the job
17  when you met in person?
18  **A.  She basically just sold the job to me.  I**
19  **don't remember the specifics, but kind of went over what**
20  **they did and what they were looking for.**
21  Q.  And after this initial meeting with
22  Ms. Stephens, did you have any other meetings with
23  Consilium?
24  **A.  After this?**
25  Q.  Yes.

**19 (Pages 70 to 73)**

**APP. 0098**

Billy Jess Bowden

74

| | | |
|---|---|---|
| 11:38 | 1 | **A. Yes.** |
| 11:38 | 2 | Q. Okay. How many meetings? |
| 11:39 | 3 | **A. One.** |
| 11:39 | 4 | Q. Okay. Can you tell me about that second |
| 11:39 | 5 | meeting. |
| 11:39 | 6 | **A. It was basically -- or maybe it was two. I --** |
| 11:39 | 7 | **I don't recall exactly. I know there was one meeting** |
| 11:39 | 8 | **with Kyle and Amy and Tisha.** |
| 11:39 | 9 | Q. And when you say Kyle, who are you referring |
| 11:39 | 10 | to? |
| 11:39 | 11 | **A. Kyle Etter.** |
| 11:39 | 12 | Q. And Amy? |
| 11:39 | 13 | **A. Gentile.** |
| 11:39 | 14 | Q. And Tisha? |
| 11:39 | 15 | **A. Schwartz.** |
| 11:39 | 16 | Q. And do you recall the date that that second |
| 11:39 | 17 | meeting occurred on? |
| 11:39 | 18 | **A. No.** |
| 11:39 | 19 | MS. NOWAK: Lezley, let's go ahead and |
| 11:30 | 20 | mark this one next. |
| 11:30 | 21 | (Exhibit No. 8 marked.) |
| 11:30 | 22 | Q. (BY MS. NOWAK) And if we look at this string, |
| 11:38 | 23 | it says sent on Friday, July 27th. And in the body of |
| 11:38 | 24 | the e-mail, it's referencing that they're planning to |
| 11:38 | 25 | see you on Monday. |

75

| | | |
|---|---|---|
| 11:38 | 1 | Does that refresh your recollection as to when |
| 11:38 | 2 | this second meeting took place? |
| 11:38 | 3 | **A. Yes.** |
| 11:38 | 4 | Q. Okay. And so if we counted out, it looks like |
| 11:38 | 5 | the second meeting that you had with Consilium was on |
| 11:38 | 6 | Monday, July the 30th? |
| 11:38 | 7 | **A. I'll agree with that.** |
| 11:38 | 8 | Q. And did anyone else participate besides Kyle, |
| 11:38 | 9 | Amy, or Tisha in that meeting? |
| 11:38 | 10 | **A. No.** |
| 11:38 | 11 | Q. And what was the purpose of your meeting with |
| 11:38 | 12 | Kyle, Amy, and Tisha? |
| 11:38 | 13 | **A. It was basically an interview.** |
| 11:38 | 14 | Q. Okay. And when you say basically an |
| 11:38 | 15 | interview, what is your understanding of what the end |
| 11:38 | 16 | result would be if the interview went well? |
| 11:38 | 17 | **A. I would be given an offer to join the company.** |
| 11:38 | 18 | Q. Okay. So did you feel like Kyle, Amy, and |
| 11:39 | 19 | Tisha were trying to convince you to come to work for |
| 11:39 | 20 | Consilium during the course of this interview? |
| 11:39 | 21 | **A. I think they were -- we were both trying to** |
| 11:39 | 22 | **feel each other out, I guess. I don't know -- yeah.** |
| 11:39 | 23 | Q. And when you say feel each other out, what do |
| 11:39 | 24 | you mean? |
| 11:39 | 25 | **A. I wasn't totally sold that I wanted to come to** |

76

| | |
|---|---|
| 1 | Consilium at that time. |
| 2 | Q. So were they trying to sell you on the |
| 3 | opportunity? |
| 4 | **A. Yes.** |
| 5 | Q. Other than the initial call with |
| 6 | Christina Stephens and these two meetings, did you have |
| 7 | any other meetings? |
| 8 | **A. Not that I recall.** |
| 9 | Q. Any other phone calls? |
| 10 | **A. Possibly.** |
| 11 | Q. Okay. Can you recall who those phone calls |
| 12 | would be -- have been with? |
| 13 | **A. Christina.** |
| 14 | Q. So other than Kyle, Amy, Tisha, and Christina, |
| 15 | you do not remember speaking with anyone else at |
| 16 | Consilium prior to accepting an offer -- |
| 17 | **A. I didn't --** |
| 18 | Q. -- of employment? |
| 19 | **A. -- speak to anyone else.** |
| 20 | Q. And I'll ask again, during this meeting that |
| 21 | took place with Kyle, Amy, and Tisha, did you at any time |
| 22 | make them aware that you had an employment agreement |
| 23 | with MHA? |
| 24 | **A. No.** |
| 25 | Q. Did it come up that you had previously worked |

77

| | |
|---|---|
| 1 | for MHA? |
| 2 | **A. I don't remember.** |
| 3 | Q. Was it at all discussed that you had |
| 4 | experience in the staffing industry? |
| 5 | **A. Yes.** |
| 6 | Q. Okay. Tell me what was discussed about your |
| 7 | prior experience. |
| 8 | **A. Mostly what I was doing at Martin Fletcher** |
| 9 | **because it was pertinent to what I would be doing at** |
| 10 | **Consilium.** |
| 11 | Q. Do you recall when you accepted Consilium's |
| 12 | offer of employment? |
| 13 | **A. I don't. I know it was a Friday.** |
| 14 | Q. If I told you that it was on Friday, August |
| 15 | the 3rd of 2012, does that sound about right? |
| 16 | **A. Yes.** |
| 17 | Q. Do you have an employment agreement between |
| 18 | yourself and Consilium? |
| 19 | **A. No.** |
| 20 | Q. Do you have any type of agreement at all with |
| 21 | Consilium related to your employment? |
| 22 | **A. No.** |
| 23 | Q. No confidentiality agreement? |
| 24 | **A. No.** |
| 25 | Q. No noncompete? |

**20 (Pages 74 to 77)**

**APP. 0099**

Billy Jess Bowden

---

**78**

11:43  1    A.  No.
11:43  2    Q.  No nonsolicit?
11:43  3    A.  No.
11:43  4    Q.  No noninterference?
11:43  5    A.  No.
11:43  6    Q.  Did you ever sign an employee handbook?
11:43  7    A.  No.
11:43  8    Q.  Did you ever agree to follow any information
11:43  9  systems policies?
11:43  10    A.  No.
11:44  11    Q.  Consilium just doesn't have their employees
11:44  12  sign anything?
11:44  13    A.  (Witness shakes head.)
11:44  14    Q.  You've never had to sign a single document
11:44  15  other than your offer letter for Consilium?
11:44  16    A.  I don't remember.
11:44  17    Q.  So is it possible that you've had to sign
11:44  18  other policies or procedures for Consilium?
11:44  19    A.  I honestly don't remember.  Possible, maybe.
11:44  20    Q.  Are there any other employees at Consilium who
11:44  21  have employment agreements?
11:44  22    A.  I don't know.
11:44  23    Q.  It's not ever been a subject of conversation
11:44  24  between you and any of the other employees?
11:44  25    A.  No.

---

**79**

11:44  1    Q.  How does Consilium compensate you?
11:44  2    A.  I get a salary plus commission.
11:44  3    Q.  And how are your commissions calculated?
11:44  4    A.  How many days a doctor works.  I get a certain
11:44  5  amount --
11:44  6    Q.  And --
11:44  7    A.  -- for each day.
11:44  8    Q.  Sorry to interrupt you.
11:44  9        Where is that information kept?  Like if I
11:44  10  wanted to go to see how many days that you had filled,
11:44  11  where would that information be maintained?
11:44  12    A.  I'm sure there's a spreadsheet somewhere.
11:45  13    Q.  Would that information be in Blue Sky?
11:45  14    A.  No.
11:45  15    Q.  Okay.  So it -- it would be elsewhere.
11:45  16        Do you get any bonuses in additional to your
11:45  17  salary and commissions or is there the potential for
11:45  18  bonuses?
11:45  19    A.  It's just commissions.  Oh, we have -- oh, we
11:45  20  do have a team bonus that we could possibly get.
11:45  21    Q.  But that would be for your entire team, not
11:45  22  something that would just be attributable to you?
11:45  23    A.  Yes.
11:45  24        And there's another bonus that we get for --
11:45  25  if we fill a certain number of days with a new client.

---

**80**

11:43  1    Q.  Are you able to go and look at the number of
11:43  2  days that you filled?
11:43  3    A.  I have it written down somewhere.  But I'm
11:43  4  sure if I asked, I could, I guess.
11:43  5    Q.  But you've never just been curious and said,
11:43  6  gosh, I'm going to see, we're six months into the year,
11:43  7  how many days have I filled?
11:43  8    A.  I kind of have a rough idea.
11:43  9    Q.  Okay.  And how -- where -- how do you get the
11:43  10  rough idea?  Do you track it yourself or is there --
11:43  11    A.  I track it myself.
11:44  12    Q.  -- you know, a -- a spreadsheet or an e-mail
11:44  13  blast that gets sent around once a month that says,
11:44  14  great job team, here's how many days we've filled thus
11:44  15  far?
11:44  16    A.  Yes, there's that, as well as a team --
11:44  17    Q.  Okay.
11:44  18    A.  -- for the team.
11:44  19    Q.  So walk me through what kind of communications
11:44  20  do you get that would update you and your team on the
11:44  21  number of days that have been filled or the clients that
11:44  22  days have been filled for?
11:44  23    A.  We talk about it.
11:44  24    Q.  Okay.  So how often do you have meetings?
11:44  25    A.  Every day.

---

**81**

11:44  1    Q.  Okay.  And then in addition to that, are
11:44  2  there --
11:44  3    A.  Monthly --
11:44  4    Q.  -- e-mails --
11:44  5    A.  -- weekly.
11:44  6    Q.  -- circulated --
11:44  7    A.  Possibly.
11:44  8    Q.  -- with those types of reports?
11:44  9    A.  Yes.
11:44  10    Q.  Do you know how many employees Consilium
11:44  11  currently has?
11:44  12    A.  I don't know the exact number.  Probably 70.
11:44  13    Q.  Do you know how many of them have previously
11:44  14  worked at MHA?
11:45  15    A.  No.
11:45  16    Q.  Can you give me just a rough estimate?
11:45  17    A.  Three.
11:45  18    Q.  Total out of all 70?
11:45  19    A.  Right now, me.  That's it --
11:45  20    Q.  Okay.
11:45  21    A.  -- that I know of.  I don't -- I don't know
11:45  22  for sure.
11:45  23    Q.  Okay.  What about for the AMN Healthcare
11:45  24  family of companies?
11:45  25    A.  I don't know.

---

**21  (Pages 78 to 81)**

**APP. 0100**

Billy Jess Bowden

82

11:48  1      Q.  Okay.
11:48  2          (Exhibit No. 9 marked.)
11:48  3      Q.  (BY MS. NOWAK)  This is a document produced by
11:48  4  you in the course of this litigation.
11:48  5          Is this a complete listing of the employees at
11:48  6  Consilium?
11:48  7      A.  No.
11:48  8      Q.  Okay.  Can you tell me who is not included on
11:48  9  this list?
11:48  10     A.  I have no idea.  There's a lot.
11:48  11     Q.  Okay.  So you tell me what -- what is this
11:48  12  list, then?
11:48  13     A.  I think this was the list when I started.
11:48  14     Q.  Okay.  So Consilium's grown significantly just
11:48  15  in the short amount of time since you've joined?
11:48  16     A.  Yes.
11:48  17     Q.  And these folks were the ones that were there
11:48  18  when you started with Consilium in August of 2012?
11:48  19     A.  Yes.
11:48  20     Q.  Did you work with any of these folks while you
11:48  21  were at MHA?
11:48  22     A.  Lyndsey Nix.  She's in the second group.
11:49  23     Q.  Okay.  And what was your relationship with
11:49  24  Lyndsey while you were at MHA?
11:49  25     A.  I just knew -- knew she worked there.  I

83

11:49  1  didn't --
11:49  2      Q.  Okay.
11:50  3      A.  -- really know her.
11:50  4      Q.  Is there anybody else besides Lyndsey Nix
11:50  5  on this list that you're aware of that was previously
11:50  6  employed at MHA?
11:50  7      A.  Not that I know of.
11:50  8      Q.  Okay.  And what about the AMN Healthcare
11:50  9  family of companies, is there anyone on this list you
11:50  10  know of that worked for Staff Care or any other AMN
11:50  11  company?
11:50  12     A.  Brent.
11:50  13     Q.  Brent Burrows.
11:50  14     A.  Uh-huh.
11:50  15         Matt Kennedy, Tisha Schwartz, Landon Webb,
11:50  16  Amy Crowdis who is now Amy Gentile, Sheri -- or
11:50  17  Michael Lawless and Sheri Ossorio, I think
11:50  18  Jessica Ferguson.
11:50  19         THE REPORTER:  Who?
11:50  20         THE WITNESS:  Jessica Ferguson.
11:50  21     A.  Oh, and Christina Stephens.
11:50  22     Q.  (BY MS. NOWAK)  What about Matt Baade, are you
11:50  23  aware if he ever worked for --
11:50  24     A.  I am aware that he worked for them.
11:50  25     Q.  And when you say for them, you're referring to

84

1  a company --
2      A.  Staff Care.
3      Q.  -- that's part -- okay.
4          What about John Moberly?
5      A.  John Moberly, yes.
6      Q.  Kyle Etter?
7      A.  Yes.
8      Q.  Monique DeGraauw?
9      A.  Oh, yes.
10     Q.  Greg Ellis?
11     A.  Yes.
12     Q.  Jill Kennedy?
13     A.  I really didn't have -- know her very well, so
14  I never really discussed it with her.
15     Q.  Okay.  So despite the fact that you had never
16  discussed it, do you know if she was employed by --
17     A.  I don't know.
18     Q.  You don't know?
19     A.  No.
20     Q.  Okay.  And you know, if you don't mind, just
21  take another quick look through.  Are there any others
22  that you're aware?  Because there's quite a few that
23  we've gone back through and reminded ourself about.
24     A.  I believe Kevin Bruce might have worked for
25  Merritt Hawkins at some point.  That's all that I know

85

1  that I can recall.
2      Q.  Now, in looking at this list and the names
3  that you've identified as being previously employed by
4  MHA and/or some other AMN Healthcare company, you've
5  identified over 50 percent of the names on this list --
6      A.  Okay.
7      Q.  -- is that correct?
8      A.  Yes.
9      Q.  Does that sound about right to you, that those
10  are the folks that are working at Consilium?
11     A.  Some -- some of these aren't working at
12  Consilium anymore.
13     Q.  But at the time that you started, these were
14  the folks at Consilium?
15     A.  Yes.
16     Q.  And over 50 percent of them were plucked from
17  MHA or AMN Healthcare?
18         MR. VOLNEY:  Objection; form.
19     A.  I don't know if they were plucked or what.
20     Q.  (BY MS. NOWAK)  But they came from there?
21     A.  Yes.
22     Q.  Okay.  Now, did you actually have specific
23  conversations with any of these folks about their prior
24  experience or you just know from being at MHA that they
25  had previously worked there?

22  (Pages 82 to 85)

APP. 0101

Billy Jess Bowden

86

11:50 1    A.  I didn't know any of these people previously
11:54 2  except Kyle and possibly Amy.
11:54 3    Q.  Okay.  And how did you know Kyle and Amy?
11:54 4    A.  They worked out in the gym.
11:54 5    Q.  So you just talked to them during gym time?
11:54 6    A.  Uh-huh.
11:54 7       And Landon.
11:54 8    Q.  And Landon?
11:54 9    A.  Uh-huh.
11:54 10   Q.  Just pleasant conversation?
11:54 11   A.  Correct.
11:55 12   Q.  Okay.  And you mentioned that some of these
11:55 13  folks are no longer at Consilium.  Which of these folks
11:55 14  are no longer at Consilium?
11:55 15   A.  Kevin Bruce, Lyndsey Nix, Matt Kennedy,
11:55 16  Jill Kennedy, and Christina Stephens.
11:55 17   Q.  When did Christina Stephens leave?
11:55 18   A.  I think it was a couple of months ago.
11:58 19   Q.  Do you know what, I'm going to hand you this
11:58 20  pen just real quick.  Let's do an exercise.
11:58 21      Do you mind going down the list and for each
11:58 22  of the folks that you've identified as having worked for
11:58 23  MHA or an AMN Healthcare company, can you please circle
11:58 24  their name.
11:58 25   A.  (Witness complies.)

87

11:58 1       MS. NOWAK:  I'm not sure the video caught
11:58 2  that big eye roll, John.  Do we want to make sure that's
11:58 3  on the record?
11:58 4       MR. VOLNEY:  Duly noted.
11:58 5    Q.  (BY MS. NOWAK)  And just to make sure we've
11:58 6  got them all, can you read down the ones that you've
11:58 7  circled very quickly.
11:58 8    A.  Matt Baade, Kevin Bruce, Brent Burrows,
11:58 9  Matthew Kennedy, John Moberly, Kyle Etter, Lyndsey Nix,
11:58 10  Tisha Schwartz, Landon Webb, Amy Gentile,
11:58 11  Michael Lawless, Sheri Ossorio, Monique DeGraauw,
11:58 12  Greg Ellis, Jessica Ferguson, and Christina Stephens.
11:58 13   Q.  And of these -- these folks that you've
11:58 14  circled, you knew Kyle Etter, Lyndsey Nix, Landon Webb,
11:58 15  and Amy Crowdis from your employment at MHA?
11:58 16   A.  I didn't -- I didn't know their names.
11:58 17   Q.  During the time that you were employed.
11:58 18   A.  Outside of Lyndsey Nix, I didn't know their
11:58 19  names.  But I know them, yes.
11:58 20   Q.  Do you know why Kevin Bruce left Consilium?
11:58 21   A.  No.
11:58 22   Q.  What about Matt Kennedy?
11:57 23   A.  I don't know.
11:57 24   Q.  He didn't tell you anything before he left?
11:57 25   A.  No.

88

1    Q.  No scuttlebutt around the office?
2    A.  I have no idea.
3    Q.  What about Lyndsey Nix?
4    A.  I didn't really talk to her before -- I think
5  she was getting married, moving.
6    Q.  And then you also reported that
7  Christina Stephens has now left.  And are you aware of
8  why she left?
9    A.  Take care of her -- her daughter.
10   Q.  Did she just have a baby?
11   A.  Uh-huh.
12      (Exhibit No. 10 marked.)
13   Q.  (BY MS. NOWAK)  Mr. Bowden, we've just handed
14  you what has been marked Deposition Exhibit No. 10.  Can
15  you tell me what this is.
16   A.  It's a text message from Scott Gresham.
17   Q.  Okay.  And who -- who is this text message to?
18   A.  To me.
19   Q.  So is this a screen shot from your phone?
20   A.  I believe it was his phone.
21   Q.  From his phone.  Okay.
22      And so is this a true and correct copy of the
23  communication between yourself and Mr. Gresham?
24   A.  Correct.
25   Q.  Is this a complete copy of the text message?

89

1  It appears that it might have been cut off here at the
2  end.  Was there more that went after this in your
3  discussion?
4    A.  Not that day.
5    Q.  Not that day?
6    A.  (Witness shakes head.)
7    Q.  But subsequent to, there would have been?
8    A.  I don't remember.
9    Q.  But it's possible?
10   A.  Possible.
11   Q.  And do you believe it's likely?
12   A.  I honestly don't remember.
13   Q.  What about before, the initial string here is,
14  hey, are you still at Delta?  Would there have been any
15  communication between yourself and Mr. Gresham prior to
16  that message?
17   A.  No.
18   Q.  Okay.  Who's Deleon McKee?
19   A.  He's someone that Stephan -- Stephan -- that
20  Scott and I worked with at MHA.
21   Q.  Okay.  And when you say Deleon McKee
22  interviewed, what does that mean?
23   A.  He had interviewed at Consilium.
24   Q.  And how did -- is Deleon a male or a female?
25   A.  It's a male.

**23 (Pages 86 to 89)**

Billy Jess Bowden

90

| | | |
|---|---|---|
| 11:59 | 1 | Q. And how did Deleon get hooked up with |
| 11:59 | 2 | Consilium? Who -- who provided Consilium his contact |
| 11:59 | 3 | information? |
| 11:59 | 4 | **A. I don't know.** |
| 11:59 | 5 | Q. Were you involved at all in his interview |
| 11:59 | 6 | process? |
| 11:59 | 7 | **A. No.** |
| 11:59 | 8 | Q. How did you come to be aware that Mr. McKee |
| 11:59 | 9 | was interviewing with Consilium? |
| 11:59 | 10 | **A. I saw him in the office.** |
| 11:59 | 11 | Q. Just passed him in the hall? |
| 11:59 | 12 | **A. Just said hi to him.** |
| 11:59 | 13 | Q. And what did he say when you passed him in the |
| 11:59 | 14 | hall? |
| 11:59 | 15 | **A. That he was interviewing with Consilium.** |
| 11:59 | 16 | Q. And that would have been on or about this |
| 11:59 | 17 | September 17th date? |
| 11:59 | 18 | **A. On or around.** |
| 11:59 | 19 | Q. Did you -- did Mr. McKee come to be employed |
| 11:59 | 20 | by Consilium? |
| 11:59 | 21 | **A. No.** |
| 11:59 | 22 | Q. Do you know who met with him when he was at |
| 11:59 | 23 | Consilium's offices? |
| 12:00 | 24 | **A. I don't know.** |
| 12:00 | 25 | Q. Would Ms. Stephens have met with him? |

91

| | | |
|---|---|---|
| 12:00 | 1 | **A. Possibly.** |
| 12:00 | 2 | Q. And likely others? |
| 12:00 | 3 | **A. I don't know.** |
| 12:00 | 4 | Q. What is the date on this string of messages |
| 12:00 | 5 | between yourself and Mr. Gresham? |
| 12:00 | 6 | **A. September 17th, 2012.** |
| 12:00 | 7 | Q. And you were aware on September 17th of 2012 |
| 12:00 | 8 | that Mr. Gresham was an employee of MHA? |
| 12:00 | 9 | **A. Yes.** |
| 12:00 | 10 | Q. And you knew Gresham from your employment at |
| 12:00 | 11 | MHA? |
| 12:00 | 12 | **A. Correct.** |
| 12:00 | 13 | Q. And you knew that Mr. Gresham was employed at |
| 12:00 | 14 | MHA as a search consultant? |
| 12:00 | 15 | **A. Correct.** |
| 12:00 | 16 | Q. And when you left MHA, you were aware that |
| 12:00 | 17 | Mr. Gresham also had an employment agreement with them? |
| 12:00 | 18 | **A. I don't remember.** |
| 12:00 | 19 | Q. Okay. So let's change that from the time you |
| 12:00 | 20 | left MHA. |
| 12:00 | 21 | You were aware that at some point in time, |
| 12:00 | 22 | Mr. Gresham had an employment agreement with MHA? |
| 12:00 | 23 | **A. It was never discussed 'til we were served.** |
| 12:00 | 24 | Q. Okay. So you're aware as we sit here today |
| 12:01 | 25 | that he had and employment agreement? |

92

| | |
|---|---|
| 1 | **A. Yes.** |
| 2 | Q. Did he ever tell you at any point in time that |
| 3 | he had an employment agreement with MHA prior to the |
| 4 | lawsuit being filed? |
| 5 | **A. I don't remember.** |
| 6 | Q. But you knew other employees at MHA had |
| 7 | employment agreements? |
| 8 | **A. It wasn't something that we ever discussed. I** |
| 9 | **didn't really know.** |
| 10 | Q. Okay. But Mr. Gresham never told you he was |
| 11 | some special case, some special exception? |
| 12 | **A. It was never discussed.** |
| 13 | Q. And you have no reason to believe at the time |
| 14 | that you were having these messages that he was some |
| 15 | special case or some special exception? |
| 16 | **A. I didn't --** |
| 17 | MR. VOLNEY: Objection; form. |
| 18 | **A. I didn't know either way.** |
| 19 | Q. (BY MS. NOWAK) Other than this particular |
| 20 | text message, from the time your employment at MHA ended |
| 21 | until September 17th, 2012, did you text with |
| 22 | Mr. Gresham? |
| 23 | **A. I think we text once in 20-- that would have** |
| 24 | **been 2011.** |
| 25 | Q. Okay. And what was the substance of that |

93

| | |
|---|---|
| 1 | communication? |
| 2 | **A. I asked him if he needed life insurance.** |
| 3 | Q. Okay. So from this -- from this text |
| 4 | regarding life insurance in 2011 to September 17th |
| 5 | in 2012, you had no other text messages with |
| 6 | Mr. Gresham? |
| 7 | **A. Not that I recall.** |
| 8 | Q. Okay. Did you ever e-mail with Mr. Gresham? |
| 9 | **A. That might have been an e-mail. I don't** |
| 10 | **recall if it was a text or an e-mail asking about the** |
| 11 | **life insurance.** |
| 12 | Q. But other than that one asking about life |
| 13 | insurance, you don't recall anything happening before |
| 14 | this particular text message? |
| 15 | **A. I don't recall.** |
| 16 | Q. Okay. Did you ever meet with him in person -- |
| 17 | **A. No.** |
| 18 | Q. -- face to face? |
| 19 | What about phone conversations? |
| 20 | **A. No.** |
| 21 | Q. Okay. So just to confirm, from the time that |
| 22 | you left MHA until September 17th 2012, the only other |
| 23 | communication you recall having with Mr. Gresham was one |
| 24 | in 2011 where you asked him if he needed life insurance? |
| 25 | **A. That's the only one I can remember.** |

**24 (Pages 90 to 93)**

Billy Jess Bowden

94

12:03 1    Q.  Okay.  And it's possible that there are
12:03 2  strings that came before or after the ones that are
12:03 3  shown in this deposition exhibit?
12:03 4    A.  I don't think there was anything -- there
12:03 5  wasn't anything before.  That's the first time I had
12:03 6  heard it -- heard from him --
12:03 7    Q.  But --
12:03 8    A.  -- in a long time.
12:03 9    Q.  -- there might have been something that
12:03 10 happened after?
12:03 11   A.  I don't -- I don't know.  I think possibly.
12:03 12   Q.  All right.  Let's look at this text message.
12:03 13      So on September 17th, you communicated to
12:03 14 Mr. Gresham that you would have Christina Stephens, who
12:03 15 is Consilium's corporate reporter -- excuse me --
12:03 16 corporate recruiter -- or who was -- contact him about a
12:03 17 possible employment opportunity at Consilium?
12:03 18   A.  He told me he was leaving, he was going to
12:04 19 quit Merritt Hawkins.  And yes, I told him Christina
12:04 20 would call him.
12:04 21   Q.  Okay.  You said he told you that he was going
12:04 22 to quit Merritt Hawkins.
12:04 23      Where in this string did Mr. Gresham advise
12:04 24 you that he was going to quit?
12:04 25   A.  We talked between -- between texts.

95

12:04 1    Q.  You talked between texts.
12:04 2      So when you told me earlier that the only
12:04 3  communication you had with Mr. Gresham between the
12:04 4  2011 -- or excuse me -- when you're departing MHA and
12:04 5  this text message was the 2011 communication regarding
12:04 6  life insurance, that was not true?
12:04 7    A.  We talked between these two texts.
12:04 8    Q.  So on September 17th?
12:04 9    A.  When he texted me, I called him.
12:04 10   Q.  Okay.  And what did y'all talk about?
12:04 11   A.  He told me that he was quitting.
12:04 12   Q.  Did he tell you he had already quit or that he
12:04 13 was going to?
12:04 14   A.  He was going to.
12:04 15   Q.  And what did he want you to do for him?
12:04 16   A.  He asked me if we needed anybody and if I was
12:04 17 happy there.
12:04 18   Q.  Okay.  So as we sit here today, you're not
12:04 19 disagreeing with me that this text message is about the
12:04 20 possibility of Mr. Gresham becoming employed by
12:04 21 Consilium?
12:04 22   A.  No, I'm not disagreeing with you.
12:04 23   Q.  Okay.  And are you aware that on this same
12:05 24 day, September 17th, that Christina Stephens contacted
12:03 25 Mr. Gresham?

96

12:03 1    A.  I don't know when she contacted him.
12:03 2    Q.  How did Ms. Stephens get Mr. Gresham's contact
12:03 3  information?
12:03 4    A.  I gave it to her.
12:03 5    Q.  So you're not denying that you handed
12:03 6  Mr. Gresham's contact information to Ms. Stephens?
12:03 7    A.  No.
12:03 8    Q.  You told her to contact him?
12:03 9    A.  I didn't tell her to contact him.  I told her
12:03 10 this guy is going to be leaving Merritt Hawkins, I'm not
12:03 11 giving him as a referral because I don't like giving
12:03 12 referrals on anybody, but if you want to call him, if
12:03 13 you want -- see what you think.
12:03 14   Q.  So you understood after you handed his contact
12:03 15 information over, that Ms. Stephens might reach out to
12:03 16 Mr. Gresham?
12:03 17   A.  Correct.
12:03 18   Q.  And that the end result of that communication
12:03 19 could be that he was offered a position of employment at
12:03 20 Consilium?
12:03 21   A.  At some point or maybe not if they don't like
12:03 22 him.
12:03 23   Q.  But you're aware that a potential result once
12:03 24 you handed Ms. Stephens his contact information was that
12:03 25 he would be employed by Consilium?

97

12:02 1    A.  Yes.
12:02 2    Q.  So you communicated with Mr. Gresham regarding
12:02 3  Consilium?
12:02 4    A.  After he communicated with me, yes.
12:02 5    Q.  But you did communicate with him?
12:02 6    A.  Yes.
12:02 7    Q.  And you determined that he was interested in
12:02 8  job opportunities at Consilium?
12:02 9    A.  Yes.
12:02 10   Q.  And you facilitated Mr. Gresham getting in
12:02 11 touch with Ms. Stephens?
12:02 12   A.  Yes.
12:02 13   Q.  And you're aware that Ms. Stephens did
12:02 14 actually contact Mr. Gresham?
12:02 15   A.  At some point, yes.
12:02 16   Q.  Do you know at what point in time that was?
12:02 17   A.  No.
12:02 18   Q.  So after Ms. Stephens spoke with Mr. Gresham,
12:02 19 did she come and report back to you about how the call
12:02 20 had gone?
12:02 21   A.  I don't recall.  Possibly.
12:02 22      MS. NOWAK:  Let's mark this one.
12:02 23      THE REPORTER:  Okay.
12:02 24      (Exhibit No. 11 marked.)
12:02 25   Q.  (BY MS. NOWAK)  Does this e-mail refresh your

25  (Pages 94 to 97)

Billy Jess Bowden

98

12:05 1   recollection that Christina and Mr. Gresham first talked
12:05 2   on September the 19th?
12:05 3       A.  I wasn't a part of that call or this e-mail,
12:05 4   so I guess --
12:05 5       Q.  But if I represented to you that they did
12:05 6   speak on September 19th, 2012, you would agree with me
12:05 7   this e-mail seems to support that?
12:05 8           MR. VOLNEY:  Objection; form.
12:05 9       A.  Yes.
12:08 10      Q.  (BY MS. NOWAK)  Okay.  And you said that
12:08 11  Ms. Stephens may have come to report back to you about
12:08 12  the call that she had with Mr. Gresham.
12:08 13      Do you recall anything that she told you about
12:08 14  the call?
12:08 15      A.  No, not specifically.
12:08 16      Q.  Okay.  She didn't say the call went well, he
12:08 17  seems like a strong candidate, thanks for putting us in
12:08 18  touch?  You don't recall any specifics that she relayed
12:08 19  to you?
12:08 20      A.  She possibly said that, yes.
12:08 21      Q.  Possibly said which of those things?
12:08 22      A.  That he was a good candidate, I guess.
12:08 23      Q.  Did Mr. Gresham reach out to you again after
12:08 24  Ms. Stephens and he had spoken?
12:08 25      A.  Yes.

99

12:08 1       Q.  Okay.  And when did that communication occur?
12:08 2       A.  I don't remember exactly.
12:08 3       Q.  Would it have been after this September 17th
12:08 4   text message?
12:08 5       A.  It was after the text message, yes.
12:08 6       Q.  Okay.  Would it have been before or after
12:08 7   September 19th?
12:08 8       A.  I don't know.
12:08 9       Q.  Okay.  Was it via telephone?
12:08 10      A.  I believe we talked.
12:09 11      Q.  Did you also text?
12:09 12      A.  I don't remember.
12:09 13      Q.  Can you tell me what -- what did y'all talk
12:09 14  about on that telephone call?
12:09 15      A.  Mostly about his situation at Merritt Hawkins.
12:09 16      Q.  Did he express that he was interested
12:09 17  following speaking with Ms. Stephens about becoming
12:09 18  employed at Consilium?
12:09 19      A.  No.  He was talking about quitting
12:09 20  Merritt Hawkins.  And I was trying to talk him out of it
12:09 21  because he was trying to -- because I was, like, you
12:09 22  don't have a job yet, you don't have anything, why would
12:00 23  you quit your job?  And he was just sick of it.
12:00 24      Q.  So your advice to him was wait 'til you have
12:00 25  another job before you quit the one you've got?

100

1       A.  Exactly.  He's got a family and a wife.  I
2   wouldn't have done that.
3       Q.  Are you aware that following this text message
4   that you had with Mr. Gresham on September 17th, that
5   Mr. Gresham actually came into Consilium's offices for
6   an interview?
7       A.  At some point.
8       Q.  But you are aware that he actually did come
9   into the offices to be interviewed?
10      A.  Yes, I'm aware of that.
11      Q.  Did you see him when he was at Consilium's
12  offices for that interview?
13      A.  I don't remember.
14      Q.  Do you recall speaking with him?
15      A.  I don't remember.  Not -- not at the office.
16      Q.  Okay.  Did you speak with him after the
17  interview had occurred?
18      A.  Yes.
19      Q.  Okay.  And what was the substance of that
20  communication?
21      A.  The fact that he liked this new industry and
22  the fact that it seemed like a good place to work.
23      Q.  So he told you that he liked the opportunity
24  and was excited about the chance to become employed by
25  Consilium?

101

1       A.  Right.
2       Q.  Did he thank you for kind of setting him up
3   with Christina?
4       A.  I don't remember.
5       Q.  Are you aware that Mr. Gresham then was
6   ultimately offered employment at Consilium?
7       A.  Yes.
8       Q.  Who told you that that offer had been
9   extended?
10      A.  He did.
11      Q.  And when did he tell you that?
12      A.  I don't remember.
13      Q.  Do you recall how he told you?
14      A.  I think he called me.
15      Q.  Did he tell you during that call whether he
16  intended to accept the offer?
17      A.  He didn't have a job, so yes.
18      Q.  And when you say he didn't have a job, what --
19  what do you mean by that?
20      A.  He'd quit Merritt Hawkins.
21      Q.  And why was it your impression that he had
22  already resigned from Merritt Hawkins at the time he
23  accepted his offer of employment at Consilium?
24      A.  He told me.
25      Q.  Sorry.  Bear with me just for a second.  I'm

26  (Pages 98 to 101)

Billy Jess Bowden

**102**

| | |
|---|---|
| 12:09 | 1 trying to find my documents. |
| 12:09 | 2 MR. VOLNEY: Do you want to take lunch? |
| 12:09 | 3 MS. NOWAK: That might be helpful because |
| 12:09 | 4 I seem to have misplaced one of my folders. And then |
| 12:09 | 5 we're, like, 12:15. You want to take -- |
| 12:09 | 6 MR. VOLNEY: Start back at 1:00. |
| 12:09 | 7 MS. NOWAK: -- 45 minutes? |
| 12:09 | 8 Thank you. |
| 12:09 | 9 THE VIDEOGRAPHER: We are now off the |
| 12:09 | 10 record. The time is 12:11 p.m. |
| 12:40 | 11 (Lunch break taken from 12:11 to 1:07 p.m.) |
| 13:09 | 12 THE VIDEOGRAPHER: We are back on the |
| 13:09 | 13 record. The time is 1:07 p.m. |
| 13:09 | 14 Q. (BY MS. NOWAK) Mr. Bowden, we're back after |
| 13:09 | 15 taking a brief lunch break. And where we left off, we |
| 13:09 | 16 were talking about Mr. Gresham's resignation from MHA |
| 13:09 | 17 and the start of his employment at Consilium. |
| 13:09 | 18 A. (Witness nods head.) |
| 13:09 | 19 Q. So I want to go back and just make sure I'm |
| 13:09 | 20 getting the time frame correctly. |
| 13:09 | 21 You and Mr. Gresham communicated about his |
| 13:09 | 22 possible employment at Consilium on September the 17th |
| 13:09 | 23 of 2012, correct? |
| 13:09 | 24 A. Correct. |
| 13:09 | 25 Q. Okay. And you've testified here today that |

**103**

| | |
|---|---|
| 13:09 | 1 you believe that Mr. Gresham had quit MHA before the |
| 13:09 | 2 time he actually officially started at Consilium? |
| 13:08 | 3 A. Yes. |
| 13:08 | 4 Q. Okay. And you're aware that Mr. Gresham |
| 13:08 | 5 formally resigned from MHA on September 24th of 2012? |
| 13:08 | 6 A. I don't know when he resigned. |
| 13:08 | 7 (Exhibit No. 12 marked.) |
| 13:08 | 8 (Discussion off the written record.) |
| 13:08 | 9 Q. (BY MS. NOWAK) Mr. Bowden, I'm going to |
| 13:08 | 10 represent to you that this is a copy of Mr. Gresham's |
| 13:08 | 11 resignation e-mail that he sent to his supervisor at |
| 13:08 | 12 MHA. |
| 13:08 | 13 You would agree with me that the date of this |
| 13:08 | 14 e-mail is Monday, September 24th? |
| 13:08 | 15 A. I agree. |
| 13:08 | 16 Q. And you would also agree with me that |
| 13:08 | 17 September 24th is approximately seven days after you and |
| 13:08 | 18 Mr. Gresham communicated, and you agreed that you would |
| 13:08 | 19 put him in touch with Ms. Stephens? |
| 13:08 | 20 A. Yes. |
| 13:09 | 21 Q. Okay. And you would also agree with me that |
| 13:09 | 22 by the time this date, September 24th, rolled around, |
| 13:09 | 23 that Mr. Gresham had already communicated with you, |
| 13:09 | 24 talked with Ms. Stephens, and had also come in for an |
| 13:09 | 25 interview at Consilium? |

**104**

| | |
|---|---|
| 1 A. I don't know about talked with Ms. Stephens or |
| 2 interview. |
| 3 Q. Okay. Can you look back at the e-mails that |
| 4 we've reviewed here today? |
| 5 A. Uh-huh. |
| 6 Q. And does any of that remind you -- |
| 7 A. I guess they -- |
| 8 Q. -- of -- |
| 9 A. -- did talk on the 19th. |
| 10 Q. Okay. So by the time this date, |
| 11 September 24th, rolls around, you're aware that you had |
| 12 communicated with Mr. Gresham about potential employment |
| 13 and Ms. Stephens had communicated with Mr. Gresham about |
| 14 potential employment? |
| 15 A. I don't know what they talked about, but -- |
| 16 Q. You're aware -- |
| 17 A. -- I talked to him. |
| 18 Q. -- they communicated? |
| 19 A. Yes. |
| 20 Q. Now, it says in this e-mail -- if you'll look |
| 21 in the second paragraph, it says, For the past few |
| 22 months, my heart and mind have not been focused solely |
| 23 on physician recruiting, and I have received an offer |
| 24 that I cannot refuse that will be a new and exciting |
| 25 endeavor for me. |

**105**

| | |
|---|---|
| 1 Did I read that correctly? |
| 2 A. Yes, you did. |
| 3 Q. So as part of this e-mail, while he does not |
| 4 reference Consilium, he does reference that he has |
| 5 already received an offer for a new and exciting |
| 6 endeavor? |
| 7 A. I don't know. I don't know what he was -- |
| 8 Q. I'm just -- |
| 9 A. -- talking about. |
| 10 Q. -- asking is that what the text states? |
| 11 A. That he's received an offer that he cannot |
| 12 refuse. |
| 13 Q. Okay. So as of September 24th, he's |
| 14 representing that he's received some type of offer? |
| 15 A. Some offer. |
| 16 Q. And you would agree with me that by the time |
| 17 September 24th rolls around, that Mr. Gresham was |
| 18 already seeking employment at Consilium? |
| 19 A. I don't know. I know that he's talked to |
| 20 Christina at that point. |
| 21 Q. Okay. So was it your impression by that date |
| 22 that he was already seeking employment? |
| 23 A. I don't know. I don't know if he had an offer |
| 24 from someone else. I honestly don't know. |
| 25 Q. What was the intent or import of you putting |

**27 (Pages 102 to 105)**

Billy Jess Bowden

106

13:13  1  him in contact with Ms. Stephens?  It was to discuss
13:13  2  potential job opportunities at Consilium, correct?
13:13  3      A.  At some point, yes.
13:13  4      Q.  Okay.
13:13  5          (Exhibit No. 13 marked.)
13:14  6      Q.  (BY MS. NOWAK)  Mr. Bowden, can you identify
13:14  7  this exhibit?
13:14  8      A.  It says the Responses to Plaintiff's First Set
13:14  9  of Interrogatories.
13:14  10     Q.  Have you reviewed this document before?
13:14  11     A.  I think I have.  I don't know.  I've reviewed
13:14  12  a lot of documents.
13:14  13     Q.  If you turn to Page 6 --
13:14  14     A.  Uh-huh.
13:14  15     Q.  -- there's a verification attached to this
13:14  16  document.  Is that your signature?
13:14  17     A.  Yes, it is.
13:14  18     Q.  Can you turn back with me to Page 3 of this
13:14  19  document.
13:14  20     A.  Yes.
13:14  21     Q.  And if you'll look about midway down the page
13:14  22  to Interrogatory No. 4, and the interrogatory is
13:14  23  requesting the date and all individuals who participated
13:14  24  or were involved in any meetings or communications
13:15  25  between you and Gresham prior to the termination of his

107

13:15  1  employment with MHA.
13:15  2          And your response to this interrogatory is,
13:15  3  Gresham contacted defendant in mid September of 2012.
13:15  4  Did I read that correctly?
13:15  5      A.  Correct.
13:15  6      Q.  And the reference to defendant here is to
13:15  7  yourself --
13:15  8      A.  Okay.
13:15  9      Q.  -- is that correct?
13:15  10     A.  Uh-huh.
13:15  11     Q.  Okay.  As --
13:15  12         MR. VOLNEY:  Answer yes.
13:15  13     A.  Yes.  I'm sorry.
13:15  14         MS. NOWAK:  Thank you, John.
13:15  15     Q.  (BY MS. NOWAK)  And then the next -- the
13:15  16  second sentence reads, As defendant recalls, Gresham
13:15  17  resigned his employment with MHA before seeking
13:15  18  employment at Consilium.
13:15  19     A.  Correct.
13:15  20     Q.  And again, defendant in this sentence refers
13:15  21  to you?
13:15  22     A.  Yes.
13:15  23     Q.  Now, we've just been over the -- the timing of
13:15  24  Mr. Gresham's communication to you on September 2- --
13:15  25  excuse me -- on September 17th and his resignation on

108

13:13  1  September 4th -- excuse me -- September 24th; is that
13:13  2  correct?
13:13  3      A.  Correct.
13:13  4      Q.  Now, in light of the discussion we've been
13:13  5  having about the events that occurred between
13:14  6  September 17th and September 24th, is it still your
13:14  7  testimony here today that the second sentence of
13:14  8  Interrogatory No. 4 is accurate?
13:14  9      A.  Being that I don't know what was spoken with
13:14  10  Christina and Scott, I don't know the exact dates of
13:14  11  when -- when he quit and when a job was offered.
13:14  12     Q.  So what was the basis for making this
13:14  13  statement in the first instance, then?
13:14  14     A.  At the time, like I said, I couldn't recall
13:14  15  until -- the exact dates that everything was done in at
13:14  16  that time.
13:14  17     Q.  Okay.  But it is your recollection here today,
13:14  18  as you've already testified, that, in fact, Mr. Gresham
13:14  19  and you spoke about his possibly seeking employment at
13:14  20  Consilium prior to September 24th?
13:14  21     A.  That's correct.
13:14  22     Q.  Are there any other inaccuracies in any of
13:14  23  your interrogatory responses?
13:14  24     A.  Not that I know of.
13:14  25     Q.  Can we turn to Interrogatory No. 7, which is

109

13:15  1  going to be on Page 4.
13:15  2      A.  (Witness complies.)
13:15  3      Q.  And I want to focus on your answer here to
13:15  4  Interrogatory No. 7.
13:15  5          The first sentence of Interrogatory 7 says,
13:15  6  Defendant inquired about employment with Consilium in
13:15  7  July 2012.
13:15  8          Did I read that correctly?
13:15  9      A.  That's correct.
13:15  10     Q.  And does defendant in this sentence refer to
13:15  11  you, Mr. Bowden?
13:15  12     A.  Yes.
13:15  13     Q.  And is this an accurate statement?
13:15  14     A.  That I inquired about employment?
13:15  15     Q.  Yes.
13:15  16     A.  Yes.
13:15  17     Q.  The testimony that you gave earlier today was
13:15  18  that Ms. Stephens reached out and engaged you.
13:15  19     A.  Right.  And I -- I did --
13:15  20     Q.  So --
13:15  21     A.  -- inquire.
13:15  22     Q.  -- which is it?
13:15  23     A.  She reached out to me and I reached out to
13:15  24  her.
13:15  25     Q.  So does this Interrogatory No. 7 disclose that

28  (Pages 106 to 109)

Billy Jess Bowden

---

**110**

13:18  1  initial communication between yourself and Ms. Stephens,
13:18  2  then? Is this an incomplete response?
13:18  3      **A.  I would say it's probably incomplete.**
13:18  4      Q.  Okay.  Besides Mr. Gresham, have you
13:18  5  communicated with any other MHA employees or
13:18  6  AMN Healthcare employees since you left MHA?
13:18  7      **A.  Yes.**
13:18  8      Q.  Who?
13:18  9      **A.  I -- I don't remember everyone.  I know I've**
13:18  10  **talked to people since I've left, but I don't remember**
13:18  11  **exactly who.**
13:18  12      Q.  Well, let's look back at your
13:18  13  interrogatory responses again.  And actually, if you'll
13:18  14  look with me on Page 3, at the top of Page 3, you'll see
13:18  15  your answer to Interrogatory No. 3.
13:18  16      **A.  Uh-huh.**
13:18  17      Q.  And in that answer, about three lines in, you
13:19  18  identify a number of persons starting with
13:19  19  Mr. Scott Gresham.
13:19  20          Do you see where I am looking?
13:19  21      **A.  Yes.**
13:19  22      Q.  Can you tell me, who is Elizabeth Kamhieh?
13:19  23      **A.  She's someone I worked with at MHA.**
13:19  24      Q.  Okay.  And what did you speak with Elizabeth
13:19  25  about?

---

**111**

13:19  1      **A.  We talked -- she's in Indiana now.  She'd left**
13:19  2  **MHA.**
13:19  3      Q.  When did you speak with Elizabeth?
13:19  4      **A.  I don't know.  Sometime within the last year.**
13:19  5      Q.  At any point in time during your
13:19  6  communications or conversations with Elizabeth, was
13:19  7  there any discussion of your work at Consilium?
13:19  8      **A.  I just told her I was with Consilium, yes.**
13:19  9      Q.  Was there any inquiry on her part or statement
13:20  10  on yours that Consilium was hiring or looking for new
13:20  11  folks?
13:20  12      **A.  No.**
13:20  13      Q.  So at any point in time, are you -- did
13:20  14  Elizabeth talk with or interview with Consilium related
13:20  15  to potential employment opportunities?
13:20  16      **A.  No.**
13:20  17      Q.  Okay.  Let's look at that next name,
13:20  18  Kevin Dodson.  Who's Mr. Dodson?
13:20  19      **A.  He works at MHA.**
13:20  20      Q.  And when have you spoken with or communicated
13:20  21  with Mr. Dodson?
13:20  22      **A.  Sometime within the last year.**
13:20  23      Q.  And what was the substance of your
13:20  24  communication with Mr. Dodson?
13:20  25      **A.  He asked me if we were hiring.**

---

**112**

1      Q.  And what did you tell him?
2      **A.  No.**
3      Q.  Did you tell him anything else besides no?
4      **A.  I really didn't want to talk to him.**
5      Q.  And why is that?
6      **A.  I just didn't really have anything to talk to**
7  **him about.**
8      Q.  Is that because you're not a fan of
9  Mr. Dodson?
10      **A.  I don't really know Kevin very well.**
11      Q.  Okay.  So what's the difference -- why were
12  you willing to introduce or -- or set Mr. Gresham up
13  with Christina Stephens, but not Mr. Dodson?
14      **A.  I just really didn't know Mr. Dodson very**
15  **well.**
16      Q.  You also have a number of other folks included
17  here, including Mike Fay.  How do you know Mike Fay?
18      **A.  He's the trainer at Merritt Hawkins.**
19      Q.  Did you spend quite a bit of time with him
20  when you first started at --
21      **A.  Yes.**
22      Q.  -- Merritt Hawkins?
23          Was he actually personally involved in the
24  training that you received from Merritt Hawkins?
25      **A.  He's the trainer.**

---

**113**

1      Q.  So talk me through, what are -- what are some
2  of the exercises or things that you went through with
3  Mr. Fay when you onboarded at MHA?
4      **A.  We did call clinics.**
5      Q.  Okay.  What is a call clinic?
6      **A.  Where you talk to a doctor and they -- you**
7  **record it and they critique it.**
8      Q.  Okay.  Anything else?
9      **A.  I don't really remember.  I did spend some**
10  **time with him, though.**
11      Q.  Okay.  A number of months?
12      **A.  Uh-huh, yes.**
13      Q.  John's better at catching those than I am.
14          You also have listed here a Mr. Javier -- and
15  I will not be able to pronounce his last name.
16      **A.  Vivanco.**
17      Q.  Okay.  And how do you know Mr. Vivanco?
18      **A.  We worked together at MHA.**
19      Q.  And you've talked to him in the last year?
20      **A.  I can't remember the last time I talked to**
21  **him.  It's been probably longer than that.**
22      Q.  Okay.  What about Brandon Schmidt?
23      **A.  I talked to him -- well, not really talked.**
24  **Just he'll send me a text every now and then with a**
25  **funny quote or something.**

---

DepoTexas, Inc. / Sunbelt Reporting & Litigation Services

Billy Jess Bowden

**114**

13:20  1    Q.  So do y'all maintain contact?
13:20  2    A.  Nothing more than that.
13:20  3    Q.  And have you spoken with Mr. Schmidt about
13:20  4  employment opportunities at Consilium?
13:22  5    A.  No.
13:22  6    Q.  So other than Mr. Dodson and Mr. Gresham, have
13:22  7  you spoken with any other employees at MHA regarding
13:22  8  potential employment opportunities at Consilium?
13:22  9    A.  No.
13:22  10   Q.  What's your current relationship with
13:22  11 Mr. Gresham?
13:22  12   A.  Friends, I guess.  I consider him a friend.
13:22  13   Q.  Some people make a distinction between work
13:22  14 friends and real friends.
13:22  15       Would you consider Mr. Gresham to be a work
13:22  16 friend or would you consider him to be a real friend?
13:22  17   A.  He's a --
13:22  18   Q.  And do --
13:23  19   A.  -- work friend.
13:23  20   Q.  -- and do you understand what I mean --
13:23  21   A.  Yeah.
13:23  22   Q.  -- when I say --
13:23  23   A.  He's a work friend.
13:23  24   Q.  So do you generally communicate with him
13:23  25 outside of work?

**115**

13:23  1    A.  Very little.
13:23  2    Q.  And the communications you've had with
13:23  3  Mr. Gresham since the time he departed relate to the
13:23  4  lawsuit?
13:23  5    A.  Yes.
13:23  6    Q.  And have copies of those communications been
13:23  7  produced to me?
13:23  8    A.  I don't know that there is copies.
13:23  9    Q.  Okay.
13:23  10   A.  I have a new phone.
13:23  11   Q.  Do you have -- do you have copies of the text
13:23  12 messages that would have been on your old phone?
13:23  13   A.  (Witness shakes head.)
13:24  14   Q.  So you've destroyed those?
13:24  15   A.  I don't have the old phone.  It doesn't
13:24  16 transfer.
13:24  17   Q.  So what happened to the old phone?
13:24  18   A.  Sold it.
13:24  19   Q.  Why is Mr. Gresham not employed at Consilium
13:24  20 any longer?
13:24  21   A.  He started his own business.
13:24  22   Q.  And what's the name of that business?
13:24  23   A.  I don't know.
13:24  24   Q.  Do you know if it has a website?
13:24  25   A.  I don't.

**116**

13:20  1    Q.  Do you know what type of business it is?
13:20  2    A.  Yes.
13:20  3    Q.  What is it?
13:20  4    A.  E-cigarettes.
13:20  5    Q.  Those electronic things?
13:20  6    A.  Yes.
13:20  7    Q.  Do you know how he got into that?
13:20  8    A.  He has a passion for them and made a business
13:20  9  out of it.  And it's doing very well from what I hear.
13:20  10   Q.  Good for him.
13:20  11       So he wasn't fired, he voluntarily --
13:20  12   A.  Yes.
13:20  13   Q.  -- terminated his employment at Consilium?
13:20  14       Do you recall when that -- when that occurred?
13:20  15   A.  I do not.
13:20  16   Q.  Was he well thought of at Consilium, do you
13:20  17 know?
13:20  18   A.  Yes.
13:20  19   Q.  How would you describe his personality?
13:20  20   A.  Happy-go-lucky.
13:20  21   Q.  Does he have a temper?
13:20  22   A.  No.
13:20  23   Q.  Has your relationship with Mr. Gresham been
13:20  24 strained at all by the fact that this lawsuit is
13:20  25 ongoing?

**117**

13:23  1    A.  No.
13:23  2    Q.  And I just want to make sure before we move
13:23  3  from this topic, I've been asking you questions about
13:23  4  your communications with Mr. Gresham both before
13:23  5  September 17th of 2012 and after September 17th of 2012.
13:23  6       Can you recall any other conversations or
13:23  7  communications that you've had with Mr. Gresham other
13:23  8  than those that you've told me about?
13:23  9    A.  Before or after?
13:23  10   Q.  So September 17th is our marker.
13:23  11   A.  Okay.
13:23  12   Q.  And I'm trying to ascertain, have you had any
13:23  13 communications with Mr. Gresham before September 17th
13:23  14 that you have not yet told me about?
13:23  15   A.  Not that I recall.
13:24  16   Q.  Okay.  And so from September 17th to the
13:24  17 present, have you had any communications with
13:24  18 Mr. Gresham that you have not yet told me about?
13:24  19   A.  Oh, I'm sure.
13:24  20   Q.  Okay.  Well, I want to hear about those.  So
13:24  21 why don't you -- I mean, I want you to walk me
13:24  22 through --
13:24  23   A.  From September 17th of which year?
13:24  24   Q.  2012.  Related to --
13:24  25   A.  Since he's left?

**30  (Pages 114 to 117)**

**APP. 0109**

Billy Jess Bowden

**118**

13:26  1    Q.   Yes.
13:26  2    **A.   Oh, I can't think of anything.**
13:26  3    Q.   Okay.  So you think that you've told me all
13:26  4  the communications?
13:26  5    **A.   (Witness nods head.)**
13:26  6    Q.   We briefly touched earlier on the fact that
13:27  7  Consilium has a database that it uses to store client
13:27  8  information in, and that that database is called Blue
13:27  9  Sky.
13:27 10         And can you confirm, do you have access to
13:27 11  Blue Sky?
13:27 12    **A.   Yes.**
13:25 13    Q.   Is Blue Sky password protected?
13:25 14    **A.   It is.**
13:25 15    Q.   So just -- not just anybody can roll in off
13:25 16  the street and see what's in it?
13:25 17    **A.   No.**
13:25 18    Q.   What type of information is contained in Blue
13:25 19  Sky?
13:25 20    **A.   Clients, potential clients, doctors that we**
13:25 21  **work with.**
13:25 22    Q.   And when you say potential clients, would
13:25 23  those be Consilium's prospects, the folks that they're
13:25 24  trying to get to become clients?
13:25 25    **A.   Yes.**

**119**

13:25  1    Q.   Would it have a list or information about the
13:25  2  names of the employees who had contacted those clients
13:25  3  or potential clients?
13:25  4    **A.   Yes.**
13:25  5    Q.   So if we were to go in and to access Blue Sky
13:25  6  and I was looking over your shoulder, we would be able
13:28  7  to tell who had contacted a specific client on behalf of
13:28  8  Consilium?
13:28  9    **A.   If they put the information in there, yes.**
13:28 10    Q.   Would it also tell us the bill rate or the pay
13:28 11  rate that was associated with a specific placement?
13:28 12    **A.   Not that I know of.**
13:28 13    Q.   Okay.  What about the days filled?
13:28 14    **A.   Not that I know of.  I don't deal in that**
13:28 15  **capacity.**
13:28 16    Q.   Okay.  So you -- your understanding of Blue
13:28 17  Sky is fairly limited.  You focus on the client list and
13:28 18  the notes associated with the client list?
13:28 19    **A.   Yes.**
13:28 20    Q.   So you're not saying that Blue Sky doesn't
13:28 21  have the capability.  You are just saying --
13:28 22    **A.   I don't know.**
13:28 23    Q.   -- you don't deal with it?
13:28 24    **A.   (Witness nods head.)**
13:28 25    Q.   With respect to Consilium's client list, would

**120**

 1  you agree with me that that list is confidential, that
 2  Consilium considers it confidential?
 3    **A.   Not really.**
 4    Q.   Okay.  So can I have a copy of that list?
 5    **A.   I don't -- I don't know.  I don't know.  That**
 6  **would be up to Consilium.  I don't know.**
 7    Q.   My question is more to the point of to your
 8  knowledge, Consilium wouldn't have a problem with
 9  anybody viewing its client list because it doesn't
10  consider that to be confidential.  Is that what you're
11  saying here today?
12    **A.   Client lists are -- are probably considered**
13  **confidential.**
14    Q.   Client lists probably are considered
15  confidential?
16    **A.   Yes.  I don't know.**
17    Q.   So it's -- but it's not published on the
18  internet?
19    **A.   No.**
20    Q.   I would have to go to Consilium and request it
21  to be able to find what is in the client list?
22    **A.   Yes.**
23    Q.   What do you think would happen if a copy of
24  Consilium's client list was given to or fell into the
25  hands of a competitor?  Do you think that would hurt

**121**

 1  Consilium?
 2    **A.   Well, most competitors are working with the**
 3  **same clinics and everything.  So it could probably hurt.**
 4  **But I mean, we're all competing for the same -- the same**
 5  **amount of -- of things.  It doesn't mean that they're**
 6  **going to get the business from them.**
 7    Q.   No.  And that's not what my question was.  I
 8  wasn't inquiring who would ultimately get the business.
 9    **A.   Right.**
10    Q.   I was just asking do you think there would be
11  an impact -- a harmful impact on Consilium if somebody
12  printed out its entire client list and walked it across
13  the street to a competitor?
14    **A.   Those competitors are probably calling the**
15  **same lists.**
16    Q.   And that includes the same contact people that
17  are included in Consilium's --
18    **A.   Yes.**
19    Q.   -- client list?
20         Are you able to print information from Blue
21  Sky?
22    **A.   I don't know.**
23    Q.   Okay.  What about running reports, do you know
24  anything about that?
25    **A.   I don't know.**

**31 (Pages 118 to 121)**

**APP. 0110**

Billy Jess Bowden

122

13:34  1    Q.  While you were working at Martin Fletcher or
13:34  2  Consilium for that matter, do you recall working with
13:34  3  any clients or doctors or client prospects that you also
13:34  4  worked with while you were at MHA?
13:34  5    A.  I don't -- no, because I worked in different
13:34  6  areas and didn't -- and didn't really cross
13:34  7  geographically.
13:34  8    Q.  So you don't think that you did?
13:34  9    A.  I don't think I did.
13:34  10   Q.  All right.
13:34  11        MS. NOWAK:  And I think we're going to
13:34  12  take a break here because Mr. Volney's identified a
13:34  13  number of documents that he has to additionally produce.
13:34  14        THE WITNESS:  Okay.
13:34  15        THE VIDEOGRAPHER:  We are off the record.
13:34  16  The time is 1:29 p.m.
13:52  17        (Break taken from 1:29 to 1:52 p.m.)
13:52  18        THE VIDEOGRAPHER:  We are back on the
13:52  19  record.  The time is 1:52 p.m.
13:52  20    Q.  (BY MS. NOWAK)  Okay.  Mr. Bowden, we are back
13:52  21  on the record after your counsel has provided a number
13:52  22  of new and additional production documents --
13:52  23    A.  Okay.
13:52  24    Q.  -- to me.  And we were taking a short break to
13:52  25  give me an opportunity to at least set eyes on them.

123

13:52  1        I am going to make my best efforts to ask you
13:53  2  the questions that I have related to these documents.
13:53  3    A.  Okay.
13:53  4    Q.  However, being that I just received them, I am
13:53  5  going to reserve my right at this time to ask further
13:53  6  questions about these documents and/or any other
13:53  7  documents that are subsequently discovered and that are
13:53  8  produced from you.
13:53  9    A.  Okay.
13:53  10   Q.  Okay.  The first document that I'd like for us
13:53  11  to talk to you about -- and I'm actually going to hand
13:53  12  it to your counsel first because it has your Social
13:53  13  Security number and I want to make sure that doesn't
13:53  14  make it into our record -- is your employment
13:53  15  application to Consilium.
13:53  16        MS. NOWAK:  And John, I think that number
13:53  17  is just on that first page.
13:53  18        (Exhibit No. 14 marked.)
13:54  19        MS. NOWAK:  And John, just to confirm on
13:54  20  the record how we're going to handle these documents
13:54  21  that have just been produced to me is that you're going
13:54  22  to actually formally produce copies that have Bates
13:54  23  stamps with the Social Security number redacted?
13:54  24        MR. VOLNEY:  Yes.
13:54  25    Q.  (BY MS. NOWAK)  Mr. Bowden, if you look at

124

1  that application which we've marked as Deposition
2  Exhibit 14, you have checked on the first page that you
3  do not have a valid driver's license.
4        Why was your license suspended?
5    A.  I might have missed -- messed up that.  It's
6  never been suspended.
7    Q.  Okay.  So that might have been an incorrect
8  statement in your employment --
9    A.  Yes.
10   Q.  -- application?
11       If we continue on a few pages, you list your
12  past employment history which I believe have
13  previously walked through here today.
14   A.  Uh-huh.
15   Q.  But in the section where we're discussing MHA,
16  you identify Tim Beidle as your direct supervisor during
17  the time that you worked at MHA.
18   A.  Correct.
19   Q.  And is that correct information, Mr. Beidle
20  was your supervisor?
21   A.  Yes.
22   Q.  Now, you checked the box there on the
23  right-hand side that indicated to Consilium that they
24  should not contact Mr. Beidle.
25   A.  Right.

125

1    Q.  And why did you do that?
2    A.  We -- we left on bad terms.
3    Q.  And what do you mean by you left on bad terms?
4    A.  When I left, I was -- what had happened was I
5  was told that I had to make a certain amount of phone
6  calls a day or else things would escalate on my
7  production.  It was the weekend before -- what was that,
8  Memorial -- no, Labor Day, and he told me to go -- go
9  ahead and go home.  Everybody cut out early that day.
10  When I came in on Tuesday, he told me that I -- that I
11  didn't make the 100 dials, that he'd suggested that I
12  resign.  I told him I wouldn't resign, that he'd have to
13  fire me.  He was the one that told me to go home, so I
14  expected that was to be all right.
15   Q.  So what's your personal opinion of Mr. Beidle?
16   A.  Personally?
17   Q.  Uh-huh.
18   A.  I don't think he's a very ethical person.
19   Q.  What was your expectation that Mr. Beidle
20  would tell Consilium about your performance if they did
21  contact you?
22   A.  He'd probably tell them at the end that it
23  probably wasn't where it should have been.
24   Q.  And were you also concerned that Mr. Beidle
25  might tell Consilium about your employment agreement?

32 (Pages 122 to 125)

Billy Jess Bowden

126

13:58  1    A.  No.
13:58  2    Q.  And that's because Consilium already knew that
13:58  3  you had an employment agreement?
13:58  4    A.  Yes.  I told -- or yeah.
13:58  5    Q.  You also list on there Tina Maxwell.
13:58  6    A.  Uh-huh.
13:58  7    Q.  Who is Ms. Maxwell?
13:58  8    A.  I believe --
13:58  9    Q.  I haven't seen her --
13:58  10   A.  -- she's --
13:58  11   Q.  -- name before.
13:58  12   A.  -- the human resources lady there.
13:58  13   Q.  Okay.  And were you familiar, did you work
13:58  14  with her at MHA?  Why did you list her as the other
13:58  15  person?
13:58  16   A.  Because whenever they need references or
13:58  17  anything like that, they go through the human resources
13:58  18  person.
13:58  19   Q.  Okay.  Another item that I saw in the
13:58  20  documents that have just been produced to me is the
13:58  21  reference to an assessment that was performed in
13:58  22  connection with your interviewing for a position at
13:59  23  Consilium.
13:59  24       What is that?
13:59  25   A.  Just a sales assessment.

127

13:59  1    Q.  Okay.  When you say just a sales assessment --
13:59  2  I've never been through one of those -- what does that
13:59  3  entail?
13:59  4    A.  They just ask you questions regarding your
13:59  5  personality.
13:59  6    Q.  And who performed that assessment with you?
13:59  7    A.  It's done on a computer.
13:59  8    Q.  Okay.  And do you have a copy of the results?
13:59  9    A.  No.
13:59  10   Q.  Would Consilium have a copy of those results?
13:59  11   A.  I don't know.
13:59  12   Q.  Have you requested if they have a copy of
13:59  13  those results?
13:59  14   A.  No.
13:59  15   Q.  Could you?
13:59  16   A.  I guess, yes.
13:59  17   Q.  And if they had a copy, you could provide it
13:58  18  to me?
13:58  19   A.  If they're okay with that and if they have a
13:58  20  copy.
13:58  21   Q.  I'm seeing a lot of e-mails in here between
13:58  22  yourself and Ms. Stephens.
13:58  23       Did you ever e-mail or communicate via e-mail
13:58  24  with anyone else at Consilium before accepting
13:58  25  employment?

128

13:58  1    A.  No.
13:58  2    Q.  So after your interview with Kyle, Amy, and
13:58  3  Tisha, you never sent them an e-mail that said, thanks
13:58  4  for interviewing me?
13:58  5    A.  I did.  Now that you say that, I did tell them
13:58  6  thank you.
13:58  7    Q.  Okay.  Did they ever respond saying, great to
13:58  8  meet you --
13:58  9    A.  No.
13:58  10   Q.  -- nice to see you again?
13:58  11   A.  No response.
13:58  12   Q.  But you did send e-mails to them?
13:58  13   A.  Yes.
13:58  14   Q.  And would you be able to get copies of those
13:58  15  for me?
13:58  16   A.  If they're in my account folder.
13:58  17   Q.  I saw in this that you got in a car wreck your
13:58  18  very first day of work.
13:58  19   A.  Yes.
13:58  20   Q.  That's a way to start with a bang.
13:58  21   A.  Oh, it was terrible.
13:58  22   Q.  I'm so sorry.
13:58  23       All right.  I want to talk about your resume.
13:58  24  And I'm going to hold on to it for just a second.  And
13:58  25  if we need to, we can share.

129

13:59  1       MR. VOLNEY:  I've got an extra copy.
13:59  2       MS. NOWAK:  Oh, good.
13:59  3    Q.  (BY MS. NOWAK)  Mr. Bowden, I'm looking at the
13:59  4  resume that you provided to Ms. Stephens in response to
13:59  5  her request.  And the very first subpart of your resume
13:59  6  is entitled Skills.
13:59  7    A.  Uh-huh.
13:59  8    Q.  And the second bullet point says extensive
13:59  9  experience in life insurance, recruiting, mortgage, and
13:59  10  retail sales industries.
13:59  11   A.  Uh-huh.
13:59  12   Q.  Okay.  Now, if we were going to divide that
13:59  13  up, if we were going to say, okay, which of your prior
13:59  14  employment gave you experience in the life insurance
13:59  15  industry, which companies would you name?
13:59  16   A.  American General.
13:59  17   Q.  Okay.  Any others?
13:59  18   A.  No.
13:59  19   Q.  Okay.  What about recruiting, which companies
13:59  20  would you say gave you experience in recruiting?
13:59  21   A.  All of them.
13:59  22   Q.  All right.  What about mortgage?
13:59  23   A.  LMI Funding, Ameriquest, Circuit City -- I'm
13:59  24  sorry.  Not Circuit City.  Ameriquest and LMI Funding.
13:59  25   Q.  And what about retail?

33 (Pages 126 to 129)

APP. 0112

Billy Jess Bowden

---

**130**

14:02  1      A.  Circuit City.
14:02  2      Q.  So let's go back and talk about recruiting
14:02  3  just a little bit more.  You said all of them would have
14:02  4  given you experience in connection with the recruiting
14:02  5  industry.
14:02  6      A.  Yes.
14:02  7      Q.  So let's divide that, then, a little more
14:02  8  loosely.  Or how would you divide that?  Would we say,
14:02  9  Mr. Bowden, which of these companies gave you experience
14:02  10  in the life insurance recruiting?
14:02  11     A.  Life insurance would be American General.
14:02  12     Q.  Okay.  And if I were to say, Mr. Bowden, which
14:02  13  of these companies gave you experience in healthcare
14:02  14  recruiting, which would you identify?
14:02  15     A.  Merritt Hawkins.
14:02  16     Q.  Okay.  Any others in healthcare?
14:02  17     A.  No.
14:03  18     Q.  How would you characterize, then -- or what --
14:03  19  what industry would you say that Martin Fletcher was
14:03  20  part of?
14:03  21     A.  That's more business development.  I don't
14:03  22  really recruit in that capacity.
14:03  23     Q.  I understand that -- is Martin Fletcher,
14:03  24  though -- the core business of Martin Fletcher, is it
14:03  25  the healthcare industry?

---

**131**

14:03  1      A.  Theirs is, yes.
14:03  2      Q.  Okay.
14:03  3      A.  But my specific job wasn't.
14:03  4      Q.  Okay.  So the experience you got from them for
14:03  5  recruiting was on the business development side of
14:04  6  healthcare?
14:04  7      A.  Yes.  I was doing business development,
14:04  8  bringing in new clinics and stuff like that.  I never
14:04  9  recruited.
14:04  10     Q.  Does it still go to healthcare staffing?  I
14:04  11  mean, the ultimate purpose of you doing your business
14:04  12  development is make a match, correct, between a client
14:04  13  and a healthcare professional?
14:04  14     A.  That's the goal.  But I don't do any of the
14:04  15  recruiting side of it.
14:04  16     Q.  Okay.  But I guess I'm just trying to define
14:04  17  the -- the -- the industry overall.  We're talking about
14:04  18  healthcare staffing?
14:04  19     A.  It's healthcare -- it's the healthcare
14:04  20  staffing industry.
14:04  21     Q.  Okay.  And if we were to use that term
14:04  22  instead, healthcare staffing, we would be talking about
14:04  23  MHA, Merritt -- sorry -- MHA, Martin Fletcher, and
14:04  24  Consilium.  They would fall kind of under that --
14:04  25     A.  Staffing agencies.

---

**132**

1      Q.  -- large umbrella of healthcare --
2      A.  Or just staffing.
3      Q.  Got it.  Okay.
4          MR. VOLNEY:  Do you want to mark that
5  one?
6          MS. NOWAK:  We certainly can, yeah, if
7  you've already given him a copy.
8          (Exhibit No. 15 marked.)
9      Q.  (BY MS. NOWAK)  I'd actually like for you to
10  go back -- we -- we looked at this employee contact list
11  earlier and marked that.  And you had circled some of
12  these folks.
13     A.  Yes.
14     Q.  Okay.  Now, your testimony earlier, I had
15  asked you if you knew any of these people during the
16  time that you were employed by MHA.  And you identified
17  four individuals.  You said Kyle Etter, Lyndsey Nix,
18  Landon Webb, and Amy Crowdis.
19         Is there anybody that you'd like to add to
20  that list?
21     A.  That I knew?
22     Q.  Yes.
23     A.  Oh, Greg Ellis.
24     Q.  Okay.  And did you know Greg well?
25     A.  I probably knew Greg better than I knew any of

---

**133**

1  the other ones.
2      Q.  Okay.  And when you say you probably knew him
3  better, how well did you know him?
4      A.  He had my paycheck every Friday.
5      Q.  So he was a good guy to know?
6      A.  (Witness nods head.)
7      Q.  And what does he do for Consilium?  Does he
8  have your paycheck every Friday?
9      A.  The payroll man.
10     Q.  Does he deliver on time?
11     A.  Always.
12     Q.  So now that we've added to this list and you
13  have reminded yourself that you also know Mr. Ellis, is
14  there anybody else that you'd like to add at this time?
15     A.  That is all.
16     Q.  Okay.
17         MS. NOWAK:  Mr. Bowden, those are going
18  to be all the questions that I have for you today.
19         Now, I do want to remind you and
20  Mr. Volney that I am reserving my right to ask
21  additional questions about the documents I've just
22  received.  And I think we've even identified a few more
23  that you either have access to or potentially have in
24  your possession that might be forthcoming and being
25  produced to me.

---

34 (Pages 130 to 133)

APP. 0113

Billy Jess Bowden

---

**134**

14:04  1         MR. VOLNEY:  I guess I will say that the
14:04  2    documents that I handed to you mid day today are largely
14:04  3    duplicates of items you already had.  And I -- I think
14:05  4    I've given you the opportunity to look at them.  But I
14:05  5    hear what you're saying.  So let's -- let's move on.
14:05  6         MS. NOWAK:  Thank you, Mr. Bowden.
14:05  7         THE WITNESS:  Thank you.
14:05  8         THE VIDEOGRAPHER:  We are off the record.
14:05  9         MR. VOLNEY:  Thank you.
14:05  10        THE VIDEOGRAPHER:  The time is 2:05 p.m.
     11         (Deposition adjourned at 2:05 p.m.)
     12
     13
     14
     15
     16
     17
     18
     19
     20
     21
     22
     23
     24
     25

---

**136**

1    _____
2         (Signature of the witness)
3
4    THE STATE OF _____
5    COUNTY OF _____
6
7       Subscribed and sworn to before me by the said
8    witness, BILLY JESS BOWDEN, on this the _____ day
9    of _____, 2014.
10
11   _____
12       Notary Public in and for the
         State of _____
13       County of _____
14   My commission expires:  _____
15
16
17
18
19
20
21
22
23
24
25

---

**135**

1             DEPOSITION CHANGES
2    WITNESS:  BILLY JESS BOWDEN
3    PAGE NO.  LINE NO.   CHANGE    REASON FOR CHANGE
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

---

**137**

1    STATE OF TEXAS   )
     COUNTY OF DALLAS )
2
3       I, Lezley Cull, Certified Shorthand Reporter
4    in and for the State of Texas, certify that the
5    foregoing deposition of BILLY JESS BOWDEN was reported
6    stenographically by me at the time and place indicated,
7    said witness having been placed under oath by me, and
8    that the deposition is a true record of the testimony
9    given by the witness.
10      I further certify that I am neither counsel
11   for nor related to any party in this cause and am not
12   financially interested in its outcome.
13      Given under my hand on this the _____ day
14   of _____, 2014.
15
16
17
18   Lezley Cull, Texas CSR 5528
     Expiration Date:  12/31/15
19   DepoTexas, Firm Registration #459
     Sunbelt Reporting, Firm Registration #301
20   6500 Greenville Avenue
     Suite 445
21   Dallas, Texas 75206
     214-373-4977
22
23
24
25   Original deposition sent to Mr. John Volney on
                for signature.

---

**35 (Pages 134 to 137)**

**APP. 0114**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MERRITT HAWKINS                )
& ASSOCIATES, LLC              )
                               )
        Plaintiff,             )
                               )
v.                             )      CIVIL ACTION
                               )   NO. 3:13-cv-00312-P
LARRY SCOTT GRESHAM            )
AND BILLY BOWDEN               )
                               )
        Defendants.            )


*****************************************
ORAL AND VIDEOTAPED DEPOSITION OF
LARRY SCOTT GRESHAM
FEBRUARY 13, 2014
*****************************************


        ORAL AND VIDEOTAPED DEPOSITION of

LARRY SCOTT GRESHAM, produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and numbered cause on the 13th of

February, 2014, from 10:00 a.m. to 2:55 p.m., before

Lezley Cull, CSR in and for the State of Texas, reported

by machine shorthand, at the offices of Lynn Tillotson

Pinker & Cox, LLP, 2100 Ross Avenue, Suite 2700, Dallas,

Texas, pursuant to the Texas Rules of Civil Procedure

and the provisions stated on the record or attached

hereto.

APP. 0115

Larry Scott Gresham

**2**

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
        Ms. Christine A. Nowak
 4   DYKEMA GOSSETT PLLC
        1717 Main Street
 5      Suite 4000
        Dallas, Texas 75201
 6      214.462.6400
        214.462.6401 (fax)
 7      cnowak@dykema.com
 8
 9   FOR THE DEFENDANTS:
        Mr. John Volney
10   LYNN TILLOTSON PINKER COX
        2100 Ross Avenue
11      Suite 2700
        Dallas, Texas 75201
12      214.981.3822
        214.891.3839 (fax)
13      jvolney@lynnllp.com
14
15
16
17
18
19   ALSO PRESENT:
        Randy Johnson - Videographer
20      Whitney Laughlin
21
22
23
24
25
```

**4**

```
 1   EXHIBITS CONTINUED
 2      Exhibit 25 - Defendant Larry Scott Gresham's
           Answer to Plaintiff's Original
 3         Complaint and Original
           Counterclaim. . . . . . . . . . 175
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
     REPORTER'S NOTE - "*" denotes previously marked exhibit
23
24
25
```

**3**

```
10:00    1              I N D E X
10:00    2   Appearances. . . . . . . . . . . . . . . . . . 2
         3
10:00    4   LARRY SCOTT GRESHAM
             Examination by Ms. Nowak. . . . . . 5, 205
10:00        Examination by Mr. Volney. . . . . . . 184
         5
10:00    6
         7   DEPOSITION EXHIBITS             PAGE
10:00    8
10:00    9   Exhibit 3 - Document printed from
                 Consilium Staffing's website. . . 43
10:00   10   Exhibit 9 - BOWDEN 000056. . . . . . . . . 145
10:00   11   Exhibit 11 - GRESHAM 000001. . . . . . . . 110
10:00   12   Exhibit 12 - 9-24-12 resignation e-mail from
                 Scott Gresham to Tim Beidle. . . . 52
10:00   13
             Exhibit 16 - Notice of Deposition. . . . . . 8
10:00   14
             Exhibit 17 - Defendant Larry Scott Gresham's
10:00   15       Responses to Plaintiff's First
                 Requests for Production. . . . . . 13
10:00   16
             Exhibit 18 - Photocopies of a text messages. . 16
10:01   17
             Exhibit 19 - Confidentiality, Non-Competition
10:01   18       and Non-Solicitation Agreement. . . 62
10:01   19   Exhibit 20 - GRESHAM 000020- GRESHAM 000022,
                 GRESHAM 000037 - GRESHAM 000051. . 76
10:01   20
             Exhibit 21 - GRESHAM 000013. . . . . . . . 124
10:01   21
             Exhibit 22 - GRESHAM 000007 - GRESHAM 000009. . 126
10:01   22
             Exhibit 23 - GRESHAM 000010 - GRESHAM 000012. . 132
10:01   23
             Exhibit 24 - Defendant Larry Scott Gresham's
10:01   24       Responses to Plaintiff's First
                 Requests for Admission. . . . . . 161
10:01   25
```

**5**

```
 1            P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  We are now on the
 3   record for the video deposition of Larry Scott Gresham.
 4   The time is 10:00 o'clock.  The date is February 13th,
 5   2014 in the matter of Merritt Hawkins & Associates, LLC
 6   versus Larry Scott Gresham, et al., Civil Action
 7   No. 3:13-CV-00312-P, being held in the United States
 8   District Court for the Northern District of Texas,
 9   Dallas Division.
10        The court reporter is Lezley Cull and the
11   videographer is Randy Johnson.  Both are representatives
12   of DepoTexas.
13        Will counsel please state their
14   appearances for the record.
15        MS. NOWAK:  Christine Nowak, counsel for
16   plaintiff Merritt Hawkins & Associates.
17        MR. VOLNEY:  John Volney for the witness.
18        THE VIDEOGRAPHER:  Would the court
19   reporter please administer the oath.
20        LARRY SCOTT GRESHAM,
21   having been first duly sworn, testified as follows:
22            EXAMINATION
23   BY MS. NOWAK:
24        Q.  Good morning, Mr. Gresham.  How are you today?
25        A.  Good.
```

**2 (Pages 2 to 5)**

Larry Scott Gresham

**6**

10:01 1    Q.  Can you please state your full name for the
10:01 2  record.
10:01 3    **A.  Larry Scott Gresham.**
10:01 4    Q.  Now, do you go by Larry?
10:01 5    **A.  No, I do not.  I go by Scott.**
10:01 6    Q.  Can you please tell me your current
10:01 7  residential address.
10:01 8    **A.  Sure.  824 Kilbridge Lane, Coppell, Texas**
10:01 9  **75019.**
10:01 10   Q.  Can you also tell me your current e-mail
10:01 11 address.
10:01 12   **A.  Sure.  Scott.gresham@verizon.net.**
10:01 13   Q.  How long have you had that e-mail address?
10:01 14   **A.  I don't recall.  A long time.**
10:01 15   Q.  Have you had any other e-mail addresses since
10:04 16 2012?
10:04 17   **A.  A Gmail address through my company.**
10:02 18   Q.  Can you please give me that address?
10:02 19   **A.  Pipthebunny@gmail.com.**
10:02 20   Q.  Did you also have work e-mail addresses during
10:02 21 that time?
10:02 22   **A.  I did.  I do not recall what they were.**
10:02 23   Q.  Can you please give me a current phone number.
10:02 24   **A.  Sure.  972-537-7611.**
10:02 25   Q.  And you understand you're here today for a

**7**

10:02 1  deposition in a lawsuit filed by Merritt
10:02 2  Hawkins & Associates?
10:02 3    **A.  Yes.**
10:02 4    Q.  And if I use the term MHA today, will you
10:02 5  understand that I'm referring to Merritt Hawkins --
10:02 6    **A.  Yes.**
10:02 7    Q.  -- & Associates?
10:02 8        And we'll get to this in a little bit.  But
10:02 9  one of the things that we have today is a court
10:02 10 reporter.  She's going to be taking down what you say
10:02 11 and what I say.  And for that reason, we have to make
10:02 12 sure that we don't talk over each other.  So if you'll
10:02 13 let me get my question out and I'll try to let you get
10:02 14 your answers out before either of the other one of us
10:02 15 talks.
10:02 16   **A.  Sure.**
10:02 17   Q.  And the other thing, because we have a court
10:02 18 reporter here with us today, we'll need to make sure
10:02 19 that we give verbal answers.  So if you can respond with
10:03 20 a yes or a no as opposed to a huh-uh or a head nod
10:03 21 because that's not something that Lezley can take down.
10:03 22   **A.  Sure.**
10:03 23   Q.  As far as other terms, if I were to use the
10:03 24 term AMN Healthcare, are you familiar with AMN
10:03 25 Healthcare?

**8**

10:03 1    **A.  Yes.**
10:03 2    Q.  And if I refer to AMN today, you'll understand
10:03 3  that I'm talking about the family of companies that
10:03 4  includes MHA?
10:03 5    **A.  Yes.**
10:03 6    Q.  You understand that you are a named defendant
10:03 7  in this lawsuit?
10:03 8    **A.  Yes.**
10:03 9        **(Discussion off the written record.)**
10:03 10       **(Exhibit No. 16 marked.)**
10:03 11   Q.  (BY MS. NOWAK)  Mr. Gresham, have you seen
10:03 12 this notice before?
10:03 13   **A.  Yes.**
10:03 14   Q.  And are you appearing here today pursuant to
10:03 15 this notice?
10:03 16   **A.  Yes.**
10:03 17   Q.  Have you ever been deposed before?
10:03 18   **A.  No.**
10:03 19   Q.  Have you ever been a party to a lawsuit
10:03 20 before?
10:03 21   **A.  Yes.**
10:03 22   Q.  Can you tell me what that was.
10:03 23   **A.  Merritt Hawkins sued Arthur Marshall two and a**
10:03 24 **half years ago maybe when I went from Merritt Hawkins to**
10:03 25 **Arthur Marshall.  And then Arthur Marshall sued**

**9**

10:03 1  **Merritt Hawkins when I went back to Merritt Hawkins.**
10:03 2    Q.  Was there a noncompete involved in that case?
10:03 3    **A.  Yes.**
10:03 4    Q.  Do you remember where that case was filed?
10:03 5    **A.  No.  I didn't have much to do with that**
10:03 6  **case -- with either case.**
10:03 7    Q.  Were you deposed --
10:03 8    **A.  No.**
10:03 9    Q.  -- in the case?
10:03 10   **A.  I'm sorry I was talking over you.**
10:03 11       **No.**
10:03 12   Q.  Do you know what the end result of the
10:03 13 litigation was?
10:03 14   **A.  To what I recall, the case between Merritt**
10:03 15 **Hawkins and Arthur Marshall when Merritt Hawkins sued**
10:03 16 **Arthur Marshall, they just -- they settled that I**
10:03 17 **wouldn't work in the same territories.  And I do not**
10:03 18 **know what the resolution on the other case was.  I don't**
10:03 19 **think it went anywhere.**
10:03 20   Q.  Other than this case involving MHA and Arthur
10:03 21 Marshall which you were a party to, have you ever been a
10:03 22 party to a litigation matter?
10:03 23   **A.  No.**
10:03 24   Q.  You've never been sued?
10:03 25   **A.  No.**

**3 (Pages 6 to 9)**

Larry Scott Gresham

**10**

10:05 1    Q.  We talked about a few of our what I'll call
10:05 2  deposition rules a second ago, not to talk over each
10:05 3  other and to make sure that we give verbal answers.  But
10:05 4  I also want to make sure that you're aware that you
10:05 5  being here today is just as if you were in a courtroom
10:05 6  before a judge and a jury.  You're under oath and the
10:05 7  testimony here today has that same effect.
10:05 8       Do you understand that?
10:05 9    A.  I do.
10:05 10    Q.  I also want to make sure if I ask you a
10:05 11  question today, I'm going to assume that you understand
10:05 12  it unless you ask me to repeat it, rephrase it, or tell
10:05 13  me that you don't understand.
10:05 14       Do you understand that?
10:06 15    A.  Yes.
10:06 16    Q.  Is there any reason that you can't give your
10:06 17  best testimony here today?
10:06 18    A.  No.
10:06 19    Q.  Are you under the influence of drugs?
10:06 20    A.  No.
10:06 21    Q.  Any alcohol?
10:06 22    A.  No.
10:06 23    Q.  Medications?
10:06 24    A.  No.
10:06 25    Q.  Have you ever been convicted of a crime

**11**

10:06 1  before?
10:06 2    A.  Yes.
10:06 3    Q.  Can you please tell me what that was.
10:06 4    A.  When I was 19 or 20, I was convicted of
10:06 5  resisting arrest.
10:06 6    Q.  And is that still on your record or was it
10:06 7  later expunged?
10:06 8    A.  It should have been expunged, yes.
10:06 9    Q.  Any other convictions?
10:06 10    A.  Speeding tickets.
10:06 11    Q.  Other than speeding tickets and resisting
10:06 12  arrest, do you have any other crimes --
10:06 13    A.  No.
10:06 14    Q.  -- that you've been charged or convicted of?
10:06 15    A.  No.
10:06 16    Q.  What did you do to prepare for your deposition
10:06 17  here today?
10:06 18    A.  Not much.  I talked to John.
10:06 19    Q.  Okay.  Did you meet with anyone else besides
10:08 20  your lawyer?
10:08 21    A.  No.
10:08 22    Q.  When did you meet with your lawyer?
10:08 23    A.  Yesterday.
10:08 24    Q.  Any other times?
10:09 25    A.  No.  We talked on the phone briefly.

**12**

1    Q.  And how long did you meet with John?
2    A.  Probably 30 minutes, 30 minutes to 45 minutes.
3    Q.  So you met with your lawyer 30 to 45 minutes
4  yesterday?
5    A.  Yes.
6    Q.  Did you review any documents while you were
7  meeting with Mr. Volney?
8    A.  Yes.
9    Q.  What documents did you review?
10    A.  These documents.  My -- my -- I don't know the
11  words for them.  What -- your complaints, my rebuttals.
12    Q.  Okay.  Did you review any of the documents
13  that you've produced in this case?
14    A.  Yes, yes.  The stuff I had on my computer and
15  I showed John text messages which you got.
16    Q.  Other than Mr. Volney, did you talk with
17  anyone else about the fact that you're being deposed
18  here today?
19    A.  No.
20    Q.  Anyone else at Consilium?
21    A.  No.
22    Q.  Did you talk with Mr. Bowden?
23    A.  No.
24    Q.  Did you talk with Mr. Bowden after his
25  deposition?

**13**

1    A.  No.
2    Q.  Have all the documents that you've reviewed
3  with John yesterday now been produced to me?
4    A.  Yes.
5       (Exhibit No. 17 marked.)
6    Q.  (BY MS. NOWAK)  Mr. Gresham, the court
7  reporter has handed you what's been marked as
8  Exhibit 17.  And these are your responses to the
9  plaintiff MHA's first request for production.
10       After you received MHA's request for
11  production, did you go out and gather documents that
12  were responsive?
13    A.  No.  When -- when was this?  Hold on.  When
14  was this given to me?
15    Q.  These responses were served in December of
16  last year.
17    A.  December of last year.
18       When I received this suit, I looked to see if
19  I had anything.  And a computer expert came to my house,
20  took my computer, hard drive, all that.  I didn't have
21  anything besides that.
22    Q.  Did the computer expert take anything other
23  than your personal computer, USB drives, disks, anything
24  else?
25    A.  I think I gave -- I gave him everything I had.

**4 (Pages 10 to 13)**

**14**

10:09  1   I remember it was my hard drive. I think there was a
10:09  2   USB connected to it -- or no. I think it was another
10:09  3   hard drive. He just took both of those.
10:09  4       Q.  So is it your testimony here today that the
10:09  5   computer expert did not take possession of any USB
10:09  6   drives?
10:09  7       A.  I do not recall him taking possession of any
10:09  8   USB drives.
10:09  9       Q.  But it's possible that he did?
10:09 10       A.  It's possible, yeah. I don't remember.
10:09 11       Q.  So did you go through any of your personal
10:09 12   e-mail, work e-mail addresses, or is the only effort you
10:10 13   took to collect documents handing over your computer
10:10 14   hard drive?
10:10 15       A.  Yes. I had -- I didn't have work e-mail.
10:10 16       Q.  Okay. Did you have a personal e-mail address?
10:10 17       A.  Uh-huh.
10:10 18       Q.  Did you review your personal e-mail to --
10:10 19       A.  No.
10:10 20       Q.  -- to see if there were any documents
10:10 21   responsive?
10:10 22       A.  No. Because I gave the hard drive that had
10:10 23   the e-mail account on it to him.
10:10 24       Q.  And did you provide the password so they could
10:10 25   review --

**15**

10:10  1       A.  Yes.
10:10  2       Q.  -- the e-mail?
10:10  3       So as we sit here today, do you believe that
10:10  4   you've produced all documents that are in your
10:10  5   possession, custody --
10:10  6       A.  Yes.
10:10  7       Q.  -- and control that are responsive to MHA's
10:10  8   request?
10:10  9       A.  Yes.
10:10 10       Q.  Do you understand what I mean when I say
10:10 11   possession, that you actually have hold of the document?
10:10 12       A.  I absolutely understand what you mean.
10:10 13       Q.  Okay.
10:10 14       A.  Thank you.
10:10 15       Q.  And I just want to make sure you understand.
10:10 16       Do you also understand what I mean when I say
10:10 17   custody or control? What does that mean to you?
10:10 18       A.  I have it. I understand.
10:10 19       Q.  Well, it can also mean that you have the
10:10 20   ability to get a copy.
10:10 21       So do you understand if I were to say that you
10:10 22   had custody or control of something, that that would
10:10 23   mean that you would have the ability to go and get a
10:13 24   copy? You may not actually have it in your hands, but
10:13 25   you could go and request a copy from someone else?

**16**

1       A.  Okay.
2       Q.  Do you understand?
3       A.  I do understand.
4       Q.  Okay. Did you go and request copies of
5   documents from anyone else or did you only provide what
6   was actually in your possession?
7       A.  I only provided what was in my possession. I
8   wouldn't waste the time.
9       Q.  Late yesterday afternoon, your counsel
10   produced a text message to me.
11       (Exhibit No. 18 marked.)
12       MS. NOWAK:  John, do you have a copy
13   already?
14       MR. VOLNEY:  No. But I'm familiar with
15   the document.
16       MS. NOWAK:  Okay.
17       Q.  (BY MS. NOWAK)  When did you give this text
18   message to your lawyer?
19       A.  Yesterday.
20       Q.  So this case was filed back in January of
21   2013, but you waited for over a year to give your lawyer
22   a copy of this text message?
23       A.  I honestly didn't even know I could go back
24   that far in my text messages. And yesterday, I did. I
25   said, oh, look, I can go -- yeah.

**17**

1       Q.  So you're telling me today that the reason
2   that we've only just received this document is because
3   you didn't check to see if you had text messages?
4       A.  Yes.
5       Q.  And in his deposition, Mr. Bowden testified
6   that he had a number of other text message strings with
7   you besides the ones that were produced to me yesterday.
8       Do you -- are you aware of any other text
9   message strings that you have with Mr. Bowden?
10       A.  Personal?
11       Q.  Yes.
12       A.  Sure.
13       Q.  Okay. And have those been produced to me?
14       A.  No.
15       Q.  And why is it that those have not been
16   produced to me?
17       A.  They're of a personal nature.
18       Q.  Are they communications between yourself and
19   Mr. Bowden?
20       A.  Yes. Billy's one of my friends.
21       Q.  And do any of those communications relate in
22   any way to this lawsuit?
23       A.  No.
24       Q.  Mr. Bowden testified that you had at least six
25   to eight text message strings between you that related

5 (Pages 14 to 17)

Larry Scott Gresham

**18**

| 10:13 | 1 | to this lawsuit. |
| 10:13 | 2 | **A. Okay.** |
| 10:13 | 3 | Q. Is it your testimony here today that he was |
| 10:13 | 4 | lying? |
| 10:13 | 5 | **A. I don't know. I don't -- this is what I have.** |
| 10:13 | 6 | Q. Did you review the other text messages, |
| 10:13 | 7 | though, to see if they were related? |
| 10:13 | 8 | **A. No.** |
| 10:13 | 9 | Q. Do you still have copies of all of those text |
| 10:13 | 10 | messages? |
| 10:13 | 11 | **A. Uh-huh.** |
| 10:13 | 12 | MR. VOLNEY: Answer yes. Sorry. |
| 10:13 | 13 | **A. Yes.** |
| 10:13 | 14 | Q. (BY MS. NOWAK) So you haven't destroyed them, |
| 10:14 | 15 | you still have all of them -- |
| 10:15 | 16 | **A. No.** |
| 10:15 | 17 | Q. -- in your possession? |
| 10:15 | 18 | **A. I have them.** |
| 10:15 | 19 | Q. And you have the ability to produce those to |
| 10:15 | 20 | your lawyer, who can then provide them to me? |
| 10:15 | 21 | **A. Sure.** |
| 10:15 | 22 | MR. VOLNEY: Assuming that they're |
| 10:15 | 23 | responsive to your discovery requests. |
| 10:15 | 24 | THE WITNESS: Exactly. |
| 10:15 | 25 | Q. (BY MS. NOWAK) So in your discovery responses |

**19**

| 10:15 | 1 | when you advised that you had no responsive documents or |
| 10:15 | 2 | had produced all responsive documents, that was |
| 10:15 | 3 | incorrect? |
| 10:15 | 4 | **A. I don't believe so.** |
| 10:15 | 5 | Q. Okay. But you didn't bother to go look at -- |
| 10:15 | 6 | **A. Right.** |
| 10:15 | 7 | Q. -- your text messages. |
| 10:15 | 8 | Are there any other places you just didn't |
| 10:15 | 9 | bother to go look? |
| 10:15 | 10 | **A. No.** |
| 10:15 | 11 | Q. Did you go through all of your work e-mails to |
| 10:15 | 12 | see if there was anything responsive or relevant? |
| 10:15 | 13 | **A. I didn't have a work e-mail.** |
| 10:15 | 14 | Q. Okay. You did not have a work e-mail address |
| 10:15 | 15 | with Consilium? |
| 10:15 | 16 | **A. I did. There was nothing responsive.** |
| 10:15 | 17 | MR. VOLNEY: Hold on. |
| 10:15 | 18 | When did you leave Consilium? |
| 10:15 | 19 | THE WITNESS: I left Consilium |
| 10:15 | 20 | September 21st maybe. |
| 10:16 | 21 | MR. VOLNEY: 2013? |
| 10:16 | 22 | THE WITNESS: 2013. |
| 10:16 | 23 | MS. NOWAK: Is there a reason you're -- |
| 10:16 | 24 | **A. So --** |
| 10:16 | 25 | MS. NOWAK: -- asking for that |

**20**

| 1 | clarification? |
| 2 | **A. -- the point is I didn't have a work e-mail at** |
| 3 | **Consilium.** |
| 4 | Q. (BY MS. NOWAK) You're telling me, as we sit |
| 5 | here today, that you never had a work e-mail with |
| 6 | Consilium? |
| 7 | **A. On -- on -- in December of 2013, I did not.** |
| 8 | MR. VOLNEY: That's the point. |
| 9 | Q. (BY MS. NOWAK) But these requests were served |
| 10 | in advance of December 2013. So why did you not look |
| 11 | through your work e-mail? |
| 12 | **A. Because I didn't have anything responsive to** |
| 13 | **the case in my work e-mail.** |
| 14 | Q. And why didn't you look through your personal |
| 15 | e-mail? |
| 16 | **A. I had nothing on there.** |
| 17 | Q. But you didn't look, did you? |
| 18 | **A. No.** |
| 19 | Q. When you resigned -- |
| 20 | MR. VOLNEY: As the discovery requests |
| 21 | made clear, I looked at his personal e-mail account that |
| 22 | was captured by the forensic expert and produced the |
| 23 | materials that I found in there that were responsive to |
| 24 | your discovery requests. |
| 25 | MS. NOWAK: I don't believe that the |

**21**

| 1 | requests do make that clear. But if you are amending |
| 2 | your responses via this record -- is that what you're |
| 3 | doing, John? |
| 4 | MR. VOLNEY: I'm -- I'm clarifying. |
| 5 | MS. NOWAK: Okay. |
| 6 | MR. VOLNEY: I think that is clear, |
| 7 | but... |
| 8 | Q. (BY MS. NOWAK) Mr. Gresham, when you left |
| 9 | MHA, when you resigned, you sent an e-mail to Mr. -- |
| 10 | **A. Yes.** |
| 11 | Q. -- Beidle; is that correct? |
| 12 | **A. Yes.** |
| 13 | Q. What account did you send that e-mail from, do |
| 14 | you recall? Did you send it from your work e-mail, did |
| 15 | you send it from your personal e-mail? |
| 16 | **A. I sent that from my home e-mail probably.** |
| 17 | Q. When you resigned from Consilium, did you send |
| 18 | an e-mail to anyone? |
| 19 | **A. I sent an e-mail to John. I don't remember** |
| 20 | **his last name. That's horrible. John Volney -- no, not** |
| 21 | **John Volney. I -- I don't remember the name. My boss,** |
| 22 | **John. I mean, this stuff is so far from me, that I'm in** |
| 23 | **a different life now.** |
| 24 | Q. But it's your testimony you did send an |
| 25 | e-mail -- |

6 (Pages 18 to 21)

**APP. 0120**

Larry Scott Gresham

**22**

10:18 1     A.  I did.
10:18 2     Q.  -- to your boss, John Moberly?
10:18 3         And do you --
10:18 4     A.  John Moberly.
10:18 5     Q.  -- recall what account you sent that e-mail
10:18 6  from?
10:18 7     A.  Probably the same account.
10:18 8     Q.  And when you say probably the same account, to
10:18 9  what account are you referring?
10:18 10    A.  Scott.gresham@verizon.net.  But I'm not sure
10:18 11 of that.
10:18 12    Q.  But you do recall sending an e-mail?
10:18 13    A.  I did send an e-mail.
10:18 14    Q.  Okay.  Mr. Gresham, can you turn with me to
10:18 15 Page 5 of your discovery responses.
10:18 16    A.  (Witness complies.)
10:18 17    Q.  And if you look down to request for production
10:18 18 No. 16, the request asks for all documents reflecting
10:18 19 communications by and between you and any other
10:18 20 employee, agent, and/or representative of Consilium
10:18 21 regarding your resignation from Consilium.
10:18 22        And you just testified that you did, in fact,
10:18 23 send an e-mail to your supervisor, Mr. John Moberly, in
10:18 24 connection with your resignation.  So is this response
10:18 25 incorrect?

**23**

10:18 1     A.  Yes, this response is incorrect.
10:18 2     Q.  So are you just being cute in your responses
10:18 3  when you're saying the defendant doesn't have any
10:18 4  documents responsive to this request?
10:18 5     A.  No.
10:18 6     Q.  Then why did you respond that you didn't have
10:18 7  any documents when, in fact, you do?
10:18 8     A.  I don't know.  Because I didn't think about
10:18 9  it.
10:19 10    Q.  Did you ever complete an application for
10:19 11 employment at Consilium?
10:19 12    A.  Yes.
10:19 13    Q.  Okay.  I haven't ever received a copy of that
10:19 14 application either.
10:19 15        Can you tell me why it is that you failed to
10:19 16 produce a copy of your completed employment application?
10:19 17    A.  I don't think it has any bearing on this case.
10:19 18 But no.
10:19 19    Q.  So you have no reason --
10:19 20    A.  I don't have a copy of it.  It's not my
10:19 21 property.  It's Consilium's property.
10:19 22    Q.  So your testimony is that you have no copy,
10:19 23 and that's why you didn't produce it?
10:19 24    A.  (Witness nods head.)
10:19 25    Q.  Did you ask Consilium for a copy?

**24**

1     A.  No.  It's not my property.
2     Q.  Mr. Gresham, did you ask Consilium for a copy?
3     A.  I answered the question.
4         No.
5     Q.  In some of the e-mail correspondence that you
6  had with Ms. Stephens, there was some other documents
7  that she provided you that were attached or that were
8  referenced in the e-mails that were also not provided to
9  me.
10        Is there a reason that you elected not to
11 provide those documents to me?
12    A.  They are not my property.
13    Q.  But you did not ask for Consilium to provide
14 you copies of those --
15    A.  No.
16    Q.  -- documents?
17        And you didn't maintain copies of them
18 yourself?
19    A.  No.
20    Q.  When this litigation was initiated and you
21 learned that you were a defendant, did your lawyer
22 instruct you not to destroy any documents related to
23 this case?
24    A.  Yes.
25    Q.  Did your lawyer tell you that you had an

**25**

1  obligation to maintain all the documents you had related
2  to this case?
3     A.  Yes.
4     Q.  And did your lawyer tell you you had an
5  obligation to go gather all of the responsive
6  documents?
7     A.  Yes.
8     Q.  Not just the places you felt like looking?
9     A.  Wait.
10        No --
11    Q.  Your lawyer --
12    A.  -- not that I recall.
13    Q.  Your lawyer did not tell you you had an
14 obligation to gather documents?
15    A.  Not that I recall.
16    Q.  When exactly did your attorney/client
17 relationship with Lynn Tillotson and Mr. Volney begin?
18    A.  With Mr. Volney, I believe it was maybe eight
19 months ago.  With Lynn Tillotson, it was January of
20 2013.
21    Q.  When you went to work for Consilium, were you
22 anticipating being named as a defendant in a lawsuit?
23    A.  No.
24    Q.  Did anyone tell you it was a possibility?
25    A.  No.

**7  (Pages 22 to 25)**

Larry Scott Gresham

**26**

| | |
|---|---|
| 10:29 | 1 |
| 10:29 | 2 |
| 10:29 | 3 |
| 10:29 | 4 |
| 10:29 | 5 |

10:29  1    Q.  Did anyone tell you that it might happen?
10:29  2    **A.  No.  Those mean the same thing, but...**
10:29  3    Q.  Did anyone tell you that Consilium was already
10:29  4    involved in lawsuits with some of the AMN Healthcare
10:29  5    family of companies?
10:29  6    **A.  With Staff Care, yes.**
10:29  7    Q.  And who informed you of that?
10:29  8    **A.  I don't recall.**
10:29  9    Q.  Do you recall --
10:29  10   **A.  I mean, it was common knowledge.**
10:20  11   Q.  Do you recall when it became common knowledge
10:20  12   to you?
10:20  13   **A.  I don't -- I don't remember.**
10:20  14   Q.  Would it have been before or after you began
10:20  15   working for Consilium?
10:20  16   **A.  After.**
10:20  17   Q.  What are the terms of your engagement
10:20  18   agreement with Lynn Tillotson?
10:20  19   **A.  I'm not -- I don't -- I don't retain them.**
10:20  20   Q.  Okay.
10:20  21   **A.  Consilium has them retained.**
10:20  22   Q.  Do you have a letter or any type of fee
10:20  23   agreement whatsoever with Lynn Tillotson?
10:20  24   **A.  I do not.**
10:20  25   Q.  Have you signed any documents for Lynn

**27**

10:20  1    Tillotson?
10:20  2    **A.  I have not.**
10:20  3    Q.  So you aren't paying any of the fees related
10:20  4    to this litigation out of your own pocket?
10:20  5    **A.  No, not at this time.**
10:20  6    Q.  Do you have any agreements with Consilium to
10:20  7    reimburse them for any fees that are paid on your
10:20  8    behalf?
10:20  9    **A.  I do not.**
10:20  10   Q.  So you've never paid a cent in legal fees?
10:20  11   **A.  For this, no.**
10:20  12   Q.  Okay.  And you have no obligation to repay any
10:20  13   legal fees in connection with this lawsuit?
10:23  14   **A.  No.**
10:23  15   Q.  Who informed you that Consilium would be
10:23  16   paying your fees?
10:23  17   **A.  It's never really even been talked about.  I**
10:23  18   **mean, honestly, I just -- when we were sued, I came up**
10:23  19   **here, talked to everybody with Joe.  And that's about**
10:23  20   **it.**
10:23  21   Q.  So no one's ever specifically told you,
10:23  22   Mr. Gresham, you won't have to pay your legal fees,
10:23  23   they'll be taken care of?
10:23  24   **A.  No.**
10:23  25   Q.  Have you ever seen any of the bills?

**28**

10:29  1    **A.  No.**
10:29  2    Q.  So are you aware of the costs or fees paid to
10:29  3    Lynn Tillotson to date in connection with this
10:29  4    litigation?
10:29  5    **A.  Not at all.**
10:29  6    Q.  Are you aware of any agreements in this case
10:29  7    that exist between your lawyers and Consilium, any --
10:29  8    **A.  I am --**
10:29  9    Q.  -- joint defense agreements?
10:29  10   **A.  I am not.**
10:29  11   Q.  Are there any agreements in this case between
10:29  12   you and Consilium relating to your testimony?
10:29  13   **A.  No.**
10:29  14   Q.  Did they tell you there are certain things
10:29  15   that you should say?
10:29  16   **A.  No.**
10:29  17   Q.  Certain things you shouldn't say?
10:29  18   **A.  No.**
10:29  19   Q.  Mr. Gresham, how old are you?
10:29  20   **A.  37.**
10:29  21   Q.  Are you married?
10:29  22   **A.  I am.**
10:29  23   Q.  Have any kids?
10:29  24   **A.  Two.**
10:29  25   Q.  Can you tell me where you went to high school.

**29**

10:20  1    **A.  Nacogdoches High School and San Marcos Baptist**
10:20  2    **Academy.**
10:20  3    Q.  Why the switch?
10:20  4    **A.  Military school.**
10:20  5    Q.  Why did you go to military school?
10:20  6    **A.  Because I thought I wanted to be in the**
10:20  7    **military.**
10:20  8    Q.  Did you end up going into the military?
10:20  9    **A.  I did not.**
10:20  10   Q.  Are you from Nacogdoches?
10:20  11   **A.  I am.**
10:20  12   Q.  I kind of want to walk from here just a little
10:20  13   bit through the rest of your educational background.
10:20  14           So can you tell me after you graduated from
10:20  15   high school -- or did you actually graduate from high
10:20  16   school?
10:20  17   **A.  I did.**
10:20  18   Q.  And after high school, did you go on to
10:20  19   college?
10:20  20   **A.  I did.**
10:20  21   Q.  And where did you go college?
10:20  22   **A.  Stephen F. -- I went to a lot of colleges.**
10:23  23   **Stephen F. Austin State University --**
10:23  24           MR. VOLNEY:  Be still.
10:23  25           THE WITNESS:  Oh, I'm sorry.

8 (Pages 26 to 29)

**APP. 0122**

Larry Scott Gresham

---

**30**

| | |
|---|---|
| 10:23 | 1 |
| 10:23 | 2 |

10:23 1    MR. VOLNEY: You're rocking.
10:23 2    **A. Stephen F. Austin State University in**
10:23 3    **Nacogdoches -- let's see -- University of Texas,**
10:23 4    **McAllen. It was McAllen. And then most recently,**
10:23 5    **University of Phoenix just to finish my degree.**
10:23 6    Q. (BY MS. NOWAK) Okay. So did you receive a
10:23 7    degree from SFA?
10:23 8    **A. No, I did not.**
10:23 9    Q. What about the University of Texas in McAllen?
10:23 10   **A. No.**
10:23 11   Q. What about the University of Phoenix?
10:23 12   **A. No.**
10:23 13   Q. So do you have a college degree?
10:23 14   **A. I do not.**
10:23 15   Q. Are there any other colleges that you
10:23 16   attended?
10:23 17   **A. University of Texas at Tyler. I attended a**
10:23 18   **lot of colleges. That may be it, but I can't...**
10:23 19   Q. Okay. And no degree from the University of
10:23 20   Texas at --
10:24 21   **A. No.**
10:24 22   Q. -- Tyler either?
10:24 23       Okay. Do you have any other types of degrees,
10:24 24   perhaps not a college degree, but --
10:24 25   **A. No.**

---

**31**

10:24 1    Q. -- any licenses or professional associations?
10:24 2    **A. No, not that I can think of right now.**
10:24 3    Q. Do you maintain any websites?
10:24 4    **A. No.**
10:24 5    Q. What about social media pages? Do you have a
10:25 6    LinkedIn profile?
10:25 7    **A. I -- I have one. I could not tell you what**
10:25 8    **the user name and password is because I haven't used it**
10:25 9    **in probably a year and a half.**
10:25 10   Q. What about Facebook?
10:26 11   **A. My company has a Facebook page.**
10:26 12   Q. Do you have a personal Facebook page?
10:26 13   **A. I do. I don't use it.**
10:26 14   Q. And when you say you don't use it, do you mean
10:26 15   you don't ever post on it or --
10:26 16   **A. I don't ever log on to it.**
10:26 17   Q. Do you have any others, Twitter accounts?
10:26 18   **A. Maybe. I don't know.**
10:26 19   Q. Do you have any hobbies, anything you do in
10:25 20   your spare time?
10:25 21   **A. Take care of my kids.**
10:25 22   Q. Do anything like play video games?
10:25 23   **A. No.**
10:25 24   Q. Okay. Do you consider yourself to be computer
10:25 25   savvy?

---

**32**

10:25 1    **A. Decently.**
10:25 2    Q. Okay. What do you mean by decently?
10:25 3    **A. I can -- I can okay with hardware, not**
10:25 4    **software.**
10:25 5    Q. Okay. What do you mean, do okay with
10:25 6    hardware?
10:25 7    **A. Put a computer together.**
10:25 8    Q. Okay. Are you familiar with World of
10:25 9    Warcraft?
10:25 10   **A. Uh-huh.**
10:25 11   Q. So I've been told that you're pretty good at
10:25 12   World of Warcraft.
10:25 13   **A. I was. I don't play video games anymore. But**
10:25 14   **yeah, I played a lot before.**
10:25 15   Q. But you were able with World of Warcraft to
10:25 16   kind of rig up a system where it could keep playing for
10:25 17   you while you were still at work?
10:25 18   **A. Yes.**
10:25 19   Q. So you are pretty proficient with --
10:25 20   **A. No.**
10:25 21   Q. -- programming --
10:25 22   **A. No, no --**
10:25 23   Q. -- World of Warcraft?
10:25 24   **A. -- not really.**
10:25 25       THE REPORTER: Okay. I'm sorry. If

---

**33**

10:24 1    you'll wait 'til she gets her whole question --
10:24 2        THE WITNESS: Sure.
10:24 3        THE REPORTER: -- out. I can only take
10:24 4    one of you at a time.
10:24 5        THE WITNESS: I'm sorry.
10:24 6        THE REPORTER: That's okay. Thank you.
10:24 7    **A. No. That's a program you buy and it does it**
10:24 8    **for you.**
10:24 9    Q. (BY MS. NOWAK) So you didn't have to do
10:24 10   anything to it special to have it continue playing when
10:24 11   you weren't actually there?
10:24 12   **A. Not really, nothing more than anything you'd**
10:24 13   **see online. When you buy the program, it tells you how**
10:24 14   **to do it.**
10:24 15   Q. Mr. Gresham, do you know what a USB drive is
10:24 16   or a USB device?
10:24 17   **A. Sure.**
10:24 18   Q. Do you know how to use one?
10:24 19   **A. Absolutely.**
10:24 20   Q. How many USBs do you think that you own?
10:24 21   **A. I don't even -- I may own one or two now. I**
10:24 22   **don't know if I own that many. I mean, the Cloud is way**
10:24 23   **better than USB.**
10:24 24   Q. And do you recall how many you gave to your
10:24 25   lawyer in connection with this lawsuit for him to

---

9 (Pages 30 to 33)

Larry Scott Gresham

**34**

10:26  1  review?
10:26  2  **A. I do not.**
10:26  3  Q. But you do understand that a number of MHA
10:26  4  documents were found on the USB hard drives that you
10:26  5  provided to your lawyer?
10:26  6  **A. No, I do not.**
10:26  7  Q. You don't understand that there were MHA
10:26  8  documents --
10:26  9  **A. On --**
10:26  10  Q. -- that you've produced in this case that were
10:26  11  found on your personal hard drive and USB devices?
10:26  12  **A. On my hard drive, not USB devices.**
10:26  13  Q. Did you ever connect a USB device to your MHA
10:29  14  computer?
10:29  15  **A. I did not.**
10:29  16  Q. Did you have VPN access when you were at MHA
10:29  17  virtual access --
10:29  18  **A. Yeah, VPN.**
10:29  19  Q. -- where you could log in remotely?
10:29  20  **A. I think Tom gave it to me. I never used it.**
10:29  21  Q. So you never logged in remotely while you were
10:29  22  at home to the office computers?
10:29  23  **A. No.**
10:29  24  Q. Okay. We've walked through your employment
10:29  25  background. Let's kind of do the same thing with your

**35**

10:29  1  work experience.
10:29  2  So you've told me that you graduated from
10:29  3  Nacogdoches High School. Now, what year was that?
10:29  4  **A. 1994.**
10:29  5  Q. And San Marcos Baptist Academy?
10:29  6  **A. Well, I went there my sophomore and junior**
10:29  7  **year.**
10:29  8  Q. So collectively you went -- you graduated in
10:29  9  1994?
10:29  10  **A. Yeah.**
10:30  11  Q. And then you went immediately to SFA?
10:30  12  **A. Six months later or something, yeah.**
10:30  13  Q. So roughly --
10:30  14  **A. Roughly --**
10:30  15  Q. -- 1995?
10:30  16  **A. Yeah. Let's say that, yeah.**
10:30  17  Q. Okay. And the University of Texas in McAllen?
10:28  18  **A. That was -- let me think. That might have**
10:28  19  **been, like, 2000, 2001.**
10:28  20  Q. Okay.
10:28  21  **A. I think the University of Tyler was before**
10:28  22  **that, maybe 1999 and 2000.**
10:28  23  Q. And then University of Phoenix?
10:28  24  **A. Just -- that's been ongoing. I mean, I went**
10:28  25  **there as recently as 2011 or '12.**

**36**

1  Q. Okay. All right. Well, then why don't we
2  walk through all of the -- the different jobs you've
3  had. And we'll cover the ones that kind of came in
4  between or at the same time as your college experience,
5  as well.
6  Were you working while you were attending SFA?
7  **A. Yes.**
8  Q. Okay. And where were you working?
9  **A. My dad owns a tombstone company, Clyde Partin**
10  **Monument Company.**
11  Q. And how long did you work for your father's
12  company?
13  **A. Let's see. I worked there 15 to 23. So**
14  **what's that? Eight years.**
15  Q. And so what year would that have ended in?
16  **A. That would have ended in -- but it was --**
17  **let's see. 15. It was like '93 to -- I would say '93**
18  **to '99.**
19  Q. And did you have any other employment during
20  the time that you were working for your dad's tombstone
21  company or was that your primary employment?
22  **A. That was my primary. I worked at other -- I**
23  **worked at, like, Arby's when I was in high school and**
24  **stuff like that. But that was my primary employment.**
25  Q. And from 1999 when you left your father's

**37**

1  company, where did you work next?
2  **A. Let's see. I was a welder. I cannot recall**
3  **the names of the companies. I don't know if you know**
4  **welding, but you almost are a contractor.**
5  Q. So what years would that have been?
6  **A. '99 to 2000. Not long.**
7  Q. Okay. And then in 2000, what was your next
8  employment?
9  **A. Bartender.**
10  Q. And how long were you a bartender?
11  **A. About a year. So 2000-2001. Let's see.**
12  **20-- maybe 2002. So maybe two years. Then right at**
13  **about that time, I moved to Harlingen, Texas when I went**
14  **to the school UT McAllen, and I was a director of**
15  **development for a children's home.**
16  Q. And do you recall the name of that children's
17  home?
18  **A. Sunny Glen Children's Home.**
19  Q. And how long did you hold that job?
20  **A. Three or four years. I think four years.**
21  **What year are we up to now?**
22  Q. Well, you said that you were at the University
23  of Texas in McAllen from 2000 to 2001.
24  **A. Uh-huh.**
25  Q. So did you continue on at the Sunny Glen

**10 (Pages 34 to 37)**

**APP. 0124**

Larry Scott Gresham

**38**

10:30 1   Children's Home after leaving the university?
10:30 2       **A.  I did.  I did.**
10:30 3       Q.  Okay.  So roughly 2001 or 2002 to --
10:30 4       **A.  It was 2006, 2007, maybe a little longer than**
10:30 5   **I told you.**
10:30 6       Q.  Okay.  And then following the Sunny Glen
10:33 7   Children's Home, where did you go next?
10:33 8       **A.  We had our first child, so we moved back to**
10:33 9   **Dallas.  I very briefly worked for an insurance**
10:33 10  **company, I mean, a month.  Then I worked for a**
10:33 11  **janitorial company selling -- janitorial sales for about**
10:33 12  **a year.  So now we're up to 2008.  And that's when I**
10:33 13  **went to work for Merritt Hawkins the first time.  I**
10:33 14  **worked there for a year to -- let's see -- April 2009.**
10:33 15  **April 2009, I went to Arthur Marshall, worked there**
10:33 16  **until the end of April 2010.  I started back at**
10:33 17  **Merritt Hawkins on May 17th, 2010, quit on this date --**
10:33 18  **I don't know.  I don't recall.  It's in there --**
10:33 19  **September something, 2012 --**
10:32 20      Q.  And then from there --
10:32 21      **A.  -- 24th, 2012.**
10:32 22          **And then from there, I went to Consilium**
10:32 23  **October 15th, 2012.**
10:32 24      Q.  Okay.  So let's talk about the companies that
10:32 25  you worked at prior to going to work for MHA.

**39**

10:32 1           Before going to work for MHA, you had no prior
10:32 2   experience in the medical staffing industry?
10:32 3       **A.  Okay.  Yes.**
10:32 4       Q.  Is that correct?
10:32 5       **A.  Somewhat.  When I worked for Knight**
10:32 6   **Janitorial, I had -- I actually had quite a bit of**
10:32 7   **dealings with medical staffing.**
10:32 8       Q.  Okay.  Can you explain to me what your
10:32 9   dealings with medical staffing --
10:32 10      **A.  Sure.  It was for a different level.  I**
10:32 11  **would -- I would go into hospitals or clinics and talk**
10:32 12  **to them about, hey, we need to clean -- janitorial**
10:32 13  **sales, you know.  But I got a lot of knowledge about the**
10:32 14  **medical industry through that, walking through ORs.**
10:32 15      Q.  But it's not your testimony here today that
10:32 16  while you were working for the janitorial company, that
10:32 17  you were placing doctors or actually doing any type of
10:33 18  medical recruiting?
10:33 19      **A.  No, absolutely not.**
10:33 20      Q.  So your first experience with that type of
10:35 21  work would have been when you went to work for MHA?
10:35 22      **A.  Yes.**
10:35 23      Q.  So it's fair to say that what you learned
10:35 24  about medical recruiting came from your employment at
10:35 25  MHA or began at your employment with MHA?

**40**

1       **A.  What I learned about permanent medical**
2   **recruiting.**
3       Q.  So you've already admitted that MHA did train
4   you when you came to work for them?
5       **A.  Of course.**
6       Q.  Can you tell me a little bit about the
7   training you did receive.
8       **A.  My training was rather brief because there's**
9   **an RIT training program, recruiter in training, I**
10  **believe.  And you -- at that time when I started there,**
11  **you -- you went -- we went through the training program**
12  **as long as it took for you to place a doctor.**
13          THE REPORTER:  I'm sorry.  You're going
14  to have to slow down for me just a little bit.
15          THE WITNESS:  Oh, sure.
16          THE REPORTER:  You went through the
17  training program what?
18          THE WITNESS:  You went through the
19  training program as long as it took for you to place
20  your first doctor.
21      **A.  When you placed your first doctor, you were**
22  **out of the program.  That was typically a three- to**
23  **four-month program.  I completed it in a month and a**
24  **half.  So my training was rather brief in comparison to**
25  **others.**

**41**

1       Q.  (BY MS. NOWAK)  Okay.  And can you tell me the
2   types of training that MHA did provide you with?
3       **A.  Mostly phone script training, tape recorder**
4   **training.**
5       Q.  Any other?
6       **A.  Of course when we first started training,**
7   **medical terms, training on medical terms, the**
8   **differences between a nonprofit and a profit hospital.**
9   **I mean, all this stuff is -- it's been a while.**
10      Q.  Are you familiar with the term onboarding?
11      **A.  Sure.**
12      Q.  What does that mean?
13      **A.  Onboarding is basically our RIT program.**
14  **Merritt Hawkins' RIT program was onboarding.**
15      Q.  And who ran that program?
16      **A.  Make Fay.**
17      Q.  And did --
18          THE REPORTER:  I'm sorry?
19          THE WITNESS:  Mike Fay, F-a-y.
20      Q.  (BY MS. NOWAK)  During the period that you
21  were in training, did you work closely with Mr. Fay
22  then?
23      **A.  I did.**
24      Q.  So just to make sure I understand, after you
25  trained and onboarded with MHA, you worked for them for

**11   (Pages 38 to 41)**

Larry Scott Gresham

---

**42**

| | |
|---|---|
| 10:35 | 1 |
| 10:35 | 2 |
| 10:35 | 3 |
| 10:35 | 4 |
| 10:35 | 5 |
| 10:35 | 6 |

some period of time, and then you left and went to work for Arthur Marshall?

   A.  I did.

   Q.  And what does Arthur Marshall do?  What are the services that that company provides?

   A.  Permanent physician placement, exactly the same thing that Merritt Hawkins provides.

   Q.  So they're a direct competitor in the market?

   A.  They are.

   Q.  Who are other competitors of MHA and the AMN Healthcare family?

   A.  Delta.  It's been so -- it's been so long. Cejka, Timeline.

         THE REPORTER:  Could you move your hand for me.

         THE WITNESS:  Sure.

   A.  Timeline.  There's another big one here in town that I can't even recall any more.  And there's many more than that.

   Q.  (BY MS. NOWAK)  So you would agree that the medical staffing or recruiting industry is fairly competitive?

   A.  I would.

   Q.  After you left Arthur Marshall, you came back to MHA; is that correct?

---

**43**

   A.  It is correct.

   Q.  And then from MHA, you went to Consilium. Now, what is it that Consilium did?

   A.  Temporary physician placement.

   Q.  And you would also characterize Consilium as a competitor of MHA?

   A.  I would not.

   Q.  And why is that?

   A.  Temporary physician staffing and permanent physician placement are two completely different animals.

   Q.  But Consilium does do permanent physician staffing?

   A.  Not to my knowledge.

   Q.  Mr. Gresham, I'm going to show you a copy of what's been previously marked as Exhibit 3.

         Can you please review that document.

   A.  Okay.  Sure.

   Q.  Does it say on here that Consilium does offer permanent placement opportunities?

   A.  It does.  I was -- the answer I gave you was wrong.

         They do -- it could happen.  I never placed anyone permanently.  It is not in Consilium's best interest to place a physician permanently.  So any time

---

**44**

a physician was placed permanently would be through the hospital pushing to have that physician on full time. Consilium does not want to place permanently.  They don't make as much money if they place permanently.

   Q.  But you would agree with me, then, that Consilium is a competitor of MHA?

   A.  I still wouldn't agree with you that they're a competitor.

   Q.  And you're making that distinction because of the difference between permanent versus locums work?

   A.  Absolutely.

   Q.  Despite the fact that Consilium does do perm work?

   A.  Absolutely.

   Q.  So you're acknowledging Consilium does do perm work?

   A.  I'm acknowledging that it could happen.

   Q.  Okay.  You would agree with me that Consilium does recruit doctors?

   A.  Yes.

   Q.  And they recruit many of the same doctors that MHA does?

   A.  No.

   Q.  Why -- what is the basis for that statement?

   A.  A permanent physician, for the most part, does

---

**45**

not want to do temporary work.  A temporary physician does not want to do permanent work.

   Q.  So you used this caveat "for the most part."

         So it is possible, of course, that some of these same doctors will overlap?

   A.  Sure.

   Q.  And you would agree with me that Consilium recruits in a number of different medical specialties, primary care, et cetera?

   A.  Yes.

   Q.  Okay.  And MHA also recruits in a number of different medical specialties?

   A.  Yes.

   Q.  And you would agree with me that Consilium services healthcare organizations?

   A.  Yes.

   Q.  They place doctors with healthcare organizations?

   A.  Yes.

   Q.  And that is the same thing that MHA does?

   A.  No.

   Q.  MHA does not place doctors with any healthcare --

   A.  Oh, yes --

   Q.  -- organizations?

---

12 (Pages 42 to 45)

APP. 0126

Larry Scott Gresham

**46**

| 10:39 | 1 | A. -- absolutely. |
| 10:39 | 2 | Q. Where are Consilium's offices located? |
| 10:39 | 3 | A. I don't even have the address anymore. |
| | 4 | They're right off of 114. |
| 10:39 | 5 | Q. And were they right off of 114 the entire time |
| | 6 | you worked for them? |
| 10:39 | 7 | A. No. They were right -- they were in |
| 10:39 | 8 | Las Colinas when I first started, in the tower with the |
| 10:39 | 9 | mustangs. And then they moved down, MacArthur and 114 |
| 10:39 | 10 | basically -- or George Bush and 114. |
| 10:39 | 11 | Q. So how close are they to MHA now? |
| 10:39 | 12 | A. Oh, they're close to MHA now, yeah. |
| 10:39 | 13 | Q. Within ten miles? |
| 10:39 | 14 | A. Within ten miles. |
| 10:39 | 15 | Q. How close were they when you first started? |
| 10:39 | 16 | A. Within ten miles. |
| 10:39 | 17 | Q. And are they located in Dallas County? |
| 10:39 | 18 | Consilium's -- |
| 10:39 | 19 | A. I think -- |
| 10:39 | 20 | Q. -- offices are -- |
| 10:39 | 21 | A. -- it's in Dallas County. |
| 10:39 | 22 | Q. -- in Dallas County? |
| 10:40 | 23 | THE REPORTER: Wait 'til she gets her |
| 10:40 | 24 | whole question out for me. |
| 10:40 | 25 | THE WITNESS: Okay. |

**47**

| 10:40 | 1 | THE REPORTER: I know it's hard to |
| 10:40 | 2 | remember. I'm not hearing the end of her questions. |
| 10:40 | 3 | THE WITNESS: Okay. |
| 10:40 | 4 | Q. (BY MS. NOWAK) Mr. Gresham, I want to talk a |
| 10:40 | 5 | little bit more about your employment at MHA. |
| 10:40 | 6 | So can you tell me again the first date that |
| 10:40 | 7 | you became employed by MHA. |
| 10:40 | 8 | A. I think it was March 31st, 20- -- March 31st, |
| 10:40 | 9 | 2008. |
| 10:40 | 10 | Q. And what position were you engaged? |
| 10:40 | 11 | A. You started as recruiter in training or search |
| 10:40 | 12 | consultant. |
| 10:40 | 13 | Q. And what was your position with Consilium? |
| 10:40 | 14 | A. I don't remember the name. I was a recruiter. |
| 10:40 | 15 | I don't remember the title. |
| 10:40 | 16 | Q. So you started with MHA March of 2008 as a |
| 10:40 | 17 | recruiter. And then how long did you stay at MHA? |
| 10:40 | 18 | A. Until -- the first time? Is that what |
| 10:43 | 19 | you're -- |
| 10:43 | 20 | Q. Yes. |
| 10:43 | 21 | A. April of 2009. |
| 10:43 | 22 | Q. What prompted you to join MHA? How did you |
| 10:43 | 23 | become employed by them? |
| 10:43 | 24 | A. I just went to a job fair. |
| 10:43 | 25 | Q. And who at MHA actually hired you? |

**48**

| 1 | A. Robert Colmery. |
| 2 | Q. And do you recall where MHA's offices are |
| 3 | located? |
| 4 | A. On Statesman Drive. |
| 5 | Q. And you were at that address the entire length |
| 6 | of your employment with MHA, both -- |
| 7 | A. I was. |
| 8 | Q. -- the first and the second time? |
| 9 | A. I was. |
| 10 | Q. What does a recruiter or a search consultant |
| 11 | do? |
| 12 | A. Actually the main thing a recruiter -- I'm |
| 13 | going to -- I'll take you back from the beginning of |
| 14 | what happens. |
| 15 | A marketer brings in an account. That |
| 16 | search -- a search consultant then gets that account, |
| 17 | flies out to wherever the client is, explains to the |
| 18 | client, you know -- or actually learns from the client |
| 19 | and finds out what they need, and then explains to the |
| 20 | client how MHA can help them, sells them a huge |
| 21 | marketing piece, comes back home. Researchers, which is |
| 22 | another department, calls tons of doctors. My main |
| 23 | dealing as a search consultant was really with the |
| 24 | client. You know, I would talk to doctors that |
| 25 | researchers gave me, but my main dealing is with the |

**49**

| 1 | client. |
| 2 | Q. So on a, you know, day in the life of, what |
| 3 | did your day look like as a search consultant or a |
| 4 | recruiter? |
| 5 | A. Talking on the phone. |
| 6 | Q. Talking on the phone with who? |
| 7 | A. Clients and physicians. |
| 8 | Q. So you talked with both sides? |
| 9 | A. Both sides. |
| 10 | Q. Did you report to anyone while you were at |
| 11 | MHA? |
| 12 | A. Robert Colmery the first time. The second |
| 13 | time, Tim Beidle. |
| 14 | Q. And just so I have them clear, let's go ahead |
| 15 | and outline. |
| 16 | You left MHA in April of 2009. And when did |
| 17 | you come back? |
| 18 | A. May 17th, 2010. |
| 19 | Q. And you remained at MHA until September of |
| 20 | 2012? |
| 21 | A. Yeah. September 24th, I believe. |
| 22 | Q. And what was your position when you became |
| 23 | employed by MHA the second time? |
| 24 | A. Search consultant. And right after that, |
| 25 | senior search consultant. |

**13 (Pages 46 to 49)**

Larry Scott Gresham

50

| | |
|---|---|
| 10:48 | 1 | Q. What's the difference between a search |
| 10:48 | 2 | consultant and a senior search consultant? |
| 10:48 | 3 | A. Nothing. More money. |
| 10:48 | 4 | Q. Who promoted you? |
| 10:48 | 5 | A. Actually it was Tom -- or Tim Beidle. You can |
| 10:48 | 6 | say Tim Beidle. |
| 10:48 | 7 | Q. What was your opinion of Tim Beidle? |
| 10:48 | 8 | A. Tim's okay. |
| 10:48 | 9 | Q. What does that mean? |
| 10:48 | 10 | A. He's okay. |
| 10:48 | 11 | Q. Nobody you'd want to slap around? |
| 10:48 | 12 | A. Somebody Billy would want to slap around |
| 10:48 | 13 | maybe. |
| 10:48 | 14 | Q. Were you part of a specific team when you were |
| 10:48 | 15 | at MHA? |
| 10:48 | 16 | A. I was. Heartland. |
| 10:48 | 17 | Q. And what does that mean? |
| 10:48 | 18 | A. It means I worked in the middle of the United |
| 10:46 | 19 | States; Illinois, Kansas, Arkansas, Missouri, Colorado. |
| 10:46 | 20 | I don't think -- I think that's it. |
| 10:46 | 21 | Q. Did you work with a specific specialty or did |
| 10:46 | 22 | you place in all specialties? |
| 10:46 | 23 | A. Theoretically, we weren't supposed to work |
| 10:46 | 24 | with -- yeah, specific specialty, primary care mostly. |
| 10:46 | 25 | We worked with the specialties that were not |

51

| | |
|---|---|
| 10:46 | 1 | hospital-based. So I could work with cardiology, |
| 10:46 | 2 | whatever. |
| 10:47 | 3 | Q. So you placed primarily in the Heartland or |
| 10:47 | 4 | worked with clients that were located in the Heartland, |
| 10:47 | 5 | but you were placing in no specific specialty, just |
| 10:47 | 6 | whatever the needs of the clients in the Heartland were? |
| 10:47 | 7 | A. I could not place hospital-based physicians. |
| 10:47 | 8 | Q. And why is that? |
| 10:47 | 9 | A. Because there were other teams for that. |
| 10:47 | 10 | Q. Who else was on your team? |
| 10:47 | 11 | A. Oh, don't get me to -- I -- Brian Couturier, |
| 10:47 | 12 | Tim Beidle. I don't remember. I mean, honestly... |
| 10:47 | 13 | Q. Do you recall working with any specific |
| 10:47 | 14 | clients while you were at MHA? |
| 10:47 | 15 | A. Sure. |
| 10:47 | 16 | So -- |
| 10:47 | 17 | A. The one -- the one I remember the most |
| 10:47 | 18 | specifically is Rifle, Colorado. They were my favorite. |
| 10:47 | 19 | Q. During the course of your employment at MHA, |
| 10:47 | 20 | did you work with other employees besides those that |
| 10:47 | 21 | were on your team? |
| 10:47 | 22 | A. Sure. |
| 10:47 | 23 | Q. So you got to know other employees who were at |
| 10:47 | 24 | MHA and perhaps also the remaining AMN Healthcare family |
| 10:47 | 25 | of companies? |

52

| | |
|---|---|
| 10:47 | 1 | MR. VOLNEY: Objection; form. |
| 10:47 | 2 | Q. (BY MS. NOWAK) I'm just trying to ascertain, |
| 10:47 | 3 | did you come to know other folks who worked at MHA and |
| 10:47 | 4 | Staff Care while you were working for MHA? |
| 10:47 | 5 | A. Sure. |
| 10:47 | 6 | Q. Did you -- were you generally able to observe, |
| 10:47 | 7 | you know, their strengths and weaknesses, who were the |
| 10:47 | 8 | good players, who were -- who were the not so good |
| 10:47 | 9 | players? |
| 10:47 | 10 | A. Sure. But I -- I didn't really pay a lot of |
| 10:47 | 11 | attention to it. I mean, this is a job -- this is a job |
| 10:47 | 12 | where it's really you and the -- and your clients. It |
| 10:47 | 13 | doesn't -- what other people do doesn't really matter. |
| 10:47 | 14 | Q. But you were still aware of who the high |
| 10:47 | 15 | performers were and who the low performers were? |
| 10:47 | 16 | A. Sure. |
| 10:47 | 17 | Q. Let's talk about this e-mail that you sent to |
| 10:47 | 18 | Tim Beidle when you resigned. |
| 10:47 | 19 | Did you send an e-mail to resign the first |
| 10:47 | 20 | time around? |
| 10:47 | 21 | A. I believe so. I don't -- yeah. I don't |
| 10:47 | 22 | recall. I think I did. |
| 10:47 | 23 | Q. Mr. Gresham, I'm going to hand you what's been |
| 10:47 | 24 | previously marked as Exhibit 12. |
| 10:47 | 25 | A. Uh-huh. |

53

| | |
|---|---|
| 10:47 | 1 | Q. And this is a copy of the e-mail that you sent |
| 10:47 | 2 | to Tim Beidle. |
| 10:47 | 3 | And again, you went from MHA directly to |
| 10:47 | 4 | Consilium? |
| 10:47 | 5 | A. No. There was -- |
| 10:47 | 6 | Q. You had employment in between? |
| 10:47 | 7 | A. Oh, no, no, no. |
| 10:47 | 8 | Q. Did you advise Consilium at any point in time |
| 10:47 | 9 | that you had an employment agreement with MHA? |
| 10:47 | 10 | A. It was common knowledge. |
| 10:47 | 11 | Q. It was common knowledge that you had an |
| 10:47 | 12 | employment agreement -- |
| 10:47 | 13 | A. Uh-huh. |
| 10:47 | 14 | Q. -- before you went to work there? |
| 10:47 | 15 | A. Uh-huh. |
| 10:47 | 16 | THE REPORTER: Is that yes? |
| 10:47 | 17 | THE WITNESS: Yes. I'm sorry. Yes. |
| 10:47 | 18 | MR. VOLNEY: It makes it -- it makes it a |
| 10:47 | 19 | little easier -- she's looking at your mouth -- if you |
| 10:47 | 20 | keep your hand down. |
| 10:47 | 21 | THE WITNESS: Right. |
| 10:47 | 22 | MR. VOLNEY: It's easier. |
| 10:47 | 23 | THE WITNESS: Okay. |
| 10:47 | 24 | THE REPORTER: Thank you. |
| 10:47 | 25 | Q. (BY MS. NOWAK) Did you ever advise MHA at any |

**14 (Pages 50 to 53)**

Larry Scott Gresham

**54**

| | |
|---|---|
| 10:49 | 1 point in time that you had gone to work for Consilium? |
| 10:49 | 2    A.   No. |
| 10:49 | 3    Q.   Did you ever tell Tim Beidle when you were |
| 10:49 | 4  resigning that you were leaving to go to work for |
| 10:49 | 5  Consilium? |
| 10:49 | 6    A.   No. |
| 10:49 | 7    Q.   Why not? |
| 10:49 | 8    A.   Because I didn't know if I was going to work |
| 10:49 | 9  for Consilium. |
| 10:49 | 10    Q.   Well, let's take a look at this e-mail. |
| 10:49 | 11    A.   Okay. |
| 10:49 | 12    Q.   Can you tell me, what time did you send this |
| 10:50 | 13  e-mail? |
| 10:50 | 14    A.   7:00 a.m. |
| 10:50 | 15    Q.   So did you ever come into the office on |
| 10:50 | 16  Monday, September 24th? |
| 10:50 | 17    A.   I did not.  I went to the doctor. |
| 10:50 | 18    Q.   So you think you sent it from home on your |
| 10:50 | 19  personal e-mail address? |
| 10:50 | 20    A.   Yeah.  Doesn't -- it doesn't say on there |
| 10:50 | 21  where I sent it from?  Yeah.  It's probably |
| 10:50 | 22  scott.gresham@verizon.net. |
| 10:50 | 23    Q.   Now, in this e-mail, you told Mr. Beidle that |
| 10:50 | 24  you were leaving your position.  And if you look at the |
| 10:50 | 25  second paragraph, it says you're leaving your position |

**55**

| | |
|---|---|
| 10:50 | 1  because your heart and mind have not been focused solely |
| 10:50 | 2  on physician recruiting. |
| 10:50 | 3        Is that -- did I read that correctly? |
| 10:50 | 4    A.   Yes. |
| 10:50 | 5    Q.   Did you intend to deceive Mr. Beidle when you |
| 10:50 | 6  told him that you were leaving the medical staffing |
| 10:50 | 7  industry? |
| 10:50 | 8    A.   I never said I was leaving the medical |
| 10:50 | 9  staffing industry. |
| 10:50 | 10    Q.   Did you intend to give that impression? |
| 10:50 | 11    A.   No. |
| 10:50 | 12    Q.   The next line says that you have received an |
| 10:50 | 13  offer that you cannot refuse. |
| 10:58 | 14        Was the offer you're referring to Consilium? |
| 10:58 | 15    A.   No. |
| 10:58 | 16    Q.   What was the offer that you were referring to? |
| 10:58 | 17    A.   There was no offer.  I just didn't want him -- |
| 10:59 | 18  Tim -- if I had gone in, we would have had a huge |
| 10:59 | 19  argument about me leaving.  So I just ended it.  I said, |
| 10:59 | 20  yeah, I've got another offer, I'm gone. |
| 10:59 | 21    Q.   I just want to make sure that we're on the |
| 10:59 | 22  same page. |
| 10:59 | 23        I have here your responses to the request for |
| 10:59 | 24  admission in this case.  And in response to the request |
| 10:59 | 25  for admission, you admitted that you accepted an offer |

**56**

| | |
|---|---|
| 1  of employment from Consilium prior to September 24th, | |
| 2  2013. | |
| 3    A.   No, I didn't.  That's written wrong if it says | |
| 4  that. | |
| 5    Q.   So it's your testimony here today that you | |
| 6  lied in the request for admissions and that you had not | |
| 7  accepted an offer of employment? | |
| 8    A.   What number is that? | |
| 9    Q.   Request for Admission No. 18. | |
| 10    A.   Well, I don't have that, I don't think. | |
| 11        MR. VOLNEY:  Well, okay.  Hold on. | |
| 12        The request for admission is admit that | |
| 13  you accepted an offer of employment from Consilium prior | |
| 14  to September 24th, 2013, which was last year, not | |
| 15  September of 2012.  So -- | |
| 16        MS. NOWAK:  John, you're correct. | |
| 17        MR. VOLNEY:  -- it is -- it is a correct | |
| 18  answer to that request for admission. | |
| 19        MS. NOWAK:  Thank you for that | |
| 20  correction.  I apologize.  I was reading it incorrectly. | |
| 21    Q.   (BY MS. NOWAK)  So it's your testimony here | |
| 22  today that at the time you sent this to Mr. Beidle, you | |
| 23  did not have an offer pending -- | |
| 24    A.   I did not. | |
| 25    Q.   -- from Consilium? | |

**57**

| | |
|---|---|
| 1    A.   I did not. | |
| 2    Q.   You just referenced an offer because you | |
| 3  thought it would be fun? | |
| 4    A.   Not because I thought it would be fun; because | |
| 5  I wanted to end my employment without an argument. | |
| 6    Q.   When did you receive an offer from Consilium? | |
| 7    A.   I don't remember the date.  October 6th, 7th. | |
| 8    Q.   Of what year? | |
| 9    A.   2012. | |
| 10    Q.   And the first time that you received an offer, | |
| 11  did you receive an offer verbally or in writing? | |
| 12    A.   In writing. | |
| 13    Q.   So there was no communication prior to your | |
| 14  offer in writing that Consilium would like for you to | |
| 15  come to work for them? | |
| 16    A.   Through -- you can -- the only thing I think I | |
| 17  have is through text messages.  If you read through | |
| 18  these, you can see that Billy said -- let's see.  It was | |
| 19  much after September 24th, though. | |
| 20    Q.   When you formally accepted your offer? | |
| 21    A.   Oh, absolutely.  It was much after.  I'm | |
| 22  trying to -- I think the only thing I had in writing or | |
| 23  verbally was actually from Billy who had no -- I mean, | |
| 24  he didn't -- he was just a guy that worked there. | |
| 25    Q.   So when did you make the decision that you | |

**15  (Pages 54 to 57)**

**APP. 0129**

Larry Scott Gresham

**58**

| | | |
|---|---|---|
| 10:53 | 1 | were going to quit MHA, though? |
| 10:53 | 2 | **A. Probably that weekend before I quit, probably** |
| 10:53 | 3 | **Saturday. I make very rash decisions.** |
| 10:53 | 4 | Q. But it's your testimony here today that at |
| 10:53 | 5 | least as early as September -- or sorry -- that |
| 10:52 | 6 | Saturday, which would have been September 22nd, you had |
| 10:52 | 7 | already made the decision that you were going to quit |
| 10:52 | 8 | MHA? |
| 10:52 | 9 | **A. And I definitely made it on Sunday when I went** |
| 10:52 | 10 | **and cleaned out my desk.** |
| 10:54 | 11 | Q. So at the time that you went to clean out your |
| 10:54 | 12 | desk, the reason you went to clean out your desk is |
| 10:54 | 13 | because you'd already made the decision that you were |
| 10:54 | 14 | terminating your employment at MHA and you no longer had |
| 10:54 | 15 | any intent to remain employed by them? |
| 10:54 | 16 | **A. Absolutely.** |
| 10:54 | 17 | Q. Did you talk with anyone at MHA about the fact |
| 10:54 | 18 | that you were considering quitting and going to work for |
| 10:54 | 19 | Consilium? |
| 10:54 | 20 | **A. I did. I think I talked to Kevin Dodson.** |
| 10:54 | 21 | Q. And what did you talk to Mr. Dodson about? |
| 10:54 | 22 | **A. I just told him I was leaving.** |
| 10:54 | 23 | Q. And when did you tell him you were leaving? |
| 10:54 | 24 | **A. I don't recall.** |
| 10:54 | 25 | Q. Did you tell him you were leaving before |

**59**

| | | |
|---|---|---|
| 10:54 | 1 | Saturday, September 22nd? |
| 10:54 | 2 | **A. Right. Or thinking of leaving.** |
| 10:54 | 3 | Q. So you advised Mr. Dodson prior to Saturday, |
| 10:54 | 4 | September 22nd that you intended to leave your |
| 10:54 | 5 | employment with MHA? |
| 10:54 | 6 | **A. That I was thinking of it.** |
| 10:54 | 7 | Q. Do you recall what date that was? |
| 10:54 | 8 | **A. I do not.** |
| 10:54 | 9 | Q. Would it have been prior to September 17th |
| 10:54 | 10 | when you were speaking with Mr. Bowden about employment |
| 10:54 | 11 | opportunities at Consilium? |
| 10:54 | 12 | **A. It could have been.** |
| 10:54 | 13 | Q. So it's possible that as early as Monday, |
| 10:54 | 14 | September 17th, that you intended to quit your job at |
| 10:55 | 15 | MHA? |
| 10:55 | 16 | **A. Well, the thought was in my head for a year.** |
| 10:55 | 17 | **So it's possible.** |
| 10:55 | 18 | Q. Did you also talk with Breanna Elliott? |
| 10:55 | 19 | **A. I may have. I don't recall.** |
| 10:04 | 20 | Q. When did you first speak with Ms. Elliott |
| 10:04 | 21 | about your potential employment with Consilium? |
| 10:04 | 22 | **A. I don't recall.** |
| 10:04 | 23 | Q. Would it have been before you resigned? |
| 10:04 | 24 | **A. It would have been before I resigned.** |
| 10:04 | 25 | Q. And it would have been before Sunday, |

**60**

| | | |
|---|---|---|
| | 1 | September 23rd? |
| | 2 | **A. I would have told her that I talked with** |
| | 3 | **Consilium. I talked with Christina Stephens.** |
| | 4 | Q. So you would have told her that you had |
| | 5 | already interviewed? |
| | 6 | **A. I didn't interview with anyone but Christina.** |
| | 7 | **But I interviewed with Christina.** |
| | 8 | Q. And Christina worked for Consilium at -- |
| | 9 | **A. Yes.** |
| | 10 | Q. -- the time? |
| | 11 | So by virtue of that, you would have told |
| | 12 | Ms. Elliott that you had interviewed with Consilium? |
| | 13 | **A. Sure.** |
| | 14 | Q. Did you also tell her that Consilium had |
| | 15 | already made you an offer and you were considering |
| | 16 | taking it? |
| | 17 | **A. I did not.** |
| | 18 | Q. So if Ms. Elliott were to testify that that |
| | 19 | was the substance of your conversation, she -- you're |
| | 20 | saying that that would be incorrect? |
| | 21 | **A. I do not recall making that statement. There** |
| | 22 | **was no offer, so it's moot, anyway. If I said it, if I** |
| | 23 | **didn't say it, it doesn't matter.** |
| | 24 | Q. But you're not denying that you might have |
| | 25 | said it? |

**61**

| | | |
|---|---|---|
| | 1 | **A. I don't know. I don't remember.** |
| | 2 | Q. Other than Mr. Dodson and Ms. Elliott, is |
| | 3 | there anyone else that you spoke to about the fact that |
| | 4 | you were contemplating going to work for Consilium? |
| | 5 | **A. I don't recall.** |
| | 6 | MS. NOWAK: Are you looking at your |
| | 7 | watch, John? |
| | 8 | MR. VOLNEY: Oh, no. I'm just -- you're |
| | 9 | doing great. It just looked like you were getting ready |
| | 10 | to move to a different subject and I was -- |
| | 11 | MS. NOWAK: I am. |
| | 12 | MR. VOLNEY: -- going to suggest five |
| | 13 | minutes. |
| | 14 | MS. NOWAK: So if we'd like to take a |
| | 15 | break, we can for five, ten minutes. |
| | 16 | MR. VOLNEY: Thank you. |
| | 17 | MS. NOWAK: Thank you. |
| | 18 | THE VIDEOGRAPHER: We're off the record |
| | 19 | at 10:55 a.m. |
| | 20 | (Break taken from 10:55 to 11:04 a.m.) |
| | 21 | THE VIDEOGRAPHER: We're on the record at |
| | 22 | 11:04 a.m. This is Tape 2. |
| | 23 | Q. (BY MS. NOWAK) I'm going to hand you what's |
| | 24 | going to be marked as Exhibit 19 once we have some |
| | 25 | stickers. |

**16 (Pages 58 to 61)**

Larry Scott Gresham

---

**62**

11:04 | 1    (Discussion off the written record.)
11:04 | 2    (Exhibit No. 19 marked.)
11:04 | 3    Q.  (BY MS. NOWAK)  Now, Mr. Gresham, you
11:04 | 4 understand that a large portion of this lawsuit centers
11:04 | 5 around your employment agreement with MHA?
11:05 | 6    A.  Yes.
11:05 | 7    Q.  And you do recall that in connection with your
11:05 | 8 employment, that you signed this employment agreement?
11:05 | 9    A.  Yes.
11:05 | 10    Q.  And is Exhibit 19 a true and correct copy of
11:05 | 11 the employment agreement that you signed with MHA on
11:05 | 12 May 17th of 2010?
11:05 | 13    A.  Yes.
11:05 | 14    Q.  And you signed this employment agreement of
11:05 | 15 your own free will?
11:05 | 16    A.  Yes.
11:05 | 17    Q.  No one coerced you into signing it?
11:05 | 18    A.  No.
11:05 | 19    Q.  You weren't under any type of duress?
11:05 | 20    A.  No.
11:05 | 21    Q.  And if we turn to the final page of this
11:05 | 22 document, is that your signature?
11:05 | 23    A.  Yes.
11:05 | 24    Q.  And you have signed contracts before?
11:05 | 25    A.  Yes.

---

**63**

11:05 | 1    Q.  And when you signed this agreement, you agreed
11:05 | 2 to be bound by the terms that are contained --
11:05 | 3    A.  Yes.
11:05 | 4    Q.  -- in this employment agreement?
11:05 | 5    A.  Yes.
11:05 | 6    Q.  And at the time that you signed it, you fully
11:05 | 7 intended to be bound?
11:05 | 8    A.  Yes.
11:05 | 9    Q.  And you understood the effects of signing?
11:05 | 10    A.  Yes.
11:05 | 11    Q.  And you agreed at the time that you were
11:05 | 12 signing, that the restrictions that were contained in
11:05 | 13 this employment agreement were reasonable and necessary
11:05 | 14 to protect MHA?
11:05 | 15    A.  No, I -- I don't agree that they're
11:05 | 16 reasonable.  But that's fine.
11:05 | 17    Q.  At the time that you signed it, you did not
11:05 | 18 agree that they were reasonable?
11:05 | 19    A.  No.  I had already left once.  No.
11:05 | 20    Q.  So did you think this was just some
11:05 | 21 meaningless agreement that you were signing?
11:05 | 22    A.  No, I didn't think it was meaningless.  I
11:05 | 23 think...
11:05 | 24    Q.  But you didn't have any intention of honoring
11:05 | 25 it, then.  Is that what you're telling me?

---

**64**

11:06 | 1    A.  Oh, no.  I was going to honor it.  Yeah.
11:06 | 2    Q.  So you're going --
11:06 | 3    A.  You're asking me if I think this is
11:06 | 4 reasonable.  It's not reasonable.  But I was going to
11:06 | 5 honor it.
11:06 | 6    Q.  You were going to intend to honor --
11:06 | 7    A.  Sure.
11:06 | 8    Q.  -- the restrictions?
11:06 | 9    And you understood that MHA would seek to
11:06 | 10 enforce the provisions that were contained in this
11:06 | 11 agreement should you violate them?
11:06 | 12    A.  Yes.
11:06 | 13    Q.  I want to walk through just a few of the
11:06 | 14 provisions that are contained in this agreement.
11:06 | 15    If you look on the very first page, the
11:06 | 16 paragraph that's next to the bottom, it begins "Whereas,
11:06 | 17 employee agrees."
11:06 | 18    Do you see where I am?
11:06 | 19    A.  Uh-huh, I do.
11:06 | 20    Q.  I'm going to read that paragraph very quickly.
11:06 | 21    Whereas, employee agrees and acknowledges that
11:06 | 22 company would not have agreed to employ or continue to
11:06 | 23 employ employee or disclose and provide access to the
11:06 | 24 company's confidential business, absent the covenants
11:06 | 25 and restrictions set forth in this agreement, especially

---

**65**

1 employee's covenants in Sections 2 and 5.
2    Did I read that correctly?
3    A.  You did.
4    Q.  Okay.  And I'm going to represent to you that
5 the covenant in Section 2 relates to confidentiality.
6 That's the title of Section 2.
7    A.  Okay.
8    Q.  And that the covenant in Section 5 relates to
9 your agreements related to noncompetition.
10    A.  Okay.
11    Q.  Did you understand at the time that you signed
12 this employment agreement that Merritt Hawkins would not
13 have hired you absent your agreement to honor Sections 2
14 and 5 of this agreement?
15    A.  Yes.
16    Q.  All right.  Well, let's start with Section 2,
17 which relates to confidentiality.  And actually, I'll
18 even back up.  We're going to look at that paragraph --
19 that Paragraph 1 -- or Section 1 first.
20    It appears to me that that's a definition of
21 what MHA defines to be confidential business
22 information.  Would you agree with that assessment?
23    A.  I agree.
24    Q.  Okay.  So you would agree that MHA considers
25 its marketing strategies and methods to be confidential

---

**17 (Pages 62 to 65)**

**APP. 0131**

Larry Scott Gresham

66

| 11:08 | 1 | information? |
| 11:08 | 2 | **A. Yes.** |
| 11:08 | 3 | Q. MHA considers things like its offer letters |
| 11:08 | 4 | and its client worksheets to be confidential |
| 11:08 | 5 | information? |
| 11:08 | 6 | **A. Yes.** |
| 11:08 | 7 | Q. MHA considers its client database to be |
| 11:08 | 8 | confidential information? |
| 11:08 | 9 | **A. Of course.** |
| 11:08 | 10 | Q. Do you recall the name of MHA's database, by |
| 11:08 | 11 | chance? |
| 11:08 | 12 | **A. MHACS.** |
| 11:08 | 13 | Q. Was that database password protected? |
| 11:08 | 14 | **A. It was.** |
| 11:08 | 15 | Q. So not just anybody could access it? |
| 11:08 | 16 | **A. No.** |
| 11:08 | 17 | Q. You had to be assigned unique security |
| 11:08 | 18 | credentials? |
| 11:08 | 19 | **A. Yes.** |
| 11:08 | 20 | Q. Did MHA's offices also have security?  You had |
| 11:08 | 21 | to badge in -- |
| 11:08 | 22 | **A. Yes.** |
| 11:08 | 23 | Q. -- to get into the office? |
| 11:08 | 24 | **A. Yes.** |
| 11:08 | 25 | Q. Did you share a computer with anyone at MHA or |

67

| 11:09 | 1 | were you assigned your own computer? |
| 11:09 | 2 | **A. You were assigned your own computer.** |
| 11:09 | 3 | Q. And you would have been the only person using |
| 11:09 | 4 | your computer during the time you were employed at MHA? |
| 11:09 | 5 | **A. Yes.** |
| 11:09 | 6 | Q. All right.  Well, let's -- let's keep going |
| 11:09 | 7 | down this definition. |
| 11:09 | 8 | You would agree with me that MHA considers the |
| 11:09 | 9 | fees that were charged by MHA to be confidential |
| 11:09 | 10 | information? |
| 11:09 | 11 | **A. Sure.** |
| 11:09 | 12 | Q. And its pricing policies? |
| 11:09 | 13 | **A. Sure.** |
| 11:09 | 14 | Q. MHA's profit margins are confidential? |
| 11:09 | 15 | **A. Sure.** |
| 11:09 | 16 | Q. MHA's client lists are -- were deemed |
| 11:09 | 17 | confidential? |
| 11:09 | 18 | **A. Sure.** |
| 11:09 | 19 | Q. MHA's list of healthcare providers, and |
| 11:09 | 20 | included in that were their salaries and benefits and |
| 11:09 | 21 | the other personal information that MHA had garnered? |
| 11:09 | 22 | **A. Yes.** |
| 11:09 | 23 | Q. The contract terms between MHA and its |
| 11:09 | 24 | clients? |
| 11:09 | 25 | **A. Yes.** |

68

| 1 | Q. Revenue reports? |
| 2 | **A. Yes.** |
| 3 | Q. Budgets? |
| 4 | **A. Yes.** |
| 5 | Q. And the other items that are listed here? |
| 6 | **A. Yes.** |
| 7 | Q. And during your employment at MHA, you were |
| 8 | given access to these items, to this type of |
| 9 | information? |
| 10 | **A. Some of that information.** |
| 11 | Q. Okay.  Well, then let's walk through it. |
| 12 | During your employment with MHA, did you have |
| 13 | access to any of MHA's marketing strategies or |
| 14 | materials? |
| 15 | **A. Yes.** |
| 16 | Q. Did you have access to the fees that were |
| 17 | charged by MHA? |
| 18 | **A. Yes.** |
| 19 | Q. Did you have access to the pricing policies of |
| 20 | MHA? |
| 21 | **A. Yes, but -- I did.** |
| 22 | Q. Did you have access to the profit |
| 23 | margins that -- |
| 24 | **A. No.** |
| 25 | Q. -- MHA was making? |

69

| 1 | **A. No.** |
| 2 | Q. What about the exact names and clients of MHA, |
| 3 | was that contained in MHA's database? |
| 4 | **A. Yes.  I -- I wouldn't have known them all.** |
| 5 | **But yes.** |
| 6 | Q. But you had access to them? |
| 7 | **A. Yes.** |
| 8 | Q. And you would have also had access to the |
| 9 | special needs of those clients -- |
| 10 | MR. VOLNEY: Objection; form. |
| 11 | Q. (BY MS. NOWAK) -- that would have been |
| 12 | included in the database, things like the benefits and |
| 13 | the personal information the clients provided to MHA? |
| 14 | **A. If we had access to that, I don't know about** |
| 15 | **it.  I mean, I --** |
| 16 | Q. It wouldn't have been information included in |
| 17 | the database? |
| 18 | **A. The only way I used a database is for a** |
| 19 | **client.  So I'm not saying it's not there.  Because the** |
| 20 | **only way I used it is I found a client, called them.** |
| 21 | **That was it.** |
| 22 | Q. So you had access to -- |
| 23 | **A. I don't know.** |
| 24 | Q. -- that information? |
| 25 | **A. I don't know.** |

**18 (Pages 66 to 69)**

Larry Scott Gresham

---

**70**

| | | |
|---|---|---|
| 11:10 | 1 | Q. Did you have access to the database? |
| 11:10 | 2 | **A. I did.** |
| 11:10 | 3 | Q. Okay. And you could search in the database |
| 11:10 | 4 | for things? |
| 11:10 | 5 | **A. I don't know if you could search. I don't** |
| 11:10 | 6 | **know.** |
| 11:10 | 7 | Q. Okay. Well -- |
| 11:10 | 8 | **A. I mean, you can ask it any way you want to. I** |
| 11:10 | 9 | **don't know.** |
| 11:12 | 10 | Q. But the names of the clients were in the |
| 11:12 | 11 | database? |
| 11:12 | 12 | **A. Yes.** |
| 11:12 | 13 | Q. The exact names of the doctors were in the |
| 11:12 | 14 | database? |
| 11:12 | 15 | **A. Yes.** |
| 11:12 | 16 | Q. Were there -- |
| 11:12 | 17 | **A. Sometimes they weren't exact names, but yes.** |
| 11:12 | 18 | Q. And you had access to those? |
| 11:12 | 19 | **A. Yes.** |
| 11:12 | 20 | Q. Did you have access to the doctors' CVs? |
| 11:12 | 21 | **A. On my own computer. Some people put them in** |
| 11:13 | 22 | **the database. It wasn't usually done.** |
| 11:13 | 23 | Q. But you maintained them on your own computer? |
| 11:13 | 24 | **A. Yes.** |
| 11:13 | 25 | Q. And those would have been CVs that you were |

**71**

| | | |
|---|---|---|
| 11:13 | 1 | using during and in the course of your employment with |
| 11:13 | 2 | MHA -- |
| 11:13 | 3 | **A. Uh-huh, yes.** |
| 11:13 | 4 | Q. -- to carry out the functions of your job? |
| 11:13 | 5 | **A. Yes.** |
| 11:13 | 6 | Q. Did you also have access to MHA's contract |
| 11:13 | 7 | terms? |
| 11:13 | 8 | **A. Yes.** |
| 11:13 | 9 | Q. What about revenue reports? |
| 11:13 | 10 | **A. Not that I know of.** |
| 11:13 | 11 | Q. Any budgets? |
| 11:13 | 12 | **A. Not that I know of.** |
| 11:13 | 13 | Q. So when it lists all of these items here in |
| 11:13 | 14 | your employment agreement, you agree MHA held up its end |
| 11:13 | 15 | of the bargain, it gave you access to confidential |
| 11:13 | 16 | information? |
| 11:13 | 17 | **A. Yes.** |
| 11:13 | 18 | Q. And they had you sign an agreement that laid |
| 11:13 | 19 | each one of these items out so you would be aware of |
| 11:13 | 20 | what they were? |
| 11:13 | 21 | **A. Yes.** |
| 11:13 | 22 | Q. And you agreed in writing that each of these |
| 11:14 | 23 | categories was confidential? |
| 11:14 | 24 | **A. Yes.** |
| 11:14 | 25 | Q. And you understood by and through this |

**72**

| | |
|---|---|
| 1 | agreement that you couldn't use any of this confidential |
| 2 | information in your employment with any other medical |
| 3 | staffing firm -- |
| 4 | **A. Yes.** |
| 5 | Q. -- such as Consilium? |
| 6 | **A. Yes.** |
| 7 | Q. So let's look at Paragraph 2. |
| 8 | And it says here in Paragraph 2 that, Employee |
| 9 | covenants and agrees that he/she will not use any of the |
| 10 | confidential business information, company training, or |
| 11 | company relationships for any purpose other than in the |
| 12 | course and scope of his/her employment and for the |
| 13 | exclusive benefit of the company. |
| 14 | What does that mean to you? |
| 15 | **A. That I won't use the information at another** |
| 16 | **company. I mean, that's --** |
| 17 | Q. And as we -- |
| 18 | **A. -- pretty simple.** |
| 19 | Q. -- sit here today, are you alleging that that |
| 20 | provision is unenforceable? |
| 21 | **A. That I would not take their database -- no.** |
| 22 | **Yeah, that's fine.** |
| 23 | Q. So as we sit here, you're not claiming that |
| 24 | you have a right to use or disclose any of MHA's |
| 25 | confidential information? |

**73**

| | |
|---|---|
| 1 | **A. No.** |
| 2 | Q. And you agree and recognize that the items |
| 3 | that are detailed here are MHA's confidential |
| 4 | information? |
| 5 | MR. VOLNEY: Objection; form. |
| 6 | You can answer. I'm just preserving my |
| 7 | objection for the record. |
| 8 | THE WITNESS: Oh, okay. I didn't know |
| 9 | what that meant. |
| 10 | MR. VOLNEY: That's all right. |
| 11 | **A. Yeah. I mean, these items listed here are** |
| 12 | **confidential information. But a lot of this stuff --** |
| 13 | **some of it's not. I mean, some of it's available all** |
| 14 | **over the place, but...** |
| 15 | Q. (BY MS. NOWAK) But you agree that the items |
| 16 | that are listed therein, MHA considered to be its |
| 17 | confidential -- |
| 18 | **A. MHA considered to be its confidential** |
| 19 | **information.** |
| 20 | Q. You agreed that you would maintain it as |
| 21 | confidential and you certainly don't disagree that a |
| 22 | large portion of those items at least are, in fact, |
| 23 | confidential? |
| 24 | **A. A large portion, sure.** |
| 25 | Q. Okay. So why don't you detail for me which of |

**19 (Pages 70 to 73)**

Larry Scott Gresham

74

11:16  1   these items are the ones that you believe, as we sit
11:16  2   here today, are not confidential.
11:16  3       A.  Well, I mean, physicians are all over the
11:16  4   internet.
11:16  5       Q.  So when you say physicians are all over the
11:16  6   internet --
11:17  7       A.  Physicians' names.
11:17  8       Q.  Okay.
11:17  9       A.  There -- there's tons of databases that are
11:17  10  free to the public that have the physicians' names.
11:17  11      Q.  So it's your position that the name of the
11:17  12  physician is not confidential?
11:17  13      A.  Right.
11:17  14      Q.  Okay.  Any other items?
11:17  15      A.  Not really.  Let me look.
11:17  16      I mean, I would assume that their revenue is
11:17  17  not confidential either because they're a traded
11:17  18  company.
11:17  19      Q.  Okay.  So you would agree with me that all of
11:17  20  the other items on this -- included in this list --
11:17  21      A.  Hold on.  If you're going to tie me to this,
11:17  22  hold on.  Let's see.
11:17  23          MR. VOLNEY:  Yeah.  Take your time.
11:18  24      A.  The mailing lists were from an outside firm,
11:18  25  so I don't know if that's confidential or not.  I don't

75

11:18  1   have an answer for that.
11:18  2       I would almost think all of H was public
11:18  3   knowledge -- or -- or quite a bit of H is public
11:18  4   knowledge.  I is public knowledge.  That's about all I
11:18  5   see.
11:18  6       Q.  (BY MR. VOLNEY)  So other than the items that
11:18  7   you have excerpted out, you would agree with me that the
11:18  8   things that are listed in this Paragraph 1, Confidential
11:18  9   Business Information, are, in fact, the confidential
11:18  10  information of MHA?
11:18  11      A.  Yes.
11:18  12      Q.  What steps did you take after you left MHA to
11:18  13  make sure that you weren't using any of their
11:18  14  confidential information?
11:18  15          THE WITNESS:  I can't do that?
11:18  16          MR. VOLNEY:  You can't do that.
11:18  17          THE WITNESS:  Oh, I'm sorry.
11:18  18      A.  What steps.  I got my wife, and we looked
11:18  19  around the house to see if I had anything.  We didn't
11:18  20  have anything in paper, you know.  I looked at my
11:18  21  computer briefly, didn't see anything.  That's -- that's
11:18  22  it.  It wasn't a big deal.
11:18  23      Q.  (BY MS. NOWAK)  It wasn't a big deal to you
11:18  24  whether or not you were disclosing --
11:18  25      A.  No, I didn't have anything.  I knew I didn't

76

11:16  1   have anything hardly.  I mean, I had -- like you see, I
11:16  2   had a CV and I had -- I had nothing.
11:16  3          MS. NOWAK:  Lezley, can we mark this as
11:16  4   Exhibit 20.
11:16  5          THE REPORTER:  Yes.
11:16  6          (Exhibit No. 20 marked.)
11:16  7          MS. NOWAK:  Here you go, John.
11:16  8       Q.  (BY MS. NOWAK)  So you would agree with me,
11:16  9   Mr. Gresham, that as part of this lawsuit, you've
11:16  10  produced certain MHA documents that were in your
11:16  11  possession?
11:16  12      A.  Yes.
11:16  13      Q.  And you've already admitted that after leaving
11:16  14  MHA, you still had in your possession certain doctor
11:16  15  CVs?
11:16  16      A.  I had what was here (indicating) in my
11:16  17  possession.
11:16  18      Q.  So in your possession, you had doctors' CVs?
11:16  19      A.  Are there CVs in there?  I don't know.  I
11:16  20  think there is one CV.  It is not a physician CV,
11:16  21  though.
11:16  22      Q.  But you did have a CV?
11:16  23      A.  A CV.
11:16  24      Q.  And you obtained it during your employment at
11:16  25  MHA?

77

11:16  1       A.  I may have.  I don't -- it could have been my
11:16  2   employment at Arthur Marshall.  I don't know.  I'd have
11:16  3   to look at it.  I don't know because I didn't work
11:16  4   with --
11:16  5       Q.  Would --
11:16  6       A.  -- PAs at Merritt Hawkins.
11:16  7       Q.  Would you -- in the -- in the document that
11:16  8   we're looking at, can you refer me to the doctor's CV --
11:16  9   or excuse me, the CV that -- that we're referring to?
11:16  10      A.  I'm looking for it right now.
11:16  11          MR. VOLNEY:  It's 49.
11:16  12          THE WITNESS:  Thank you.
11:16  13      A.  Yes.  This was a CV of one of my clients at
11:16  14  Merritt Hawkins, not a doctor I was working with.
11:16  15      Q.  (BY MS. NOWAK)  Okay.  So this is a CV of one
11:16  16  of your clients?
11:16  17      A.  Yes.
11:16  18      Q.  So you would agree with me that you obtained
11:16  19  this document during the course of your employment with
11:16  20  MHA?
11:16  21      A.  Yes.
11:16  22      Q.  And it relates to a client of MHA?
11:16  23      A.  Yes.
11:16  24      Q.  Okay.  And you've also admitted that you had
11:16  25  in your possession after leaving MHA letters to doctors?

20  (Pages 74 to 77)

Larry Scott Gresham

78

11:28 1 **A. No. I'm sorry. This was not a -- this was**
11:28 2 **not a CV of one of my clients. This was a CV of a PA I**
11:28 3 **was working at -- working with while at MHA. It was the**
11:28 4 **only PA search I ever did.**
11:28 5 Q. So does the testimony remain the same --
11:28 6 **A. Yes.**
11:28 7 Q. -- that this is someone that you worked with
11:28 8 while you were at MHA?
11:28 9 **A. Yes.**
11:28 10 Q. This is a client or a doctor of MHA?
11:28 11 **A. Yes.**
11:28 12 Q. Absent your employment with MHA, you would not
11:29 13 have this information?
11:29 14 **A. Yes.**
11:29 15 Q. And if we can turn back to the front, you also
11:29 16 had a -- have admitted that you had several letters to
11:29 17 doctors.
11:29 18 Would these be the letters to which you're
11:29 19 referring?
11:29 20 **A. Yes.**
11:29 21 Q. Okay. And what are these letters?
11:29 22 **A. Offer letters.**
11:29 23 Q. And are these letters that you obtained
11:29 24 through the course of your employment at MHA?
11:29 25 **A. The third is a letter I wrote and the other**

79

11:29 1 **two are letters someone else wrote. Yes.**
11:29 2 Q. And when would you have written this letter?
11:29 3 And I believe you're referring to Gresham 22?
11:29 4 **A. April 20th, 2011.**
11:29 5 Q. And that would have been during the course of
11:29 6 your employment with MHA?
11:29 7 **A. Yes.**
11:29 8 Q. And to satisfy your job functions as --
11:29 9 **A. Yes.**
11:29 10 Q. You also had in your possession after leaving
11:29 11 MHA, MHA's client worksheets?
11:29 12 **A. Yes.**
11:20 13 Q. And those are forms that MHA has developed?
11:20 14 **A. Yes.**
11:20 15 Q. Okay. Let's walk through these a little more
11:20 16 specifically.
11:20 17 So the first page here is Gresham No. 20. Can
11:20 18 you tell me what that document is?
11:20 19 **A. An offer letter.**
11:20 20 Q. Okay. And did you ever work with Dr. Hartman
11:20 21 while you were at MHA?
11:20 22 **A. I did not.**
11:20 23 Q. Have you ever worked with Dr. Hartman while
11:20 24 you were at Consilium?
11:20 25 **A. No. I don't even know who Dr. Hartman is.**

80

11:28 1 Q. Okay. This is a form of an offer letter that
11:28 2 MHA uses?
11:28 3 **A. Yes -- no. It's a form of an offer -- that**
11:28 4 **Breanna Elliott from MHA uses. Everybody has their own**
11:28 5 **offer letter. We wrote them ourselves.**
11:28 6 Q. Okay. And you wrote -- you would have written
11:28 7 those letters during the course of your employment.
11:28 8 Did you base your letter off of seeing other
11:28 9 MHA employee letters?
11:28 10 **A. It looks like I based -- no. I thought I**
11:28 11 **based mine off those, but I didn't.**
11:28 12 Q. But you would have likely based your letter
11:28 13 off of looking at other employee letters?
11:28 14 **A. Yes.**
11:28 15 Q. You wouldn't have created it from scratch, you
11:28 16 would have referred to other MHA documents in order to
11:28 17 come up with your offer letter that you drafted and
11:28 18 created while you were employed by MHA?
11:28 19 **A. I created some from scratch. I mean -- yeah.**
11:28 20 **Some from scratch, some from others.**
11:28 21 Q. Okay. So you've identified the first two
11:28 22 documents as being offer letters.
11:28 23 Now, did you obtain those directly from
11:28 24 Ms. Elliott?
11:28 25 **A. Yeah. She e-mailed them to me, I'm sure.**

81

11:29 1 Q. Do you recall when she would have e-mailed
11:29 2 them to you?
11:29 3 **A. I don't. I -- it could have been August -- it**
11:29 4 **could have been that day, August 25th, 2010. I don't**
11:29 5 **know.**
11:29 6 Q. Is it possible that she could have e-mailed
11:29 7 them to you after you left MHA?
11:29 8 **A. No.**
11:29 9 Q. Let's turn to that third page, the April 20,
11:29 10 2011 letter.
11:29 11 **A. Uh-huh.**
11:29 12 Q. Can you tell me what this letter is?
11:29 13 **A. It's an offer letter.**
11:29 14 Q. Did you ever work with this doctor during the
11:29 15 course of --
11:29 16 **A. I did. I worked with that doctor and that**
11:29 17 **client.**
11:29 18 Q. At MHA?
11:29 19 **A. At MHA.**
11:29 20 MR. VOLNEY: Let her finish, please.
11:29 21 THE REPORTER: Yes, please, because I'm
11:29 22 not hearing --
11:29 23 THE WITNESS: I'm sorry.
11:29 24 THE REPORTER: -- the end of her
11:29 25 questions at all.

21 (Pages 78 to 81)

DepoTexas, Inc. / Sunbelt Reporting & Litigation Services

Larry Scott Gresham

**82**

11:24  1    THE WITNESS: Okay. I'm sorry.
11:22  2    Q. (BY MS. NOWAK) Did you ever work with this
11:22  3  doctor while you were at Consilium?
11:22  4    A. No, no.
11:22  5    Q. Did you ever work with East Arkansas Family
11:22  6  Health while you were at Consilium?
11:22  7    A. I did not.
11:22  8    Q. Are you aware of whether or not Consilium or
11:22  9  anyone else at Consilium worked with East Arkansas
11:22  10 Family Health while you were there?
11:22  11   A. I am not.
11:22  12   Q. Can you tell me what the next document --
11:22  13 document is? It's entitled Community Worksheet.
11:22  14   What would you have used that for during your
11:22  15 employment at MHA?
11:22  16   A. When I filled out and met with clients, I
11:22  17 would use this to -- to write my notes on.
11:22  18   Q. All right. And if we continue on and turn to
11:22  19 Gresham 40.
11:22  20   A. (Witness complies.)
11:22  21   Q. Is this still part of that same worksheet?
11:23  22   A. It is.
11:23  23   Q. And is this all information that MHA
11:23  24 identified as being valuable and that MHA wished for you
11:23  25 to, you know, acquire from the MHA clients during your

**83**

11:23  1  visits?
11:23  2    A. This is my note. This is how I wrote notes.
11:23  3    Q. Can you turn to Gresham 48.
11:23  4    A. (Witness complies.)
11:23  5    Q. Can you tell me what that document is?
11:23  6    A. That is a Client Authorization for Personal
11:25  7  Letter Campaign and Internet Advertisement.
11:25  8    THE REPORTER: Okay. You need to repeat
11:25  9  that for me, please. Just repeat it.
11:25  10   THE WITNESS: A client Authorization For
11:25  11 Personal Letter Campaign and Internet Advertisement.
11:25  12   THE REPORTER: Thank you.
11:25  13   Q. (BY MS. NOWAK) Okay.
11:25  14   A. A marketing campaign.
11:25  15   Q. And did you ever work with this client,
11:25  16 Missouri Eye Institute, while you were at MHA?
11:25  17   A. I did.
11:25  18   Q. Okay. And have you ever worked with that
11:25  19 client while you were at Consilium?
11:25  20   A. No.
11:25  21   Q. And were you aware of whether or not Consilium
11:26  22 ever did work with the Missouri Eye Institute?
11:26  23   A. I am not at this point.
11:26  24   Q. You --
11:26  25   A. Well, I haven't been there. It's hard for me

**84**

1  to answer that question. I haven't been there in six
2  months.
3    Q. At the time that you were there, were they --
4    A. No.
5    Q. -- working with Missouri Eye Institute?
6    And then I believe we've already talked about
7  the final item, which is the CV.
8    Now, you admit that each of these documents
9  belong to MHA?
10   A. I do.
11   Q. And you admit that you utilized these
12 confidential documents during your employment with MHA?
13   MR. VOLNEY: Objection; form.
14   A. I utilized -- I used these documents.
15   Q. (BY MS. NOWAK) But following your employment
16 with MHA, you continued to have them in your possession?
17   A. Okay. Yes.
18   Q. And you saved them to your personal hard
19 drive?
20   A. That was common. We did that at MHA because
21 MHA was not a 9:00 to 5:00 job. We worked often at
22 home. And these were things I sent to myself. Like, if
23 I had to fly the next morning at 6:00 in the morning, I
24 needed the community worksheet.
25   Q. So how would these documents have gotten on

**85**

1  your personal computer? Would you have used your USB
2  drive to --
3    A. No. I --
4    Q. -- get them there?
5    A. -- would e-mail them to myself.
6    MR. VOLNEY: Take a deep breath. We're
7  doing fine. I'm mainly concerned about her.
8    THE WITNESS: I know, I know. I'm very
9  sorry.
10   THE REPORTER: That's okay.
11   Q. (BY MS. NOWAK) And you had each of these
12 documents in your possession while you were employed by
13 Consilium?
14   A. I -- yes. For three months, I guess, until
15 the -- the gentleman came over and got my hard drive.
16   Q. So while you were employed by Consilium, you
17 had --
18   A. I said yes.
19   Q. -- MHA's confidential information?
20   A. I said yes.
21   Q. And you shared it with any of the other
22 Consilium employees?
23   A. Absolutely not. I didn't know it was on my
24 computer.
25   Q. Did you ever ask any of the other employees of

**22 (Pages 82 to 85)**

Larry Scott Gresham

**86**

11:25  1   MHA to send you documents once you had left MHA?
11:25  2     **A.  Absolutely not.**
11:25  3     Q.  Did you ever ask Breanna Elliott to send you
11:25  4   stuff?
11:25  5     **A.  No.**
11:25  6     Q.  Can you go back to that employment agreement.
11:25  7   And if you'll turn with me to the fourth page in that
11:25  8   Paragraph 4.  It's entitled Return of Documents.
11:25  9     **A.  (Witness complies.)**
11:25 10     Q.  And it says here that, Employee acknowledges
11:26 11   that all documents, records, and materials that he/she
11:26 12   prepares and confidential business information, company
11:26 13   training, and company relationships that he/she may have
11:26 14   access to, may be given or entrusted to him/her, may
11:26 15   develop, or he/she may acquire knowledge of in the
11:26 16   course of his or her employment are and shall remain the
11:26 17   sole property of company and/or the company.
11:26 18     Did I read that correctly?
11:26 19     **A.  Yes.**
11:26 20     Q.  And that next line says, In the event that
11:26 21   employee's employment terminates for any reason or, upon
11:26 22   demand, employee agrees to immediately return or turn
11:26 23   over all confidential business information, company
11:26 24   training, and information about company relationships,
11:26 25   and any copies thereof, regardless of the format, in

**87**

11:26  1   his/her possession, custody, or control, as well as any
11:26  2   documents, records, notes of other work product,
11:26  3   materials, information, and other property in his/her
11:26  4   possession, custody, or control which is in any way
11:28  5   connected with or derived from his/her services to or
11:28  6   affiliation with company.
11:29  7     Did I read that correctly?
11:29  8     **A.  You did.**
11:29  9     Q.  Now, you agreed to return all the documents
11:29 10   that we've just been discussing.
11:29 11     **A.  Okay.**
11:29 12     Q.  And you obviously did not?
11:29 13     **A.  I did.**
11:29 14     Q.  You did return all of these documents --
11:29 15     **A.  You have them.**
11:29 16     Q.  -- prior to leaving your employment at MHA?
11:29 17     **A.  No.**
11:29 18     Q.  So MHA had to file a lawsuit against you to
11:29 19   get these copies back.
11:29 20     **A.  Okay.**
11:29 21     Q.  Is that correct?
11:29 22     **A.  I don't think that's why the lawsuit was**
11:29 23   **filed.  But sure.**
11:29 24     Q.  But the fact of the matter remains that when
11:29 25   your employment with MHA terminated, you did not return

**88**

 1   MHA's confidential information?
 2     **A.  Okay.**
 3     Q.  Is that a yes or a no, sir?
 4     **A.  That's my answer.**
 5     Q.  The question is:  At the time that your
 6   employment terminated, did you return all of MHA's
 7   confidential information?
 8     **A.  I answered you.  It's not the answer you want.**
 9     Q.  Okay is not an answer, sir.
10     I'm asking whether or not you did or did not
11   return the confidential information?
12     **A.  Oh, I did not.**
13     Q.  Okay.  Let's continue going through this
14   employment agreement.  And we're going to start now with
15   Paragraph 5, which is entitled Noncompetition.
16     And there's actually three parts to this
17   particular paragraph.  There's part A, B, and C.  So
18   we'll take it part by part.
19     In this first part, Part A, is entitled
20   Covenant Not to Compete.  Are you with me?
21     **A.  I'm with you.**
22     Q.  Okay.  And it says here in this sub -- excuse
23   me, Paragraph 5, Subsection A, that during the term of
24   employee's employment with the company and for a period
25   of 12 months after the termination of employee's

**89**

 1   employment with the company for any reason, employee
 2   agrees that he/she will not within the restricted
 3   territory perform services of the same, similar, or
 4   greater nature to those performed by employee for the
 5   company for any person, entity, or venture which
 6   competes with the business of the company, which
 7   business includes recruiting and providing temporary and
 8   permanent healthcare professional placements and other
 9   staffing services to healthcare professionals,
10   healthcare facilities, and other healthcare
11   organizations.
12     Did I read that correctly?
13     **A.  You did.**
14     Q.  So if we were going to break that down, it
15   says here that if your employment with MHA terminates
16   for any reason, that for a period of one year after
17   that, you won't go to work for a company that does the
18   same or -- excuse me, offers the same or similar
19   services if they're located within that restricted
20   territory; is that correct?
21     **A.  Yes.**
22     Q.  And I want to talk just a little bit about
23   what constitutes same or similar.  But let's go ahead
24   and look at what's defined as the restricted territory.
25     The restricted territory is defined as Dallas,

**23 (Pages 86 to 89)**

Larry Scott Gresham

90

| | |
|---|---|
| 11:29 | 1 |
| 11:30 | 2 |

11:29  1    Texas and all counties adjacent to Dallas County,
11:30  2    including the counties of Collin, Denton, Ellis, Hunt,
11:30  3    Johnson, Kaufman, Rockwall, and Tarrant.
11:30  4         Did I read that correctly?
11:30  5    **A.  Yes.**
11:30  6    Q.  Okay.  And you would agree with me that
11:30  7    Consilium's offices are located in Dallas County?
11:30  8    **A.  Yes.**
11:30  9    Q.  And you did go to work for Consilium within
11:30  10   the 12-month period following the termination of your
11:30  11   employment with MHA?
11:30  12   **A.  I did.**
11:30  13   Q.  And if you review the definition of same or
11:30  14   similar services contained in this Subsection A, which
11:30  15   includes businesses that recruit and provide temporary
11:30  16   and permanent healthcare professionals, you would agree
11:30  17   with me that Consilium falls within that definition?
11:30  18   **A.  I would not agree that they're competitors.**
11:30  19   Q.  I didn't ask if they were competitors.  I
11:30  20   asked if they provided same or similar services within
11:30  21   the definition included in this paragraph.
11:30  22        MR. VOLNEY:  Objection; form.
11:30  23   Q.  (BY MS. NOWAK)  I asked if Consilium is a
11:30  24   business that provides recruiting -- a business that
11:30  25   includes recruiting and providing temporary and

91

11:32  1    permanent healthcare professionals placements and other
11:32  2    staffing services?
11:33  3    **A.  Consilium is a recruiting company that**
11:33  4    **provides temporary placement opportunities for**
11:33  5    **physicians.**
11:33  6    Q.  So you would agree with me that Consilium
11:33  7    would fall within the definition of the businesses
11:33  8    included within this paragraph that you were precluded
11:33  9    from going to work with?
11:33  10   **A.  I would not.**
11:33  11   Q.  Okay.  And tell me, what's the basis for that
11:33  12   statement?
11:33  13   **A.  Because this says providing temporary and**
11:33  14   **permanent.  I didn't provide -- I provided temporary.  I**
11:33  15   **didn't provide temporary and permanent.  If it said**
11:33  16   **temporary or permanent, I may agree with you.**
11:33  17   Q.  But Consilium provides temporary and permanent
11:33  18   healthcare professionals, correct?
11:33  19   **A.  Not when I was there.  I never saw it happen.**
11:33  20   **So what they say on their website, I -- I can only tell**
11:33  21   **you what I know.**
11:33  22   Q.  But as we sit here today, you are aware that
11:33  23   Consilium holds itself out as providing temporary and
11:33  24   permanent services?
11:33  25   **A.  I am not.**

92

11:    1         MR. VOLNEY:  Objection; form.
11:    2    Q.  (BY MS. NOWAK)  Okay.  Can you please rereview
11:    3    Exhibit No. 3.
11:    4    **A.  I saw what it said.**
11:    5    Q.  And so as you sit here --
11:    6    **A.  But I worked there.**
11:    7    Q.  My question to you is:  Consilium holds itself
11:    8    out as providing temporary and permanent services,
11:    9    correct?
11:    10        MR. VOLNEY:  Objection; form.
11:    11        THE WITNESS:  What does that mean?
11:    12        MR. VOLNEY:  I -- I get to preserve my
11:    13   objection to her question if I think there's something
11:    14   wrong with it, it's misleading, or misstates the record,
11:    15   or whatever reason I have.  I get to say objection;
11:    16   form.  If you understand the question, you're obligated
11:    17   to answer it.
11:    18        THE WITNESS:  Okay.  Okay.  Got you.  I
11:    19   didn't know what that meant.
11:    20   **A.  No.  I would -- from my understanding, they**
11:    21   **provided temporary service from -- I worked there.**
11:    22   Q.  (BY MS. NOWAK)  But you understand that
11:    23   Consilium held themselves out -- they advertised that
11:    24   they provide temporary and permanent services?
11:    25        MR. VOLNEY:  That's not what that

93

1    document says.
2         Objection; form.
3         MS. NOWAK:  Are you answering for your
4    witness, John?
5         MR. VOLNEY:  No.  I think your question
6    is misleading.  I think you've made your point.  It's
7    time to move on.
8         MS. NOWAK:  So are you instructing the
9    witness not to answer that question?
10        MR. VOLNEY:  So he can answer it again.
11   We can be here all day arguing over --
12   **A.  You don't understand.  I'll answer the same**
13   **answer every time because I don't agree with you.**
14   Q.  (BY MS. NOWAK)  When you signed this
15   employment agreement, you agreed to this Provision 5A,
16   correct?
17   **A.  I did.**
18   Q.  So at the time that you became employed by MHA
19   for a second time, you agreed that if you left MHA and
20   went to work for another business that provided medical
21   staffing services within Dallas County, that you would
22   be in violation of this agreement?
23   **A.  That provided temporary and permanent staffing**
24   **services.**
25   Q.  And you're aware that MHA has all of its

**24  (Pages 90 to 93)**

Larry Scott Gresham

94

11:33 1 employees that receive access to its confidential
11:33 2 information sign an employment agreement that is the
11:33 3 same or similar to the one that you've signed?
11:34 4     A. I -- I'm sure. I didn't see them all sign it,
11:34 5 but I'm sure.
11:34 6     Q. And you understood that when you signed this
11:34 7 agreement, that MHA was relying on you to honor it?
11:34 8     A. Yes.
11:34 9         MR. VOLNEY: Objection; form.
11:34 10     Q. (BY MS. NOWAK) If you continue on in that
11:34 11 Paragraph A, the very next line says that, Employee
11:34 12 agrees that this covenant not to compete is reasonable
11:34 13 and necessary to protect the company's legitimate
11:34 14 business interests.
11:34 15         Did I read that correctly?
11:34 16     A. Yes.
11:34 17     Q. So when you signed this agreement, you said
11:34 18 that the restriction -- the 12-month restriction was
11:34 19 reasonable?
11:34 20     A. Yes.
11:34 21     Q. And you intended to honor that?
11:34 22     A. Yes.
11:34 23     Q. And you also said that the restricted
11:34 24 territory, that you could not go to work for another
11:34 25 company that was located in Dallas County, was

95

11:34 1 reasonable?
11:34 2     A. Yes. I signed the document.
11:35 3     Q. And at the time that you signed it, you fully
11:35 4 intended to honor it?
11:35 5     A. Yes. But I didn't think it was reasonable.
11:35 6     Q. So --
11:35 7     A. We've already been over that, though.
11:35 8     Q. But this agreement says that you believe that
11:35 9 it is reasonable.
11:35 10         So at the time that you signed it, you didn't
11:35 11 intend to honor these terms. Is that what you're
11:35 12 saying?
11:35 13     A. No. I intended to honor it.
11:35 14     Q. I think I'm having a disconnect with you,
11:35 15 Mr. Gresham, because --
11:35 16     A. I think you are.
11:35 17     Q. -- you signed an agreement that says that you
11:35 18 agree that the covenants are reasonable, correct?
11:35 19     A. Okay.
11:35 20     Q. But you're telling me at the time you signed
11:35 21 it, you did not, in fact, believe what you were signing?
11:35 22     A. I believe that I would honor it. I did not
11:35 23 believe that it was reasonable. No one believes that
11:35 24 that is reasonable, but --
11:35 25     Q. So when you say here employee agrees that this

96

1 covenant not to compete is reasonable, that's incorrect?
2 When you -- when you signed this, you did not believe
3 that? You did not intend to honor that provision?
4     A. I intended to honor the provision, yes. We --
5 I told you that.
6         MR. VOLNEY: Could we go off the record
7 for one minute? This is not related to any of your
8 questions. It's related to lunch.
9         MS. NOWAK: Okay.
10         MR. VOLNEY: I'm just going to ask my --
11         THE REPORTER: Hold on.
12         Go ahead.
13         THE VIDEOGRAPHER: We're off the
14 record --
15         MR. VOLNEY: I'm sorry.
16         THE REPORTER: That's okay.
17         THE VIDEOGRAPHER: -- at 11:36.
18         (Off the record.)
19         THE VIDEOGRAPHER: We're on the record at
20 11:37 a.m.
21     Q. (BY MS. NOWAK) Okay. Mr. Gresham, we've been
22 discussing Paragraph 5A of your employment agreement.
23 And the line that we've been discussing is Employee
24 agrees that this covenant not to compete is reasonable
25 and necessary.

97

1         So at the time that you signed this agreement,
2 you said that 12 months was a reasonable restriction; is
3 that correct?
4     A. Yes.
5     Q. And at the time you signed this, you said that
6 the restricted territory as defined was also reasonable?
7     A. Yes.
8     Q. And you would agree with me that 12 months
9 from the date of your resignation at MHA until the time
10 of its expiration would have been September 24th, 2013?
11     A. Yes.
12     Q. And September of 2013, how long had you been
13 working at Consilium?
14     A. In September of -- a year -- no. Ten months,
15 ten and a half months. But I wasn't even working there
16 September 24th, 2013.
17         THE REPORTER: You need to repeat that.
18 I couldn't hear you.
19         THE WITNESS: But I wasn't working there
20 September 24th, 2013, I don't believe.
21     Q. (BY MS. NOWAK) When do you recall resigning
22 from Consilium?
23     A. I think -- I believe it was September 20th or
24 21st. I don't recall.
25     Q. Let's turn now to that next page, Page 5, and

25 (Pages 94 to 97)

APP. 0139

Larry Scott Gresham

98

11:38  1   look at Subsection B entitled Nonsolicitation of
11:38  2   Clients.
11:38  3        A.  (Witness complies.)
11:38  4        Q.  And it says in this provision that, During
11:38  5   employee's employment with the company and for a period
11:39  6   of 12 months following the termination of employee's
11:39  7   employment with the company for any reason, employee
11:39  8   agrees not to either individually or jointly, directly
11:39  9   or indirectly, either as an employee, employer,
11:39 10   operator, agent, independent contractor, owner,
11:39 11   consultant, partner, investor, or otherwise, call upon,
11:39 12   solicit, or provide any products or services that
11:39 13   compete with the products and services offered by the
11:39 14   company to any actual or prospective client, customer,
11:39 15   or candidate for placement/healthcare professionals of
11:39 16   the company and who was serviced directly or indirectly
11:39 17   by employee or with whom employee otherwise dealt
11:39 18   directly or indirectly, including the management or
11:39 19   supervision of others who serviced or dealt with such
11:39 20   client, customer, or candidate, during the 12-month
11:39 21   period prior to his or her separation from the company.
11:39 22        Did I read that correctly?
11:39 23        A.  Yes.
11:39 24        Q.  And this provision basically says that for 12
11:39 25   months following your termination -- or the termination

99

11:40  1   of your employment at MHA, you won't communicate or work
11:40  2   with any of the clients, customers, or the candidates of
11:40  3   MHA that you actually serviced directly or indirectly
11:40  4   during the final year of your employment at MHA?
11:40  5        A.  Correct.
11:40  6        Q.  Is that what you understand this provision to
11:40  7   mean?
11:40  8        A.  It is.
11:40  9        Q.  So at the time that you signed this employment
11:40 10   agreement, you understood that if you left MHA, for a
11:40 11   year after that, you were precluded from working with,
11:40 12   contacting in any way, any of the clients, candidates,
11:40 13   customers that you worked with at MHA for the last 12
11:40 14   months of your employment?
11:40 15        A.  Yes.
11:40 16        Q.  And what steps did you take after leaving MHA
11:40 17   to make sure that you weren't soliciting any of those
11:40 18   people?
11:40 19        A.  The company I went to work -- I didn't solicit
11:40 20   clients for the company I worked -- the next company I
11:40 21   worked for, so it didn't matter.
11:40 22        Q.  You didn't work with any clients, customers,
11:40 23   or candidates?
11:40 24        A.  I worked with candidates, but I didn't work
11:40 25   with clients or customers.  I don't know what steps you

100

1   would take.  Oh, I talked to that doctor before, I won't
2   talk to him.  Yeah, I would do that if that happened.
3        Q.  And did that --
4        A.  It never -- it never happened.
5        Q.  And how can you be sure that it never
6   happened?  Did you review documents to make sure that it
7   didn't happen?  Did you have a list of folks that you
8   knew you couldn't contact?
9        A.  I knew who I talked to before.
10        Q.  Let's go ahead and look just briefly at the
11   Subsection C which is talking about soliciting and
12   recruiting other employees.  And I won't go through the
13   effort of reading this whole provision.
14        But did you understand that this provision
15   meant that for a period of 36 months after the
16   termination of employment at MHA, that you wouldn't
17   solicit or recruit other MHA employees --
18        A.  Yes.
19        Q.  -- away from MHA?
20        A.  Yes.
21        Q.  And this -- since you left MHA in September of
22   2012, you understand that this provision remains in
23   effect as we sit here today?
24        A.  I'm sure it does.
25        Do you mean the provision on myself?

101

1        Q.  Yes.
2        A.  Oh, yes, I do.
3        Q.  And as we sit here today, do you intend to
4   honor that provision?
5        A.  Sure.
6        Q.  Some of the language in this agreement, if
7   you'll see, it references in these provisions that you
8   can't do actions either directly or indirectly.
9        In general, you would agree with me you can't
10   instruct someone else to do something that you're
11   prohibited from doing under this agreement, can you?
12        A.  Sure.
13        Q.  So if this agreement says you can't solicit a
14   candidate, you can't go whisper in someone else's ear
15   and say, hey, I can't call them, so you call them?
16        A.  Right, of course.
17        Q.  Let's move on from the employment agreement
18   just for a little bit and talk about your employment at
19   Consilium.
20        So you were employed with Consilium for
21   approximately a year?
22        A.  Right.  About ten and a half months.
23        Q.  And you've already testified that you were a
24   recruiter for them?
25        A.  I was.

26 (Pages 98 to 101)

DepoTexas, Inc. / Sunbelt Reporting & Litigation Services

APP. 0140

Larry Scott Gresham

**102**

1    Q.  And you were placing medical specialists with
2  providers?
3        A.  On a temporary basis.  I wouldn't even call
4  it -- actually, I wouldn't call it placing.  I would
5  call it staffing.
6        Q.  Okay.  What was the official start date of
7  your employment?
8        A.  October 15th, 2012.
9        Q.  And is that the date that you accepted your
10  offer of employment or the date that you actually first
11  showed up for work?
12       A.  First showed up for work.
13       Q.  Did you have any other titles other than
14  recruiter during the time that you were employed by
15  Consilium?
16       A.  Recruiter wasn't actually my title.
17       Q.  Okay.
18       A.  I don't remember what the title was --
19       Q.  Whatever --
20       A.  -- senior something.
21       Q.  Whatever the title was, did it change during
22  the time you were there or remain the same?
23       A.  No.
24       Q.  And the end result of it is that you were
25  acting as a recruiter?

**103**

1        A.  Yes.
2        Q.  Whatever the title is?
3        A.  Yes.
4        Q.  What territories did you work in?
5        A.  The East Coast and Texas.
6        Q.  And who's included in the East Coast and
7  Texas?
8        A.  We mostly -- Florida, a little Georgia,
9  New York.  I mean, we -- it could be the entire eastern
10  coast --
11       Q.  Okay.
12       A.  -- and Texas.
13       Q.  Did you ever while you were working at
14  Consilium do any staffing that involved the Heartland?
15       A.  No.
16       Q.  You never made any placements or any staffing
17  whatsoever to anyone that was located in the Heartland?
18       A.  When I was at Consilium, we had no accounts in
19  the Heartland, anyway.
20       Q.  Okay.  What specialties did you work in while
21  you were at Consilium?
22       A.  Hospital-based specialties.
23       Q.  And you were on Mr. Moberly's team?
24       A.  Yes.
25       Q.  Had you ever worked with or did you know

**104**

1  Mr. Moberly while you were at MHA?
2        A.  I did not.
3        Q.  Who else was on your team while you were at
4  Consilium?
5        A.  Kevin Bruce, Brent -- I can't remember Brent's
6  last name anymore.
7        Q.  Would it have been Burrows?
8        A.  Yes, Brent Burrows.
9            I don't remember some of the other recruiters
10  because it was in and out.  I mean, that's the type of
11  business it is.
12       Q.  What do you mean in and out?  People came and
13  went --
14       A.  Sure.
15       Q.  -- pretty quickly --
16       A.  Sure.
17       Q.  -- on a regular basis?
18       A.  Sure.
19       Q.  Do you recall where Mr. Bruce was employed
20  prior to coming to Consilium?
21       A.  I know at some point he was employed by MHA,
22  but I don't know when that was.
23       Q.  And what about Mr. Burrows?
24       A.  I know that Mr. Burrows had been employed by
25  Staff Care.

**105**

1        Q.  And Staff Care, is it your understanding, is
2  part of the AMN family of companies?
3        A.  Yes.
4        Q.  So a sister company to MHA?
5        A.  Somewhat.
6            MR. VOLNEY:  Evil sister.
7        A.  Yeah, yeah.  They don't get along very well.
8        Q.  (BY MS. NOWAK)  How is it that you came to
9  learn about Consilium?
10       A.  I texted Billy and said, are you still at
11  Delta, and I found out he was at Consilium.  And I had
12  known about Consilium before because Joe Hawkins started
13  it.
14       Q.  And how are you familiar with Mr. Hawkins?
15       A.  He signed my checks when I started at MHA.  He
16  had actually just left.  But I mean, everybody at MHA
17  knew Joe, who he was.
18       Q.  Was he considered to be a fairly influential
19  guy in this industry?
20       A.  Sure.
21       Q.  So how is it that you came to be hired, then,
22  at -- at Consilium?  Walk me through -- what was the
23  chain of events?
24       A.  Okay.  I texted Billy to see if he was at
25  Delta.  That evening, which was the 7- -- let me help

27 (Pages 102 to 105)

Larry Scott Gresham

**106**

11:48 1 myself here -- the 17th, I talked with
11:49 2 Christina Stephens. On the 19th, I met with Christina
11:49 3 for a brief time at lunchtime. On the 21st, I took a
11:49 4 personality test. I didn't -- I think on the 26th or
11:49 5 27th, I talked with Joe and Matt Baade. Then I don't
11:49 6 really remember -- then I had to come in for another
11:49 7 interview with John a day or two after that. I
11:49 8 interviewed with John, waited a good week, week and a
11:49 9 half for an offer, and then went to work.
11:49 10     Q. Okay. Well, let's kind of walk through this
11:49 11 just piece by piece.
11:49 12     So on September 17th, you said you texted with
11:49 13 Mr. Bowden?
11:49 14     A. Yes.
11:49 15     Q. And through the course of those texts,
11:49 16 Mr. Bowden ultimately gave your contact information to
11:49 17 Ms. Stephens?
11:50 18     A. I suppose.
11:50 19     Q. And you became employed by Consilium after
11:50 20 Mr. Bowden had given that contact information to
11:50 21 Ms. Stephens?
11:50 22     A. Yes.
11:50 23     Q. And if we review this text message, it appears
11:50 24 that Mr. Bowden was promising to have Ms. Stephens call
11:50 25 you; is that correct?

**107**

11:50 1     A. That's what the text -- it says, I'll have
11:50 2 Christina give you -- Christina give you a call today.
11:50 3     Q. And she did, if fact, call you?
11:50 4     A. She did.
11:50 5     Q. And you knew Mr. Bowden from your employment
11:50 6 at MHA?
11:50 7     A. Billy's my friend. I mean, I've known -- I've
11:50 8 talked to Billy. I mean, that's why this is this thick
11:50 9 and this is, like, three weeks.
11:50 10     Q. I'm just trying to figure out when did you
11:50 11 first meet him. I mean, did you meet Mr. Bowden while
11:50 12 you were work at MHA?
11:50 13     A. I did.
11:50 14     Q. So y'all worked together --
11:50 15     A. Uh-huh.
11:50 16     Q. -- and you became -- you became friends. But
11:50 17 the origination of your relationship was your employment
11:50 18 with MHA?
11:51 19     A. Yes.
11:51 20     Q. Is this a true and correct copy of the text
11:51 21 messages between yourself and Mr. Bowden from
11:51 22 September 17th through November 14th of 2012?
11:51 23     A. Yes.
11:51 24     Q. And you've already testified today that you do
11:51 25 have other text messages with Mr. Bowden that have not

**108**

1 been produced to me in this litigation?
2     A. Yes. From November 14th on, sure.
3     Q. When you spoke with Ms. Stephens on September
4 the 17th, did she call you?
5     A. She called me.
6     Q. And what did you discuss?
7     A. I don't remember. She told me about
8 Consilium. I -- I honestly don't remember. I mean,
9 that's been, like, two years.
10     Q. What did you understand the point of her
11 calling you to be?
12     A. To tell me about Consilium.
13     Q. And what was the end result that you were
14 hoping for? Was it an employment opportunity at
15 Consilium?
16     A. If I wanted that. I mean, I talk to many
17 people.
18     Q. But during the call, were you and Ms. Stephens
19 discussing, you know, the potential employment
20 opportunities that existed at Consilium?
21     A. I don't know if she ever brought up the
22 employment opportunities that existed, actually. She
23 told me about Consilium.
24     Q. Okay. And after that call on September 17th,
25 did you and Mr. Bowden discuss how the call went?

**109**

1     A. How did that go -- let's see -- it went really
2 well.
3     THE REPORTER: I'm sorry?
4     THE WITNESS: I said yes, it went really
5 well.
6     A. I'm coming up on Wednesday at lunch.
7     So we did.
8     Q. (BY MS. NOWAK) So the end result of your
9 phone call with Ms. Stephens on September 17th is that
10 she invited you to come into Consilium's offices on
11 Wednesday, September the 19th?
12     A. Yes.
13     Q. And you did go to Consilium's offices?
14     A. Yes.
15     Q. Did you speak with anybody besides
16 Ms. Stephens at that time?
17     A. I do not believe so.
18     Q. So to the best of your recollection, the only
19 person that you met with or saw while you were at
20 Consilium's offices was Ms. Stephens?
21     A. There were other people -- their office is
22 very small. So there were other people in cubicles. I
23 didn't -- I went to her office. So I saw other people,
24 yes, but...
25     Q. Did you stop and talk with Mr. Bowden while

**28 (Pages 106 to 109)**

**APP. 0142**

Larry Scott Gresham

---

**110**

11:53 1 you were there?
11:53 2   **A. I don't remember. This may give you more**
11:53 3 **insight into that than I can. I don't remember.**
11:53 4   Q. And what was the substance of the meeting that
11:53 5 you had with Ms. Stephens on the 19th? What did you
11:53 6 discuss?
11:53 7   **A. Almost the same thing as the phone call, just**
11:53 8 **telling me more about Consilium.**
11:53 9   Q. And did you discuss during the course of that
11:53 10 meeting the potential job opportunities that existed at
11:53 11 Consilium?
11:53 12   **A. What I recall -- what I recall is her talking**
11:52 13 **about that there weren't -- they were so tight, that**
11:52 14 **there weren't a lot of opportunities for recruiters.**
11:52 15   Q. Mr. Gresham, I'm going to show you what's been
11:52 16 previously marked as Exhibit 11.
11:52 17   **A. Okay.**
11:52 18   Q. Can you take a look at that.
11:52 19   **A. (Witness complies.)**
11:52 20   Q. Do you mind reading that e-mail --
11:52 21   **A. Oh, I guess they did.**
11:52 22   Q. -- aloud for --
11:52 23   **A. Okay.**
11:52 24   Q. -- the record.
11:52 25   **A. Sure.**

---

**111**

11:54 1       **Thank you for taking time to talk to me**
11:54 2 **today --**
11:54 3       THE REPORTER: Okay. You're going to
11:54 4 have to slow down for me.
11:54 5       MR. VOLNEY: Yeah.
11:54 6       THE REPORTER: I can't take you that
11:54 7 fast.
11:54 8   **A. Thank you for taking the time today to talk**
11:54 9 **with me about Consilium Staffing as a whole, as well as**
11:54 10 **the recruiter opening. I remain extremely excited about**
11:54 11 **the position. I look forward to our future meetings.**
11:54 12       MR. VOLNEY: Slow down.
11:54 13   **A. Additionally, thank you for adjusting your**
11:54 14 **schedule to accommodate such an early meeting on Friday**
11:54 15 **morning. Have a great evening and I will see you on**
11:55 16 **Friday at 7:00 a.m.**
11:55 17   Q. (BY MS. NOWAK) So does this e-mail refresh
11:55 18 your recollection of what you and Ms. Stephens discussed
11:55 19 on September the 19th, that you discussed an employment
11:55 20 opportunity --
11:55 21   **A. It --**
11:55 22   Q. -- specifically a recruiter opening?
11:55 23   **A. It really still does not. I mean, I told you**
11:55 24 **I had -- I don't have the recollection.**
11:55 25   Q. Do you have any reason to doubt that this

---

**112**

1 e-mail that you sent to Ms. Stephens is incorrect?
2   **A. No.**
3   Q. Had you ever worked with Ms. Stephens during
4 your employment at MHA?
5   **A. No.**
6   Q. Did you contact or reach out to Ms. Stephens
7 prior to the time that she phoned you on September the
8 17th?
9   **A. No.**
10   Q. So it was -- you only received that call after
11 Mr. Bowden had given her your contact information?
12   **A. Yes.**
13   Q. And after you spoke with Ms. Stephens on
14 September 19th, you again texted with Mr. Bowden?
15   **A. Yes. Let's see. Hold on.**
16   **Yes.**
17   Q. He told you he thought things were looking
18 good?
19   **A. Yes.**
20   Q. Did you also speak with Mr. Bowden on
21 September 19th, do you recall?
22   **A. I don't recall.**
23   Q. So you might have?
24   **A. I could have. Oh, he said call me tonight if**
25 **you have the chance. So I probably did.**

---

**113**

1   Q. Okay. And what would y'all have talked about?
2   **A. I have no idea. I mean, this is two years**
3 **ago. He called me a butt pirate. I mean, that's the**
4 **thing. We're friends. It -- it could have been -- who**
5 **knows what we talked about.**
6   Q. Can you turn with me to Gresham 62, please.
7   **A. Sure.**
8   Q. It says here about midway down the page under
9 September 20th, it said, This is killing me, LOL, I just
10 want to walk out.
11   **A. I told you I wanted to quit.**
12   Q. Okay. So as of September 20th, you intended
13 to quit --
14   **A. For a --**
15   Q. -- MHA?
16   **A. For a year I wanted to quit.**
17   Q. But you had made the decision as of
18 September 20th that you were going to quit, it was just
19 a matter of the timing?
20   **A. No. It doesn't say that. I said -- it says,**
21 **I just want to walk out.**
22   Q. I know. I'm just asking you.
23   **A. I don't know. I -- I mean, I don't know.**
24   Q. Did you have a September 21st meeting with
25 Ms. Stephens?

---

**29 (Pages 110 to 113)**

**APP. 0143**

Larry Scott Gresham

**114**

11:55  1     A.   Yes, I did.
11:55  2     Q.   And what happened during that September 21st
11:55  3   meeting?
11:55  4     A.   I took a personality test.
11:55  5     Q.   What did they have you do during a personality
11:55  6   test?
11:55  7     A.   Answer questions.
11:55  8     Q.   Like what?
11:55  9     A.   Some of that -- there were math questions.
11:55  10   And then -- I mean, it's a -- it's the type A, B, C.
11:55  11   It's a personality test.  It's just questions.
11:55  12     Q.   Did you actually --
11:55  13     A.   They're random.
11:55  14     Q.   -- meet with Ms. Stephens or did you just take
11:55  15   this personality assessment?
11:55  16     A.   I met with her, she gave me the test, I
11:55  17   finished the test, I gave it back to her.  I probably
11:55  18   did say words with her.
11:55  19     Q.   Where did the meeting take place?
11:55  20     A.   In her office.
11:55  21     Q.   And did you meet with anybody else besides
11:55  22   Ms. Stephens on September 20th?
11:55  23     A.   I did not.
11:55  24     Q.   And if we look at your text messages with
11:55  25   Mr. Bowden, when you say finished in 23 minutes, are you

**115**

11:56  1   talking about the length of time that it took for you to
11:56  2   get through the personality test?
11:56  3     A.   Yes.  Because I was on a crunch.  I had to get
11:56  4   to work.
11:56  5     Q.   And you didn't want to get caught?
11:56  6     A.   Sure.
11:56  7     Q.   Did you ever see Mr. Bowden at Consilium's
11:56  8   offices during any of the times that you were there for
11:56  9   meetings or interviews?
11:56  10     A.   I don't know if I saw him on that Wednesday.
11:56  11   I know on this Friday I didn't see him, because when
11:56  12   he -- I remember when he said, hey, I'm downstairs
11:56  13   having Bible study, I didn't go by --
11:56  14     Q.   Okay.
11:56  15     A.   -- because I had to get out of there.
11:56  16     Q.   But it's possible that some of the other times
11:56  17   that you were there in the office you might have seen
11:56  18   him --
11:56  19     A.   I might have.
11:56  20     Q.   At the end of your personality assessment on
11:56  21   September the 21st, did Consilium extend an offer of
11:56  22   employment to you?
11:55  23     A.   On September 21st?
11:55  24     Q.   Yes.
11:55  25          Did Christina tell you, it looks good, you'll

**116**

1   be getting an offer?
2     A.   I don't recall.  I don't think so.
3     Q.   Is it possible that she did?
4     A.   It's not possible -- no, it's not possible
5   because I hadn't met with the partners.  She -- she did
6   not have the ability to extend an offer.
7     Q.   Okay.  So if we're looking at our timing,
8   Friday was September the 21st and then Saturday would
9   have been September 2nd, Sunday would have been
10   September 23rd, and then Monday is September 24th when
11   you resigned.
12     A.   Okay.
13     Q.   Friday was the last date that you ever went
14   into work at MHA; is that correct?
15     A.   Yes.
16     Q.   Did you actually go into the offices on
17   Friday --
18     A.   I did.
19     Q.   -- September 21st?
20     A.   I did.
21     Q.   Okay.  And did you work a full day?
22     A.   I'm sure I did.
23     Q.   And did you give any indication to anyone that
24   you wouldn't be back on Monday?
25     A.   No.

**117**

1     Q.   Okay.  Did you know that you wouldn't be back
2   on Monday?
3     A.   I don't think I knew yet what I was going to
4   do.
5     Q.   So you made that decision sometime on
6   Saturday?
7     A.   Saturday or Sunday.
8     Q.   Okay.  And on Sunday, you went into MHA's
9   offices?
10     A.   Yes.
11     Q.   And do you recall what time you went into
12   MHA's offices?
13     A.   I don't recall.  In the afternoon.  But the --
14   the card would tell you what time I came in.
15     Q.   If I represented to you that you came in at
16   4:00 in the afternoon, would that sound correct to you?
17     A.   That's fine.
18     Q.   Can you look with me again at these text
19   messages, and let's look at Gresham Page 66.
20     A.   Okay.
21     Q.   And about midway down the page, September the
22   21st -- 24th, excuse me -- 2012 at 9:12 a.m. Mr. Bowden
23   sends you a message saying, You doing the dirty deed
24   yet?
25     A.   Quitting.

**30 (Pages 114 to 117)**

Larry Scott Gresham

**118**

| | | |
|---|---|---|
| 12:58 | 1 | Q.  Is that what -- |
| 12:58 | 2 | A.  Yes. |
| 12:58 | 3 | Q.  -- he's referring to? |
| 12:59 | 4 | Had you already spoken to Mr. -- Mr. Bowden |
| 12:59 | 5 | about the fact that you were quitting? |
| 12:59 | 6 | A.  I may have talked to him Saturday or Sunday. |
| 12:59 | 7 | Q.  It stands to reason that you did talk to him, |
| 12:59 | 8 | otherwise he wouldn't -- |
| 12:59 | 9 | A.  Why would he know. |
| 12:59 | 10 | Q.  -- have had any information to send this text |
| 12:59 | 11 | message? |
| 12:59 | 12 | A.  Why would he know. |
| 12:59 | 13 | Q.  Correct. |
| 12:59 | 14 | After Friday, September the 22nd, when is the |
| 12:59 | 15 | next time that you met with Mr. Bowden or Ms. Stephens |
| 12:59 | 16 | or anyone else from Consilium? |
| 12:59 | 17 | A.  Let's see.  I met with Billy for lunch at |
| 12:59 | 18 | Ali Baba on September 25th, it looks like. |
| 12:59 | 19 | Q.  So that would have been the day after you |
| 12:59 | 20 | formally resigned? |
| 12:59 | 21 | A.  Yes. |
| 12:59 | 22 | Q.  Did you talk with Mr. Bowden, though, on the |
| 12:59 | 23 | date that you did resign? |
| 12:59 | 24 | A.  I don't recall.  If it's not in the text, I |
| 12:59 | 25 | have no recollection. |

**119**

| | | |
|---|---|---|
| 12:00 | 1 | Q.  Okay.  Let's back up just a little bit. |
| 12:00 | 2 | You have a string here in these text messages |
| 12:00 | 3 | that says, did it, ha ha, was brutal. |
| 12:00 | 4 | A.  Uh-huh. |
| 12:00 | 5 | Q.  What do you mean by that? |
| 12:00 | 6 | A.  I mean, there were things I enjoyed about |
| 12:00 | 7 | Merritt Hawkins.  So it's -- it's always tough to quit. |
| 12:00 | 8 | Q.  And that's what you're referring to when you |
| 12:00 | 9 | use -- |
| 12:00 | 10 | A.  Quitting my job. |
| 12:00 | 11 | Q.  -- the term brutal? |
| 12:00 | 12 | A.  Uh-huh. |
| 12:00 | 13 | Q.  What did you discuss with Mr. Bowden on |
| 12:00 | 14 | September the 25th when you had lunch? |
| 12:00 | 15 | A.  Our kids and the Dallas Cowboys mostly. |
| 12:00 | 16 | Q.  Did you talk about Consilium? |
| 12:00 | 17 | A.  We could have. |
| 12:00 | 18 | Q.  Is it likely that you did? |
| 12:00 | 19 | A.  It's likely. |
| 12:00 | 20 | Q.  And if you had been discussing Consilium, |
| 12:00 | 21 | would you have been discussing your potential employment |
| 12:00 | 22 | at Consilium? |
| 12:00 | 23 | A.  On September the 25th, I was probably -- yeah, |
| 12:00 | 24 | I'm sure. |
| 12:00 | 25 | Q.  When was your next meeting with Consilium or |

**120**

| | |
|---|---|
| 1 | someone who worked at Consilium after September the |
| 2 | 25th? |
| 3 | A.  I met with Joe and Matt I think that week.  I |
| 4 | just don't remember if it was the 26th or the 27th. |
| 5 | Q.  Okay.  But it would have been either |
| 6 | Wednesday, September 26th or Thursday, September 27th? |
| 7 | A.  I believe so. |
| 8 | Q.  And where did that meeting with Joe Hawkins |
| 9 | take place? |
| 10 | A.  In his office. |
| 11 | Q.  And was anyone else present? |
| 12 | A.  Matt Baade. |
| 13 | Q.  And were you familiar with Mr. Baade from your |
| 14 | employment at MHA? |
| 15 | A.  I was not. |
| 16 | Q.  And what was the substance of your discussions |
| 17 | with Mr. Hawkins and Mr. Baade on either September 26th |
| 18 | or September 27th? |
| 19 | A.  The main crux of that discussion was the |
| 20 | differences in temporary and permanent staffing and how |
| 21 | permanent -- permanent physician recruiters don't |
| 22 | usually do well in temporary staffing -- |
| 23 | Q.  Did -- |
| 24 | A.  -- because they're so different. |
| 25 | Q.  Did you discuss anything else? |

**121**

| | |
|---|---|
| 1 | A.  That's about -- that's all Joe really wanted |
| 2 | to discuss with me. |
| 3 | Q.  So did it come up at all the fact that you |
| 4 | were seeking employment at Consilium? |
| 5 | A.  Sure. |
| 6 | Q.  And what was discussed about the fact that you |
| 7 | were seeking employment from Consilium? |
| 8 | A.  That I was seeking employment from Consilium. |
| 9 | I don't know. |
| 10 | Q.  I'm just trying to ascertain, did you talk |
| 11 | about what folks got paid at Consilium, did you talk |
| 12 | about how many recruiter options were open, or did you |
| 13 | just all sit there in a room and stare at each other? |
| 14 | A.  No, we didn't -- Joe talked.  I don't know if |
| 15 | you've met Joe.  Joe talked.  And -- and payment or |
| 16 | nothing like that came into it.  It wasn't time to talk |
| 17 | about money. |
| 18 | Q.  Okay.  Where did this meeting take place? |
| 19 | A.  In Joe's office. |
| 20 | Q.  And was that at the Consilium's offices -- |
| 21 | A.  Yes. |
| 22 | Q.  -- or was that at a different location? |
| 23 | A.  I'm sorry.  Yes. |
| 24 | Q.  Can you look with me on page Gresham 69.  So |
| 25 | back to these text -- |

31 (Pages 118 to 121)

Larry Scott Gresham

122

12:03 1    A.  Yes.
12:03 2    Q.  -- messages.
12:03 3        And if you'll look at the string that starts
12:03 4    September 26th.
12:03 5    A.  Okay.
12:03 6    Q.  There's a reference in here -- it says, Not
12:03 7    meeting with Joe 'til next week.  He has to meet his
12:03 8    attorney in the a.m.
12:03 9    A.  So I didn't meet with him that week.
12:03 10   Q.  So do you think it would have been the
12:03 11   following rowing week, perhaps?
12:03 12   A.  It says there next Thursday at noon.
12:03 13   Q.  Okay.
12:03 14   A.  So I suppose that's when it was.
12:03 15   Q.  So does this refresh your recollection that
12:03 16   you didn't meet with Mr. Baade and Mr. Hawkins on
12:03 17   September 27th, but it would have been the following
12:03 18   week which I believe would have been Thursday, October
12:03 19   the 2nd?
12:03 20   A.  That -- yes.
12:03 21   Q.  Okay.  What does this mean, he has to meet his
12:03 22   attorney in the a.m.?
12:04 23   A.  I don't know.  That's probably why the meeting
12:04 24   got cancelled.
12:04 25   Q.  Who told you that he had to meet with his

123

12:06 1    attorney?
12:06 2    A.  Probably his secretary.  His secretary -- I
12:06 3    don't recall this stuff.  His secretary probably called
12:06 4    and said, hey, Joe's got an appointment with his
12:06 5    attorney, can we move it to next Thursday.
12:06 6    Q.  Did they tell you at that time who Joe's
12:06 7    attorney was --
12:06 8    A.  No.
12:06 9    Q.  -- that he was meeting with?
12:06 10   A.  No.
12:06 11   Q.  Did anyone tell you that Joe was meeting with
12:06 12   his lawyers and that it had anything to do with your
12:06 13   employment agreement?
12:06 14   A.  No.
12:06 15   Q.  Did anybody say that Joe was meeting with his
12:06 16   lawyers and that it had something to do with MHA?
12:06 17   A.  No.
12:06 18   Q.  After this particular meeting with Joe and
12:06 19   Matt Baade on October the 22nd (sic), did you have any
12:07 20   other meetings with Consilium?
12:07 21   A.  Again, I think if that was on a Thursday, it
12:07 22   may have been the next day that I met with John and
12:07 23   Kyle Etter.  And there's another name, Kyle Etter.  But
12:07 24   it could have been the -- the Friday after that.  I
12:07 25   don't remember.  But yes, I did meet with somebody else.

124

1    Q.  So there was at least one other meeting?
2    A.  There was one other meeting.
3        MS. NOWAK:  Lezley, what's our next
4    exhibit?
5        THE REPORTER:  21.
6        MS. NOWAK:  Okay.
7        (Exhibit No. 21 marked.)
8    Q.  (BY MS. NOWAK)  Mr. Gresham, I'm going to hand
9    you what's going to be marked as Deposition Exhibit
10   No. 21.
11       Does this help refresh your recollection about
12   the timing of those meetings?
13   A.  Okay.  It was after -- it must have been
14   October 3rd or 4th that I met with them -- oh.
15       MR. VOLNEY:  Take your time.
16       THE WITNESS:  Yeah, sure.
17   A.  October 3rd, I met with Kyle, John, and Amy.
18   Q.  (BY MS. NOWAK)  Okay.  And it says that on
19   Tuesday --
20   A.  Oh --
21   Q.  -- you met with Joe and Matt?
22   A.  -- I see.  Yeah, I met with Joe on Tuesday.
23   So obviously it was moved from Thursday to Tuesday, the
24   Joe Hawkins meeting.
25   Q.  So in terms of timing, it appears that you had

125

1    a meeting with Joe and Matt on Tuesday, October 2nd.
2    The following day, you came back for a subsequent
3    meeting with Kyle Etter, John Moberly, and Amy Gentile;
4    is that correct?
5    A.  Yes.
6    Q.  Okay.  Did you ever meet with anyone else or
7    speak with anyone else at Consilium prior to accepting
8    an offer of employment?
9    A.  I probably shook almost everyone's hand there
10   as I walked through, but no sit down meetings.
11   Q.  What was the substance of your meeting with
12   Kyle, John, and Amy?
13   A.  Wanted to tell me about their specific
14   divisions.  They each ran a division.
15   Q.  And was it your understanding during each of
16   the meetings that you were having that you were
17   discussing with Consilium your potential employment at
18   Consilium?
19   A.  Sure.
20   Q.  And were Kyle, John, and Amy encouraging you
21   to come to work for Consilium?  Did they tell you it was
22   a great place to work, they thought you'd really like
23   it?
24   A.  Yes.
25   Q.  Do you recall when you received your formal

32  (Pages 122 to 125)

APP. 0146

Larry Scott Gresham

126

12:09 1 offer letter from Consilium?
12:09 2    **A.  I do not.**
12:09 3       MS. NOWAK:  Lezley, this will be
12:09 4 Deposition Exhibit No. 22.
12:09 5       THE REPORTER:  Thank you, ma'am.
12:09 6       (Exhibit No. 22 marked.)
12:09 7    **A.  On that Thursday, they gave me an offer**
12:09 8 **letter.**
12:09 9    Q.  (BY MS. NOWAK)  So does this document refresh
12:09 10 your recollection that on Thursday, October 4th, you
12:09 11 received your formal written offer letter from
12:08 12 Consilium?
12:08 13    **A.  Yes.**
12:08 14    Q.  And at the time you received this e-mail on
12:08 15 October 4th, had you already accepted an offer from
12:08 16 Consilium?
12:08 17    **A.  At the time I received the offer letter?**
12:08 18    Q.  Uh-huh.
12:08 19    **A.  No.**
12:08 20    Q.  But in any event, you did sign the offer
12:08 21 letter and return it on October 4th?
12:08 22    **A.  Yes.**
12:08 23    Q.  And you've already told us this -- but it does
12:08 24 list herein -- that your official start date was going
12:08 25 to be Monday, October the 15th?

127

12:08 1    **A.  Right.**
12:08 2    Q.  And that is, in fact, the date you started?
12:08 3    **A.  Yes.**
12:08 4    Q.  Just to go back over some of these dates
12:08 5 because we've -- we've kind of talked about a lot.
12:08 6       You resigned from MHA on September the 24th,
12:08 7 which was seven days after your initial contact with
12:08 8 Mr. Bowden and Ms. Stephens about the potential
12:08 9 employment opportunities at Consilium?
12:08 10    **A.  Yes.**
12:08 11    Q.  Did Ms. Stephens or anyone else at Consilium
12:08 12 ever tell you they needed you to formally resign from
12:08 13 MHA before they'd send you an offer letter?
12:08 14    **A.  No.**
12:08 15    Q.  Do you know why Ms. Stephens doesn't call MHA
12:08 16 for references?
12:08 17    **A.  Well, the reason I would expect is because MHA**
12:08 18 **won't really give a reference.**
12:08 19    Q.  Is that your understanding?
12:08 20    **A.  That's an AM-- -- that's my understanding**
12:08 21 **that's an AMN -- AMN policy.  They'll tell you how long**
12:08 22 **a person worked there.  That's about it.**
12:08 23    Q.  So it has nothing to do with the number of
12:08 24 folks who are working at Consilium that were prior or
12:09 25 previous MHA employees?

128

12:09 1    **A.  That wasn't my understanding.**
2    Q.  What's your current relationship with
3 Mr. Bowden?
4    **A.  We're still friends.**
5    Q.  Do you speak with him very often?
6    **A.  Not -- not incredibly often.**
7    Q.  Have you spoken with him since you left
8 Consilium?
9    **A.  Yes.**
10    Q.  We already know that you've been texting with
11 him, correct?
12    **A.  Uh-huh.**
13    Q.  Have you also met him in person or talked with
14 him on the phone?
15    **A.  I haven't seen him since I left.  And I don't**
16 **think I've talked to him on the phone either.  I**
17 **haven't.**
18    Q.  What are the substance of the communications
19 between yourself and Mr. Bowden since you left
20 Consilium?  What have those been?  What have y'all
21 talked about?
22    **A.  All kinds of stuff.  I mean, the Dallas**
23 **Cowboys is probably first and foremost.**
24    Q.  Did you talk about this lawsuit?
25    **A.  He's told me that he was going to be deposed.**

129

1    Q.  Anything else related to the lawsuit?
2    **A.  No.  Just that the deposition was moving and**
3 **things like -- moving back, moving forward, those type**
4 **of things.**
5    Q.  Other than those text messages that we've been
6 discussing throughout the course of this deposition, is
7 there any other written communications that you've had
8 with Mr. Bowden?
9    **A.  No.**
10    Q.  No e-mails?
11    **A.  No.  I don't even know his e-mail address.**
12    Q.  Have you texted with anyone else at Consilium
13 besides Mr. Bowden since your departure?
14    **A.  No.**
15    Q.  Have you texted with anyone at Consilium,
16 period, related to or about this lawsuit?
17    **A.  No.**
18       MS. NOWAK:  John, I'm actually at, like,
19 a breaking point --
20       MR. VOLNEY:  Sure.
21       MS. NOWAK:  -- before I switch to a
22 topic.  So we can keep going, but it will probably be
23 about another half hour or we can take a break.
24 What's --
25       MR. VOLNEY:  No.  Let's take a break.

**33 (Pages 126 to 129)**

Larry Scott Gresham

---

130

| | |
|---|---|
| 13:00 | 1 |
| 13:00 | 2 |
| 13:00 | 3 |
| 13:00 | 4 |
| 13:05 | 5 |
| 13:05 | 6 |
| 13:05 | 7 |
| 13:05 | 8 |
| 13:05 | 9 |
| 13:05 | 10 |

1    MS. NOWAK: -- your preference?
2    MR. VOLNEY: Let's take a break.
3    THE VIDEOGRAPHER: We're off the record
4 at 12:10 p.m.
5    (Lunch break taken from 12:10 to 1:05 p.m.)
6    THE VIDEOGRAPHER: We're on the record at
7 1:05 p.m. This is Tape 3.
8    Q. (BY MS. NOWAK) Mr. Gresham, we're back from a
9 brief lunch break. And before we move much further, I
10 want to close out just a few topics with you.
11    We talked earlier about Ms. Elliott and
12 Mr. Dodson and you said that you had spoken with them
13 prior to leaving MHA about the fact you were considering
14 employment with Consilium?
15    A. Yes.
16    Q. Did you talk with anyone else besides
17 Ms. Elliott or Mr. Dodson --
18    A. I don't --
19    Q. -- that you can recall?
20    A. I do not recall.
21    Q. Is it possible that you talked with others?
22    A. It is possible.
23    Q. In connection with your employment at
24 Consilium, you provided the names of certain references
25 for Consilium to contact.

---

131

1    Do you recall the names of the references that
2 you provided?
3    A. I don't.
4    Q. Is it possible that it was Ms. Elliott and
5 Mr. Dodson?
6    A. No.
7    Q. Do you think it would have been other MHA
8 employees?
9    A. I don't remember putting an MHA employee. I
10 may have. I mean, I'm trying to remember the
11 application because I may have had to put a reference
12 from my previous position.
13    THE VIDEOGRAPHER: I'm sorry. Are you
14 wearing that -- that microphone?
15    THE WITNESS: Is it not high enough?
16    THE VIDEOGRAPHER: Oh, okay. No. I'm
17 good. Never mind. I'm sorry.
18    THE WITNESS: You got it?
19    THE VIDEOGRAPHER: I've got it.
20    A. I don't remember who I put on there.
21    Q. (BY MS. NOWAK) But it's possible, then, that
22 your references would have been listed on your
23 employment application?
24    A. They should have been.
25    Q. Okay. And it's your testimony that Consilium

---

132

1 would have a copy of that employment application?
2    A. I'm sure they do.
3    Q. But you, in connection with this lawsuit, did
4 not request a copy from Consilium?
5    A. No. That's Consilium's.
6    Q. And you haven't provided or produced a copy to
7 me in this litigation?
8    A. No.
9    MS. NOWAK: Lezley, what number are we
10 at?
11    THE REPORTER: I believe 22 -- no,
12 there's a 22.
13    23.
14    (Exhibit No. 23 marked.)
15    Q. (BY MS. NOWAK) Mr. Gresham, I've handed you
16 what's been marked as Deposition Exhibit No. 23. And
17 this is a -- a cover e-mail that you sent to
18 Christina Stephens attaching your offer and background
19 check.
20    And if we turn to the last page of this
21 exhibit, is this a true and correct copy of your offer
22 letter that you signed and sent back to Consilium?
23    A. Yes.
24    Q. Okay. How were you compensated while you were
25 at Consilium? Is it consistent with what is contained

---

133

1 in this offer letter?
2    A. Salary plus commission, yes.
3    Q. And how did you calculate your commission?
4    A. My commission was upon days worked by
5 physicians.
6    Q. Is there an actual formula or do we just --
7    A. There is. I don't remember what it was.
8    Q. Okay. Just something that Consilium had --
9 did they make you aware of what the formula would be
10 before you came to work for them?
11    A. I don't recall if it was before I came to work
12 or the first day I worked.
13    Q. In addition to the salary and your
14 commissions, were you also entitled to any bonuses?
15    A. Well, when I started, they gave me 1,000 per
16 month for two months. That's it, you know, besides
17 salary and commission.
18    Q. What was the total amount that you earned from
19 Consilium in 2013?
20    A. In 2013, I didn't work. I would guess 30 to
21 $40,000-something through September, maybe 50.
22    Q. Now, Mr. Bowden --
23    A. Gresham.
24    Q. Oh, my gosh. I'm so sorry, Mr. Gresham.
25    A. That's okay.

---

34  (Pages 130 to 133)

Larry Scott Gresham

---

**134**

13:09  1    Q.  It's been your testimony here today that you
13:09  2  quit your job at MHA and that you had no job to go to at
13:09  3  the time that you quit; is that correct?
13:09  4    A.  Yes.
13:09  5    Q.  So it's your testimony that despite the fact
13:09  6  that you had a family to support, you quit your job with
13:09  7  no offer in hand from Consilium?
13:09  8    A.  Yes.  I have very wealthy parents.
13:09  9    Q.  You must have also felt pretty good about your
13:10 10  chances about landing that job at Consilium?
13:10 11    A.  No, not just Consilium.  I knew I could get a
13:10 12  job.
13:10 13    Q.  Did you feel pretty good about your chances
13:10 14  about getting an offer from Consilium?
13:10 15    A.  I felt pretty good about my chances of getting
13:10 16  an offer from anyone.
13:10 17    Q.  But if I were to ask you specifically about
13:10 18  Consilium, did you feel that your chances on the day
13:10 19  that you, you know, resigned from MHA were pretty good
13:10 20  at getting that job at Consilium?
13:10 21    A.  If I wanted it, yes.
13:10 22    Q.  Mr. Gresham, when we started out this
13:10 23  deposition, I was asking you who you had spoken with in
13:10 24  preparation for the deposition or about the deposition.
13:10 25        Since this deposition began, have you talked

---

**135**

13:12  1  now with anyone else about the deposition?  While we
13:12  2  were on the lunch break, did you talk with anyone
13:12  3  besides Mr. Volney about your deposition?
13:12  4    A.  Mr. Volney asked me to keep my hands from my
13:12  5  face.
13:12  6        MR. VOLNEY:  Okay.  You're technically
13:12  7  not supposed to tell her what we talked about, but
13:12  8  I'll -- she's heard that one, so --
13:12  9        THE WITNESS:  Yeah.
13:12 10        MS. NOWAK:  And I'm happy for us to mark
13:12 11  it.
13:12 12        MR. VOLNEY:  That's okay.
13:12 13    Q.  (BY MS. NOWAK)  I'm actually -- I don't want
13:12 14  to know anything you talked about with Mr. Volney.
13:12 15        I'm asking have you talked with anyone else
13:12 16  besides Mr. Volney?
13:12 17    A.  No.
13:12 18    Q.  Did you text with anyone else about the
13:12 19  litigation or this deposition while we were on the lunch
13:12 20  break?
13:13 21    A.  I called my wife.
13:13 22    Q.  Okay.  And what did you tell your wife about
13:13 23  the deposition?
13:13 24    A.  How much longer it would probably be.
13:13 25    Q.  Okay.  And what did you tell your wife about

---

**136**

 1  how much longer you thought it would probably be?
 2    A.  Maybe three to four hours.
 3    Q.  Okay.  Did you tell her anything else?  Did
 4  you tell her how you thought it was going?
 5    A.  No, no.  I'm sorry.  No.
 6    Q.  Do you have those text messages in front of
 7  you still?
 8    A.  Yes.
 9    Q.  If we look at the very first page of those
10  text messages in Gresham Page 56, can you tell me, do
11  you know who Deleon McKee is?
12    A.  I do.
13    Q.  And who is Deleon McKee?
14    A.  Deleon worked with Merritt Hawkins during my
15  first employment with Merritt Hawkins.  He was a
16  marketer.
17    Q.  So he is also a former MHA employee --
18    A.  He is.
19    Q.  -- that went to interview over at Consilium?
20    A.  Yes.  That's what Billy said.
21    Q.  Do you know if Mr. Bowden was involved in
22  those interviews?  Did y'all ever discuss it?
23    A.  I don't know.  I -- I wouldn't expect he was.
24    Q.  Besides Mr. McKee, are you aware of any other
25  former MHA employees that were interviewed during the

---

**137**

 1  course of your employment with Consilium?
 2    A.  Drew -- and I can't remember his last name --
 3  was a former employee.
 4    Q.  Anyone else that you --
 5    A.  I --
 6    Q.  -- recall?
 7    A.  -- can't think of anyone else, but I could be
 8  wrong.
 9    Q.  So it's possible that there are others?
10    A.  Sure.
11    Q.  Is it likely that there are others?
12        MR. VOLNEY:  Objection; form.
13    A.  Yeah.  I don't know if it's -- I don't know if
14  it's likely.  I don't...
15    Q.  (BY MS. NOWAK)  Okay.  I'm going to now ask
16  you to go back to your employment agreement.
17    A.  Okay.
18    Q.  We talked a while back fairly extensively
19  about this Paragraph 5 and the Subsections A, B, and C.
20  And you and I were discussing the restrictions in there
21  and that at the time of signing, that you agreed that --
22  that the restrictions in this covenant were reasonable;
23  is that correct?
24    A.  Yes.
25    Q.  Okay.  And as we sit here today, though, your

---

**35 (Pages 134 to 137)**

**APP. 0149**

Larry Scott Gresham

**138**

13:14 1  testimony is that you no longer feel them to be
13:15 2  reasonable, you think that they are unreasonable now; is
13:15 3  that correct?
13:15 4      A. Yes.
13:15 5      Q. Okay. So I'd like for you to give me an idea
13:15 6  of what you feel would be reasonable. You're telling us
13:15 7  that a period of 12 months is not reasonable.
13:15 8          So what would you consider to be a reasonable
13:15 9  period of time?
13:15 10     **A. No. I'm not saying a period of 12 months.**
13:15    **That's reasonable.**
13:15 12     Q. 12 months is reasonable?
13:15 13     **A. It's reasonable.**
13:15 14     Q. Okay. Well, what about this restricted
13:15 15  territory? It says you shouldn't do Dallas or any
13:15 16  counties adjacent to Dallas County, including Collin,
13:15 17  Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall, and
13:15 18  Tarrant. Is it your testimony today that you feel that
13:15 19  is unreasonable?
13:15 20     **A. That is unreasonable.**
13:15 21     Q. Okay. And what, in your opinion, would be
13:15 22  reasonable?
13:15 23     **A. Well, I can give you an example. If I sold**
13:15 24  **widgets, you sold widgets, I had an employee within this**
13:15 25  **area -- in the same area that wanted to go from my**

**139**

13:15 1  **company to your company to sell widgets, he's directly**
13:15 2  **competing with me. Merritt Hawkins services the entire**
13:15 3  **country. I service the Heartland. It doesn't matter**
13:15 4  **where I live to do that work. That's what makes that**
13:15 5  **unreasonable to me.**
13:15 6      Q. So it's your opinion that it shouldn't matter
13:15 7  where the companies are located because this is talking
13:15 8  about where the business is --
13:16 9      **A. Yeah. It has no bearing on what you do where**
13:16 10  **you -- where you're located.**
13:16 11     Q. So it's your testimony here today that there
13:16 12  should be no restricted territory contained --
13:16 13     **A. Absolutely.**
13:16 14     Q. -- in this agreement?
13:16 15          Okay. I'm just trying to make sure I
13:16 16  understand what it is that you consider as reasonable
13:16 17  versus unreasonable.
13:16 18     **A. Sure.**
13:16 19     Q. And if we turn to that next subsection,
13:16 20  Subsection B, we have that same 12-month period and it's
13:16 21  kind of a look forward and a look back period.
13:16 22     **A. Uh-huh.**
13:16 23     Q. It says, you know, for a period of 12 months,
13:16 24  you're not supposed to contact.
13:16 25          As we sit here today, do you believe that's a

**140**

1  reasonable period of time?
2      **A. Sure.**
3      Q. Okay. And do you think that look back
4  period -- the 12-month look back is a reasonable period
5  of time?
6      **A. Yes.**
7      Q. Okay. And if we move on to Subsection C where
8  it's got the nonsolicitation of personnel, and there
9  it's -- it's actually a longer period of time. It's for
10  36 months you're not supposed to solicit or recruit MHA
11  employees.
12          And as we sit here today, do you feel that is
13  a reasonable period of time?
14     **A. Probably not.**
15     Q. Okay. And if we were to say -- what would be
16  a reasonable period of time, in your opinion?
17     **A. 12 months. I mean, that's just me. That's my**
18  **own mind.**
19     Q. I'm trying to get what your own mind is in
20  terms of, you know, what -- what you would consider to
21  be reasonable.
22     **A. Uh-huh.**
23     Q. Do you have an employment agreement with
24  Consilium -- or did you have an employment agreement
25  with Consilium?

**141**

1      **A. I believe all I had was an application.**
2      Q. So no type of other agreement --
3      **A. No.**
4      Q. -- whatsoever?
5      **A. It was just a right to work agreement, I**
6  **believe, or a work at will agreement.**
7      Q. No confidentiality agreements?
8      **A. I would be lying to you if I said yes or no.**
9  **I don't know.**
10     Q. What about noncompetes?
11     **A. I don't know.**
12     Q. Nonsolicit?
13     **A. Can't remember.**
14     Q. What about an employee handbook? Did you ever
15  sign an employee handbook?
16     **A. I don't believe I signed an employee handbook.**
17  **We had an employee handbook.**
18     Q. And have you personally reviewed that employee
19  handbook?
20     **A. The only handbook I'm talking about is a**
21  **training handbook that had to do with temporary**
22  **physician placement.**
23     Q. But you were provided a copy of that?
24     **A. Yes.**
25     Q. Were there any policies at Consilium that you

**36 (Pages 138 to 141)**

**APP. 0150**

Larry Scott Gresham

**142**

13:18  1    were required to sign dealing with information systems
13:18  2    or the protection of Consilium's information?
13:18  3        **A.  I don't recall, honestly.**
13:18  4        Q.  Mr. Gresham, on what date did you leave your
13:18  5    employment with Consilium?
13:18  6        **A.  I don't know.  September -- I mean, I'm just**
13:18  7    **guessing if I -- September 20th.**
13:19  8            MR. VOLNEY:  Don't guess.
13:19  9        **A.  I don't know.  September something.**
13:19  10       Q.  (BY MS. NOWAK)  September of what year?
13:19  11       **A.  2013.**
13:19  12       Q.  And when you left Consilium, what did you go
13:19  13   to do?  Was it a voluntary separation?
13:19  14       **A.  Yeah.  I -- I own another company.**
13:19  15       Q.  So it's your testimony here today that you
13:19  16   voluntarily resigned, Consilium didn't fire you, you
13:19  17   elected to go pursue other opportunities?
13:19  18       **A.  Yes.**
13:19  19       Q.  Okay.  So -- and the other opportunity that
13:19  20   you went to pursue is a new company?
13:19  21       **A.  Yes.**
13:19  22       Q.  What is the name of that company?
13:19  23       **A.  SBKC Products.**
13:19  24       Q.  And when did you form that company?
13:19  25       **A.  I actually formed it as a sole proprietorship**

**143**

13:19  1    in June as SB Products and moved to an LLC -- no.  In
13:19  2    July.  I'm sorry.
13:19  3        Q.  In July of what year?
13:20  4        **A.  2013.**
13:20  5            **Changed it to SBKC Products, an LLC, in**
13:20  6    **December of 2013.**
13:20  7        Q.  So before you ever resigned from Consilium,
13:20  8    you had your company up and running and ready for you to
13:20  9    move to?  You had another job to immediately
13:20  10   transition --
13:20  11       **A.  I had --**
13:20  12       Q.  -- to?
13:20  13       **A.  I had a side job that became a full-time job.**
13:20  14       Q.  And how is your company doing?
13:20  15       **A.  Good.**
13:20  16       Q.  And what products does your company sell?
13:20  17       **A.  The -- the juice for E-cigarettes.**
13:20  18       Q.  And can you tell us what E-cigarettes are?
13:20  19       **A.  Vapor -- personal vaporizers.  I mean --**
13:20  20       Q.  I need --
13:20  21       **A.  -- they --**
13:20  22       Q.  -- to establish for the record, I mean, what
13:20  23   is an E-cigarette, what is --
13:20  24       **A.  Nicotine sensation device.**
13:20  25       Q.  Okay.  And what is the juice that you're

**144**

1    referring to?
2        **A.  The -- the juice that goes in the E-cigarette**
3    **or the nicotine sensation device.**
4        Q.  And who do you market your products to?
5        **A.  Stores.**
6        Q.  What is your relationship with Consilium at
7    this point in time?  Did you part on good terms?
8        **A.  Absolutely.**
9        Q.  And I believe you told me earlier that you
10   sent a resignation e-mail or letter to Mr. Moberly.
11           Do you recall what you told Mr. Moberly at the
12   time that you were resigning?
13       **A.  Exactly what I was doing, that I had another**
14   **venture and I couldn't -- I didn't want to try to put**
15   **too many eggs in one basket.  It wasn't fair.**
16       Q.  Do you know how many employees Consilium had
17   at the time of your departure in September of 2013?
18       **A.  I do not.  And I don't want to guess.**
19       Q.  Can you give me a ballpark?  I mean, are we
20   talking 50, 60 --
21       **A.  Less than 50.**
22       Q.  -- 70?
23       **A.  Less than 50.**
24       Q.  Less than 50 at the time that you left in
25   September of 2013?

**145**

1        **A.  I believe less than 50, but I think it was**
2    **close.**
3        Q.  And of the 50 folks that you recall being
4    there, do you recall how many of them used to work for
5    MHA and/or for a company that's part of the AMN family
6    of companies?
7        **A.  I do not.**
8        Q.  I'm going to hand you what's been previously
9    marked as Exhibit 9.
10       **A.  Sure.**
11       Q.  This is a document that Mr. Bowden produced to
12   us, the employee contact list.
13           Is this a complete listing of all the
14   employees of Consilium at the time that you were
15   departing?
16       **A.  I really can't tell you.  I -- I thought there**
17   **were more.  This doesn't look like that many.  But maybe**
18   **so.**
19       Q.  Do you recognize the names on this list as
20   being employees of Consilium or former employees?
21       **A.  I recognize some of them as being former**
22   **employees.  This is a very old list.**
23       Q.  Okay.  And can you tell me in looking down this
24   list any of the names that you recognize who are folks
25   that used to work at MHA and/or an AMN Healthcare

**37 (Pages 142 to 145)**

Larry Scott Gresham

146

13:23  1   company?
13:23  2        A.  This is great.  I've already got a cheat
13:23  3   sheet.
13:23  4        I know that Matt worked for Staff Care.  Kevin
13:23  5   at some point worked for Merritt Hawkins.  Brent worked
13:23  6   at Staff Care.
13:23  7        THE REPORTER:  Slow down for me just a
13:23  8   little bit.
13:23  9        THE WITNESS:  Oh, sure.
13:23  10       THE REPORTER:  Kevin worked where?
13:23  11       THE WITNESS:  Kevin worked at Merritt
13:23  12  Hawkins.
13:24  13       A.  Brent worked at Staff Care.  I think
13:24  14  Matt Kennedy worked at Staff Care.  I know he worked for
13:24  15  an AMN company.  John Moberly worked for an AMN company,
13:24  16  I believe at first, Staff Care.  I don't know.
13:24  17  Kyle Etter worked for Staff Care.  I did not have a
13:24  18  relationship with Lyndsey Nix.  She didn't work there
13:24  19  when I worked there, but she worked for Merritt Hawkins.
13:24  20  I don't know about Tisha.  Landon worked for Staff Care.
13:24  21  Amy Crowdis worked for Lyndsey Nix.  I don't know about
13:24  22  Michael Lawless.  Monique worked for Joe.  Greg Ellis,
13:24  23  I -- yeah, I think he did.  He worked in accounting for
13:24  24  AMN.  I don't know about Jessica Ferguson.  And I
13:24  25  believe Christina worked for Staff Care.

147

13:24  1        Q.  (BY MS. NOWAK)  Other than the folks that are
13:24  2   circled who Mr. Bowden had previously identified, are
13:24  3   there any others that you know worked for MHA or an AMN
13:24  4   family of companies?
13:24  5        A.  Oh, there is one other.
13:24  6        Q.  Okay.
13:24  7        A.  Brian MacInnis worked for Merritt Hawkins.
13:24  8        Q.  Any others on this list?
13:24  9        A.  I don't -- no, ma'am.
13:24  10       Q.  Okay.  So you would agree with me that over
13:24  11  50 percent of the people on this list who are listed as
13:24  12  being employees of Consilium Staffing came from MHA or
13:24  13  the AMN family of companies?
13:24  14       A.  Yes, on this list.  This list is very old.
13:24  15  This list is from before I worked there.
13:25  16       Q.  But you would still agree with me that over
13:25  17  50 percent of these folks came from MHA or AMN?
13:25  18       A.  Yes.
13:25  19       Q.  At the time that you worked at Consilium, is
13:25  20  it true that Consilium hired mostly folks who had prior
13:25  21  experience of some nature or type in the medical
13:25  22  staffing industry?
13:25  23       A.  Yes.
13:25  24       Q.  So they would have worked somewhere else that
13:25  25  did staffing, and then would have come to Consilium?

148

1        A.  Yes.
2        Q.  Do you recall what the name of the database
3   that Consilium uses is?
4        A.  I do not.  It was web based.  I don't know
5   what it was called.
6        Q.  If I represented to you that it was called
7   Blue Sky, does that sound right to you?
8        A.  That's it.
9        Q.  While you worked at Consilium, did you have
10  access to Blue Sky?
11       A.  I did.
12       Q.  And did you use Blue Sky as part of and/or to
13  complete your job for Consilium?
14       A.  A very small part, yes.
15       Q.  When you say a very small part, what small
16  part was -- was it of your job with Consilium?
17       A.  That's where physicians were.  I didn't use it
18  that much because it was small.
19       Q.  So what information would you have recorded in
20  Blue Sky?
21       A.  Physicians' names, phone numbers, and
22  marketing with hospitals' names and phone numbers.  That
23  wasn't my job.
24       Q.  So you said it was only a very small part.  So
25  did you mostly record information about the activities

149

1   that you were doing for Consilium somewhere else?
2        A.  No.  I just found doctors on the internet to
3   call.
4        Q.  And then did you record the doctors that you
5   were contacting in Blue Sky?
6        A.  Sometimes.
7        Q.  But not all the time?
8        A.  I'm horrible at recordkeeping.
9        Q.  So most of the time, you didn't keep track of
10  who you were contacting on behalf of Consilium?
11       A.  On paper.
12       Q.  And what happened -- what happened to your
13  paper records?
14       A.  They had -- when I left, they had everything.
15  I didn't take anything unless I had thrown it away.  You
16  know, it was just names.
17       Q.  If you had used Blue Sky, let's talk kind of
18  about --
19       A.  Okay.
20       Q.  -- what Blue Sky is for.
21       A.  Sure.
22       Q.  Do you know what type of information is
23  contained in Blue Sky?
24       A.  Well, I know -- yes.  Doctors, PAs, whatever,
25  you know, medical professionals' information, hospitals'

38 (Pages 146 to 149)

Larry Scott Gresham

150

13:25  1    and clinics' information, and then job information, like
13:25  2    people that are working that are married together and --
13:25  3    I mean, pretty much everything is contained in Blue Sky.
13:25  4        Q.   Okay.  So it would have a -- it does have a
13:25  5    list of Consilium's clients?
13:25  6        A.   Yes.
13:25  7        Q.   And when you say it has client information,
13:25  8    what type of information are we talking about?  You
13:25  9    know, just name, address, phone number or is there
13:25 10    additional information that's pertinent to the client
13:25 11    such as, you know, bill rates, pay rates?  I mean, what
13:25 12    other -- what information is there about clients?
13:25 13        A.   I never dug too deep into Blue Sky because I
13:25 14    didn't need that information.  So all I saw was
13:25 15    addresses, phone numbers.
13:26 16        Q.   Was there other information contained in Blue
13:26 17    Sky, to your knowledge, though?
13:26 18        A.   Yes.
13:26 19        Q.   What other information?
13:26 20        A.   I don't know.
13:26 21        Q.   You just know that it --
13:26 22        A.   Yeah.
13:26 23        Q.   -- was there?
13:26 24        A.   I didn't use it for that.
13:26 25        Q.   Was one of the reasons that Consilium had Blue

151

13:26  1    Sky to help keep track of the clients and the physicians
13:26  2    that it was contacting?
13:26  3        A.   Sure.
13:26  4        Q.   But you didn't use it for that purpose?
13:26  5        A.   I would put clients -- doctors in.
13:26  6        Q.   Sometimes?
13:26  7        A.   Sometimes.  But when I say on paper, we had
13:26  8    other lists that we called from that they had paid for.
13:26  9    So all -- I think -- I think all of those doctors were
13:26 10    already in there.  So there would be no reason for me to
13:26 11    put them in.
13:26 12        Q.   Did you check to see if they were already in
13:26 13    there?
13:26 14        A.   I would some, but I knew they were already in
13:26 15    there.
13:26 16        Q.   And when you contacted, did you record in Blue
13:26 17    Sky that -- that you had actually contacted them?
13:26 18        A.   I would.  I don't -- I don't -- yeah.  I don't
13:26 19    understand how this is pertinent.  I mean, yes.
13:26 20        Q.   Would Blue Sky also give us information about,
13:26 21    for instance, you know, the contract terms that
13:26 22    Consilium might have with a client?
13:26 23        A.   I believe it would.
13:26 24        Q.   And the profit margin that Consilium would be
13:26 25    making?

152

1    A.   It may have.  I don't know.
2        Q.   Okay.  What about things like bill rates and
3    pay rates then?
4        A.   Maybe.
5        Q.   Okay.
6        A.   I didn't --
7        Q.   You never --
8        A.   That was not my job.
9        Q.   -- used it for that?
10        Did Consilium consider its Blue Sky database
11    to be confidential?
12        A.   I'm sure.
13        Q.   It -- was it password protected?
14        A.   It was password protected.
15        Q.   Consilium doesn't just hand out --
16        A.   No.
17        Q.   -- that information to folks out on the
18    street, they consider it to be their confidential
19    information, the data that's in Blue Sky?
20        A.   Yes.
21        Q.   Are there any other security measures at
22    Consilium other than password protection on computers?
23        A.   I -- the door has a lock.  I don't -- I don't
24    know.
25        Q.   Other the door having a lock and the

153

1    passwords -- the computers having passwords, is there
2    anything else?
3        A.   There may be a security system.  I'm sure
4    there was a security system.
5        Q.   Video cameras?
6        A.   I think we had -- I think we had key fobs.
7    But when -- when I got to work, the door was always
8    open.  I think the key fob only controlled the
9    downstairs of the entire building.
10        Q.   Do you know if you're able to print
11    information from Blue Sky?
12        A.   Yes, you are.
13        Q.   Do you know if you're able to run reports?
14        A.   Yes, you are.
15        Q.   We talked earlier about whether or not you had
16    contacted any clients or doctors that you worked with at
17    MHA while you were at Consilium.
18        A.   Uh-huh.
19        Q.   And your testimony, as we sit here today, is
20    that you have not --
21        A.   Not --
22        Q.   -- correct?
23        A.   -- to my knowledge.
24        Q.   So I'd like for you to clarify.
25        What do you mean by to your knowledge?  Did

39  (Pages 150 to 153)

Larry Scott Gresham

**154**

13:28  1    you look at any documents to ascertain whether you had
13:28  2    contacted any clients or documents or are you going
13:28  3    solely off your -- you know, your memory?
13:28  4        A. Just my gut, just my memory.
13:28  5        Q. Do you recall the number of clients that you
13:29  6    worked with while you were at Consilium?
13:29  7        A. I worked with no clients.
13:29  8        Q. Okay. The number of doctors?
13:29  9        A. No.
13:29  10       Q. Can you ballpark it for me?
13:29  11       A. No.
13:29  12       Q. Do you remember the names of all of them?
13:29  13       A. No. I worked with over -- I couldn't even
13:29  14   ballpark it, that I actually -- no. Well, I could. I
13:29  15   mean, the doctors that I called and the doctors that I
13:29  16   worked with are two completely different things. The
13:29  17   doctors I worked with, 50.
13:29  18       Q. The doctors that you called?
13:29  19       A. I can't ballpark it. I mean, I can't --
13:29  20       Q. Thousands?
13:29  21       A. Thousands.
13:29  22       Q. Let's go back now and talk about Sunday,
13:29  23   September the 23rd.
13:29  24       A. Okay.
13:29  25       Q. So we've kind of talked about the timing. You

**155**

13:29  1    know, you met with Consilium again on Friday,
13:29  2    September 21st. Saturday was September the 22nd, and
13:30  3    you may have made the decision then that you were going
13:30  4    to be resigning. But then we -- we get to Sunday,
13:30  5    September 23rd and you've made the decision and you've
13:30  6    decided you're going to go up to MHA's offices because
13:30  7    you were not going to work for them --
13:30  8        A. Uh-huh.
13:30  9        Q. -- anymore; is that correct?
13:30  10       A. Yes.
13:30  11       Q. Okay. And Sunday's not usual business hours
13:30  12   for MHA, is it? The office isn't full and buzzing on --
13:30  13       A. The office --
13:30  14       Q. -- Sunday?
13:30  15       A. The office is not full and buzzing. There
13:30  16   were no business hours as a recruiter at MHA. I mean
13:30  17   you worked when you worked.
13:30  18       Q. But was the office generally open, like, on
13:30  19   Monday to Friday? I mean, the office wasn't staffed on
13:30  20   Saturdays and Sundays?
13:30  21       A. Right, it was not.
13:30  22       Q. And do you recall -- I think we've already
13:30  23   discussed -- what time you arrived?
13:30  24       A. I did not recall. I knew it was in the
13:30  25   afternoon. You said 4:00.

**156**

1    Q. Okay. And do you recall how long you stayed?
2        A. I was there about, at the most, 30 minutes.
3        Q. So it would not have been several hours?
4        A. No.
5        Q. Do you recall how you accessed MHA's offices?
6        A. Front door.
7        Q. Okay. Did you have to use a security badge to
8    get in?
9        A. Yes.
10       Q. And did you use the security badge that MHA
11   had issued to you for your employment?
12       A. Of course, yes.
13       Q. Did you also come to the office on Saturday,
14   September the 22nd?
15       A. Not that I recall.
16       Q. Is it possible that you did?
17       A. Probably not.
18       Q. Was there anyone else in the office when you
19   arrived on -- on Sunday, September the 23rd?
20       A. There was at least one other person. I do not
21   know his name. He was a marketer.
22       Q. So he would have been on your floor?
23       A. On my floor.
24       Q. In the same section of the building as you?
25       A. Yes.

**157**

1    Q. But you don't recall the name?
2        A. No.
3        Q. So after you badged into the offices, what did
4    you do next?
5        A. Went to my computer -- well, got all my stuff,
6    put it in a box, cleaned off my desktop, took my
7    documents folder, put it in the trash, took my desktop
8    and put it in the trash.
9        Q. Okay. Let's walk back through each of those.
10       So you got a box and you cleared off your
11   desktop. And by desktop, you literally mean the
12   physical surface --
13       A. Desktop.
14       Q. -- of your desk?
15       So what did you take off of your desktop and
16   put in this box?
17       A. Pictures of myself, pictures of my family, my
18   personal belongings. That's the best way to say it.
19       Q. Anything that belonged to MHA, any documents,
20   anything that related at all to doctors or medical
21   staffing?
22       A. Absolutely not.
23       Q. Any scripts, any training materials?
24       A. (Witness shakes head.)
25       Q. The only thing that went in that box was

**40 (Pages 154 to 157)**

**APP. 0154**

Larry Scott Gresham

**158**

1    pictures and other similar personal effects?
2    A. Yes.
3    Q. Okay. And then after that, you accessed your
4    MHA computer?
5    **A. It could have been after that or before or**
6    **during. I mean, it could have been the same time.**
7    Q. But you did access --
8    **A. Yes.**
9    Q. -- your MHA computer?
10    And how did you access that computer?
11    **A. What do --**
12    Q. Did you have to use your security credentials
13    that MHA had assigned to you? You had --
14    **A. Oh, we had --**
15    Q. -- to use --
16    **A. We had a password.**
17    Q. -- a password and your unique user name?
18    **A. Yes.**
19    Q. And again, at this juncture, you had already
20    decided to resign and that you were no longer going to
21    be working for MHA?
22    **A. Yes.**
23    Q. Just so hopefully I can cut this down a little
24    bit, I'm going to go very quickly through things that I
25    think that you have already admitted about that Sunday.

**159**

1    **A. Sure.**
2    Q. So you admit that you intentionally accessed
3    MHA's offices?
4    **A. Yes.**
5    Q. You admit that you intentionally accessed
6    MHA's computers?
7    **A. Yes.**
8    Q. And just to clarify, on your MHA computer, you
9    were able to send e-mail from that computer?
10    **A. Yes.**
11    Q. It was hooked up to the internet?
12    **A. Yes.**
13    Q. And you had previously on that computer sent
14    e-mails across state lines?
15    **A. Yes.**
16    Q. And you admit that you purposely accessed
17    files on your MHA computer --
18    MR. VOLNEY: Objection; form.
19    Q. (BY MS. NOWAK) -- on that Sunday?
20    MR. VOLNEY: Objection; form.
21    **A. I cleaned up -- I cleaned off my terminal.**
22    Q. (BY MS. NOWAK) But in doing that, you had to
23    actually go in and access, you had to select files --
24    MR. VOLNEY: Objection --
25    Q. (BY MS. NOWAK) -- correct?

**160**

1    MR. VOLNEY: Objection; form.
2    **A. Yeah. I cleaned off my terminal so the next**
3    **person would have a clean desktop.**
4    Q. (BY MS. NOWAK) Did you open any files while
5    you were sitting at your MHA computer?
6    **A. I don't recall. I put everything in the**
7    **trash.**
8    Q. So is it possible that you opened files?
9    MR. VOLNEY: Objection; form.
10    MS. NOWAK: What's the basis for your
11    objection?
12    MR. VOLNEY: You're asking him to
13    speculate.
14    **A. I mean, this is -- this is -- I know why he's**
15    **objecting, because I -- I went in there to clean off my**
16    **desktop to clean it for the next person. I don't**
17    **remember. I put everything in the trash. It's...**
18    Q. (BY MS. NOWAK) So it's your testimony, as we
19    sit here today, that you don't recall whether or not you
20    did open files?
21    **A. Right.**
22    Q. So it's possible that you did and it's also
23    possible that you didn't?
24    **A. It's more possible that I didn't. But yes.**
25    MR. VOLNEY: That you did not?

**161**

1    THE WITNESS: That I did not.
2    MR. VOLNEY: Thank you.
3    Q. (BY MS. NOWAK) Do you have a copy of the
4    request for admission over there? I don't know if we've
5    marked one yet.
6    MS. NOWAK: Why don't we do that real
7    fast, Lezley. I forget what our next number is.
8    THE REPORTER: Okay. It's 24.
9    (Exhibit No. 24 marked.)
10    Q. (BY MS. NOWAK) And Mr. Gresham, I'm not
11    trying to be difficult, but if you'll turn with me to
12    Page 28. I'm just trying to get through the things that
13    you've already admitted.
14    **A. Sure.**
15    Q. Okay. So if we turn to Page 28 and we look at
16    the very top, Request for Admission No. 114, it says,
17    Admit that on September 23rd, 2012, you accessed your
18    Merritt Hawkins work computer.
19    **A. Yes.**
20    Q. And you admitted to that?
21    **A. Right.**
22    Q. Okay. And then if we look at the next one, it
23    says, Admit that on or about September 23rd, 2012, you
24    deleted files on your Merritt Hawkins work computer; is
25    that correct?

**41 (Pages 158 to 161)**

**APP. 0155**

Larry Scott Gresham

162

13:38  1      A.  Yes.
13:38  2      Q.  Okay.  And if we keep going, it says, Admit
13:38  3  that prior to formally resigning, you deleted files on
13:38  4  your Merritt Hawkins work computer.
13:38  5          Did I read that correctly?
13:38  6      A.  Yes.
13:38  7      Q.  And you did delete files from your
13:38  8  Merritt Hawkins work computer?
13:38  9      A.  Yes.
13:38  10     Q.  And the files that you deleted included your
13:38  11 home directory?  And when I say home directory, I'm
13:38  12 referring to the -- your desktop and your My Documents.
13:39  13     **A.  Just like I said, I don't remember the**
13:39  14 **structure, the file structure.**
13:39  15     Q.  Okay.  But is it your testimony here today
13:39  16 that you did delete your My Documents?
13:39  17     **A.  I don't recall.  I think I did.**
13:39  18     Q.  Okay.  And what about the items that were on
13:39  19 your desktop?
13:39  20     A.  Yes.
13:39  21     Q.  And you intentionally deleted those files?
13:39  22     A.  Yes.
13:39  23     Q.  When you moved them into your recycle bin, the
13:39  24 intent was for you to delete them?
13:39  25     **A.  Yes, because everything was held on a server,**

163

13:39  1  **anyway.  I was just cleaning off my desktop.**
13:39  2      Q.  The point of moving them into the recycle bin
13:39  3  was for you to delete them?  You intentionally moved
13:39  4  them in there for them to be deleted?
13:39  5      A.  Yes.
13:39  6          MR. VOLNEY:  Objection; form.
13:40  7      Q.  (BY MS. NOWAK)  The documents that were
13:40  8  contained in your home directory that you were deleting,
13:40  9  were those documents that you had created during the
13:40  10 course of your employment with MHA?
13:40  11         MR. VOLNEY:  Objection; form.
13:40  12         MS. NOWAK:  What's the basis?
13:40  13         MR. VOLNEY:  Hold on.  I'll withdraw the
13:40  14 objection.  Let's see how he answers.
13:40  15     **A.  Okay.  I mean, the -- I don't know.  I don't**
13:40  16 **remember -- I don't remember what was in there.  It was**
13:40  17 **in my -- I can't remember at this point.  It's been two**
13:40  18 **years.**
13:40  19     Q.  (BY MS. NOWAK)  So your testimony --
13:40  20     **A.  I didn't put a lot of thought into it.  I**
13:40  21 **cleaned off my terminal so the next person would have a**
13:40  22 **clean terminal.  Everything was held in the server.  I**
13:40  23 **didn't -- it didn't matter.  This is what people did.**
13:40  24     Q.  Mr. Gresham, my question to you is:  Did the
13:40  25 files that you deleted contain documents that you

164

1  created or generated during the course of your
2  employment with MHA?
3      **A.  I don't remember what was in the files.**
4  **I'm -- I'm speculating.  I don't remember.  I don't**
5  **remember if it was -- I know there was a lot of personal**
6  **information in those files, which is the main reason you**
7  **want to take it off your computer.**
8      Q.  Okay.  So let's go back to what we can agree
9  on.
10         You agree you deleted everything that was in
11 the My Documents?
12     **A.  I -- I do.**
13     Q.  And you agree that you deleted everything that
14 was on your desktop?
15     **A.  I do.  I took the My Documents folder, I drug**
16 **it to the recycle bin, and I highlighted everything on**
17 **the desktop, put it in the recycle bin.**
18     Q.  And your intention when you drug all those
19 files into the recycle bin was to delete the files?
20     **A.  From my terminal.**
21     Q.  Okay.  So let's talk about this caveat.  You
22 keep saying from my terminal.
23         Your intention was to delete the files?
24     **A.  Not from the server.**
25     Q.  Okay.  It's your testimony that every single

165

1  one of the documents that was saved on your computer was
2  also backed up and on the server?
3      **A.  It's my understanding.**
4      Q.  Okay.  And you knew that to be true?
5      **A.  Yes.**
6      Q.  You'd talked with the IT folks at MHA and they
7  had told you that everything that was on your computer
8  was also going to be on the server?
9      **A.  No.  I just -- I know how a server works.  I**
10 **don't -- no, I don't know.  I mean...**
11     Q.  I mean, you certainly didn't tell Tim Beidle
12 on Monday that you had been at the office deleting
13 files, did you?
14     **A.  No.  It's pretty obvious.  He walked in and my**
15 **desk was clean.**
16     Q.  Mr. Gresham, let's walk through what would
17 have been included in your home directory, what we've
18 been referring to as your My Documents.
19         Would you have kept doctors' CVs there?
20     **A.  Yes.**
21     Q.  Okay.  And doctors' CVs would have been
22 documents that contained MHA confidential information?
23     **A.  Yes.**
24         MR. VOLNEY:  Objection; form.
25         MS. NOWAK:  Basis?

**42 (Pages 162 to 165)**

**APP. 0156**

Larry Scott Gresham

**166**

13:42  1          MR. VOLNEY:  How could a doctor's CV be
13:42  2  confidential information of Merritt Hawkins?  It's a
13:42  3  third party's document listing his -- where he works,
13:42  4  where he got his degree.  I don't think that that's
13:42  5  confidential.
13:42  6          MS. NOWAK:  Well, that may be your
13:42  7  opinion, John, but we're not here for your testimony
13:42  8  today.
13:42  9          MR. VOLNEY:  Well, you asked me the basis
13:43 10  of my objection.  So next time, don't ask me.
13:43 11     Q.  (BY MS. NOWAK)  Mr. Gresham, doctors' CVs, you
13:43 12  received those during and through the course of your
13:43 13  employment --
13:43 14     A.  Yes.
13:43 15     Q.  -- with MHA?
13:43 16     A.  Yes.
13:43 17     Q.  And you utilized them to accomplish and carry
13:43 18  out your job functions at MHA?
13:43 19     A.  A small amount, a -- bit.
13:43 20     Q.  Okay.  You also had a folder in your My
13:43 21  Documents called general business.  What type of
13:43 22  documents would you have kept in there?
13:43 23     **A.  Who knows?  I mean, seriously, because I -- I**
13:43 24  **mean, you've probably seen what I had.  I didn't keep**
13:43 25  **anything organized.  I mean, that's why I don't know**

**167**

13:43  1  **what was on it, on anything.**
13:43  2     Q.  Okay.  But you would agree with me you did
13:43  3  keep some things in there like call scripts?
13:43  4     **A.  There may have been call scripts on there.  I**
13:43  5  **didn't use call scripts.**
13:43  6     Q.  But they might have in been your My Documents?
13:42  7     **A.  Yes.**
13:42  8     Q.  Okay.  References?
13:42  9     **A.  Yes, probably.**
13:42 10     Q.  Interview letters?
13:42 11     **A.  Yes.**
13:42 12     Q.  Offer letters?
13:42 13     **A.  Yes.**
13:42 14     Q.  Hospital profiles?
13:42 15     **A.  Yes.**
13:42 16     Q.  Letters of agreement?
13:42 17     **A.  Yes.**
13:42 18     Q.  Client worksheets and write-ups?
13:42 19     **A.  Yes.**
13:42 20     Q.  Physician reimbursements?
13:42 21     **A.  Yes.**
13:42 22     Q.  Sample mailers?
13:42 23     **A.  Yes.**
13:42 24     Q.  Now, if there had been a folder entitled
13:42 25  before the profile, what type of documents would have

**168**

 1  been contained in that folder?
 2     **A.  Probably the hospital worksheets, direct mail**
 3  **template.**
 4     Q.  What is a post profile?
 5     **A.  It's what you write after you meet with a**
 6  **client.  It's a letter.**
 7     Q.  So did you also maintain your post profiles?
 8     **A.  Sure.  The -- everything that you're saying**
 9  **that was on there is backed up in MHACS because**
10  **everything -- all of this, we have to send to the admin**
11  **department to put in MHACS.**
12     Q.  But my question to you is:  Was this contained
13  in your My Documents?
14     **A.  Probably.  I don't know.  Probably.**
15     Q.  Okay.  What about progress --
16     **A.  I mean --**
17     Q.  -- reports?
18     **A.  -- you already know the answer.  You know it**
19  **better than I do.**
20     Q.  What about progress reports, would --
21     **A.  Probably.**
22     Q.  -- you have contained those in your My
23  Documents folder?
24     **A.  Probably.**
25     Q.  Weekly reports?

**169**

 1     **A.  Probably.**
 2     Q.  And write-ups?
 3     **A.  Probably.**
 4     Q.  So all of the items that we've been
 5  discussing, these call scripts, references, interview
 6  letters, offer letters, hospital profiles, those are all
 7  things that you used during the course of your
 8  employment with MHA?
 9     **A.  Yes.**
10     Q.  They're all documents that were the property
11  of MHA?
12     **A.  Yes.**
13     Q.  And you deleted those records?
14     **A.  No.  I took -- I took them off my desktop.  I**
15  **did not delete them.  They were on the server --**
16     Q.  What is the --
17     **A.  -- and they were in MHACS.**
18     Q.  What is the effect of moving a document into
19  the recycle bin?
20     **A.  Well, that effect is different if you're on a**
21  **server structure or on a personal computer at home.  So**
22  **I can't really answer that question.  It deletes it off**
23  **that terminal.**
24     Q.  So it deletes it?
25     **A.  Off that terminal.**

**43 (Pages 166 to 169)**

Larry Scott Gresham

**170**

13:46   1    Q.   Did you also copy all these documents?
13:46   2    **A.   No.**
13:46   3    Q.   You didn't hook a USB drive up to your
13:46   4    computer and --
13:46   5    **A.   You can't -- you can't hook a USB drive up to**
13:46   6    **a computer at Merritt Hawkins.  That's the silliest**
13:46   7    **thing I've ever heard.**
13:46   8    Q.   Why is it your understanding that you can't
13:46   9    hook a USB drive up to a computer at Merritt Hawkins?
13:46   10   **A.   Because two years before I left, someone tried**
13:46   11   **to hook up a USB drive and steal MHACS.  And they turned**
13:46   12   **off that function.**
13:46   13           THE REPORTER:  Okay.  You need to move
13:46   14   your hand, please.
13:46   15           THE WITNESS:  Someone tried to steal
13:46   16   MHACS, so they turned off that function.
13:46   17           THE REPORTER:  Max?
13:46   18           THE WITNESS:  M-H-A-C-S.
13:46   19   **A.   And they turned off that function.**
13:46   20   Q.   (BY MS. NOWAK)  And why would MHA be concerned
13:46   21   about people stealing their database or stealing files
13:46   22   like this?
13:46   23   **A.   Because their database is proprietary**
13:46   24   **information.**
13:46   25   Q.   Did you ever work with a Dr. Esteban while you

**171**

13:45   1    were at MHA?
13:45   2    **A.   Dr. Esteban.  The name is familiar.**
13:45   3    Q.   Did you ever maintain a list of your accounts
13:45   4    at MHA?
13:45   5    **A.   Maintain a list, what do you mean?**
13:45   6    Q.   Like, did you keep a list of the clients or
13:45   7    the accounts that you were working on?
13:45   8    **A.   I worked with Dr. Esteban at Arthur Marshall,**
13:45   9    **not at MHA, I believe.**
13:45   10   Q.   Is that your testimony, that you --
13:45   11   **A.   I believe so.**
13:45   12   Q.   -- worked with --
13:45   13   **A.   That's when I remember the name.**
13:45   14   Q.   -- Dr. Esteban at Arthur Marshall?
13:45   15   **A.   He was a client of mine at Arthur Marshall, I**
13:45   16   **believe, unless there's another Dr. Esteban.  I worked**
13:45   17   **with a lot of doctors.**
13:45   18   Q.   So do you know if -- or excuse me -- recall
13:45   19   whether you maintained a list of accounts or clients
13:45   20   that you were working with while you were at MHA?
13:45   21   **A.   Sure.**
13:45   22   Q.   And where did you keep that list?
13:45   23   **A.   On the computer.  I don't know.**
13:45   24   Q.   Did you update it every year?
13:45   25   **A.   No, unless they told us we had to.  I don't**

**172**

1    remember.
2    Q.   Do you recall what you would have named or
3    called that file?
4    **A.   No.**
5    Q.   Would it have been account listing?
6    **A.   Maybe.**
7    Q.   Why would you have printed a copy of your
8    account listing?
9    **A.   I didn't print a copy of my account listing.**
10   **I don't remember doing that.  I don't know why I would**
11   **have unless I printed a lot of stuff.  And I don't think**
12   **I printed anything.  I didn't walk back into the printer**
13   **room.**
14   Q.   So it's your testimony that you don't think
15   that you printed anything on Sunday, September 23rd?
16   **A.   I do not.**
17   Q.   What about the week prior when you were
18   interviewing with Consilium, did you print any
19   documents --
20   **A.   Oh, I'm sure I --**
21   Q.   -- during that week?
22   **A.   -- printed documents.  I was working with**
23   **doctors.**
24   Q.   Okay.
25   **A.   I was doing my job.**

**173**

1    Q.   Would you have taken those -- any of those
2    records with you?
3    **A.   No.**
4    Q.   Okay.  What would have been the purpose of
5    printing a copy of your account listing during that
6    week?
7    **A.   If I had to turn it in to my boss.**
8    Q.   Okay.  So how often did you have to turn in
9    your account listing to your boss?
10   **A.   Okay.  Now I know what we're talking about.**
11   **Account listing, yeah.  We had a meeting every Friday**
12   **where we went over our accounts and we had to print our**
13   **account listing for that.**
14   Q.   Okay.
15   **A.   I had to -- my mind had to be jogged.**
16           MS. NOWAK:  You were giving me a look.  I
17   didn't know if you were trying to say you thought it was
18   time to take a break or something.
19           MR. VOLNEY:  No.  I don't care.
20   Q.   (BY MS. NOWAK)  What about a file named war,
21   w-a-r.  Would you have had an Excel spreadsheet named
22   war?
23   **A.   Not that I know of.  What's on it?**
24   Q.   I don't know.  But you liked it a lot.
25   **A.   I have no idea.**

**44 (Pages 170 to 173)**

APP. 0158

174

13:49  1        MR. VOLNEY: Just for the record, you're
13:50  2   referring to some internal documents from
13:50  3   Merritt Hawkins that have not been turned over in the
13:50  4   case.
13:50  5        Q.  (BY MS. NOWAK) Mr. Gresham, you have some
13:50  6   affirmative defenses that you've asserted in this case;
13:50  7   is that correct?
13:50  8        A.  Some what?
13:50  9        Q.  Affirmative defenses.
13:50  10       Do you know what an affirmative defense is?
13:50  11       A.  Meaning you can't put a USB drive in the
13:50  12  computer.  Or at least you can put one in, but -- is
13:50  13  that what you're talking an about?
13:50  14       Q.  No.  I'm talking more in the -- in the
13:50  15  litigation, we filed a lawsuit and asserted certain
13:50  16  claims against you.  We said these are the things that
13:50  17  you have done.  And in response, you and your lawyer
13:50  18  would have talked and you would have asserted what's
13:50  19  called affirmative defenses.  So they're your defenses
13:50  20  to why your claims that Merritt Hawkins has asserted
13:50  21  are, in your opinion, incorrect or improper.
13:50  22       A.  Okay.
13:50  23       Q.  Okay.  Are you familiar with the affirmative
13:50  24  defenses that your lawyers have asserted on your behalf?
13:50  25       A.  Sure.

175

13:58  1        Q.  Okay.  So one of the affirmative defenses that
13:58  2   your lawyers have asserted is that MHA has waived its
13:58  3   claims.
13:58  4        Do you know what the factual basis for that
13:58  5   defense is?
13:58  6        A.  No.
13:58  7        Q.  Okay.  So you -- you, as we sit here today,
13:58  8   are not aware of any factual basis that supports the
13:58  9   allegation that MHA has waived its claims?
13:58  10       A.  We may have had that discussion.  I don't
13:58  11  recall at this time.  I mean, you're just throwing out
13:58  12  something that I don't even see in front of me.
13:58  13       Q.  I can give you --
13:58  14       A.  Yeah, that would be great.
13:58  15       Q.  -- a copy of your answer if you'd like.
13:59  16       A.  That would be great.
13:59  17       MS. NOWAK: Here, Lezley.
13:59  18       THE REPORTER: Okay.
13:59  19       MS. NOWAK: Thank you, ma'am.
13:59  20       THE REPORTER: Uh-huh.  25.
13:59  21       (Exhibit No. 25 marked.)
13:59  22       A.  And where was that, do you know?
13:59  23       Q.  (BY MS. NOWAK) I do.  If you'll give me just
13:59  24  a second.
13:59  25       So if you'd turn to Page 9.

176

1        A.  Okay.  No. 1?
2        Q.  Let's actually start with No. 2.
3        So it says, Plaintiff's claims are barred in
4   whole or in part because plaintiff waived its claims
5   and/or is estopped from asserting those claims.
6        And I want to start with the first part where
7   you have made the allegation that plaintiff has waived
8   its claims.  And I'd like to know what's the factual
9   basis for your assertion that MHA has waived its claims?
10       MR. VOLNEY: Objection; form.
11       A.  I don't -- don't know the answer to that.  I
12  don't...
13       Q.  (BY MS. NOWAK) Okay.  Well, let's look at the
14  second part of that.  It says plaintiff is estopped from
15  asserting its claims.
16       What is the factual basis for your allegation
17  that MHA is estopped from asserting these claims?
18       MR. VOLNEY: Objection; form.
19       A.  Oh, this is -- yeah.  It's not saying -- I'm
20  not saying both things.  I'm saying and/or.  Tricky.
21       Q.  (BY MS. NOWAK) So I'm just trying to -- to
22  understand.
23       Do you have any factual basis for your
24  assertion that plaintiff has either waived its claims or
25  is estopped from asserting its claims?

177

1        MR. VOLNEY: Objection; form.
2        Q.  (BY MS. NOWAK) I'm just trying to get at the
3   facts.  What are the facts that underlie this
4   allegation?
5        MR. VOLNEY: Objection; form.
6        Q.  (BY MS. NOWAK) Are you aware of any?
7        MR. VOLNEY: Objection; form.
8        A.  I don't -- I mean, I don't even know what
9   we're talking about here, honestly.  The claim that I
10  inserted a USB drive and downloaded information, that's
11  probably what that's about.  And yeah, it's common
12  knowledge.  I mean, there are people that can tell you
13  that set that up that it just be done.
14       Q.  (BY MS. NOWAK) So you think that this
15  Subparagraph 2, the factual allegation that underlies it
16  is solely related to the USB?
17       MR. VOLNEY: Hold on, hold on.
18       You're just harassing him.  He's not a
19  lawyer.  This is a legal document created by --
20       MS. NOWAK: I'm not --
21       MR. VOLNEY: -- his lawyers.
22       MS. NOWAK: -- asking for any legal --
23       MR. VOLNEY: If you want to ask in an
24  interrogatory, I'll give you all those facts.  All
25  right?

45 (Pages 174 to 177)

**178**

13:51 1    MS. NOWAK: I'm entitled to know what the
13:51 2 witness's understanding of the facts are.
13:51 3    MR. VOLNEY: Well, if he -- he's already
13:51 4 explained to you he doesn't have an understanding.
13:52 5    MS. NOWAK: I'm entitled to ask these
13:52 6 questions, though, John. I'm entitled to understand
13:52 7 from the witness himself what is the underpinnings of
13:52 8 his case, what are the factual bases.
13:52 9    MR. VOLNEY: I think he's asked -- he's
13:52 10 answered your question. He doesn't know what it means.
13:52 11    MS. NOWAK: Okay.
13:52 12    Q. (BY MS. NOWAK) Well, then let's look at the
13:52 13 first paragraph, then.
13:52 14    What is your factual basis for alleging that
13:52 15 your employment agreement is unenforceable?
13:52 16    **A. I worked for a temporary staffing agency after**
13:52 17 **I worked for Merritt Hawkins, which was a permanent**
13:52 18 **staffing agency.**
13:52 19    Q. Okay. And if we can continue on, what's the
13:52 20 factual basis for alleging that the restrictions
13:52 21 contained in your employment agreement are unreasonable?
13:52 22    MR. VOLNEY: Other than what's stated in
13:52 23 the answer itself?
13:53 24    MS. NOWAK: Pardon me, John. I'm just
13:53 25 asking what -- what are the facts that support his

**179**

13:53 1 assertion that the restrictions are unreasonable. And
13:53 2 if you want, we can break it down.
13:53 3    Q. (BY MS. NOWAK) What -- what is is -- what are
13:53 4 the facts that assert, you know, your allegation that
13:53 5 the restriction as to time is unreasonable? I thought
13:53 6 we had agreed earlier today that you thought 12 months
13:53 7 was reasonable.
13:53 8    **A. Well, I mean, it's fine.**
13:53 9    Q. Okay. And what about the geographic area,
13:53 10 what's the factual --
13:53 11    **A. Unreasonable.**
13:53 12    Q. -- basis --
13:53 13    **A. We -- I went all over that. That's...**
13:53 14    Q. So I can refer to your earlier testimony?
13:53 15    **A. Yes, you can refer to my earlier testimony.**
13:53 16    Q. Okay. And what about the scope of activity,
13:53 17 what's the factual basis for your allegation that
13:53 18 restriction is unreasonable?
13:53 19    **A. Temporary and permanent are not competitive**
13:53 20 **with one another at all. They're two completely**
13:53 21 **different types of business.**
13:53 22    MS. NOWAK: We've been going about an
13:53 23 hour. Why don't we take a break.
13:54 24    THE WITNESS: Let's just get done. Let's
13:54 25 go.

**180**

13:54 1    MS. NOWAK: I'd like to take a
13:54 2 five-minute break. Thank you.
13:54 3    MR. VOLNEY: Okay.
13:54 4    THE VIDEOGRAPHER: We're off the record
13:54 5 at 1:54 p.m.
13:54 6    (Break taken from 1:54 to 2:12 p.m.)
13:54 7    THE VIDEOGRAPHER: We're on the record at
13:54 8 2:12 p.m. This is Tape 4.
13:54 9    Q. (BY MS. NOWAK) Mr. Gresham, do you know how
13:54 10 to unlock a USB port?
13:54 11    **A. No.**
13:54 12    Q. Do you know how to activate a USB port?
13:54 13    **A. No.**
13:54 14    Q. Do you know how to do anything with USB ports
13:54 15 other than plug a USB drive into it?
13:54 16    **A. No.**
13:54 17    Q. We talked earlier about the documents that
13:54 18 were contained in your My Documents --
13:54 19    **A. Uh-huh.**
13:54 20    Q. -- you know, all the different folders.
13:54 21    And the documents that we've discussed thus
13:54 22 far were all related to your work functions at MHA --
13:54 23    **A. Uh-huh.**
13:54 24    Q. -- things that you did as part of your
13:54 25 employment --

**181**

13:53 1    **A. Uh-huh.**
13:53 2    Q. -- is that correct?
13:53 3    **A. Yes.**
13:53 4    Q. Is it your testimony that you also had
13:53 5 personal items in there?
13:53 6    **A. I'm sure I did.**
13:53 7    Q. Why is it that you -- let me rephrase that.
13:53 8    You didn't delete just your personal items,
13:53 9 though; is that correct?
13:53 10    **A. Yes.**
13:53 11    Q. So on that Sunday, September 23rd, you deleted
13:53 12 both your personal items and items that belonged to MHA?
13:53 13    **A. Yes.**
13:53 14    Q. Do you have those requests for admission there
13:53 15 in front of you? It's the very thick document.
13:53 16    **A. I have it somewhere here.**
13:53 17    Q. And I'll be honest, I don't recall what number
13:53 18 it was.
13:53 19    **A. Okay. Here it is.**
13:53 20    Q. Okay. Can you turn with me to Page 34 and
13:53 21 Request for Admission No. 47 (sic).
13:53 22    **A. No. 147?**
13:53 23    Q. Yes.
13:53 24    **A. Okay.**
13:53 25    Q. Okay. And the question there was, Admit that

**46 (Pages 178 to 181)**

Larry Scott Gresham

**182**

14:16  1    you have documents or property in your possession,
14:15  2    custody, or control which belong to Merritt Hawkins.
14:15  3         Did I read that correctly?
14:15  4    **A.  Yes.**
14:15  5    Q.  And if you look at your response on the
14:15  6    following page, Page 35, at the time these responses
14:15  7    were given, you denied the request.  But as we sit here
14:15  8    today, is your response different?
14:18  9    **A.  No.**
14:18 10    Q.  So it's not your testimony that you had
14:18 11    documents or property in your possession, custody, or
14:18 12    control that belonged to Merritt Hawkins?
14:18 13    **A.  No, besides the documents that have been**
14:18 14    **given.**
14:18 15    Q.  Those are the documents I'm talking about.
14:18 16    **A.  Oh, yes.**
14:18 17         MR. VOLNEY:  Can I interject just to
14:18 18    clarify?
14:18 19         MS. NOWAK:  Yes.
14:18 20         MR. VOLNEY:  We -- we did some
14:18 21    supplemental or amended answers to requests for
14:18 22    admission where --
14:18 23         MS. NOWAK:  Was 147 included in those?
14:18 24         MR. VOLNEY:  It was not.  And I'm just
14:18 25    going to tell you I think that was an oversight.

**183**

14:18  1         MS. NOWAK:  Okay.
14:18  2         MR. VOLNEY:  Because I think I just
14:18  3    identified the ones in the middle and I didn't, for
14:18  4    whatever reason -- there's so many of them.
14:18  5         MS. NOWAK:  Identify that one?
14:18  6         MR. VOLNEY:  Right.  But I mean, I'm not
14:18  7    trying to hide anything.  That should --
14:18  8         MS. NOWAK:  I just wanted to clarify.
14:18  9         MR. VOLNEY:  That should have been
14:18 10    supplemented.  I'm sorry.  I apologize.  That's on me,
14:18 11    not him.
14:18 12         MS. NOWAK:  So John, can we reach an
14:18 13    agreement that you will supplement --
14:18 14         MR. VOLNEY:  Right.
14:18 15         MS. NOWAK:  -- response for Request for
14:18 16    Admission No. 147?
14:18 17         MR. VOLNEY:  Right.
14:18 18         MS. NOWAK:  Okay.  Thank you.
14:18 19         And at this time, I'm going to reserve my
14:18 20    remaining time with the witness and my right to recall
14:18 21    him.  I think it's abundantly clear that there hasn't
14:18 22    been a full production made in this case and that there
14:18 23    are documents outstanding that should be made available
14:18 24    to me.
14:18 25         So at this time, I have no further

**184**

 1    questions, but I do reserve my right to the remaining
 2    time and to recall the witness.
 3         MR. VOLNEY:  I understand what you're
 4    saying, but I disagree with you.  So we'll just argue
 5    about this at a different time.  Thank you.
 6         MS. NOWAK:  Thank you.
 7         THE VIDEOGRAPHER:  Off the record at
 8    2:16 p.m.
 9         (Off the record 2:16 to 2:18 p.m.)
10         THE VIDEOGRAPHER:  We're on the record at
11    2:18 p.m.
12              EXAMINATION
13    BY MR. VOLNEY:
14         MR. VOLNEY:  Okay.  I just have -- it's
15    John Volney for -- for the witness and for Mr. Bowden.
16    I just have a few follow-up questions just based on the
17    questions that Ms. --
18         MS. NOWAK:  Nowak.
19         MR. VOLNEY:  -- Christine Nowak asked.
20         I was struggling with that W there for a
21    second.
22    Q.  (BY MR. VOLNEY)  Okay.  So when you were
23    employed with Merritt Hawkins, tell -- tell the jury,
24    Mr. Gresham, how many times you were employed by
25    Merritt Hawkins.

**185**

 1    **A.  Twice.**
 2    Q.  Okay.  And what led to your leaving
 3    Merritt Hawkins the first time?
 4    **A.  The only reason I left was 2008, the economy**
 5    **got pretty bad and our accounts dwindled.  A recruiter**
 6    **needs 10 to 12 accounts to do well.  I think I was down**
 7    **to two.  So I went to a company that had more accounts.**
 8    Q.  Okay.  Now, what was the name of the company
 9    that you went to?
10    **A.  Arthur Marshall.**
11    Q.  What business was Arthur Marshall in?
12    **A.  Permanent position recruiting.**
13    Q.  Was it a direct -- in your view, a direct
14    competitor of Merritt Hawkins?
15    **A.  Absolutely.**
16    Q.  Now, when -- when you were with
17    Merritt Hawkins the first time around, did you have an
18    employment agreement similar to the employment agreement
19    that Ms. Nowak showed you today?
20    **A.  I think it was the same one.**
21    Q.  Was it just a different date?
22    **A.  Just a different date.**
23    Q.  It had similar noncompetition and
24    confidentiality provisions?
25    **A.  Yes.**

**47 (Pages 182 to 185)**

Larry Scott Gresham

186

14:29   1        Q.  Now, how long were you at Arthur Marshall?
14:29   2        A.  Almost one year exactly.
14:29   3        Q.  Did -- did Merritt Hawkins at that time do
14:29   4   anything to enforce its contractual rights against you
14:29   5   while you were at Arthur Marshall?
14:29   6        A.  They did.  They sued Arthur Marshall and I was
14:29   7   named in the suit.
14:29   8        Q.  And so they also sued you?
14:29   9        A.  I think -- I think so, yeah.  I think it was
14:20  10   both of us.
14:20  11        Q.  Were they making -- leaving aside the claims
14:20  12   that are related to the deletion of materials that was
14:20  13   on your desktop, were they making the same sorts of
14:20  14   claims that they're making in this lawsuit against you?
14:20  15        A.  Exactly.
14:20  16        Q.  Claims about their alleged confidential
14:20  17   information and nonsolicitation on competition
14:20  18   provisions?
14:20  19        A.  Yes.
14:20  20        Q.  Now, what was the ultimate resolution of that
14:20  21   earlier lawsuit?
14:20  22        A.  I believe it was settled.  I could not work in
14:20  23   the same states that I worked in at Merritt Hawkins
14:20  24   while I was employed at Arthur Marshall at least for one
14:20  25   year, I believe, for one year.

187

14:20   1        Q.  So tell us, when you were at Merritt Hawkins
14:20   2   the first time around, what states did you work in?
14:20   3        A.  I worked in the Heartland.
14:20   4        Q.  Okay.  And so when you went to
14:20   5   Arthur Marshall, what -- what states did you work in?
14:20   6        A.  I don't remember exactly the states.  I worked
14:20   7   mostly on the eastern coast.  One of my big states was
14:20   8   Kentucky.  I didn't work any of the Heartland states
14:20   9   like Missouri.
14:22  10        Q.  And -- and I think you've told us the
14:23  11   resolution of the Merritt Hawkins case against you and
14:23  12   Arthur Marshall was that you would not work in the
14:23  13   Heartland while at Arthur Marshall?
14:23  14        A.  Yes.
14:23  15        Q.  Were you required to move outside of Dallas
14:23  16   County to continue to work at Arthur Marshall?
14:23  17        A.  I was not.
14:23  18        Q.  Now, I understand even though they sued you,
14:23  19   you ended up going back to work for Merritt Hawkins?
14:23  20        A.  I did.
14:23  21        Q.  Tell us how that took place.
14:23  22        A.  Billy Bowden called me one day to see what I
14:23  23   was doing and he said, hey, you want to come back?  And
14:23  24   I was like, what?  No, I'm not -- I can't go back.  And
14:23  25   then Tim Beidle called me on the phone and asked me to

188

 1   come back and I met with Tom Florence.
 2        THE REPORTER:  Who?
 3        THE WITNESS:  Tim Beidle.
 4        THE REPORTER:  No.  Tom.
 5        THE WITNESS:  Florence, F-l-o-r-e-n-c-e.
 6        THE REPORTER:  Thank you.  I just didn't
 7   hear you.
 8        MR. VOLNEY:  Thank you.
 9        Q.  (BY MR. VOLNEY)  So did you then interview
10   again with Mr. Beidle?
11        A.  I didn't really interview -- I mean, yeah, I
12   guess -- I guess you would call it an interview.
13        Q.  Did you meet with him in person?
14        A.  I met with Tom and Tim in person.
15        Q.  Now, when you were with Arthur Marshall, did
16   you have an employment agreement with them?
17        A.  I did -- I don't recall having an agreement
18   like this (indicating).  I think it was an offer letter
19   and then an application, more like what I think I had at
20   Consilium.
21        Q.  Now, ultimately you made the decision to leave
22   Arthur Marshall and go back to Merritt Hawkins?
23        A.  Yes.
24        Q.  And at the time you signed your second
25   employment agreement with Merritt Hawkins, your prior

189

 1   lawsuit filed against you by Merritt Hawkins had been
 2   resolved, correct?
 3        A.  Yes, correct.
 4        Q.  And at the time that you signed your second
 5   employment agreement, Merritt Hawkins had already sued
 6   you once for breach of your employment agreement?
 7        A.  Yes.
 8        Q.  But despite that prior lawsuit between you and
 9   Merritt Hawkins, Merritt Hawkins asked you to come back?
10        A.  And they gave me a promotion.
11        Q.  And they gave you a promotion.  What were you
12   promoted to?
13        A.  Well, I was -- it was an under the table
14   promotion because some of my friends were still at
15   Merritt Hawkins from before.  So I started off -- when I
16   came back, I was a search consultant with the
17   understanding that in three months, I would be given
18   senior search consultant.  That was my idea because I
19   didn't want to come right back in -- having left as a
20   search consultant and come right back in as a senior
21   search consultant.  I was -- I already had the promotion
22   financially.  When I came back, they paid me as a senior
23   search consultant.
24        Q.  So did they pay you more when you came back?
25        A.  They paid me more.

48  (Pages 186 to 189)

Larry Scott Gresham

190

| | |
|---|---|
| 14:23 | 1 |
| 14:23 | 2 |

Q. Now, I understand this led to a -- was there
then a lawsuit filed against you by Arthur Marshall?
   A. Yes, there was.
   Q. Did they also sue Merritt Hawkins?
   A. Yes.
   Q. Do you know what the resolution of that
lawsuit was?
   A. I don't -- I heard about that one time. I had
no dealing with that lawsuit, none. So I --
   Q. So what --
   A. -- I think it just went away.
   Q. Do you know, sitting here today, how many of
its former employees Merritt Hawkins has sued for the
sorts of violations they're suing you for?
   A. I don't -- I couldn't tell you that.
   Q. Was it common knowledge at Merritt Hawkins
while you were there that Merritt Hawkins would sue you
if you left to work for a competitor?
   A. Yes.
   Q. Was that talked about in meetings at
Merritt Hawkins?
   A. Not in -- I don't think it was ever talked
about in a meeting.
   Q. Well, how did you learn about that fact?
   A. By people being sued.

191

Q. People being sued?
   A. By colleagues that left being sued.
   Q. So --
   A. I mean, pretty much, like you said, if you
left, went to a competitor or something they deemed as a
competitor, you would be sued.
   Q. Now, earlier, Ms. Nowak asked you a number of
questions about your covenant not to compete with
Merritt Hawkins. I just want to be clear about
something.
      Did -- while you were there, did
Merritt Hawkins provide temporary staffing services --
   A. No.
   Q. -- in the medical industry?
   A. No. Staff Care did that.
   Q. So it would be wrong to say that
Merritt Hawkins' business includes temporary staffing?
   A. Yes.
   Q. And if that's what it says in your agreement,
that's a lie by Merritt Hawkins, correct?
      MS. NOWAK: Objection --
   A. Yes.
      MS. NOWAK: -- form.
   Q. (BY MR. VOLNEY) Yes?
   A. Yes.

192

Q. Do you know why they would want to include
that lie in their employment agreement?
      MS. NOWAK: Objection; form.
   A. My thought would be so you couldn't go work
for a locums agency either.
   Q. (BY MR. VOLNEY) Okay. Now, one of the things
you touched on earlier in your testimony is the
differences between the locum business and the permanent
staffing business.
   A. Right.
   Q. Could you explain for the Court and the jury
in this matter, what are the differences between those
two businesses?
   A. Absolutely.
      First of all, in permanent staffing, you're --
you're finding a person a permanent position. They'll
move their entire family. They'll live there. It's a
life changing event for that physician or medical
personnel. Second, in locums, you're not. That person
is never going to leave his home. He's being -- he's
being staffed by a hospital for a short amount of time.
      A person that wants a new job for life or for
however long that's going to be is not going to do
temporary work. And a temporary physician that enjoys
temporary work is not going to do permanent work. Maybe

193

at some point, that will happen, but it's not -- the
second -- the second huge difference is in permanent
staffing, your main dealings are with the client or the
hospital or clinic. In locum staffing, I never dealt
with a hospital or clinic. I only talked to doctors.
   Q. So your -- your -- your clients while you were
at Merritt Hawkins were what kind of entities?
   A. Hospitals and clinics.
   Q. And who were your clients when you were
working for Consilium?
   A. My clients would have -- would have been my
doctors. I mean, I didn't really have clients,
honestly. I -- I didn't have clients. Consilium did.
It was hospitals.
   Q. In terms of where you fit in at Consilium was
to find the doctors to fill --
   A. That's it.
   Q. -- the positions?
   A. That's it.
   Q. Now, just to put a finer point on some of the
testimony you gave earlier, what -- what geographic area
did you concentrate in while you were at
Merritt Hawkins?
   A. The Heartland, which would have been -- let me
see if I get all the states -- Illinois, Kansas,

49 (Pages 190 to 193)

DepoTexas, Inc. / Sunbelt Reporting & Litigation Services

Larry Scott Gresham

**194**

| | |
|---|---|
| 14:29 | 1 |

14:29  1  **Colorado, Missouri, Arkansas.  I think that's -- I think**
14:29  2  **that's it.**
14:29  3    Q.  And so we talked about the geographic area.
14:29  4  But when we talk about your clients while you were at
14:29  5  Merritt Hawkins, we're talking about hospitals and
14:29  6  healthcare facilities in those states that you've just
14:29  7  listed for us?
14:30  8    A.  **Absolutely.  And Oklahoma.  I'm sorry.  And**
14:30  9  **Oklahoma.**
14:30  10    Q.  Now, contrast that for me with the geographic
14:30  11  area that you worked in when you were at Consilium.
14:30  12    A.  **I worked with Texas and the East Coast.**
14:30  13    Q.  And what kind of -- who -- who -- who is it in
14:30  14  the healthcare industry that you were dealing with while
14:30  15  you were at Consilium?
14:30  16    A.  **Physicians.**
14:30  17    Q.  So contrast -- contrast that for me with who
14:30  18  you were -- what types of entities you were dealing with
14:30  19  while you were at Merritt Hawkins.
14:30  20    A.  **Clients and physicians; hospitals, clinics,**
14:30  21  **and physicians.**
14:30  22    Q.  Right.  Okay.
14:30  23    A.  **But the geographical area you're talking**
14:30  24  **about, that was hospitals and clinics.**
14:30  25    Q.  When you were at Consilium, did you ever make

**195**

14:28  1  contact with anybody you dealt with while you were at --
14:28  2  and anybody, I mean any clients or physicians you dealt
14:28  3  with while you were at Merritt Hawkins?
14:28  4    A.  **No.**
14:28  5    Q.  And how is it that you came up with the
14:28  6  potential business contacts while you were Consilium?
14:28  7    A.  **Call lists.**
14:28  8    Q.  Are there published call lists that tell you
14:28  9  who -- who are the healthcare providers in various
14:28  10  locations?
14:28  11    A.  **There's companies that make call lists.  Yeah,**
14:28  12  **they're published.**
14:29  13    Q.  Okay.  Did you also use the internet?
14:29  14    A.  **Uh-huh, yes.**
14:29  15    Q.  You can -- tell me how that would work.
14:29  16    A.  **I would just go on certain websites and do a**
14:29  17  **search for doctors.  I mean, we even used the Yellow**
14:29  18  **Pages.  We used everything.**
14:29  19    Q.  Now, when you were at Merritt Hawkins, did you
14:29  20  deal with any clients who were in Texas?
14:29  21    A.  **I did not.**
14:29  22    Q.  Did you deal with any clients in -- then I
14:29  23  guess I would be fair to say if we look at the list of
14:29  24  Texas counties that's in your employment agreement with
14:29  25  Merritt Hawkins, we'll see Dallas County, Collin County,

**196**

1  Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall, and
2  Tarrant.  Then while you were at Merritt Hawkins, none
3  of your business was in those counties?
4    A.  **No, none of it was.**
5    Q.  All right.  And -- all right.
6        Now, one of the documents in front of you is
7  the set of documents marked Gresham 20.  Could you
8  locate that for me.
9    A.  **Sure.**
10    Q.  And tell me what the exhibit number is.
11    A.  **Okay.**
12        **Okay.  Exhibit No. 20.**
13    Q.  Okay.  Good.  That's a coincidence there.
14        Now, my understanding from your prior
15  testimony is that these are some Merritt Hawkins-related
16  documents that were located on your -- sort of the hard
17  drives that -- that were imaged by your counsel back
18  when you were sued in 2012?
19    A.  **Yes.**
20    Q.  And did you use any of these documents while
21  you were at Consilium?
22    A.  **No.**
23    Q.  Did you contact any of the people identified
24  on these documents while you were at Consilium?
25    A.  **No.**

**197**

1    Q.  Did you even know you had these documents in
2  your possession while you were at Consilium?
3    A.  **No.**
4    Q.  Do you use these types of offer letters
5  identified as Exhibit 20, Pages Gresham 20 through 22?
6  Do you use these types of offer letters at Consilium?
7    A.  **No.**
8    Q.  Now, what about the community worksheet that
9  is Gresham 37, is this something that you would use --
10  that you did use while you were at Consilium?
11    A.  **No.**
12    Q.  Does Consilium use these types of forms?
13    A.  **No.**
14    Q.  Do you know why you had the Client
15  Authorization for Personal Letter Campaign Internet
16  Advertisement that's labeled Gresham 48 in your
17  possession?
18    A.  **Sure.  It's the same reason I had the**
19  **community worksheet in our possession.  Often when we**
20  **would fly get on a Monday morning, it may be we have to**
21  **get up at 4:00 o'clock in the morning to fly.  We**
22  **couldn't go by the office that early to get anything**
23  **because we probably wouldn't make it to the airport.  So**
24  **we would have them on our own computers, print them off,**
25  **get on the airplane.**

**50  (Pages 194 to 197)**

**APP. 0164**

Larry Scott Gresham

**198**

14:32 1    Q.   Was it common practice while you were at
14:32 2    Merritt Hawkins for employees to e-mail themselves
14:32 3    company-related documents?
14:32 4        A.   Absolutely.  We were told to by our
14:32 5    supervisors.
14:32 6        Q.   And tell me who your supervisor was.
14:32 7        A.   Tim Beidle, and before that, Robert Colmery.
14:32 8        Q.   Okay.  And they understood that you might --
14:32 9    in your recollection, they understood that you would be
14:32 10   e-mailing yourself your Merritt Hawkins-related
14:32 11   documents?
14:32 12       A.   Sure.  They wanted us to work from home.
14:32 13       Q.   Did you use this client authorization or the
14:32 14   information that's on this client authorization while
14:32 15   you were at Consilium?
14:32 16       A.   No.
14:32 17       Q.   Does Consilium do personal letter campaigns?
14:32 18       A.   No.
14:32 19       Q.   Do they do internet advertisements?
14:32 20       A.   No.
14:32 21       Q.   My understanding of -- of Merritt Hawkins'
14:32 22   business is that in some respects, it's a glorified mail
14:32 23   house?
14:32 24       A.   Yes.
14:32 25       Q.   Is that what Consilium does?

**199**

14:32 1        A.   Not at all.
14:35 2        Q.   Okay.  Now, last document -- or last part of
14:35 3    this exhibit is the resume of Donald Turner, PA.
14:35 4        A.   Yes.
14:35 5        Q.   You see that?
14:35 6        A.   Yes.
14:35 7        Q.   Why would you have this in your possession?
14:35 8        A.   When I was on one of these trips, the doctor
14:35 9    gave it to me.  And I don't honestly remember why it was
14:35 10   there.  I mean, I obviously was talking to that guy at
14:35 11   night or something probably.
14:35 12       Q.   So just to understand in terms of your -- your
14:35 13   efforts to -- to locate Merritt Hawkins-related
14:35 14   documents once you were sued, tell the Court and the
14:35 15   jury what you did.
14:35 16       A.   I just went -- once I was sued, I looked at
14:35 17   my -- well, when I was sued, I gave it to counsel, the
14:35 18   computer.  That day, the day that I was sued, a
14:35 19   forensics expert came to my house and took everything.
14:35 20       Q.   And when you say everything, was it all
14:35 21   electronic media that was in your possession on the date
14:35 22   that you were sued?
14:36 23       A.   Yes.
14:36 24       Q.   That includes your hard drives?
14:36 25       A.   Yes.

**200**

14:33 1        Q.   Does it include any USB drive that you had?
14:33 2        A.   Yeah.  If I had one, it included it.
14:33 3        Q.   Do you know if there was a forensic image made
14:33 4    of your cell phone?
14:33 5        A.   I don't know.  I know the passwords were given
14:33 6    to my cell phone so that they could -- the passwords, so
14:33 7    they could get into my cell phone.
14:33 8        Q.   Now, did you also give access to your counsel
14:33 9    to your e-mail accounts?
14:33 10       A.   I did.
14:33 11       Q.   And that also -- that would then include your
14:33 12   scott.gresham@verizon.net account?
14:33 13       A.   Yes.
14:33 14       Q.   Now, you understand that in the course of the
14:33 15   lawsuit, Merritt Hawkins has served some discovery
14:33 16   requests on you --
14:33 17       A.   Yes.
14:33 18       Q.   -- where they asked you to go out and look for
14:33 19   documents?
14:33 20       A.   Yes.
14:33 21       Q.   What did you do to try to find paper
14:33 22   documents?
14:33 23       A.   I looked through my house.  I had my wife help
14:33 24   me look through the house.  There was nothing.
14:33 25       Q.   And with respect to the electronic documents --

**201**

14:33 1        A.   I figured it was handled because I gave the
14:33 2    computer to the forensics expert.
14:33 3        Q.   All right.  Now, thank you.  Let's see.
14:33 4        Do you -- I want to ask you a few more
14:33 5    questions about Merritt Hawkins.
14:33 6        During your -- your last weeks of work at
14:33 7    Merritt Hawkins -- I'm talking the week that began
14:33 8    September 17th or -- well, let's focus on
14:33 9    September 17th, 2012 for the minute -- for the moment.
14:33 10       What prompted you to contact Billy Bowden on
14:33 11   September 17th, 2012?
14:33 12       A.   I was just tired of working there.  Honestly,
14:33 13   I mean, there's lot of things.  It's not that Merritt
14:33 14   Hawkins is a bad company or AMN is a bad company.  It
14:33 15   takes a lot of your time to do permanent physician
14:33 16   placement.  Locums position placement is not the same
14:33 17   kind of job.  Permanent position placement is 24 hours a
14:33 18   day and you always start from ground zero every month.
14:33 19   Locums position staffing is more like annuities and it
14:33 20   builds and builds and builds and it's also an 8:00 to
14:33 21   5:00 job.  So I had had that feeling for a long time.
14:33 22       Q.   Well, I mean, when you texted Billy on
14:33 23   September 17th of 2012, had you already decided you were
14:33 24   going to go into another medical staffing job?
14:33 25       A.   I -- I had known for months that I was

**51 (Pages 198 to 201)**

**APP. 0165**

Larry Scott Gresham

**202**

14:38  1  probably going to leave. I didn't know what I was going
14:38  2  to do.
14:38  3      Q. All right. Did -- during that week of
14:38  4  September 17th, did Billy encourage you to leave
14:38  5  Merritt Hawkins?
14:38  6      A. I think he told me the opposite. I think he
14:38  7  told me, man, stay where you are, you know, it's -- it's
14:38  8  good. I don't really remember, though. But he never
14:38  9  encouraged me, you know, I mean, besides, hey, I'd love
14:38 10  you here, we're friends.
14:38 11      Q. During your last week of work at
14:38 12  Merritt Hawkins, did you continue to do your job at
14:38 13  Merritt Hawkins?
14:38 14      A. Of course.
14:38 15      Q. And would that include printing out documents
14:38 16  as part of that job?
14:38 17      A. Absolutely.
14:38 18      Q. And when Ms. Nowak asked about an account
14:38 19  list, is that part of your normal practice, to print
14:38 20  that account list and give it to Mr. Beidle?
14:38 21      A. It is. We had to do it every week.
14:38 22      Q. Okay. Do you know what Merritt Hawkins keeps
14:39 23  track of in terms of your use of its printers?
14:39 24      A. No.
14:39 25      Q. Do you know if they keep track of when you

**203**

14:39  1  enter and exit the building?
14:39  2      A. I -- I assume they do.
14:39  3      Q. Do you know whether they keep track of when
14:39  4  you log in to their VPN?
14:39  5      A. Sure.
14:39  6      Q. And do you know whether they keep track of
14:39  7  when you log in to your work terminal?
14:39  8      A. Sure.
14:39  9      Q. And we spent a lot of time talking about
14:39 10  the -- the -- what you did when you went to the office
14:39 11  on September 23rd, 2012.
14:39 12          Was it -- the documents that you dragged to
14:39 13  your recycle bin that were Merritt Hawkins-related, were
14:39 14  those documents already available to Merritt Hawkins on
14:39 15  its own servers, in your understanding?
14:39 16      A. Yes.
14:39 17      Q. And tell me why you know that.
14:39 18      A. Well, all the documents that she listed are --
14:39 19  they're template documents. They're all on -- they're
14:39 20  all on the M or -- I think M drive -- anyway, the server
14:39 21  drive. The only documents that I was worried about were
14:39 22  I had documents that had my credit card information on
14:40 23  them and things like that. I knew that that stuff --
14:40 24  that's why I just swathed and deleted it. It was my --
14:40 25  I was just cleaning up the terminal.

**204**

 1      Q. Was there any policy and procedure in place at
 2  Merritt Hawkins, to you knowledge, that prohibited you
 3  from cleaning up your terminal --
 4      A. No.
 5      Q. -- before you leave?
 6      A. No.
 7      Q. Do you know if you cleaned up your terminal
 8  before you quit the first time?
 9      A. I'm sure I did.
10      Q. Did they say anything to you at that time?
11      A. No.
12      Q. They certainly didn't sue you for cleaning up
13  the terminal?
14      A. No.
15      Q. Do you know if they sued anybody else for
16  cleaning up their terminal before leaving?
17      A. I do not.
18      Q. Is there -- how would you characterize the
19  rate of turnover of employees at Merritt Hawkins?
20      A. It's pretty high. It's high.
21      Q. Now, you entered the Merritt Hawkins RIT
22  program in what year?
23      A. 2008.
24      Q. How many employees entered that program with
25  you in 2008?

**205**

 1      A. My class -- I think -- I think my class had 40
 2  RITs in it.
 3      Q. How many of those RITs were left a year later?
 4      A. When I left after one year, there were only
 5  two of us left.
 6      Q. So two out of 40?
 7      A. Uh-huh.
 8      Q. So at least 38 of those other folks had quit?
 9      A. Yes.
10      Q. All right.
11          MR. VOLNEY: Those are all the questions
12  I have for now. I'll save the rest for later. Thank
13  you.
14          MS. NOWAK: No. I have questions. But
15  thank you.
16          EXAMINATION
17  BY MS. NOWAK:
18      Q. Mr. Gresham, we were talking about your first
19  versus second employment with MHA.
20          And is it your testimony here today that when
21  you left MHA the first time to go to Arthur Marshall,
22  they took immediate steps to enforce the employment
23  agreement they had with you?
24      A. I don't know. We were -- I don't remember how
25  long after that I -- that I became employed by

**52 (Pages 202 to 205)**

**APP. 0166**

Larry Scott Gresham

---

**206**

14:40 1  Arthur Marshall that they received the suit. So I
14:40 2  really couldn't answer that question.
14:40 3     Q.  But you know that they took steps --
14:40 4     A.  Yes.
14:40 5     Q.  -- to enforce the employment agreement?
14:40 6     And it's common knowledge at Merritt Hawkins
14:40 7  that they do pursue and maintain their employment
14:40 8  agreements?
14:40 9     A.  Yes.
14:40 10    Q.  You testified earlier when Mr. Volney was
14:40 11 asking you questions that Mr. Beidle encouraged you to
14:40 12 e-mail MHA documents to yourself; is -- is that correct?
14:40 13    A.  Absolutely.  If we were -- like, we'd be
14:40 14 working on a doctor, especially offer letters.  If we
14:40 15 were working on a doctor, I'd say, man, I've got to go
14:40 16 home because this, this, this, this.  They'd say, hey,
14:40 17 just e-mail that, talk to him tonight.
14:40 18    Q.  Do you --
14:40 19    A.  And I would tell him I was going to.
14:40 20    Q.  Do you recall signing the information systems
14:40 21 policies when you were an employee at MHA?
14:40 22    A.  No, I don't recall.
14:42 23    Q.  Are you familiar with any of the MHA systems
14:42 24 policies?
14:42 25    A.  No.

---

**207**

14:42 1     Q.  So you would be surprised to learn that MHA
14:42 2  does not, in fact, encourage you to e-mail documents to
14:42 3  your personal account?
14:42 4     A.  I would think that's an issue they need to
14:42 5  take up with their employees because their people's
14:42 6  bosses tell them to.
14:42 7     Q.  So is it your testimony that you've never
14:42 8  reviewed during the course of your employment with MHA
14:42 9  any of the information systems policies?
14:42 10    A.  Not to my -- I don't remember reading them.
14:43 11    Q.  You seem very hung up and keep coming up to
14:43 12 this difference between locums versus permanent medical
14:43 13 staffing.
14:43 14    You do agree they are both medical staffing?
14:43 15    A.  Sure.
14:43 16    Q.  So we're talking about the medical staffing
14:43 17 industry?
14:43 18    A.  Sure.
14:43 19    Q.  Okay.  And Consilium does recruit doctors,
14:43 20 don't they?
14:43 21    A.  Right.
14:43 22    Q.  They work with healthcare, you know,
14:43 23 professionals and physicians --
14:43 24    A.  Right.
14:43 25    Q.  -- is that correct?

---

**208**

1     A.  McDonald's and Bob's both use beef.
2     Q.  I think most people would disagree with that
3  characterization.
4     A.  Well...
5        MR. VOLNEY:  I've got a funny story to
6  tell you afterwards, but go ahead.
7     Q.  (BY MS. NOWAK)  But my question is:  Consilium
8  does work with healthcare professionals, correct?
9     A.  Yes.
10    Q.  They recruit healthcare professionals?
11    A.  Yes.
12    Q.  And they also work with clients?  Clients
13 being healthcare organizations, hospitals, you know,
14 managed care facilities.
15    A.  Yes.  I didn't say they didn't.  I said I
16 didn't.
17    Q.  Okay.  So your testimony here today -- and
18 just to make sure the record is clear, your testimony is
19 that you didn't work with those while you were at
20 Consilium, but Consilium itself does work with
21 physicians, healthcare providers, and healthcare
22 organizations?
23    A.  Yes.
24    Q.  It is a business in the medical staffing
25 industry?

---

**209**

1     A.  Yes.
2     Q.  Okay.  I also want to clarify another
3  statement that you made.
4     You testified that you provided all electronic
5  media to your counsel on January 1 of 2013; is that
6  correct?
7     A.  Yes.
8     Q.  And that includes your cell phone?
9     A.  Yes.
10    Q.  So you're telling us, as we sit here today,
11 that as of January 1, 2013, your lawyer had access to
12 the text message that I received yesterday for the first
13 time?
14    A.  I think.  And I told you -- when he asked
15 about the cell phone, I said I think so.
16    Q.  Okay.
17    A.  I mean, this is not stuff -- I gave everyone
18 what they wanted.
19    Q.  So do you know, as we sit here today, whether
20 you gave your lawyer access to your cell phone or not?
21    A.  I do not.  I know that I gave them passwords.
22 And I don't know what they did with those.  I don't
23 know.  Like, even though I played World of Warcraft for
24 awhile, I don't know.
25       THE REPORTER:  Even though you played

---

**53 (Pages 206 to 209)**

---

**210**

14:45  1   what?
14:45  2          THE WITNESS: I was joking with her.
14:45  3          THE REPORTER: No, no. I --
14:45  4          THE WITNESS: Even though I played World
14:45  5   of Warcraft and that makes me a computer expert, I don't
14:45  6   know.
14:45  7          THE REPORTER: World War?
14:45  8          THE WITNESS: World of Warcraft.
14:45  9      Q. (BY MS. NOWAK) So you don't actually remember
14:45  10  what electronic media you provided to your lawyer?
14:45  11     **A. No. I provided everything they asked for.**
14:45  12     Q. Okay. But you don't recall what it is that
14:45  13  they asked for, whether it included your phone, all of
14:45  14  your USB drives, you just gave them some stuff and you
14:45  15  just don't recall exactly what --
14:45  16     **A. The only thing I don't recall is the phone. I**
14:45  17  **know that I gave them Verizon passwords, which -- or**
14:46  18  **Sprint passwords, things like that. I don't recall if I**
14:46  19  **gave them the physical phone or not.**
14:46  20     Q. When we talk about that Sunday, September 23rd
14:46  21  date and you went up to the office and -- and drug all
14:46  22  those files and deleted them off of your computer, you
14:46  23  stated your testimony was that you believed all of those
14:46  24  documents were template documents.
14:46  25          What does that -- what does that mean? What

---

**211**

14:46  1   is a template document?
14:46  2      **A. They were all created from a template, just**
14:46  3   **like this document -- well, this practice history is a**
14:46  4   **template.**
14:46  5          THE REPORTER: This what history,
14:46  6   practice?
14:46  7          THE WITNESS: This practice history.
14:46  8      Q. (BY MS. NOWAK) So that itself is a template.
14:46  9   But once it's filled out and has information in it, it's
14:46  10  no longer considered a template, is it?
14:46  11     **A. Okay. I agree.**
14:46  12     Q. I mean, it has specific information?
14:46  13     **A. I agree.**
14:46  14     Q. So is your testimony that the documents that
14:46  15  were contained in your My Documents, were they template
14:46  16  documents, were they blank forms or were they completed
14:45  17  forms that had information about MHA's clients included
14:45  18  on them?
14:45  19     **A. I'm sure there were both. And -- but the**
14:45  20  **documents that had been completed were backed up in**
14:45  21  **MHACS by admin.**
14:45  22     Q. Okay. And so your testimony was that you were
14:45  23  worried about your credit card information and that's
14:45  24  why you deleted all those files?
14:45  25     **A. Any personal information. I was giving an**

---

**212**

1   example.
2      Q. But your testimony was that all of that
3   information was backed up on the server. So how would
4   it have gotten rid of your credit card information to
5   drag it into the recycle bin?
6      **A. I wasn't worried about the IT department**
7   **stealing my credit card information. Okay? I was**
8   **worried about the next person that comes to the**
9   **computer, if it's not cleaned up, saying, oh, what's**
10  **this, some guy's credit card information.**
11     Q. So it was your understanding that everything
12  was backed up on the server, but that when you left,
13  your computer would just be reissued automatically with
14  everything on it to the next person?
15     **A. I don't know.**
16     Q. And that was what you believe the impetus was
17  for you going to the office and deleting all those
18  files?
19     **A. Yeah. Just to get the personal information**
20  **and stuff off there, clean it up.**
21     Q. Then why -- why did you not limit your
22  deletions to your personal information?
23     **A. Because I didn't want to spend a lot of time**
24  **up there. I didn't care to. I had other things to do.**
25  **I just swathed everything and deleted it.**

---

**213**

1      Q. Included within your My Documents, though,
2   there were specific folders that were dedicated to
3   personal information, my photos, you know, my travel.
4          Why not delete just those folders?
5      **A. Because I didn't follow that structure. I put**
6   **stuff wherever I wanted to. I just put stuff. Like if**
7   **My Documents opens -- when you -- when you save**
8   **something, usually it doesn't go to my pictures, my --**
9   **it goes to My Documents. Some people that are really**
10  **interested in categorizing their files will find the**
11  **right place to put it. I don't. I save it in My**
12  **Documents.**
13     Q. So it wasn't important to you to differentiate
14  between what was MHA's documents versus what was yours
15  in deleting those files?
16     **A. I wasn't deleting the files. I -- you're**
17  **going to go back to what we've already established. I**
18  **knew that the files were saved, were backed up. It**
19  **didn't matter how I took them off the terminal. It was**
20  **a terminal. I just didn't want the next person -- even**
21  **the IT guy -- even if the IT guy comes up to clean my**
22  **computer, like you said, I don't want him seeing my**
23  **credit card information right there.**
24     Q. So what's the difference between him seeing it
25  right there on your terminal versus backed up on the

---

**54 (Pages 210 to 213)**

Larry Scott Gresham

**214**

| | |
|---|---|
| 14:57 | 1 |
| 14:57 | 2 |
| 14:57 | 3 |
| 14:57 | 4 |
| 14:57 | 5 |
| 14:57 | 6 |
| 14:55 | 7 |

14:57 1  server?
14:57 2      **A. Peace of mind.**
14:57 3          **I mean, you're, like, going around in circles**
14:57 4  **about nothing.**
14:57 5      Q. But you're not denying that the documents that
14:57 6  you dragged into the recycle bin contained information
14:55 7  about MHA's clients?
14:55 8      **A. I've never denied it, no.**
14:55 9      Q. And that there were documents that you created
14:55 10 during the course of your employment?
14:55 11     **A. I have -- I've never denied it.**
14:55 12     Q. And for your employment?
14:55 13     **A. Never denied it.**
14:55 14     Q. And you are aware that MHA has alleged in this
14:55 15 lawsuit that it was not able to recover the files that
14:55 16 you deleted?
14:55 17     **A. I was aware they alleged it, but...**
14:58 18         MS. NOWAK: Give me a five-minute break
14:48 19 and then we can wrap up again.
14:48 20         MR. VOLNEY: Okay.
14:48 21         THE VIDEOGRAPHER: We're off the record
14:48 22 at 2:48.
14:53 23         (Break taken from 2:48 to 2:53 p.m.)
14:53 24         THE VIDEOGRAPHER: We're on the record at
14:53 25 2:53 p.m.

**215**

14:53 1          MS. NOWAK: Can I go now?
14:53 2          THE REPORTER: Yes, ma'am.
14:53 3          MS. NOWAK: I didn't jump too fast?
14:53 4          THE REPORTER: No.
14:53 5          MS. NOWAK: I'm going to once again
14:53 6  reserve my right and time to recall this witness given
14:53 7  that I don't think that there's been a full production
14:54 8  in this case.
14:54 9          And John, before we conclude, I do want
14:54 10 to ask you, there's been a representation made that the
14:54 11 witness may have or did provide Lynn Tillotson with his
14:54 12 cell phone and access to all of the text messages back
14:54 13 in January 1 of 2013. So I'd like to know, have you had
14:54 14 access to the text message that was produced to me
14:54 15 yesterday since January 1 of 2013?
14:54 16         MR. VOLNEY: Well, first of all, I'm not
14:54 17 testifying here today. But I --
14:54 18         MS. NOWAK: I'm just inquiring as to --
14:54 19         MR. VOLNEY: When I found about it
14:54 20 yesterday, which I found out yesterday morning at 9: --
14:54 21         THE WITNESS: 9:30.
14:54 22         MR. VOLNEY: -- 30, I immediately had him
14:54 23 e-mail it to me and then I produced it to you. That's
14:54 24 my first knowledge of it. And I remember that you had
14:54 25 asked during Mr. Bowden's deposition whether the

**216**

1  remainder of that text -- text message existed. Billy
2  said he didn't have it. So I asked him. And when I got
3  it, I provided it to you.
4          MS. NOWAK: I'm just trying to clarify
5  because the witness has said that he thinks that he gave
6  you back in January 21 -- January of 2013 his -- his
7  cell phone and access to all of those text messages.
8  I'm just trying to ascertain did you have access to
9  those in January 2013.
10         MR. VOLNEY: I'm telling you what
11 happened. I don't know what we had access to or not. I
12 certainly didn't have it. I didn't know if -- well,
13 I'll have to go back and look. I don't know.
14         MS. NOWAK: All right. Well, with that,
15 I think that we're off the record having -- me having
16 reserved my time and my rights.
17         THE VIDEOGRAPHER: We're off the record
18 at 2:55 p.m.
19         (Deposition adjourned at 2:55 p.m.)
20
21
22
23
24
25

**217**

1          DEPOSITION CHANGES
2  WITNESS: LARRY SCOTT GRESHAM
3  PAGE NO.  LINE NO.  CHANGE   REASON FOR CHANGE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

DepoTexas, Inc. / Sunbelt Reporting & Litigation Services

**APP. 0169**

Larry Scott Gresham

**218**

1      _____
2          (Signature of the witness)
3
4      THE STATE OF _____
5      COUNTY OF _____
6
7          Subscribed and sworn to before me by the said
8      witness, LARRY SCOTT GRESHAM, on this the _____ day
9      of _____, 2014.
10
11
        _____
12         Notary Public in and for the
           State of _____
13         County of _____
14     My commission expires:  _____
15
16
17
18
19
20
21
22
23
24
25

**219**

1      STATE OF TEXAS    )
       COUNTY OF DALLAS  )
2
3          I, Lezley Cull, Certified Shorthand Reporter
4      in and for the State of Texas, certify that the
5      foregoing deposition of LARRY SCOTT GRESHAM was reported
6      stenographically by me at the time and place indicated,
7      said witness having been placed under oath by me, and
8      that the deposition is a true record of the testimony
9      given by the witness.
10         I further certify that I am neither counsel
11     for nor related to any party in this cause and am not
12     financially interested in its outcome.
13         Given under my hand on this the _____ day
14     of _____, 2014.
15
16
17
18     Lezley Cull, Texas CSR 5528
       Expiration Date:  12/31/15
19     DepoTexas, Firm Registration #459
       Sunbelt Reporting, Firm Registration #301
20     6500 Greenville Avenue
       Suite 445
21     Dallas, Texas 75206
       214-373-4977
22
23
24
       Original deposition sent to Mr. John Volney on
25     _____ for signature.

**56 (Pages 218 to 219)**

APP. 0170

**Wendy Cassidy**

| | |
|---|---|
| From: | Scott Gresham <scott.gresham@verizon.net> |
| Sent: | Wednesday, September 19, 2012 7:57 PM |
| To: | Christina Stephens |
| Subject: | Thank you |

Christina,

Thank you for taking the time today to talk to me about Consilium Staffing as a whole, as well as the recruiter opening. I remain extremely excited about the position, and I look forward to our future meetings. Additionally, thank you for adjusting your schedule to accommodate such an early meeting on Friday morning. Have a great evening, and I will see you on Friday at 7:00 AM.

Thanks,

**Scott Gresham**

EXHIBIT
11

GRESHAM 000001

**APP. 0171**

**From:** Scott Gresham
**Sent:** Monday, September 24, 2012 7:00 AM
**To:** Tim Beidle
**Subject:** Resignation

Dear Tim,

Please accept this notification that I am leaving my position at Merritt Hawkins effective September 24. I appreciate the opportunities I have been given at Merritt Hawkins and your professional guidance and support. I wish you and Merritt Hawkins continued success in the future.

For the past few months, my heart and mind have not been focused solely on physician recruiting, and I have received an offer that I cannot refuse that will be a new and exciting endeavour for me. Again, I appreciate the support everyone at Merritt Hawkins has given me, and I wish the Heartland continued success.

Respectfully,

Scott Gresham
*** Notice from Dykema Gossett PLLC: To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein. This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately. Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message. DYKEMA



EXHIBIT
12

EXHIBIT
C

**Wendy Cassidy**

| | |
|---|---|
| **From:** | Scott Gresham <scott.gresham@verizon.net> |
| **Sent:** | Thursday, October 04, 2012 10:59 AM |
| **To:** | Christina Stephens |
| **Subject:** | RE: Good morning |

That sounds great!

Thanks,

Scott Gresham

**From:** Christina Stephens [mailto:cstephens@consiliumstaffing.com]
**Sent:** Thursday, October 04, 2012 10:55 AM
**To:** Scott Gresham
**Subject:** RE: Good morning

Hey Scott,

Everything went very well on our end and I expect to be able to get back with you later today with more details! Thank you! Christina

**From:** Scott Gresham [mailto:scott.gresham@verizon.net]
**Sent:** Thursday, October 04, 2012 10:53 AM
**To:** Christina Stephens
**Subject:** Good morning

Good morning Christina,

I am just checking in to get an update on the status of everything.  I had a great time meeting with Joe and Matt on Tuesday and Kyle, John, and Amy yesterday.  I look forward to hearing from you, and have a great day!

Thanks,

Scott Gresham

EXHIBIT
21
PENGAD 800-631-6989

1

GRESHAM 000013

**APP. 0173**

**Wendy Cassidy**

| | |
|---|---|
| From: | Scott Gresham <scott.gresham@verizon.net> |
| Sent: | Thursday, October 04, 2012 5:15 PM |
| To: | Christina Stephens |
| Subject: | Offer and Background Authorization |
| Attachments: | background.pdf; offer.pdf |

Christina,

I have attached the offer and background check authorization to this email. I look forward to working with you guys as well. I think you have a great thing going on, and I am excited to be a part of it!

Thanks,

**Scott Gresham**

EXHIBIT
23
PENGAD 800-631-6989

1

GRESHAM 000010

APP. 0174

**CONSILIUM STAFFING, LLC**
**CONSUMER AUTHORIZATION & RELEASE**

In connection with Consilium Staffing, LLC considering me for employment, continued employment, promotion or reassignment, I authorize Consilium Staffing, LLC and/or its agent, SelectForce, Inc., to obtain a consumer report which may include information on my character, general reputation, personal characteristics, and mode of living from public record sources or through personal interviews with previous employers or associates. Public record check may include but not limited to a criminal or felony background check, sex offender's registry check, education verification and social and past address trace. I understand that a consumer reporting agency investigation may include obtaining a motor vehicle license and that we will conform to the Driver Privacy Protection Act. The applicant is required for the motor vehicle to provide a consent form and a photo I.D. before obtaining the record. Our company will retain the consent form and the results for a period of 5 years.

I authorize, without reservation, any person or entity contacted by Consilium Staffing, LLC, or its agent, SelectForce, Inc. to furnish the above-stated information and I release any such person or entity from any and all liability for furnishing such information. I further release Consilium Staffing, LLC and its affiliated companies, their officers, employees and agents, and specifically, **SelectForce, Inc.**, their affiliated companies, their officers, employees and agents from any liability and responsibility arising from the preparation of said report. I understand that false or misleading statements made on this authorization, or made during the employment process, will disqualify me from consideration for employment or result in my immediate discharge if employed.

By my execution hereof I acknowledge I have been provided with a Consumer Disclosure advising me that a credit report will be requested and used for the purpose of evaluating me for employment, continued employment, promotion or reassignment as an employee.

PLEASE PRINT

NAME: _LARRY_      _Scott_           _GRESHAM_
       First        Middle          Last          Maiden

DOB* ▮▮▮▮  SSN# ▮▮▮▮▮  DR.LIC. # ▮▮▮▮▮       STATE ISSUED: _TX_

ADDRESS: ▮▮▮▮

CITY: ▮▮▮▮      STATE: ▮   ZIP: ▮▮       How Long? _2 years_

PREVIOUS ADDRESS: ▮▮▮▮

CITY: ▮▮▮▮      STATE: ▮   ZIP: ▮▮       How Long? _2 years_

SIGNATURE: _[signature]_           DATE: _____

*"Date of Birth" (DOB) will be used solely for the purpose of identification in doing background checks and will not be considered in the "employment" process.

**CONSUMER DISCLOSURE**

In connection with Consilium Staffing, LLC considering you for employment, continued employment, promotion or reassignment, **Consilium Staffing, LLC** and/ or **SelectForce, Inc.** may obtain a consumer report on you which may include information on character, general reputation, personal characteristics, and mode of living from public record sources or personal interviews with previous employers or associates.

You have the right, upon written request, to receive a written description of the nature and scope of the investigation requested and a written summary of your rights under the Fair Credit Reporting Act.

**I HEREBY ACKNOWLEDGE RECEIPT:**

_LARRY S Gresham_                    _10/4/2012_
   Print Name                                    Date

_[signature]_
   Signature

GRESHAM 000011

APP. 0175



## CONSILIUM STAFFING
YOUR PARTNER IN LOCUM TENENS

5215 N. O'CONNOR BLVD. SUITE 325
IRVING, TX 75039

October 4th, 2012

Dear Scott Gresham,

On behalf of the entire Consilium Staffing team, I am pleased to extend to you an offer of employment as a Senior Recruiting Consultant. The annual base pay for this position is $45,000 to be paid bi-weekly. Consilium Staffing, LLC also agrees to pay you a guarantee against commissions in the amount of $1000 per month for a period of 2 months beginning November 2012. Commissions (if applicable) will be paid on the last day of the following month. We anticipate the first day of your employment to begin on Monday October 15th, 2012.

Consilium Staffing, LLC provides medical and dental benefits including employer paid premiums (subject to employee paid deductibles). Consilium Staffing, LLC employees receive Paid Time Off, plus eight Company paid holidays: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and the day after (Friday), and Christmas Day.

If you accept this employment offer and become a member of the Consilium Staffing team, you will become eligible for health benefits on the first day of the month following 30 days of employment. This offer is contingent upon proof of identification, work authorization and successful completion of reference and background check.

This letter is not a contract of employment. Consilium Staffing LLC reserves the right to change the terms and conditions of employment at any time, without notice. Employment with Consilium Staffing, LLC is employment "at-will." Either you or the Company may choose to terminate the employment relationship at any time.

By accepting this offer of employment, you represent to Consilium Staffing, LLC that you do not possess any confidential or proprietary information belonging to any of your prior employers, and that you do not need any such information to perform the duties for which you are being hired by Consilium Staffing, LLC. You further represent to Consilium Staffing, LLC that you are under no contractual or other restriction or obligation that will in any way limit your ability to provide services to Consilium Staffing, LLC or to engage in activities on behalf of Consilium Staffing. To the extent you have not already done so, all confidential or proprietary information belonging to any of your prior employers that may have ever been in your possession should be returned to such employer prior to the commencement of your employment with Consilium Staffing, LLC.

Your skills and knowledge will contribute significantly to our overall growth plans. We are also excited that our organization will provide you with career development opportunities and challenges.

To indicate acceptance of this offer, please sign this letter in the space provided below and return it to me as soon as possible. We look forward to having you join Consilium Staffing, LLC.

Sincerely,

Christina Stephens, Corporate Recruiting Manager
Consilium Staffing, LLC

LARRY S Gresham            10/4/2012

Name            Signature            Date

GRESHAM 000012

**APP. 0176**

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT dated this April 28, 2008, ("Agreement") is entered into by and between Merritt, Hawkins & Associates, a Texas corporation (" MHA "), and Billy Bowden ("Employee").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties covenant and agree as follows:

## ARTICLE I
## EMPLOYMENT

MHA hereby agrees to employ the Employee and the Employee hereby accepts such employment and agrees to perform the services specified herein upon the terms and conditions set forth in this Agreement.

## ARTICLE II
## DUTIES

The Employee shall be employed as a[n] Search Consultant of MHA, effective April 28, 2008. The Employee understands and agrees that his/her primary responsibilities will encompass part or all of the following: recruitment of medical specialists, selling of services to clients, and account management of new and current business either on the permanent or contract side of the business. The Employee agrees to perform the duties normally incidental to that position for as long as he or she shall hold that office and to perform such other duties and responsibilities as may be prescribed from time to time by the Board of Directors of MHA (the "Board"). The Employee also agrees to perform, without additional compensation, such services for corporations or other enterprises affiliated with MHA as the Board may from time to time specify.

## ARTICLE III
## EXTENT OF SERVICE

a:  The Employee shall devote such time, attention and energy to the business of MHA and corporations affiliated with MHA as the Board shall require, and shall not during the term of this Agreement be engaged in any other personal activity if such activity requires the personal services of Employee and is pursued for gain, profit or other pecuniary advantage.

b:  The foregoing shall not be construed as preventing the Employee (1) from making investments in businesses of enterprises provided such investments do not require any personal services on the part of the Employee in the operation or the affairs of such businesses or enterprises or (2) participating in any charitable or philanthropic activities.





ARTICLE IV
CONFIDENTIAL INFORMATION

a:    The Employee will be trained, by MHA, in the capacity of a[n] Search Consultant or and will have access to and develop confidential information relating to the exact names and contacts of clients of MHA, the fees charged by MHA, and sales techniques unique to the success of MHA.

b:    In addition, the Employee further acknowledges that the Confidential Information received through training and employment by MHA will enable the Employee to cultivate the loyalty and good will of MHA clients or customers and will enable the Employee to develop close, personal relationships with MHA clients.  The Employee agrees that Confidential Information documented in MHA files, records and documents is the property of MHA and agrees that the Employee shall not, without the prior written consent of MHA, disclose or make available to any person, or use directly or indirectly, any of such Confidential Information, except in connection with the performance of the Employee's employment by MHA.

c:    This obligation shall not apply to such portion of MHA or its client's information which the Employee can establish:  (a) was previously known to the Employee prior to the Employee' obtaining the same from MHA or its client or developing the same for MHA's or its client; (b) was in the public domain prior to the time of disclosure by MHA or its client to Employee or prior to the time such information was developed by Employee for MHA or its client; or (c) was later disclosed to Employee by a third party who did not receive the same, directly or indirectly, from MHA or its client or who had no obligation of secrecy with respect thereto.  The Employee further recognizes the need of MHA to protect these legitimate business interests by a covenant not to compete as provided under Article VII.

d:    The Employee acknowledges and agrees that this non-disclosure obligation shall survive any termination of this Agreement and shall be fully enforceable by MHA or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason for such termination.

e:    For purposes of the Agreement, the term "Confidential Information" shall be defined as information in the possession of, prepared by, obtained by, or compiled by MHA which is not generally available to the public.  "Confidential Information" shall include, but is not limited to, information pertaining to:  (i) the identity of MHA customers, clients and prospects; (ii) the business, finances and special needs of MHA, its customers, clients, contacts and prospects; (iii) MHA policies and procedures; (iv) MHA compensation plans and employee benefits; (v) confidential market studies; (vi) pricing studies, information and analyses; (vii) current and prospective business projections; (viii) business plans and strategies; (ix) financial statements and information; (x)  special processes, procedures and services of MHA; (xi) methods of bidding, bids to customers, clients and prospects and profit margins; and (xii) unique software programs and databases developed by MHA including, but not limited to, all computer disks, slides, files, manuals or other information pertaining to such software programs and

APP. 0178

databases. The Employee acknowledges and agrees that this information, if disclosed, could place MHA at a competitive advantage.

### ARTICLE V
### AUTHORSHIP

a:   Moreover, if during Employee's employment by MHA, Employee creates any original work of authorship fixed in any tangible medium of expression which is the subject matter of copyright (such as videotapes, written presentations on acquisitions, computer programs, models, manuals, brochures or the like) relating to MHA's business products, or services, whether such work is created solely by Employee or jointly with others, MHA shall be deemed the author of such work if the work is prepared by Employee in the scope of Employee's employment; or, if the work is not prepared by the Employee within the scope of Employee's employment but is specialty ordered by MHA as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation or as an instructional text, then the work shall be considered to be work made for hire and MHA shall be the author of the work.

b:   In the event such work is neither prepared by the Employee within the scope of Employee's employment or is not a work specially ordered and deemed to be a work made for hire, then the Employee hereby agrees to assign, and by these presents, does assign, to MHA all of Employee's worldwide right, title and interest in and to such work and all rights of copyright therein.

c:   Both during the period of Employee's employment by MHA and thereafter, Employee agrees to assist MHA and its nominee, at any time, in the protection of MHA worldwide right, title and interest in and to the work and all rights of copyright therein, including but not limited to, the execution of all formal assignment documents requested by MHA or its nominee and the execution of all lawful oaths and publications for registration of copyright in the United States and foreign countries.

### ARTICLE VI
### TERMINATION OF EMPLOYMENT

In the event that this Agreement is terminated for any reason, the Employee agrees he/she shall, prior to the effective date of termination, return any and all records; files; documents; materials; copies; equipment; literature; data; information; audio or videotapes; slides; computer disks, files or information; software programs; order forms; memoranda; correspondence; customer lists or information; prospect lists or information; financial statements or other information pertaining to MHA its customers clients, contacts or prospects; agreements; contracts; orders; records; policy or procedure manuals; memoranda; and/or any cards or notes acquired, compiled or coming into the Employee's knowledge, possession or control in connection with his/her activities as an employee of MHA, as well as all machines, parts, equipment or other materials received from MHA or from any of its customers, clients, or prospects in connection with such activities.

## ARTICLE VII
## NON-COMPETITION

a:    The Employee acknowledges and agrees that as an employee and representative of MHA, the Employee will be responsible for building and maintaining business relationships and goodwill with current and future customers, clients and prospects on a personal level.  The Employee acknowledges and agrees that this responsibility creates a special relationship of trust and confidence between MHA, the Employee and these persons or entities.  The Employee acknowledges and agrees that this special relationship of trust and confidence between MHA, the Employee and current and future customers, clients and prospects creates a high risk and opportunity for the Employee to misappropriate these relationships and goodwill existing between MHA and such persons and entities.  The Employee acknowledges and agrees that it is fair and reasonable for MHA to take steps to protect MHA  from the risk of such misappropriation.

b:    The Employee acknowledges and agrees that he/she has received and will continue to receive substantial, valuable consideration for the agreements set forth in this section including:  (i) access to Confidential Information, as defined above; (ii) continued employment; (iii) specialized training and knowledge pertaining to the products, services, business practices, procedures and Confidential Information utilized by MHA; and (iv) compensation and benefits as described herein.  The Employee acknowledges and agrees that this constitutes fair and adequate consideration for the agreements set forth in this section.

c:    In consideration for the valuable consideration described above, the Employee acknowledges and agrees as follows:

(1)    For a period of twelve (12) months following the termination of this Agreement by either party, for whatever reason, the Employee will not solicit, contact, or communicate with any person, company or business that was a client, customer or prospect of MHA, and that the Employee personally solicited, contacted, communicated with or accepted business from while he/she was an employee of MHA at any time during the twelve (12) months preceding the termination of this Agreement, for the purpose of engaging in the Same or a Similar Business as MHA in the Market Area.

(2)    For a period of twelve (12) months following the termination of this Agreement by either party, for whatever reason, the Employee will not engage in the Same or a Similar Business as MHA  anywhere in the Market Area, including working as an agent, consultant, partner, employee, officer, shareholder or independent contractor, for any company of business engaged in the Same or a Similar Business as MHA  anywhere in the Market Area.

(3)    The Employee acknowledges and agrees that these non-competition agreements shall survive any termination of the Agreement and shall be fully enforceable by MHA to its successor assignee subsequent to the termination of the Employee's employment. Regardless of the reason for such termination.

(4)    In the event that the Employee violates this Section VII, and MHA is required to initiate legal action to secure the Employee's compliance with Section VII, the Employee understands and agrees that, in addition to any other legal or equitable relief to which MHA may be entitled under applicable law, he/she shall be prohibited from violating Section VII of the Agreement for a period of twelve (12) months from the date a final judgment is entered in favor of MHA enforcing Section VII of this Agreement.

d.    For purpose of this section, the following definitions shall apply:

(1)    The term "Same or a Similar Business as MHA" shall be defined as the business of recruitment of medical specialists, selling of services to clients, and account management of new and current business.

(2)    The term "Market Area" shall be defined as any location within fifty (50) miles of the office of MHA to which the Employee is currently assigned. The Employee understands and agrees that MHA shall have the sole discretion to assign the Employee to a different office, or modify the geographic scope of the Employee's sales territory description. In the event that MHA assigns the Employee to a new office, the parties agree that, for the purposes of this section, the "Market Area" shall be modified to include any location within fifty (50) miles of the new office to which the Employee is assigned.

e.    The Employee acknowledges and agrees that the Agreements set forth above are ancillary to an otherwise enforceable agreement and supported by independent valuable consideration as required by Tex. Bus. & Comm. Code Ann. ~ 15.50 (or any successor provision). The Employee further acknowledges and agrees that the limitations as to time, geographical area, and scope of, activity to be restrained are reasonable and acceptable to the Employee, and do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of MHA. The Employee further agrees that if, at some later date, a court of competent jurisdiction determines that these Agreements do not meet criteria set forth in Tex. Bus. & Comm. Code Ann. ~ 15.50 (2) (or any successor provision), these Agreements may be reformed by the court, pursuant to Tex. Bus. & Comm. Code Ann. ~ 15.51 (c) (or any successor provision), and enforces to the maximum extent permitted under Texas law.

ARTICLE VIII
NON-INTERFERENCE

The Employee agrees that, for a period of thirty-six (36) months subsequent to the termination of this Agreement, whether such termination occurs at the insistence of MHA or the Employee, the Employee shall not solicit or recruit directly or by assisting others, any other employees of MHA, its parent companies, subsidiary companies, affiliated companies, successors or assigns, nor shall the Employee contact or communicate with any other employees of MHA , its parent companies, subsidiary companies, affiliated companies, successors or assigns, for the purpose of inducing other employees to terminate their employment with MHA, its parent companies, subsidiary companies, affiliated companies, successors or assigns. For the purposes of this covenant, "other employees" shall refer to employees who are still actively employed by, or doing business with, MHA, or any of its parent companies, subsidiary companies, affiliated companies, successors or assigns, at the time of the attempted recruiting or hiring. The Employee acknowledges and agrees that these non-interference agreement shall survive any termination of the Agreement and shall be fully enforceable by MHA or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason of such termination.

## ARTICLE IX
## REMEDIES

a.    MHA and Employee, jointly and severally, acknowledge that it would be impossible to calculate or ascertain accurately and definitely the damages MHA would sustain from a breach by Employee of the provisions of this Agreement and that no adequate remedy at law exists. Accordingly, in the event of a breach or threatened breach by the Employee of this Agreement, including without limitation breach of Article VII, MHA shall be entitled to an injunction restraining such prohibited activity.

b.    Nothing herein, however shall be construed as prohibiting MHA from pursuing concurrently with the above injunction, such other relief as a result of such breach or threatened breach, including the recovery of damages from the Employee.

c.    It is agreed that in the event of a breach of this Agreement by Employee it would be impractical or extremely difficult to fix the actual damages and therefore Employee agrees that upon its breach of this Agreement it will pay to MHA as liquidated damages and not as a penalty the sum equal to the standard fee charges to any client for each physician who accepts employment or associates with any person or entity as a result of a breach of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

a.    The obligations specified in this Agreement shall survive the termination of the employment relationship and are in addition to the obligations otherwise imposed by the law; the expiration of these specific obligations does not terminate the obligations imposed by law.

b.    The parties acknowledge and agree that this Agreement may be assigned by

MHA to any other person or entity without the consent of the Employee. In the event of any such assignment, the duties and obligations of the Employee, and the rights of MHA (including, but not limited to, the Confidential Information, Non-Competition, Authority and Non-Interference provisions set forth in this Agreement), shall inure to the benefit of, be fully enforceable by, the assignee. The parties further acknowledge and agree that the Employee's duties; obligations, compensation and benefits are personal to the employee and may not be assigned to any person or entity without the written consent of MHA. In the event of the Employee's death, this Agreement shall be enforceable by the Employee's estate, executors or legal representatives, but only to the extent that such persons may collect any compensation due to the Employee under this Agreement.

      c.    The Employee understand and agrees that, with respect to any compensation or benefits required to be paid under this Agreement, MHA is authorized to withhold any amounts from such compensation required by Federal, state or local law.

      d.    The parties acknowledge and agree that, in the event that either party initiates litigation to enforce any provision of the Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party its reasonable costs and expenses, including attorneys' fees, incurred in connection with such litigation.

      e.    The parties acknowledge and agree that each provision of this Agreement shall be enforceable independently of every other provision. Furthermore, the parties acknowledge and agree that, in the event any provision of this Agreement is determined to be unenforceable for any reason the remaining covenants and/or provisions will remain effective, binding and enforceable. The parties further agree that, in the event that any provision of this Agreement is determined to be unenforceable for any reason, the parties agree to substitute a comparable provision dealing with the same subject matter as the unenforceable provision which approximates the effect and intent of the unenforceable provision to the maximum extent permissible under applicable law.

      f.    The parties acknowledge and agree that the failure of either to enforce any provision of this Agreement shall not constitute a waiver of that particular provision, or of any other provisions, of this Agreement

      g.    The parties acknowledge and agree that this Agreement constitutes the complete and entire agreement between the parties; that the parties have executed this Agreement based upon the express terms and provisions set forth herein; that the parties have not relied on any representations, oral or written, which are not set forth in this Agreement; that all previous agreement, either oral or written, shall have any effect on the terms or provisions of this Agreement; and that all previous agreements, either oral or written, are expressly superseded and revoked by this Agreement. In addition, the parties acknowledge and agree that the provisions of this Agreement may not be modified by any subsequent agreement unless the modifying agreement (I) is in writing; (ii) contains an express provision referencing this Agreement; (iii) is signed by the Employee; and (iv) is signed by the President or CEO or MHA.

h.    This Agreement does not alter in any way the fact that Employee's employment relationship with MHA exists only at the will of both MHA and Employee.  Either MHA or Employee may terminate the employment relationship at any time for any lawful reason, with or without cause, by the giving of verbal or written notice of termination.

i.    This Agreement shall be governed and construed in accordance with the substantive laws of the State of Texas.  MHA is based in Irving, Texas, and this Agreement is to be partially performed in Irving, Texas.  It is agreed that any and all disputes arising out of this Agreement will be heard and decided in the state or federal courts situated in Dallas County, Texas.  Both MHA and Employee hereby appoint the Secretary of State for the State of Texas as its and Employee's agent to receive and accept service of process in connection with any and all such litigation.

Merritt, Hawkins & Associates

By: _____

Robert Colmery
Divisional Vice President

Date: 4-23-06

EMPLOYEE: _____

Billy Bowden

Date: 4/23/06

APP. 0184



# EMPLOYMENT AGREEMENT

between

## Merritt, Hawkins & Associates

and

## Larry Gresham

Search Consultant

March 31, 2008

MHA000238

**APP. 0185**

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT dated this March 31, 2008, ("Agreement") is entered into by and between Merritt, Hawkins & Associates, a Texas corporation (" "), and Larry Gresham ("Employee").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties covenant and agree as follows:

## ARTICLE I
## EMPLOYMENT

hereby agrees to employ the Employee and the Employee hereby accepts such employment and agrees to perform the services specified herein upon the terms and conditions set forth in this Agreement.

## ARTICLE II
## DUTIES

The Employee shall be employed as a[n] Search Consultant of , effective March 31, 2008. The Employee understands and agrees that his/her primary responsibilities will encompass part or all of the following: recruitment of medical specialists, selling of services to clients, and account management of new and current business either on the permanent or contract side of the business. The Employee agrees to perform the duties normally incidental to that position for as long as he or she shall hold that office and to perform such other duties and responsibilities as may be prescribed from time to time by the Board of Directors of (the "Board"). The Employee also agrees to perform, without additional compensation, such services for corporations or other enterprises affiliated with as the Board may from time to time specify.

## ARTICLE III
## EXTENT OF SERVICE

a:     The Employee shall devote such time, attention and energy to the business of and corporations affiliated with as the Board shall require, and shall not during the term of this Agreement be engaged in any other personal activity if such activity requires the personal services of Employee and is pursued for gain, profit or other pecuniary advantage.

b:     The foregoing shall not be construed as preventing the Employee (1) from making investments in businesses of enterprises provided such investments do not require any personal services on the part of the Employee in the operation or the affairs of such businesses or enterprises or (2) participating in any charitable or philanthropic activities.

MHA000239

ARTICLE IV
CONFIDENTIAL INFORMATION

a:     The Employee will be trained, by , in the capacity of a[n] Search Consultant or  and will have access to and develop confidential information relating to the exact names and contacts of clients of , the fees charged by , and sales techniques unique to the success of .

b:     In addition, the Employee further acknowledges that the Confidential Information received through training and employment by  will enable the Employee to cultivate the loyalty and good will of  clients or customers and will enable the Employee to develop close, personal relationships with  clients.  The Employee agrees that Confidential Information documented in files, records and documents is the property of  and agrees that the Employee shall not, without the prior written consent of , disclose or make available to any person, or use directly or indirectly, any of such Confidential Information, except in connection with the performance of the Employee's employment by .

c:     This obligation shall not apply to such portion of  or its client's information which the Employee can establish:  (a) was previously known to the Employee prior to the Employee' obtaining the same from  or its client or developing the same for 's or its client; (b) was in the public domain prior to the time of disclosure by  or its client to Employee or prior to the time such information was developed by Employee for  or its client; or (c) was later disclosed to Employee by a third party who did not receive the same, directly or indirectly, from  or its client or who had no obligation of secrecy with respect thereto.  The Employee further recognizes the need of  to protect these legitimate business interests by a covenant not to compete as provided under Article VII.

d:     The Employee acknowledges and agrees that this non-disclosure obligation shall survive any termination of this Agreement and shall be fully enforceable by  or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason for such termination.

e:     For purposes of the Agreement, the term "Confidential Information" shall be defined as information in the possession of, prepared by, obtained by, or compiled by  which is not generally available to the public.  "Confidential Information" shall include, but is not limited to, information pertaining to:  (i) the identity of  customers, clients and prospects; (ii) the business, finances and special needs of , its customers, clients, contacts and prospects; (iii) policies and procedures; (iv) compensation plans and employee benefits; (v) confidential market studies; (vi) pricing studies, information and analyses; (vii) current and prospective business projections; (viii) business plans and strategies; (ix) financial statements and information; (x) special processes, procedures and services of ; (xi) methods of bidding, bids to customers, clients and prospects and profit margins; and (xii) unique software programs and databases developed by  including, but not limited to, all computer disks, slides, files, manuals or other information pertaining to such software programs and databases.  The Employee acknowledges and agrees that this information, if disclosed, could place  at a competitive advantage.

MHA000240

## ARTICLE V
## AUTHORSHIP

a:    Moreover, if during Employee's employment by , Employee creates any original work of authorship fixed in any tangible medium of expression which is the subject matter of copyright (such as videotapes, written presentations on acquisitions, computer programs, models, manuals, brochures or the like) relating to 's business products, or services, whether such work is created solely by Employee or jointly with others,  shall be deemed the author of such work if the work is prepared by Employee in the scope of Employee's employment; or, if the work is not prepared by the Employee within the scope of Employee's employment but is specialty ordered by  as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation or as an instructional text, then the work shall be considered to be work made for hire and  shall be the author of the work.

b:    In the event such work is neither prepared by the Employee within the scope of Employee's employment or is not a work specially ordered and deemed to be a work made for hire, then the Employee hereby agrees to assign, and by these presents, does assign, to  all of Employee's worldwide right, title and interest in and to such work and all rights of copyright therein.

c:    Both during the period of Employee's employment by  and thereafter, Employee agrees to assist  and its nominee, at any time, in the protection of  worldwide right, title and interest in and to the work and all rights of copyright therein, including but not limited to, the execution of all formal assignment documents requested by  or its nominee and the execution of all lawful oaths and publications for registration of copyright in the United States and foreign countries.

## ARTICLE VI
## TERMINATION OF EMPLOYMENT

In the event that this Agreement is terminated for any reason, the Employee agrees he/she shall, prior to the effective date of termination, return any and all records; files; documents; materials; copies; equipment; literature; data; information; audio or videotapes; slides; computer disks, files or information; software programs; order forms; memoranda; correspondence; customer lists or information; prospect lists or information; financial statements or other information pertaining to  its customers clients, contacts or prospects; agreements; contracts; orders; records; policy or procedure manuals; memoranda; and/or any cards or notes acquired, compiled or coming into the Employee's knowledge, possession or control in connection with his/her activities as an employee of , as well as all machines, parts, equipment or other materials received from  or from any of its customers, clients, or prospects in connection with such activities.

## ARTICLE VII
## NON-COMPETITION

MHA000241

a:      The Employee acknowledges and agrees that as an employee and representative of , the Employee will be responsible for building and maintaining business relationships and goodwill with current and future customers, clients and prospects on a personal level. The Employee acknowledges and agrees that this responsibility creates a special relationship of trust and confidence between , the Employee and these persons or entities.   The Employee acknowledges and agrees that this special relationship of trust and confidence between , the Employee and current and future customers, clients and prospects creates a high risk and opportunity for the Employee to misappropriate these relationships and goodwill existing between  and such persons and entities.  The Employee acknowledges and agrees that it is fair and reasonable for MHA to take steps to protect  from the risk of such misappropriation.

b:      The Employee acknowledges and agrees that he/she has received and will continue to receive substantial, valuable consideration for the agreements set forth in this section including:  (i) access to Confidential Information, as defined above; (ii) continued employment; (iii) specialized training and knowledge pertaining to the products, services, business practices, procedures and Confidential Information utilized by ; and (iv) compensation and benefits as described herein.  The Employee acknowledges and agrees that this constitutes fair and adequate consideration for the agreements set forth in this section.

c:      In consideration for the valuable consideration described above, the Employee acknowledges and agrees as follows:

(1)      For a period of twelve (12) months following the termination of this Agreement by either party, for whatever reason, the Employee will not solicit, contact, or communicate with any person, company or business that was a client, customer or prospect of , and that the Employee personally solicited, contacted, communicated with or accepted business from while he/she was an employee of at any time during the twelve (12) months preceding the termination of this Agreement, for the purpose of engaging in the Same or a Similar Business as MHA in the Market Area.

(2)      For a period of twelve (12) months following the termination of this Agreement by either party, for whatever reason, the Employee will not engage in the Same or a Similar Business as  anywhere in the Market Area, including working as an agent, consultant, partner, employee, officer, shareholder or independent contractor, for any company of business engaged in the Same or a Similar Business as  anywhere in the Market Area.

(3)      The Employee acknowledges and agrees that these non-competition agreements shall survive any termination of the Agreement and shall be fully enforceable by MHA to its successor assignee subsequent to the termination of the Employee's employment. Regardless of the reason for such termination.

MHA000242

**APP. 0189**

(4)     In the event that the Employee violates this Section VII, and is required to initiate legal action to secure the Employee's compliance with Section VII, the Employee understands and agrees that, in addition to any other legal or equitable relief to which may be entitled under applicable law, he/she shall be prohibited from violating Section VII of the Agreement for a period of twelve (12) months from the date a final judgment is entered in favor of enforcing Section VII of this Agreement.

d.     For purpose of this section, the following definitions shall apply:

(1)     The term "Same or a Similar Business as " shall be defined as the business of recruitment of medical specialists, selling of services to clients, and account management of new and current business.

(2)     The term "Market Area" shall be defined as any location within fifty (50) miles of the office of  to which the Employee is currently assigned.   The Employee understands and agrees that  shall have the sole discretion to assign the Employee to a different office, or modify the geographic scope of the Employee's sales territory description.  In the event that  assigns the Employee to a new office, the parties agree that, for the purposes of this section, the "Market Area" shall be modified to include any location within fifty (50) miles of the new office to which the Employee is assigned.

e.   The Employee acknowledges and agrees that the Agreements set forth above are ancillary to an otherwise enforceable agreement and supported by independent valuable consideration as required by Tex. Bus. & Comm. Code Ann. ~ 15.50 (or any successor provision).  The Employee further acknowledges and agrees that the limitations as to time, geographical area, and scope of, activity to be restrained are reasonable and acceptable to the Employee, and do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of .  The Employee further agrees that if, at some later date, a court of competent jurisdiction determines that these Agreements do not meet criteria set forth in Tex. Bus. & Comm. Code Ann. ~ 15.50 (2) (or any successor provision), these Agreements may be reformed by the court, pursuant to Tex. Bus. & Comm. Code Ann. ~ 15.51 (c) (or any successor provision), and enforces to the maximum extent permitted under Texas law.


ARTICLE VIII
NON-INTERFERENCE

The Employee agrees that, for a period of thirty-six (36) months subsequent to the termination of this Agreement, whether such termination occurs at the insistence of  or the Employee, the Employee shall not solicit or recruit directly or by assisting others, any other employees of , its parent companies, subsidiary companies, affiliated companies, successors or assigns, nor shall the Employee contact or communicate with any other employees of  , its parent companies,

MHA000243

subsidiary companies, affiliated companies, successors or assigns, for the purpose of inducing other employees to terminate their employment with , its parent companies, subsidiary companies, affiliated companies, successors or assigns. For the purposes of this covenant, "other employees" shall refer to employees who are still actively employed by, or doing business with, , or any of its parent companies, subsidiary companies, affiliated companies, successors or assigns, at the time of the attempted recruiting or hiring. The Employee acknowledges and agrees that these non-interference agreement shall survive any termination of the Agreement and shall be fully enforceable by  or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason of such termination.

## ARTICLE IX
## REMEDIES

a.    and Employee, jointly and severally, acknowledge that it would be impossible to calculate or ascertain accurately and definitely the damages  would sustain from a breach by Employee of the provisions of this Agreement and that no adequate remedy at law exists.  Accordingly, in the event of a breach or threatened breach by the Employee of this Agreement, including without limitation breach of Article VII,  shall be entitled to an injunction restraining such prohibited activity.

b.    Nothing herein, however shall be construed as prohibiting  from pursuing concurrently with the above injunction, such other relief as a result of such breach or threatened breach, including the recovery of damages from the Employee.

c.    It is agreed that in the event of a breach of this Agreement by Employee it would be impractical or extremely difficult to fix the actual damages and therefore Employee agrees that upon its breach of this Agreement it will pay to  as liquidated damages and not as a penalty the sum equal to the standard fee charges to any client for each physician who accepts employment or associates with any person or entity as a result of a breach of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

a.    The obligations specified in this Agreement shall survive the termination of the employment relationship and are in addition to the obligations otherwise imposed by the law; the expiration of these specific obligations does not terminate the obligations imposed by law.

b.    The parties acknowledge and agree that this Agreement may be assigned by  to any other person or entity without the consent of the Employee.  In the event of any such assignment, the duties and obligations of the Employee, and the rights of  (including, but not limited to, the Confidential Information, Non-Competition, Authorship and Non-Interference provisions set forth in this Agreement), shall inure to the benefit of, be fully enforceable by, the assignee.  The parties further acknowledge and agree that the Employee's duties; obligations, compensation and benefits are personal to the employee and may not be assigned to any person

or entity without the written consent of MHA. In the event of the Employee's death, this Agreement shall be enforceable by the Employee's estate, executors or legal representatives, but only to the extent that such persons may collect any compensation due to the Employee under this Agreement.

c.      The Employee understand and agrees that, with respect to any compensation or benefits required to be paid under this Agreement, is authorized to withhold any amounts from such compensation required by Federal, state or local law.

d.      The parties acknowledge and agree that, in the event that either party initiates litigation to enforce any provision of the Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party its reasonable costs and expenses, including attorneys' fees, incurred in connection with such litigation.

e.      The parties acknowledge and agree that each provision of this Agreement shall be enforceable independently of every other provision. Furthermore, the parties acknowledge and agree that, in the event any provision of this Agreement is determined to be unenforceable for any reason the remaining covenants and/or provisions will remain effective, binding and enforceable. The parties further agree that, in the event that any provision of this Agreement is determined to be unenforceable for any reason, the parties agree to substitute a comparable provision dealing with the same subject matter as the unenforceable provision which approximates the effect and intent of the unenforceable provision to the maximum extent permissible under applicable law.

f.      The parties acknowledge and agree that the failure of either to enforce any provision of this Agreement shall not constitute a waiver of that particular provision, or of any other provisions, of this Agreement

g.      The parties acknowledge and agree that this Agreement constitutes the complete and entire agreement between the parties; that the parties have executed this Agreement based upon the express terms and provisions set forth herein; that the parties have not relied on any representations, oral or written, which are not set forth in this Agreement; that all previous agreement, either oral or written, shall have any effect on the terms or provisions of this Agreement; and that all previous agreements, either oral or written, are expressly superseded and revoked by this Agreement. In addition, the parties acknowledge and agree that the provisions of this Agreement may not be modified by any subsequent agreement unless the modifying agreement (I) is in writing; (ii) contains an express provision referencing this Agreement; (iii) is signed by the Employee; and (iv) is signed by the President or CEO or .

h.      This Agreement does not alter in any way the fact that Employee's employment relationship with  exists only at the will of both  and Employee. Either  or Employee may terminate the employment relationship at any time for any lawful reason, with or without cause, by the giving of verbal or written notice of termination.

MHA000245

i.     This Agreement shall be governed and construed in accordance with the substantive laws of the State of Texas.   is based in Irving, Texas, and this Agreement is to be partially performed in Irving, Texas.  It is agreed that any and all disputes arising out of this Agreement will be heard and decided in the state or federal courts situated in Dallas County, Texas. Both  and Employee hereby appoint the Secretary of State for the State of Texas as its and Employee's agent to receive and accept service of process in connection with any and all such litigation.

Merritt, Hawkins & Associates

By: _____
         Robert Colmery
         Divisional Vice President

Date: 3-24-08

EMPLOYEE: _____
              Larry Gresham

Date: 3-30-08

MHA000246

APP. 0193

---

## CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

---

**THIS CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT** ("Agreement") is entered into on this _17_ day of _MAY_ , 20_10_, by and between Merritt, Hawkins & Associates. (Merritt Hawkins, its parent, subsidiaries and affiliates shall collectively be referred to herein as the "Company"), and _Larry S. Gresham_, an individual ("Employee" or "you").

### W I T N E S S E T H :

**WHEREAS,** Employee is accepting employment with _MERRITT HAWKINS_ as _Search Consultant_ and

**WHEREAS,** the Employee agrees to perform the duties normally incidental to the position for as long as he or she shall hold that office and to perform such other duties and responsibilities as may be prescribed from time to time by the Company. The Employee also agrees to perform, without additional compensation, such services for corporations or other enterprises affiliated with the Company as the Company may from time to time specify; and

**WHEREAS,** Company shall disclose to Employee and Employee shall have access to the Company's Confidential Business Information, as that term is defined below; and

**WHEREAS,** Company will provide you access to valuable, proprietary, confidential, and specialized Company Training, as that term is defined below; and

**WHEREAS,** Company will provide you with access to its actual and prospective customers or candidates for recruiting and other staffing services as well as Company's relationships with its candidates / healthcare professionals, clients, employees and vendors (collectively referred to in this Agreement as "Company Relationships"); and

**WHEREAS,** the nature of the business of Company requires that Employee carry out his/her duties in a confidential manner and the Company desires to protect the Confidential Business Information, Company Training, Company Relationships, and other legitimate business interests of Company; and

**WHEREAS,** Employee agrees and acknowledges that Company would not have agreed to employ, or continue to employ, Employee or disclose and provide access to the Company's Confidential Business Information, absent the covenants and restrictions set forth in this Agreement, especially Employee's covenants in Sections 2 and 5.

**NOW, THEREFORE,** in consideration of the promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of

SD 895695 v3

1

EXHIBIT
19

EXHIBIT
B

APP. 0194

which is hereby acknowledged, and as a condition to, and in consideration of, the employment of Employee by Company, the parties do hereby agree as follows:

1.     Confidential Business Information.     Employee understands and acknowledges that, by virtue of Employee's position, Employee will acquire and/or will have access to knowledge of various confidential, trade secret and/or proprietary information of the Company and/or its clients (all of which is hereinafter referred to as "Confidential Business Information"). By way of illustration only, and not limitation, Confidential Business Information includes information regarding: (a) marketing, advertising, public relations and/or promotional strategies, programs, plans and methods; (b) pricing policies, methods and concepts, product and services strategies, training programs, and methods of operation and other business methods; (c) mailing lists and lists of and information relating to current, former and prospective clients and accounts of the Company; (d) lists of and information relating to healthcare professionals, prospective healthcare professionals and other candidates for placement, including positions held, salaries and benefits received and other personal information concerning and/or provided by healthcare professionals, prospective healthcare professionals and other candidates for placement; (e) the personnel needs of current, former and/or prospective clients and accounts of the Company; (f) terms of service contracts between the Company and its clients, accounts, vendors and/or suppliers; (g) business plans, expansion plans, management policies and other business policies and strategies; (h) business and sales forecasts, market analyses, costs, sales and revenue reports, budgets, other financial data which relates to the management and operation of the Company and its products and services, and other analyses not publicly disclosed; (i) the Company's competitors; (j) employment lists, and salary, compensation and other information regarding employees, agents, independent contractors, consultants and representatives of the Company; (k) internally developed computer programs and software and specialized computer programs and source code; (l) internal procedures, programs, reports and forms of the Company; (m) Company Training and Company Relationships; and (n) other confidential, trade secret and/or proprietary information that allows the Company to compete successfully.

2.     Confidentiality. Employee covenants and agrees that he/she will not use any of the Confidential Business Information, Company Training or Company Relationships for any purpose other than in the course and scope of his/her employment and for the exclusive benefit of the Company. Except for disclosure in the course and scope of his/her employment with Company and on behalf of the Company, Employee will never at any time, either during or after his/her employment with Company, directly or indirectly, use, publish, disseminate, distribute or otherwise disclose any Confidential Business Information, Company Training or Company Relationships to any other person, firm, corporation, partnership, association or other entity.

Employee also agrees to take all steps necessary, and all steps requested to ensure that the Confidential Business Information, Company Training and Company Relationships are kept secret and confidential and for the sole use and benefit of the Company and to comply with all applicable policies and procedures of the Company regarding the storage and security of all such information, whether in hard copy form or stored on computer disks or other electronic media. Employee also acknowledges that the Confidential Business Information, Company Training and Company Relationships are,

2

APP. 0195

and have been, the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

Employee acknowledges and agrees that the Confidential Business Information, Company Training and Company Relationships are special and unique assets of the Company. Employee further agrees that the disclosure of any Confidential Business Information, Company Training and Company Relationships of the Company, both during and after his/her employment or use of any Confidential Business Information, Company Training or Company Relationships for Employee's own benefit would constitute a breach of this Agreement.

3.   _Work Product._ Employee acknowledges that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions or improvements relating to technological matters, whether or not capable of being protected by patent, copyright, trade secret or other intellectual property right (the "Work Product"), conceived by the Employee while employed by or consulting with Company, whether formally or informally, compensated or uncompensated, or whether during regular working hours, or while Employee is an officer or director of Company, provided such Work Product is related in some manner to the business (present and/or contemplated) of Company, shall be owned and belong exclusively to Company and that Employee shall have no personal interest in or right to use the Work Product. Employee further acknowledges that all Work Product, conceived by the Employee while employed by or consulting with Company, whether formally or informally, compensated or uncompensated, or while Employee is an officer or director of Company, provided such Work Product was conceived on Company's time and/or with Company's equipment, supplies, facilities, or Confidential Business Information shall be owned and belong exclusively to Company and that Employee shall have no personal interest in or right to use the Work Product, irrespective or whether or not such Work Product is related in some manner to the business (present and/or contemplated) of Company. Employee shall, unless Company otherwise agrees in writing, and without additional compensation: (i) promptly disclose to Company all Work Product, and business opportunities related to the present and/or contemplated business of Company ("Business Opportunities"); (ii) assign to Company and comply with all reasonable instructions of Company regarding assigning, upon request, the entire rights to all Work Product and Business Opportunities; (iii) give an affidavit and live testimony (as may be necessary or desirable in the sole and absolute discretion of Company) in support of his/her inventorship or creation in any appropriate case; and (iv) execute such other documents and take such other action as may be required to protect the rights of Company in any such Work Product and Business Opportunities, including without limitation, such patent, trademark and copyright applications, as may be necessary or desirable in the sole and absolute discretion of Company to obtain, maintain, protect or vest in Company the entire right, title and interest in and to the Work Product and Business Opportunities. Employee agrees that all Work Product, all derivatives thereof, and Employee's contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act. If any portion of the Work Product is not ruled to be a "work made for hire," Employee hereby assigns and transfers to Company and its respective successors and assigns, absolutely and forever all right, title and interest in and to such "Work Product," including, without limitation, the right to use same in any and all versions of the Work Product and in any other works in any media published or licensed by Company and the right to recover for

3

past or future infringements thereof. This provision shall not apply to Work Product for which no equipment, supplies, facility, or Confidential Business Information of Company was used and which was developed entirely on Employee's own time, and (a) which does not relate (1) to the business of Company; or (2) to Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by Employee for Company.

    4.    <u>Return of Documents</u>. Employee acknowledges that all documents, records and materials that he/she prepares, and Confidential Business Information, Company Training, and Company Relationships that he/she may have access to, may be given or entrusted to him/her, may develop, or he/she may acquire knowledge of in the course of his/her employment are and shall remain the sole property of Company and/or the Company. In the event that Employee's employment terminates for any reason, or upon demand, Employee agrees to immediately return or turn over all Confidential Business Information, Company Training and information about Company Relationships (and any copies thereof regardless of the format) in his/her possession, custody or control, as well as any documents, records, notes, or other work product, materials, information and other property in his/her possession, custody or control which is in any way connected with or derived from his/her services to, or affiliation with, Company.

    5.    <u>Non-Competition</u>. During Employee's employment, Employee acknowledges and agrees that he/she will receive and will continue to receive substantial, valuable consideration for the agreements set forth in this section including: (i) access to Confidential Business Information, as defined above; (ii) specialized training and knowledge pertaining to the products, services, business practices and procedures and Confidential Business Information utilized by Company (referred to in this Agreement as Company Training); and (iii) access to Company Relationships. Employee acknowledges and agrees that this constitutes fair and adequate consideration for the agreements set forth in this section.

    In consideration for the valuable consideration described above and ancillary to Employee's promises and covenants in Sections 2 and 4 above, Employee acknowledges and agrees as follow:

    (A)    <u>Covenant Not To Compete</u>: During the term of Employee's employment with the Company and for a period of twelve (12) months after the termination of Employee's employment with the Company for any reason, Employee agrees that he/she will not, within the Restricted Territory, perform services of the same, similar, or greater nature to those performed by Employee for the Company, for any person, entity or venture which competes with the business of the Company (which business includes recruiting and providing temporary and permanent healthcare professionals, placements and other staffing services to healthcare professionals, healthcare facilities and other healthcare organizations). For purposes of this covenant, the Restricted Territory is defined as ***<u>Dallas, Texas, and all counties adjacent to Dallas County, including the counties of Collin, Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall, and Tarrant.</u>***

    Employee agrees that this covenant not to compete is reasonable and necessary to protect the Company's legitimate business interests, including, without

4

limitation, the confidential and professional information and trade secrets of the Company (*i.e.* the Company's Confidential Business Information), the substantial relationships between the Company and its customers, clients and candidates for placement (*i.e.* Company Relationships), specialized training and knowledge pertaining to the products, services, business practices and procedures utilized by Company (*i.e.* Company Training), and the goodwill of the Company and is reasonable, necessary, and designed to enforce Employee's promises in Sections 2-4 above. Employee also agrees that the 12-month duration of this covenant not to compete is reasonable. Additionally, Employee acknowledges and agrees that the geographical limitation of this covenant not to compete also is reasonable and that the enforcement of this covenant not to compete, whether by injunctive relief, damages, if possible, or otherwise, is in no way contrary to the public health, safety and welfare.

(B)   <u>Non-Solicitation of Clients</u>. During Employee's employment with the Company and for a period of twelve (12) months following the termination of Employee's employment with the Company for any reason, Employee agrees not to, either individually or jointly, directly or indirectly, either as an employee, employer, operator, agent, independent contractor, owner, consultant, partner, investor or otherwise, call upon, solicit or provide any products or services that compete with the products and services offered by the Company to any actual or prospective client, customer or candidate for placement / healthcare professionals of the Company and who was serviced, directly or indirectly, by Employee or with whom Employee otherwise dealt, directly or indirectly, including management or supervision of others who serviced or dealt with such client, customer or candidate, during the 12-month period prior to his/her separation from the Company.

Employee agrees that this covenant not to solicit clients, customers, or candidates is reasonable and necessary to protect the Company's legitimate business interests, including, without limitation, the confidential business or professional information and trade secrets of the Company (*i.e.* the Company's Confidential Business Information), and the substantial relationships between the Company and its customers, clients and candidates for placement (*i.e.* Company Relationships), specialized training and knowledge pertaining to the products, services, business practices and procedures utilized by Company (*i.e.* Company Training), and the goodwill of the Company and is reasonable, necessary, and designed to enforce Employee's promises in Sections 2-4 above. Employee also agrees that the 12-month duration of this covenant not to solicit clients, customers, or candidates is reasonable and that the enforcement of this covenant, whether by injunctive relief, damages, if possible, or otherwise, is in no way contrary to the public health, safety and welfare.

(C )   <u>Non-Solicitation of Personnel</u>. Employee agrees that during his/her employment with the Company and for a period of thirty-six (36) months after the termination of Employee's employment with the Company for any reason, Employee will not, himself/herself or through any individual or entity, (i) solicit, induce or attempt to induce away from employment or association with the Company any then-current officer, director, employee, independent contractor, consultant, agent, or other personnel or representative of the Company or any such

5

individual who has provided services to the company within the preceding six month period, (ii) otherwise intentionally disrupt, impair, damage or interfere with any relationship between the Company and any of its then-current officers, directors, employees, independent contractors, consultants, agents, or other personnel or representatives or any such individual who has provided services to the company within the preceding six month period.

Employee agrees that this covenant not to solicit personnel is reasonable and necessary to protect the Company's legitimate business interests, including, without limitation, the confidential business or professional information and trade secrets of the Company (*i.e.* Confidential Business Information), the substantial relationships between the Company and its officers, directors, employees, independent contractors, consultants, agents, and other personnel and representatives and is reasonable, necessary, and designed to enforce Employee's promises in Sections 2-4 above. Employee also agrees that the thirty-six (36) month duration of this covenant is reasonable and that the enforcement of this covenant, whether by injunctive relief, damages, or otherwise, is in no way contrary to the public health, safety and welfare.

6.     Specific Performance; Injunction. Employee understands that if he/she violates any of the terms of this Agreement, Employee will be subject to disciplinary action up to and including termination of employment. Employee further agrees and acknowledges that the covenants and undertakings contained in this Agreement relate to matters that are of a special, unique and extraordinary character and that a violation or breach by Employee of any of the covenants and undertakings contained in this Agreement will cause irreparable harm or damage to the Company, the monetary amount of which would be difficult, if not impossible, to ascertain and which cannot be adequately compensated. As a result, Employee agrees that, in addition to any other available remedies, the Company shall have the right to seek and obtain specific performance, an injunction, restraining order or other equitable relief from a court of competent jurisdiction to enforce this Agreement in the event of an actual, potential or threatened violation or breach of any provision of this Agreement. Without regard to whether the Company seeks or is granted any such equitable relief, the Company will not be prejudiced in its right to seek and be awarded damages for the violation or breach of any provision of this Agreement. Employee understands that the rights and remedies provided for in this Agreement are cumulative and will be in addition to any rights and remedies otherwise available to the Company under applicable law. Employee also agrees that the existence of any claim or cause of action that he/she may have against the Company, whether predicated on this Agreement or otherwise, shall not constitute a valid defense to the enforcement of the covenants and undertakings contained in this Agreement.

Employee further agrees and acknowledges that should legal proceedings be initiated by Company to enforce the restrictive covenants contained in Section 5 of this Agreement, the commencement of the applicable time period of said restrictive covenants will commence on the date of the entry of an order granting Company injunctive, monetary or other relief from Employee's actual, potential or threatened violation or breach of said restrictive covenants and will remain in effect for the original time period of the restrictive covenant. Employee acknowledges and agrees that the purpose and effect of the restrictive covenants contained in Section 5 of this Agreement would be frustrated by measuring the

6

APP. 0199

applicable time period of said restrictive covenants from the termination of Employee's employment where Employee fails to honor the restrictive covenants contained in Sections 5 of this Agreement until directed to do so by court order.

7.   <u>Maximum Restrictions of Time, Scope and Geographical Area</u>. Although the restrictions in this Agreement regarding competition, solicitation and breach of confidentiality are considered by the parties to be reasonable for the purposes of protecting the value intended to be received by Company from this Agreement with Employee, if any such restriction is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time, or over too broad a range of activities, or in too large a geographic area, or otherwise, then such restriction shall be interpreted only to extend over the maximum period of time, range of activities, geographic area, or other terms, as to which it may be enforceable. The parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or geographic area, to delete specific words or phrases, and replace any invalid or unenforceable term or provision with an enforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

8.   <u>Notices</u>. Employee agrees and acknowledges that during his/her employment and for a period of twelve (12) months following the termination of Employee's employment for any reason, Employee will inform each prospective new employer he/she may have, prior to accepting employment, of the existence of this Agreement, and he/she shall provide each prospective employer with a copy of this Agreement. Employee also agrees and acknowledges that the Company has the right to independently contact any potential or actual future employer of Employee to notify the future employer of Employee's obligations under this Agreement and provide such future employer with a copy of this Agreement. The Company shall also be entitled to notify such actual or potential future employer of the Company's understanding of the requirements of this Agreement and what steps, if any, the Company intends to take to insure compliance with or enforcement of this Agreement.

9.   <u>Prior Disclosure</u>. Employee represents and warrants that he/she has not used or disclosed any confidential information, trade secret, copyright or any other intellectual property he/she may have obtained from Employer prior to signing this Agreement, in any way inconsistent with the provisions of this Agreement.

10.   <u>Confidential Information of Prior Employers</u>. Employee will not disclose or use during the period of his/her employment with the Company, any proprietary or confidential information, trade secret, copyright or any other intellectual property belonging to a previous employer or other third party which Employee may have acquired because of employment with an employer other than the Company or acquired from any other third party, whether such information is in Employee's memory or embodied in a writing or other physical form.

11.   <u>Agreement Not to Be Construed as Creating a Contract of Employment</u>. Employee understands and acknowledges that Employee's execution of this Agreement will in no way be construed as creating a contract of employment between the Company and Employee and that Employee's employment status remains "at will" and Employee's

7

SD 895695 v3

APP. 0200

employment may be terminated by Employee or the Company, at any time, with or without notice and with or without cause.

12.     Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

13.     Disparagement. During Employee's employment with the Company and after termination of such employment, Employee agrees to refrain from engaging in a any conduct or pattern of conduct that involves the making or publishing, in all forms of communications, including but not limited to e-mails, chat rooms, instant messaging and all other forms of electronic communication, of any written or oral statements or remarks (including the repetition or distribution of derogatory rumors, allegations, negative reports, or comments), which are disparaging, deleterious, or damaging to the integrity, reputation, or goodwill of the Company, its employees, and its affiliates.

14.     Complete Agreement. This Agreement constitutes the entire agreement among the parties and supersedes all other prior agreements and understandings, both written and oral, with respect to the subject matter hereof.

15.     Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and each of which shall be deemed an original.

16.     Successors and Assigns; Assignment. Employee expressly consents that Company may assign the rights and benefits given to it in this Agreement, and this Agreement shall survive any sale of assets, merger, consolidation, or other change in corporate structure.

17.     Choice of Law; Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Texas. The parties hereto agree that all actions and proceedings relating hereto shall be litigated in ***Dallas County***, Texas, unless the claim is mandated by law to be filed elsewhere.

18.     Litigation. The parties acknowledge and agree that, in the event that either party initiates litigation to enforce any provision of the Agreement, the prevailing party in such litigation shall be entitled to recover from the non-prevailing party its reasonable costs and expenses, including attorney's fees, incurred in connection with such litigation.

19.     Amendment and Waiver. This Agreement may not be changed or amended except in writing signed by the parties. The waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of such provision or the breach of any other provision contained in this Agreement.

8

APP. 0201

20.     Headings. The headings contained in this Agreement are inserted for convenience only.  They do not constitute a part of this Agreement and in no way define, limit or describe the intent of this Agreement or any provisions hereof.

21.     Construction.  This Agreement shall not be construed against any party by reason of the fact that the party may be responsible for the drafting of this Agreement or any provision hereof.

22.     Knowledge of Rights and Duties.  Employee has carefully reviewed and completely read all of the provisions of this Agreement and understands and has been advised that he/she may consult with counsel of his/her choice for any explanation of his/her rights, duties, obligations and responsibilities under this Agreement, should Employee so desire.  Employee acknowledges that he/she enters into this Agreement of his/her own free will.

*[Signature page follows]*

9

**APP. 0202**

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date and year first above written.

COMPANY:

MERRITT, HAWKINS & ASSOCIATES

By: _____  5-10-10

Its: _____


EMPLOYEE:

_____
(Signature)

Larry Scott Gresham
(Print Name)

[SIGNATURE PAGE TO CONFIDENTIALITY, NON-COMPETITION AND
NON-SOLICITATION AGREEMENT]

●●○○○ Sprint   1x          11:41 AM          ⚹▯ ▆▆▯

**‹ Back (30)**          **Billy**          **Contact**

Text Message
Sep 17, 2012, 12:06 PM

Hey are you still at delta?

Sep 17, 2012, 1:52 PM

Did you get in touch with your corporate recruiter?

Hey buddy I'll have Christina Stephens give you a call today.

Consilium staffing

Ok excellent

Deleon McKee interviewed last week

How did that go?

 Text Message          Send

GRESHAM 000056
**APP. 0204**

EXHIBIT
18

18



●●●○○ Sprint   3G          11:41 AM

 Back (30)          **Billy**          Contact

I always liked him but not sure that I trusted him.

Joe Hawkins knows him... Not sure what Deleon wanted.... We were interviewing him for a position but I think he wanted more of a partnership with Joe

I felt the same way about him

Ah

Sep 17, 2012, 5:30 PM

She called you?

Ya went really well.  I'm coming up on wed at lunch

 Text Message          Send

GRESHAM 000057
**APP. 0205**



< Back (30)          **Billy**          Contact

Sep 17, 2012, 8:23 PM

Awesome man!

Sep 18, 2012, 7:15 AM

Ya I'm excited to meet with her; how long does the whole process take there?

Sep 19, 2012, 1:07 PM

Let me know what she thought if you hear

She thought you were awesome.... Wants to move forward ASAP...

When you leave mha I need you to do one thing.

What?9





GRESHAM 000058
**APP. 0206**



●●●○○ Sprint   3G          11:41 AM                    ⚡ ✶ 🔋

**‹ Back (30)**          **Billy**          Contact

> What?9

Slap Beidle in the back of
the head.

> Haha

Sep 19, 2012, 4:14 PM

> Hey call me tonight if you
> have the chance

Sure.. What time works
best?

Sep 19, 2012, 5:34 PM

> Any..I get off @ 7

Sep 20, 2012, 9:43 AM

You call?

 Text Message                    Send

GRESHAM 000059
**APP. 0207**



**‹ Back (30)**      **Billy**       **Contact**

Butt dial lol

Hahaha... You little butt pirate!

I am what I am and I be what I be.  I gotta be me!

Ha... Remember that time we airport education Maria Perez together? That was fun.

Haha yeah.  I was shocked when we saw her

She's still there too

I know I called up there trying to sell some locums coverage. Christopher rural health

 Text Message            Send

GRESHAM 000060
**APP. 0208**

 **Back (30)**     **Billy**     Contact

I know I called up there trying to sell some locums coverage. Christopher rural health.

Haha.  They hate Mha now

They hate all companies... Won't use outside firms

At Fletcher they worked with Mary Francis Dumass... So funny to hear the report complain about her.

I know her

I remember... In El dorado

 Text Message      Send

GRESHAM 000061
**APP. 0209**



‹ Back (30)     **Billy**     Contact

> Yes...Brian still works with them

Sep 20, 2012, 4:41 PM

> This is killing me lol...I just want to walk out

Hahaha

Sep 21, 2012, 7:58 AM

> Finished in 23 minutes lol

Ha I'm downstairs in the lounge having bible study... Come by and I'll introduce you to the guys

> Oh man, I left at like 730

Oh... Ok



GRESHAM 000062

**APP. 0210**



●●●●○ Sprint  3G      11:42 AM

  **Billy**      Contact

We were here since 7

Aww man

Let me know if she says anything else to you

I'd be interested in doing a bible study with you guys too

It's awesome man... Had a great study

She loves you and you did well on your test.

Sep 21, 2012, 9:44 AM

Awesome

Sep 23, 2012, 2:28 PM

  Text Message      Send

GRESHAM 000063
**APP. 0211**

 Back (30)   **Billy**   Contact

You're right line is garbage

Sick

I guess free thought since written was on the guy he'd just stand there

What the heck

Lol

When did he become butterfingers

I thought he was knocked out

Hate that oline

 Text Message   Send

GRESHAM 000064
**APP. 0212**



●●●○○ Sprint  3G      11:42 AM

**‹ Back (30)**      **Billy**      Contact

Ya, free is garbage

Murray is so talented, and we can't even use him because our line can't even run block

But thankfully the tb offense Is horrific

Odd strategy by tb.

Ya

I thought they were giving up

Whew

Sep 24, 2012, 9:12 AM

You doing the dirty deed

Send

32

GRESHAM 000065
**APP. 0213**



●●●○○ Sprint  3G        11:42 AM

< Back (30)          **Billy**          Contact

Odd strategy by tb.

Ya

I thought they were giving up

Whew

Sep 24, 2012, 9:12 AM

You doing the dirty deed yet?

Did it haha, was brutal

Call me 972 272 6913...
When you can

Sep 25, 2012, 10:38 AM

Have time to grab some Ali

  Text Message          Send

GRESHAM 000066
**APP. 0214**

●●●○○ Sprint  3G        11:42 AM

**‹ Back (30)**        **Billy**        Contact

Have time to grab some Ali baba for lunch?

Sure man, where is that?

Ah, on MacArthur, what time?

SECOND corner of 114 and MacArthur... We went with stephan... Buffet style

Ok cool, noon?

I meant southeast corner... Not second... 1140?

Kk sounds good

Noon will work... If you can get there a little before it's

○ Text Message        Send

34

●●●○○ Sprint  3G          11:42 AM          ⚡ ⚹ 🔋

**‹ Back (30)**          **Billy**          Contact

Noon will work... If you can get there a little before it's good because it gets packed right at noon.

> Ok I can get there at 1140 no

> Np I mean

Then let's do it 1140

> Kk

Kkk

> Ok I'm here, I'm out front

Sep 25, 2012, 1:01 PM

Hey buddy... It was great talking to you. Thanks

 Text Message          Send

35

GRESHAM 000068
**APP. 0216**

●●●○○ Sprint 3G    11:42 AM    ⏹ ✈ ⚡◐ ▬▭

**‹ Back (30)**    **Billy**    **Contact**

Hey buddy... It was great talking to you. Thanks again for lunch!

My pleasure.  It was great to see you

Sep 26, 2012, 2:36 PM

Not meeting with joe till next week, he has to meet hi attorney in the am

Next thirs at noon

Sep 26, 2012, 4:08 PM

Damn... Sorry dude... Did you tell Christina that you left mha?

No not yet

Send

36

GRESHAM 000069
**APP. 0217**

●●●○○ Sprint  3G       11:42 AM           ⬀ ✳▯ ▬▭▸

**❮** Back (30)          **Billy**              Contact

Damn... Sorry dude... Did
you tell Christina that you
left mha?

No not yet

It's not that bad of a thing
really

Time to deconstruct

Cool... They're going to
bring you on... Enjoy the
time off!

Sep 27, 2012, 12:43 PM

I was talking to Cristina
and told her you left mha...
She was like great I can
have him meet with the
partners then and speed
things up. She's going to

◉  Text Message                    Send

37

GRESHAM 000070
**APP. 0218**

 Sprint 3G          11:42 AM

‹ Back (30)          **Billy**          Contact

I was talking to Cristina and told her you left mha... She was like great I can have him meet with the partners then and speed things up. She's going to

call you.

Ok

And thanks for talking with her !

She Really wants you here.

Awesome!

Sep 27, 2012, 3:34 PM

I havent heard from her yet.  Maybe I am still

 Text Message          Send

38

GRESHAM 000071
**APP. 0219**

●●○○○ Sprint  3G      11:42 AM        ✻⬚ ▬▬

**‹ Back (30)**        **Billy**        **Contact**

I havent heard from her yet.  Maybe I am still meeting with joe on Thursday.  Did you tell her I quit on Monday?

No I told her you just did. Attorney's are here so every one is busy with them.

Ah ok

Sep 28, 2012, 12:33 PM

Have you heard anything new today yet?

No... I'll talk to her.

I just spoke with her, she's

 Text Message                    Send

39

●●○○○ Sprint  3G          11:43 AM                    ✳️📶 🔋

‹ Back (30)              **Billy**              Contact

I just spoke with her, she's going to try to move it up, but still set for thurs

Cool

Oct 2, 2012, 4:14 PM

Coming back tomorrow at 10.  Let me know if you hear anything.

Calling you from my office

Oct 3, 2012, 1:54 PM

You heard anything?

No been busy. I'll let you know when I do.

Kk

📷                                    Send

40

GRESHAM 000073
**APP. 0221**

 •●○○○ Sprint  3G    **11:43 AM**    ✳️▯ ▬▬▯

< Back (30)    **Billy**    Contact

No been busy. I'll let you know when I do.

Kk

Oct 3, 2012, 5:12 PM

You never heard anything? I guess she'll call tomorrow

Yes... Here and matt were talking about you offer. She said they lived you and as long as your salary expectations are in line. You should be good

Awesome great news

Thanks, I'm so impatient I was getting anxious.

 Text Message    Send

GRESHAM 000074
**APP. 0222**

 

**‹ Back (30)**     **Billy**     Contact

Oct 4, 2012, 3:15 PM

Alright I'm starting on the 15th. Not sure if psych or hospital based, but recruiting

Cool man! Congrats! You get a decent offer?

Ya, they tried to lowball and not give me the commission, but I got it out of them

Hahaha... They give you 50?

She offered the commission thing quick lol. She also said 45, but she is going to try to get

 Text Message     Send

20



●●○○○ Sprint 📶          10:31 AM          ⁕ 🔋

**‹ Back (30)          Billy          Contact**

SO.

Cool man... Happy for you.

> I'm excited to work with you guys.  I might should have said I wanted account manager, but both jobs sound fine.

> So much better than mha

It is so far

I had to give Christina your referral for MHA. She said that she doesn't call them for references

> Ya, did you crucify?

Oh yeah... They are

 Text Message          Send

21

GRESHAM 000076
**APP. 0224**

 Sprint 10:32 AM 

**‹ Back (30)**        **Billy**        Contact

Oh yeah... They are
rescinding your offer


Lol

Oct 31, 2012, 11:50 AM

Came to get a haircut and
couturier is here.

I always run into him!

Nov 8, 2012, 12:07 PM

Sorry bro... I had to go.

Ya went way long ...

Nov 14, 2012, 9:43 PM

Did you mess with the
Asus any?

                                          Send

22

GRESHAM 000077
**APP. 0225**