**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MERRITT HAWKINS & ASSOCIATES, LLC | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:13-cv-00312-P |
| LARRY SCOTT GRESHAM, BILLY BOWDEN, AND CONSILIUM STAFFING LLC | § § § § | |
| Defendants. | § § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

Dated:  November 10, 2014

Respectfully submitted,

/s/ *Christine A. Nowak*
Brian A. Colao
SBN:  00793528
Christine A. Nowak
SBN: 24050200
Jason M. Ross
SBN: 24027819
Zachary Hoard
SBN:  24053826
Dykema Gossett PLLC
Comerica Bank Tower
1717 Main Street, Suite 4200
Dallas, Texas 75201
(214) 462-6400 – Telephone
(214) 462-6401 – Facsimile

**ATTORNEYS FOR PLAINTIFF MERRITT
HAWKINS & ASSOCIATES, LLC**

## TABLE OF CONTENTS

**Page**

I.     Summary of Argument ................................................................................. 1

II.    Summary Judgment Evidence ...................................................................... 3

III.   Factual Background ...................................................................................... 3

    A.     MHA is in the Medical Staffing Business. ........................................ 3

    B.     April 2008: Bowden is Hired by MHA and Executes an Employment
        Agreement. ......................................................................................... 4

    C.     April 2010: Gresham Returns to Work for MHA and Executes a
        Confidentiality, Non-Competition and Non-Solicitation Agreement. ................... 7

    D.     September 7, 2010: Bowden Leaves MHA. ..................................... 10

    E.     September 2012: Bowden Contacts Gresham to Induce Him to Leave MHA. .... 11

    F.     September 23, 2012:  Gresham Accesses His Computers on a Sunday
        Without Authorization and Deletes and Copies MHA's Confidential
        Information. ...................................................................................... 13

    G.     September 24, 2012: Gresham formally resigns from MHA ............... 14

    H.     Just Ten Days After Quitting MHA, Gresham Formally Joins MHA's
        Competitor, Consilium ..................................................................... 15

    I.     MHA Suffered Injury Resulting From Gresham's Departure and
        Competition ...................................................................................... 17

IV.    Argument And Authorities ........................................................................ 18

    A.     Standard of Review .......................................................................... 18

    B.     Defendants Are Not Entitled to Summary Judgment on MHA's Breach of
        Contract, Tortious Interference, and Aiding and Abetting Claims. ............ 18

        1.     Texas Standard for Enforceability ......................................... 19

        2.     The Agreements Contain Reasonable Limitations. ................ 19

    C.     Defendants Cannot Show That MHA Has No Admissible Evidence on
        Damages ........................................................................................... 29

D.     Gresham Is Not Entitled to Summary Judgment on MHA's Claims Under the CFAA and for Harmful Access By Computer. ..................................................... 30

    1.     Defendants' Reliance on Bridal Expo., Inc. v. Van Florestein is Misplaced. ................................................................................................. 30

    2.     Recent Fifth Circuit Precedent Conclusively Demonstrates that Gresham's Access was Without Authorization or Exceeded Authorization. ......................................................................................... 32

    3.     MHA Was Not Able to Recover All Files Deleted by Gresham From His "My Documents" Folder. .................................................................. 33

E.     Gresham is Not Entitled to Summary Judgment on MHA's Claim for Conversion. ........................................................................................................ 34

F.     Defendants Gresham and Bowden Are Not Entitled to Summary Judgment on MHA's Claims for Breach of Fiduciary Duty. ................................................... 35

    1.     Gresham and Bowden owed MHA a Fiduciary Duty. .............................. 35

    2.     MHA Has Satisfied the Elements of Its Claim for Breach of Fiduciary Duty. .......................................................................................................... 37

    3.     Defendants Have Prevented MHA From Conducting Relevant Discovery as to Gresham's Use of MHA's Information. ......................... 39

G.     Defendants are Not Entitled to Summary Judgment on MHA's Misappropriation Claim. .............................................................................................................. 39

    1.     The Information Accessed, Copied, and Deleted By Gresham Was Confidential. ............................................................................................... 40

    2.     MHA Has Shown that Defendants Used the Confidential Information That Was Misappropriated by Gresham; Defendants Have Prevented MHA From Conducting Relevant Discovery as to Gresham's Use of MHA's Information. ............................................................................... 41

H.     Defendants are Not Entitled to Summary Judgment on MHA's Texas Theft Liability Act Claim. ....................................................................................... 43

V.     Prayer for Relief ........................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arrow Chemical Corp. v. Pugh,*
    490 S.W.2d 628 (Tex. Civ. App.—Dallas 1972, no writ) ......................................................23

*Beta Tech., Inc. v. Meyers,*
    2013 U.S. Dist. LEXIS 147095 (S.D. Tex. Oct. 10, 2013)....................................................32

*Bridal Expo, Inc. v. Van Florestein,*
    No. 4:08-CV-03777, 2009 WL 255862 (S.D. Tex. Feb. 3, 2009) ..............................30, 31, 32

*Brunswick Corp. v. Vineberg,*
    370 F.2d 605 (5th Cir. 1967) ................................................................................................18

*Butler v. Arrow Mirror & Glass, Inc.,*
    51 S.W.3d 787 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ............................................22

*by Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,*
    209 S.W.3d 644 (Tex. 2006)...........................................................................................8, 18

*Casey Enterprises v. American Hardware Mutual Ins. Co.,*
    655 F.2d 598 (5th Cir. 1981) ................................................................................................17

*CDX Holdings, Inc. v. Heddon,*
    2012 U.S. Dist. LEXIS 86041 (N.D. Tex. Mar. 2, 2012) ......................................................18

*Cuidad Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Services, LLC,*
    404 S.W.3d 737 (Tex. App.—El Paso 2013, no pet.)............................................................34

*Devon Energy Corp. v. Westacott,*
    No. H-09-1689, 2011 WL 1157334 (S.D. Tex. Mar. 24, 2011) .............................................41

*Diversified Human Resources Group, Inc. v. Levinson-Polakoff,*
    752 S.W.2d 8 (Tex. App.—Dallas 1988, no writ) ...........................................................22, 24

*Electronic Data Systems Corp. v. Powell,*
    524 S.W.2d 393 (Tex. Civ. App.—Dallas 1975, writ ref'd n.r.e.) ..........................................25

*Evan's World Travel, Inc. v. Adams,*
    978 S.W.2d 225 (Tex. App.—Texarkana 1998, no pet.)..................................................22, 24

*Evans v. City of Houston,*
    246 F.3d 344 (5th Cir. 2001) ................................................................................................17

*Express One Intern., Inc. v. Steinbeck,*
    53 S.W.3d 895 (Tex. App.—Dallas 2001, no pet.)...............................................................34

*Gen. Universal Sys., Inc. v. Lee*,
   379 F.3d 131 (5th Cir. 2004) ........................................................................39, 40

*Gen. Universal Sys. v. HAL Inc.*,
   500 F.3d 444 (5th Cir. 2007) ...............................................................................41

*Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*,
   669 F.2d 1026 (5th Cir. 1982) ........................................................................17, 18

*In Re Electro-Motor, Inc. v. Indus Apparatus Servs., Inc.*,
   390 B.R. 859 (Bkr. E.D. Tex. 2008) .....................................................................19

*Joe N. Pratt Ins. v. Doane*,
   2009 U.S. Dist. LEXIS 88314 (S.D. Tex. Sept. 25, 2009) ....................................32

*Johnson v. Brewer & Pritchard, P.C.*,
   73 S.W.3d 193 (Tex. 2002)...........................................................................35, 36

*Justin Belt Co. v. Yost*,
   502 S.W.2d 681 (Tex. 1973).....................................................................22, 24, 25

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
   160 S.W.2d 509 (Tex. 1942).................................................................................35

*Light v. Centel Cellular Co.*,
   883 S.W.2d 642 (Tex. 1994).................................................................................18

*Lyondell Chem. Co. v. Occidental Chem. Corp.*,
   608 F.3d 284 (5th Cir. 2010) ...............................................................................27

*Marsh USA Inc. v. Cook*,
   354 S.W.3d 764 (Tex. 2011).............................................................................19, 22

*Meats by Linz, Inc. v. Dear*,
   No. 3:10-CV-1511-D, 2011 U.S. Dist. LEXIS 42800 (N.D. Tex. Apr. 20, 2011) .................32

*Milbank v. Simons*,
   No. W-11-172, 2013 U.S. Dist. LEXIS 165941 (W.D. Tex. Nov. 19, 2013).........................34

*Molex, Inc. v. Nolen*,
   759 F.2d 474 (5th Cir. 1985) ...............................................................................35

*Navigant Consulting, Inc. v. Wilkinson*,
   508 F.3d 277 (5th Cir. 2007) ..........................................................................35, 37

*Peat Marwick Main & Co. v. Haas*,
   818 S.W.2d 381 (Tex. 1991)......................................................................23, 24, 25

*Property Tax Assocs., Inc. v. Staffeldt,*
    800 S.W.2d 349 (Tex. App.—El Paso 1990, writ denied)................................................22, 24

*Ramada Dev. Co. v. Rauch,*
    644 F.2d 1097 (5th Cir. 1981) ..............................................................................................27

*Shoreline Gas, Inc. v. McGaughey,*
    2008 Tex. App. LEXIS 2760 (Tex. App.—Corpus Christi 2008, no pet.).............................19

*Southwestern Energy Prod. Co. v. Berry-Helfand,*
    411 S.W.3d 581 (Tex. App.—Tyler 2013) .......................................................................37, 42

*Stone v. Griffin Communications and Security Systems, Inc.,*
    53 S.W.3d 687 (Tex. App.—Tyler 2001, no pet.) ................................................................20

*T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.,*
    965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998, pet dism'd) ......................................36

*Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts,*
    300 S.W.3d 348 (Tex. App.—Dallas 2009, pet denied) ........................................................43

*United States v. John,*
    597 F.3d 263 (5th Cir. 2010) ................................................................................................32

**RULES**

Fed. R. Civ. P. 56(c) .....................................................................................................................17

Federal Rule of Evidence 408.......................................................................................................27

Federal Rules of Evidence 701 and 702 .......................................................................................29

**STATUTES**

TEX. BUS. & COMM. CODE § 15.50...............................................................................................19

TO THE HONORABLE COURT:

Plaintiff Merritt Hawkins & Associates, LLC ("Plaintiff" or "MHA") hereby files this response to Defendants Larry Scott Gresham, Billy Bowden, and Consilium Staffing, LLC's ("Defendants") Motion for Summary Judgment, and in support respectfully shows the Court the following:

## I.      SUMMARY OF ARGUMENT

Defendants' Motion for Summary Judgment should be denied in its entirety for numerous reasons.  As outlined in detail below, Defendants have mischaracterized the law—in one case egregiously so—and have mischaracterized the evidence on virtually every claim asserted by MHA.  Defendants have failed to meet their burden to show that there is no genuine issue of material fact as to any of the claims asserted by MHA.

**First**, Defendants have moved for summary judgment on MHA's claims for breach of contract, tortious interference, and aiding and abetting on the ground that the non-compete and non-interference provisions in Gresham's and Bowden's respective employment agreements are unenforceable as a matter of law.  As MHA demonstrated in its own affirmative Motion for Partial Summary Judgment, the non-compete and non-interference provisions are enforceable and the evidence before the Court proves that Gresham and Bowden violated those provisions.  Thus, MHA respectfully requests that the Court rule that the respective provisions are enforceable as a matter of law, that Defendants are not entitled to summary judgment on MHA's claims for breach of contract, tortious interference, and aiding and abetting, and that MHA in turn is entitled to summary judgment on its claim for breach of contract.

**Second**, Defendants contend they are entitled to summary judgment on all of MHA's claims because MHA cannot prove the damages elements for any of its claims.  Defendants incorrectly assert that MHA's president, Mark Smith, may not provide testimony on MHA's

damages because he is not a qualified "expert."   Defendants misunderstand Mr. Smith's designation and the law on lay opinion testimony regarding damages.   As outlined in greater detail in MHA's Response to Defendants' Motion to Exclude Mr. Smith (Dkt. No. 99), Mr. Smith may, at a minimum, provide testimony as MHA's long-time president who is intimately involved in the company's day-to-day operations regarding the damages incurred by MHA. Thus, MHA has met its burden to show competent, admissible evidence of damages at this summary judgment stage.

**Third**, Defendants are not entitled to summary judgment on MHA's claims under the Computer Fraud and Abuse Act and for harmful access by computer.   On both counts, Defendants argue that Gresham's deletion and copying of files from his MHA work computer did not exceed his authorized access of the computer.   Here, Defendants rely on cases from the Southern District of Texas that have been specifically abrogated by more recent Fifth Circuit precedent, but Defendants fail to bring those more recent cases to the Court's attention.   Under relevant precedent, Gresham's actions greatly exceeded his authorized access, and Defendants are not entitled to summary judgment on these claims.

**Fourth**, Defendant Gresham is not entitled to summary judgment on MHA's claim for conversion because, despite Defendants' representations to the contrary, Texas law does recognize a conversion claim such as the one asserted by MHA.   As outlined in greater detail below, unauthorized copying of another party's confidential client list or trade secrets can support a claim for conversion in Texas.   Therefore, Gresham is not entitled to summary judgment on MHA's claim for conversion.

**Fifth**, Defendants are not entitled to summary judgment on MHA's claim for breach of fiduciary duty.   Once again, despite Defendants' representations in their brief, Texas law clearly

recognizes that employees, even at-will employees, who work as salespeople may owe fiduciary duties to their employers.  Furthermore, the law is clear that an employee violates that obligation if he misappropriates his employer's trade secrets or carries away certain information, such as customer lists and other confidential information, without authorization.  MHA has satisfied each of the elements of its breach of fiduciary duty claim.  Thus, Defendants are not entitled to summary judgment.

**Sixth**, Defendants are not entitled to summary judgment on MHA's claim for trade secret misappropriation because MHA has conclusively demonstrated that the information at issue in this case was confidential, proprietary, and constituted trade secrets.  MHA has also met its burden to demonstrate the use required to prevail on a misappropriation claim.

**Finally**, Defendants' arguments on MHA's claim under the Texas Theft Liability Act are equally unpersuasive because MHA has conclusively demonstrated that the information at issue in this case was confidential, proprietary, and constituted trade secrets.

For all of these reasons, and the reasons outlined below, Defendants' Motion for Summary Judgment should be denied in its entirety.

## II.       SUMMARY JUDGMENT EVIDENCE

The summary judgment evidence relied upon by Plaintiff is included in the Appendix filed in support of this brief.  Citations to documents in the Appendix are identified as "App. 001 – 124."

## III.      FACTUAL BACKGROUND

### A.       MHA is in the Medical Staffing Business.

MHA is in "the business of recruitment of medical specialists" for open medical staffing positions for its clients.  App. 006 (Bowden Agreement, at Art. VII (d)(1)).  In this highly competitive field, MHA's competitors include companies that "recruit[] and provide[] temporary

and permanent healthcare professionals, placements and other staffing services to healthcare professionals, healthcare facilities and other healthcare organizations."   App. 061 (Gresham Agreement at § 5(A)).

**B.     April 2008: Bowden is Hired by MHA and Executes an Employment Agreement.**

In April 2008 Defendant Bowden first came to work for MHA as a search consultant, a job that consisted of recruiting medical professionals for staffing positions.   App. 011 (Bowden Dep. at 28:6-8); App. 024 (Beidle Dep. at 13:17-23).   Before working for MHA, Bowden had no experience or background in health care recruiting or staffing.   App. 011 (Bowden Dep. at 28:12-17).   On April 23, 2008, Bowden and MHA executed an Employment Agreement (the "Bowden Agreement").   That Employment Agreement provides in relevant part as follows:

ARTICLE VIII – NON-INTERFERENCE

The Employee agrees that, for a **period of thirty-six (36) months** subsequent to the termination of this Agreement, **whether such termination occurs at the insistence of MHA or the Employee**, the **Employee shall not solicit or recruit directly or by assisting others, any other employees of MHA**, its parent companies, subsidiary companies, affiliated companies, successors or assigns, **nor shall the Employee contact or communicate with any other employees of MHA**, its parent companies, subsidiary companies, affiliated companies, successors or assigns, for the purpose of inducing other employees to terminate their employment with MHA, its parent companies, subsidiary companies, affiliated companies, successors or assigns.   For the purposes of this covenant, "other employees" shall refer to employees who are still actively employed by, or doing business with, MHA, or any of its parent companies, subsidiary companies, affiliated companies, successors or assigns, at the time of the attempted recruiting or hiring.   The Employee acknowledges and agrees that these non-interference agreement shall survive any termination of the Agreement and shall be fully enforceable by MHA or its successor or assignee subsequent to the termination of the Employee's employment, regardless of the reason of such termination.

App. 007 (Bowden Agreement at Art. VIII (emphasis added)).   Pursuant to the terms of the Bowden Agreement, MHA promised to provide Bowden with MHA's Confidential Information. App. 003 (Bowden Agreement at Art. IV).   Indeed, Bowden testified and conceded that MHA fulfilled its promise by providing him with MHA's Confidential Information:

Q:      So when it lists all these items in your employment agreement, you would agree with me that MHA held up its end of the bargain, it gave you access to each of these confidential items during your employment?

MR. Volney:   Objection; form.

A:      Yes.

Q:      And they had you sign an agreement that laid all of these items out so you would understand what they believed to be confidential?

A:      Yes.

Q:      And at the time you signed it, you understood what MHA thought was confidential?

A:      Yes.

Q:      And you, in fact, agreed that each of these categories was, in fact, MHA's confidential information?

A:      Yes.

App. 015 (Bowden Dep. at 50:4-19).   At the time he signed the Bowden Agreement, Defendant

Bowden acknowledged and agreed that "the limitations as to time, geographical area, and scope

of, activity to be restrained are reasonable and acceptable to [Bowden], and do not impose any

greater restraint than is reasonably necessary to protect the goodwill and other business interests

of MHA."   App. 006 (Bowden Agreement at Art. VII(e)).   Further, Bowden testified and

conceded that he understood the impact and effect of signing the Bowden Agreement at the time

he signed it, and he intended to be bound by it.   App. 014 (Bowden Dep. at 44:16-46:16).

Bowden further testified and acknowledged that he understood that he was bound by the Non-

Interference provision of the Bowden Agreement for 36 months from the date of his termination

from MHA.   App. 016 (Bowden Dep. at 63:9-65:25).

The Bowden Agreement included the Non-Interference provision to allow MHA to

protect its business interest in the goodwill of its company, including maintaining the longevity

and stability of its highly-trained work force.   App. 039 (Smith Dep. at 108:9-24; 109:24-110:1).]

Moreover, the Non-Interference provision in the Bowden Agreement enables MHA to protect its interest in limiting the training and recruiting expenses incident to losing employees due to the influence and interference of former employees.  App. 040 (Smith Dep. at 112:4-9) ("These [employees] are folks that we've spent considerable money training to get in a situation where we've allowed them to develop relationships with our clients, which we spent an incredible amount of money securing these folks and not to be able to be influenced by an outside party that has their own agenda.").

When MHA agreed to hire Defendant Bowden, MHA provided him with its valuable Confidential Information, including its confidential training, its client lists, and its internal financial data.  App. 003 (Bowden Agreement at Art. IV); App. 015 (Bowden Dep. at  50:4-19); App. 039 (Smith Dep. at 108:12-24).  In return for those valuable benefits, and in return for the insider knowledge about MHA that Bowden thereby acquired, MHA required him to promise that he would not use his position of trust, the *bona fides* he acquired as a result of having worked at MHA, and his confidential knowledge of MHA to convince MHA employees to quit. As MHA's President Mark Smith testified:

> [W]hen we bring people into our organization there's a certain level of trust provided them in different tiers, whether it be initially allowing them into—with training information, client lists, financial data, et cetera, different levels.  But to allow someone to come into the organization and then once they depart, whether it be at their own free will or at our request, to be able to damage the organization by recruiting away our team members is not something that's acceptable.  We've invested millions in getting these folks trained and into their roles and productive, and we weren't going to allow them to do damage to the organization until they are outside of this [36-month] window.

App. 039 (Smith Dep. at 108:12-24).]  Put another way, Bowden's promise that he would not communicate with MHA employees for the purpose of inducing them to leave the company was

agreed to "in return for what we gave [Bowden] in the process in terms of training, experience, and access." App. 039 (Smith Dep. at 109:24-110:1).

Furthermore, the Non-Interference provision does not prevent MHA employees from seeking independent advice on their continued employment at MHA from independent parties. "If they want to get career advice, if they want to be able to say should I stay or should I go, then they're going to need to get that from another party not from a former ex-employee or disgruntled employee at Merritt Hawkins." App. 040 (Smith Dep. at 111:20-24). Rather, the Non-Interference provision enables MHA to protect its goodwill, employee morale and other business assets while only minimally restricting a small fraction of potential persons with whom a current employee could consult for career advice. App. 040 (Smith Dep. at 111:12-24).

**C.    April 2010: Gresham Returns to Work for MHA and Executes a Confidentiality, Non-Competition and Non-Solicitation Agreement.**

In 2008, Defendant Gresham first came to work for MHA. App. 044 (Gresham Dep. at 38:12-13). Before working for MHA, Gresham also had no experience in medical recruiting. App. 044 (Gresham Dep. at 39:15-40:5). In April 2009, after working for MHA for one year and accepting MHA's training, Gresham left MHA to work for a competing medical recruiting company. After working at MHA's competitor for roughly one year, Gresham returned to work for MHA on May 17, 2010. App. 044 (Gresham Dep. at 38:12-17). Upon returning to work for MHA in 2010, Gresham and MHA executed a Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Gresham Agreement"). The Gresham Agreement provided in relevant part as follows:

> 2.    <u>Confidentiality</u>. Employee covenants and agrees that he/she will not use any of the Confidential Business Information, Company Training or Company Relationships for any purpose other than in the course and scope of his/her employment and for the exclusive benefit of the Company. Except for disclosure in the course and scope of his/her employment with Company and on behalf of the Company, Employee will never at any time, either during or after

his/her employment with Company, directly or indirectly use, publish disseminate, distribute or otherwise disclose any Confidential Business Information, Company Training or Company Relationships to any other person, firm, corporation, partnership, association or other entity.

Employee also agrees to take all steps necessary, and all steps requested to ensure that the Confidential Business Information, Company Training and Company Relationships are kept secret and confidential and for the sole use and benefit of the Company and to comply with all applicable policies and procedures of the Company regarding the storage and security of all such information, whether in hard copy form or stored on computer disks or other electronic media. Employee also acknowledges that the Confidential Business Information, Company Training and Company Relationships are, and have been, the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

5.   <u>Non-Competition</u>.  During Employee's employment, Employee acknowledges and agrees that he/she will receive and will continue to receive substantial, valuable consideration for the agreements set forth in this section including: (i) access to Confidential Business Information, as defined above; (ii) specialized training and knowledge pertaining to the products, services, business practices and procedures and Confidential Business Information utilized by Company (referred to in this Agreement as Company Training); and (iii) access to Company Relationships.  Employee acknowledges and agrees that this constitutes fair and adequate consideration for the agreements set forth in this section.

In consideration for the valuable consideration described above and ancillary to Employee's promises and covenants in Sections 2 and 4 above, Employee acknowledges and agrees as follow:

(A)   <u>Covenant Not To Compete</u>:   During the term of Employee's employment with the Company and for a period of twelve (12) months after the termination of Employee's employment with the Company for any reason, Employee agrees that he/she will not, within the Restricted Territory, perform services of the same, similar, or greater nature to those performed by Employee for the Company, for any person, entity or venture which competes with the business of the Company (which business includes recruiting and providing temporary and permanent healthcare professionals, placements and other staffing services to healthcare professionals, healthcare facilities and other healthcare organizations).   For purposes of this covenant, the Restricted Territory is defined as ***<u>Dallas, Texas, and all counties adjacent to Dallas County, including the counties of Collin, Denton, Ellis, Hunt, Johnson, Kaufman, Rockwall, and Tarrant.</u>***

Employee agrees that this covenant not to compete is reasonable and necessary to protect the Company's legitimate

business interests, including, without limitation, the confidential and professional information and trade secrets of the Company (i.e. the Company's Confidential Business Information), the substantial relationships between the Company and its customers, clients and candidates for placement (i.e. Company Relationships), specialized training and knowledge pertaining to the products, services, business practices and procedures utilized by Company (i.e. Company Training), and the goodwill of the Company and is reasonable, necessary, and designed to enforce Employee's promises in Sections 2-4 above. Employee also agrees that the 12-month duration of this covenant not to compete is reasonable. Additionally, Employee acknowledges and agrees that the geographical limitation of this covenant not to compete also is reasonable and that the enforcement of this covenant not to compete, whether by injunctive relief, damages, if possible, or otherwise, is in no way contrary to the public health, safety and welfare.

App. 059-060, 062-063 (Gresham Agreement at §§ 2, 5). Pursuant to the terms of the Gresham Agreement, Defendant Gresham promised to be bound by the Non-Competition provision stated above in consideration for MHA's promise to provide Gresham with MHA's Confidential Information. App. 062-063 (Gresham Agreement at § 5); App. 046-049 (Gresham Dep. at 65:16-71:17; 73:15-75:11). Indeed, Gresham testified that MHA fulfilled its promise by providing him with MHA's Confidential Information. App. 048 (Gresham Dep. at 71:13-72:6). Further, Gresham candidly testified that at the time of signing, he fully intended to be bound by the Gresham Agreement and understood the effects of signing the Agreement. App. 046 (Gresham Dep. at 62:10-63:10). Gresham further testified that, at the time of signing, he understood that MHA would seek to enforce the provisions of the Gresham Agreement if he violated them. App. 046 (Gresham Dep. at 64:9-12).

At the time Gresham signed the Agreement, he agreed that the 12-month Non-Competition provision was reasonable, and he intended to honor it. App. 051 (Gresham Dep. at 94:17-95:2; 97:1-7). Indeed, even at the time of his deposition in this case, Gresham conceded that a 12-month time period for a non-compete provision is a reasonable scope of time. App.

051, 055 (Gresham Dep. at 97:1-4; 138:5-13).  Further, in his testimony, Gresham admitted that

when he signed the Agreement, he also agreed that the geographic restrictions were reasonable:

> Q:     And at the time you signed this, you said that the restricted territory as
> defined was also reasonable?
>
> A:     Yes.

App. 051 (Gresham Dep. at 97:5-7).  Thus, any contention by Defendant Gresham now, in

hindsight, that that the geographic scope of the non-compete is unreasonable stands in direct

conflict with Gresham's own explicit agreement and concession at the time of signing that it *was*

reasonable.  *See also* APP 062-063 (Gresham Agreement at § 5) ("Employee acknowledges and

agrees that the geographical limitation of this covenant not to compete also is reasonable ….").

Indeed, Gresham stated at his deposition that the only geographic scope that is reasonable in his

view is for a non-compete to proscribe *no geographic limitation at all*, thus demonstrating his

after-the-fact unwillingness to be restricted by *any* meaningful non-compete provision

whatsoever.  App. 055 (Gresham Dep. at 139:11-18).

### D.      September 7, 2010: Bowden Leaves MHA.

On September 7, 2010, approximately two years after being hired by MHA, Defendant

Bowden's employment with MHA ended.  App. 014 (Bowden Dep. at 42:11-15).  Thus, the 36-

month Non-Interference provision in the Bowden Agreement remained in force until **September

7, 2013**.  App. 016 (Bowden Dep. at 63:9-65:25).  Bowden testified that he fully understands and

acknowledges that the Non-Interference provision remained in effect until September 2013.

Indeed, Defendant Bowden's testimony could not be more clear:

> Q:     Now, it says here at the top of Page 6, The employee agrees that for a
> period of 36 months subsequent to the termination of this agreement, whether
> such termination occurs at the insistence of MHA or the employee, the employee
> shall not solicit or recruit directly or by assisting others any other employees of
> MHA, its parent companies, subsidiary companies, affiliated companies,
> successors or assigns, nor shall the employee contact or communicate with any

other employees of MHA.  And then if we skip down a little further, it says, for the purpose of inducing other employees to terminate their employment with MHA. Did I read that correctly?

A:      Yes.

Q:      Okay.  Let's go back and break that down a little bit because that's a big paragraph. It says here that this particular provision is enforceable for 36 months, correct?

A:      That's correct.

…

Q:      So if you left MHA in September of 2010, when is it your understanding that this provision would expire?

A:      36 months later.

App. 016 (Bowden Dep. at 63:9-64:15).

### E.      September 2012: Bowden Contacts Gresham to Induce Him to Leave MHA.

In September 2012, with roughly one year left on the effective term of the Non-Interference provision, Defendant Bowden began communicating with Defendant Gresham by mobile-phone text message to induce him to leave MHA and join him at his new employer, Defendant Consilium.  On September 17, 2012, Defendants Bowden and Gresham exchanged the following text messages:

Gresham:      Hey are you still at delta?

Gresham:      Did you get in touch with your corporate recruiter?

Bowden:       Hey buddy I'll have Christina Stephens[1] give you a call today.

Bowden:       Consilium staffing

Gresham:      Ok excellent

* * *

---

[1] Christina Stephens is a corporate recruiter for Consilium.  App. 017 (Bowden Dep. at 70:22-25).

| Bowden: | She called you? |
|---|---|
| Gresham: | Ya went really well.  I'm coming up on wed at lunch |
| Bowden: | Awesome man! |

On September 18-19, 2012, the conversation continues:

| Gresham: | Ya I'm excited to meet with her; how long does the whole process  take there? |
|---|---|
| Gresham: | Let me know what she thought if you hear |
| Bowden: | She thought you were awesome…. Wants to move forward ASAP… |
| Bowden: | When you leave mha I need you to do one thing. |
| Gresham: | What?9 [sic] |
| Bowden: | Slap Beidle in the back of the head. |

On September 20, 2012:

| Gresham: | This is killing me lol…I just want to walk out |
|---|---|
| Bowden: | Hahaha |

On September 21, 2012:

| Gresham: | Finished in 23 minutes lol[2] |
|---|---|
| | * * * |
| Gresham: | Let me know if she says anything else to you |
| | * * * |
| Bowden: | She loves you and you did well on your test. |

---

[2] Gresham testified that this message referred to a personality test conducted by Consilium as part of the hiring process.  App. 052 (Gresham Dep. at 113:24-115:4).

App. 068--74 (Text Messages).  In his deposition testimony, Defendant Bowden admitted that on September 17, 2012, as he communicated with Defendant Gresham, he knew that Gresham was employed as a search consultant with MHA.  App. 018 (Bowden Dep. at 91:4-15).  Bowden further admitted that he gave Gresham's contact information to Christina Stephens, Consilium's corporate recruiter.  App. 019 (Bowden Dep. at 95:18-97:15).  Bowden further testified that as an MHA employee he was subject to a one-year non-compete and, in fact, as far as he knows, every MHA employee—including Gresham—was also subject to a non-compete provision in their employment agreement.  App. 012 (Bowden Dep. at 32:25-33:16).

**F.     September 23, 2012:  Gresham Accesses His Computers on a Sunday Without Authorization and Deletes and Copies MHA's Confidential Information.**

Bowden and Gresham communicated by text every day from September 17, 2012 through September 21, 2012: the day that Gresham took his "personality test" as part of the Consilium hiring and retention process.   App. 068-075 (Text Messages); App. 052-053 (Gresham Dep. at 113:24-115:4).   In fact, Gresham received an offer of employment from Consilium during the week of September 17, 2012, while he was still employed by MHA.  More specifically, MHA employee Breanna Elliott testified that Gresham told her that he had an offer from Consilium and would soon resign from MHA to join that rival firm:

> A:     The week prior to when he resigned, which was Monday, September 24th, during the course of the week we had discussions related to the fact that Billy Bowden had contacted him about Concilium [sic] and that he would like working there.  We had discussed almost daily as he had gone on multiple interviews with him.  We discussed, you know, they had made him an offer, and, you know, was -- you know, earlier in the week it was, "What's your opinions of locums?  Do you think, you know, this would be a good move?" By the end of the week it was more discussions about "When am I going to turn in my resignation?"  He was considering "Do I stay 'til the end of the month?"  The perception on the floor is if you leave before the 31st, the last day of the month, that you won't receive your commission check. So he was worried, "Do I stay through the 31st and make sure I get my commission check or do I take a week off and play this new video game that is coming out," which he was really excited about.  So it was conversations like that along the week.

Q:      Okay.  Did he tell you during that week of -- of prior to September 24th, 2012, that he had received an offer from Concilium [sic]?

A:      Yes.

App. 091 (Elliott Dep. at 10:3-11:3).

With an employment offer from Consilium in hand, Gresham surreptitiously accessed MHA's offices on Sunday September 23, 2012, the day before he planned to resign his employment with MHA.   App. 056 (Gresham Dep. 154:25 – 156:12).   Outside of normal business hours, using his MHA security badge, Gresham then proceeded to access his work computer and copy and delete MHA's confidential and proprietary information.  App. 105-106, 108-109 (Jones Report pp. 8-9, 11-12).

As detailed in the report of Kelly Jones, Gresham accessed and copied 447 individual files on Sunday September 23, 2012.  App. 105 (Jones Report p. 8).  Gresham also deleted 840 files from his MHA work computer on that same day.  App. 108 (Jones Report p. 11).  276 of those files were located on the local C: Drive of his MHA computer.  App. 109 (Jones Report p. 12).  Because these files were stored locally to his computer instead of on the MHA network (in violation of MHA policy), these 276 files were not backed up and, thus, are not recoverable to MHA.  App. 109 (Jones Report p. 12).

**G.      September 24, 2012: Gresham formally resigns from MHA.**

On Monday, September 24, 2012, at 7:00 am, Gresham e-mailed Tim Beidle, MHA's Vice President and Gresham's supervisor, to officially resign from MHA.  App. 112 (Email Resignation).  Just a little over two hours later, Bowden sent Gresham yet another text message

to ask about his resignation from MHA: "You doing the dirty deed yet?"[3]   App. 077 (Text Messages).

### H.     Just Ten Days After Quitting MHA, Gresham Formally Joins MHA's Competitor, Consilium.

Ten days after "doing the dirty deed" of resigning from MHA, the courtship that began with Bowden introducing his new company's corporate recruiter to Gresham ended with Gresham formally signing an offer letter to begin work for Bowden's employer, Consilium. App. 113 (Offer Letter); App. 054 (Gresham Dep. at 126:20-22). At the time he began work for Consilium, the 12-month term of Gresham's non-competition agreement was still in full force— as even Gresham acknowledges. App. 061 (Gresham Agreement at § 5(A)); App. 051 (Gresham Dep. at 97:1-16).

Consilium's office, where Gresham worked after leaving MHA, is in Dallas County and less than ten (10) miles away from Gresham's previous office at MHA. App. 013 (Bowden Dep. 37:13-22); App. 045 (Gresham Dep. at 46:2-21). Both MHA and Consilium are in the medical staffing business. App. 013 (Bowden Dep. at 37:13-22). MHA considers Consilium and other companies whose primary business is in "temporary" placements as competitors and rivals, because it is not uncommon for temporary placement companies to also make permanent medical staffing placements, thus directly competing with MHA. App. 025 (Beidle Dep. at 23:20-24:5); App. 031-032 (Smith Dep. at 9:6-13; 9:23-10:10). Indeed, MHA President Mark Smith was asked whether he views Consilium as a competitor to MHA and stated: "Well, I have to. As I look on their web site, they say they do permanent placement." App. 038 (Smith Dep. at

---

[3] Gresham understood "the dirty deed" to mean "quitting." App. 053 (Gresham Dep. at 117:21-118-5).

80:16-17); App. 026 (Beidle Dep. at 52:1-16).  Consilium, by its own admission, is often in the permanent (i.e., not merely "temporary") medical staffing business.  As stated on its website:

> Does Consilium Staffing offer Permanent Placement opportunities?
>
> **Yes!** Consilium specializes in locum tenens placement however, ***through our search and recruiting efforts we are oftentimes aware of permanent positions available within hospitals and clinics around the country***.  In addition, there are many times when locum tenens placements are used ***as a trial period before offering a salaried [i.e. permanent] position to a provider***.  This ensures that both the provider and facility are a great fit before making a long term commitment to each other.

App. 114 (Consilium Website Printout) (emphasis added).

Consilium's corporate representative confirmed in sworn testimony that  Consilium does in fact make permanent placements and pays commissions for those placements.  App. 117 (Baade Dep. at 79:16 – 80:4).  Most interestingly, and quite bizarrely, Consilium's corporate representative attempted to explain away the fact that Consilium's website represents that it performs permanent placement services by testifying that the website is wrong, and described the website as a "marketing piece" that is "maybe a little bit misleading."  App. 116-117 (Baade Dep. at 76:16 – 78:9).

Regardless of whether Consilium is *primarily* focused on making permanent or temporary medical staffing placements, it is very much a medical staffing company.  By the express terms of his Agreement, Gresham was restricted for twelve months from performing the same or similar services for any business that competes with MHA, including businesses that operate for "recruiting and providing *temporary and permanent healthcare professionals*, placements, and other staffing services for healthcare professionals, healthcare facilities and other healthcare organizations." App. 061 (Gresham Agreement at § 5(A)) (emphasis added).

## I.      MHA Suffered Injury Resulting From Gresham's Departure and Competition.

When Gresham quit MHA to work for Consilium—its competitor in the medical staffing field—MHA suffered economic injury.   Specifically, MHA was forced to replace Gresham's experience with an inexperienced new hire who required training and ramp-up time.   App. 027-028 (Biedle Dep. at 89:11-90:7); App. 033 (Smith Dep. at 19:8-13).   Further, MHA incurred the cost of training a new employee, as the employee that was originally hired to supplement Gresham ended-up replacing him, thus creating a vacant position upstream.   App. 027-028 (Beidle Dep. at 89:11-90:7).   The training costs MHA necessarily incurred were calculated by assuming a $40,000 per year salary for a new hire, and proportioning 20 weeks of that salary, based upon MHA's average training time, during which time the new hire would be generating no income for MHA.   App. 034-35 (Smith Dep. at 49:13-50:3).   Further, MHA incurred additional overhead costs related to benefits paid to a trainee.   App. 035 (Smith Dep. at 50:7-17). MHA additionally incurred economic damages in terms of the time that a supervising employee spent training a new hire, when such time could not be spent generating income.   App. 035-036 (Smith Dep. at 52:11-23; 56:14-25).   MHA incurred lost profits by replacing an experienced and fully-trained recruiter—Gresham—with a new hire, who was unable to match Gresham's historic revenue generation during her first months with MHA.   App. 037 (Smith Dep. at 62:12-63:13).

The damages MHA incurred as a result of Gresham's work for Consilium include lost profits as described above; the profits made by Consilium as a result of Gresham's employment with that rival company; and the cost of MHA of having Gresham, immediately upon leaving MHA, use his skill, expertise, training, and MHA's Confidential Information, all of which he acquired during his employment with MHA, to benefit Consilium in attracting medical staffing business.

## IV.   ARGUMENT AND AUTHORITIES

### A.   Standard of Review

Summary judgment may be entered only when the moving party has met its burden of showing that there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c); *Casey Enterprises v. American Hardware Mutual Ins. Co.*, 655 F.2d 598, 601-02 (5th Cir. 1981).  The party seeking summary judgment bears the burden of demonstrating that there is no actual dispute as to any material fact in the case.  *See Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982).  Doubts about any fact are to be resolved in favor of the non-moving party, and any reasonable inferences are to be drawn in favor of that party.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001); *Impossible Elec.*, 669 F.2d at 1031.  "A court must not decide any factual issues it finds in the record, but if such are present, the court must deny the motion and proceed to trial."  *Impossible Elec.*, 669 F.2d at 1031. "The moving party must demonstrate the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever." *Id.* (*citing Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967).  Applying these standards to the facts of the instant case, Defendants' Motion for Summary Judgment should be denied in its entirety.

### B.   Defendants Are Not Entitled to Summary Judgment on MHA's Breach of Contract, Tortious Interference, and Aiding and Abetting Claims.

Defendants contend that they are entitled to summary judgment on MHA's claims for breach of contract, tortious interference, and aiding and abetting solely because the non-interference provision of the Bowden Agreement and the non-competition provision of the Gresham Agreement are unenforceable.  In particular, Defendants argue that the scope of

Bowden's Non-Interference Agreement and of Gresham's Non-Compete are too broad to be enforceable as a matter of law. Defendants are simply incorrect. The scope of each provision is both legally permissible and specifically tailored to the purpose of the agreement. In fact, Bowden's recruitment of Gresham underscores the necessity for MHA to use such non-interference agreement and non-compete agreements with its employees.

### 1.    Texas Standard for Enforceability

"The enforceability of a non-competition covenant is a question of law for the court to decide." *CDX Holdings, Inc. v. Heddon*, 2012 U.S. Dist. LEXIS 86041, at *17 (N.D. Tex. Mar. 2, 2012) (citing *Light v. Centel Cellular Co.*, 883 S.W.2d 642, 644 (Tex. 1994) *abrogated in part on unrelated grounds by Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006)).   Under Texas's Covenants Not to Compete Act, a non-competition covenant, such as the one contained in the Gresham Agreement, is enforceable "if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COMM. CODE § 15.50. Further, the Texas Supreme Court has recognized that agreements that restrict a former employee's solicitation of the former employer's employees are likewise governed by the Covenants Not to Compete Act. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011).

### 2.    The Agreements Contain Reasonable Limitations.

#### a.    The Bowden Non-Interference Provision.

In arguing that Bowden's Non-Interference provision is unreasonable in scope, Defendants conflate the law of non-solicitation of employees with that of simple non-competition. Despite Defendants' unsupported protestations to the contrary, non-interference

provisions such as this have been upheld under Texas law.  For example, in *In Re Electro-Motor, Inc. v. Indus Apparatus Servs., Inc.*, 390 B.R. 859 (Bkr. E.D. Tex. 2008), a bankruptcy court applying Texas law enforced a non-interference provision of three years.  Defendants have previously attempted to distinguish *In Re Electro-Motor* on the basis that it did not involve a final determination.  However, the fact remains that the *In Re Electro-Motor* court enforced the three-year provision without reservation, regardless of the stage of that litigation.  *Id.*  Similarly, *Shoreline Gas, Inc. v. McGaughey*, 2008 Tex. App. LEXIS 2760, at *26-28 (Tex. App.—Corpus Christi 2008, no pet.), provides an example of another non-interference provision deemed enforceable by a Texas court.  While the *Shoreline Gas* court ultimately upheld the denial of a preliminary injunction, it did so not because the non-interference clause was unenforceable but rather because the applicant failed to establish the threat of an irreparable injury.  *See Shoreline*, 2008 Tex. App. LEXIS 2760, at *28.  Although both of these cases emerged at the preliminary injunction phase, each necessarily involved a finding that the non-interference provision at issue was one under which the plaintiff had a "probable right to recovery" under a presumptively enforceable agreement.

In conflating broad non-competition agreements with limited non-interference provision, Defendants neglect the appropriate analysis.  This Court should consider the length of the non-interference provision in the context of the limited and modest restraint that such a provision imposes.  *Stone v. Griffin Communications and Security Systems, Inc.*, 53 S.W.3d 687, 694 (Tex. App.—Tyler 2001, no pet.) ("We conclude that there was some probative evidence to allow the trial judge to conclude that the restraint created was not greater than necessary to protect [Employer's] legitimate interests.  We further conclude that there was evidence to support the trial court's finding that the necessity of the restraint created was not outweighed by the hardship

to the promisor or injury to the public."). **Limitations of two to five years are routine in the context of non-solicitation provisions**. *Id.* at 696 (emphasis added).

Here, the demands placed upon Bowden by his specific Non-Interference Provision are minimal. Bowden is merely prohibited from contacting or communicating with a narrow, specific class of individuals: current MHA employees. Moreover, Bowden is not totally prohibited from contacting or communicating with them, merely from contacting or communicating *for the purpose of inducing them to terminate their employment with MHA*. Defendants' argument that the non-competition provision is only one year but the non-interference provision is three years inadvertently highlights this very point – the non-interference provision is less restrictive than the non-competition provision, and therefore it is reasonable for a longer duration than the non-competition provision.

Putting aside the *de minimis* demands placed upon Bowden by his Non-Interference Provision (i.e., to avoid inducing MHA employees to stop working for MHA) Defendants argue that the only evidence put forth by MHA in support of the length of this Non-Interference Provision is Smith's testimony that it "seems like a fair time." This is simply false. Bowden *himself* agreed and confirmed that "the limitations as to time, geographical area, and scope of activity to be restrained are reasonable and acceptable." App. 006 (Bowden Agreement at Art. VII(e)). Bowden testified unequivocally that he understood "the full impact and effect" of signing his employment agreement, did not believe the restrictions to be meaningless, and understood that they were put in place to protect MHA's business interests. App. 014-015 (Bowden Dep. 45:20 – 46:16). Bowden himself apparently saw nothing unreasonable about the scope of his Non-Interference Provision or its length. Furthermore, MHA's President identified goodwill, maintaining the integrity of its workforce, employee morale and other business assets

as legitimate interests of MHA protected by the non-interference provision.  App. 020-021 (Bowden Dep. 108:9-24, 111:25 – 112:9).  Indeed, these provisions protect MHA by preventing confidential information known to former employees regarding current employees from influencing the hiring decisions of competitors.  The legitimacy of MHA's interests is not disputed or denied by Defendants' Response.

To be sure, the Non-Interference Provision would not prevent Bowden from recruiting employees of *other* medical staffing companies and did not prevent Bowden from working in his chosen field.  It merely prevented him from using the intimate knowledge and the *bona fides* he gained as an employee of MHA to raid his former employer's workforce.  Bowden himself agreed that this was a reasonable restraint, and that it placed virtually no burden upon him until he actively recruited Gresham to leave MHA in violation of his obligations.  The restraint placed upon Bowden was no greater than that necessary to protect MHA's needs to protect its workforce.  Accordingly, the Non-Interference Provision in the Bowden Agreement is enforceable as a matter law, and Defendants are not entitled to summary judgment.

### b.    The Gresham Non-Competition Provision.

Under the Non-Competition Provision in his contract, Gresham remains free to compete with MHA anywhere within the State of Texas or beyond, other than the handful of counties forming the DFW Metroplex.  Despite this strictly limited geographic scope, Defendants argue that the Non-Competition Provision is impermissibly broad or amounts to an "industry-wide" exclusion.  Neither of these arguments are supported under the law.

### i.    The geographic scope of Gresham's Non-Competition Clause is reasonable.

In determining the enforceability of a covenant not to compete, courts consider whether the covenant contains limitations that are reasonable as to geographical area and do not "impose

a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." *Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 777 (Tex. 2011). The territory in which an employee worked for an employer is generally considered to be the benchmark of a reasonable geographic restriction. *Butler v. Arrow Mirror & Glass, Inc.,* 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (citing *Curtis v. Ziff Energy Group*, Ltd., 12 S.W.3d 114, 119 (Tex. App.—Houston [14th Dist.] 1999, no pet.)); *Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 232-33 (Tex. App.—Texarkana 1998, no pet.). Texas courts have generally held that a geographical limitation imposed on the employee which consists of the territory within which the employee worked during his employment is a reasonable geographical restriction. *See Evan's World Travel, Inc.* 978 S.W.2d at 232-33, citing *Property Tax Assocs., Inc. v. Staffeldt*, 800 S.W.2d 349, 351 (Tex. App.—El Paso 1990, writ denied); *Diversified Human Resources Group, Inc. v. Levinson-Polakoff*, 752 S.W.2d 8, 12 (Tex. App.—Dallas 1988, no writ); *Justin Belt Co. v. Yost*, 502 S.W.2d 681, 685 (Tex. 1973).

It is undisputed that Gresham worked for MHA within the DFW Metroplex. In fact, MHA is located within Irving, in the very center of the DFW metropolitan area. A geographic scope limited the DFW Metroplex for a salesman who worked for his employer in the DFW Metroplex has been held to be reasonable. *Arrow Chemical Corp. v. Pugh*, 490 S.W.2d 628, 630 (Tex. Civ. App.—Dallas 1972, no writ) ("It is undisputed that [Employee] performed his agreement with appellant company from March 9, 1970 until September 3, 1971 in both Dallas and Tarrant Counties. [Employee] voluntarily terminated his employment with appellant corporation. The evidence is conclusive that during the time [Employee] worked for appellant the business of selling janitorial supplies in the territory was highly competitive.")

Defendants attempt to distinguish Gresham's employment by arguing that the fact that he had a "telephone sales job" somehow exempts him from a local geographic scope provision.  In reality, the nature of Gresham's employment renders the local nature of his non-competition provision all the more important. The ease of telephone contact with his prospects regardless of their physical location—and the resulting ease of changing his target area—mean that Gresham could easily use the training and confidential information he received from MHA to benefit a local Dallas-area competitor of MHA.   The Non-Competition Provision therefore seeks to prevent Gresham from assisting MHA's Dallas-area competitors in recruiting medical professionals, as specialty professional recruitment such as medical staffing involves broad geographic regions in which a recruiter may seek to make placements.   Stated simply, if Gresham wishes to work in medical recruiting during the term of his Non-Competition Provision, he must do so based somewhere other than in the DFW Metroplex.

Defendants point to *Peat Marwick Main & Co. v. Haas,* 818 S.W.2d 381, 386-87 (Tex. 1991) in an effort to point out an example of a local limitation held to be unreasonable. However, in *Peat Marwick,* the overbroad definition of "clients" led to problems with the clause, as the definition included clients of the firm both before and after the employees' employment with the firm.  *Id.* at 388.  As a result, the restraint was unreasonable and could not protect the former employer's interests.  *Id.*  That is not the case here, as Gresham is merely prohibited from working in the same niche as MHA – medical staffing –in a narrow geographic area—the DFW Metroplex.  Thus, the *Peat Marwick* case is readily distinguishable and unavailing.

Here, Gresham's Non-Competition Provision merely prohibits him from performing the same or similar services for businesses that operate for "recruiting and providing temporary and permanent healthcare professionals, placements, and other staffing services for healthcare

professionals, healthcare facilities and other healthcare organizations" *within the local area where he worked* (i.e., the Dallas-area). This is hardly an industry-wide exclusion, and Texas courts have routinely upheld similar non-competition agreements. *See Evan's World Travel, Inc.* 978 S.W.2d at 232-33, citing *Property Tax Assocs., Inc. v. Staffeldt*, 800 S.W.2d 349, 351 (Tex. App.—El Paso 1990, writ denied); *Diversified Human Resources Group, Inc. v. Levinson-Polakoff*, 752 S.W.2d 8, 12 (Tex. App.—Dallas 1988, no writ); *Justin Belt Co. v. Yost*, 502 S.W.2d 681, 685 (Tex. 1973).

Indeed, Gresham *agreed* that the geographic territory covered by the Non-Competition Provision was reasonable when he signed it. Only afterward did he assert that he considered any geographic limitation unreasonable. In fact, the geographic restraint placed on Gresham is no greater than that necessary to prevent Gresham from doing precisely what he did—leaving to work for a direct competitor located only a few miles from MHA.

> ii.     **Gresham's Non-Competition Agreement Does Not Constitute an Industry-Wide Exclusion.**

Defendants additionally argue that Gresham's Non-Competition Provision constitutes an "industry wide" exclusion. This is facially incorrect. An industry wide exclusion, such as the one discussed in *Peat Marwick,* is one that totally prevents an individual from practicing in a certain industry. In the case of *Peat Marwick,* the industry wide exclusion at issue prohibited an accountant from practicing accountancy with any of an over broadly defined number of "clients," including those that pre-dated and came after his tenure with the firm. *Id.* In contrast, Gresham's agreement does not prohibit him from working in the staffing industry generally, but only from "providing the same or similar services" *to a competitor of MHA in the DFW Metroplex.* Further, unless either the entire staffing industry can be defined as competitors of MHA located in the DFW Metroplex, which Defendants do not attempt, the agreement clearly

lacks any "industry wide" exclusion of Gresham's work in the medical staffing industry.  It is narrowly tailored to prevent him from doing the same job, locally, for a local competitor.

### iii.    MHA and Consilium Are Competitors in the Same Industry.

Defendants continue to argue, although now with less conviction, that MHA and Consilium are not competitors because Consilium is in the business of temporary medical staffing, while MHA is in the business of permanent medical staffing.  Therefore, Defendants posit, MHA has no legitimate, protectable business interest in preventing its former employees from working for Consilium.

As an initial matter, Texas courts do not construe "competitors" in such an artificially narrow manner, and have previously found competition between companies that operate in the same general area of the health-care industry.  *See Electronic Data Systems Corp. v. Powell,* 524 S.W.2d 393, 395 (Tex. Civ. App.—Dallas 1975, writ ref'd n.r.e.) (upholding an injunction preventing an employee subject to a non-compete from working for a competitor in electronic data systems in the "health care area of data processing.").

However, even assuming such a distinction is meaningful for the purposes of Gresham's Non-Competition Provision—which specifically encompasses *both* temporary and permanent medical staffing—the undisputed facts demonstrate that the two companies are direct competitors.  Consilium admits as much on its website, enthusiastically representing that it provides *permanent* placement services.  Further, Consilium has an established policy, much like MHA, of paying commissions for permanent placements—the very line of business they claim they are not in.  Even further, Consilium's corporate representative gave deposition testimony confirming that  Consilium does in fact make permanent placements and pays commissions for those placements.  App. 117 (Baade Dep. at 79:16 – 80:4).  More strikingly, Consilium's corporate representative attempted to explain away the fact that Consilium's website represents

that it performs permanent placement services by testifying that the website is wrong, and described the website as a "marketing piece" that is "maybe a little bit misleading."  App. 116 (Baade Dep. at 76:16 – 78:9).

Moreover, the existence of Staff Care, a sister company to MHA that is not a party to this lawsuit, is irrelevant to the question of whether MHA and Consilium are competitors.  Defendant Bowden and Consilium both freely admit that MHA and Consilium are *both* in the "healthcare staffing industry" and the "medical staffing industry."  App. 013 (Bowden Dep. at 37:13-18); App. 140 (Baade Dep. at 68:24 – 69:8).   Bowden further concedes that any temporary placements by Consilium may become permanent.  App. 013 (Bowden Dep. at 35:11-25).  The undisputed facts are that both companies compete in the medical staffing industry and that Consilium claims in its own marketing materials that it offers precisely the same services – permanent staffing – that MHA specializes in.

**iv.  MHA Has Not Admitted that Gresham's Non-Competition Clause is Unenforceable; Any Previous Agreements with Gresham, Dispute with Gresham, or Settlement with Gresham Are Irrelevant to the Current Dispute.**

Defendants once again argue that MHA somehow waived Gresham's Non-Compete Provision through its conduct in an unrelated dispute.  Specifically, they contend that Gresham's prior term of employment at MHA and the circumstances of his first departure from MHA somehow create a waiver of MHA's rights to pursue this current litigation arising from his *second* term of employment at MHA.   Not only is the evidence Defendants cite for this proposition inadmissible and improper, it is also completely irrelevant to the current dispute before the Court and should be disregarded.  Moreover, the facts underlying that dispute arising from Gresham's earlier stint of employment at MHA actually *support* MHA's current claim and

do not represent a preemptive waiver of MHA's rights to enforce Gresham's Non-Compete Provision.

As a preliminary matter, MHA objects to Defendants' evidence of "waiver" as inadmissible. Federal Rule of Evidence 408 protects "conduct or statements made in compromise negotiations regarding a claim that was disputed as to validity or amount." *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 295 (5th Cir. 2010) (internal quotation marks and citations omitted). Rule 408 "is designed to encourage settlements by fostering free and full discussion of the issues." *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir. 1981). Defendants impermissibly subvert Rule 408 in an effort to introduce extraneous evidence of the resolution of a prior dispute between Gresham and MHA regarding his previous period of employment at MHA. Evidence of any previous compromise or settlement between the parties arising from Gresham's earlier (and separate) term of employment at MHA is inadmissible, and Defendants cite to no authority suggesting otherwise. Defendants' evidence concerning the earlier settlement arising from a separate period of employment should be ignored by the Court.

To the extent that the Court deems this evidence admissible, it demonstrates nothing more than the fact that, as in this case, MHA routinely enforces its non-compete agreements with its former employees. To review that prior dispute: Gresham left his first stint at MHA to work for another competitor, Arthur Marshall. MHA, as in this case, sought to prevent Gresham from violating his prior non-competition agreement. As in this case, MHA sought to prevent the dissemination of its confidential information and to restrain Gresham from competing against it in violation of his non-compete agreement. The nature of any earlier settlement or an earlier dispute—whether monetary or otherwise—is irrelevant to this case, as this case involves

different facts, different agreements, a different period of employment, a different time period, a different competitor and different circumstances for all parties.

Contrary to Defendants' assertions, MHA waived no rights, but instead vigorously pursued its rights against Gresham under a non-competition clause much like the one at issue in this case; MHA could hardly estop itself in a previous dispute from suing to enforce a future agreement it had yet to enter into. More fundamentally, MHA's previous and separate dispute with Gresham—and the confidential settlement of that prior dispute—is simply irrelevant to the case currently before the Court.

Based on all of the foregoing, the non-interference provision of the Bowden Agreement and the non-competition provision of the Gresham Agreement are enforceable as a matter of law. Defendants are not entitled to summary judgment on MHA's claims for breach of contract, tortious interference, and aiding and abetting. On the contrary, MHA is entitled to summary judgment on its claim for breach of contract.

**C.     Defendants Cannot Show That MHA Has No Admissible Evidence on Damages.**

Defendants purport to move for summary judgment on each and every claim asserted by MHA on the grounds that MHA has no admissible evidence to show that it suffered any damages as a result of any of the conduct committed by the Defendants. Defendants argue that the expert testimony of MHA's president, Mark Smith, constitutes MHA's sole evidence of damages, and since Mr. Smith's testimony is inadmissible as expert testimony under Federal Rules of Evidence 701 and 702, they are entitled to summary judgment on all claims asserted by MHA.

Defendants' argument here fails because Defendants misunderstand Mr. Smith's designation and the law on lay opinion testimony regarding damages. Plaintiff designated Smith to offer his lay opinions regarding the company's damages, which are founded upon his extensive knowledge of MHA's business, his review of company records, and his knowledge of

this lawsuit.  Well-established precedent holds that, under these circumstances, Smith may testify as a lay witness at trial pursuant to Rule 701.  Therefore, Defendants' reliance on their motion to exclude Mr. Smith's "expert" testimony is misplaced.  At a minimum, Mr. Smith's testimony as MHA's long-time president who is intimately involved in the company's day-to-day operations creates a fact issue as to whether MHA has met its burden to show competent, admissible evidence of damages.  Defendants are not entitled to summary judgment on this point.[4]

**D.     Gresham Is Not Entitled to Summary Judgment on MHA's Claims Under the CFAA and for Harmful Access By Computer.**

In their Motion for Summary Judgment, Defendants argue that MHA cannot prevail on their claims under the Computer Fraud and Abuse Act and for Harmful Access by Computer because Gresham was authorized to access all of the information on his MHA work computer.  Defendants thereby report to this Court that while "authorization" is not defined in the CFAA, courts in the Fifth Circuit refuse to apply the CFAA in a manner that equates "without authorization" or "exceeding authorization" with acting adverse to one's current or former employer.  Defendants, however, fail to point this Court to a recent Fifth Circuit opinion that does precisely that.  Accordingly, Defendants are not entitled to summary judgment on this point.

**1.     Defendants' Reliance on *Bridal Expo., Inc. v. Van Florestein* is Misplaced.**

As an initial matter, Defendants rely on the 2009 case out of the Southern District of Texas, *Bridal Expo, Inc. v. Van Florestein*, No. 4:08-CV-03777, 2009 WL 255862 (S.D. Tex. Feb. 3, 2009), for the proposition that to show a defendant acted "without authorization" or "exceeding authorization" under the CFAA, the plaintiff must show the defendant obtained

---

[4] For a detailed explanation of why Defendants' Motion to Exclude Mr. Smith fails, MHA respectfully directs the Court to MHA's Response to Defendants' Motion to Exclude Opinion Testimony of Mark Smith and Brief in Support Thereof filed contemporaneously with this Response, and which is fully incorporated herein by reference.

unauthorized access to computer data.  *Id*. at *3.  While that court did conclude that two employees did not act in excess of their authorization when they accessed, deleted, copied, and took their employer's confidential information just prior to resigning, the court specifically stated in its analysis that the Fifth Circuit had not yet taken a position on the issue.  *Id*. at *33.

Furthermore, the court in *Bridal Expo* specifically noted in its reasoning that the two employees had not signed confidentiality agreements with their employer.  *Id*.  The court also specifically relied on the fact that a representative of the employer saw the employees using their computers on their last day and did not complain about their access.  *Id*.  Based on those factors, the court concluded that the employees did not act in excess of their authorization.  *Id*.

The present case is readily distinguishable from *Bridal Expo*.  Unlike the employees in *Bridal Expo*, Gresham's employment agreement did include confidentiality obligations, including acknowledgements that MHA's business information was confidential and proprietary, and an agreement that Gresham would take all necessary steps to ensure that the information remained confidential.  The Employment Agreement states in pertinent part as follows:

> 2.    <u>Confidentiality</u>.  Employee covenants and agrees that he/she will not use any of the Confidential Business Information, Company Training or Company Relationships for any purpose other than in the course and scope of his/her employment and for the exclusive benefit of the Company.  Except for disclosure in the course and scope of his/her employment with Company and on behalf of the Company, Employee will never at any time, either during or after his/her employment with Company, directly or indirectly use, publish disseminate, distribute or otherwise disclose any Confidential Business Information, Company Training or Company Relationships to any other person, firm, corporation, partnership, association or other entity.

> Employee also agrees to take all steps necessary, and all steps requested to ensure that the Confidential Business Information, Company Training and Company Relationships are kept secret and confidential and for the sole use and benefit of the Company and to comply with all applicable policies and procedures of the Company regarding the storage and security of all such information, whether in hard copy form or stored on computer disks or other electronic media. Employee also acknowledges that the Confidential Business Information,

Company Training and Company Relationships are, and have been, the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

App. 059-060 (Gresham Agreement at § 2).

In starker contrast to *Bridal Expo*, no one at MHA witnessed Gresham accessing his computer. On the contrary, Gresham, with an employment offer from Consilium in hand, surreptitiously accessed MHA's offices on the Sunday before he resigned on Monday, outside of normal business hours, using his MHA security badge and knowing that he would no longer do any work for the benefit of MHA. App. 056 (Gresham Dep. 154:25 – 156:12). He then proceeded to access his work computer and copy and delete MHA's confidential and proprietary information. App. 105-106, 108-109 (Jones Report pp. 8-9, 11-12). Thus, no one from MHA witnessed Gresham's access, and Defendants' reliance on *Bridal Expo* is far from compelling.

## 2. Recent Fifth Circuit Precedent Conclusively Demonstrates that Gresham's Access was Without Authorization or Exceeded Authorization.

Even more striking, however, is Defendants' failure to notify the Court that the *Bridal Expo* case has now been specifically abrogated in light of a 2010 Fifth Circuit decision analyzing this issue. In *United States v. John*, 597 F.3d 263 (5th Cir. 2010), the court specifically addressed the question of "whether 'authorized access' or 'authorization' may encompass limits placed on the *use* of information obtained by permitted access to a computer system and data available on that system." *Id.* at 271 (emphasis original). The court determined that the concept of 'exceeds authorized access' may include exceeding the purposes for which access is 'authorized.'" *Id.* at 272. Critically, the court concluded that "[a]ccess to a computer and data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded." *Id.*

In *Beta Tech., Inc. v. Meyers*, 2013 U.S. Dist. LEXIS 147095, at *9-10 (S.D. Tex. Oct. 10, 2013), another case Defendants fail to mention in their Motion, the Southern District

specifically abrogated the *Bridal Expo* case, relying on the more recent *John* Fifth Circuit decision.  In that case, the court concluded that a CFAA claim was properly asserted when the employee was alleged to have violated a confidentiality agreement and the employer's computer use policy, which explicitly prohibited making unauthorized copies of company data.  *Id.* (noting specifically that *Bridal Expo* and *Joe N. Pratt Ins. v. Doane*, 2009 U.S. Dist. LEXIS 88314 (S.D. Tex. Sept. 25, 2009) predate the Fifth Circuit's ruling in *John*).

Most importantly, this District Court has recently relied on the *John* case to hold that an employee's access of an employer's computer and use of data in violation of a restrictive covenant agreement to compete with the employer may itself constitute "unauthorized access." *See Meats by Linz, Inc. v. Dear*, No. 3:10-CV-1511-D, 2011 U.S. Dist. LEXIS 42800, at *3 (N.D. Tex. Apr. 20, 2011) (holding plaintiff stated a claim under the CFAA where it alleged facts allowing the court to draw the reasonable inference that defendant accessed plaintiff's computer system and data and used it, in violation of the restrictive covenant agreement, to compete directly with plaintiff).

Thus, in light of the facts that Gresham's employment agreement included non-disclosure obligations and that Gresham surreptitiously accessed his computer on a Sunday outside of normal business hours, and in light of the recent Fifth Circuit precedent outlined above, there is at a minimum a fact issue as to whether Gresham's computer access was "without authorization" or "exceeded authorization."   Defendants are not entitled to summary judgment on MHA's claims under the CFAA and for Harmful Access by Computer.

### 3.    MHA Was Not Able to Recover All Files Deleted by Gresham From His "My Documents" Folder.

As a final attempt to avoid liability for MHA's claim for Harmful Access by Computer, Defendants argue that MHA cannot show that its property was injured as a result of Gresham's

unauthorized access of his MHA work computer because MHA was able to recover the files Gresham deleted. This is simply not the case.

As detailed in the report of Kelly Jones, Gresham deleted 840 files on Sunday September 23, 2012 from his MHA computer. App. 108-109 (Jones Report pp. 11-12). 276 of these files were located on the local C: Drive of his MHA computer. App. 108 (Jones Report p 11). Because these files were stored locally to his computer instead of on the MHA network (in violation of MHA policy), these 276 files were not backed up and, thus, were not recoverable by MHA. App. 109 (Jones Report p. 12). Thus, MHA's property was in fact injured, and Defendants are not entitled to summary judgment on MHA's claims under the CFAA and for Harmful Access by Computer.

**E.     Gresham is Not Entitled to Summary Judgment on MHA's Claim for Conversion.**

Defendants incorrectly argue that MHA does not have a cognizable conversion claim under Texas law. Texas law generally has not recognized a cause of action for conversion of intangible property except in cases where the underlying intangible right has been merged into a document and that document has been converted. *Express One Intern., Inc. v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.).

However, notwithstanding the physicality of the property at issue, unauthorized copying of another party's confidential client list or trade secrets can support a claim for conversion in Texas. *Milbank v. Simons*, No. W-11-172, 2013 U.S. Dist. LEXIS 165941, at *41 (W.D. Tex. Nov. 19, 2013). Specifically, where the property at issue in a conversion claim is essentially information, and not a tangible item, a claim for conversion is proper if the plaintiff can show that the defendant intended to use the information in a manner that excluded or was inconsistent with the plaintiff's rights. *Id.*; *Cuidad Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Services, LLC*, 404 S.W.3d 737, 749 (Tex. App.—El Paso 2013, no pet.).

Here, as outlined in more detail above, Gresham's accessed his work computer without authorization on the Sunday before he resigned, and he proceeded to copy and delete MHA's confidential and proprietary information in violation of the confidentiality obligations he owed MHA under his employment agreement. Thus, Gresham unquestionably used the information he accessed in a manner inconsistent with MHA's rights under his employment agreement. At a minimum, there is a fact issue as to whether Gresham's actions constitute conversion of MHA's confidential information, and Gresham is not entitled to summary judgment on MHA's claim for conversion.

## F. Defendants Gresham and Bowden Are Not Entitled to Summary Judgment on MHA's Claims for Breach of Fiduciary Duty.

Defendants Gresham and Bowden contend they are entitled to summary judgment on MHA's breach of fiduciary duty claims for two reasons: (1) Gresham and Bowden owed no fiduciary obligation to MHA as a matter of law; and (2) even if there was a fiduciary obligation, and even if Gresham copied MHA's confidential information prior to leaving MHA, MHA's claim fails because it has no proof that Gresham (or anyone else) used that information while at Consilium. Defendants are wrong on both counts.

### 1. Gresham and Bowden owed MHA a Fiduciary Duty.

Defendants place misguided reliance on the general rule that Texas does not recognize a fiduciary duty between employers and employees. The Fifth Circuit has expressly stated that an informal fiduciary relationship may arise between an employee and an employer in situations such as this case. *See e.g. Molex, Inc. v. Nolen*, 759 F.2d 474, 479 (5th Cir. 1985) (applying Texas law and holding that a sales representative had a fiduciary relationship with his employer); *see also Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942) (holding that a "trusted" salesman occupied the relationship of a fiduciary to his employer). Furthermore,

when a fiduciary relationship exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected to his agency. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007).

While an at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed, the Texas Supreme Court and the Fifth Circuit have noted that the right to prepare to compete with one's employer is not absolute. *Navigant Consulting*, 508 F.3d at 284; *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002). Specifically, an employee may not appropriate his employer's trade secrets and may not carry away certain information, such as customer lists and other confidential information. *Id*.

Accordingly, because MHA has submitted competent summary judgment evidence that shows that Gresham accessed his work computer without authorization on the Sunday before he resigned, and he proceeded to copy and delete MHA's confidential and proprietary information in violation of the confidentiality obligations he owed MHA under his employment agreement, there can be no question that Gresham owed MHA a fiduciary obligation and violated that obligation through his conduct.

Moreover, an employee has a general duty to refrain from using confidential or proprietary information acquired during the employment in a manner adverse to the employer. *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet dism'd). This obligation survives termination of the employment. *Id*. Thus, because Bowden used confidential knowledge and relationships he obtained during his employment with MHA in a manner adverse to MHA—to unlawfully solicit Gresham to leave

his employment with MHA—Bowden too unquestionably owed MHA a fiduciary obligation and violated that obligation.

### 2.    MHA Has Satisfied the Elements of Its Claim for Breach of Fiduciary Duty.

Defendants argue that even if Gresham did indeed copy and misappropriate MHA's confidential information, MHA cannot prevail on its breach of fiduciary duty claim because MHA cannot show that Gresham or anyone else used that information while at Consilium.  In doing so, however, Defendants conflate the elements of a breach of fiduciary duty claim with a claim for trade secret misappropriation.  The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff *or* benefit to the defendant.  *Navigant Consulting*, 508 F.3d at 283 (emphasis added). As outlined above, MHA has satisfied the first two elements—Gresham unquestionably owed MHA a fiduciary obligation and breached that obligation by "carrying away" MHA's confidential information.

In order to satisfy the third element, MHA may show some injury to MHA *or* some benefit to the Defendants.  *Id.* (emphasis added).  Furthermore, damages in cases involving trade secrets can take a variety of forms.  *Southwestern Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 608 (Tex. App.—Tyler 2013).  The methods used to calculate damages associated with trade secrets include the value of plaintiff's lost profits, the defendant's actual profits from use of the secret, the value of the trade secret, or the developmental costs the defendant avoided by the misappropriation.  *Id*. at 608-609.

In particular, courts may measure damages by measuring the value of the misappropriated trade secret to the defendant, expressed as the benefits, profits, or advantages gained by the defendant as a result of the misappropriation.  *See id*. at 609.  The law looks to the

time when the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant.  *Id.*  Furthermore, a lack of profit from his misappropriation and use of the secret does not exempt the wrongdoer from his liability in the amount of the trade secret's value when it was misappropriated.  *Id.*

The evidence adduced to date, at a minimum, creates fact issues as to both MHA's lost profits and the value of the secrets to the Defendants.   When Gresham quit MHA, he surreptitiously took MHA's confidential information, and went to work for Consilium—a clear competitor of MHA—and MHA suffered economic injury.  Specifically, MHA was forced to replace Gresham's experience with an inexperienced new hire who required training and ramp-up time.  App. 027-028 (Biedle Dep. at 89:11-90:7); App. 033 (Smith Dep. at 19:8-13).  Further, MHA incurred the cost of training a new employee, as the employee that was originally hired to supplement Gresham ended-up replacing him, thus creating a vacant position upstream.  App. 027-028 (Beidle Dep. at 89:11-90:7).  MHA incurred lost profits by replacing an experienced and fully-trained recruiter—Gresham—with a new hire, who was unable to match Gresham's historic revenue generation during her first months with MHA.  App. 037 (Smith Dep. at 62:12-63:13).

In addition, MHA has submitted evidence demonstrating that the information copied and deleted by Gresham would have been highly valuable to Gresham and Consilium at the time of the misappropriation.  The information misappropriated by Gresham created a competitive advantage for Gresham and Consilium in placing physicians—the fee for one placement can range from $20,000 to $30,000.  App. 041 (Smith Dep. at 126:6-23).  The client lists copied and deleted by Gresham highly valuable as they provided Gresham and Consilium with extensive knowledge regarding those clients, including the current and future needs of those potential

clients.  *Id.*    Accordingly, MHA has satisfied the elements of its breach of fiduciary duty claim because it has submitted competent summary judgment evidence demonstrating both harm to MHA and benefit to the Defendants.  Defendants are not entitled to summary judgment on MHA's claim for breach of fiduciary duty.

> **3.      Defendants Have Prevented MHA From Conducting Relevant Discovery as to Gresham's Use of MHA's Information.**

To the extent this Court is inclined to require MHA to adduce exactly how Gresham specifically used MHA's confidential information at Consilium, the Court should wait to resolve that issue until Consilium has complied with its discovery obligations regarding Gresham's work computer.  MHA has requested to inspect Gresham's work computer from his time at Consilium in order to properly discover the full scope of Gresham's misuse of MHA's information, but Defendants have utterly refused to turn over the computer.  *See* App. 119-123 (Defendant Gresham's Responses to Plaintiff's First Request for Inspection at p. 3).  Consilium should not now be rewarded as they attempt to hide behind their failure to comply with their discovery obligations.  At a minimum, the Court should refrain from ruling on this issue until Consilium has complied with its obligation to allow MHA to inspect Gresham's work computer.

**G.      Defendants are Not Entitled to Summary Judgment on MHA's Misappropriation Claim.**

Defendants contend that MHA cannot prevail on its misappropriation claim because (1) MHA has not showed that any of the information Gresham copied or deleted constitutes a trade secret, confidential information, or proprietary information, and (2) MHA cannot show that Gresham (or anyone else) used any of that information after Gresham took it.  Defendants are once against wrong on both counts.

1. **The Information Accessed, Copied, and Deleted By Gresham Was Confidential.**

In order to determine whether information is a trade secret or constitutes the requisite confidential or proprietary information, a court must examine six "relevant but non-exclusive" criteria:  (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004).  The party claiming a trade secret is required to satisfy all six factors because trade secrets do not fit neatly into each factor every time.  *Id*.  Determining whether any given piece of information is entitled to trade secret protection, then, is a contextual inquiry which must evaluate a number of factors.  *Id*.

In this case, Gresham's Employment Agreement itself included an acknowledgment that MHA maintained its business information as confidential and proprietary, including, among other things, its marketing information, pricing policies, training programs, lists of prospective healthcare professionals and other candidates for placement, contract terms, business plans and forecasts, market analyses, and other internal procedures and reports.  App. 059 (Gresham Agreement at § 2).  Gresham himself agreed not to disclose or otherwise distribute MHA's confidential information to any other company.  *Id*.  Perhaps most importantly, Gresham agreed to take all necessary steps to ensure that MHA's confidential information was kept secret and confidential and for the sole use and benefit of MHA.  *Id*.

Furthermore, Gresham agreed during his deposition that MHA considered and worked to maintain the confidentiality of its marketing strategies, offer letters, client worksheets, client

database, pricing policies, profit margins, and client lists.  App. 046-047 (Gresham Dep. at 65:24 – 67:18).  Gresham also testified that MHA kept its information secret by keeping its database password protected, such that only those employees who were assigned unique security credentials can access that information.  App. 047 (Gresham Dep. at 66:10 – 67:2).  He additionally testified that MHA enforced heavy security at its offices by restricting access to only employees with appropriate badges.  *Id.*  Even further, Consilium itself acknowledges that the information identified above is confidential and proprietary.  *See* App. 124 (Consilium Staffing Acceptable Use Policy, § 4.2(1)).

Gresham further admitted at his deposition to possessing information that MHA considered confidential after he began his employment with Consilium, including doctor information, client worksheets, marketing information, and offer letters.  App. 049-050 (Gresham Dep. at 76:13-23, 77:15 – 79:14).  Thus, MHA has conclusively demonstrated that the information retained, accessed, and copied by Gresham constituted trade secrets, confidential and proprietary information.

> **2.** **MHA Has Shown that Defendants Used the Confidential Information That Was Misappropriated by Gresham; Defendants Have Prevented MHA From Conducting Relevant Discovery as to Gresham's Use of MHA's Information.**

Defendants place a misguided reliance on *Devon Energy Corp. v. Westacott*, No. H-09-1689, 2011 WL 1157334, at *7 (S.D. Tex. Mar. 24, 2011) for the proposition that MHA cannot show that Gresham used the information he copied.  In actuality, any exploitation of a trade secret or confidential information that is likely to result in injury to the owner or enrichment to the defendant constitutes "use" for purposes of a misappropriation claim.  *Gen. Universal Sys. v. HAL Inc.*, 500 F.3d 444, 451 (5th Cir. 2007).

Furthermore, the court in *Devon Energy* specifically determined that the plaintiff could not show "use" because the sole allegation was that the defendant deleted the plaintiff's

proprietary information and, in the process, destroyed the plaintiff's only source for the particular work the defendant had done for plaintiff. *Devon Energy*, 2011 WL 1157334 at *22. Here, MHA has shown not only that Gresham deleted MHA's confidential information, but that he also likely copied it.

In particular, MHA has demonstrated that Gresham accessed and copied 447 individual files in total. App. 105 (Jones Report p. 8). The "Last Accessed" time-stamp for these 447 individual files reflects these files were all accessed within 25 seconds of one another. App. 105 (Jones Report p. 8). After ruling out other factors or actions that could have caused the Last Accessed times of such a large number of files to be altered within such a short period of time, Digital Works concluded that Gresham copied these files. App. 105 (Jones Report p. 8).

A file called "tsweb.htm" was located on the Gresham computer. Such a file is used to access and connect to a remote computer. App. 104 (Jones Report p. 7). Once connected to the remote computer, users are able to save and/or copy files from the local computer to the remote computer and from the remote computer to the local computer. App. 104 (Jones Report p. 7). The "tsweb" file on the Gresham computer has a creation time of September 21, 2012 at 8:14:25 a.m., the last business day Gresham was at MHA. App. 104 (Jones Report p. 7). The last access time of this file on the Gresham computer is September 23, 2012 at 4:08:39 p.m., seconds before Gresham last accessed 447 individual files in rapid succession. App. 104 (Jones Report p. 7).

Further, as outlined above, damages in cases involving trade secrets can take a variety of forms, including the value of plaintiff's lost profits, the defendant's actual profits from use of the secret, the value of the trade secret, or the developmental costs the defendant avoided by the misappropriation. *Southwestern Energy Prod. Co.*, 411 S.W.3d at 608-609. MHA has submitted

evidence that, at a minimum, creates fact issues as to MHA's own lost profits and the value of the trade secrets at the time of the misappropriation.  *See supra* Section F(2).

To the extent this Court is inclined to require MHA to adduce exactly how Gresham specifically used MHA's confidential information at Consilium, the Court should wait to resolve that issue until Consilium has complied with its discovery obligations regarding Gresham's work computer.  MHA has requested to inspect Gresham's work computer from his time at Consilium in order to properly discovery the full scope of Gresham's misuse of MHA's information, but Defendants have utterly refused to turn over the computer.  *See* App. 119-123 (Defendant Gresham's Responses to Plaintiff's First Request for Inspection at p. 3).  Consilium should not now be rewarded as they attempt to use their own failure to comply with discovery obligations as a sword to pursue summary judgment.  At a minimum, the Court should refrain from ruling on this issue until Consilium has complied with its obligation to allow MHA to inspect Gresham's work computer.

**H.   Defendants are Not Entitled to Summary Judgment on MHA's Texas Theft Liability Act Claim.**

As with the misappropriation claim, Defendants contend they are entitled to summary judgment on MHA's Texas Theft Liability Act claim because MHA cannot show that any information allegedly taken by Gresham constitutes a trade secret or confidential or proprietary information.  As outlined above, MHA has in fact demonstrated that the information copied and deleted by Gresham was confidential and proprietary and constituted trade secrets.  Thus, at a minimum there is a fact issue and Defendants are not entitled to summary judgment.  *See Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts*, 300 S.W.3d 348, 366 (Tex. App.— Dallas 2009, pet denied) (noting that theft of trade secrets is specifically included in Theft Liability Act's definition of theft).

Furthermore, despite the fact that MHA has demonstrated the existence of trade secrets in this case, it is not necessary for a plaintiff to show evidence of a trade secret to prevail on a claim under the Texas Theft Liability Act.  *See Integrated Conveyor Sys.*, 300 S.W.3d at 369-370 (concluding that evidence of a trade secret is not necessary to prove a claim for violation of the Texas Theft Liability Act).  Thus, Defendants' motion for summary judgment on this claim should fail without further analysis.

## V.      PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, MHA respectfully requests that Defendants' Motion for Summary Judgment be denied in its entirety, and that MHA be granted such additional relief to which it is entitled in law or equity.

Respectfully submitted,


/s/ *Christine A. Nowak*
Brian A. Colao
SBN:  00793528
Christine A. Nowak
SBN: 24050200
Jason M. Ross
SBN: 24027819
Zachary Hoard
SBN:  24053826
Dykema Gossett PLLC
Comerica Bank Tower
1717 Main Street, Suite 4200
Dallas, Texas 75201
(214) 462-6400 – Telephone
(214) 462-6401 – Facsimile

**ATTORNEYS FOR PLAINTIFF MERRITT
HAWKINS & ASSOCIATES, LLC**


## CERTIFICATE OF SERVICE

I certify that on November 10, 2014, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record, who has consented in writing to accept this Notice as service of this document by electronic means.

Jeffrey M. Tillotson, P.C. and/or John Volney
LYNN TILLOTSON PINKER & COX, LLP
2100 Ross Ave, Ste. 2700
Dallas, Texas 75201


 /s/ *Christine A. Nowak*
Christine A. Nowak